IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
Rochester Division

DONALD MONTGOMERY,
as an individual, and on behalf of
all other persons similarly situated,

**COMPLAINT**

Plaintiff

_vs._

Civil No.: _____

ANDREW M. CUOMO, Governor of the State
of New York; ANN MARIE T. SULLIVAN,
Commissioner of the New York State
Office of Mental Health; MICHAEL C. GREEN,
Executive Deputy Commissioner of the
New York State Division of Criminal Justice Services;
JOSEPH A. D'AMICO, Superintendent of
the New York State Police; VINCENT F. DEMARCO,
Suffolk County Sheriff's Department; and,
EASTERN LONG ISLAND HOSPITAL,

Hon. _____

Defendants.

## COMPLAINT

### (For Declaratory Judgment and Injunctive Relief)

Plaintiff, Donald Montgomery, as an individual and on behalf of all other persons
similarly situated, does hereby, through his attorney, allege against Andrew M. Cuomo,
Governor of the State of New York; Ann Marie T. Sullivan, Commissioner of the New
York State Office of Mental Health; Michael C. Green, Executive Deputy Commissioner
of the New York State Division of Criminal Justice Services; Joseph A. D'Amico,
Superintendent of the New York State Police; Vincent F. DeMarco, Suffolk County

Sheriff's Department, and Eastern Long Island Hospital (hereinafter "the Defendants")
as follows:

## NATURE OF THE ACTION

This lawsuit alleges the creation, implementation, marketing, and use of a reporting
system for medical professionals to transmit personal health information to the State
pursuant to NY Mental Hygiene Law §9.46, enacted January 15, 2013 as part of the
"New York Secure Ammunition and Firearms Enforcement Act" violates the civil
liberties of the Plaintiff and all other persons similarly situated, including his/their rights
under the Second, Fourth, Fifth, and Fourteenth Amendments to the United States
Constitution.  The State has amassed the confidential, personal health information of tens
of thousands of people into a database shared by various State agencies.  The personal
health information amassed includes, but is not limited to, any mental health diagnosis of
a patient.  The personal health information is shared by numerous agencies, including, but
not limited to law enforcement and non-state agencies and offices.  The State does not
use a subpoena to obtain this confidential personal health information.  The State has
made the affirmative misrepresentation to medical professionals and others that
transmitting the data is lawful.  Neither the treatment providers, nor the State has
provided notice to patients of the sharing of their personal health information.  In the
absence of relief from this Court, virtually no one whose personal health information has
been freely shared by medical providers and state and local actors will learn or be able to

find out whether the integrity of their personal health information has been compromised,

including that it has been transmitted to law enforcement personnel.

## THE PARTIES

1.   Plaintiff DONALD MONTGOMERY is an individual person with a residence in

Fairport, New York, which is within the Western District Court of New York.

The Plaintiff is both a Veteran of the United States Armed Services and a retired

law enforcement officer, having served his country and his community with

distinction.  The Plaintiff brings this action on behalf of himself and all other

persons similarly situated.

2.   Defendant ANDREW M. CUOMO is the Governor of the State of New York,

whose principal place of business is in Albany (Albany County), New York.  The

Governor was the principal architect of the Act, signed it into law, and oversees its

implementation, including, but not limited to, the provisions herein enumerated.

The Governor also has the ultimate authority over the New York State Office of

Mental Health, the New York State Department of Criminal Justice Services, and

the New York State Police Department.

3.   Defendant ANN MARIE T. SULLIVAN is the Commissioner of the New York

State Office of Mental Health ("OMH") with a principal place of business in

Albany, New York.  Ms. Sullivan is authorized to supervise and implement all

operations and functions of OMH.  The Office of Mental Health is an executive

agency responsible for collecting and distributing the personal health information from medical professionals under the challenged law and other, associated provisions. The functions performed by OMH relevant to the Plaintiff's claims are, but are not limited to, collection of personal health information, dissemination of personal health information, creation and operation of a computer system to support such collection and dissemination of personal health information, marketing of the personal health information collection program to medical professionals, and creation and operation of a program to collect personal health information directly from individuals and their treatment providers including as part of a review process.

4.    Defendant MICHAEL C. GREEN is the Executive Deputy Commissioner for the New York State Department of Criminal Justice Services ("DCJS") with a principal place of business in Albany, New York. Mr. Green is authorized to supervise and implement all operations and functions of DCJS. The Department of Criminal Justice Services is an executive agency responsible for collecting and distributing personal health information from treatment providers and/or the Office of Mental Health and/or the New York State Police under the challenged law and other, associated provisions. The functions performed by DCJS relevant to the Plaintiff's claims include, but are not limited to, entering personal health information into the National Instant Criminal Background Check System ("NICS"), comparing personal health information against the NICS and/or other

databases both federal, state, and local, identifying persons who hold New York

pistol permits, influencing pistol permit determinations and/or firearms

confiscations, and directing other state and local law enforcement entities to

suspend and/or revoke a pistol permit and/or conduct a firearms confiscation.

5.     Defendant JOSEPH A. D'AMICO is the Superintendent of the New York State

Police with a principal place of business in Albany, New York.  Mr. D'Amico is

authorized to supervise and implement all operations and functions of the New

York State Police ("NYS Police").  The NYS Police is an executive department

responsible for collecting and distributing personal health information from

treatment providers, OMH, DCJS, and other local government and law

enforcement offices and agencies under the challenged law and other, associated

provisions.   The functions performed by the NYS Police relevant to the Plaintiff's

claims are, but are not limited to, entering such information into NICS, comparing

such information against NICS and/or other databases whether federal, state, or

local, identifying persons who hold or are applying for New York pistol permits,

influencing the application and continued possession of pistol permits and/or

firearms confiscation, and directing other law enforcement entities to suspend

and/or revoke a pistol permit and/or conduct a firearms confiscation.

6.     Defendant VINCENT F. DEMARCO is the Chief Sheriff at the Suffolk County

Sheriff's Department with a principal place of business in Hauppauge (Suffolk

County), New York.  Mr. DeMarco has ultimate authority for supervising and

implementing all operations and functions of the Suffolk County Sheriff's

Department.  The Suffolk County Sheriff's Department is independent of the

authority of the State, and Mr. DeMarco is a law enforcement officer elected by the

voters of Suffolk County, and, as such, has independent constitutional authority to

determine the enforceability of any law.  The Suffolk County Sheriff's Department

did collect personal health information from other of the Defendants to use in its

determination to suspend and then to terminate the pistol permit of the Plaintiff, as

well as to confiscate his firearms.

7.     Defendant EASTERN LONG ISLAND HOSPITAL is a private hospital with a

principal place of business in Greenport (Suffolk County), New York.  Eastern

Long Island Hospital provides medical services to persons, including the Plaintiff.

Eastern Long Island Hospital engages in reporting of personal health information

to non-covered entities and non-medical third parties, such as the other Defendants,

as well as other federal, state, and local government entities.

## JURISDICTION AND VENUE

8.     All individually named Defendants are being sued in their official capacities.

9.     This case arises under the Constitution and the laws of the United States, and it

presents one or more federal questions within this Court's jurisdiction under

Article III of the United States Constitution and 28 U.S.C. § 1331. This court also

has jurisdiction of this case under 28 U.S.C. §1343(a)(3) in that this action seeks to

redress the deprivation, under color of the laws, statutes, ordinances, regulations,

customs, and usages of the State of New York, of rights, privileges, or immunities

secured by the United States Constitution. And further, this court has jurisdiction

of this case under 42 U.S.C. §1983 in that this action seeks relief from the

deprivation of rights, privileges, or immunities secured by the United States

Constitution under color of statute, ordinance, regulation, custom, or useage by the

State of New York. The Court also has jurisdiction under 5 U.S.C. §702 (the

"Administrative Procedure Act").

10.    Venue lies in this District Court pursuant to 28 U.S.C. §1391.

11.    The Court has the authority to grant declaratory relief pursuant to 28 U.S.C.

       §§2201 – 2202 (the "Declaratory Judgment Act"), and 42 U.S.C. §1983.

12.    The Court has the authority to award attorney's fees and costs pursuant to

       28 U.S.C. §2412 and 42 U.S.C. §1988.

## FACTS

13.    On January 15, 2013, Defendant Andrew Cuomo, Governor of the State of New

       York, signed into law the "New York Secure Ammunition and Firearms Act"

       (hereafter "the Act"), which included a new reporting requirement for treatment

providers of those with mental health needs at new Mental Hygiene Law §9.46 and associated amended provisions.  As such, the Act severely and adversely effects the Plaintiff, along with tens of thousands of similarly situated persons throughout New York.

14.  The statutory provision at issue herein is Mental Hygiene Law §9.46, as follows:

> (a) For purposes of this section, the term "mental health professional" shall include a physician, psychologist, registered nurse or licensed clinical social worker.

> (b) Notwithstanding any other law to the contrary, when a mental health professional currently providing treatment services to a person determines, in the exercise of reasonable professional judgment, that such person is likely to engage in conduct that would result in serious harm to self or others, he or she shall be required to report, as soon as practicable, to the director of community services, or the director's designee, who shall report to the division of criminal justice services whenever he or she agrees that the person is likely to engage in such conduct.  Information transmitted to the division of criminal justice services shall be limited to names and other non-clinical identifying information, which may only be used for determining whether a license issued pursuant to section 400.00 of the penal law should be suspended or revoked, or for determining whether a person is ineligible for a license issued pursuant to section 400.00 of the penal law, or is no longer permitted under state or federal law to possess a firearm.

(c) Nothing in this section shall be construed to require a mental health professional to take any action which, in the exercise of reasonable professional judgment, would endanger such mental health professional or increase the danger to a potential victim or victims.

(d) The decision of a mental health professional to disclose or not to disclose in accordance with this section, when made reasonably and in good faith, shall not be the basis for any civil or criminal liability of such mental health professional.

15.   Governor Cuomo was the principal architect of the Act.

16.   On Monday, January 14, 2013, Governor Cuomo issued a "Message of Necessity," preceding the legislative vote on the Act, declaring the Bill was an emergency vote, should not be subject to the three-day desk rule, and would enhance the safety of "children, first responders and citizens as soon as possible."

17.   No hearings or testimony preceded passage of the Act, nor was any research commissioned.

18.   MHL §9.46 requires a mental health professional providing treatment services to a person to report, as soon as practicable, personal health information concerning the patient to the director of community services under the auspices of OMH.

19.     Under the implementation of MHL §9.46, the OMH local directors of community

        services transmit personal health information to various of the other Defendants,

        particularly to DCJS.

20.     Under the implementation of MHL §9.46, the Defendants within the state

        government transmit personal health information between each other and store

        such personal health information in one or more electronic computer programs,

        databases, and other formats (herein "databases").

21.     Passage of MHL §9.46 resulted in a fundamental shift in the presumption of

        confidentiality for mental health treatment that has been codified and recognized

        for decades.

22.     Prior to the enactment of MHL §9.46, the statutory standard for a break in the

        confidential doctor-patient relationship leading to a report to a law enforcement

        officer was " a likelihood of serious harm to self or others," meaning "a substantial

        risk of physical hard to self as manifested by threats of or attempts at suicide or

        serious bodily harm or other conduct demonstrating that he is dangerous to himself

        or a substantial risk of physical harm to other persons as manifested by homicidal

        or other violent behavior by which others are placed in reasonable fear or serious

        physical harm."  This standard was codified in MHL Art. 9, including, but not

        limited to §9.37 and §9.39.

23.   Prior to the enactment of MHL §9.46, the state statutory standard for a break in the
      confidential doctor-patient relationship leading to a report to a law enforcement
      officer was in harmony with the federal statutory standard, notably the one
      articulated under "HIPAA."  (As used throughout this pleading, the acronym
      "HIPAA" is used to designate, collectively, both to the "Health Insurance
      Portability and Accountability Act," first at Pub.L. 104-91 (1996) and the
      "HITECH" or "The Health Information Technology for Economic and Clinical
      Health Act," as well as to those common references that may break down its
      provisions into designations such as "The Privacy Rule," "The Transactions and
      Code Sets Rule," "The Security Rule," "The Unique Identifiers Rule,"
      "The Enforcement Rule," and "The Breach Notification Rule.")

24.   Under 45 CFR §164.512(j), in the HIPAA Security Rules, there is federal authority
      to disclose specified and limited protected health information, such as the patient's
      name, address, and Social Security Number, in order to avert a serious threat to
      health or safety where the covered entity, in good faith, believes the use or
      disclosure "(i)(A) is necessary to prevent or lessen a serious and imminent threat to
      the health or safety of a person or the public <u>and</u> (B) is to a person reasonably able
      to prevent or lessen the threat, including the target of the threat, *or*, (ii) is necessary
      for law enforcement authorities to identify or apprehend an individual (A) because
      of a statement by an individual admitting participation in a violent crime that the
      covered entity reasonably believes may have caused serious physical harm to the

victim *or* (B) where it appears from all the circumstances that the individual has

escaped from a correctional institution or from lawful custody (as those terms are

defined at 45 CFR §164.501)." (emphasis added)

25.    Prior to the effective date of MHL §9.46, medical and mental health professionals

have historically had the option and the professional mandate to utilize one or more

forms of "involuntary commitment" when demanded by their professional

judgment.  Involuntary commitment can include law enforcement restraint,

observation for up to 72-hours, hospitalization upon certification by two examining

physicians, and even compulsory medication.  A corresponding set of laws

emerged under Mental Hygiene Law Art. 9, including various patient and third

party designee notifications, rights to counsel, rights to judicial intervention and

hearings, and such other civil liberty protections as are generally afforded to those

who are literally or effectively detained against their will or capacity, such as when

incarcerated.

26.    On March 16, 2013, a state-wide reporting system went into effect to implement

MHL §9.46, involving the OMH, DCJS, and the NYS Police, local law

enforcement officers throughout New York such as the Suffolk County Sheriff's

Department, and treatment providers, both public and private, throughout New

York such as the Eastern Long Island Hospital.

27. On March 16, 2013, the NYS Office of Mental Health launched the "Integrated SAFE Act Reporting System" ("ISARS") to facilitate reporting of personal health information by medical professionals pursuant to MHL §9.46.

28. One NYS Senate Committee hearing (by invitation only) relative to MHL §9.46 was conducted on May 31, 2013, Senator David Carlucci, Chair, and Senator David J. Valesky, present. This hearing before two NYS Senators was conducted after passage of the Act and after implementation of the ISARS statewide reporting system. (All references herein to "testimony" refer to statements made by witnesses at this hearing.)

29. The statewide reporting system functions through an on-line computer program designed to elicit personal health information from treatment providers on an automated form. The user interface then transmits the personal health information from the treatment provider to OMH, specifically, and to the State, generally.

30. The Office of Mental Health underplays and misrepresents the seriousness of the personal health information being transmitted on the MHL §9.46 form, including, but not limited to its statement that "The 9.46 form captures a patient's demographic information. No diagnosis/medical information is provided," as per its "Introduction for Mental Health Providers" (dated March 12, 2013), available to the public on the OMH website.

31.     The MHL §9.46 form includes the patient's diagnosis in a pull-down list of

        Diagnostics and Statistical Manual codes and includes a "reason" field (required)

        as an expandable text box.

32.     According to the "Integrated SAFE Act Reporting System, version 1.0.2.6 User

        Guide," the "diagnosis" field is required, although it allows for the selection of

        "diagnosis or condition deferred on Axis I" (Axis I being a reference to a multi-

        axial mental health diagnosis). The drop down list of diagnoses is taken from the

        DSM-IV-TR.

33.     According to the "Integrated SAFE Act Reporting System, version 1.0.2.6 User

        Guide," the "reason" field is required, and accepts a minimum of 50 and a

        maximum of 500 characters. The field is used to enter "the reason why they

        believe the patient being reported is a specific threat."

34.     Also on the OMH website is the OMH "Guidance Document" (undated), which

        misrepresents the MHL §9.46 report and relief from liability for personal health

        information transmission is conditioned upon the medical professional making a

        determination pursuant to the "likely to result in serious harm to self or others"

        standard.

35.     The OMH "Guidance Document" describes that upon receipt of a report, the local

        Director of Community Services reviews the report to make a determination under

the "likely to result in serious harm to self and others" standard, at which point OMH transmits identifying information to DCJS and/or the NYS Police, which then transmit(s) that information to the local firearms licensing official "who must either suspend or revoke the license." (emphasis added)

36.    In reality, once the Form 9.46 personal health information is received at OMH it is, in whole or in part, transmitted /or accessed by other departments and agencies of the state and local governments, including, but not limited to DCJS and the NYS Police.

37.    According to the testimony of Attorney Beth Haroules, Senior Staff Attorney at the New York Civil Liberties Union, the personal health information collected under MHL §9.46 goes into what DCJS calls a "Disqualifying Data Database," which includes those under guardianship orders, those with developmental disabilities, and those adjudicated as involuntarily admitted to a psychiatric facility.

38.    According to the OMH "Guidance Document," as a next step "DCJS will then determine whether the person possesses a firearms license and, if so, will notify the appropriate local licensing official, who must suspend or revoke the license as soon as practicable. The person must surrender such license and all firearms, rifles, or shotguns to the licensing officer, but if the license and weapons are not surrendered, police and certain peace officers are authorized to remove all such weapons." (emphasis added)

39.    The OMH "Guidance Document" demonstrates the intention of the State to use an
       MHL §9.46 report to usurp the statutory discretion ascribed to the county-level
       pistol permit licensing officer under Penal Law §400.00.

40.    The deliberations of the NYS Assembly on January 15, 2013 also reflected an
       understanding that a report under MHL §9.46 that matched to a record at DCJS
       would result in an immediate revocation of the license and the confiscation of all
       firearms. (p. 43)

41.    Under Penal Law §400.00(1), at the county level, an applicant for a new license or
       a license holder for renewal is considered upon application and investigation by the
       licensing officer, who is entitled to an understanding whether the person has ever
       suffered from any mental illness, and/or has been involuntarily committed to a
       mental institution or a secure treatment facility. The applicant is not automatically
       disqualified by virtue of having ever suffered from a mental illness, but is required
       to disclose such information. The licensing officer has the discretion to make a
       determination of the suitability of the issuance of or denial of an individual
       applicant, as well as for a suspension or revocation.

42.    There is a distinction between the licensing officer's discretionary power and the
       federal, mandatory disqualifying events for the ownership, transfer, and possession
       of a firearm. An individual who falls under the federal disqualifying events at

18 U.S.C. §922(g)(1)-(9) is permanently restricted from purchasing, transferring, or possessing a firearm.

43.     Specifically, 18 U.S.C. §922(g)(4), it is unlawful for a person "who has been adjudicated as a mental defective or who has been committed to a mental institution" to "ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

44.     Under 27 CFR §478.11, the term "adjudicated as a mental defective" is defined as:

> "(a) A determination by a court, board, commission, or other lawful authority that a person, as a result of marked subnormal intelligence, or mental illness, incompetency, condition, or disease:
>
> > (1) Is a danger to himself or to others; or
> >
> > (2) Lacks the mental capacity to contract or manage his own affairs.
>
> (b) The term shall include:
>
> > (1) A finding of insanity by a court in a criminal case; and
> >
> > (2) Those persons found incompetent to stand trial or found not guilty by reason of lack of mental responsibility pursuant to articles 50a and 72b of the Uniform Code of Military Justice, 10 U.S.C. 850a, 876b."

45.    The federal term "committed to a mental institution" at 18 U.S.C. §922(g)(4) does
       not include a person at a medical facility for observation or in a mental institution
       by voluntary admission.

46.    The OMH "Guidance Document" indicates the State's awareness that it should not
       be populating the NICS database with records of persons who do not meet this
       specific statutory criteria.

47.    From the onset of the Act, the Conference of Local Mental Health Hygiene
       Directors, among others, took the position that local mental health offices are
       neither designed nor funded to carry out this function, and that the reporting
       requirement interferes with the relationship of the treatment provider and the
       individual.

48.    The State adopted the position that all (100%) of emergency room admissions to a
       state psychiatric center meet the MHL §9.46 reporting criteria.

49.    Additionally, certain hospital administrators and/or hospital attorneys "have
       recommended or required that all persons admitted to hospitals with a mental
       illness diagnosis be reported under NY MHL §9.46," according to the testimony of
       Jed Wolkenbreit, Counsel to the Conference of Local Mental Health Hygiene
       Directors.

50.   Once the personal health information is transmitted to and/or accessed by the NYS
      Police, the personal health information is run against one or more additional
      databases, including a database of pistol permit holders.

51.   According to the testimony of Attorney Haroules, once the data is collected, state
      and local law enforcement have "carte blanche access" to the names and
      identifying information of people within the Disqualifying Data Database.

52.   According to the New York Times article of October 19, 2014, reporting responses
      received through their Freedom of Information Law request, from March 16, 2013
      until October 3, 2014, a total of 41,427 persons have been reported by treatment
      providers pursuant to MHL §9.46.

53.   According to the New York Times article of October 19, 2014, a reported
      278 persons matched as pistol permit holders out of the 41,427 persons reported by
      treatment providers to the State pursuant to MHL §9.46.  This figure translates into
      a match for less than One Percent (1%) of those persons reported to the State by
      medical professionals.

54.   According to the New York Times article of October 19, 2014, of the reported
      278 persons matched as pistol permit holders, the largest geographic groups were
      the 36 persons in Monroe County, followed by 17 in Westchester County, 16 in
      Suffolk County, and 14 in Dutchess County.  It is presumed that the Plaintiff is one

of the matched persons, but it is unknown whether he was included in the statistical tabulations for Suffolk County or Monroe County.

55. The day after this statistical information about the MHL §9.46 database was published by the New York Times on October 19, 2014, Governor Cuomo made a statement to the New York Times that the figures were "too low."

56. According to the testimony of Attorney Wolkenbreit, since on or about March 15, 2013, approximately 3,000 persons per month have been reported by treatment providers pursuant to NY Mental Hygiene Law §9.46. This would equate to more than 60,000 people by this time.

57. According to the testimony of Attorney Wolkenbreit, over 92% of reports through ISARS in the first 60-days after launch came from hospitals, "primarily Article 28 hospital emergency departments and psychiatric units," 5% came from outpatient providers, and "an insignificant number" came from private practitioners.

58. According to the testimony of Attorney Wolkenbreit, some reports appear to be made by "someone other than a mental-health professional treating the patient."

59. According to the testimony of Attorney Wolkenbreit, some reports might be submitted through an automated computer report made at admission through the "Electronic Health Records System."

60.   According to the testimony of Attorney Wolkenbreit, some reports might be submitted for children as young as 11 years of age.

61.   According to the testimony of Attorney Wolkenbreit, of the first 6,000 persons reported, approximately eleven (11) were actionable reports.

62.   The full extent of the transmission of personal health information from treatment providers to the State is unknown.

63.   The full extent of access to the personal health information by one or more of the government Defendants is unknown.

64.   The full extent of the use of the personal health information collected and in circulation by the government Defendants is unknown.

65.   The credentials and training of those with access to the personal health information transmitted by treatment providers and collected by the government Defendants is unknown.

66.   The electronic and physical security measures, protocols, training, and expertise used by the government Defendants to protect this personal health information, if any, are unknown.

67.   Since in or about January 2014, individual members of the Shooters Committee on
      Political Education ("SCOPE"), Monroe County Chapter, have pursued such basic
      information about the MHL §9.46 system as is outlined in the preceding
      paragraphs, but have been denied this information from the Governor and the
      NYS Police.  SCOPE is a Petitioner in one of three pending lawsuits in New York
      State Supreme Court, Albany County, against Governor Cuomo and the
      NYS Police pursuant to CPLR Art. 78 to compel production of various records
      under the State's Freedom of Information Law.  On or about December 5, 2014,
      the Records Access Officer at the NYS Police provided written responses,
      including that there are "no records"[1] pertaining to security clearance requirements
      for personnel who will be authorized to access the statewide license and record
      database, "no records" of the names of personnel assigned to build the statewide
      database, no records relating to the qualifications of persons who will be authorized
      to access the statewide license and record database, and "no records" relating to
      any notifications that will be sent to individuals providing notification that a check
      has been run through the statewide license and record database on that individual.

68.   In comparison to the structure and implementation of HIPAA, the State has no law
      or regulation defining "personal health information," its solicitation, its protection,

---

[1] The term "record" as used relative to a New York Freedom of Information Request has a
statutory definition at Public Officers Law §86(4), meaning "any information kept, held, filed,
produced or reproduced by, with or for an agency or the state legislature, in any physical form
whatsoever, including, but not limited to reports, statements, examinations, memoranda,
opinions, folders, files, books, manuals, pamphlets, forms, papers, designs, drawings, maps,
photos, letters, microfilms, computer tapes or discs, rules, regulations or codes."

its inter-agency and inter-governmental transmission, its employee authorizations, its electronic platforms and protections, or other similar measures.

69. In comparison to the federal HIPAA, there are no state level consequences, whether through criminal or civil prosecution, incarceration, fine, or loss of approval for government contract that would apply to the improper use of the personal health information solicited by or coming into the possession of state and local government entities.

70. According to the testimony of Dr. Glenn Martin, President of the New York State Psychiatric Association, MHL §9.46 amounts to a lower standard than the HIPAA reporting exceptions standard and is thus a state statutory violation of HIPAA. Dr. Martin revealed during his testimony that this organization had filed a formal complaint with the Office of Civil Rights at the United States Department of Health & Human Services.

71. The NY Office of Mental Health affirmatively promoted the use of the §9.46 on-line reporting system, using a variety of promotional materials aimed at treatment providers through its website, written documents, and a help line.

72. Because of the marketing by the State Defendants, generally, and OMH, specifically, an atmosphere has been created that makes medical and mental health professionals afraid to not report an individual through ISARS, even if, in their

professional judgment, the person does not represent a threat of immediate harm to the self or others.

73.     No person is notified by the Defendants of the transmission of personal health information from medical providers to the State or Federal Government.

74.     No person is requested by the Defendants to give permission to the medical providers for the transmission of personal health information from the medical providers to the State or Federal Government.

75.     No person is notified by the Defendants of the transmission of personal health information from the medical providers to the State or the Federal Government.

76.     No patient is notified by the Defendants of any right s/he may have to request a removal of her or his personal health information from any record-keeping system of the State or Federal Government.

77.     No patient is notified by the Defendants of any right s/he may have to obtain copies of records of transmission of personal health information from treatment providers to the State or Federal Government.

78.     Medical providers do not maintain records of transmission of the personal health information to the State or Federal Government as part of the medical record of the patient.

79.   No patient is notified of any right s/he may have to legal representation in matters
      associated with the reporting of their personal health information to the State or
      Federal Government.

80.   Such failures of notification of patients relative to the reporting system pursuant to
      MHL §9.46 is designed to minimize patient awareness and ability to take legal and
      other action to try to protect their personal health information from inappropriate
      transmission from treatment providers to the State and Federal Government.

81.   The State intends its operations around MHL §9.46 to be conducted in a secretive
      and over-reaching manner.

82.   The State does not have a breach notification protocol to inform individuals that
      their personal health information has come under the auspices of the State or in the
      event that the State should commit a breach of personal health information as this
      term is defined and understood as part of the HIPAA Breach Notification Rule.

83.   In September 2013, the NYS Police published a "field guide" to the "NY SAFE
      Act," which included instruction from Counsel to the NYS Police to NYS Police
      employees on the confiscation of firearms and the destruction of firearms.

84.   Included in the instructions to employees of the NYS Police in its "field guide" are
      the following instructions relative to firearms of persons owned by persons

"ineligible because of a mental health disqualifier." The use of the phrase "mental health disqualifier" is not defined within the NYS Police "field guide." The phrase "mental health disqualifier" has a commonly-used meaning in reference to the federal 18 U.S.C. §922(g)(4) provision. The phrase "mental health disqualifier" does not have a state equivalent statutory provision or common meaning. The NYS Assembly on January 15, 2013, indicated its intention that the mental health provisions of the SAFE Act should "[bring] our statute in conformity" "with federal law" (p. 90), including that a firearm should not be provided "…to somebody who is dangerously mentally ill, who's been adjudicated as such." (p. 92)

85.  The NYS Police "field guide" thus incorrectly uses the legal term "mental health disqualifier" as having a broad and generic meaning for the officer in the field, which is incompatible with the federal statutory term.

86.  Specifically, the NYS Police "field guide" instructs officers as follows:

> "If the person is determined to be ineligible because of a mental health disqualifier or due to an order of protection, the statute provides that he or she will be afforded the opportunity to arrange for the lawful transfer or sale of that weapon. The law enforcement agency assigned will secure the weapon for safekeeping until the person has made these arrangements in accordance with the procedure set forth in Penal Law 400.05(6). If the subject fails to make these arrangements, the weapon automatically becomes a nuisance weapon and must be destroyed or rendered useless for its intended purpose." (p. 6)

"If the license and weapons are not surrendered, they will be removed by a police officer and declared a nuisance. At that point, the person would lose the ability to lawfully transfer the weapon." (p. 12)

"If a person becomes ineligible to hold a pistol permit, the Safe Act requires the person to surrender **all** firearms to police, including all rifles and shotguns for which no license or registration is required." (emphasis in original, p. 12)

Once OMH has notified DCJS, "...DCJS will notify the State Police to confirm the existence of the license and the licensing authority will be notified so they can make a determination as to whether to suspend or revoke the subject's license. The licensing authority, and the appropriate local law enforcement agency, will handle the suspension and the recovery of any weapons in the same manner as they do now in the event the licensing authority revokes a firearms license." (p. 13)

87.   In reality, the NYS Police have taken the position of instructing local licensing officials to suspend and terminate pistol permits for all persons reported through MHL §9.46 as having been involuntarily committed to a mental institution.

88.   The NYS Police have taken or are actively in the process of taking effective control of the county-level licensing system.

89.   The NYS Police have taken the position of directing local law enforcement agencies and offices to conduct warrantless search and seizures of the homes and

personal properties of persons reported through MHL §9.46 to seize all firearms and licenses.

90.   The NYS Police have taken effective control of county and local law enforcement office discretion on the approach to investigation of, judicial application for, and prosecution of individuals who own firearms.

91.   The level of control taken by the NYS Police as the effective agent of the Governor and DCJS is expressed also in the "Memorandum" that accompanied the Act, wherein it states:  "When a Section 9.46 report is made, the Division of Criminal Justice Services will determine whether the person possesses a firearms license and, if so, will notify the appropriate local licensing official, who must suspend the license.  The person's firearms will then be removed."

92.   The policies, procedures, and actions of the NYS Police may or may not also be related to a determination of the inclusion of the reported individual in the NYS Police database of registered "assault weapons" pursuant to NY Penal Law §265.00(22).

93.   And, the policies, procedures, and actions of the NYS Police may or may not also be related to a determination of the inclusion of the reported individual in the federal database of "NFA firearms," registered under the National Firearms Act (Pub. Law 474, 1934).

94.   The implementation of MHL §9.46 is the beginning of the unlawful confiscation of firearms through a police state model.

95.   If the deliberations of the NYS Assembly on January 15, 2013 are any indication, there is an expressed intention that the State will only go further, as Members call for dealing "more severely" with those with mental health concerns (p. 56) and getting the "guns out of their hands and [making] sure they don't get it" (p. 60).

96.   MHL §9.46 potentially delays what would be an appropriate response in the event of serious and imminent threat of danger to the self or others using a firearm because the ISARS reporting creates a slower data transmission protocol than use of the statewide "911" system, through which a live call goes to a live operator and across to local law enforcement, who already have the ability to ascertain whether the individual has a pistol permit and/or registered assault weapons.

97.   According to the testimony of Eric Neblung, PhD, President of the New York State Psychological Association, MHL §9.46 does "nothing" to allow a mental health provider to take immediate action to deal with a dangerous mental health patient, as the provision is not designed to allow clinicians to breach confidentiality in a way that will allow them to take the "necessary, direct, and immediate steps that will simultaneously help a dangerous patient and protect society from that patient," instead requiring the mental health professional to make a report "that must work its way relatively slowly through a bureaucracy."

98. According to the testimony of Attorney Haroules, because reporting under MHL §9.46 calls for criminal investigation, it "ensures" that there will be numerous and potentially adverse contact between persons with disabilities and law enforcement officers who are untrained in mental health and disability issues.

99. MHL §9.46 is a less safe reporting protocol of personal health information than was already provided for under NY Mental Hygiene Law Art. 9 and HIPAA.

100. MHL §9.46, as it is commonly understood among laymen, is already chilling those who may be in need of medical and/or mental health services, whether out of fear for their privacy or concern about their Second Amendment freedoms, or both.

101. According to the testimony of Dr. Neblung, the chilling effect upon patients can include "fear of triggering a sudden and dramatic governmental intrusion into their private lives."

102. MHL §9.46 is also acting as a negative impetus for medical and mental health providers, who fear liability for reporting as well as liability for failing to report.

103. According to the testimony of Ari Moma, R.N., member of the New York Nurses Association, which represents more than 270,000 registered nurses across the State, by including nurses within the listing of reporters pursuant to MHL §9.46, it pulls nurses outside the scope of their medical responsibilities to a mental health patient

as part of a treatment team, while simultaneously exposing nurses to liability, a danger of losing their license, and a risk of losing their livelihoods.

104.   MHL §9.46 is having a chilling effect more likely to result in decreased safety of individual patients and of the broader society.

105.   The adverse impact of MHL §9.46 will only increase with the filing of this lawsuit and the making public the extent of the abuses of individual civil liberties by the Defendants, particularly against those with no pistol permit because the pistol permit revocation has functioned as an accidental form of notification of the reporting event.  Without any notification process, the general public will be left to fear the worst and will consciously and actively avoid contact with the mental health setting when access to such services may be medically advisable or appropriately self-directed.

106.   According to the testimony of Attorney Carla Rabinowitz, Public Policy Chair of the New York Association of Psychiatric Rehabilitation Services, those persons facing mental health issues are twelve times more likely to become a victim of a crime than to commit a crime, and are five times more likely than a member of the general public to become a murder victim.

107.  According to the testimony of Attorney Rabinowitz, there is no study demonstrating a person facing mental health issues is any more likely than a member of the general public to commit a violent crime.

108.  According to the testimony of Attorney Rabinowitz, there are studies that reflect a potential correlation between drug use and violence, which study findings apply to the general public, not just mental health service recipients.

109.  Federal law enforcement agencies have yet to develop a profile of the "mass shooter."

110.  The State has not developed a profile of the "mass shooter."

111.  According to the American Psychological Association, there is no study that predicts future violence.

112.  According to the testimony of Attorney Mary Beth Anderson, Project Director at the Urban Justice Mental Health Project and Managing Director at the Urban Justice Center, the MHL §9.46 reporting requirement will increase discrimination against people with mental health issues and would not have done anything to prevent recent events in Connecticut, Colorado, Arizona, or "any of the places where we've seen some tremendous mass shootings in the past couple of years."

113. According to the testimony of Attorney Anderson, when a person with a mental health issue commits a crime, it is not usually a violent crime. And, in the uncommon instance that it is a violent crime, it is generally not a gun crime.

114. According to the testimony of Jason Lippman, Senior Associate of Policy and Advocacy for the Coalition of Behavioral Health Agencies, representing 130 not-for-profit coalition members, only about 4% of violent crimes are committed by individuals with mental illness.

115. According to the testimony of Jason Lippman, more reliable predictors of violence include age, gender, prevalence of substance abuse, the nature and quality of one's environment, and past behavior.

116. According to the testimony of Dr. Neblung, more powerful predictors of violence are active substance abuse, the presence of environmental stressors, and a history of past violence.

117. According to the testimony of Jason Lippman, misperceptions about people with mental illness can lead to discrimination and hinder recovery.

118. Crimes that can be charged associated with a "mass shooting" scenario in which four or more persons are injured by gunfire without the shooter taking a cooling down period is a statistically irrelevant fraction of chargeable offenses.

119.  Governor Cuomo is simultaneously campaigning for policies directly contradictory
      to public safety, including aggressive early release from prison, including those
      convicted of violent felonies, prison closings, and legalization of marijuana.

120.  The current political and societal climate is focused upon those with mental health
      issues as a false culprit without any basis in federal or state law enforcement
      profiling and in direct contravention to the expert knowledge of the medical and
      mental health professionals in conjunction with community advocates.

121.  To report every person who seeks medical or mental health support services
      through a government mandate or sponsored program is to fuel the fire of the
      stigma of a class of persons who are more likely to be victimized than to commit
      violent crimes with firearms, such as mass shootings.

122.  Among those categories of persons who do and will continue to suffer most
      gravely as a result of MHL §9.46, its implementation, and its heightened stigma are
      Veterans and law enforcement officers.

123.  On January 16, 2013, the President of the United States issued a Memorandum
      including that by October 1, 2013, and annually thereafter, federal agencies that
      possess relevant records for the NICS database shall submit a report, which, *inter
      alia*, for agencies that make qualifying adjudications related to the mental health of
      a person, "the measures put in place to provide notice and programs for relief from

disabilities as required under [the NICS Improvement Amendments Act of 2007 (Pub Law 110-180)]," including "the measures put in place to correct, modify, or remove records accessible by the NICS when the basis under which the record was made available no longer applies."

124.   This federal directive is particularly applicable to New York, which was found to be the single worst performing state in a national state survey of data uploads to the NICS database, mistakenly believing that it had reported more than 10 million records, when only approximately 4 million records had been successfully entered.

125.   In or about 2010, New York received more than ten million dollars from the federal government, specifically to improve the accuracy of its mental health and domestic violence record uploads into NICS.  No other state received as much money under this statutory program.

126.   Instead of rectifying its uploads of data fields of those individuals who had suffered a disqualifying event under 18 U.S.C. §922(g)(4) through the adjudication of confinement for a mental health defect, as per a well-developed body of federal law, regulations, and case precedents, it appears that the Defendants, including Eastern Long Island Hospital, now routinely upload identifying personal information of any person coming into contact with the mental health setting.

127.   New York is a state which provides personal identifying information for inclusion in the NICS database, including such information as pertains to the federal disqualifying event found at 18 U.S.C. §922(g)(4), when a person has been adjudicated a mental defective or has been committed to a mental institution.

128.   The Defendants have compromised the integrity of the NICS system, which will result in false denials at the point of purchase of firearms when an individual submits the Form 4473 as part of his or her federal background check.

129.   There is no meaningful process offered by the State to remove the false classification and/or disqualification.  The "process" offered by OMH requires a person to sign HIPAA releases for records for an extended period of years to all medical providers and to submit to a mental health examination at the provider of the State's choosing.  The State's "process" is a further violation of the privacy of persons falsely reported as having been disqualified.

### THE PLAINTIFF'S CIRCUMSTANCES

130.   On or about March 19, 2014, the Plaintiff had gone for routine blood work and was pronounced "healthy" by his primary care physician.

131.   On or about May 6, 2014, the Plaintiff went to his primary care physician with a complaint that he was having trouble sleeping.

132.  On or about Saturday, May 10, 2014, the Plaintiff presented himself at the
      Emergency Department of the Eastern Long Island Hospital due to persistent
      trouble sleeping.  The diagnosis was listed as "Depression; Insomnia."
      A prescription was given to the Plaintiff for Trazodone, 50 mg, at bedtime, and a
      recommendation was made that he contact his primary care physician and a
      counseling service for re-evaluation in 2-3 days or if symptoms worsened.

133.  On or about Friday, May 23, 2014, the Plaintiff again presented himself at and this
      time was admitted to the Eastern Long Island Hospital for a continuous period of
      approximately 48-hours for sleep deprivation.

134.  On or about his admission on May 23, 2014, unbeknownst to the Plaintiff, the
      Eastern Long Island Hospital labeled the Plaintiff as an "involuntary admission."

135.  At the time of his presentation at the Emergency Department on May 23, 2014, the
      "Nurse's Notes" included "Patient has no thoughts of hurting self.  Patient has no
      thoughts of hurting others.  Patient is not having suicidal thoughts.  Patient is not
      having homicidal thoughts."  The initial threat assessment was negative.

136.  On or about May 23, 2014, the "Psychiatric Admission History" of the Plaintiff
      included a "mental status examination" that stated, in full, "This is a well-
      developed, well-kempt male, dressed casually and in no acute distress.  He is calm,
      pleasant, cooperative.  Eye contact is good, speech is fluent.  Mood is mildly

depressed. Affect is appropriate, somewhat anxious but otherwise mood-congruent. He denies suicidal ideation, homicidal ideation. There is no evidence of any psychotic process, mania, or OCD symptoms. Insight, judgment, impulse control are good."

137. The Plaintiff did not meet the criteria for an emergency mental health admission pursuant to MHL §9.27, *et seq.*, including as such is articulated on the Eastern Long Island Hospital "Emergency Admission" Form OMH 474 (2-09), section A.

138. Eastern Long Island Hospital did not treat the Plaintiff as, nor was he afforded the rights guaranteed to, a patient under an involuntary admission pursuant to MHL §9.27, *et seq.*

139. The Plaintiff was not adjudicated as a mental defective by the Eastern Long Island Hospital in accordance with MHL §9.27, *et seq.*

140. Some time after his presentation at the Emergency Department on May 23, 2014, someone from Eastern Long Island Hospital left a black folder with the Plaintiff, without discussion of its contents. The Plaintiff did not review these materials. The Plaintiff was not asked to sign any of these materials. The Plaintiff took the black folder home and later provided it to his Attorney, who reviewed it. Within the black folder was a one-page sheet titled "Notice of Status and Rights/Emergency Admission (to be given to the patient at the time of admission to

the hospital)/Section 9.30 Mental Hygiene Law." On the form was written "Donald" and the date of arrival at hospital "5/23/2014." None of the rest of this form was completed including the patient identification block, the "TO" line, the contact information for the Mental Hygiene Legal Service," the signature and date of a staff physician, and the "COPIES TO" area.

141.   The form in the black folder substantially differs from the copy of the same form provided in response to a request for the Plaintiff's medical records. The copy provided to the Plaintiff's Attorney from the Eastern Long Island Hospital was completed, including the full identification information for the Plaintiff and the full contact information for the Mental Hygiene Legal Services. This form in this version was not provided to the Plaintiff. It is unknown how or when this became part of the medical records of the Plaintiff, as claimed by Eastern Long Island Hospital.

142.   Continuously from the Plaintiff's admission through the Plaintiff's discharge less than 48-hours later on May 25, 2013, the Eastern Long Island Hospital wrongfully labeled the Plaintiff as an "involuntarily admission."

143.   The Plaintiff is a Veteran of the United States Navy.

144.   The Plaintiff is a retired law enforcement officer with a distinguished career of more than 30-years, who retired with the rank of Detective Sergeant. The Plaintiff

had a spotless record and was awarded the department's Bravery Medal.  The

Plaintiff had been a Commanding Officer for 15 years.

145.  At the time of his presentation at the Emergency Department of Eastern Long

Island Hospital, the Plaintiff suffered from sleep deprivation, occasioned by his

move from one location in the state to another, with his wife of many years, to live

closer to their adult child and young grandchild.

146.  The Plaintiff had no mental health history.

147.  The Plaintiff had no pre-existing medical conditions.

148.  The Plaintiff was of good health and sound mind, except for a short-term difficulty

sleeping during an intrastate relocation in or about May 2014.

149.  The Plaintiff held a pistol permit since July 2005, for a period of approximately

nine years.

150.  In order to obtain his pistol permit, the Plaintiff went through a background check

and was approved by the county licensing officer, Defendant Suffolk County

Sheriff's Department.

151.  The Plaintiff, as of May 2014, owned four (4) handguns, specifically, a Colt

.38 revolver, a Derringer .38, a Glock 26 9 mm, and a Smith & Wesson

Bodyguard 380. All of the Plaintiff's handguns were properly registered at all times.

152. Of the firearms owned by the Plaintiff as of May 2014, one had been his law enforcement department issue firearm, one he won at the police academy for being the best all-around recruit, one he bought in approximately 1975, one he bought approximately two years ago

153. The Plaintiff has additionally undergone multiple background checks during the course of his career.

154. On or about May 25, 2014, less than 48-hours after he presented, the Plaintiff was discharged from Eastern Long Island Hospital.

155. The "Discharge Summary" from Eastern Long Island Hospital correctly lists that the Plaintiff was experiencing stress "in the setting of buying a new home and selling the old one" and that with properly prescribed medications "he slept soundly for the two nights."

156. During his admission at the Eastern Long Island Hospital, one of the psychiatrists said to the Plaintiff, "You don't belong here" and "I don't know why you were referred here."

157.  On or about May 29, 2014, the New York State Police sent a letter to the Suffolk County Clerk's Office wrongfully stating that the Plaintiff "has been adjudicated as a mental defective or has been involuntarily committed to a mental institution" and that the Plaintiff was prohibited from possessing a firearm, rifle, or shotgun "pursuant to 18 U.S.C. 922(g)(4)."

158.  The Plaintiff is not, as a matter of federal law, "disqualified" from firearms ownership, possession, or transfer under the federal disqualifying events found at 18 U.S.C. §922(g)(4) because the Plaintiff has not been adjudicated as a mental defective, nor was he involuntarily committed to a mental institution.

159.  On or about May 30, 2014, the Plaintiff received a telephone call from an officer at the Suffolk County Sheriff's Department, informing him that the Suffolk County Sheriff's Department was going to have to come over and pick up his handguns because they were under repeated pressure from the New York State Police to immediately do so.

160.  On or about May 30, 2014, the Suffolk County Sheriff's Department arrived at the Plaintiff's then residence and took physical possession of the Plaintiff's pistol license and provided him with a "General Receipt."

161.  On or about May 30, 2014, the Suffolk County Sheriff's Department arrived at the
      Plaintiff's then residence and took physical possession of the Plaintiff's four
      firearms and provided him with an "Inventory."

162.  When on or about May 30, 2014 the Plaintiff inquired to the Suffolk County
      Sheriff's Department into what was happening, the Suffolk County Sheriff's
      Department informed the Plaintiff that he had been reported for an involuntary
      psychiatric admission.

163.  On June 2, 2014, the Suffolk County Sheriff's Department notified the Plaintiff
      that his pistol license was suspended, based upon the wrongful notification from
      the NYS Police that the Plaintiff was adjudicated as a mental defective or had been
      involuntarily committed to a mental institution, such that he was federally
      disqualified from possessing a firearm, rifle, or shotgun.

164.  The Plaintiff on or about June 10, 2014 made a written request to the Eastern Long
      Island Hospital to correct the misinformation that the Plaintiff had been
      involuntarily committed and to transmit such correction to the NYS Police and the
      Suffolk County Sheriff's Department.  This letter was copied to the NYS Police
      and to the Suffolk County Pistol License Bureau at the Suffolk County Sheriff's
      Office.

165.    On or about July 2, 2014, Eastern Long Island Hospital declined to correct the misinformation that the Plaintiff had been involuntarily committed.

166.    On September 8, 2014, the Suffolk County Sheriff abruptly and without a hearing terminated the Plaintiff's pistol permit.

167.    On September 11, 2014, Counsel to the Plaintiff received a telephone call from an officer at the Suffolk County Sheriff's Department, stating that he heard that the Sheriff was going to have to terminate the Plaintiff's license, that it was "out of their hands," and that they "would otherwise have to fight the state."  The officer confirmed that there were "zero problems in Don's file."

168.    If the Plaintiff had not been a pistol permit holder, he would not have known that his personal health information had been transmitted by the Hospital to other of the Defendants.

169.    If the Plaintiff had not been a pistol permit holder, even a request for a complete, hospital certified copy of his medical records would not have revealed that his personal health information had been transmitted by the Hospital to other of the Defendants and possibly beyond.

170.    The Plaintiff did not provide permission to transmit his personal health information to third parties outside of the Hospital, other than his medical insurance carrier.

171. The Plaintiff was not asked to provide permission for the Hospital to transmit his personal health information to third parties outside of the Hospital, other than his medical insurance carrier.

172. The Plaintiff's personal health information was transmitted from Eastern Long Island Hospital to other of the Defendants without the Plaintiff's consent, notice, or ability to seek emergency legal intervention.

173. The Plaintiff's personal health information became part of the data collected, maintained, and utilized by the Defendants for unauthorized purposes.

174. To illustrate the seemingly arbitrary and capricious nature of the implementation of MHL §9.46, consider in comparison to the Plaintiff's experience, the following recent statements published by a single person who asserts himself to be a gun owner in continuous possession of his firearm(s) as of the date of this pleading:

   a. "I stayed in Jeff's apartment for nine months, too broken to do anything else. Even routine decisions were overwhelming.  Thinking about where to live – near the girls in Westchester County? in an apartment in the city where I'd be close to work? – seemed beyond my emotional reach." (pp. 232-233)

   b. "Many days I didn't have the energy to try to unravel the tangled ball of emotions." (p. 233)

   c. "I was obsessive about seeing them." (p. 233)

d.   "But the constant high of political life – the juice; the action; the buzz; even more, the direction and goal – was gone." (p. 234)

e.   "Now I needed a total recalibration.  Politics was not an option.  What do I do?  I was lost." (p. 234)

f.   "I realized that my frightening experience on the boat was a clear metaphor for my life after politics and marriage.  I felt now as I had then, lost without anything I usually depended on to keep me safe." (p. 234)

g.   "Some have suggested that I see my return to political life as a second chance.  Not really.  I see it as if I had come back from the dead." (p. 267)

175.   The above sub-paragraphs were written by Governor Cuomo in his October 2014 autobiography, describing his state of mind at the time of his divorce.  Governor Cuomo is both the principle architect of the SAFE Act and in charge of the ultimate oversight and implementation of the MHL §9.46 ISARS system and associated personal health information.  Governor Cuomo's autobiographical statements reflect precisely why MHL §9.46 should be struck down and the ISARS system should be shut down:  how, by comparison to Governor Cuomo, has the Plaintiff lost his civil liberties and his property?

176.   On the "Admission/Procedure Consent" form of Long Island Hospital, signed by the Plaintiff on May 23, 2014, it states "Any resdisclosure of medical record information by the recipient(s) is prohibited except in connection with the further care of the patient and used solely for the patient's benefit."

177. Confiscation of the Plaintiff's firearms, termination of his pistol permit, and transmission and utilization of his personal health information as detailed herein was not done due to patient safety concerns and does not make New York a safer place.

178. Confiscation of the Plaintiff's firearms, termination of his pistol permit, and transmission and utilization of his personal health information places the Plaintiff and his family in a position of being unable to adequately defend themselves in the home and elsewhere and impedes the Plaintiff's use of his long and distinguished years of training and service from being used in the aid of others in the community.

179. There is no meaningful process in New York through which the Plaintiff can seek to restore his rights and privileges under the Second Amendment of the United States Constitution.

180. The Plaintiff requested the Eastern Long Island Hospital change its wrongful "involuntary admission" labeling, and it expressly refused to do so.

181. The Plaintiff requested the Suffolk County Sheriff's Department Licensing Bureau afford him a hearing to request his suspended pistol permit be restored and it, instead, terminated his pistol permit without a hearing.

182. A pistol permit in New York is issued upon the discretion of the licensing officer who, in this instance, refused even the opportunity for a hearing to the Plaintiff.

183.   A study of appeals of pistol permit revocation appeals shows a near zero (0%) chance of achieving a reversal of the pistol permit license upon appeal.

184.   There is no meaningful process for the Plaintiff to attempt to have his wrongful "disability" removed from his record through OMH.  The process offered to obtain a "Certificate of Relief Pertaining to Firearm Possession" demands production of "medical records detailing your psychiatric history over the past 20 years" plus "medical records from all of your current treatment providers over the past 5 years" plus "evidence of your reputation" and more, and even if items "a" through "f" are submitted, it indicates that "we may also request that you undergo a clinical evaluation and risk assessment."

185.   The OMH "process" to request relief from a "disability" is a further intrusion into the Plaintiff's life at a time when his reputation is now unjustly besmirched through the actions of the Defendants and where there is no clinically justifiable reason for him to submit to a mental health examination by someone of the State's choosing. It would amount to a waiver of privacy at the very time that the Plaintiff is a litigant against OMH, among other state actors.

186.   The Plaintiff cannot even obtain his own records from the State Defendants.  Each request under the Freedom of Information Law to the individual State actions was rejected as containing confidential information, or, in the case of the NYS Police, has simply gone unanswered in excess of statutory periods.

187. The Plaintiff is ineligible to request reconsideration through NICS because in order to initiate that process, he needs to have been denied the privilege of the purchase of a firearm upon submission of the federal ATF Form 4473 at the point of attempted purchase. The Plaintiff has not (nor will he) attempted to purchase a firearm since such time as he was contacted by the Suffolk County Sheriff's Department.

188. The Plaintiff's only recourse is to proceed with the instant action.

## AS AND FOR A FIRST CAUSE OF ACTION:
### Violation of the Right to Privacy

189. Paragraphs "1" through "188" are repeated and realleged as if set forth again, herein.

190. The individual right of privacy is recognized to be a penumbra, reflecting that the people should be free from government intrusion, emanating from the individual liberties enshrined in the United States Constitution, particularly through the Bill of Rights at the First through Tenth Amendments and including the Fourteenth Amendment, and as reflected in such decisions of the United States Supreme Court as *Griswold vs. Connecticut,* 381 U.S. 479 (1965).

191. The reporting provisions of NY Mental Hygiene Law §9.46 violate the right to privacy of the people, including the Plaintiff, who have the right to be secure in and to enjoy the privacy of his/their personal health information and their doctor-patient relationship, including, but not limited to, all "individually identifiable health information" as that term is understood under 45 CFR §160.103 to mean

such information as identifies the individual or can be used to identify the individual and relates to past, present, or future physical or mental health or the condition or care of the individual.

192.  NY Mental Hygiene Law §9.46, both on its face and through its implementation, unjustly infringes the civil liberties of the Plaintiff and every other individual person reported by a medical professional to the State through ISARS, particularly considering that more than 99% of the tens of thousands of persons reported did not even have a pistol permit at such time as their personal health information was transmitted.

193.  NY Mental Hygiene Law §9.46, both on its face and through its implementation, unjustly infringes the civil liberties of the Plaintiff and all other persons similarly situated, particularly considering that the Plaintiff was negative as a threat assessment and not representing any likelihood of imminent threat of harm to himself or to others.

194.  The Defendants' repeated and far-flung transmissions amongst themselves and to other third parties of the personal health information of the Plaintiff and others similarly situated constitute an egregious violation of the civil liberties of the Plaintiff and every other individual whose personal medical information was collected by the State through ISARS.

195.  The Defendants' treatment of the Plaintiff's personal health information has resulted in his emotional distress, his loss of reputation, and other monetary damages.  What the Defendant built across the course of his life and his career was destroyed through the intentional actions of the Defendants.

196.  The Defendants' treatment of the Plaintiff's personal health information demonstrates a reckless indifference to his civil liberties and, in deed, to the civil rights of those similarly situated, warranting the award of treble damages.

## AS AND FOR A SECOND CAUSE OF ACTION:
### Violation of the Equal Protection Clause

197.  Paragraphs "1" through "196" are repeated and realleged as if set forth again, herein.

198.  The Plaintiff and all persons similarly situated are entitled to the equal protection of the laws pursuant to the United States Constitution at the Fourteenth Amendment.

199.  NY Mental Hygiene Law §9.46 is a discriminatory denial of equal protection of the laws for persons coming into contact with medical providers for mental health purposes.

200.  The Defendants used and continue to use NY Mental Hygiene Law §9.46 and its implementation through programs and systems such as ISARS to target a specific and vulnerable patient population, profiling and discriminating against such class of individuals coming into contact with the mental health setting, whether or not any individual persons presents a credible, immediate threat to the self or to another.

201.  The grotesque overreach of NY Mental Hygiene Law §9.46 and its implementation through programs and systems such as ISARS to target a specific and vulnerable group of individuals coming into contact with the mental health setting does nothing more than exacerbate the stigma already associated with persons facing mental health challenges and issues.

202. NY Mental Hygiene Law §9.46 segregates and singles out persons coming into contact with the mental health setting for treatment different than the general patient population.

203. Within the class of those coming into contact with the mental health setting, NY Mental Hygiene Law §9.46 and its implementation through programs and systems such as ISARS unjustly and disproportionately results in deprivation of individual liberties of Veterans and law enforcement officers.

204. Within the class of those coming into contact with the mental health setting, NY Mental Hygiene Law §9.46 and its implementation through programs and systems such as ISARS unjustly and disproportionately results in deprivation of individual liberties of pistol permit holders and applicants.

205. The Defendants' treatment of the Plaintiff as a person involuntarily committed to a mental institution and as part of a class of persons likely to commit violent crime with a firearm has resulted in his emotional distress, his loss of reputation, and other monetary damages.

206. The Defendants' treatment of the Plaintiff as a person involuntarily committed to a mental institution and as part of a class of persons likely to commit violent crime with a firearm demonstrates a reckless indifference to his civil liberties and, in deed, to the civil rights of those similarly situated, warranting the award of treble damages.

## AS AND FOR A THIRD CAUSE OF ACTION:
### Violation of the Due Process Clauses

207. Paragraphs "1" through "206" are repeated and realleged as if set forth again, herein.

208.   The Plaintiff and all persons similarly situated are entitled to both procedural and substantive due process, under the United States Constitution at the Fourth, Fifth, and Fourteenth Amendments.

209.   The right to bear arms under the United States Constitution at the Second Amendment has been declared to be a fundamental right.

210.   The taking of the Second Amendment rights of the Plaintiff and all persons similarly situated violates his/their due process rights.

211.   The taking of the firearms of the Plaintiff and all persons similarly situated from their personal ownership, dominion, and use violates his/their fundamental rights under the United States Constitution at the Second Amendment as well as his/their rights to be secure in their persons and property under the United States Constitution at the Fourth Amendment and the Fourteenth Amendment.

212.   The process through which the Plaintiff and other persons similarly situated have been reported and disqualified from firearms ownership, possession, transfer, and use is arbitrary and capricious.

213.   The standard under which the Plaintiff and other persons similarly situated have been reported is vague and ambiguous.

214.   The lack of a meaningful process and forum through which the Plaintiff and all persons similarly situated could request a redress of their grievances for the restoration of his/their pistol permits, for the restoration of his/their rights to buy, sell, transfer, and possess firearms, and for the restoration of his/their firearms violates his/their due process rights.

215.   The Defendants' lack of notification of the Plaintiff and others similarly situated of the transmission of personal health information constitute an egregious violation of the civil liberties of the Plaintiff and every other individual person whose personal medical information was collected by the State under the guise of MHL §9.46.

216.   The Plaintiff's ability or lack thereof to obtain a redress from the Defendants of their misuse and mischaracterization of the Plaintiff's personal health information has resulted in his emotional distress, his loss of reputation, and other monetary damages.

217.   The Plaintiff's ability or lack thereof to obtain a redress from the Defendants of their misuse and mischaracterization of the Plaintiff's personal health information demonstrates a reckless indifference by the Defendants to his civil liberties and, in deed, to the civil rights of those similarly situated, warranting the award of treble damages.

## AS AND FOR A FOURTH CAUSE OF ACTION:
### The Right to Keep and Bear Arms

218.   Paragraphs "1" through "217" are repeated and realleged as if set forth again, herein.

219.   MHL §9.46 as enacted and implemented by the Defendants violates the Second Amendment rights of the Plaintiff and others similarly situated.

220.   As a direct result of the report filed against him by Eastern Long Island Hospital and through the subsequent actions undertaken by the Defendants, the Plaintiff wrongfully lost his pistol permit, his firearms, and his rights to own, possess, and transfer firearms.

221.   The rights afforded to an individual, including the Plaintiff, under the Second Amendment to the United States Constitution is fundamental, and should be accorded both the highest protection and the highest compensation because monetary compensation for such civil liberties is, by definition, inadequate.

222.   The Defendants' termination of the Plaintiff's civil liberties under the Second Amendment of the United States Constitution, including his use of firearms both for the defense of his home and family, as well as his personal enjoyment of firearms use in the shooting sports, is a basis for an award of monetary damages.

223.   The Defendants' termination of the Plaintiff's civil liberties under the Second Amendment of the United States Constitution demonstrates a reckless indifference to, if not an actual malicious intention to subvert, such individual liberties and, indeed, to the civil rights of those similarly situated, warranting an award of treble damages.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff respectfully requests on behalf of himself and on behalf of all others similarly situated that the Court grant the following relief:

I.   A declaratory judgment striking down and rendering void *ab initio* New York Mental Hygiene Law §9.46 as representing an unconstitutional violation of the Second, Fourth, Fifth, and Fourteenth Amendments of the United States Constitution, and as otherwise enumerated herein;

II.   A preliminary and then a permanent injunction enjoining the Defendants, their officers, agents, and employees from administration, operation, and implementation of New York Mental Hygiene Law §9.46 through ISARS and through any other format or program or successor thereto;

III.    An order that the Defendants shall immediately transmit to the Court a complete copy of the data collected under MHL §9.46 through the ISARS reporting system and through any other similar format or program;

IV.    An order that the Defendants be required to immediately transmit written notification to every reported person concerning whom it received personal health information collected through the MHL §9.46 ISARS reporting system or through any other similar format or program, and also providing public notification and information through a website to be established by the State of New York, Office of the Governor, and through which persons may inquire whether their personal health information was collected through the MHL §9.46 ISARS reporting system, or otherwise;

V.    An order directing that the Defendants be required to certify the purge of all electronic and any paper records of patients' personal health information collected through the reporting system under NY Mental Hygiene Law §9.46;

VI.    An award of monetary damages, including punitive damages, to the Plaintiff pursuant to 42 U.S.C. §1983;

VII.    An award of attorney's fees and costs to the Counsel for the Plaintiff pursuant to 28 U.S.C. §2412 and/or 42 U.S.C. §1988; and,

VIII.    An award such other, further, and different relief as to the Court is just.

Dated:  December 17, 2014
         Webster, New York

                              By:    _Paloma A. Capanna_

                                     Paloma A. Capanna, Attorney
                                     633 Lake Road
                                     Webster, New York 14580
                                     (585) 377-7260
                                     paloma@law-policy.com