IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
Rochester Division

---

DONALD MONTGOMERY,
as an individual, and on behalf of
all other persons similarly situated,

Plaintiff

vs.

ANDREW M. CUOMO, Governor of the State
of New York; ANN MARIE T. SULLIVAN,
Commissioner of the New York State
Office of Mental Health; MICHAEL C. GREEN,
Executive Deputy Commissioner of the
New York State Division of Criminal Justice Services;
JOSEPH A. D'AMICO, Superintendent of
the New York State Police; VINCENT F. DEMARCO,
Suffolk County Sheriff's Department; and,
EASTERN LONG ISLAND HOSPITAL,

Defendants.

**Declaration of the Plaintiff,
Donald Montgomery**

Civil No.: 6:14-cv-06709

Hon. Charles J. Siragusa

---

**Donald Montgomery**, in accordance with 28 U.S.C. §1746, does declare under penalty of perjury that the foregoing is true and correct:

1. I am the Plaintiff in the above-captioned action.

2. I previously submitted a Complaint in this matter, which I ask to be considered as part of this application.

3. I make this request for relief on behalf of myself and on behalf of all other persons similarly situated.

4. I bring this Motion for a preliminary injunction and other relief to shut down the ISARS statewide reporting system and database, to alert all persons who have been ensnared through this State-sponsored system of the breach of their individual privacy rights, and to learn the full extent of what has been wrongfully reported and circulated about me.

5. I am a Veteran of the United States Armed Forces.

6. I am retired from the Suffolk County Police Department after 30-years of distinguished service.

7. I have no notable medical history.

8. I have no mental health history.

9. I suffered, briefly, from insomnia, and followed the recommended path of seeing my primary care physician and a counselor, and seeking hospitalization.

10. Upon information and belief, I was wrongfully tagged as one of many "involuntarily committed" persons when I walked through the doors of the Emergency Room at Eastern Long Island Hospital.

11. I am fortunate to be in a position to come forward with my personal experience, not only to seek redress for the grievances against me, but also on behalf of the tens of thousands of people who do not even know that their personal health information has been compromised and on behalf of those few people who may be aware of the unlawful transmission of such information and who may not be in a position to file suit. {Please refer to Exhibit 11, NY Times, "Mental Health Issue Put 34,500 on New York's No-Guns List" (October 19, 2014) and please also refer to Exhibit 4, New York State Senate transcript, Standing Committee on Mental Health and Developmental Disabilities, "Public Hearing: To Look at the Implementation and Impact of the Mental Health Requirements in the New York Safe Act" (conducted May 31, 2013), testimony of Jeb Wolkenbreit, Attorney, Conference of Local Mental Health Hygiene Directors, pp. 9-10.}

12. Until and unless this Court grants the requested relief, every day more and more people will be reported by their medical providers to the State, which will then transmit this personal health information through various offices and agencies, apparently without training its personnel, imposing IT security protocols, or notifying the individuals of the State's receipt of and use of their personal health information. {Please refer to the Declaration of Stephen J. Aldstadt and the associated Exhibit 32 of responses to FOIL requests.}

13. Until and unless this Court grants the requested relief, there will continue to be no way for individuals to learn whether they are among the more than 60,000

estimated people whose personal health information has been compromised, as the State will not release this information pursuant to a Freedom of Information Request and as medical providers may not be maintaining this information as part of a patient's medical record.

14. And, until and unless this Court grants the requested relief, countless individuals will be chilled from seeking appropriate medical care and treatment out of a well-founded fear that their personal health information will be transmitted in a clandestine manner by their medical provider to the State with no sound method to learn of such data breach and no appropriate mechanism to seek relief from any subsequent State-imposed firearms disqualification.

### The Plaintiff's Circumstances.

15. On or about March 19, 2014, I went for routine blood work and was told by my primary care physician that I was "healthy."

16. I have been generally healthy and I have no history of mental health issues.

17. On or about May 6, 2014, I went to see my doctor because I was having trouble sleeping.

18. On or about Saturday, May 10, 2014, I went to the Eastern Long Island Hospital Emergency Department because I was continuing to have trouble sleeping. I was given a prescription for Trazodone 50 mg at bedtime, and a recommendation to

contact my primary care physician and to contact a counseling service for re-evaluation in 2-3 days or if symptoms worsened.

19. On or about Friday, May 23, 2014, I again went to the Eastern Long Island Hospital because I was still having trouble sleeping.

20. I went to the hospital of my own free will. My wife of 43 years, Lynn, transported me there on May 23, 2014, visited with me throughout the admission, and my brother Christopher took me home after the discharge on May 25, 2014. Other family members also visited me at the hospital.

21. On or about Friday, May 23, 2014, I was admitted to the Eastern Long Island Hospital for a continuous period of approximately 48-hours because I was continuing to have difficulty sleeping.

22. At some point at the Emergency Department and/or during this hospital admission of May 23-25, 2014, upon information and belief, the Eastern Long Island Hospital labeled me an "involuntary commitment."

23. At the time of my presentation at the Emergency Department on May 23, 2014, the "Nurse's Notes" included "Patient has no thoughts of hurting self. Patient has no thoughts of hurting others. Patient is not having suicidal thoughts. Patient is not having homicidal thoughts."

Page 5 of 17

24. On or about May 23, 2014, the "Psychiatric Admission History" included a "mental status examination" that stated, in full, "This is a well-developed, well-kempt male, dressed casually and in no acute distress. He is calm, pleasant, cooperative. Eye contact is good, speech is fluent. Mood is mildly depressed. Affect is appropriate, somewhat anxious but otherwise mood-congruent. He denies suicidal ideation, homicidal ideation. There is no evidence of any psychotic process, mania, or OCD symptoms. Insight, judgment, impulse control are good."

25. The "Discharge Summary" from Eastern Long Island Hospital correctly lists that the Plaintiff was experiencing stress "in the setting of buying a new home and selling the old one" and that with properly prescribed medications "he slept soundly for the two nights."

26. During his admission at the Eastern Long Island Hospital, one of the psychiatrists said to the Plaintiff, "You don't belong here" and "I don't know why you were referred here."

27. Some time after I got to the Emergency Department on May 23, 2014, someone from Eastern Long Island Hospital left a black folder on my nightstand, without discussion of its contents, and I just found it there. I did not review its content. I was not asked to sign any of the materials in the folder.

28. I took the folder home and later provided it to my Attorney, who reviewed it, and brought its contents to my attention.

29. Within the black folder was a one-page sheet titled "Notice of Status and Rights/Emergency Admission (to be given to the patient at the time of admission to the hospital)/Section 9.30 Mental Hygiene Law." On the form was written "Donald" and the date of arrival at the hospital "5/23/2014." None of the rest of this form was completed, not the patient identification block, not the "TO" line, not the contact information for the Mental Hygiene Legal Service, not the signature and date of a staff physician, and not the "COPIES TO" area. {Please refer to Exhibit 20.}

30. The form in the black folder substantially differs from the copy of the same form provided in response to a request for my medical records, made by my Attorney. The copy of this form provided to my Attorney from the Eastern Long Island Hospital was completed, including the full identification information for me and the full contact information for the Mental Hygiene Legal Services. I did not receive a copy of the form in this version. {Please refer to Exhibit 20.}

31. There were no legal proceedings of any kind prior to, during, or after my hospital admission. I was not offered to meet with nor assigned representation of an attorney during my hospital admission. I had no contact with an attorney or a judge.

32. At the point I left the hospital, I did not know that I had been labeled an "involuntary commitment" by the hospital.

33. Several days later, at or about the time I learned Suffolk County Sheriff's Department would be coming to impound my firearms, I called the hospital and was transferred to a man who was, upon information and belief, a nurse named "Bud," who said to me in no uncertain terms, "Oh yes, if you went through the Emergency Room, you were involuntarily committed."

### The Plaintiff's Background.

34. I am a Veteran of the United States Navy.

35. I am a retired law enforcement officer with a distinguished career of more than 30-years, retired with the rank of Detective Sergeant. I had a spotless record and was awarded the Department's Bravery Medal. I was a Commanding Officer for 15 years.

36. At the time I went to the Eastern Long Island Hospital, I was suffering from sleep deprivation, occasioned by my move from Suffolk County to Monroe County, with my wife of then 43 years, to live closer to our adult child and young grandchild.

37. I have no mental health history.

38. I have no pre-existing medical conditions.

39. I was of good health and sound mind, except for a short-term difficulty sleeping during an intrastate relocation in or about May 2014.

40. I held an unconditional pistol license since July 2005.

41. In order to obtain my pistol permit, I went through a background check and was approved by the county licensing officer, Defendant Suffolk County Sheriff's Department.

42. As of May 2014, I owned four (4) handguns, specifically, a Colt .38 revolver, a Derringer .38, a Glock 26 9 mm, and a Smith & Wesson Bodyguard 380.

43. At all times, all of my handguns were accurately and timely listed on my permit.

44. Of the firearms owned by me as of May 2014, one was my department-issue firearm, one I won for being second place scholastically in my class of recruits, one I bought in approximately 1975, and one I bought approximately two years ago.[1]

45. I additionally underwent multiple background checks during the course of my career in law enforcement.

46. I have also gone through an annual renewal for my H.R. 218 ("LEOSA") permit for nationwide concealed carry in any jurisdiction in the United States as a qualified law enforcement officer.

---

[1] *N.B.:* in the Complaint, at paragraph 152, the Plaintiff indicated that one of his four firearms was won at the police academy for being the best all-around recruit. The Plaintiff wishes to make a correction to that allegation. For that honor, he received a cash prize. The referenced firearm was awarded for being second place scholastically in his class of recruits.

## The Confiscation of the Plaintiff's Pistol License and Handguns.

47. Unbeknownst to me, upon information and belief on or about May 29, 2014, the New York State Police sent a letter to the Suffolk County Clerk's Office wrongfully stating that I was "adjudicated as a mental defective or has been involuntarily committed to a mental institution" and that I was prohibited from possessing a firearm, rifle, or shotgun "pursuant to 18 U.S.C. 922(g)(4)." {Please refer to Exhibit 23.}

48. On or about May 30, 2014, I received a telephone call from the Suffolk County Sheriff's Department, apologizing that they would be coming to pick up my guns because they were under repeated pressure from the New York State Police to immediately do so.

49. I was shocked, but believed that this mistake would be easily corrected.

50. I own four handguns, which I had unloaded and open on the kitchen table prior to the arrival of the Suffolk County Sheriff's Department officer on or about May 30, 2014. I also had my permit available. I surrendered the firearms and the permit at their request. I received receipts for these items. {Please refer to Exhibit 24.}

51. On or about June 2, 2014, the Suffolk County Sheriff's Department notified me in writing that my pistol license was suspended based upon the misinformation from the New York State Police. {Please refer to Exhibit 25.}

52. I made several efforts to promptly inform the Suffolk County Sheriff's Department that I had not been involuntarily committed.

53. On or about June 10, 2014, I sent a written request to the Eastern Long Island Hospital to correct the mistake and to transmit such correction to the New York State Police and the Suffolk County Sheriff's Department. I copied this letter to the New York State Police and the Suffolk County Pistol License Bureau at the Suffolk County Sheriff's Office. {Please refer to Exhibit 21.}

54. In response to my letter, the hospital sent me a letter (dated July 2, 2014), essentially stating that they had checked their records and no mistake was made such that no correction would be made to the erroneous label of "involuntary commitment." {Please refer to Exhibit 22.}

55. Upon information and belief, on or about September 2, 2014, my lawyer sent a letter requesting a hearing on the pistol license suspension to the Suffolk County Sheriff, who is the licensing officer. {Please refer to Exhibit 26.}

56. Upon information and belief, shortly thereafter, on or about September 11, 2014, my lawyer received a telephone call from the Suffolk County Sheriff's Department, stating that my pistol permit record was clean, but that the Sheriff was going to revoke my permit. Upon information and belief, the officer said it was "out of their hands" and that "they would have to fight the state." Upon information and

belief, the officer confirmed to my lawyer that there were "zero problems with [my] file," in reference to my pistol license.

57. On or after September 12, 2014, I received a letter from the Suffolk County Sheriff's Department, terminating my permit (dated September 8, 2014). This letter of one sentence states "Due to the fact that you permanently reside in Monroe County, your pistol license with the Suffolk County Sheriff, which is currently suspended, is hereby cancelled." {Please refer to Exhibit 27.}

58. At or about this same time, upon information and belief, my attorney received a letter from the Suffolk County Sheriff's Department stating "As far as conducting a hearing in reference to Mr. Montgomery's pistol license status, it is my belief that would not resolve the issue. I advised Mr. Montgomery numerous times that the NY State Police sent our office a letter deeming him adjudicated as mental defective or having been involuntarily committed to a mental institution. Under federal law, he is prohibited from possessing a firearm, rifle, or shotgun. Our office has no authority to change that." {Please refer to Exhibit 28.}

59. I recently filed a special proceeding in New York State Supreme Court, Suffolk County, pursuant to CPLR Art. 78 to request the revocation be vacated, or, in the alternative, that a hearing be directed to be conducted after a transfer of the matter to the Monroe County Licensing Officer. This case was filed on January 5, 2015 and given Index Number 15-00121. It was assigned to the Hon. William B.

Rebolini. The Notice of Petition is returnable February 19, 2015. The Suffolk County Sheriff's Department was served, but has not yet appeared in the case.

60. It is my understanding from my pistol license application process that the Suffolk County Sheriff serves as the Licensing Officer.

61. Both my lawyer and I were unable to cause the Suffolk County Sheriff to conduct a hearing, to review my hospital records or any other evidence, to consider that evidence, and to render a written decision. The Suffolk County Sheriff refused to conduct a proceeding to review my individual circumstances, instead, upon information and belief, giving in to the State and the written and verbal communication from the NYS Police.

### The Plaintiff's Efforts under FOIL.

62. I was unsuccessful at obtaining any copies of government records about me through the Freedom of Information process.

63. In response to the request sent to the Office of Mental Health, after two letters requesting extensions of time to respond, OMH took the position that the records requested were confidential. {Please refer to Exhibit 29.}

64. In response to the request sent to the Department of Criminal Justice Services, a response was received without letterhead, date, or signature, indicating that I would

need to contact a third party vendor and provide my fingerprints. {Please refer to Exhibit 30.}

65. In response to the request sent to the NYS Police, a response was received requesting an extension of time to respond and, upon information and belief, telephone calls were exchanged with my Counsel and their Records Access Officer, but no records were ever received. {Please refer to Exhibit 31.}

66. As to the request sent to the Suffolk County Clerk's Office, no response was ever received. {Please refer to Exhibit 32.}

67. In spite of my efforts with the assistance of Counsel to learn the extent and content of the misinformation that had gone into circulation, we were unsuccessful at every turn. At best, it would have provided insight into the operations of the statewide database and program. But, learning such information would not have created any relief from the breadth of misinformation at the federal, state, and county levels.

68. I will have to reply upon an order of this Court to the Motion and/or the discovery process to obtain copies of such records.

### The OMH "Relief from Disabilities" Process.

69. I reviewed the Office of Mental Health "relief from disabilities" process, as depicted on its website. The process would call for me to sign release forms to cover roughly 20 years of medical records, obtain clearance from the NY

Department of Criminal Justice Services, obtain clearance from the FBI, and compile "evidence of reputation" through notarized documents from former employers and current family or friends, among other records. And, as if obtaining all of these records in the required format would not be enough, the website states, "Whether or not you provide a psychiatric evaluation, we may also request that you undergo a clinical evaluation and risk assessment" at the mental health professional of the choosing of the State. {Please refer to Exhibits 9A – 9D.}

70. The "process" offered by OMH would only amount to a further violation of my privacy, particularly because it can include a state-sponsored "mental health and risk evaluation."

### The NICS Appeal Process.

71. I cannot submit an appeal to NICS because I do not have a "NICS Transaction Number," which would be issued if I went to a firearms retailer, completed ATF Form 4473, and was denied. Without the NICS denial, I cannot start the NICS appeal process. {Please refer to Exhibits 16A – 16E.}

72. Further, how would I complete ATF Form 4473 at a dealer? One of the questions that must be completed under penalty of perjury is question #11f, whether he applicant has ever been adjudicated a "mental defective" or "involuntarily committed." {Please refer to Exhibit 14.} The truthful answer to this question is "no," but, upon information and belief, this would appear to be a false answer,

based upon the information that may have been transmitted into the NICS Index by one or more of the Defendants. {Please refer to Exhibits 22 and 23.}

73. I do not want to risk federal prosecution for either what would wrongfully appear to be a false answer or for the attempted purchase of a firearm when it would wrongfully appear that I am a disqualified individual.

## Conclusion.

74. Short of filing this lawsuit, there appears to be no way out of the bureaucratic maze created through the hospital and state reporting to state and federal databases that has been wrongfully made against me.

75. I made a concerted effort to correct the misinformation circulating about me since I received the telephone call from the Suffolk County Sheriff's Department on or about May 30, 2014.

76. If this can happen to me, particularly given my background, this can happen to anyone.

77. It shouldn't be happening to anyone, simply because of seeking out medical care and treatment.

78. I urge this Court to suspend MHL §9.46 and its associated reporting system and statewide database to prevent the Defendants from conducting activities that are

unconstitutional in nature and in result, to provide notification to everyone in the database of the circulation of their personal health information, and to direct the Defendants to provide me with whatever records have been wrongfully made against me.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: ~~Webster~~ FAIRPORT, New York
January 14th, 2015

_____
Donald Montgomery