IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
Rochester Division

---

DONALD MONTGOMERY,
as an individual, and on behalf of
all other persons similarly situated,

          Plaintiff

      *vs.*

ANDREW M. CUOMO, Governor of the State
of New York; ANN MARIE T. SULLIVAN,
Commissioner of the New York State
Office of Mental Health; MICHAEL C. GREEN,
Executive Deputy Commissioner of the
New York State Division of Criminal Justice Services;
JOSEPH A. D'AMICO, Superintendent of
the New York State Police; VINCENT F. DEMARCO,
Suffolk County Sheriff's Department; and,
EASTERN LONG ISLAND HOSPITAL,

          Defendants.

---

**Declaration of William R. Nojay,
N.Y.S. Assemblyman**

Civil No.:  6:14-cv-06709

Hon. Charles J. Siragusa

---

**William R. Nojay**, under penalty of perjury and in accordance with 28 U.S.C. §1746, states and declares as follows:

1.    I am a New York State Assemblyman for the 133rd Assembly District, and I have served in this capacity since January 2013.  Among my committee assignments, I am now a member of the Committee on Mental Health.  I am an Attorney, licensed to practice in the courts of the State of New York and I also hold an MBA. I am a former New York certified Emergency Medical Technician (EMT) and

volunteer ambulance driver for my town's emergency medical service (EMS), and have received extensive training in HIPAA rules and restrictions on the disclosure of personal health information as those rules apply to medical personnel.

My brother, now deceased, was severely developmentally disabled. For this reason I have been involved with public policy relating to the developmentally disabled and mentally ill my entire adult life. I am a former Board Member and Treasurer of the Al Sigl Center of Community Agencies for the Developmentally Disabled in Monroe County, New York and former Chair (and current Member of the Board) of its housing subsidiary. Finally, I hold a New York State Concealed Carry Permit, am a firearms owner, and a competitive shooter.

2.     I submit this Declaration in support of the Plaintiff's list of requested relief. I have read the Complaint filed in this case.

3.     This Declaration will provide the Court with a narrative and analysis of the events which transpired in the NYS Assembly on Tuesday, January 15, 2013 relative to Assembly Bill A2388-2013, which was signed into law that afternoon and which has come to be known in common parlance as the "SAFE Act." This detail will support the overarching message of this Declaration, specifically that Assembly Bill A2388-2013 was not advanced through the normal legislative process and that there is no basis for an assertion that the provision that became Mental Hygiene Law §9.46 enhances public safety. The Plaintiff should ultimately succeed on the merits of his claims, including that NY Mental Hygiene Law §9.46 should be

struck down as unconstitutional.  More immediately, the Plaintiff should be granted

his request for temporary injunctive relief to stop the transmission of personal

health information of thousands of people per month from their medical providers

to the State, as well as stopping the State handling of such personal health

information within the "Integrated SAFE Act Reporting System" ("ISARS") and/or

other statewide database and program.

### Terminology Used Throughout This Declaration

4.     The acronym "HIPAA" is used to designate, collectively, both the "Health

Insurance Portability and Accountability Act," first at Pub.L. 104-91 (1996) and

the "HITECH" or "The Health Information Technology for Economic and Clinical

Health Act," as well as to those common references that may break down its

provisions into designations such as "The Privacy Rule," "The Transactions and

Code Sets Rule," "The Security Rule," "The Unique Identifiers Rule,"

"The Enforcement Rule," and "The Breach Notification Rule."

5.     The term "personal health information" is used in reference to the legal term

"protected health information," defined at 45 CFR 160-103, specifically meaning

such "individually identifiable health information," which is a subset of health

information, including demographic information collected from an individual that

is created or received by a health care provider, among others, and relates to past,

present, or future physical or mental health or condition of an individual, the health

care provided to an individual, specifically that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.  Examples under the HIPAA Privacy Rule of "individually identifiable health information" include the person's name, address, birth date, and Social Security Number.

6.    The term "medical provider" is a plain English reference to hospitals, doctors (including psychiatrists), nurses, and other support staff, who provide medical care and treatment to a patient.

7.    The term "medical care and treatment" is a plain English reference intended to include the subset of those seeking and receiving treatment for a mental health condition.

8.    Attached to this Motion is a copy of the official transcript of the New York State Assembly proceedings on Tuesday, January 15, 2013 concerning Assembly Bill A2388-2013.  This document is hereafter referenced as "Assm.Tr." with page numbers.  {Please refer to Exhibit 3.}

9.    Attached to this Motion is a copy of the official transcript of the New York State Senate Standing Committee on Mental Health and Developmental Disabilities, "Public Hearing:  To Look at the Implementation and Impact of the Mental Health Requirements in the New York Safe Act" (conducted May 31, 2013).  This

document is hereafter referenced as "Sen.Tr." with page numbers.  {Please refer to Exhibit 4.}

## The Process Through Which Assembly Bill A2388-2013 Was Passed Made It a Foregone Conclusion that There Would Be Problems.

10.   The day that Assembly Bill A2388-2013 was debated – Tuesday, January 15, 2013 – was the first week of the new legislative session in Albany.  The Bill was introduced in the Senate late in the day prior and was furnished to the Assembly after 10 p.m. that same night.

11.   None of us saw the legislation until approximately 12 hours prior to the start of session on the Tuesday – those "12 hours" being 10 p.m. until the start of Session at 10 a.m. the following morning.  There was no staff briefing on the Bill.  The Assembly staff had not seen the Bill language before the Members and, therefore, had no awareness of the Bill's language prior to it being distributed to Members of the Legislature.  The Bill impacted or amended 57 sections of law in multiple, different statutes, and was 39-pages long.

12.   The approximately four hours the Assembly was in session regarding this Bill on January 15, 2013 was not a typical debate.  Typically, an Assembly debate is led by people who are subject matter experts, such as committee chairs.  Debates are typically held after Members and staff have had an opportunity to review the language, especially if the proposed legislation amends statutory language and has

multiple, complex impacts on existing statutes across several disciplines. In the case of Assembly Bill A2388-2013, the amendments to existing statutes impacted the mental health laws, HIPAA and state privacy rules, law enforcement and firearms licensing statutes, among other specialized topics. The session was led by Assemblyman Joseph Lentol, whose official biography does not indicate any experience or training in mental health care or application of HIPAA rules. During the debate, Assemblyman Lentol did not appear to have either command of the Bill or the subject matters of the Bill. No other Member of the Assembly participating in the debate appeared to have knowledge of the mental health provisions or their possible impact on HIPAA privacy rules or the mental health profession.

13.   Certainly, no one imagined on January 15, 2013 that MHL §9.46 and associated provisions would lead to the ISARS system and the reporting of tens of thousands of people per year into a statewide database for use by law enforcement at state, county, and local levels.

14.   No hearings or testimony preceded passage of the Bill, nor was any research commissioned or received.

15.   Assembly Bill A2388-2013 was delivered to members and staff of the Assembly under an emergency declaration by the Governor, which suspended the three day desk rule. Use of the "Message of Necessity" allowed for an immediate vote. New York State Constitution, Art. III, Section 14.

16.   There was little to no time for the general public or for citizens with a specific

interest in the subject matter of the Bill to obtain, review, and lobby their

representatives prior to the vote on the Bill.  There was certainly no time to consult

any experts on any area impacted by the Bill, including any medical or mental

health expert or any HIPAA or HITECH legal or technical expert.

17.   It was admitted on the floor of the Assembly that even if the provisions of the Bill

had been in effect it would not have prevented the tragedy in Connecticut or other

high profile crimes committed with firearms.  [Assm.Tr.83]

18.   At no time during the Assembly debate was there a discussion of the pre-existing

provisions of Mental Hygiene Article 9, including that there was no

acknowledgment of the pre-existing system in place to procure an involuntary

commitment.

19.   Likewise, during the Assembly debate, there was no discussion of the federal

disqualifying events, including that of being adjudicated a "mental defective" or

being "involuntarily committed to a mental institution" at 18 U.S.C. §922(g)(4).

**The Assembly Remarks on the Mental Hygiene Provisions
of Assembly Bill A2388-2013 Evidence a Disregard for the
Civil Rights of Those with Mental Health Infirmities.**

20.   The mental health provisions of Assembly Bill A2388-2013 were barely mentioned

during the session.  The primary focus on the floor was around the "assault

weapons" provision now housed at Penal Law §265.00(11).  A few questions were asked, regarding potential implementation of MHL §9.46, but the answers were partial or incorrect, especially as compared to what we know from this lawsuit about the reporting system as it was developed, launched, and implemented by the Executive Branch.

21.     This does not mean that the comments made upon the floor didn't involve those with mental health infirmities.  To the contrary, the remarks of various Members of the Assembly evidence an attitude to scapegoat those with mental health infirmities as the proverbial "bad guy."  The vote came up rapidly, and, after both the shootings in Newtown, Connecticut and Webster, New York, emotions were running high, and pressure from Governor Cuomo and conference leadership to vote on and pass the Bill was enormous.

22.     The Bill made no distinction among numerous diagnosable mental illnesses.  On the Assembly floor, every patient was simply lumped together as having a mental issue.  There was no reference to the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR").[1]  Not a peep was heard about the multi-axial diagnosis or even the process to arrive at a patient diagnosis.  The only question that came up

---

[1] The DSM is now in its Fifth Edition.  Reference is made herein to the DSM-IV because this is the version that was utilized for the ISARS program, according to its ISARS Users Guide, p. 33, found at Exhibit 7.

was whether someone on anti-depressant medication would be reported and the answer was "no."

> Mr. McLaughlin: … Is there anything in this bill regarding antidepressants and their use or the restrictions of anybody on an antidepressant or – I know we're talking a lot about mental health. Is there anything about antidepressants?

> Mr. Lentol: No, there isn't. [Assm.Tr.163]

23.    There were no statistics presented relative to those who suffer from mental health issues, whether as to their rates of criminal conduct or as to their rates of victimization.

24.    If any Member of the Assembly was, on that day, a mental health professional, not one Member self-identified as such. To the best of knowledge and belief, no Member of the Assembly is a mental health professional. Upon information and belief, no Member of the Assembly who sat on the Mental Health Committee at the time of the debate had reviewed the provisions in advance of the other Members. In other words, no one in the Assembly with any knowledge or experience, or responsibility for legislation pertaining to mental health issues, was involved with drafting the SAFE Act or its debate on the Floor of the Assembly.

25.    Instead, what was echoed in the chamber were the fears and stereotypes of our broader society both against those with mental health issues and those who commit crimes. The debate was superficial, did not include discussions of scientific

evidence or law enforcement experience with the mentally ill, and did not address in detail or with benefit of expert input the privacy issues arising from the mental health reporting requirements of the Bill.

26.   Assemblyman Reilich, for example, spoke in favor of increasing institutionalization of those with mental health issues:

> "You know, my concern with this bill is that it's all about guns and there is some input on mental health, but it should be much more than that. This individual [referencing a text about a local shooting] should have been institutionalized. Now, I know today we want to mainstream everybody and many deserve to be mainstreamed and I support that, but many deserve to be institutionalized to protect society from them." [Assm.Tr.55]

> "I doubt that and until we deal with more severely the mental health aspect, unfortunately, these types of horrific acts will occur again." [Assm.Tr.56]

27.   Assemblyman Tedisco made it an "us" versus "those people" issue:

> "We want to deal with people who are a danger to themselves and others. Mental illness is a serious problem. We should help those people, but we can't let that help and our concern for them goes beyond the safety and well-being of innocent law-abiding citizens so we have to take guns out of their hands and make sure they don't get it (*sic*)." [Assm.Tr.60]

28.  Assemblyman Abinanti favored allowing the publication of the names and
     addresses of pistol license holders so that friends and neighbors could look up
     those with "mental problems" and (presumably) report them to the local licensing
     official.  [Assm.Tr.109]

29.  At the same time, Members of the Assembly clearly recognized the stigmatization
     in our society of those with mental illness, which can itself contribute to the
     inhibition of seeking and receiving treatment, as stated between Assemblyman
     Saladino and Assemblyman Lentol:

        Mr. Saladino:  Is the act of stigmatizing someone with mental illness
        adverse to their life and to their recovery?

        Mr. Lentol:  Yes. [Assm.Tr.138]

30.  Alternatives to mandatory reporting were raised, including "[b]etter access to
     intensive mental healthcare, better and more inclusive access to inpatient rehab and
     detox for substance abuse patients," [Assm.Tr.141] armed safety resource officers
     [Assm.Tr.130], health facilities in schools and guidance counselors [Assm.Tr.178].
     In the words of Assemblyman Ortiz,

        "Last, but not least, I also would like to say that the arguments of
        this bill and what we have discussed here today should not be about
        people with mental illness being violent, it should be about people
        with mental illness getting the appropriate services that they need in
        their community, and, furthermore, we should be working together

as the budget gets developed in bringing resources to our school
system from pre-K all the way to college." [Assm.Tr.190-191]

31.   Almost five (5) months after the fact of passage of the Bill, on May 31, 2013, the
New York State Senate Standing Committee on Mental Health and Developmental
Disabilities conducted a public hearing.  Those who testified were mental health
professionals and leaders from around the State, each one of which testified against
MHL §9.46.

32.   Right from the first witness to testify, the only two State Senators in attendance,
Senators Carlucci and Valesky, asked if anyone had filed any lawsuits against
MHL §9.46. [Sen.Tr.23]

33.   Leading mental health professionals from advocacy groups and professional
associations from around the state provided not only testimony, but expert-level
testimony – the kind of testimony we needed to hear in the Legislature *before* the
Bill was presented in "final" form and called up for a vote.

34.   For example, Jed Wolkenbreit, Attorney for the Conference of Local Mental
Hygiene Directors explained that "about 90 percent" of the reports made by
medical providers to the Directors of Community Service at OMH were pushed
through to DCJS without conducting an individual evaluation of the transmitted
clinical information.  [Sen.Tr.10]  Mr. Wolkenbreit also highlighted problems
experienced by the Directors, including reports made by someone other than the

statutorily designated medical professional [Sen.Tr.10], reports being automatically generated by the Electronic Health Records System [Sen.Tr.11], en masse reporting of all persons admitted to state psychiatric centers [Sen.Tr.11], hospitals reporting all persons admitted with a mental illness diagnosis [Sen.Tr.12], patients as young as 11 years of age being reported [Sen.Tr.13], and less than One Percent (1%) of reports resulting in action [Sen.Tr.15].

35.   An additional example of importance comes from the testimony of Dr. Glen Martin, President of the New York State Psychiatric Association, who pointed out that "likely" is essentially a meaningless word in the mental health field because of the difficulties associated with predicting violent behavior, whereas "imminent" is a standard with which clinicians can conduct the well-established, individual patient threat assessment. [Sen.Tr.28]

36.   The Plaintiff, Mr. Montgomery, represents precisely the kind of hypothetical scenario about which these experts testified to in forewarning on May 31, 2013. Mr. Montgomery is exactly the kind of person we were told on January 15, 2013 would not be reported. This case brings forward critical data of necessity to the Legislature. I urge this Court to act because it can do so more quickly and efficiently than the Legislature and it is clear that the ISARS system has gone too far beyond the line marked "constitutional."

## Both MHL §9.46 and the ISARS Reporting System
## are Unconstitutional and Unnecessary.

37.   There was no thought in the Assembly on the day we voted that the ISARS

reporting system would ensnare more than 3,000 people per month [Sen.Tr.10] or

grow to more than 40,000 reported persons {Please refer to Exhibit 11,

Hartocollis, NY Times, October 19, 2014} or be thought of by Governor Cuomo as

being too few people being reported {Please refer to Exhibit 12, Hartocollis and

Kaplan, NY Times, October 19, 2014}.

38.   What we were told was that providers would conduct individual assessments of

their patients, that they would be individually reported to the local mental health

office where a second individual evaluation would be conducted before the person

was reported to the Department of Criminal Justice Services. [Assm.Tr.43]

Clearly, that is not what is happening.

39.   I was opposed to the Bill in many respects, including the provision that became

Mental Hygiene Law §9.46 and associated provisions, and I voted against

Assembly Bill A2388-2013.

40.   My dissatisfaction with the mental health provisions of Assembly Bill A2388-2013

has only increased.  I joined the Mental Health Committee to be in a position to

push back against the impact of this and associated provisions and to give voice to

those with mental health issues.  This population has historically been under-

represented in politics, if not marginalized and disenfranchised.  The ability of any

one patient with a mental health problem to stand up against privacy and other civil liberty violations has also been limited.

41.    Mr. Montgomery is that statistical rarity that shows an unconstitutional law and its application for what it is.

42.    Mental Hygiene Law §9.46 and associated provisions causes medical providers to violate the privacy of the provider-patient relationship, in general, and to violate HIPAA, specifically.

43.    On the day that the ISARS system was launched, the United States Department of Veterans Affairs issued a statement that "federal laws safeguarding the confidentiality of veterans' treatment records do not authorize VA mental health professionals to comply with this NY State law."  {Please refer to Exhibit 13, "VA defies gun statute," Times Union (March 12, 2013).}

44.    At least one of the experts who testified before the Senate Standing Committee on Mental Health and Developmental Disabilities stated that his organization had already filed a complaint with the United States Office of Civil Rights based upon their belief that the statute is not compliant with HIPAA. [Sen.Tr.35]

45.    Mental Hygiene Law §9.46 is an affront to the presumption of confidentiality for mental health treatment that has been codified and recognized for decades at the federal and state levels.

46.   Prior to the enactment of Mental Hygiene Law §9.46, the statutory standard for a

break in the confidential doctor-patient relationship leading to a report to a law

enforcement officer was "a likelihood of serious harm to self or others," meaning

"a substantial risk of physical harm to self as manifested by threats of or attempts

at suicide or serious bodily harm or other conduct demonstrating that he is

dangerous to himself or a substantial risk of physical harm to other persons as

manifested by homicidal or other violent behavior by which others are placed in

reasonable fear or serious physical harm." This standard was codified in Mental

Hygiene Law Article 9, including, but not limited to §9.37 and §9.39.

47.   Prior to the enactment of Mental Hygiene Law §9.46, the state statutory standard

for a break in the confidential doctor-patient relationship leading to a report to a

law enforcement officer was in harmony with the federal statutory standard,

notably the one articulated under HIPAA. Under 45 CFR §164.512(j), there is

federal authority to disclose specified and limited protected health information,

such as the patient's name, address, and Social Security Number, in order to avert a

serious threat to health or safety where the covered entity, in good faith, believes

the use or disclosure "(i)(A) is necessary to prevent or lessen a serious and

imminent threat to the health or safety of a person or the public <u>and</u> (B) is to a

person reasonably able to prevent or lessen the threat, including the target of the

threat, *or,* (ii) is necessary for law enforcement authorities to identify or apprehend

an individual (A) because of a statement by an individual admitting participation in

a violent crime that the covered entity reasonably believes may have caused serious physical harm to the victim *or* (B) where it appears from all the circumstances that the individual has escaped from a correctional institution or from lawful custody (as those terms are defined at 45 CFR §164.501)." (emphasis added)

48. Prior to the effective date of Mental Hygiene Law §9.46, medical and mental health professionals have historically had the option and the professional mandate to utilize one or more forms of "involuntary commitment" when demanded by their professional judgment regarding an individual patient. Involuntary commitment can include law enforcement restraint, observation for up to 72-hours, hospitalization upon certification by two examining physicians, and even compulsory medication. A corresponding set of laws emerged under Mental Hygiene Law Article 9, including various patient and third party designee notifications, rights to counsel, rights to judicial intervention and hearings, and such other civil liberty protections as are generally afforded to those who are literally or effectively detained against their will or capacity, such as when incarcerated.

49. The Defendants and other medical providers are transmitting information that clearly qualifies as "protected health information" under HIPAA and they are doing so with the knowledge that it is flowing to law enforcement offices and other non-medical agencies.

50.   Reporting by medical providers that a person is "likely to" do something negative within the next five years exceeds the HIPAA exemption for individual, emergency reporting of an "immediate threat."

51.   Mental Hygiene Law §9.46 and its marketing by the Office of Mental Health, in particular, encourages medical providers to violate HIPAA through the routine sharing of a patient's personal health information, including the patient's mental health diagnosis and other narrative-style information.

52.   Upon information and belief, on March 16, 2013, the NYS Office of Mental Health launched the "Integrated SAFE Act Reporting System" ("ISARS") to encourage and facilitate the reporting of personal health information by medical professionals pursuant to MHL §9.46.  This may be tied to the "Disqualified Persons Database" and may be a feeder into the NICS disqualified persons reporting.

53.   It appears highly unlikely that the Executive Branch designed, coded, tested, disseminated, and even wrote user booklets for the ISARS program within the two months from the date of the vote on the Bill and the statewide launch of the system. It appears more than reasonable to believe that the Governor already had this system underway prior to the vote on the Bill on January 15, 2013 and that various affirmative misrepresentations or material omissions were made to the Assembly.

**MHL §9.46 Was Not Intended to Create a Mandatory Reporting
System Tied to Automatic Termination of Pistol Licenses
and Confiscation of Firearms.**

54.  The State Defendants have taken the position that it is "mandatory" for a "mental

health professional" (as that term is defined in MHL §9.46) to report a patient,

irrespective whether the patient is known or believed to have a firearm.

55.  For example, the nomenclature of the OMH "Guidance Document" repeatedly uses

the language "mandated reporter" throughout, e.g., "All mandated reporters within

the hospital who provide direct mental health treatment services and have direct

knowledge of individuals subject to the SAFE Act reporting requirements, must

notify the designated staff member of the information they have about the

individual subject to the SAFE Act reporting requirements." {Please refer to

Exhibit 5, OMH "Guidance Document," unpaginated, at the prefatory page.)

And, for example, "Once the conditions for making a report are met, the law

requires the mental health professional to report to the County Director of

Community Services, or designee." {Please refer to Exhibit 5, OMH "Guidance

Document," p. 4, emphasis in original.}

56.  Equally, documents such as the "Introduction for Mental Health Providers" (dated

March 12, 2013) characterizes the "New MHL 9.46" with the top bullet point that

"A 'mental health professional' must report a person who 'is likely to engage in

conduct that would result in serious harm to self or others' to County Director of

Community Services (DCS) or designee as soon as practicable." {Please refer to

Exhibit 8, OMH "Introduction for Mental Health Providers," PowerPoint,

unpaginated, slide 3.}

57.   Upon information and belief, the statewide reporting system functions through an

on-line computer program designed to elicit personal health information from

treatment providers on an automated form.  The user interface then transmits the

personal health information from the treatment provider to OMH, specifically, and

to the State, generally.

58.   The Office of Mental Health underplays and misrepresents the seriousness of the

personal health information being transmitted on the MHL §9.46 form, including,

but not limited to its statement that "The 9.46 form captures a patient's

demographic information.  No diagnosis/medical information is provided,"  as per

its claims to the public on the OMH website.  In its "Introduction for Mental Health

Providers" it makes the false representation that "The 9.46 form captures a

patient's demographic information.  No diagnosis/medical information is

provided." {Please refer to Exhibit 8, OMH, "Introduction for Mental Health

Providers" *supra*, unpaginated, slide 29.}

59.   The MHL §9.46 form includes the patient's diagnosis in a pull-down list of

Diagnostic and Statistical Manual codes and includes a "reason " field as an

expandable text box.  Both the diagnosis and the "reason" are required to be completed in order for the medical provider to submit the form into ISARS.

60.   According to the "Integrated SAFE Act Reporting System, version 1.0.2.6 User Guide," the "diagnosis" field is required, although it allows for the selection of "diagnosis or condition deferred on Axis I" (Axis I being a reference to a multi-axial mental health diagnosis).  The drop down list of diagnoses is taken from the DSM-IV-TR. {Please refer to Exhibit 7, "User Guide: Integrated SAFE Act Reporting System (ISARS), Version 1.0.2.6" (updated September 30, 2013), pp. 33-34.}

61.   According to the "Integrated SAFE Act Reporting System, version 1.0.2.6 User Guide," the "reason" field is required, and accepts a minimum of 50 and a maximum of 500 characters.  The field is used to enter "the reason why they believe the patient being reported is a specific threat." {Please refer to Exhibit 7, ISARS User Guide, *id.,* p. 35.}

62.   Also on the OMH website the OMH "Guidance Document," generally misrepresents the MHL §9.46 report and relief from liability for personal health information transmission is conditioned upon the medical professional making a determination pursuant to the "likely to result in serious harm to self or others" standard.  {Please refer to Exhibit 5, OMH "Guidance Document," *supra.*}

63.     The OMH "Guidance Document" describes that upon receipt of a report, the local

        Director of Community Services reviews the report to make a determination under

        the "likely to result in serious harm to self and others" standard, at which point

        OMH transmits identifying information to DCJS and/or the NYS Police, which

        then transmit(s) that information to the local firearms licensing official "who <u>must</u>

        either suspend or revoke the license as soon as practicable." {Please refer to

        Exhibit 5, OMH "Guidance Document," emphasis added, *supra,* p. 2.}

64.     According to the OMH "Guidance Document," as a next step "DCJS will then

        determine whether the person possesses a firearms license and, if so, will notify the

        appropriate local licensing official, who must suspend or revoke the license as soon

        as practicable.  The person must surrender such license and all firearms, rifles, or

        shotguns to the licensing officer, but if the license and weapons are not

        surrendered, police and certain peace officers are authorized to remove all such

        weapons." {Please refer to Exhibit 5, OMH "Guidance Document," *supra,*

        emphasis added, p. 2.}

65.     The OMH "Introduction for Mental Health Providers" describes that, upon receipt

        of a MHL §9.46 report, "DCJS determines if subject of report has or has applied

        for a firearms license or has registered an assault weapon, and works with State

        Police, which notifies the appropriate county firearms licensing official," and "The

        county licensing official must suspend or revoke the license as soon as

        practicable," and "Licensing official notifies local law enforcement to remove

gun(s)." {Please refer to Exhibit 8, OMH "Introduction for Mental Health Providers," *supra*, slide 3.}

66.   Equally troublesome, in its training materials the Office of Mental Health describes that each time an MHL §9.46 report is filed, an evaluation will be made as to whether an emergency removal order under MHL §9.45 should be issued for an emergency extraction of a person with transport to a psychiatric facility for examination and possible admission.  {Please refer to Exhibit 8, OMH "Introduction to Mental Health Providers, PowerPoint," *supra*, slide 34.}

67.   In the Assembly on January 15, 2013, it was emphasized that the MHL §9.46 report would result in a mandatory revocation of a pistol license and firearms confiscation by the NYS Police or by those county or local law enforcement officers acting on behalf of the State, as follows:

> Mr. Brennan:  …  Will it be mandatory that the license be revoked and the weapon confiscated or not?
>
> Mr. Ortiz:  The answer is yes and they will be notified to the proper authority.
>
> Mr. Brennan:  I see.  In other words, the State Police will revoke the license and confiscate the weapon?
>
> Mr. Ortiz:  The local authority will do so.  [Assm.Tr.43]

68.   The OMH "Guidance Document," the Assembly exchange, and other remarks demonstrate the intention of the State Executive Branch to use an MHL §9.46 report to usurp the statutory discretion assigned to the county-level pistol permit licensing officer under Penal Law §400.00.

69.   Under Penal Law §400.00(1), at the county level, an applicant for a new license or a license holder for renewal is considered upon application and investigation by the licensing officer, who is entitled to an understanding whether the person has ever suffered from any mental illness, and/or has been involuntarily committed to a mental institution or a secure treatment facility.  The applicant is not automatically disqualified by virtue of having ever suffered from a mental illness, but is required to disclose such information.  The licensing officer has the discretion to make a determination of the suitability of the issuance of or denial of an individual applicant, as well as for a suspension or revocation.

**MHL §9.46 Does Not Satisfy Requirements of 18 U.S.C. §922(g)(4).**

70.   There is a distinction between the licensing officer's discretionary power and the federal, mandatory disqualifying events for the ownership, transfer, and possession of a firearm.  An individual who falls under the federal disqualifying events at 18 U.S.C. §922(g)(1)-(9) is permanently restricted from purchasing, transferring, or possessing a firearm.

71.   Specifically, 18 U.S.C. §922(g)(4), it is unlawful for a person "who has been adjudicated as a mental defective or who has been committed to a mental institution" to "ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

72.   Under 27 CFR §478.11, the term "adjudicated as a mental defective" is defined as:

> "(a) A determination by a court, board, commission, or other lawful authority that a person, as a result of marked subnormal intelligence, or mental illness, incompetency, condition, or disease:
>
> > (1) Is a danger to himself or to others; or
> >
> > (2) lacks the mental capacity to contract or manage his own affairs.
>
> (b) The term shall include:
>
> > (1) a finding of insanity by a court in a criminal case; and
> >
> > (2) those persons found incompetent to stand trial or found not guilty by reason of lack of mental responsibility pursuant to articles 50a and 72b of the Uniform Code of Military Justice, 10 U.S.C. 850a, 876b."

73.   The federal term "committed to a mental institution" at 18 U.S.C. §922(g)(4) does not include a person at a medical facility for observation or in a mental institution by voluntary admission.  27 CFR §478.11

74.  There is a possibility that the State is confusing the federal disqualifying events

under 18 U.S.C. 922(g)(4) and reports received of voluntary admissions and

pursuant to MHL §9.46. It would be wrong to merge this data, and any upload of

merged data will compromise the integrity of the NICS Index. The casual manner

in which the personal health information appears to be circulating and the lack of

attention to distinctions with a drive towards data collection, license suspension,

and firearms confiscation degrades both the mental health community and the

general public in that it equates treatment with "not to be trusted," "dangerous,"

and "safety threat."

75.  The OMH "Guidance Document" indicates the State's awareness that it should not

be populating the NICS database with records of persons who do not meet these

specific statutory criteria, and, yet, Mr. Montgomery has somehow become

wrongfully disqualified. {Please refer to Exhibit 5, OMH "Guidance Document,"

*supra,* p. 5.}

76.  Discovery will be important for the Legislature to monitor as this case progresses.

We are going to need as much information as possible to understand the work

ahead of us to try to undo the civil liberties violations that have been brought down

on us by MHL §9.46 and other, associated provisions, as well as its

implementation.

**The Full Extent of Data Transmission and Sharing Is Not Yet Known
and Discovery in This Case Will Be Important Also to the Legislature**

77.   The full extent of the transmission of personal health information from medical providers to the State is unknown.

78.   The full extent of access to the personal health information by one or more of the government Defendants is unknown.

79.   The full extent of the use of the personal health information collected and in circulation by the government Defendants is unknown.

80.   The credentials and training of those with access to the personal health information transmitted by treatment providers and collected by the government Defendants is unknown.

81.   The electronic and physical security measures, protocols, training, and expertise used by the government Defendants to protect this personal health information, if any, are unknown.

82.   These are just a few of the many reasons why this lawsuit is vital to our legislative understanding of the extreme overreach of the Executive Branch through its implementation of MHL §9.46 in general and the ISARS program in particular.

83.   In comparison to the structure and implementation of HIPAA, the State has no law or regulation defining "personal health information," its solicitation, its protection,

its inter-agency and inter-governmental transmission, its employee authorizations, its electronic platforms and protections, or other similar measures.

84.   In comparison to the federal HIPAA, there are no state level consequences, whether through criminal or civil prosecution, incarceration, fine, or loss of approval for government contract that would apply to the improper use of the personal health information solicited by or coming into the possession of state and local government entities.

85.   Upon information and belief, no person is notified by the Defendants of the transmission of personal health information from medical providers to the State, nor is there a statutory requirement to do so.

86.   Upon information and belief, no person is requested by the Defendants to give permission to the medical providers for the transmission of personal health information from the medical providers to the State, nor is there a statutory requirement to do so.

87.   Upon information and belief, no person is notified by the Defendants of the transmission of personal health information from the medical providers to the State, nor is there a statutory requirement to do so.

88.   Upon information and belief, no patient is notified by the Defendants of any right s/he may have to request a removal of her or his personal health information from

any record-keeping system of the State, nor is there a statutory requirement to do so.

89. Upon information and belief, no patient is notified by the Defendants of any right s/he may have to obtain copies of records of transmission of personal health information from treatment providers to the State, nor is there a statutory requirement to do so.

90. Medical providers do not have a state statutory requirement in conjunction with MHL §9.46 to maintain a record of the transmission of the personal health information to the State or Federal Government as part of the medical record of the patient.

91. The State does not have a breach notification protocol to inform individuals that their personal health information has come under the auspices of the State or in the event that the State should commit a breach of personal health information as this term is defined and understood as part of the HIPAA Breach Notification Rule.

92. Upon information and belief, no patient is notified of any right s/he may have to legal representation in matters associated with the reporting of their personal health information to the State, nor is there a statutory requirement to do so.

93.   Upon information and belief, such failures of notification of patients relative to the
reporting system pursuant to MHL §9.46 was designed to minimize patient
awareness and ability to take legal and other action to try to protect their personal
health information from inappropriate transmission from treatment providers to the
State.

94.   It appears that the Executive Branch, headed by Governor Cuomo, intends its
operations around MHL §9.46 to be conducted in a secretive and over-reaching
manner.

95.   Upon information and belief, Governor Cuomo was the principal architect of
Assembly Bill A2388-2013.

96.   Upon information and belief, Mr. Montgomery could not even obtain from the
State Defendants whatever records they may have about him through Freedom of
Information Requests.  It is vital that this Court grant interim relief that establishes
a method through which people can inquire to obtain such information, particularly
whether they have been reported and are part of the ISARS database, as well as to
obtain copies of the related government records.

97.   It is equally vital that this Court direct the State Defendants to take affirmative
action to transmit notifications to all persons in the ISARS database.

98.    The situation that has been created by the State Defendants requires no less than an

approach that mirrors the HIPAA Breach Notification Rule at 45 CFR §§164.400-

414.

**There is No Question the Personal Health Information
is Being Used For Law Enforcement Purposes
that Would Otherwise Require a Warrant.**

99.    In September 2013, the NYS Police published a "Field Guide" to the "NY SAFE

Act," which included instruction from Counsel to the NYS Police to NYS Police

employees on the confiscation of firearms and the destruction of firearms. {Please

refer to Exhibit 10, NYS Police "Guide to the New York Safe Act for Members of

the Division of State Police," Office of Division Counsel (September 2013),

pp. 2, 6 (hereafter "NYS Police Field Guide").]

100.    Included in the instructions to employees of the NYS Police in its "Field Guide"

are the instructions relative to firearms of persons owned by persons "ineligible

because of a mental health disqualifier." {Please refer to Exhibit 10, NYS

Police "Field Guide," *id.,* pp. 2, 6.] The use of the phrase "mental health

disqualifier" is not defined within the NYS Police "Field Guide." The phrase

"mental health disqualifier" has a commonly-used meaning in reference to the

federal 18 U.S.C. §922(g)(4) provision. The phrase "mental health disqualifier"

does not have a state equivalent statutory provision or common meaning. The

NYS Assembly on January 15, 2013, indicated its intention that the mental health

provisions of the SAFE Act should "[bring] our statute in conformity" "with federal law" [Assm.Tr.90], including that a firearm should not be provided "…to somebody who is dangerously mentally ill, who's been adjudicated as such." [Assm.Tr.92]

101. The NYS Police "Field Guide" thus incorrectly uses the legal term "mental health disqualifier" as having a broad and generic meaning for the officer in the field, which is a far lesser standard than the federal statutory term.  {Please refer to Exhibit 10, NYS Police "Field Guide," *supra* at p. 6.}

102. Specifically, the NYS Police "Field Guide" instructs officers as follows:

> "If the person is determined to be ineligible because of a mental health disqualifier or due to an order of protection, the statute provides that he or she will be afforded the opportunity to arrange for the lawful transfer or sale of that weapon.  The law enforcement agency assigned will secure the weapon for safekeeping until the person has made these arrangements in accordance with the procedure set forth in Penal Law 400.05(6).  If the subject fails to make these arrangements, the weapon automatically becomes a nuisance weapon and must be destroyed or rendered useless for its intended purpose." {Please refer to Exhibit 10, NYS Police "Field Guide, *id.*}

> "If the license and weapons are not surrendered, they will be removed by a police officer and declared a nuisance.  At that point, the person would lose the ability to lawfully transfer the weapon." {Please refer to Exhibit 10, NYS Police "Field Guide, *supra* at p. 12.}

"If a person becomes ineligible to hold a pistol permit, the Safe Act requires the person to surrender **all** firearms to police, including all rifles and shotguns for which no license or registration is required." {Please refer to Exhibit 10, NYS Police "Field Guide, *supra* at p. 12, emphasis in the original.]

Once OMH has notified DCJS, "…DCJS will notify the State Police to confirm the existence of the license and the licensing authority will be notified so they can make a determination as to whether to suspend or revoke the subject's license. The licensing authority, and the appropriate local law enforcement agency, will handle the suspension and the recovery of any weapons in the same manner as they do now in the event the licensing authority revokes a firearms license." {Please refer to Exhibit 10, NYS Police "Field Guide, *supra* at p. 13.}

103.  In reality, upon information and belief, the NYS Police have taken the position of instructing local licensing officials to suspend and terminate pistol permits for all persons reported through MHL §9.46 as having been involuntarily committed to a mental institution as well as those tagged as a "mental defective" or "involuntarily committed."

104.  The NYS Police appear to have taken or are actively in the process of taking effective control of the county-level licensing system.

105.  It appears that the NYS Police have taken the position of directing local law enforcement agencies and offices to conduct warrantless search and seizures of the

homes and personal properties of persons reported through MHL §9.46 to seize all firearms and licenses.

106. The NYS Police appear to have taken effective control of county and local law enforcement office discretion on the approach to investigation of, judicial application for, and prosecution of individuals who own firearms.

107. The level of control taken by the NYS Police as the effective agent of the Governor and DCJS is expressed also in the "Memorandum" that accompanied the Act, wherein it states: "When a Section 9.46 report is made, the Division of Criminal Justice Services will determine whether the person possesses a firearms license and, if so, will notify the appropriate local licensing official, who must suspend the license. The person's firearms will then be removed." {Please refer to Exhibit 2, "Memo: Bill Number S2230," unpaginated, under section titled "Provisions Related to Persons with mental Illness."}

108. The policies, procedures, and actions of the NYS Police may or may not also be related to a determination of the inclusion of the reported individual in the NYS Police database of registered "assault weapons" pursuant to NY Penal Law §265.00(22).

109. And, the policies, procedures, and actions of the NYS Police may or may not also be related to a determination of the inclusion of the reported individual in the

federal database of "NFA firearms," registered under the National Firearms Act (Pub. Law 474, 1934).

110. The implementation of MHL §9.46 is the beginning of the unlawful confiscation of firearms through a police state model.

111. If the deliberations of the NYS Assembly on January 15, 2013 are any indication, there is an expressed intention that the State will only go further, as Members call for dealing "more severely" with those with mental health concerns [Assm.Tr.56] and getting the "guns out of their hands and [making] sure they don't get it" [Assm.Tr.60]

### MHL §9.46 Does Not Help Those With Mental Health Needs and Discriminates Against Them as a Class of Individuals.

112. MHL §9.46 potentially delays what would be an appropriate response in the event of serious and imminent threat of danger to the self or others using a firearm because the ISARS reporting creates a slower data transmission protocol than use of the statewide "911" system, through which a live call goes to a live operator and across to local law enforcement, who already have the ability to ascertain whether the individual has a pistol permit and/or registered assault weapons.

113. MHL §9.46 is a less safe reporting protocol of personal health information than was already provided for under NY Mental Hygiene Law Art. 9 and HIPAA.

114. There is no meaningful process offered by the State to remove the false classification and/or disqualification. The "process" offered by OMH requires a person to sign HIPAA releases for records for an extended period of years to all medical providers and to submit to a mental health examination at the provider of the State's choosing. {Please refer to Exhibits 9A – 9D.} The State's "process" is a further violation of the privacy of persons falsely reported as having been disqualified.

115. To report every person who seeks medical or mental health support services through a government mandate or sponsored program is to fuel the fire of the stigma of a class of persons who are more likely to be victimized than to commit violent crimes with firearms, such as mass shootings.

116. Among those categories of persons who do and will continue to suffer most gravely as a result of MHL §9.46, its implementation, and its heightened stigma are Veterans and law enforcement officers.

117. Every day that goes by while this lawsuit is on its way to striking down MHL §9.46 is another day that dozens of people will lose control of their personal health information as it is reported and then circulated from their medical provider to state, county, and local offices and agencies. More than 99% of the people reported will not be matched to a pistol license record or a registered firearm. Even less than that 1% of people who hold a pistol license or who own a registered

firearm will trigger an actionable situation that involves direct contact with law enforcement for the confiscation of firearms. Of those few people whose firearms will be confiscated, a percentage of those individuals will have their rights restored and their firearms returned.

118. So out of the estimated more than 60,000 people currently estimated to be in the ISARS database, how many people are we talking about as an outcome and, if they truly constituted an immediate threat of harm to self or others, why wouldn't those few people simply be reported through "911" by their treatment provider and handled on an emergency basis in compliance with the preexisting Mental Hygiene Law Article 9 and HIPAA provisions?

## Conclusion.

119. I would respectfully urge this Court to immediately shut down the ISARS reporting system and suspend any reporting requirements under MHL §9.46 during the pendency of this action, to require an immediate notification of all persons whose personal health information has been reported, and to set up a judicially-administered or supervised process through which individuals can inquire whether their personal health information has been reported.

120. I will continue to do what I can in the legislature to correct this situation, but, right now, what is called for is immediate judicial intervention.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated:   *HENRIETTA*   , New York
January *14* , 2015


_____
William R. Nojay