*Montgomery vs. Cuomo*

Exhibit Group B

Exhibit #3 – NYS Assembly Transcript (January 15, 2013)

**TUESDAY, JANUARY 15, 2013**                    **10:24 A.M.**

ACTING SPEAKER AUBRY:  The House will come to order.

In the absence of clergy, let us pause for a moment of silence.

(Whereupon, a moment of silence was observed.)

Visitors are invited to join members in the Pledge of Allegiance.

(Whereupon, Acting Speaker Aubry led visitors and members in the Pledge of Allegiance.)

A quorum being present, the Clerk will read the

1

Journal of Monday, January 14th.

Mr. Morelle.

MR. MORELLE:  Mr. Speaker, I move to dispense with the further reading of the Journal of Monday, January 14th and ask that the same stand approved.

ACTING SPEAKER AUBRY:  Without objection, so ordered.

Mr. Morelle.

MR. MORELLE:  Mr. Speaker, may I have the members' attention so that we can announce the schedule for the day and prepare the members.  We have a busy day ahead.  I would ask for the members' cooperation.  The Codes Committee has met and completed its business this morning.  We are now calling the Ways and Means Committee to meet in the Speaker's Conference Room and join Chairman Farrell there.  Once that is done, we will then go to a Rules Committee meeting that will produce a Calendar which we will take up for today.  In addition, as you know, a number of Committee meetings have to be called off the floor:  Consumer Reports, Real Property Taxation, Health and Local Governments.  So with that as a general outline, Mr. Speaker, if there are any introductions and housekeeping, now would be the appropriate time.

ACTING SPEAKER AUBRY:  There are none.

MR. MORELLE:  Very good then.  We are going to now, as I indicated, call Ways and Means so, please, members of the Ways and Means Committee, if you would proceed quickly to the

Speaker's Conference Room and the House will stand at ease until we call the Rules Committee.

ACTING SPEAKER AUBRY:  The House will stand at ease.

MR. MORELLE:  Thank you, Mr. Speaker.

(Whereupon, at 10:26 a.m., the House stood at ease.)

\*   \*   \*   \*   \*

**A F T E R   T H E   R E C E S S**                **11:14 A.M.**

ACTING SPEAKER AUBRY:  The House will come to order.

Mr. Morelle.

MR. MORELLE:  Yes, Mr. Speaker.  I would like to advance the main Calendar.

ACTING SPEAKER AUBRY:  On a motion by Mr. Morelle, the Calendar is advanced.

MR. MORELLE:  Mr. Speaker, before we take up that Calendar, I would like to note that Mr. Magnarelli is in the Speaker's Conference Room and members of the Local Governments Committee should make their way.  We have a Committee meeting on Local Governments immediately in the Speaker's Conference Room.

I also note, Mr. Speaker, that I believe there are some introductions if you would take them up at this time.

ACTING SPEAKER AUBRY:  Mrs. Duprey for an introduction.

MRS. DUPREY:  Thank you, Mr. Speaker, and may I

3

also join your colleagues from yesterday in congratulating you on your new position.  You look good up there.

ACTING SPEAKER AUBRY:  Thank you.

MRS. DUPREY:  I am delighted today to have Professor Tom Mandeville and some students from Clinton Community College here to observe -- some of them are certainly very interested in the bill that we're going to be taking up in a few minutes and I would like to introduce those students at this time:  Racheal Barcomb, Brent Chatenauneuf, Hope Cruz, Emily Decker, Landon Gosselin, Kristena Hebert, Ryan Seabron and Richard Tarabula.  And I ask that you welcome them to our Chamber today, Mr. Speaker.

ACTING SPEAKER AUBRY:  On behalf of Mrs. Duprey, the Speaker and all the members, we welcome these students and their professor to the Chamber.  We extend the privileges of the floor and hope that you enjoy the proceedings.  You have, in fact, come on a very historic day and we hope it adds to your continuing education.  Thank you for joining us.

(Applause)

Mr. Palmesano.

MR. PALMESANO:  Yes, thank you, Mr. Speaker, and, again, congratulations on your new position.  Joining us in the Chamber today in the back of the Chamber is Seth Olney from Barrington, New York in Yates County, a friend and former intern in the New York State Assembly, but also now as a very successful small business owner on Keuka Lake.  And he's here to join us for the

4

discussion today.  If you would please extend your warm welcome and cordial invitation to the House for today.

ACTING SPEAKER AUBRY:  On behalf of Mr. Palmesano, the Speaker and all the members, we welcome former interns back any time we can get them.  We're happy to hear that you have embarked on such well-rewarded endeavors and hope that your business grows in the State and we hope that you enjoy the proceedings and will come back and visit us real soon.  Thank you for joining us.

(Applause)

Rules Report No. 3, the Clerk will read.

THE CLERK:  Bill No. 2388, Rules Report No. 3, Silver, Lentol, Ortiz, Morelle, Farrell, Weinstein, Camara, Hooper, O'Donnell, Titone, Paulin, Moya, Glick, Wright, Schimel, Gottfried, Rosenthal, Kavanagh, Steck, Weprin.  An act to amend the Criminal Procedure Law, the Correction Law, the Family Court Act, the Executive Law, the General Business Law, the Judiciary Law, the Mental Hygiene Law, the Penal Law and the Surrogate's Court Procedure Act, in relation to suspension and revocation of firearms licenses; private sale or disposal of firearms, rifles or shotguns and establishing a minimum age to possess a firearm; to amend the Family Court Act, the Domestic Relations Law and the Criminal Procedure Law, in relation to providing for the mandatory suspension or revocation of the firearms license of a person against whom an order of protection or a temporary order of protection has been issued under

5

certain circumstances, or upon violation of any such order; to amend the Penal Law, in relation to community guns and the criminal sale of a firearm and in relation to the definitions of aggravated and first degree murder; to amend Chapter 408 of the Laws of 1999 constituting Kendra's Law, in relation to extending the expiration thereof; and to amend the Education Law, in relation to the New York State school safety improvement teams; and in relation to building aid for metal detectors and safety devices.

ACTING SPEAKER AUBRY:  On a motion by Mr. Lentol, the Senate bill is before the House.  The Senate bill is advanced.  The Governor's Message is at the desk.  The Clerk will read.

THE CLERK:  Pursuant to the provisions of Section 14 of Article III of the Constitution and by virtue of the authority conferred upon me, I do hereby certify to the necessity of an immediate vote on Assembly Bill No. 2388 and Senate Bill No. 2230.

The facts necessitating an immediate vote on the bills are as follows:

Some weapons are so dangerous, and some ammunition devices so lethal, that New York State must act without delay to prohibit their continued sale and possession in the State in order to protect its children, first responders and citizens as soon as possible.  This bill, if enacted, would do so by immediately banning the ownership, purchase and sale of assault weapons and large capacity ammunition feeding devices, and eliminate them from

commerce in New York State.  For this reason, in addition to enacting a comprehensive package of measures that further protects the public, immediate action by the Legislature is imperative.

Because the bill has not been on your desks in final form for three calendar legislative days, the Leaders of your Honorable Bodies have requested this message to permit the immediate consideration of this bill.

ACTING SPEAKER AUBRY:  Mr. Lentol to open.

MR. LENTOL:  Thank you, Mr. Speaker.  First and foremost, I want to thank everyone who contributed to this bill on both sides of the aisle and on both sides of the issue and, primarily, I want to thank the Speaker for his steadfastness in coming to a conclusion on the proposition of gun control and also the Governor for working as hard as he did to bring the Senate along and for coming up with a bill that I think will be historic in the annals of time in this House and in this State.  I also want to thank all of my colleagues for providing information, criticism and coming up with a proposal that I think is the best product we could get, both out of the Senate and the Assembly.

We have a problem in our State with the illegal use of guns and we must work to fix it, just like we have worked to fix all kinds of other criminal problems in our society.  And I am proud, as I know others are, that New York is taking the lead on this issue because we must prevent and protect our public from the mass destruction that can now take place in literally seconds because we do

allow our citizens to own weaponry.  I believe this legislation moves us toward that goal and I am proud of it.  And I welcome any questions by any of you, or an explanation of the bill, if you wish.

ACTING SPEAKER AUBRY:  Mr. Jordan.

MR. JORDAN:  Thank you, Mr. Speaker.  Will Mr. Lentol yield?

ACTING SPEAKER AUBRY:  Will you yield, Mr. Lentol?

MR. LENTOL:  Yes, I will.

MR. JORDAN:  Thank you, Mr. Lentol.  You know, there's a lot here so I will try to work my way through it deliberatively.  I guess my first question, do you know, roughly, how many sections of law we're amending today with this bill?

MR. LENTOL:  Excuse me.  I have to take off my shoes to count.  Fifty-seven sections.

MR. JORDAN:  Well, those are being added, that's how many sections are contained in the bill.  Within each one of those, there are amendments, there are deletions, there are alterations to other sections, articles and chapters of law.  Do you know, roughly, how many?

MR. LENTOL:  We didn't count them.  I'm sorry, Mr. Jordan.

MR. JORDAN:  And my concern becomes, and I will try to only make this point once, you know, we received this bill just over 14 hours ago and my understanding is already we've identified

several problems that are going to have to be corrected through chapter amendment, significant problems, and that is the type of event that occurs when we fail to deliberate and follow the process.

My understanding is when does this new law, if it were to pass today and be signed, when does it become effective?

MR. LENTOL:  There's different effective dates for different sections, so if you ask me a specific section, I can give it to you.

MR. JORDAN:  How many different effective dates are there; do you know?

MR. LENTOL:  Five different effective dates.  Five or six, I'm told.

MR. JORDAN:  Or perhaps more.  When does the ban on -- and I'll try to use short-phrase, but the ammunition ban. When does that take effect?

MR. LENTOL:  High-capacity clips is immediate and the assault weapons ban is 90 days.

MR. JORDAN:  Okay, but the ammo ban is -- did you say immediate or in 90 days?

MR. LENTOL:  The '94 clips, pre-'94 clips are immediate; the magazines that hold more than 10 rounds.

MR. JORDAN:  And the assault weapon ban, you say, takes effect in 90 days?

MR. LENTOL:  That's correct.

MR. JORDAN:  And what happens after that 90th

day?  So, on the 91st day what does the lawful owner of a gun that has been deemed to fit the category here, what happens at that point? What do they have to do?  Do they have to burn it?  Turn it in?  What happens at that point?

   MR. LENTOL:  You have one year to register that weapon before it becomes illegal.

   MR. JORDAN:  And who do they register that with?

   MR. LENTOL:  State Police.

   MR. JORDAN:  Okay.  And so, will the State Police have a registration system in place in 90 days?

   MR. LENTOL:  Yes, they will.  They told us they will.  This bill was not drafted in an ivory tower.  The Governor chose to have the State Police, who know more about weaponry than we do, provide most of the provisions that are contained in the bill with respect to weapons.

   MR. JORDAN:  How long does the State Police Superintendent have to create this registry under your bill, or under this bill?

   MR. LENTOL:  Ninety days.  They have 90 days to perfect it.

   MR. JORDAN:  I actually would suggest to you, you may check closer, I believe he has one year to create the registry database.

   MR. LENTOL:  They tell us they're going to be ready in 90 days, however.

10

**NYS ASSEMBLY**                                    **JANUARY 15, 2013**

MR. JORDAN:  Well, they may tell you that, but I'm asking under the language of the bill.

MR. LENTOL:  Under this bill we've given them leeway.  So, there is a year provision, but they're ready in 90 days.

MR. JORDAN:  So on the 91st day when a current lawful, law-abiding citizen who happens to learn about the existence of this bill goes online to register and there's nothing to register, what are they to do at that point?

MR. LENTOL:  Well, they can mail in a form.

MR. JORDAN:  What form?

MR. LENTOL:  A form that will be provided online or by the State Police.

MR. JORDAN:  But that's assuming it's ready.

I'll move on.  Within the bill, I think we look to expand the definition of assault weapon and we add a couple of new criteria.  One of them is a second handgrip.  Admittedly, I only had 14 hours to search so it certainly was not an exhaustive search.  What is the legal definition in New York of a second handgrip?

MR. LENTOL:  I don't think there's a legal definition. It's a factual determination as to what constitutes a second handgrip.

MR. JORDAN:  And so, at what point are we going to provide our businesses in New York State with guidance statutorily as to what constitutes a second handgrip so they know whether or not an otherwise lawful rifle is now deemed unlawful under this statute? Is there any provision in this to provide them with that guidance?

11

MR. LENTOL:  No, there isn't but --

MR. JORDAN:  Thank you.  Is there a definition in this bill for what constitutes a protruding grip, which I believe is another new addition that we have added?

MR. LENTOL:  I'm informed by counsel that the State Police, in their wisdom, have agreed to provide a website which will tell the public as well as the manufacturers what is legal and what is not legal.

MR. JORDAN:  And will the State Police website have the effective law?

MR. LENTOL:  No.  It will have the effective regulation, I presume.

MR. JORDAN:  Okay.  Trying to move along then. We talk about this registry and let's imagine that the State Police is able to produce this registry timely.  I understand that the Governor put out in his, perhaps, State of the State or recently that he believes there are over a million of these what they call assault rifles currently in New York State.  Did we ask the Superintendent of the State Police, who are admittedly greatly understaffed with four years of no new classes, continued underfunding, perhaps, in the budget whether they have the capacity and manpower and staffing to receive, process and handle over a million registrations in 365 calendar days?

MR. LENTOL:  Well, I'm glad you're concerned about that, but I know that the Governor, it's his agency and he has asked the State Police about it and they say that they can do it.

12

MR. JORDAN:  And what happens when they're not able to?  And so we're now at the one year after the 91st day and somebody goes to register that assault rifle and they are unable to and then there's a reason that they have an encounter with the police, perhaps they're on their way to a shooting range and they have this what is now deemed in New York an assault rifle safely locked and secured in the rear of their car and they're now arrested and charged with either a misdemeanor or a felony, I suspect, for failure to properly register.  Is there a defense in this bill to that failure to register?

MR. LENTOL:  There's no defense, but --

MR. JORDAN:  That's what I thought.

MR. LENTOL:  -- you're speculating, you're speculating about what would happen and the Legislature, in its wisdom, if that were to occur, could come up with what we come up with in the past and that is extenders.

MR. JORDAN:  Right.  Could, but no guarantee and so what we're doing and my concern is and I recognize your -- and I appreciate the challenge you have because you did not write the entire scope of this bill, but nor have we had a proper opportunity to air it in the light of day and through proper public discourse, but we're taking law-abiding citizens and we are making them criminals.  And I have seen in this House and in New York plenty of times where we have created requirements that they're not capable of meeting and that ends up falling on the backs of the citizens.

Moving perhaps then to a new area.  My understanding is that we are now looking at --

MR. LENTOL:  By the way, Mr. Jordan, Mr. Jordan, just to answer your question.

MR. JORDAN:  I didn't ask a question, though, and I have limited time.

MR. LENTOL:  You had asked a question and I know you have limited time, but I just wanted to not leave a misimpression and that is as long as you apply, you're protected.

MR. JORDAN:  But if there's nothing to apply to, you're not protected because it's a simple --

MR. LENTOL:  Well, there's going to be an application, that's for sure, and the State Police is going to provide an application.

MR. JORDAN:  Well, I did not see --

MR. LENTOL:  And so long as you apply and even if they're not up and running, it will prevent you from being charged with a crime.

MR. JORDAN:  As we move on, if you could ask counsel before we're finished to cite to where application alone provides protection, that would be great.

MR. LENTOL:  Page 33, Section 14 -- line 14 and 15.

MR. JORDAN:  Thank you.  We'll take a look at that.

We now are entering a new realm completely and

14

that is, as I understand it, if I go to a local sporting store to buy .22 shells, there is now a process that has to be followed; is that correct?

       MR. LENTOL:  Yes.

       MR. JORDAN:  And what is that process?

       MR. LENTOL:  You have to have a background check.  You give your permit or your license and they check to determine whether or not you have the appropriate background in order to receive the --

       MR. JORDAN:  And who is going to perform that check?

       MR. LENTOL:  The seller of the ammunition.  Presumably a licensed dealer.

       MR. JORDAN:  I know, but who are they going to -- what database will they access to perform that check?

       MR. LENTOL:  It's State NICS I'm told, which is the national registry, but we're going to have our own that will be up and running.

       MR. JORDAN:  And are we amending the statute to now allow the use of the NICS system for purposes of verifying or running a background check on ammunition?

       MR. LENTOL:  It's State NICS we're talking about and so we'll have our own database.  We're not talking about accessing the Federal database, which I assume we're going to get cooperation from the Feds on anyway, but we're going to have our own system in operation just to make some of these checks.

**NYS ASSEMBLY**                                **JANUARY 15, 2013**

MR. JORDAN:  Well, I guess I'm trying to understand what is this background check going to consist of and as an owner of a sporting good store or perhaps a shooting range or perhaps a gun club, who are they going to call?  What number do they dial to run this check and when does that become effective?

MR. LENTOL:  It's DCJS is the one that they would call that would be the superseding agency and there will be a number provided for them to call.

MR. JORDAN:  And what are the hours of operation?

MR. LENTOL:  Twenty-four hours.

MR. JORDAN:  So there's going to be someone manning that phone 24 hours a day?

MR. LENTOL:  Correct.

MR. JORDAN:  And is that included in the budget somewhere in this legislation, proposed legislation?

MR. LENTOL:  We don't have a budget yet.

MR. JORDAN:  When does this requirement for a background check to purchase .22 shells or .22 bullets, rather, to be -- proper --

MR. LENTOL:  In one year.

MR. JORDAN:  When does that go into effect?

MR. LENTOL:  One year.

MR. JORDAN:  The effective date is one year on that?

16

MR. LENTOL:  Yes.

MR. JORDAN:  And many gun clubs, many shooting ranges provide ammunition.  How will they comply with this new legislation?

MR. MORELLE:  Mr. Speaker, if the gentleman -- while Mr. Lentol gathers his thoughts, if I could just indicate that the Local Governments Committee has completed its work and I would ask members of the Health Committee to join Mr. Gottfried in the Speaker's Conference Room.  Meeting of the Health Committee in the Speaker's Conference Room, Mr. Speaker.

ACTING SPEAKER AUBRY:  Health Committee, Speaker's Conference Room.

MR. LENTOL:  So, it isn't gun clubs that it applies to.  It's only licensed dealers who sell ammunition.  It's not gun clubs who provide ammunition for shooting.

MR. JORDAN:  Well, actually, I would direct your attention to how commercially-sold is defined and I apologize - the draft we were provided last night has that on page 20, Section 39, line 49 through 51.  I don't know which version you have currently, but perhaps that section will help counsel direct me where it would be in our bill that we have today on our desk.

And while they look I'll read, "Seller of ammunition means any person, firm, partnership, corporation or company who engages in the business of --" and then I'll skip to the last part "-- keeping ammunition."  And I submit to you that under plain

17

English, a gun club or a target range or a sporting event that is in the business of keeping ammunition so they know what's being used on their premises is in the business of keeping ammunition and I think with that wording, that directly applies to gun clubs, to shooting ranges, et cetera.  And are they going to be granted -- because I believe, statutorily, the information that's going to be delivered through a NICS check is very much guarded and protected information, to the extent that last year, I believe, we had to pass legislation in this House to allow public defenders to have access to that information.  And so now if I understand you correctly, we're opening that window to sporting goods stores, to sport clubs, to shooting ranges, to a whole host of groups that previously we excluded public defenders from having access for the very people they're representing in criminal court.  And I ask you how are we proposing in this bill, because I looked and I couldn't find it, to address that very important, obviously, privacy issue that we have set as a public policy that we're now opening that very broad window?

MR. LENTOL:  I think you're asking two different questions, but let me answer the one I think you're addressing.  I believe you think that that language is broad enough to include gun clubs and other folks who provide ammunition.  And I would just say to you, you went to law school like I did and I think the language of this is controlled by what I remembered to be the ejusdem generis rule, which means that the specific -- is the general meaning of the statute is controlling here and not the last section.

18

MR. JORDAN: Well, I'm only reading the definition and I will submit under New York, which is often extremely zealous in their enforcement of various laws when it raises fees and revenue, would read this very liberally to include someone keeping.

MR. LENTOL: And if you look at page 36, line 7 you will see that it only refers to commercial transfer of ammunition taking place, will not take place unless a licensed dealer in firearms or registered of ammunition, blah, blah, blah. So, we're only talking about commercial transfer of ammunition.

MR. JORDAN: Mr. Lentol, prior to wrapping up then, at the beginning I think there was a little confusion on the question of when does the ammunition ban take effect. Is that immediate or 90 days?

MR. LENTOL: There's no ammunition ban in the bill. There's a provision that requires background checks.

MR. JORDAN: I'm sorry. On the clips, on the capacity.

MR. LENTOL: Oh, I'm sorry.

MR. JORDAN: If someone has -- on 10 or more, when does that ban go into effect?

MR. LENTOL: There are two different time periods. The pre-'94 clips, the ones that are more than 10, are immediate. That effective date is immediate. When we're talking about 10-round clips, that effect is in --

MR. JORDAN: Mr. Speaker, I suspect there are

19

others anxiously awaiting.  I appreciate your indulgence.

Thank you, Mr. Lentol.

ACTING SPEAKER AUBRY:  Anxiously.  Thank you, Mr. Jordan.

Mr. Graf.

MR. GRAF:  Thank you.  Will the Chairman yield?

ACTING SPEAKER AUBRY:  Will you yield?

MR. LENTOL:  Yes, sir.

MR. GRAF:  First off, Joe, happy birthday.

MR. LENTOL:  Thank you.

MR. GRAF:  And this is not your present.

Couple questions.  Under this bill, when we talked about this in Codes, police officers, the clips, the number of bullets in a magazine, the way the bill is written right now, when a cop has 14, 15 bullets in a clip, they will be restricted to 7 bullets; is that correct?

MR. LENTOL:  Yes.

MR. GRAF:  So we're going to be taking bullets out of the cops' guns?

MR. LENTOL:  No.

MR. GRAF:  Well, Joe, if they presently have 14, they won't be able to carry 14, right?

MR. LENTOL:  Mr. Graf, let me assure you that the intent of this statute is only -- does not do anything to what the police are entitled to carry.  They already have an exemption and because of the objection that you made, I believe that the Governor is preparing,

**NYS ASSEMBLY**                                    **JANUARY 15, 2013**

as we speak, a chapter amendment to take care of the language and make it clearer.

MR. GRAF:  Joe, can you tell me how many chapter amendments we're up to now with this bill?

MR. LENTOL:  Only one.  They'll all be in one chapter amendment.

MR. GRAF:  How many issues are going to be in that chapter amendment?

MR. LENTOL:  It depends on what we need.  I mean, we'll decide that possibly by the debate.

MR. GRAF:  Okay.  Do we know where we're up to now?

MR. LENTOL:  We're up to maybe three.

MR. GRAF:  Three, okay.  Now, the other provision here is -- now, with the clips, excuse me, pre-'94 clips, that takes effect immediately when the Governor signs this bill; correct?

MR. LENTOL:  I'm sorry?

MR. GRAF:  The pre-'94 clips.

MR. LENTOL:  Yes.

MR. GRAF:  That takes effect immediately --

MR. LENTOL:  That's right.

MR. GRAF: -- once the Governor signs this bill.

MR. LENTOL:  Correct.

MR. GRAF:  So in actuality, if we have, say, a sitting legislator up here who has one of these pre-'94 clips, okay, and

**NYS ASSEMBLY**                                    **JANUARY 15, 2013**

between the time that the Governor signs this he's got to race home or he could be subject to arrest?

        MR. LENTOL:  As we discussed in Codes, I think you would agree, Mr. Graf, that -- and in many cases I've heard members on your side argue about prosecutorial discretion and that no DA in his right mind would want to penalize a police officer for doing something unknowingly that was illegal.

        MR. GRAF:  Unfortunate for me, I was a New York City cop when Liz Holtzman was the DA in Brooklyn, so I'm not that sure that they won't be prosecuted by an overzealous DA.

        There's a couple other issues here, Joe.  In the way that the bill is written right now, just to get it on the record, all right, it's supposed to be I believe it's a year for turning in certain clips that have more than seven bullets; is that correct?

        MR. LENTOL:  No.

        MR. GRAF:  It's actually 60 days, right?

        MR. LENTOL:  The only clips that would be required to be turned in are the ones that are pre-'94 that have more than 10 rounds capacity.  The ones that are 10, people who now posses and own a 10-round clip would be grandfathered in and be able to own those clips so long as they only put seven rounds in them when they use them.

        MR. GRAF:  Okay.  One other thing is I think we discussed in Codes also that the police officer going to a school right now, he's not exempt because we haven't incorporated the exception

for police officers entering a school with a firearm.  So, the police

officer going into a school with a firearm under the bill how it's

presently written would be violating the law; isn't that correct?

          MR. LENTOL:  That's one of the things that's going

to be in the chapter amendment to clarify it to allow a police officer to

do that.

          MR. GRAF:  Okay.  So that's another boo-boo we

have in this bill?

          MR. LENTOL:  I wouldn't call it a "boo-boo."  I

would call it a mistake in drafting.

          MR. GRAF:  Okay.  Now under this also - I'm

looking at page 8 - and under this transfer of what they call

"immediate family."

          MR. LENTOL:  Yes.

          MR. GRAF:  So now, for instance, I have a carry

permit.  My wife's uncle has handguns and if I'm in his will for his

handguns, I have to take them and bring them to a gun store in order

for me to take possession of them even though I can just add them on

my permit?

          MR. LENTOL:  You don't have to bring the guns

with you.  All you have to do is have a background check done.

          MR. GRAF:  Even though I have a license, I have to

do another background check?

          MR. LENTOL:  Right.  The purpose of the

background check is to check it against the NICS database to make

sure that you're still eligible to have that gun.  It may be that you've become mentally ill or you've committed a domestic violence offense that you're no longer eligible to have that permit.

MR. GRAF:  All right.  And we're sending all these reports to the FBI, page 9, "Any such records" -- I mean, is this in accordance with the HIPAA laws that we have?  We're going to be transmitting private information, medical information to the FBI?

MR. LENTOL:  Yes, it is.

MR. GRAF:  It's in compliance with the HIPAA laws?

MR. LENTOL:  Yes.

MR. GRAF:  Okay.

MR. LENTOL:  By the way, I'm glad you brought that up because I want to commend Mr. Ortiz for providing us with a lot of information and his input on the mental health, as well as the Kendra provisions of this bill.

MR. GRAF:  Now, the other thing, too, is if I'm at a gun range and I buy a box of bullets, I have to go through a check when I buy the bullets, right, the box of bullets?

MR. LENTOL:  That's right.

MR. GRAF:  And if I decide that I haven't left the gun range, but I want to shoot another box of bullets, I'm going to have to go through another check?

MR. LENTOL:  Only if you're dealing with a commercial seller does that rule apply.  That's the conversation that I

had with Mr. Jordan.  It's not -- if you're at the range and they're

providing ammunition for you to shoot, that doesn't apply here.  You

don't need a background check to get that ammunition.

MR. GRAF:  What if I'm buying the ammunition?

MR. LENTOL:  Buying the ammunition from

somebody who's a dealer, firearms dealer or an ammunition dealer,

you need to get a background check before you can buy it.

MR. GRAF:  Well, wouldn't that count in a range if

I'm buying it from the range?

MR. LENTOL:  No.  It's a different business.  It's not

selling ammunition.  It's range, you're at the range.  It's not

commercially -- it is the sale of bullets, but it's not commercially sold.

You're selling it for the use on the range.

MR. GRAF:  Okay.  And now the person that this --

it's not me as a person purchasing it.  It's the person that's selling the

ammunition that has the legal liability; correct?

MR. LENTOL:  Correct.

MR. GRAF:  What are we doing with the Internet

sales of ammunition?  So you can't buy ammunition over the Internet.

If an out-of-state ammo dealer ships straight to a person's home, how

are we going to get jurisdiction over them?  How are we going to

enforce this law with the Internet sales?

MR. LENTOL:  It's got going to be easy, I'll tell you

that, and I believe that you've hit on something that's important that

we have to figure out how do it.  It's not unlike texting, people who

sell over the Internet to New York State residents, but it's a problem that I hope we're able to deal with after this.  But let's get this bill done and then we'll worry about Internet sales of ammunition.

MR. GRAF:  Okay.  Well, I'll speak on my vote later. Joe, I thank you very much.

MR. LENTOL:  You're welcome.

ACTING SPEAKER AUBRY:  Ms. Paulin.

MS. PAULIN:  I have just a couple of questions.

MR. LENTOL:  Sure.  And by the way, before you ask the questions, we have a chapter amendment that takes care of some of the issues you discussed with me and staff.

MS. PAULIN:  Thank you so much.  I really appreciate it because I realize in putting a bill like this together, it's so comprehensive and so important that there's always small things that we do have to focus on and change.  So, I appreciate you're being very supportive of some of those specifics as it relates to my county.

On page 31 of the bill, paragraph 10, subparagraph b, I just want to understand that it's true that that provision would apply Statewide, I'm asking.

MR. LENTOL:  Statewide certification would apply Statewide; that's correct.

MS. PAULIN:  To all licensees no matter whether they already have a process in place?

MR. LENTOL:  Correct.

MS. PAULIN:  Thank you.  And if a county has a

more stringent requirement, such as Westchester has with safe storage, that this law would not pre-empt Westchester's ability from protecting its --

MR. LENTOL:  That's correct.  Absolutely correct.

MS. PAULIN:  Thank you.  I would just like to add that I think this law is an incredibly important piece of legislation. Having worked on gun legislation since I've arrived here, I can say that I am so proud of this day, so proud to be part of an effort that better protects all of our residents across the State.  So, thank you so much for your leadership in this and the Speaker's leadership; it is a day to remember.  Thank you.

MR. LENTOL:  Thank you.

ACTING SPEAKER AUBRY:  Mr. Butler.

MR. BUTLER:  Thank you very much, Mr. Speaker. Would Mr. Lentol yield for a few questions?

MR. LENTOL:  Yes, I will, Mr. Butler.

MR. BUTLER:  Mr. Lentol, in our briefing material there are frequent references to a "dangerous weapon."  Would you characterize an assault weapon as a dangerous weapon?

MR. LENTOL:  Yes.

MR. BUTLER:  All right.  Now, there are prohibitions in this bill against transporting or carrying a dangerous weapon, i.e. an assault weapon; is that correct, as well?

MR. LENTOL:  Nothing new in the bill about transporting.  I think it's already the law with respect to transporting.

MR. BUTLER:  But under the new definition of what an assault weapon is, it's my understanding that there is a possibility that a particular weapon that is manufactured by Remington Arms in Ilion, New York could fall under the definition of an assault weapon; is that correct?

MR. LENTOL:  Yes.  Manufacturing exemptions aren't covered by the bill.

MR. BUTLER:  There are no manufacturing exemptions.

MR. LENTOL:  The exemptions stay in place.

MR. BUTLER:  So would this then essentially be a de facto ban on the manufacturer of those weapons?

MR. LENTOL:  Not at all.

MR. BUTLER:  They could continue to manufacture even those weapons would be banned in New York State?

MR. LENTOL:  The existing exemptions are not changed.  They have a gunsmith exemption that allows --

MR. BUTLER:  But, yet, I see it says, "Illegally using, carrying or possessing other dangerous weapons."  So that wouldn't be transporting if they made them there and transported them out of the State?

MR. LENTOL:  Well, the exemption overrides that section.

MR. BUTLER:  All right.  Well, I guess I would consider that to be good news.  During the course of the negotiations

**NYS ASSEMBLY**                    **JANUARY 15, 2013**

over this bill, did anyone reach out to Remington Arms asking for

their input or involvement in fashioning this legislation?

        MR. LENTOL:  Yes.

        MR. BUTLER:  They were approached?

        MR. LENTOL:  Yes, they were.

        MR. BUTLER:  Okay.  Did they actually get

involved or did they decline involvement?

        MR. LENTOL:  I don't think they -- did they

participate?  They didn't participate.  They just wanted to know what

we were doing.

        MR. BUTLER:  Okay.  One additional question.  Is

there any exemption, for example, for security guards, people who

drive armored cars, people who are in that position to provide

protection who are not police officials, but may need the protection of

a weapon, may need more than a seven-round clip.  Is there any

carve-out or exemption for those?

        MR. LENTOL:  If they're peace officers they come

under the exemption.  If they're not, they don't.

        MR. BUTLER:  Okay.  Thank you, Mr. Lentol.

        On the bill, Mr. Speaker, if I may.

        ACTING SPEAKER AUBRY:  On the bill.

        MR. BUTLER:  You know, yesterday afternoon at

the beginning of our Session we heard Speaker Silver and the

leadership from both sides of the aisle talk about this House and the

accomplishments of the People's House and we were told to take pride

29

in the work we do and now, less than 24 hours later, we're taking up a bill that, number one, tramples on the Constitutional rights of our constituents to legally posses firearms, that uses a process to bring this bill to the floor by fiat rather than a legislative process that allows for public input and reasoned deliberation and, finally, has the potential to put at risk hundreds of jobs in the already economically-depressed Mohawk Valley.

Mr. Speaker, my colleagues, I see no reason to take pride in any of this. I suspect at the conclusion of today's Session, many of my colleagues will return to their offices and grind out press releases about the measures they have supported here that will stop the scourge of gun violence. And I'm sure a major point that will be made is that New York State will be the first State in the Union to adopt stricter gun laws but, in my view, we've made a sham of the legislative process that Speaker Silver spoke so eloquently about yesterday. Where were the public hearings? Where was the vetting process? Where is the give and take of a healthy Democratic process?

Yesterday, we had a delegation of employees from Remington Arms here and, as you would expect, they're concerned about their jobs, their families and the future of the company. It was an interesting lesson in civics and government for them because we couldn't give them here any details of the bill because it hadn't been printed at that time, mid-afternoon; yet, just a few hours later, the other House was voting on this bill. Now, these are honorable and hard-working men and women who get up in the morning and do a

good day's work and they deserved to be able to see and assess the legislation that may have such a tremendous impact on their lives.

You know, I could talk about Remington Arms, and I often have, and its history.  They've been located in Ilion, New York for almost two centuries and they're a mainstay of our economy in the Mohawk Valley and I would only say at this point that its development has paralleled the evolution of our country and our society and the question has to be asked here today:  Has Remington and our society reached a point in our history where government reaches too far to control every aspect of our lives?

Again, Mr. Speaker, I take no pride in what we are doing here today.  Thank you very much.

ACTING SPEAKER AUBRY:  Mr. Katz.

MR. KATZ:  Thank you, Mr. Speaker.  On the bill.

ACTING SPEAKER AUBRY:  On the bill.

MR. KATZ:  The New York State Constitution provides for proper vetting of bills before they are voted on, allowing time for responsible legislators to do their due diligence.  Only in cases of extreme emergencies should the Governor circumvent this process.  Why are we being bullied into voting on this bill without our proper, responsible due diligence?  Solely due to the Governor's misguided, egotistic notion that this will advance his Presidential aspirations.  As if anybody in this nation, other than he, actually care about who comes out first, second or last in gun control legislation that only restricts the rights of law-abiding citizens and does nothing

to remove illegal guns from the criminals.

I agree with elements of this bill, strengthening Kendra's Law, exempting FOIL requests for legal gun owners. Especially important to me are the proactive measures regarding the mentally ill.  Remember, every one of the heinous circumstances we have, unfortunately, witnessed over the last few years were caused by people with severe mental problems.  But each provision should be voted on for its merits as a stand-alone bill.  There are provisions in this bill redefining semi-automatic weapons that will make law-abiding citizens a new class of criminals overnight.

I come to Albany proudly and voluntarily as a citizen legislator.  I leave my wife and three young daughters home alone for days at a time to represent my constituents up here, far from home. After what happened to the young mother in Loganville, Georgia who defended her two young children against an intruder, this bill will turn me into a criminal because you can bet that before I leave to do the People's work, there will be more than seven bullets in the magazine in my wife's firearm.

Here are some real emergencies for our State.  Not one word in the Governor's State of the State on unfunded mandate relief for our counties that must cough up to the State an average of 96 cents on every property tax dollar.  Number Two, Albany, Rochester and Syracuse are on the verge of declaring bankruptcy because of these mandates, with the Governor currently negotiating bailouts for these cities.  Yonkers is close behind.  Who do you think will pay for

these bailouts?  Why aren't we here all night at your command to solve these problems, Governor Cuomo?

I will leave you with these quotes.  One, "A free people ought not only to be armed, but they should have sufficient arms and ammunition to maintain a status of independence from any who might attempt to abuse them which would include their own government," George Washington.  Number Two, "The world is filled with violence.  Because criminals carry guns, we decent, law-abiding citizens should also carry guns; otherwise, they will win and decent people will lose," James Earl Jones.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you, Mr. Katz.

Mr. Morelle, why do you rise?

MR. MORELLE:  Yes, Mr. Speaker, if I can just interrupt to indicate that the work of the Health Committee is completed and I'd like to call members of the Real Property Taxation Committee to join Mrs. Galef in the Speaker's Conference Room.  Meeting of the Real Property Taxation Committee in the Speaker's Conference Room.

ACTING SPEAKER AUBRY:  In the Speaker's Conference Room, Real Property Taxation Committee.

Mr. Losquadro.

MR. LOSQUADRO:  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  You're welcome.

MR. LOSQUADRO:  Congratulations.

ACTING SPEAKER AUBRY:  Thank you, sir.

MR. LOSQUADRO:  Will the Chairman yield for a few questions?

ACTING SPEAKER AUBRY:  Will you yield?

MR. LENTOL:  Yes, Mr. Losquadro.

MR. LOSQUADRO:  Thank you.  Just to clarify.  I know it's been repeated, but I just wanted to double-check.  The ban on magazines with 10 rounds will take effect in 90 days?

MR. LENTOL:  Let's just check.  I'm not sure if it's 90 days or a year.  Ninety days, you're right.

MR. LOSQUADRO:  Ninety days.  To the question earlier about manufacturers being consulted.  Were any manufacturers consulted about retooling their lines or making provisions?  Because I think demand is going to far outstrip supply probably for a year to 18 months on many weapons, in my opinion, sort of creating a de facto ban where many individuals may not be able to shoot their weapons.

I'll give you an example.  You own a Glock 19.  It came factory with a 15-round magazine.  You don't have any other magazines because those are the only ones you've owned.  Well, within 90 days you're going to have to sell or destroy those magazines.  The likelihood of someone at home being able to remove the butt plate from that magazine, modify the spring or add a blocking device in it are very unlikely and gunsmiths are going to be overwhelmed with those requests to begin with.  So within 90 days you're going to have a situation where a person is not going to be able to find seven-round magazines for these weapons.  Are they supposed to just

34

leave that gun in a drawer locked up and hope that maybe in a year or 18 months they might be able to get a magazine that they can shoot the gun they own lawfully?

MR. LENTOL:  Well, the answer to your question generally is that you're probably right, but the market will follow the demand and just like somebody who has an assault weapon that's pre-'94 that's going to have to get rid of it, unfortunately, if somebody has a handgun, a pistol that takes a 10-round clip, he's going to have to retool and get a different weapon, as well.

MR. LOSQUADRO:  Well, the assault weapons create a little bit different situation because many of the magazines, especially for the .223's, are all based on a clone of the Colt AR-15/M16 design so those magazines are pretty universal.  So if manufacturers start creating low-capacity magazines, some of which are already available, five-round magazines, pistols - each magazine is proprietary.  Some of the Colt 1911 style magazines are more universal but, for the most part, each manufacturer's magazines are proprietary for their individual gun and the likelihood of being able to find a magazine, especially for a lower production or an older weapon -- the Glock I used might not be a great example because those guns are more readily available, more people own them.  But for some of the guns that are low production, maybe out of production, you may create a situation, I believe, that people will not be able to shoot the guns they own lawfully, some of those magazines might not be able to to be modified even by a gunsmith.  So, this is a concern

that I have.  I just wanted to bring that to your attention.

Have retailers weighed in on the background check on ammunition, such as even some of the big ones, like Wal-Mart, which happens to be probably one of the largest retail sellers of ammunition.  Have they weighed in as to their ability to have enough staff on hand to be able to perform these checks?

MR. LENTOL:  We haven't heard from them directly.

MR. LOSQUADRO:  Were they reached out to in this process?

MR. LENTOL:  Yes, they were.

MR. LOSQUADRO:  They were.  I can tell you, just going trapshooting usually the first stop on Saturday morning is going to Wal-Mart to pick up shells for the shotgun.  I guess now I'll probably have to make time after work during the week because I'm not going to want to wait two or three hours on line at Wal-Mart with the 30 other, 40 other people that are having background checks completed.  I think this could really possibly become yet another unfunded mandate on retailers having to put additional staff on to be able to keep up just with the volume of people trying to complete simple transactions that would ordinarily just take the cash out of their pocket or the swipe of a credit card.

MR. LENTOL:  Well, that's not true.  If you read the bill, first of all, the background check should only takes seconds and the only reason it wouldn't is if the system were down and if the system were down, the rule wouldn't apply and they could get the

ammunition without a background check.

MR. LOSQUADRO:  Well, I certainly hope that's the case, but in practical application, you know, to err is human, to really foul things up requires a computer.  So, in practical application I see that this may prolong the process for people who do not own assault weapons, do not even own handguns, just someone who wants to go out trapshooting with their shotgun or go to the range with a regular rifle that is not covered under any of these bans.  So, again, this remains a serious concern of mine.

Can someone pre-qualify to buy ammunition?  Like I know right now I do have my handgun license.  If I go to buy a firearm, I show my pistol license, that shows me as having pre-qualified for all of the checks that they would ordinarily have to perform.  So if you have a license from an agency that already shows you've had a background check or those other things that have taken place and the licensing agency keeps track of whether or not you have orders of protection or any of those other things that may disqualify you from having that handgun permit, if I went in to buy ammunition and I showed that handgun permit, would they still have to run that background check?

MR. LENTOL:  The answer is yes and for an obvious good reason, that is that we want to have an updated check of that person's ability to be able to have that permit because as I explained to Mr. Graf --

MR. LOSQUADRO:  Even though my licensing

agency, Suffolk County, has a system to track any court orders or --

MR. LENTOL:  How does a dealer know whether or not you committed a violent domestic violence offense?

MR. LOSQUADRO:  Because the County of Suffolk tracks that and would've rescinded my pistol permit had that been the case.

MR. LENTOL:  And if you went there before they did it?

MR. LOSQUADRO:  Pardon me?

MR. LENTOL:  If you went there before they rescinded it to get the ammunition?

MR. LOSQUADRO:  I said --

MR. LENTOL:  It's an up-to-date check to make sure that you're still qualified to be able not only to have the permit but to buy the ammunition.

MR. LOSQUADRO:  All right.

Additional qualifying features, a second handgrip.  Is that one of the items that's listed?

MR. LENTOL:  Is that one of the items that what?

MR. LOSQUADRO:  That's listed as an additional qualifying feature for a --

MR. LENTOL:  Yes.

MR. LOSQUADRO:  A handgrip that is added to a weapon is usually a removable feature, something that's added to something called the Picatinny Rail which can accept multiple

**NYS ASSEMBLY**                                    **JANUARY 15, 2013**

features on a gun so if someone were just to detach that, that would no longer remain as a qualifying feature?

MR. LENTOL:  Yes.

MR. LOSQUADRO:  So the attachment point, the Picatinny Rail, is not a qualifying feature?

MR. LENTOL:  That's right.

MR. LOSQUADRO:  Okay.

MR. LENTOL:  Just to remind everybody, this is information that we worked on because the State Police said that this is what we need to do to modify assault weapons so that they're not readily capable of lethality, the kind of lethality that we saw.

MR. LOSQUADRO:  Well, whether or not -- and this is just between us, you know, having shot weapons responsibly probably since I'm about 12 years old, whether or not you hold the four grip with an underhand grip or a pistol grip makes very little difference on the accuracy or the usability of a weapon, so it's neither here nor there.

MR. LENTOL:  It does.  Remember we have to --

MR. LOSQUADRO:  I understand.  I was with the input.  I just wanted to really make sure that the Picatinny Rail, the attachment point itself was not one of the qualifying features.

MR. LENTOL:  Absolutely.

MR. LOSQUADRO:  Thank you.

On the bill.

ACTING SPEAKER AUBRY:  On the bill.

39

MR. LOSQUADRO:  Thank you.  You know, the Rabbi that opened our Session last week spoke about perversion of rights or the corruption of rights.  He talked about freedom from religion, as he put it, being a perversion of the freedom of religion.  You know, many people in this Chamber, rightfully so, representing many people, myself and all of my colleagues included, people who have, unfortunately, long-suffered with civil rights abuses should really take note that Article 2, Section 4 of the New York Civil Rights Law says, "The right of the people to keep and bear arms cannot be infringed."  Have you noticed that's slightly different from the United States Constitution which says "shall not."  It's not "shall not", not "may not", not -- unless we think it's a really good idea it says, "cannot be infringed."  This is the New York State Civil Rights Law.

Now, to infringe is, of course, to encroach upon in any way that violates the laws or rights of another.  I, too, will -- I know we're all very fond and we saw Mr. McEneny in the Chamber yesterday and we're all very fond of quoting some of our Founding Fathers and important people from the past, but I will just close with two quotes that I think are very important and very relevant to this discussion.  "They that give up essential liberty to obtain a little temporary safety deserve neither safety nor liberty."  That was Benjamin Franklin.  The next one I found especially interesting because Thomas Paine was someone who suffered tremendous discrimination himself.  He was someone who at the end of his life, denounced organized religion and especially at the time that he was

40

alive, suffered tremendously for it and really died ostracized for someone who was one of our great Founding Fathers.  Thomas Paine said, "He that would make his own liberty secure must guard even his enemy from oppression, for if he violates this duty he establishes a precedent that will reach to himself."

We must be very careful which rights we pick and choose that we want to change because when we say this one can be removed or this one could be changed or we can take this away from somebody, it's just a matter of time before it's one that's important to someone that doesn't think this one is important.  Thank you.

ACTING SPEAKER AUBRY:  Mr. Brennan.

MR. BRENNAN:  Thank you, Mr. Speaker.  Some of my questions involve mental health but primarily involve the interaction between the mental health system and the criminal justice system, so I don't know how this will play out.

In the bill there is a provision that requires therapists who believe that their patient is a danger to self or others to report that condition to State Police and my question is, who are the mandatory reporters in the legislation?

ACTING SPEAKER AUBRY:  Mr. Ortiz, do you yield?

Mr. Morelle.

MR. MORELLE:  Yes, pardon the interruption, Mr. Speaker.  I just want to call the Consumer Affairs and Protection Committee in the Speaker's Conference Room.  Mr. Dinowitz is

prepared to join all of you, so members of the Consumer Affairs and Protection Committee should make their way to the Speaker's Conference Room.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Consumer Affairs in the Speaker's Conference Room.

Mr. Ortiz.

MR. ORTIZ:  Yes, Mr. Speaker.  I'm very glad to respond to Mr. Brennan's question.  The health professionals, psychologists, psychiatric professionals will report that to the director of community services and the director of community services will report that as they choose to the Division of Criminal Justice Services.

MR. BRENNAN:  The director of community services is the local county?

MR. ORTIZ:  The local county, that's correct.

MR. BRENNAN:  So in New York City it would be New York City Department of Mental Health.

MR. ORTIZ:  Department of Mental Health, the Commissioner.

MR. BRENNAN:  What is the scope of the types of licensed individuals?  Is it a person with a mental health license for counseling?  What's the scope of the mandatory reporting?

MR. ORTIZ:  It will include physicians, psychologists, registered nurses or a licensed clinical social worker, they will be able to report to the director of community services.

MR. BRENNAN:  In the course of a treatment.  In

42

the course of treatment?

        MR. ORTIZ:  That is correct, sir.

        MR. BRENNAN:  Okay.  All right.  After this information is provided from the local community service director to the State Police, what is the process after that takes place?

        MR. ORTIZ:  It will be reported to the Division of Criminal Justice Services and then after that they will make the determination if they do have a gun license and then the Division will determine whether or not they will revoke or continue their licensing of the gun.

        MR. BRENNAN:  In other words, they will determine that the person who has been reported to -- they will determine if the person who has been reported as a danger to self or others has a license and then what procedure will they follow?  Will it be mandatory that the license be revoked and the weapon confiscated or not?

        MR. ORTIZ:  The answer is yes and they will be notified to the proper authority.

        MR. BRENNAN:  I see.  In other words, the State Police will revoke the license and confiscate the weapon?

        MR. ORTIZ:  The local authority will do so.

        MR. BRENNAN:  The police department.

        MR. ORTIZ:  New York City Police Department and the county police department.

        MR. BRENNAN:  All right.  If there is no record of

gun ownership by the person that is alleged to be a danger to self or others, what happens then?

MR. ORTIZ: They will be put on the database of DCJS and then they will stay there for approximately five years, a period of five years.

MR. BRENNAN: I see, but would there be a review of whether an immediate member of the family might have a gun license or something like that? Is there any further duty to investigate if there's no record of gun ownership?

MR. ORTIZ: The county director will provide the services and they will follow up.

MR. BRENNAN: I see. In other words, but the persons --

MR. ORTIZ: With the family. They will meet with the family, then they will follow up to make the appropriate decision.

MR. BRENNAN: In other words, the possibility of further mental health treatment may be triggered by this report.

MR. ORTIZ: Absolutely. The answer is yes.

MR. BRENNAN: Okay. The issue of whether the information that was provided regarding the danger to self or others of that person, will that information be allowed to be disclosed to anyone in the public domain? Could it be FOILed and what would happen under that circumstance?

MR. ORTIZ: The answer is no. The answer is the information will be kept confidential and that the director of

community services will continue to work together with DCJS.

MR. BRENNAN:  In other words, a newspaper, a member of the public could not access any information about the fact that this matter of a danger to self or others was reported to mental health system and police and criminals?

MR. ORTIZ:  The answer is yes.  They cannot have access to this information.

MR. BRENNAN:  There are some other aspects of what is known as Kendra's Law that are affected by the legislation. Could you describe them, please?

MR. ORTIZ:  Regarding Kendra's Law, this bill will require the director of community services and the director of the assistant outpatient treatment programs to evaluate the need for continuation of an AOT ordered prior to this expiration.  If the director determines that the subject of an AOT, which is Assistant Outpatient Treatment, order is still eligible or if the director has been unsuccessful in eliciting the corporation of the subject to submit to an examination, the director might petition for an order of continued AOT.  Secondly, a director will also be required to notify the program coordinator in writing of his determination of whether to continue the AOT if granted and whether a petition was or will be filed.

MR. BRENNAN:  That relates to existing orders?

MR. ORTIZ:  That is correct.

MR. BRENNAN:  Okay.  Now, the person who was indicated to be a danger to self or others, is a potential AOT order

triggered for that person, notwithstanding the fact that they don't have one at that time when the mental health system gets notice of this?

MR. ORTIZ:  It depends.  They can be a voluntary or they can be an AOT.

MR. BRENNAN:  But there's a duty to evaluate on the part of the mental health system that individual following this --

MR. ORTIZ:  Yes.  If they will harm them self.

MR. BRENNAN:  So we have a lot of people in nursing homes, for instance, you know, who are bedridden and so if they say, *I hate my son, I'm going to kill him,* and the registered nurse hears that, they have a duty to report it, all right, or in the course of their evaluation if they presume that that's credible in some way, then they might have a duty to report it.  But in the evaluation that might take place, somebody from the mental health system shows up, they see this person as an elderly person bedridden in a nursing home, there's not necessarily a need to enforce an AOT order on that person, but somebody else might pose some other type of risk in which case something like that might be triggered; is that correct?

MR. ORTIZ:  If they are in the nursing home and they are being identified, Mr. Brennan, and I assume that the person maybe is over 70 or 80 years old.

MR. BRENNAN:  Over 700 years old?

MR. ORTIZ:  We can determine the age group, but if they qualify, you know, they will --

MR. BRENNAN:  There will be different

46

**NYS ASSEMBLY**                          **JANUARY 15, 2013**

circumstances involved with this.

    MR. ORTIZ:  Through the process.

    MR. BRENNAN:  All right.  Thank you very much.

    MR. ORTIZ:  Thank you, Mr. Brennan.

    ACTING SPEAKER AUBRY:  Mr. DiPietro.

    MR. DIPIETRO:  Thank you.  Will the Chairman

yield?

    ACTING SPEAKER AUBRY:  Will you yield, Mr.

Lentol?

    MR. LENTOL:  Yes, I will.  Before I do that I just

want to -- Mr. Jordan asked me a question earlier and I just want to

clarify what I said because it may have come out as though there was

no immediate assault weapon ban and this bill does provide an

immediate assault weapon ban so that tomorrow if this bill is signed

today, you cannot go out and buy any assault weapon in New York

State; however, there is a registration requirement for those people

who presently have assault weapons and can keep them so long as

they register within 90 days -- a year, I'm sorry, a year and 90 days.

    Yes, sir.

    MR. DIPIETRO:  Thank you, sir.

    As a freshman and someone who has only been here

one week, I was disappointed in the fact that as we take up probably

one of the most important bills of the year or of the last few years that

this has been rushed, this has been put on our desks late.  This is

something that I've witnessed in New York State for a number of

years in my capacity as a mayor and watched this Body.  And I just

need to say right off the beginning as I come here and witness it for

the first time on my first day that I'm very disappointed.  While I will

go in -- and I'm on Committees and will debate bills, very minor, and

will go to Committee and we'll talk about them for months and then

we'll finally vote that we take something as major as this and ram it

through for what I perceive as a bill that, A, is for a personal agenda

and, B, which I don't think is going to affect one criminal from

committing a crime.  But what it does is it limits the rights of

law-abiding citizens from protecting themselves, which I have a

personal story I'll get to in a second that hopefully will illustrate my

point.

I have had over 430 e-mails and texts in my district

since this bill was announced, zero, zero have been in support of any

more gun control.  I just got off the phone a little while ago with

Senator Gallivan who told me he has 850 correspondence from his

constituents and only two, he told me, two are in support.  I think with

numbers like that it becomes more clear.  I'm sure some people in this

room have districts which would like to see more gun control, but as

by colleague stated, New York State makes it very clear that we

cannot infringe any more laws and regulations on law-abiding citizens

when it comes to guns.

I won't get into the details of the gun bill itself

because I think as we are hearing here in this debate that it's fraught

with a lot of inequities, a lot of loopholes that maybe in the future will

48

be buttoned up, but we can't have any guarantee.  But I did -- one thing I'm hearing in my district as I've talked with six New York State troopers and two sheriffs - all today - they're very upset and they're telling me that the law enforcement people they talk to are very upset. One of the reasons is they feel that this is going to put them in extra danger.  They have told me today they are inclined not to go to households, if they have to, to confiscate a weapon.  They fear for their safety.  They fear that this is going to spawn civil disobedience in the form of a Martin Luther King or a Ghandi where as it happened in Canada when they tried to prohibit, I forget the name of the rifle, that a number of farmers and citizens just did not register them to the tune of 30 or 40 percent.  If we had that happen in New York State, is the Governor going to send out the militia or the State Troopers or the sheriffs and try and round up these weapons?  Will there be push-back from law-abiding citizens who do not want their weapons taken?

It opens up a can of worms.  As you can tell, I'm opposed and I take this to my colleagues here today who are going to vote for this logically.  The more I understand, 12 times as many homicides are committed in New York State by people who are on drugs and on welfare, so I would assume that if later in the year a bill gets brought up that we are going to drug test all welfare recipients that we will be in unanimous support for that because that is the logical conclusion I see following here.

So lastly, I want to tell you a story.  Back in 2007 -- I have a four-year-old daughter.

MR. LENTOL:  Excuse me, Mr. Speaker.  I've been waiting patiently for a question and I haven't heard one yet.

MR. DIPIETRO:  I'm going to get to one in just one second.  In 2007 at my home four youths between 19 and 21 drove their car through the neighborhood, stopped in front of my house after vandalizing a number of homes in the area.  It was the middle of the summer.  I had a four-year-old daughter next to me, 5:30 in the morning and the sun was coming up and they were outside my home screaming at each other about something which made me very scared.  I called the police.  I was the Mayor at the time and while I was waiting for them to come they talked about -- they were outside saying -- to enter my home.  At that point I wished I had a gun with more than a six-round capacity against four intruders.  Luckily, when they were actually on their way up my doorstep that the police came and they were arrested and I later found out they were armed, they were on drugs and they committed thousands of dollars of vandalism in the area.

So my question, Mr. Speaker, is when we -- when you put this law into effect, what is the guarantee that law-abiding citizens -- or, excuse me, that criminals will adhere to it?  That's -- whenever I look at a bill, I look at the common-sense side and I ask, *Will this legislation effectively prevent or do what it's intended to do?*  I don't see it.  I just would like an explanation, sir.

ACTING SPEAKER AUBRY:  Mr. Lentol, why do you rise?

**NYS ASSEMBLY**                    **JANUARY 15, 2013**

MR. LENTOL:  I have no microphone.

ACTING SPEAKER AUBRY:  There was a question in that, I believe, Mr. DiPietro?

MR. DIPIETRO:  There was.

MR. LENTOL:  I did hear a question and the answer is that you haven't read the entire bill --

MR. DIPIETRO:  Yes, I have, sir.

MR. LENTOL:  -- because there's plenty in this bill that provide criminal penalties for a variety of gun offenses for people who carry illegal guns, and I suggest that you do that.  And I might also add that there is no provision in this bill for confiscation of anyone's weapon so local police nor State Police will be required to go out and confiscate any weapons.  It allows, in effect, people to continue to own assault weapons so long as they register them.

MR. DIPIETRO:  Well, as I read the bill, and correct me if I'm wrong, and I could be, but if they refuse to register their weapon --

MR. LENTOL:  If they refuse to register their weapon they could be guilty of a crime.

MR. DIPIETRO:  How would that be --

MR. LENTOL:  It can be enforced, but I assure you that there is no confiscation going on here.

MR. DIPIETRO:  Okay.

MR. LENTOL:  And the State Police aren't going to go out and try to get somebody's weapon.  They may not even know

51

about the weapon if the person doesn't register, so I don't know how they could confiscate it.  The idea here is to try to register all assault weapons so that the State Police can have a handle on the weapons. And, Mr. DiPietro, I assure you that the State Police helped to write this bill and the reason they wrote it is because they have to go out on the street and contend with all of these different weapons that they don't presently posses and are not armed with and they're concerned, more than anybody else in our society, about the number of assault weapons, AR 15s, AK 47s that are out there in the hands of criminals and everyone else.  So, this was written for them for the most part.

MR. DIPIETRO:  Okay.  I just needed a clarification. One more point, sir.

MR. LENTOL:  Yes, sir.

ACTING SPEAKER AUBRY:  Is this on the bill, Mr. DiPietro?

MR. DIPIETRO:  Yes.

ACTING SPEAKER AUBRY:  On the bill.

MR. DIPIETRO:  On the bill.

Again, if someone refuses to register and it's after -- and they have the registration period, will they be summoned?  Will they not be bothered if they just say, *I'm not going to register?*  What is the penalty if they just don't register?

MR. LENTOL:  If they knowingly fail to register it's an A misdemeanor.  So, nobody is going to go to their house for an A misdemeanor.

MR. DIPIETRO:  So then they'll turn themselves in, I guess.

MR. LENTOL:  I'm sorry?

MR. DIPIETRO:  So they'll have a misdemeanor so the police won't go pick them up.  They'll have to turn themselves in, is that...

MR. LENTOL:  Well, technically, sometimes if that weapon is being used in a crime or somebody is carrying it down the street and the cop stops them and they say, *Hey, this guy's got an illegal assault weapon,* he would be charged with an A misdemeanor, but I don't know and the State Police haven't told me that they're going to go out and look for assault weapons.  The idea really here is to prevent people from doing it because, as you've suggested, there are many law-abiding citizens in this State.  They don't want to break the law.  They will, the law-abiding citizens that you're talking about, will register under the law because that's their duty and they understand it and I recognize that.  We're not really talking about those people.  We're talking about those who fail to register that we need to police and we're trying to get a handle on that by this bill.

MR. DIPIETRO:  Thank you.  Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you, Mr. DiPietro.

Ms. Schimel.

MS. SCHIMEL:  Thank you, Mr. Speaker.  I have a question, Mr. Lentol.

53

MR. LENTOL:  Yes, Michelle.

MS. SCHIMEL:  Yes.  Will you yield?

MR. LENTOL:  Yes, I will.

MS. SCHIMEL:  It's not really under Penal Law, but under the Environmental Conservation Law, I just want to confirm this, that in New York State for hunting, what is the maximum number of rounds that you can use, let's say, to hunt big game?  Isn't there restrictions in terms of hunting; do you know?

MR. LENTOL:  Yes.  In the En Con Law, it's six.

MS. SCHIMEL:  Six.  So, for that matter, this bill gives, if you're not hunting, another round for good measure so-to-speak.  Thank you.

On the bill, Mr. Speaker.

ACTING SPEAKER AUBRY:  On the bill.

MS. SCHIMEL:  This is a historic day and I stand with the Governor and the Houses, both Houses of the New York State Legislature.  We're going to pass the strongest, most comprehensive plan to ban assault weapons, high-capacity magazines, increase penalties on illegal gun possession, enacting - finally - a universal background check and strengthening databases of known violently-ill patients.  We will be the first in the nation.  In the aftermath of the tragedies of Newtown and Webster and far too many to even name, I am pleased to report I was on the Senate floor yesterday, it had bipartisan support.

Make no mistake about it, everyone.  I repeat, make

no mistake about it:  The number of gun deaths in New York State will decrease because of the bold action we take today and now, once we pass this bill, hopefully in bipartisan support overwhelmingly, the other states of the Union and the Federal government will follow our need.  Today, today the public safety of the citizens of New York State was the priority and I thank you for that.

ACTING SPEAKER AUBRY:  Mr. Reilich.

MR. REILICH:  On the bill.

ACTING SPEAKER AUBRY:  On the bill.

MR. REILICH:  On December 24th last year, I was awakened about 7:00 a.m. by a text message from my son saying that a friend of his was involved in an altercation about 15 minutes from my home.  He told me that he had been shot and was lying on the ground and they were unable to get to him because they didn't know where the perpetrator of the crime was.  Unfortunately, about a half-an-hour later I received a call from him saying that he had deceased.

You know, my concern with this bill is that it's all about guns and there is some input on mental health, but it should be much more than that.  This individual should have been institutionalized.  Now, I know today we want to mainstream everybody and many deserve to be mainstreamed and I support that, but many deserve to be institutionalized to protect society from them. This individual had been questioned if he thought he would ever kill again and he said he couldn't say he wouldn't have.  And we look back

to other tragedies that have occurred recently in our country, whether it be the Oklahoma City bombing, that was committed with fertilizer. In China the same day that the horrific crime was committed in Connecticut in a classroom, in China in a classroom a man entered wielding a knife and slashed 20 children, the same day.  On September 11th, 3,000 people were killed with 19 box cutters and in Webster, where this individual had committed this horrific act, 18 years prior he killed his grandmother with a hammer.

Now, we can blame fertilizer, we can blame knives, we can blame hammers, we can blame box cutters and we can blame guns, but until we really deal with the mental health issues, we're not really going to begin to solve this problem.  And when it's talked about mental health individuals making a determination if somebody should be institutionalized or removed from society, many say, *Oh, that's a tough decision.  How are they going to do that?*  Well, if they can't, who can?

Now, they're not going to catch everybody, but unless we deal with mental health and the mental health aspect of this instead of our primary focus being on guns, on the tool that these people use to perpetrate these horrific crimes, we're really not doing anything but making all of ourselves feel good.  We'll go home tonight and say, *Oh, we passed this bill and, boy, New York is safer as a result of it.*  But is it really?  Is it really?  I doubt that and until we deal with more severely the mental health aspect, unfortunately, these types of horrific acts will occur again.

ACTING SPEAKER AUBRY:  Mr. Tedisco.

MR. TEDISCO:  Mr. Speaker, on the bill.

ACTING SPEAKER AUBRY:  On the bill, Mr. Tedisco.

MR. TEDISCO:  Mr. Speaker and my colleagues, for a large part of my entire life and for just about every day of my public service life I have never left my house without carrying in my breast pocket the most important document we have in the entire world; it's the Constitution of the United States of America.  Now, I say the second-most important document because when we pledged allegiance under God, probably the most important document to me is the Holy Bible because everything in this Constitution was given to you and I before we ever came into this world.  There's no man who ever gave us, or woman, who ever gave us any of the freedoms or liberties in here.  They're God-given freedoms and liberties.  Now, you can impede them.  You can attempt to reduce them, but you never can really take them away.  That happens in totalitarian states where they try to, but every young child, every mother, every father, every grandmother in every corner of the world, with every tinhorn dictator has the same freedoms and liberties that are in this Constitution of the United States of America, that's why it's such a great document.

And you know within this document there's what's called the Second Amendment and you've heard what a portion of that says.  It says, "The people's right to keep and bear arms shall not be infringed."  Let me just highlight the word "the people."  I know it

57

talks about a militia.  It doesn't talk about CIA agents.  It doesn't talk

FBIs.  It doesn't talk about policemen or law enforcement officials.  It

doesn't talk about Assemblymen or Senators or Presidents.  It talks

about the people and in the United States of America and really in the

world, when this Constitution talks about the people it talks about

everybody's right.

                    Amendment Number Two.  You're going to turn that

into Amendment 1.5 today because you're going to diminish it

seriously.  You're going to diminish that portion of the Constitution of

the United States of America.  A lot of people say, *Why do you need*

*these guns?  Why do you need all those bullets?  What's the purpose of*

*all of that?*  And the answer which comes out from a lot of Americans,

gun owners and not gun owners, it's a part of the freedoms and

liberties that we have in the United States of America.  It was put in

there by our Founding Fathers and many others along the way with

amendments.  It's for our public safety to protect the woman in

Georgia and her family, five bullets she put into the body of the man,

he was still moving.  Now, if there were two or three people in there

and she only had seven bullets in there she might be dead and so

might her child be dead, but most importantly -- and this is where you

snicker sometimes -- it's to protect us from our own government.

They were wise.  They were smart, our Founding Fathers.  They

understood what was happening with the King.  They understood what

freedom and liberty is all about.  They understood how precious and

important it was and they said you should be fearful, that's why there's

federalism.  That's why there's not centralized power.  That's why the states have a certain level of power.  They put that into the Constitution of the United States of America.  They knew how important that was.

So they snicker after you say we might become a totalitarian state.  We might have a rogue government, snicker.  I would venture to guess those same people, if they got the chance to go back over 100 years and sat down with that great President Abraham Lincoln, would've said, *Mr. Lincoln, you're going to start a civil war over the fact that you think our freedoms and liberties in this union is going to break apart over the scourge of slavery?  You're going to actually start a civil war because of that, take guns out and kill each other in America?*  He said, *Yes,* and they would've snickered at him.  But we know what history had to say about how important that war was and what that meant to freedom and liberty in the future and we still haven't reached it, but it was important to make that happen.

You know, facts are very difficult things to deal with sometimes especially when you have an agenda, especially when you have a political agenda.  Here are the facts:  In New York State last year, and there's no way to run from this, there were 769 murders and homicides, 769 murders and homicides.  Those committed by the guns you want to ban today, these assault weapons, these killers of people could've been up to five, may not have been, up to five.  This is the false sense of well-being you're giving to the people of New York State, 769 murders and you think you're going to stop five of them and

you've solved the problem?  That's what's dangerous about this bill.

People are going to go in their homes and get your press releases and

all your flags and say, *I'm a lot safer today.  They banned those guns*

*that could've killed five out of 769 homicides and murders.*

   Now, I could've brought an assault weapon here

today, but it's against the rules to bring an object on to the floor.  You

know what that would have been?  A blunt instrument, probably a

hammer because you know how many people were killed in those

homicides by a hammer?  Thirty-one people were killed by a blunt

instrument in a homicide in New York State and you want to ban, get

rid of the ones that killed five people?  Don't get me wrong, you

shouldn't kill any people, but there's no set of laws, there's no

diminishment of the rights and freedoms in the Constitution that is

going to save everybody's life.  Look, we have a death penalty in some

of the states.  We have life imprisonment.  We have some of the most

stringent laws in the world, but people still burglarize, they still rape

and they still kill.  There's no set of laws or regulations or guidelines

which are going to stop all bad people from doing bad things, but we

have to try, you're absolutely right.  We have to try.

   And there are so many good things in this bill.  We

want to deal with people who are a danger to themselves and others.

Mental illness is a serious problem.  We should help those people, but

we can't let that help and our concern for them go beyond the safety

and well-being of innocent law-abiding citizens so we have to take

guns out of their hands and make sure they don't get it.  We have to

increase penalties for people who get guns illegally, use them illegally, fire them illegally, kill people illegally, do other dangerous acts and break the law illegally; that's good.  We should have an assault-free school zone where if somebody comes on a college campus or anyplace where there's a captive audience of our future - that's our children - their penalties are doubled, whether they abduct, they use a knife, they use a gun, any assault on one of our children should be doubled. You know what?  We have a speed-free school zone in New York State, did you know that?  Penalties are increased for speeding on school grounds.  We have drug-free school zones. Penalties are increased for selling or using drugs on a school.  We don't have an assault-free school zone.  We don't increase penalties for going on school grounds and abducting a child or hurting a child or shooting a child.  There's no increased penalties on our schools, our future, we should have that, I agree with those.

            But the facts are very difficult things.  Thirty-one individuals of the 769 homicides killed by blunt instruments, 161 by knives, stabbings.  Do you realize if you ban knives in New York State you would have the potential to close to 100 percent or 75 percent better than banning those guns which killed less than five people?  How can you seriously stand up there and say by banning a weapon that assaulted less than five people in this way and all the other instruments we have here for the 769 homicides is going to create a better sense, and should, of well-being for the people to make them safer?  How can you do that with a serious and straight face?

And then the worst part of doing this is that you're using innocent children and adults who were murdered by a madman for your own political agenda and in doing so, you're not only diminishing the rights and freedoms in this great document, the Constitution of the United States of America, all those freedoms and liberties, but you're actually making people less safe because now they're not going to be able to protect themselves at the level they were before and now there will be that sense of well-being, *My government has done something about that,* you may have achieved that.  Well, somebody said you can fool all of the people some of the time, and some of the people all the time but you can't fool all the people all the time and they will rise and they will understand what you've done here and I think that's going to come to bear in the future for you in your districts.  And I think this is a tragic day for freedom and for liberty, not only here in New York State and this nation, but in the world.  Thank you, Mr. Speaker.

ACTING SPEAKER TITONE:  Ms. Russell.

MS. RUSSELL:  Thank you, Mr. Speaker.  Would Mr. Lentol yield for a few questions?

ACTING SPEAKER TITONE:  Mr. Lentol.

MR. LENTOL:  Yes, I will.  I'd be happy to.

MS. RUSSELL:  Thank you.  My questions are more in the line of clarification.  There's been a lot discussed today and there are some areas of particular concern that I'd just like to ensure that I understand completely.

MR. LENTOL:  Sure.

MS. RUSSELL:  What kind of gun or weapon will have to be surrendered or turned in under this legislation?

MR. LENTOL:  None.

MS. RUSSELL:  None.  So no weapons that are pre-'94 or post-'94 that someone owns legally right now as we speak will have to be turned in under this legislation?

MR. LENTOL:  Just registration is required.

MS. RUSSELL:  Okay, a registration would be required.  Can you tell me what kind of magazine or large-capacity ammunition feeding device will have to be surrendered or turned in under this legislation?

MR. LENTOL:  Pre-'94 that hold more than 10 in a clip, more than 10 rounds in a clip.

MS. RUSSELL:  Okay.  There's been some discussion about people that own 10-round clips or magazines right now and what the implication of this legislation would be on that ownership.  Could you explain what someone would have to differently if this legislation passes?

MR. LENTOL:  Yes.  You can't buy them tomorrow so they're going to be banned.  You can't go out and buy a 10-round clip, but if you have one, then you can only use it with seven rounds in the clip.  It will be grandfathered in.  It won't be illegal to have it as long as you only have seven rounds in it.

MS. RUSSELL:  Do you have to disable the other

three pulls?

MR. LENTOL:  That's not a requirement in the bill.

MS. RUSSELL:  Okay.  Thank you.  I'm just wondering, do you need to obtain a license to own or possess an assault weapon under this legislation?

MR. LENTOL:  No.  Just register it.

MS. RUSSELL:  Okay.  What about a semi-automatic weapon or a manual-action weapon?  Will you need a license to own those?

MR. LENTOL:  Only if it's a handgun, a Glock or some other handgun.

MS. RUSSELL:  Can you also tell me what the effect would be on old guns, say collector's items of guns from --

MR. LENTOL:  They're not illegal under this bill. They're allowed to be possessed, continued to allowed to be possessed.

MS. RUSSELL:  And how old do they have to be in order to fall under that?

MR. LENTOL:  Fifty years.

MS. RUSSELL:  Fifty years.  So if a gun is more than 50 years old, regardless if it falls within the definition of an assault weapon --

MR. LENTOL:  Yes.  Curios is the term of art used in the legislation.

MS. RUSSELL:  Okay.  These issues are very

important to me so thank you for taking the time to clarify these issues.  I appreciate it.  Thank you, Mr. Speaker, Mr. Lentol.

ACTING SPEAKER TITONE:  Mr. McLaughlin.

MR. MCLAUGHLIN:  Thank you, Mr. Speaker. Will Mr. Lentol yield?

MR. LENTOL:  Yes, Mr. McLaughlin.

MR. MCLAUGHLIN:  Thanks, Joe.  Happy birthday.

MR. LENTOL:  Thank you.

MR. MCLAUGHLIN:  I'm sure you wanted to spend it right here.

Couple of questions for you and sorry if they seem a little nit-picky or detailed, but we didn't get this bill until very late last night and that's what happens when things get rushed through around here, so we're kind of still digesting some of this.  So a couple of questions for you.  On the magazines being dropped, the magazine limit being dropped from 10 to 7.

MR. LENTOL:  Yes.

MR. MCLAUGHLIN:  The simple question is why? Why are we limiting law-abiding citizens' ability to defend themselves in a home invasion by 30 percent?

MR. LENTOL:  I think the short answer to that bill is that if you have a magazine with only seven bullets it will limit the amount of people you could unlawfully kill.

MR. MCLAUGHLIN:  Well, that's true.  It also would limit the ability to defend yourself, would it not, from people

**NYS ASSEMBLY**                                   **JANUARY 15, 2013**

that are invading your home?

        MR. LENTOL:  Change the clip.

        MR. MCLAUGHLIN:  Change the clip.  I'm sure the people who are under invasion will be we thrilled to hear that, "change the clip."  We heard a Senator say that the other day on the radio, change the magazine or change the clip and call the police. That will work great in rural Albany County or up in the Adirondacks where your nearest police may be 60 miles away, so I don't think they'll be too thrilled to hear that response.  But I heard you say earlier, and part of the thing that we like is that there's increased penalties for criminals to illegally use weapons.  The truth is we already have penalties for illegal use of weapons, do we not?

        MR. LENTOL:  Yes.  It raises the penalties.

        MR. MCLAUGHLIN:  And criminals, being what they are, don't seem to care too much about any penalty that's why they are, by definition, criminals.  So, I'm just wondering why we think that this is, after 600 failed gun laws, apparently, in this State, why this is the magic elixer that is suddenly going to get criminals to pay attention to a law?  Isn't it kind of a fallacy to think that and aren't we just infringing upon law-abiding citizens' rights to keep and bear arms?  And I'm not sure what part of will not be or cannot or shall not be infringed is subject to debate or difficult to understand, but are we not just infringing upon the law-abiding citizen?

        MR. LENTOL:  No, we're not.  I think you're mistaken in that this bill has a two-pronged approach.  It raises the

penalties for criminals, you're right about that, and it also tries, as best we can as a State because, you know, this province should belong to the Federal government, but like other places in our law they haven't acted so we believe that it's up to us to lead the way.  You know, the border of Connecticut is only a few miles away from the State of New York and I, for one, don't want to wait for a tragedy like Newtown before we take some action to prevent it.

MR. MCLAUGHLIN:  Right, and I don't really want to wait for a potential tragedy of a home being invaded and losing a family because they obeyed this law and only had seven bullets in a magazine when there were two or three animals coming in to do them harm.  So it cuts both ways, make no mistake about that, it cuts both ways and it mainly impacts the law-abiding citizen.

Let me ask you a question about Federal law.  In the Obamacare legislation, there is a provision in there, it's Senate Amendment 3276, Section 2716, part c.  Some people say it was put in there to quiet down the NRA but, nevertheless, it is in there and it says that the government cannot collect, "...any information relating to the lawful ownership or possession of a firearm or ammunition."  So by enacting this law are we not then violating what is now Federal law?

MR. LENTOL:  I don't know.  I think that relates to health care.  I don't think it has anything to do with this.

MR. MCLAUGHLIN:  It absolutely relates to gun control legislation because it says you cannot collect any information.

**NYS ASSEMBLY**                         **JANUARY 15, 2013**

It has nothing to do with health care, nothing.

MR. LENTOL:  You can say that it outlaws our total licensing scheme if you wanted to --

MR. MCLAUGHLIN:  No, I can't say that because this amendment is very specific in what it says.  It says that the government cannot collect any information relating to the lawful ownership or possession of a firearm or ammunition.  It's very clear.

MR. LENTOL:  It is clear that the Federal government doesn't choose to do that, but it doesn't say anything about the States.

MR. MCLAUGHLIN:  Well, I'm just saying.  So you're saying to me -- and I didn't go to law school, but you're saying to me that it's okay that New York State willfully violate Federal law, willfully violate Obamacare, because that's what we're doing.

MR. LENTOL:  I'm in favor of states' rights.

MR. MCLAUGHLIN:  It doesn't answer the question, Joe.  So there's no legal answer to that, just that you're in favor of states' rights.  So, that's okay with you that we're ignoring that aspect of Obamacare?

MR. LENTOL:  We're not ignoring it.  It's just that they haven't prevented us from taking that kind of action.

MR. MCLAUGHLIN:  Well, I suspect they will when the legal challenges arise to this.

MR. LENTOL:  I believe that's another provision of the Constitution that allows the State to take different action than the

**NYS ASSEMBLY**                    **JANUARY 15, 2013**

Federal government if they've not prevented us from doing that by taking that power away from us.

MR. MCLAUGHLIN:  Absolutely correct.  We are allowed to take different action.  I don't believe we're allowed to violate Federal law, but we'll see.

One of the sections here, if I'm right, there is an immediate, as of today, they'll be an immediate ban on law-abiding citizens' ability to own a weapon or to purchase a weapon -- sorry, purchase a weapon that is as of right now still legal, correct?  There's none of them on the shelves, by the way; they're selling like hotcakes.  But they are legal to buy it now.  They'll be illegal, let's say, 5 o'clock, when the Governor signs this, whenever it happens to be, right?

MR. LENTOL:  Correct.

MR. MCLAUGHLIN:  That's correct.  Is it 60 days down the line that the increased penalties kick in?

MR. LENTOL:  For failure to register?

MR. MCLAUGHLIN:  No, related to criminal activity with a gun, illegal possession of a gun.  I believe I thought I saw there was a 60-day --

MR. LENTOL:  Sixty days.

MR. MCLAUGHLIN:  Sixty.  So we give the criminals a 60-day window to wrap up their crime without those increased penalties, but we slam the door on law-abiding citizens today.  That makes sense.

MR. LENTOL:  It's an increase in penalties.

69

MR. MCLAUGHLIN:  Okay.  Ammo registration. Already hearing from local gun shop owners, one of whom I've already heard from is the biggest gun shop owner in this area.  He's already said, he was on the radio today, I've already gotten word he's not going to comply.  He will not do these private sale background checks, that's him.  I don't know what's going to happen across the State.  I suspect that these men and women that adhere to and honor the Second Amendment of these United States will also choose not to comply.  Dick's Sporting Goods may decide not to do it and they're a huge gun seller.  There may be a lot of retailers that say, *We're not doing it.  We're not going to maintain the records.  We're not going go through the background checks because we disagree with them,* for reason, I'm not even arguing whether that's right or wrong, I'm just saying there's a lot of them who are going to have objection to that and for ten lousy dollars they're just simply not going to do it.  What do we do then?  How do private sales take place if, en masse, nothing happens, if all over the State people refuse comply with this, what's our plan then?

MR. LENTOL:  Well, first of all, licensed dealers may not want to participate in a gun show, and that's their right, but this bill incentivizes them to do so by allowing them to charge a fee.

MR. MCLAUGHLIN:  $10.

MR. LENTOL:  And there are some licensed dealers that will want to get that fee and they can probably get a lot of fees at a gun show so they'll be willing to participate.

70

As far as the ammunition is concerned, when you talked about the licensed dealers, again, I have to repeat myself:  I believe that those folks are lawful citizens and they will comply with the law.

MR. MCLAUGHLIN:  I'm not saying they will not -- I'm not saying that they won't comply, I'm saying they just may choose not to participate, but I think you misunderstood my question.  In a private sale, not between family members, but I want to sell my gun to another Assemblymember, that would require a NICS check, correct?

MR. LENTOL:  Right, just like a gun show sale.  It would be the same requirement.

MR. MCLAUGHLIN:  Yes, correct.  But, we're not at a gun show.  I want to sell it.  I then need a NICS check and I cannot find a dealer anywhere to do it.  None of the gun shops will do it, the major retailers have decided not to do it.  So it's not a gun show thing.  It's just, you're going to bring a stop virtually to a lot of private sales that way, I think, if they choose not to comply.  It's not that they're flaunting the law, they're choosing not to participate.  And we can't force them, can we?  Is there any provision in here that says we'll --

MR. LENTOL:  No, we can't.

MR. MCLAUGHLIN:  Okay.  Can't force them.

MR. LENTOL:  But we could probably rest assured that there will be voluntary compliance because there is a fee involved and I suspect that there are a lot of gun dealers who are going to want

71

that fee.

MR. MCLAUGHLIN:  Yes, I don't think they're clamoring for 10 bucks, Joe, with all the recordkeeping requirements that they're under right now.  They're selling guns and ammo like it's going out of style, this $10 doesn't matter to these guys.

MR. LENTOL:  Steve, I know if I was a dealer and it brings a customer into the shop that I would want to do that.

MR. MCLAUGHLIN:  We'll see.  I mean, we will see what happens.  I may be wrong, but it's not what I'm hearing so far. So far, earlier in the debate, there are 57 sections of law that we're amending, right, plus various chapter amendments?

MR. LENTOL:  Give or take a few, yes.

MR. MCLAUGHLIN:  Right.  So, we've got some issues with this bill already which I think speaks to why we don't rush things or why we should not rush things; would you agree with that or not agree?  I mean, do you think this law, as it's written right now, is complete?

MR. LENTOL:  I agree that in a perfect world we should have extended hearings and we should try to have as perfect a piece of legislation as can be had on the books.  I also believe that when we have a pileup of events, like what happened in Wisconsin and Aurora and then it strikes close to home in Newtown, Connecticut, that this cries out for action and if the Federal government is not going do it, as I said before, then the State of New York has to once again, like it has in the past, lead the way.

MR. MCLAUGHLIN:  But there's no indication that the Federal government is not going to take action?  They, in fact, are on the verge of taking action shortly.  Was this not just a rush to get something done so that we could have bragging rights across the State?  Because clearly there's a lot of problems with this bill that could have been taken care of before printing this a couple a hundred times, rolling it out to the population of New York under cover of darkness without the details being hashed out.  This is like half cooking the meal and then everybody gets food poisoning from it because it's not done correctly.  There's a lot that could have been done.

MR. LENTOL:  The Governor is trying to save lives and I have to commend him for that.

MR. MCLAUGHLIN:  Well, let's talk about that. Let's talk about saving lives.  As my colleague pointed out, 769 homicides, which have been dropping year after year after year.  Now, I know next year when they drop again people will talk about how this ban did it.  It won't have anything to do with it hardly because only five were caused by long guns.  Long guns; not assault rifles.  May have been five at maximum, might have been two, might have been one, might have been none; we don't know, but it was five.  So, if this is about saving lives, why aren't you going after handguns which are, by and large, overwhelmingly the problem and overwhelmingly the weapon of choice among gang members?  Why not?  And doesn't that sort of lack a little bit of integrity to go after point --

73

MR. LENTOL:  Mr. McLaughlin.

MR. MCLAUGHLIN:  Hold on.

MR. LENTOL:  We are going after handguns.  We are going after handguns.  We've done that before and we're doing it again in this bill.

MR. MCLAUGHLIN:  What handguns?

MR. LENTOL:  We've made it a C violent felony to have a handgun in the State New York.

MR. MCLAUGHLIN:  Illegally.

MR. LENTOL:  Illegally; isn't that what you're talking about?

MR. MCLAUGHLIN:  So you think that the criminals are going to pay attention to that because now it's a Class C felony?

MR. LENTOL:  Well, what do you want to do?  You want to make it --

MR. MCLAUGHLIN:  I'm simply saying that you're making the point that you want to save lives and if you were truly interested in doing that, you'd be having an argument about banning all weapons, number one, which I don't agree with, but you'd be having that argument because that would be an actually valid argument to have that we should ban all weapons.  It would be a complete violation of the Second Amendment but, apparently, that's trivial anymore.

But what I'm saying here is it lacks a little bit or it

74

smacks a little bit of grand standing to say that we're going to go after these assault weapons which cause, statistically across the nation and the same holds true in New York, assault weapons are used in one-fifth, .2 percent of all violent crimes and in about 1 percent of gun crimes, 1 to 7 percent of all homicides in the U.S. are caused by assault weapons.  So, don't kid yourself that we're going after the real issue here, because we're not.

MR. LENTOL:  There's nobody grand standing here, especially not the Governor.  You know --

MR. MCLAUGHLIN:  Really.

MR. LENTOL:  -- I agree with you.  I'm in favor of the Second Amendment.  I'm going to surprise you.  I'm in favor of the Second Amendment.  I believe in the Constitution, I also believe in the Preamble that I won't read, but, more importantly, we have to remember the Constitution was amended back when they used muskets, okay, with one shot being able to be fired by a musket and then you had to reload.

MR. MCLAUGHLIN:  Yes.

MR. LENTOL:  Do you remember that?

MR. MCLAUGHLIN:  I absolutely do.  And you know why?

MR. LENTOL:  Do you remember that from your history?

MR. MCLAUGHLIN:  Because that was the state-of-the-art weapon of the day, Joe.

**NYS ASSEMBLY**                              **JANUARY 15, 2013**

MR. LENTOL:  That's right.  Our Constitution has to expand as the times call for it.

MR. MCLAUGHLIN:  Gotcha.  So, the Constitution was also written and distributed on a printing press.  So are we saying we should limit the freedom of speech?  Because, you know, the Internet and text messaging and everything else, that's just not what they intended?

MR. LENTOL:  The Supreme Court of the United States renders decisions every day that interprets the Constitution and expands its applicability to today's times.

MR. MCLAUGHLIN:  Oh, you're right, and they've ruled three times now that the right of the people to defend themselves cannot be infringed which, I believe, is exactly what we're doing.  I believe this is just an arbitrary --

MR. LENTOL:  That's not a Constitutional amendment in the Second Amendment.

MR. MCLAUGHLIN:  Why did we not come up with a five-round limit or a two- or a one-?  Why seven?  What's the magic number there at seven?

MR. LENTOL:  The Governor proposed seven.  We thought it was reasonable and so did the Senate.

MR. MCLAUGHLIN:  I'll be back.

MR. LENTOL:  Glad to have you.

ACTING SPEAKER AUBRY:   Thank you so very much.

76

Mrs. Arroyo.

MRS. ARROYO:  Thank you, Mr. Speaker.  And I want to thank the Speaker of the House for the selection of a very handsome and smart and responsible person to be --

ACTING SPEAKER AUBRY:   You're always in order with that statement.

MRS. ARROYO:  My congratulations.  I have a question to Mr. Lentol, the Chairman, and it's a simple one.

MR. LENTOL:  Yes, Mrs. Arroyo.

MRS. ARROYO:  Could you explain to us and to this Body that if the State of Connecticut had a portion of a law like this, that those 20 children that were killed, that those six employees - one of them was a young Puerto Rican woman - would be alive today if a law like this existed in Connecticut before that incident?

MR. LENTOL:  I hope so.  Unfortunately, we can't really tell for sure, but all we can do in this business is try, isn't it?  Try and do the best we can for the people and I think that this particular statute, crafted by the Governor -- and, again, I'll say it again and I'll keep saying it, the State Police who has to deal with the violence.  Remember in Connecticut, the State Police had to go out there?  They didn't know what they were facing, what kind of assault weapons the guy had, how many rounds of ammunition he had in his clips and it turned out that he had four guns, four, I don't know what they were, but they were semi-automatic handguns, as well as an assault rifle in his car.  And that's what we're talking about, trying to

77

not only protect our children from being assaulted by these rapid-fire rifles and guns, but also protecting our police from the danger that they pose to them.

MRS. ARROYO:  Thank you.  I can realize that we have to be glad that we have the leadership that we have in our Speaker and the common sense of the other House to support this bill, but the great leadership of our Governor that has been mentioned here as a candidate for President - I would be very proud to have him as President of this nation - and I want to thank all of them for the leadership because, in fact, what we are doing is preventing a catastrophe that could happen any time at any moment and we cannot wait until something drastic happens in order to react.

On the other hand, we are concerned about the industry, about the people that make guns because they create revenues for this State and they create jobs, but we are protecting them also when this law allows the Justice Department to persecute the people that bring guns into the State of New York that are not fabricated here, to compete with them and to diminish the ability of the one that is produced here to make money and pay revenues.  I thank God to be here and I'm very proud to vote yes on this bill.

ACTING SPEAKER AUBRY:  Mr. Goodell.

MR. GOODELL:  Thank you, Mr. Speaker.  It's good to see you up there.  Would the sponsor yield?

ACTING SPEAKER AUBRY:  Will you yield?

MR. LENTOL:  Yes, Andrew.

MR. GOODELL:  Mr. Lentol, as I understand this bill, we expand the definition of assault weapons, but we allow everyone who has a weapon that today is legal but tomorrow would be defined as an assault weapon to keep that weapon; is that correct?

MR. LENTOL:  That's correct.

MR. GOODELL:  There's no confiscation?

MR. LENTOL:  None.

MR. GOODELL:  There's no buyback, there's no elimination of these guns?

MR. LENTOL:  That's correct.

MR. GOODELL:  So, all these guns that this bill would make illegal today will still be out in the public tomorrow, correct?

MR. LENTOL:  Well, what would be illegal is if the person who has a right to have the gun and registers it tries to sell it to somebody in New York.

MR. GOODELL:  But he has a year --

MR. LENTOL:  That would be a problem.

MR. GOODELL:  But he has a year to register it.

MR. LENTOL:  That's correct.

MR. GOODELL:  So, between this morning when I got up and all these guns were legal and if this passes tomorrow, when they're all illegal, all these guns covered by this, they're still out there, right?

MR. LENTOL:  That's right.

MR. GOODELL:  So, why was it such a necessity that we adopt this legislation today and that we not get the legislation?  I didn't get a copy of it until nearly midnight.  What is the emergency that changes this whole dynamic?

MR. LENTOL:  I think the emergency exists in beginning to register these weapons so that we have a handle on them and we're doing something --

MR. GOODELL:  So, if we waited until Friday to register them, there would be some sort of catastrophic event other than the fact that the Federal government --

MR. LENTOL:  No.

MR. GOODELL:  -- might beat us to this registration requirement?

MR. LENTOL:  No, I think the haste is the faster we get it, hopefully the faster we can prevent other crimes.

MR. GOODELL:  Is there any emergent situation, though, between today, Tuesday, and Thursday or Friday of this week that would have enabled us time to get copies of this legislation out to our constituents and to reach out to affected groups and get their advice and counsel?

MR. LENTOL:  I don't think we know the answer to that question.  All I can tell you is that it would be a tragedy, wouldn't it, if we waited until next week to do it and we had a shooting in a school by somebody who owned a banned assault rifle?

MR. GOODELL:  Indeed, I think it would be a

**NYS ASSEMBLY**                    **JANUARY 15, 2013**

tragedy and, of course, this legislation wouldn't prevent that, would it, because all those guns are still going to be out there on the street tomorrow, right?

MR. LENTOL:  It's true, but we have at least a registration of those who have the weapons so we can check to determine whether or not they have disqualified themselves from having the weapon because of mental incapacity or some other factor.

MR. GOODELL:  But as we've noted, they have a year to do that registration.

MR. LENTOL:  That's right.

MR. GOODELL:  Right.

MR. LENTOL:  But the longer we wait, the longer we don't get the information.

MR. GOODELL:  Ahh.  So we're really concerned about that time period between January 15, 2014 and January 17, 2014, right, that extra three days at the end of the one-year registration.  I'm sorry, Joe, that's a rhetorical question.

MR. LENTOL:  I think that's a fair assessment. That's a fair assessment.  I don't want to wait more than a couple of days but, you know, we have to give some lead time in the law and we understand that.

MR. GOODELL:  We've talked a little bit about the data from the DCJS, the Department of Criminal Justice Services, had indicated that in 2011, five people were killed with a rifle.  Do you know how many of those five murders with a rifle involved an assault

81

weapon?

MR. LENTOL:  I don't know.  I'm sorry.

MR. GOODELL:  The data from DCJS also indicated that there were 393 murders with a handgun.  Do you know how many of those handguns would be affected by this ban?

MR. LENTOL:  I don't know.

MR. GOODELL:  The Governor mentioned I believe in the State of the State message that he thought there were a million people that owned these kinds of guns.  Is that the number that you're familiar with, as well?

MR. LENTOL:  Yes.  I don't think he came up with that number out of the air.  I think the State Police and DCJS probably gave him the best information they have at their disposal now.

MR. GOODELL:  So you think a million is a reasonable estimate of how many gun owners will be affected by this legislation?

MR. LENTOL:  I'll take him at his word.

MR. GOODELL:  I would, as well.  If we have a million of these gun owners out there with these guns but only five murders were committed last year, statistically, aren't these guns much, much safer than cars or motorcycles or bicycles?

MR. LENTOL:  We register them, too.

MR. GOODELL:  Well, we haven't registered bicycles yet.  That was proposed last year, but we didn't go forward with it.  But, I mean, statistically, that's a very, very small number of

**NYS ASSEMBLY**                    **JANUARY 15, 2013**

deaths with a million of these owners out there, isn't it?

MR. LENTOL:  As far as I'm concerned, one death is too many.

MR. GOODELL:  Well, I would agree and, you know, last week or a few weeks ago we saw repeated news coverage of people who were killed by subways in New York City, as you know, and those are tragedies, too.  I mean, innocent people pushed on the tracks by someone who is not mentally stable and, in fact, Kendra's Law was named after that kind of situation, right?

MR. LENTOL:  Yes, it was.

MR. GOODELL:  As you know, the *New York Times* reported that 55 people were killed by subways in New York City last year, 11 times more people were killed by subways than by a rifle.  That would suggest that subways are a lot more dangerous than rifles.

MR. LENTOL:  I still have no problem using a subway, though.  I have a problem with somebody coming down the street with an assault weapon, though.

MR. GOODELL:  Well, and I agree.  And, you know, we're all concerned about that.  If this legislation were in effect, say, a month ago, would it have prevented what happened at Webster?

MR. LENTOL:  At where?

MR. GOODELL:  At Webster.

MR. LENTOL:  No, I don't think so.

MR. GOODELL:  Do you think if this legislation were in effect here in New York State a month ago it would have

prevented what happened in Sandy Hook, Connecticut?

   MR. LENTOL:  No.

   MR. GOODELL:  As you know, the Columbine

tragedy, which was a horrific tragedy, of course, that occurred --

   MR. LENTOL:  I mean, let me amend that statement

because Sandy Hook could have been prevented if, you know, the

parent was the one who owned the weapons and if the parent --

   MR. GOODELL:  The parent did own the weapons in

Sandy Hook.

   MR. LENTOL:  Yes, the parent owned the weapons

and under the safe storage provision of this bill, it might have been

locked up as a result of, you know, if the child had mental disability

issues that were known to the parent, there might have been a

requirement for that weapon to be locked up.

   MR. GOODELL:  Well, as you know, the safe

storage provisions under this bill aren't triggered by a parent knowing

that their child has mental issues, it's triggered by very specific

criteria, right?

   MR. LENTOL:  Yes, that's right.

   MR. GOODELL:  He has to be institutionalized.

None of those criteria applied in Sandy Hook, did they?

   MR. LENTOL:  That's true, so I said maybe.

   MR. GOODELL:  Okay.

   MR. LENTOL:  There was a possibility that, you

know, maybe there were things we yet don't know about, the child's

mental health issues.

MR. GOODELL:  Senator Gillibrand was quoted a few weeks ago as saying that according to FBI statistics, 90 percent of the guns recovered in New York City and crime scenes came from outside of New York State and 70 percent Upstate.  Is that your understanding, as well?

MR. LENTOL:  Yes.

MR. GOODELL:  So, what we're talking about is dealing with five rifles, of which statistically four of them would have come from outside the State anyway?  So we're talking about maybe dealing with one murder?  This is the necessity that causes us to get bills at midnight?  I'm sorry.  I apologize, Joe.

MR. LENTOL:  That's all right.  You know, there are a lot of unsolved killings that we don't know how they occurred, where the gun was bought.

MR. GOODELL:  Can I ask some questions on specific language, if I may?

MR. LENTOL:  Sure.

MR. GOODELL:  Let's look at page 18, which is the definition of assault weapon.

MR. LENTOL:  Page 18.

MR. GOODELL:  This is page 18 of the bill. Obviously, for a rifle, it has to be a semi-automatic and then it has to have something else such as an adjustable stock .  To be honest with you, I didn't quite understand -- why does an adjustable stock make a

semi-automatic rifle more dangerous?

MR. LENTOL:  The answer is the one I gave before:
Because the State Police says that it does.

MR. GOODELL:  Well, as you know, you can buy
multiple size stocks, right, whatever you want to buy?  But some
people prefer an adjustable stock so that they can use it and they can
go out with their son or their daughter and they can adjust the stock
rather than take the gun a part.  Why would an adjustable stock make
a rifle more dangerous?

MR. LENTOL:  All I can tell you is that the reason
that this was done, because we relied upon the expertise of the State
Police.

MR. GOODELL:  And that applies, as well, to a
thumbhole stock?  I mean, a hole in the stock makes it now an assault
weapon?

MR. LENTOL:  All of the features.  All of the
features were provided by them.  We didn't create this in a vacuum.

MR. GOODELL:  Okay.  Well, that's fair enough.
Now, if you have one of the weapons which you bought today
lawfully, legally here in New York State and is outlawed, say,
tomorrow by this bill, am I correct that you cannot transfer it to
anyone in New York State other than a licensed gun dealer?

MR. LENTOL:  Yes.

MR. GOODELL:  What happens when you die?
Now you're a grieving widow or widower, assuming that they didn't

kill you with it, but now your estate owns these guns.  What does the estate do?

MR. LENTOL:  I think that the administrator or the executor of the estate would have the power to sell that weapon to somebody out-of-state.

MR. GOODELL:  So, we are exporting what we consider to be dangerous weapons to other states, our neighboring states like Connecticut, for example?

MR. LENTOL:  Not "we", the administrator.

MR. GOODELL:  The administrator.  So, it's okay for the administrator then to sell this to somebody else in Connecticut or Colorado or somewhere outside the State?  That's our solution?

MR. LENTOL:  Would you support an absolute ban?  This is all we have.

MR. GOODELL:  Not at all.  I favor the Second Amendment.  I'm just trying to figure out how this would work.  How long does the estate have to sell --

MR. LENTOL:  I'm just trying to devise ways for you as to what would happen to that weapon or what could be reasonably done with it by the widower and through the administration of the estate.

MR. GOODELL:  Right, I'm just questioning --

MR. LENTOL:  Or it could be destroyed.

MR. GOODELL:  But you can't just give it to your son, can you?

MR. LENTOL:  No.

MR. GOODELL:  That would be illegal, even though your son could use it lawfully as long as you were alive; is that correct?

MR. LENTOL:  It would be held by law enforcement for one year.  I'm told it would be held by law enforcement for one year.

MR. GOODELL:  And after one year it would be confiscated?

MR. LENTOL:  Could be sold.  If it's not sold during the year, it would be destroyed.

MR. GOODELL:  And does the estate get any reimbursement for the value of this weapon that is destroyed?

MR. LENTOL:  No.

MR. GOODELL:  Now, am I correct that the day before you die, you could go hunting with your son or daughter and they could use this weapon lawfully in the United States -- in New York State, rather?

MR. LENTOL:  Say that again.

MR. GOODELL:  Am I correct that if you lawfully own these guns you can go hunting or target shooting with your son or daughter as long as you are alive?

MR. LENTOL:  Yes.

MR. GOODELL:  But if you die then they can't even own them?

MR. LENTOL:  Right.

MR. GOODELL:  All right.  It just seems a little strange to me.

Can you help me a little bit understand some of these mental health issues?  And I agree with a lot of my colleagues and I agree with you, Joe, that mental health issues are very important.  I'm just trying to understand quite how this law works.

MR. LENTOL:  I could try, but I might defer to Mr. Ortiz who is the expert.  But you can ask me the question.

MR. GOODELL:  It's always great to have other experts.  Look at him.

As you know, sometimes you can have a mental health issue that's temporary in nature.  I mean, you might have a head injury, for example, not be able to handle your own affairs, maybe even be unconscious and then recover.

MR. LENTOL:  Yes.

MR. GOODELL:  If you need a committee to handle your financial affairs while you're recovering, this law, am I correct, on page 26, makes it impossible for you to keep your guns in the meantime?

MR. LENTOL:  Yes.

MR. GOODELL:  And is that a temporary disability because your license it revoked or suspended.  Is it just a temporary revocation?

MR. LENTOL:  Yes , it is.

89

MR. GOODELL:  When you regain consciousness you can apply to get your guns back?

MR. LENTOL:  Yes.

MR. GOODELL:  And in the meantime, who holds your guns?

MR. LENTOL:  Hopefully, it's kept in safe storage, but -- law enforcement would probably have the gun.

MR. GOODELL:  I see also, by the way, that any addiction to a controlled substance is a criteria --

MR. LENTOL:  Disqualifier.

MR. GOODELL:  -- that results in the loss of your license, correct?

MR. LENTOL:  Yes.  Federal law.

MR. GOODELL:  It's new in our statute, but you're saying it's not new under Federal law?

MR. LENTOL:  That's right.

MR. GOODELL:  So we're just bringing our statute in conformity.

MR. LENTOL:  Conforming it with Federal law.

MR. GOODELL:  Okay.

I had a question on a couple sections and I was hoping you could help clarify it.  On page 22, which is relating to the penalties, it states that a person who knowingly fails to register a firearm would be guilty of criminal possession of a firearm as a Class E felony; is that correct?  Am I reading that correctly?

90

**NYS ASSEMBLY**                                    **JANUARY 15, 2013**

MR. LENTOL:  Yes, you are.

MR. GOODELL:  So, if I'm reading this -- if I understand this correctly, we have about a million gun owners out there right now who followed every rule in the book, bought lawful rifles and if they don't register within a year, they could be guilty of a Class E felony?

MR. LENTOL:  Yes.

MR. GOODELL:  Mr. Lentol, thank you very much.

MR. LENTOL:  The 30-day cure period, however, for innocent failure to register unknowingly.

MR. GOODELL:  What a great thing.  We have 30 days to cure before you have a Class E felony.

MR. LENTOL:  If you didn't know what the law was, you'd have 30 days to cure it.  You'd have the year first and then you'd have a 30-day cure period after it was determined that you didn't know and you could cure it within 30 days and then you wouldn't be guilty of any crime.

MR. GOODELL:  Thank you, Mr. Lentol.

ACTING SPEAKER AUBRY:   Thank you, Mr. Goodell.

Mr. Kavanagh.

MR. KAVANAGH:  Thank you, Mr. Speaker.  On the bill.

ACTING SPEAKER AUBRY:   On the bill, Mr. Kavanagh.

MR. KAVANAGH:  Mr. Speaker, this has been a long and very informative debate about a very important issue and I understand the complexity of the bill and the need for lots of questions about the details, but I think it's important that when you're reviewing a piece of legislation like this, obviously, there are going to be things in a bill this complicated you don't like, maybe things you would have done better, but it's important when we're deciding how to vote on a bill like this to remember that the key question is whether a piece of legislation like this is a substantial improvement over the status quo, over the law as it is now.

And, you know, we've heard some criticisms today. We've heard a criticism that the bill does not do enough with respect to mental health issues, even though it already improves on Kendra's Law, which is one of the strongest laws of its kind in the country, and even though it has new provisions that are intended to address things we've seen recently, like requiring safe storage of guns, which is not currently required in instances where there is somebody in your household who you have reason to believe might be prepared to do something terrible; even though it goes to mental health people and professionals and suggests that they take steps to make sure that we are alerted to people who might do danger to us.

We've heard a criticism today that this bill, if I heard it correctly, that this bill will impede the ability of Americans to fight their government, to fight people, perhaps American soldiers, perhaps other government officials who have sworn to uphold the Constitution

of the United States and that the purpose of the Second Amendment is to make sure that people are adequately armed to protect themselves against the Constitution and against the American government.  We've heard that criticism today.

Mr. Speaker, for myself, I would like to live in a society where legislative Bodies like this can recognize that there is a right to gun ownership in this United States that's been recognized by our Supreme Court, that there are legitimate uses for guns, that there are hunters, there are other people that feel it's valuable to have a gun to protect their homes, even though we know that they're, perhaps, more likely to have a tragedy in their homes than to legitimately protect their homes with that gun; we understand that's a personal choice.

But we also understand that limits are possible.  This bill strikes a wonderful balance between those issues and a widespread recognition in our society among most of our citizens that reasonable changes in the law are necessary.  The assault weapon ban builds on a long-standing tradition of this country, of the Federal and State government allowing certain weapons and deciding that some other weapons have, perhaps, too great a fire power.  I haven't heard many people in this Chamber today argue that there should be no such limits, but some of the logical conclusion of the arguments we've heard are that there should be no such limits and you wonder if that would apply to explosives, you wonder if it would apply to truly extreme weapons.

But what we're saying today is some of these weapons are beyond what we think is reasonable to be purchased and owned by New Yorkers.  While we're doing that, we're also taking a reasonable step and saying that since we've set the law at a certain place previously, that we're going to allow people to continue, but we're going to know where those weapons are, we're going to make sure they're registered.  Again, a very reasonable provision.

We've heard a lot about mental health in the debate leading up to this legislation and these provisions did not come out of the blue today.  We've heard a lot about mental health.  I've mentioned a few of the provisions that are specifically addressed to mental health, but the biggest one we're passing today, if you are concerned about non-law-abiding citizens and you are concerned about people with mental health issues who shouldn't be using guns, shouldn't be having guns, you should be very happy today that we are passing universal background checks.  If you like the law as it is, then you like the fact that one of those well-meaning, law-abiding citizens can advertise their firearm on the Internet, they can meet a stranger in a parking lot, they can take cash for that weapon, hand the weapon over to the person without any interest or concern or knowledge of that person's criminal history, without any interest or concern or knowledge of that person's mental health history and arm that person.

And we've talked a lot about law-abiding citizens, but law-abiding citizens, Mr. Speaker, are people who follow the laws that this Legislature and this Governor have, in their wisdom, decided are

the laws that law-abiding citizens ought to follow.  There are not classes of law-abiding citizens who just kind of do the right thing as they see it.  There are law-abiding citizens that follow the laws.  The part of the purpose of the law is to instruct New Yorkers about what, as a society, we think there's a consensus on.  There is an overwhelming consensus that you should not provide a firearm to somebody who is dangerously mentally ill, who's been adjudicated as such.  There's probably a consensus even in this Chamber that the gunman in the Webster shooting should not have been provided with a weapon after being convicted of a felony for, of all things, murdering his grandmother with a hammer.  We've talked a little bit about hammers today.  And, yet, selling that gentleman, that person a weapon is totally legal in this State until we pass this bill.

So, again, there are a lot of concerns.  I respect the concerns especially of some Minority members who may have seen the draft of this bill very late.  You know, honestly , I think this bill came together very rapidly and a lot of us were absorbing some of the provisions yesterday.  We can all nitpick.  We could all even find some things we have some fundamental concerns about, but this is a bill that will be profoundly better for New Yorkers who are concerned about safety.  It balances the rights of people who want to use guns and it's the right thing to do.

And I would just like to end by complimenting the Governor and the Speaker of this House who has made sure that this Chamber, this Legislative Body has been a long-standing leader on

this issue and what we are doing today, there is, no doubt, that if we pass these provisions today, just as we have, many of them, already in New York City, which has played a role in making New York City virtually the safest place in this country, if we pass these bills today and enact them Statewide and, particularly, as my colleague, Assemblywoman Schimel, has suggested, if other states follow suit, we will make this State safer, we will make this country safer and it's the right thing to do.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:   Thank you, Mr. Kavanagh.

Mr. Peter Lopez.

MR. P. LOPEZ:  Thank you, Mr. Speaker.  And I'm not sure which Chairman, if it's Chairman Lentol or Chairman Ortiz. This is back to page 10 of the bill, so I'm not sure which Chairman would yield.  It's on the mental health and hygiene.

ACTING SPEAKER AUBRY:   Let them look up the section you refer to and then we'll make a decision.

MR. P. LOPEZ:  Yes, Mr. Speaker, it's on page 10, Section 20, line 9 and it's actually the paragraph B on line 16 dealing with the reporting and the provision dealing with removing a person's ability to own a gun for mental health purposes.

ACTING SPEAKER AUBRY:   Mr. Ortiz, I suspect that's you.  Do you yield?

MR. ORTIZ:  Yes, I will.  I was trying to get ready for Mr. Lopez.

MR. P. LOPEZ:  Thank you, Mr. Chairman, and thank you, Chairman Ortiz.  Just a quick question.  In regard to the section, and I understand the intent of it and, you know, certainly to identify individuals who, in the -- sorry, Mr. Speaker, Mr. Ortiz is having trouble hearing me.

So, Mr. Ortiz, in regard to this section, again, it's my understanding that the intent is to have mental health professionals in the field who have clients be able to identify where there may be individuals they have concerns about in regard to gun ownership; is that accurate?

MR. ORTIZ:  Yes; yes, sir.

MR. P. LOPEZ:  Now, in that section it talks about a process of the mental health clinician advising DCJS and making a recommendation that this person not be allowed to possess a firearm. Now, how does that process work and could you kind of walk me through that a little bit?

MR. ORTIZ:  Well, the way that the process works is that the individual will be evaluated by a mental health professional, as you mentioned before, the psychiatrist, psychologist, physicians, and that professional will recommend that individual to the director of community services, and the director of community services will be required to transmit a report to the Division of Criminal Justice Services.

MR. P. LOPEZ:  So, in that regard -- so, now a report's been transmitted to DCJS?

97

MR. ORTIZ:  That is correct.

MR. P. LOPEZ:  So then what happens within DCJS?

MR. ORTIZ:  I'm sorry, Mr. Lopez.  And they only will be reported if they agree with the recommendations of the social worker whether this individual is mentally ill or mentally incapable to carry responsibility regarding carrying a gun, a licensed gun.

MR. P. LOPEZ:  Okay.  So, they come to that determination and then what?  Then they take away the privilege?

MR. ORTIZ:  Well, depending on what the outcome is, I'm assuming the outcome will be that the individual is not fit to carry a gun or a license, the license will be revoked.

MR. P. LOPEZ:  And with that, and I guess this is where I struggle and this is part of the challenge that we face with this sort of legislation where we look at, again, the issue of public safety and protecting the public versus the rights of us all, as citizens.  So, DCJS comes to that determination.  At what instant does the person whose rights are being revoked have an ability to be a part of the decision-making process within DCJS?

MR. ORTIZ:  They can address that to the local licensing office.

MR. P. LOPEZ:  I guess what I'm driving at, and I'll just think about instances, it could be a liquor license or it could be a driver's license or some other certification where an agency has control over a privilege, in this case, diminishing a Constitutional right, would there be -- and I don't see this described in statute and I

98

**NYS ASSEMBLY**                                    **JANUARY 15, 2013**

don't see any rule making.  I've having trouble too, Mr. Ortiz.

MR. ORTIZ:  Mr. Speaker, can we bring the House to a more quiet... Sorry, Mr. Lopez.

MR. P. LOPEZ:  What I don't see in the language of the statute, of the bill as we look at it, I don't see any process or any language that compels DCJS to come up with rule making or to hold an investigatory hearing or have an administrative law judge bring the individual present and allow the individual to present their side of the equation.  I guess what I'm driving at is what seems to be missing is the basic premise of equal protection under the law.  I don't see anything here.  And, again, this is not to second-guess the healthcare professional, but just as a citizen, you know, any one of us should have an ability to defend our rights and I don't see anything in here, unless I'm missing something, that provides for the individual whose rights are being revoked or taken away to have a say.

MR. ORTIZ:  Mr. Lopez, if you recall how we do legislation here, usually we have to look through different chapters, different articles, as well.  So, Article 78 of the local level, of the local licensing folks, they will be able to execute Article 78 in order to give them the process that you are requesting and asking for.

MR. P. LOPEZ:  And, Mr. Speaker, if the Chairman would continue to yield?

MR. ORTIZ:  Yes, Mr. Speaker.

MR. P. LOPEZ:  And I am still have trouble hearing, Mr. Ortiz; it may be your closeness to the mike, too.

99

ACTING SPEAKER AUBRY:   Members, please hold down the conversations so that the individuals can hear each other.

MR. P. LOPEZ:  Thank you, Mr. Speaker.  So, as we get back to the remedy that you were describing, Article 78, my understanding of an Article 78 is that it's a request of a court to interpret an administrative decision.  So, you present a case, you file for an Article 78 review of an administrative decision; is that the process you're describing?

MR. ORTIZ:  At the end, if they're unsatisfied then they can go to the Article 78, Mr. Lopez.

MR. P. LOPEZ:  So, for all of us, at least the way I understand it, and please correct me if I'm wrong, so, the Article 78 review is really outside of the agency decision-making process.  It really is an extraordinary review by a court to determine whether an agency's decision was proper and the challenge is, and this gets back to the issue of equal protection under the law, the challenge is that an individual now has to find an attorney or find someone who can help prepare the Article 78 and then file it with the court.  And, generally, there's a charge.  And I've spoken to a number of attorneys who address Article 78s. You know, you could go estimate anywhere between $3- and $5,000 to prepare a thoughtful, intelligent Article 78 filing and you have to do that within 30 days of the decision.

So, my concern is, and help me if I'm missing this, is that absent a review mechanism in the statute, we're telling that

someone, who may see their rights be taken away -- and it may be -- maybe, again, the mental health clinician may be accurate with their assessment; they may not.  And so, we're erring on the side of taking someone's rights away and possibly even denying them the ability to appeal just on financial grounds because they don't have the money to even file the Article 78.  I'm looking for your thought on that.

MR. ORTIZ:  I've been informed, Mr. Lopez, that the Article 78 that applied to the local licensing, the people can -- they don't need an attorney to do that, according to my counsel; therefore, they will be able to do that between themselves, so between the parties involved and the licensing department.

MR. P. LOPEZ:  And just to be clear, again, and just to make sure I'm not confusing terms of art, Article 78, as I understand it, is the external court review of an agency decision; is that accurate?

MR. ORTIZ:  The answer is yes.

MR. P. LOPEZ:  So, again in my experience, and, again, I was the local official and there were many times where I was aware of Article 78 proceedings, many people, particularly everyday persons who are not skilled in the law, skilled in presenting court arguments are going to be very challenged to present something to the court in the form and fashion that the court will accept and, thus, it begs, in many cases, the expert assistance of counsel to advance the argument intelligently and something that can be properly received and acted on by the court.  And so, that's my concern here is we're creating a financial barrier because we're not providing public

**NYS ASSEMBLY**                                    **JANUARY 15, 2013**

defense; there's no public defender, there's no administrative law judge, which is a no-cost option within the agency.  We're now creating a basis of financial discrimination against equal protection under the law.  That's my concern.

MR. ORTIZ:  Mr. Lopez, I hear your concern, but we all go through the same review procedures and I know you're asking for a little more and I would like to say to you we will keep that under consideration.

MR. P. LOPEZ:  Thank you.  And on the bill, Mr. Speaker.  Thank you, Mr. Chairman.

ACTING SPEAKER AUBRY:   On the bill.

MR. P. LOPEZ:  Again, this begs the question, Mr. Speaker, of the issue of advancing legislation of this ilk, critical legislation and certainly something that we all embrace.  You know, we want a safe society.  We want a balancing of freedoms.  That's something that we all treasure as Americans.  The challenge is in our haste, we bypass the opportunity for other people besides just us in the Chamber to review this, to look at it, to comment intelligently on it, to weed out the issues that may be unintended consequences and we heard in previous discussions -- I lose track of the number of chapter amendments that are being contemplated or spoken about as a result of this legislation.

In this case, here's another instance where I'm fearful that equal protection under the law may be diminished in the case of this review.  And, again, the clinician may be accurate and, certainly,

we want to be cautious, but the issue is if they're not accurate, will someone's rights be diminished because they don't have the financial or technical wherewithal to mount a defense of their own Constitutional freedoms?

So, with that, Mr. Speaker, again, thank you for the opportunity.  I do have grave concerns with elements of the bill, particularly in regard to the haste and the inability of us as a community Statewide to come together and craft this intelligently, again, as a collective undertaking.  Thank you.

ACTING SPEAKER AUBRY:  Mr. Abinanti.

MR. ABINANTI:  Thank you, Mr. Speaker.  First of all, will the sponsor yield for a simple question?

ACTING SPEAKER AUBRY:  Will you yield?

MR. LENTOL:  Yes, I will, Mr. Speaker.

MR. ABINANTI:  Mr. Chairman, I would like to refer you to the section that deals with safe storage.  I just want to confirm that my understanding is correct that there's no language here that preempts a locality from having a stronger piece of legislation by local law which would require gun owners to safely store their guns.

MR. LENTOL:  Right.  There's no presumption by implication on this issue.

MR. ABINANTI:  There's no preemption by implication and there's no specific language preempting it.

MR. LENTOL:  Right.  No --

MR. ABINANTI:  No expressed preemption and no

preemption by implication?

    MR. LENTOL:  That's correct.

    MR. ABINANTI:  Thank you, Mr. Chairman.

    Mr. Speaker, in another time and another place a modern poet named Bob Dylan, if I can call him a poet, said, "How many deaths will it take until we know that too many people have died?"  Unfortunately, Mr. Speaker, it's taken far too many deaths to get us to this point.  Gun violence is plaguing all of our communities in many different ways, whether it's guns on the street or whether it's people with mental problems killing lots of people at once.  I'm somewhat concerned that I'm hearing from some members here, *Well, it hasn't happened in New York; therefore, there's no basis for the law that we're considering today.*  It happened in Connecticut; it's happened throughout the country.  I have lists and lists of kids who have been killed around this country and it wasn't just in Connecticut. Going back to the '80s, the '70s, this is not a new phenomenon.  It's time we stepped up to protect the people in our State.  Every one of these incidents affects all of us and every one of these incidents sets the stage for the next one.

      We need an effective, common-sense plan.  I would suggest that we need to keep guns away from those who would misuse them; remove the opportunity; don't have them there.  Ban the military-style weapons, register all guns, regulate their transfer, mandate that all guns in this State must be securely stored.  Carefully license every gun owner.  Train them in gun safety and check them

periodically to make sure they're still qualified.  That doesn't repeal the Second Amendment, it just makes it work for everyone.

Secondly, we need to use more mental health professionals in our communities to minimize the likelihood of violence.  When we deal at budget time, I challenge my colleagues to join me in putting more money in the budget for mental health facilities rather than cutting the government services that are out there today.

And lastly, I think we need to change our culture and the political dynamic.  Let's stop glorifying violence, guns and those who use them.  All I hear today is we need to have these weapons to defend ourselves.  Well, we're not going to be invaded by an Army.  The reasonable gun owners that I talk to tell me they want one gun with one bullet.  They're going to lock themselves in their bedroom, and if that guy comes in, that's when they pull the trigger.  In the meantime, they are calling the police.  I've been told that by woman after woman after woman who is concerned about the violence that we have today but -- and who are reasonable gun owners who have licenses and who say they don't want to further more violence, they just want to protect themselves.  They know enough to retreat and then, if necessary, if the police don't get there in time, they then have their protection.  And they're doing that without endangering the rest of the society.

Mr. Speaker, guns are not toys and we've got to stop treating them like toys.  Guns are made to kill people and assault

weapons to kill a lot of people. So, why are we shocked when they're used for their intended purposes? We allow civilians to arm themselves for war. Why are we shocked when they act like they're in the middle of a war? The answer is not more violence. The answer is to make sure that we have reasonable gun laws. The answer is not to arm everyone so that gun manufacturers can make more money and more people die. The Second Amendment does not guarantee the right to bear arms to kill innocent firefighters, teachers and children, and that's the message we have to send. We are under siege by those who misuse guns. No one is safe in this country until we get reasonable gun laws. Lax gun laws are literally killing us. We need to stop the violence now.

It's been said that a camel is a horse drawn by committee. Well, Mr. Speaker, this legislation was drawn by a big committee, by a lot of people with a lot of disparate interests. We did not get a racehorse, we got a camel and this camel is carrying us in the right direction and it will bring us to a safer place, but it's taking us very slowly.

Some of my colleagues have pointed out some of the defects in this legislation and, therefore, they say do nothing. No. I suggest we put in some future legislation. If there is a problem, if we are not restricting enough guns because some are still out there, if we're not taking guns away, if we're not taking all assault weapons away, well, then, I challenge my colleagues. Join me. I'll put in legislation that says none of these guns at all, period. If that's a

problem with this legislation, because those of us who wanted stronger anti-gun violence measures compromised with those who don't want anything at all and you're saying that's bad?  Well, then fine, let's fix it.  I'll be glad to carry that legislation.  But the drafters of this legislation tried to accommodate all interests and tried to quell the concerns of the Second Amendment advocates.  So, you ended up with legislation which is not as strong as it could be, but it's a step forward.  We're going in the right direction and we're sending a message.

You know, I hear over and over again about lawful gun owners who have legally owned guns.  It strikes me that all guns somewhere along the way started off as legal and in the hands of a lawful gun owner, but somehow it ended up in the hands of somebody who misuses it.  So, enough of the legal gun owners.  I am tired of hearing about legal, lawful gun owners.  Some legal, lawful gun owner allowed her kid to get his hands on her assault rifle in Connecticut and everywhere else .  These little kids who are shooting other students, who are going into the classrooms with guns didn't buy these guns themselves.  They got them from lawful gun owners, supposedly responsible gun owners.  And every one of these crimes that we're talking about are done with guns that started off legally. The problem is we, as a government, have not kept them in the hands of lawful people.  We've allowed them to get out of their hands.  We, in Westchester County, have a law a that says every gun owner has to have every gun safely stored so that it cannot be stolen, that it cannot

107

get into the hands of someone with a mental problem, it cannot get into the hands of kids.  Why are we not considering that for the entire State?  Why do we have this narrow, narrow exception in here?  Why?  Because the people who are supposedly Second Amendment believers have blocked us from putting that legislation forward; that's why.

You know, there were some other problems with this, Mr. Speaker, as well.  Some people interpret the Second Amendment, which they claim protects their right to be armed, they also believe it gives them the right to secrecy.  A newspaper in Westchester County actually revealed, put online the list of all of the legal gun owners in Westchester County and they got excoriated for it because somehow the mantra of the NRA that your home is safer if you have a gun and it will deter somebody to come rob your house if they know you have a gun, now all of a sudden that doesn't matter anymore.  Now all of a sudden you have a right to secrecy.  What's going on?  What's really going on is people believe somehow that the Second Amendment going to protect them from some excess of government out there.  That this government is going to come in and lock them up and they need to be armed.

Well, Mr. Speaker, I prefer to use the power not of the Second Amendment, but of the First Amendment.  I believe freedom of the press and freedom of speech is the true champion and the true protector of democracy and to say to the newspapers that they can't publish information that the public wants to know, I think, is the true violation of our Constitution.

This bill contains restrictions which, I think, are intolerable, but I'm going to vote for them because this is a compromise.  I believe the newspapers should be able to list all of the people who have guns.  I would recognize some exceptions for undercover police officers and people like that who have put themselves on the line for our community and who really need to continue to be undercover, but I believe that this is an infringement of the First Amendment.  I prefer to rely on the First Amendment and the newspaper, I believe, did us a favor.  Look.  How do we know about excess of government?  How do we know that the person who is issuing permits is not issuing them to someone who has a mental problem or someone who should not have a gun?  The only way we can control government is to know what it is doing and now we're going to have this process which makes gun permits secret.

First and secondly, allowing public information enlists the public in the enforcement of the statutes.  I will tell you right now, I looked at that database that *The Journal News* published in Westchester County and I identified inaccuracies in the database, people who have moved still have guns registered at their old address.  That is the public now can say to the officer who is licensing, *You better send out a police officer and check that out.*

You know, we passed a law in Westchester County that requires recertification.  We did it back in 1997 and the purpose of it was so that the end of five years or any time in between a police officer can go out and make sure the gun is there and I'm not going to

suggest to you that this recertification process is perfect, because it's not.  But we had a situation in Westchester County where if it had been done properly by the police department, it would have saved some lives.

We had a gentleman who was a lawful gun owner, had his license right up to the date that he left the State of New York and left the gun behind in the closet where it was found by the next person who sold it.  It ended up being the weapon that killed somebody.  The police, when they found out that this gentleman did not renew his license at the end of five years, went looking for him and instead of tracing him to Florida and asking, *Do you still have your gun?*  They said, *Case closed.*  Well, this law which we're passing now is going to rely on the police department and individual citizens to make sure that those who lawfully have guns follow and will perform not just their rights, but their responsibilities as well.  Guns are dangerous and innocent people suffer when they're misused.

Mr. Speaker, I appreciate the opportunity to speak in favor of this legislation.  Hopefully, this will bring us forward to a little bit of a better place.  I think there's still a lot more that needs to be done.  Those of us who want to stop gun violence are going to continue the efforts to move forward, but I urge an affirmative vote because I think this is a very good piece of legislation and deserves the support of this Legislature.

ACTING SPEAKER AUBRY:  Thank you, Mr. Abinanti.

Ms. Corwin.

MS. CORWIN:  Thank you, Mr. Speaker, and congratulations to you on your promotion.

ACTING SPEAKER AUBRY:   Thank you, Ms. Corwin.

MS. CORWIN:  Just a couple comments, more a comment to what some of my other colleagues have pointed out, particularly the comment about improving the status quo, the feeling that our objective here is to just improve the status quo.  I have a very different point of view on that.  I think what we're supposed to be doing here is solving a problem, a very big problem.  You know, when I watched the video of the school shooting in Newtown, I was devastated by it because what came to my mind was the years that I spent going into my kids' elementary school volunteering as a parent, and walking through those doors where we had the glass on either side of the doors, and we had glass inside those doors and then we had glass all along the main office.  So, when you're standing on the sidewalk and you're looking in the building, you're seeing hundreds of children in the hallway and you're seeing several different school officials working in the main office.  All I could picture when I saw that video was what it would have been like if I were standing in that space right then and the shooting was happening while I was there and how much devastation.  It could have been more than 20 kids and 6 adults.  It could have been hundreds if it was a little bit different place.  And so, I think when I look at that, I see this as a real problem that we

111

**NYS ASSEMBLY**                                    **JANUARY 15, 2013**

need to solve but, yet, I don't see how this bill solves the problem.

      The Connecticut shooting was the impetus to this debate.  But if you look at the bill, the bill doesn't even solve the Connecticut shooting.  If this bill were in place in Connecticut a month ago, the shooter would have still had access to those guns because his mother never would have had to deny him access because he was never adjudicated as having a mental -- as being mentally disabled or mentally unable to have the guns.  In fact, our legislation that we put forth today, he was not convicted of a felony.  He was not adjudicated as mentally defective, he hadn't been committed to a mental institution and he was never a subject of an order of protection.  So, here we implement this bill, or we propose this bill to solve a problem and it doesn't really solve it.  And if you say, *Well, this bill would take care of the guns, the weapons that were used*, well, yeah, except that if you look at the Aurora, Colorado shooting or look at Timothy McVeigh in Oklahoma City, he didn't even need a gun to cause those kinds of problems.  In Aurora, Colorado he used homemade napalm.  He used homemade bombs and electronic devices that he got directions on the internet for.  So, if you don't have the gun, you still have the weapon to cause that kind of damage.

      So, this bill does not solve the problem.  I appreciate that a lot of people put a lot of time and energy into trying to solve this problem, but this bill doesn't do it and I don't think it even comes close to do doing it.  The only thing this bill really does is infringe on the rights of law-abiding gun owners; that's the only thing that it really

accomplishes.  So, what I think we need to do is we need to go back
and do something else because I, certainly, don't want to apply the
same logic to fertilizer and rental trucks to stop an Oklahoma
City-type killing that we're trying to use here by trying to ban weapons
when it's really the shooter that's the problem, not the weapon.

One other point I just wanted to make about this
process that we've just gone through.  You know, you guys see me
walking around the hallways at 11 o'clock, at midnight.  I am
miserable at 11 o'clock or midnight, waiting for a bill to come out on
the floor.  And I can tell by some of the questions that are asked that
it's not just the Minority, but some members of the Majority who don't
really know what's in this bill either.  And I wish I could say this is the
only time this has ever happened, but I was here in 2009-2010 when
this kind of thing happened all the time.  It's called legislating in the
dark, literally, in the dark of night, but without knowing what's going
on.  Other than the few hands in leadership, we don't know what's
going on.  Do we want to go back to 2009 and 2010?  Do you
remember the news reports, the approval ratings we had?  I think at
the time our approval rating was, like, 19 percent.  And do you blame
the public?  I mean, come on here.  We're here all day.  I was in my
office at 8:30 this morning.  We have all day long to look at the bills,
to have the discussions, have the meetings, have the discussion and
debate so everyone can see what's going on.

I received hundreds and hundreds of e-mails and
letters and phone calls to my offices over the last few days opposing

**NYS ASSEMBLY**                    **JANUARY 15, 2013**

this type of legislation.  I received just as many in the last 12 hours

complaining about the process.  I, personally, do not want to go back

to the dysfunction of 2009 and 2010.  It's not fair to the people in this

State, it's not fair to us.  So, please, I say to the Governor, I say to the

Speaker and I say to all my colleagues here today, let's not go there.

It's a bad place to be.  Nothing good is accomplished that time of night

and we shouldn't be doing that anymore.  Thank you.

ACTING SPEAKER AUBRY:   Thank you, Ms.

Corwin.

Mr. Crouch.

MR. CROUCH:  Thank you, Mr. Speaker.  Would

the sponsor yield for a couple of questions?

MR. LENTOL:  Yes, I will, Mr. Crouch.

MR. CROUCH:  Earlier, I think you were questioned

briefly about the concept of a pistol grip on a military-style weapon.

MR. LENTOL:  Pistol grip.  I thought you said "fiscal

cliff."

(Laughter)

MR. CROUCH:  I wish it was that simple.  That

factor alone on a military-style weapon kicks it into an assault weapon

so it makes it illegal?

MR. LENTOL:  Yes.

MR. CROUCH:  Even if the so-called "assault

weapon" was fixed so that it could only carry seven cartridges, the fact

that it still has a pistol grip --

MR. LENTOL:  Yes.

MR. CROUCH:  -- detachable magazine with only seven cartridges?

MR. LENTOL:  The amount of the rounds is irrelevant.  Again, I'll repeat what I said earlier.  These are standards and recommendations by the State Police whereby they believe that makes it a dangerous weapon.  These are the features that they believe -- and they wrote the bill -- that qualify it as a dangerous weapon.

MR. CROUCH:  I don't like the term "assault weapon."  They are military-style weapons, in my mind, and I believe the technology, if you'll call it that, or the design of having a pistol grip is there for a purpose.  It gives the soldiers a lot more control if it's used, like, one-handed in the military.  Certainly, in hunting activities, being able to grasp that rifle with both hands but still with one using a pistol grip, to me, it gives that -- the hunter a lot more control and a lot more accuracy in that rifle but, yet, we've taken that option away.  Even though he's only got two or three or four shots in the clip, that seems to me kind of, you know, kind of a bad thing to do.  We want to help that hunter be more accurate and have more control of his rifle if he's crawling over a log or something like that.  I mean, you just strictly took the recommendations without any concentration of talking to, maybe, some of the hunters and gun owners?

MR. LENTOL:  Well, I think that, you know, first of all, you have to remember that the Senate and the Governor were

**NYS ASSEMBLY**                                    **JANUARY 15, 2013**

involved in the negotiation of this bill, and the second thing is I don't think there's any problem with the hunter having another clip that he can put into the rifle.

      MR. CROUCH:  But, still, if it's a pistol grip --

      MR. LENTOL:  -- with seven rounds in it.

      MR. CROUCH:  -- a pistol grip which gives him more control of that rifle, more accuracy, he can't have it?

      MR. LENTOL:  Correct.

      MR. CROUCH:  That's unfortunate.  How about the penalties for illegal possession?  We talked about illegal possession, illegal use of handguns.  Does it increase the penalties for illegal possession?

      MR. LENTOL:  Yes.  I'll get you the section.  Well, there are several provisions that -- criminal use of a firearm, in particular, increases penalties for criminal possession of a firearm during the commission of a violent felony offense and a drug offense.

      MR. CROUCH:  What would be the maximum penalty for something like that?

      MR. LENTOL:  The maximum penalty -- it would become -- the possession of an unloaded firearm, for example, during the commission of a violent felony offense will be a Class D violent and will require a mandatory minimum determinant sentence of three-and-a-half to seven years.

      MR. CROUCH:  How about a second offense?

      MR. LENTOL:  Second offense would be a C violent

-- I'm sorry.   A five-year minimum on a D for that offense.

MR. CROUCH:  Any thoughts to life?  If they're out there, you know, it's only by chance, maybe, that they haven't shot somebody if they're doing a criminal activity with an illegal gun.  You know, we've seen in recent past somebody has gone out --

MR. LENTOL:  Right.  So, the third time this occurred the person could get life.

MR. CROUCH:  Could get life?

MR. LENTOL:  That's right.

MR. CROUCH:  Okay.

MR. LENTOL:  That's just one example, and there are others in the bill.  Possession of an unloaded firearm, for example, would become an E felony as opposed to a Class A misdemeanor, which it is now.  So, if you have an unloaded gun, it will now become an E felony.  Having a weapon on school grounds would become an E felony instead of an A misdemeanor.

MR. CROUCH:  Okay.

MR. LENTOL:  Community guns that we hear so much about in New York City, would redefine or clarify the law of criminal facilitation to allow somebody who shares a community gun to be guilty of a felony.

MR. CROUCH:  Right.

MR. LENTOL:  Enterprise corruption.  We have a new section that would provide for enterprise corruption for people who engage in a pattern of conduct of criminal behavior to be

117

punished under our own RICO statute.

MR. CROUCH:  Some of these increases in penalties, could any of them be pled down to a lesser offense?

MR. LENTOL:  Not if they're mandatory.

MR. CROUCH:  Okay.  They're all mandatory then?

MR. LENTOL:  Yes.

MR. CROUCH:  They're all mandatory?

MR. LENTOL:  They're all mandatory.  There are some exceptions in the law, but the DA would have to agree.

MR. CROUCH:  Okay.  The recertification process, I asked this question in Ways and Means.  My understanding and the answer I got was that the firearms that are licensed today -- I have a pistol permit, I have to recertify in five years.  I currently have a license, so I'll get a notice in three years that my license will run out?  I've got to recertify?  But somebody getting a pistol permit tomorrow, in five years that will -- he'll have to recertify but he or she doesn't get a notice; am I correct?

MR. LENTOL:  Correct.

MR. CROUCH:  So, if he fails to recertify, what happens then?  He's guilty of a crime?  It's a misdemeanor, I believe?

MR. LENTOL:  It would result in revocation of the license.

MR. CROUCH:  Okay and a Class A misdemeanor?

MR. LENTOL:  Right.  But I assume you would have time to cure that, claim you didn't get notice or -- it acts as a

revocation, but then you could reapply.

MR. CROUCH:  You could reapply.

MR. LENTOL:  If you failed to recertify, that's right.

MR. CROUCH:  And so he's got three or four guns in the house, he's lost his license to own those guns at that time.  To reapply, does he have to go through the standard -- you know, the fingerprinting and all the background checks like he originally did to get a pistol permit?

MR. LENTOL:  He would, and that's really the danger of it so that he should be careful to fill out that certification and remember the date and make sure that he's certified so he doesn't have to go through the registration because, remember, certification is not a registration.  The registration process is more detailed and more cumbersome.

MR. CROUCH:  What if he's --

MR. LENTOL:  The licensing.

MR. CROUCH:  -- traveling out of the country routinely on business or even serving his country?

MR. LENTOL:  I'm sorry?

MR. CROUCH:  What if he's traveling routinely on business or serving his country so he's out for the course of a year and he's busy?  How does he handle that?  Now he comes home two months after his license ran out, he's got to go through the whole thing again?

MR. LENTOL:  Well, he should be able to do it

119

**NYS ASSEMBLY**                    **JANUARY 15, 2013**

online from wherever he is.

MR. CROUCH:  But if he's busy and doesn't think about it...

MR. LENTOL:  Well, if it's important to him, he wants to continue to have that weapon and maintain his license, it's important enough for him to take time to recertify; it's the law.

MR. CROUCH:  But, potentially -- we get notified of our driver's license running out.  There are a lot of things we get a standard notification so -- to help us keep in compliance with the law.  But this, there's no notification here?

MR. LENTOL:  Yes.  There's nothing in the bill that prohibits the State Police from providing notice to the individual, it's just that it's not written in the bill.

MR. CROUCH:  Okay.

MR. LENTOL:  And we think that they will do it anyway.

MR. CROUCH:  Anything from preventing me -- you know, we live in Chenango.  I represent part of Broome County.  Anything from preventing me from traveling 50 miles to the south and buying ammunition in Pennsylvania and bringing it back home?

MR. LENTOL:  No.

MR. CROUCH:  So, anything on our border towns and gun shops around the borders of the State, they suddenly are out of the picture because a lot of people won't --

MR. LENTOL:  Unfortunately not.  We don't have

interstate commerce power.  And I'm sorry you said it, but we can only deal with the State of New York and, more importantly, it illustrates the need for broader legislation to be enacted by Congress.

MR. CROUCH:  Okay.  Thank you, Joe.

MR. LENTOL:  You're welcome.

MR. CROUCH:  On the bill.  This, in my estimation, is kind of a feel-good piece of legislation.  There are some good things in it on the mental health aspect that need to be tidied up, and we can still go further with that, but the tragedies that we've experienced recently has brought this to a bigger light and the knee-jerk reaction is to call for more gun control.  It basically impacts the law-abiding citizens of this State, more so.  The criminals will still have the guns of their choice.  Those that are bent on causing harm to somebody else will still do that, whether it's by rifle, pistol, hammer -- which seems to be more en vogue than the rifles according to the statistics -- knives, well over 161 stabbings, deaths by stabbing in the State in 2011.  So, the person that's bent on causing harm to somebody will still commit that crime but, yet, we've made the possibility of having law-abiding citizens become criminals, guilty of even as little as a Class A misdemeanor by forgetting to re-up your license in five years, but also possession of certain guns, rifles, because that's their choice of maybe target shooting or whatever they want to do, and shooting competitions, and we've now made them potentially criminals.

It's already been noted this would not have prevented anything out in Newtown, Connecticut.  Connecticut, by the way, has

**NYS ASSEMBLY**                              **JANUARY 15, 2013**

an assault weapons ban.  So, much of this stuff is irrelevant, what we're doing.  It's just, again, a feel-good -- anybody that goes home today and says, *Well, we've solved that problem* is delusional.  We're giving a lot of the citizens of this State a false sense of security in saying we've banned all these weapons and it's going to stop.  It's not going to stop.  There are going to be other avenues of destruction.  You can go on the Internet and find out how to make a pipe bomb.  You can go to the low technology -- it's been around for years and years and years -- of a Molotov cocktail.  Consider the fact that if that shooter in Connecticut had walked in with three Molotov cocktails, three quarts of gasoline, he could have ignited them and tossed them in the same period of time and, quite frankly, that really, really would have been a tragedy.  The person who tossed a pipe bomb in, a couple pipe bombs into that theater, that would have been also a tragedy.  So, I think we're kind of deluding ourselves if we think we've really solved a big issue here.  We've only kind of complicated a lot of people's lives that are very much in earnest of safe storage, safe handling of handguns and, yet, we've made their lives more difficult.

So, I can't support this.  If it was a piece of legislation in certain parts dealing with mental health issues, I could.  But we're avoiding a lot of issues that are kind of --  we're dancing around the edges of our culture, our changing culture of violence, the way we deal with violence, the way we deal with kids, dysfunctional families, mental health in our schools, and there's a lot of things all rolled in together.

When I went to high school we had shooting sports as part of our curriculum, and we could sign up for the rifle team and we shot competitively with other schools.  Many of my friends at school had their gun in their pickup truck because they hunted -- in deer season they hunted on their way to school, they hunted on their way home.  Nobody even thought about the danger of bringing a gun into school.  It never was even considered.  Today if you mention "gun" in school, they're going to be arresting you and taking you down the street to have you analyzed for a mental disability.

So, I think we've come a far way of something that we should be doing.  We're not the same culture and there's a lot of things to blame, but we're not addressing those problems.  We're not going to solve these problems.  If we changed a lot of things today we're not going to solve them until 20 years down the road when we have an opportunity to teach our young kids respect for each other, not to be bullying in schools, and a lot of those things that we're all dealing with now, but we're dancing around the fringes on having some real solutions.

So, I can't support this bill.  I'm disappointed in the way that it's come about that we suddenly have a message of necessity to deal with it and the first day of Session, it hasn't been vetted by the public.  Countless calls to our office about just what's in it.  You know, I'm not hearing -- liking what I'm hearing, questions about it.  So, we should have had an opportunity to have public hearings around the State on this and let the public weigh in.  Believe me, there's a lot

of smart people out there and they have a lot of good ideas that we,

unfortunately, didn't have an opportunity to listen to.  So, I'm voting in

the negative.

ACTING SPEAKER AUBRY:   Thank you, Mr.

Crouch.

Ms. Glick.

MS. GLICK:  Thank you, Mr. Speaker.  We've heard

a great many comments from colleagues, most of which were very

thoughtful, whether you're for or against the legislation.  We always

hear about the law-abiding citizen, but we make lots of restrictions,

even though most people are going to follow the law, sometimes they

don't.  Sometimes they don't because of extreme circumstances that

we can't foresee.  For a long time, we didn't do anything about drunk

driving because these were all law-abiding citizens.  Many of them

were police officers, judges, legislators and we didn't didn't do

anything about that.  But the carnage became so extreme and Mothers

Against Drunk Driving stood up and said we have to make changes

because too many people are dying.

Now, I don't know the number of weapons that are

out there in comparison to the number of cars -- and we can

manipulate statistics.  We do that all the time in our debates.  But, for

example, literally, millions of people take the New York City subways

every day, every day, millions of people are on the subways.  So,

statistically, if you take the number of people and the number of

dreadful incidents where either people have been killed by subways

because they choose to jump in front of one or are attacked and pushed in front of one, statistically it is an incredibly small number. But, we are in discussions in New York City about how we can adjust the way in which trains arrive.  Do they come in more slowly?  There are things we're trying to do.  So, just because we haven't done certain things in the past doesn't mean that we can't address them in the future.  We had simpler times.  We grew -- you know, when I grew up, every weekend, Saturday mornings, Hopalong Cassidy, the Lone Ranger, everybody had a cap gun, never thought twice about it.  Now parents are a little less anxious to have their youngsters acclimated to what becomes a deadly weapon in someone's hands.

After the Virginia Tech mass murders -- and let's be clear, these aren't tragedies, these are mass murders -- we're not even referencing Virginia Tech anymore because so many other mass murders have occurred since then.  But, after Virginia Tech there was an experiment that was done and they took students, because the answer was kids should be armed.  The professors should be armed. So, they did a little experiment and they took young people who were somewhat familiar with weapons and they put them in a lecture hall and they were given guns that, I guess, I don't think it was laser tag, maybe it was a little paint pellet or something, and they knew that there would be an intruder.  They just, of course, didn't know when. And in came an intruder, you know, a make-believe intruder with a gun and what ensued was chaos.  All of the young people who thought that they were very good at handling weapons wound up, in the chaos,

shooting their classmates.  Nobody actually hit the intruder, as it turns

out, but they wound up hitting each other or missing the people they

were sure they had hit.  And it turns out that adrenaline, which is, you

know, a physiological reaction to an emergency, affects your large

motor muscles so you can run like hell, but it really messes up your

small motor control, which is why you need highly-trained people

using weapons in emergency situations and, even then, they don't

always get it right.

There was an emergency on Fifth Avenue sometime

in the last several months.  A gentleman walked up and shot a former

co-worker because he believed he had been responsible for him losing

his job.  The police responded quickly.  They did get the perpetrator,

and the perpetrator was shot dead, although he wasn't fleeing.  He was

standing, walking away.  But he had the gun and he was walking

away, but the police, in a crowded situation, wound up shooting either

seven or nine other people.  And those were trained police officers.

So, the notion that people can, unless they're highly trained, defend

themselves with automatic weapons, semi-automatic weapons, is a

little bit of a fantasy.  Even the most conservative Judge Scalia said

that there can be reasonable restrictions imposed on gun ownership

without violating the Second Amendment.  And I know nobody wants

to hear that.  Nobody wants to hear that.

I don't think we should take people's guns away.

People who -- I think they should be trained.  I think they should be

licensed.  And if they have committed domestic violence, they should

**NYS ASSEMBLY**                                 **JANUARY 15, 2013**

never have a gun.  Not that they got over their -- how many women

have been murdered holding an order of protection because the gun

that their police officer husband or ex-husband had was used to

murder them and then, in many instances, to kill himself?

                We deal with reality the best way we can, and it's

become a more violent society.  Maybe the answer is take away all the

guns, give everybody a video game and then they'd have to hit you

over the head with it if they wanted to kill you.  But, obviously, people

have a legitimate right to hunt.  Many people feed their families that

way.  Nobody wants to take those guns away from people, but nobody

is hunting with semi-automatic weapons.  You do not want to have

eight or nine bullets in what you hope will be your family's next meal.

So -- and, you know what?  Somebody mentioned explosives.  Well,

you know, we do kind of track large purchases of fertilizer to ensure

that it is going for a legitimate use because people are now using them

for, again, mass murders.  We're not going to solve every problem.

But I do think that not trying to control the proliferation of

high-capacity magazines, my personal preference would be that

people could only use them at ranges because if you're going -- if you

want to use those kind of weapons, you should be doing it in a

controlled environment, and maybe they get kept at the range and you

check them out so that they -- so that we know that they're properly

secured.  You know, that's what I would do because I think that's what

makes sense, but that's not what we're doing and I'm not looking to

confiscate weapons.  Everybody, you know, has a right.  And in New

York City we restrict it because it's a very congested area.  It doesn't mean that we don't have people murdering each other, but we actually haven't had major invasions in schools.  And you know what?  It's not just schools.  How many people have had invasions in churches?  Do we arm the clergy?  We've had them at Bible study.  So, this isn't about people who behave morally and people who have no morals and are criminals.  There are people who are seemingly normal until -- my sister always says, *He was a very quiet man.  He was a very quiet man until he killed his entire family at Thanksgiving,* because of these horrible situations that we hear about.

        So, we're not going to solve everything, but that doesn't mean that we don't try to make some reasonable controls.  People who are law-abiding, responsible gun owners will now know that they have to register and re-up their registration.  There are people who don't register their cars and don't carry insurance, but does that mean we just throw up our hands and say, *Well, nobody's going to register their cars, no one's going to get insurance?*  No.  We believe in a civil society that people will follow reasonable rules.  These are reasonable rules, and it's an attempt to protect the majority.  And I don't know whether it's a majority or not that have weapons in their homes.  In some places it is; in some places it certainly is not.

        But I would just close by saying we try to respond to what is happening in our society today, not look back 100 years ago and say that there were no police departments, there were no people who lived anywhere near you, you were on your own.  So, the Second

Amendment was you can have a gun, but that gun, you know, isn't going to be able to spray ten bullets into a small crowd in a parking lot in Arizona.  And in Arizona you can carry guns, but there are places that have symbols, guns, zero, you know, with a sign with an "X" through it because they don't want you.  The law allows you, but don't come in here with your firearm.  So, these are reasonable restrictions. I would urge people to think about the greater good and to vote in the affirmative.

ACTING SPEAKER AUBRY:   Thank you, Ms. Glick.

Ms. Tenney.

MS. TENNEY:  Thank you, Mr. Speaker, and congratulations on your promotion.  Mr. Lentol, I'm going to give you a break today on your birthday.  So, on the bill, Mr. Speaker.

ACTING SPEAKER AUBRY:   On the bill.

MS. TENNEY:  Let me echo the sentiments of my colleagues who spoke so eloquently on the Second Amendment and preserving the rights, our Second Amendment rights and our law-abiding citizens.  Let me make a point of clarity in response to one of our colleagues.  The Virginia Tech shooter used a handgun and had a backpack filled with ten clip -- a ten magazine clip.  It took about three-and-a-half seconds to change a clip.  None of that is going to be prevented by this bill that we're passing, hopefully not, but I'm afraid we will, today.  So, I just want to point that out.  And I would also like to speak to the problem-solving aspect discussed by one of

my colleagues.  I think -- I believe I'm the only one.  Currently my district office is in a school.  I'm right down the hall from the students.  They can come in my office.  We go down the hall and have lunch.  We have one of those rare things that was eliminated in the 2010 budget.  We have a school resource officer in our school, which is secured.  We also have a locking system and a security system and he also carries a gun.  He carries his gun and interacts with the students every day.  We feel comfortable having him there and he's a wonderful addition.  Only nine school resource officers in our entire county.  Something we should be considering on a problem-solving basis.

I would like to get to another issue that has to do with my new district, and what an honor it is for me now to have Remington Arms as the largest private employer in our region.  In the Governor's State of the State address he described decades of decline in Upstate New York.  He described it as sad and troubling; however, among the many bright spots in our economy in Upstate New York, we have Remington Arms, which is, to date, the oldest, continuously-running manufacturing facility in the United States.  It started in 1816, 200 years in a few years.  We have generations of families who have produced high-quality firearms and ammunition for our country, for our military, for our sportsmen, hunters and anyone who values our Second Amendment rights.  The Remington is truly an iconic brand, and one thing that -- one fact that many of you may not know, there is only one worldwide brand that has the same name

recognition as Remington, and that's Nike.  That's how iconic this brand is.

I wanted to mention yesterday I had dozens and dozens of employees from Remington Arms here to meet with legislators and to meet with the Governor.  Unfortunately, because of the way this process was conducted, none of those people from Remington Arms got to meet with the Governor, although we did wait on the Second Floor for someone to come.  It's my understanding that the Governor has never toured Remington Arms.  He's never met with the nearly 1,400 employees we have in Ilion, New York, a very small hamlet in the Town of German Flatts in Herkimer County.

Something I would like to say about this is I just feel that hustling this bill through without public debate and education of our decision makers about guns, creating firearms, quality firearms, was not had.  We may be jeopardizing the livelihood of hard-working people who, for generations -- and there are generations of people who have now worked at Remington Arms -- who have gone to work each day and created these top-quality worldwide products.  They've served our central New York community with honor.  They've served in volunteer capacities in our communities and they're a vital part of Upstate New York.  These people deserved to have their voices heard yesterday, particularly by the Governor.  I wish he could have seen the faces on these people as they faced the specter of possibly losing their job.  They had a chance, and I hope that we aren't denying them a livelihood by voting in favor of this bill today.  Thank you, Mr.

Speaker.

ACTING SPEAKER LAVINE:  Mr. Saladino.

MR. SALADINO:  Mr. Speaker, would the sponsor yield for some questions?

ACTING SPEAKER LAVINE:  Mr. Lentol?

MR. LENTOL:  Yes, sir.

MR. SALADINO:  All right, Joe.  Happy birthday. Are you having a good birthday?

MR. LENTOL:  Oh, yeah.

MR. SALADINO:  Joe, can you tell us, is it your opinion that greater access to mental healthcare is more effective in the success of their care?

MR. LENTOL:  Say that again.  I missed --

MR. SALADINO:  Increasing access to mental health care.

MR. LENTOL:  Yes.

MR. SALADINO:  Increasing the intensity of mental health care --

MR. LENTOL:  Absolutely.

MR. SALADINO:  -- makes a big difference?  How about when it comes to substance abuse, increasing access to detox and rehab increases the success for those patients?

MR. LENTOL:  No question about it.

MR. SALADINO:  Calling for and making sure that we embrace inpatient care rather than leaving people to their own

132

devices makes a difference in getting people off substances and getting them -- helping them with the care they need?

MR. LENTOL:  I think the evidence speaks for itself.

MR. SALADINO:  Are there times when mental health problems lead to tragic crimes?

MR. LENTOL:  I think you answered your own question.

MR. SALADINO:  How about with substance abuse?

MR. LENTOL:  Absolutely.

MR. SALADINO:  So, why is it that these issues weren't more fully addressed in this bill?

MR. LENTOL:  I can't answer that.  I wasn't the drafter of the bill, so I think, though, that we had an immediate problem, that we've seen a lot of bullets being sprayed around the United States of America and we didn't want to wait for that to happen in New York.  We wanted to enact measures that are going to help now.  And down the road there will be other measures, I'm sure, that the Governor and the Legislature will entertain in order to try and obviate these mass killings either by some of the measures that you've proposed or by more mental health services available to people in neighborhoods, that we've never done, by the way, in this State.

MR. SALADINO:  Do you realize that --

MR. LENTOL:  And the budget process is coming up and there's going to be an opportunity to deal with some of the issues that you've discussed, and I hope that the Governor, in his wisdom,

understands that all of this is related, the need for mental health clinics in communities, because we've had a shortage of mental health services available to people in New York State and that's going to be a problem for us.  If it's not an immediate problem, it's a problem in the future.

MR. SALADINO:  Joe, you mentioned bullets being sprayed and not wanting to wait until those types of tragedies strike here in New York State, but, in fact, they have happened.  Isn't it true that every week, every month, we hear about more cases of gang members and others spraying bullets in neighborhoods, sometimes hitting children?  I was watching television just two nights ago, I heard of another case.  Isn't that happening quite often?

MR. LENTOL:  That's why we've enacted with this bill some criminal sentencing provisions, components of the bill, that deal with the situations that you've described and we've raised the penalties and we're trying our best to come up with a workable bill that all sides who participated in this discussion thought would help end senseless gun violence.

MR. SALADINO:  Part of my consternation with this, part of my question is when you speak of all sides, I don't understand why it's so difficult to get stiffer penalties, longer prison sentences for those who use a gun in a crime.  And I know that we've finally used this opportunity, with the begging of the Majority and the Senate, with the pleading of the Governor, but why is it that when I speak to our State Senators they tell me that many of their pleas to

greatly, greatly increase State prison sentences for those who use a gun in the commission of a crime were rejected in the negotiation of this bill?

      MR. LENTOL:  I don't think they were rejected.  I think there was a compromise.

      MR. SALADINO:  But a compromise means one side is asking for something.

      MR. LENTOL:  That's right.

      MR. SALADINO:  The other side is saying no.  Why did the Majority in the Assembly say no?

      MR. LENTOL:  Because there are tough criminal penalties in this bill.  We may not have gone as far with those criminal penalties as the Senate wanted, but neither did they go as far as we wanted, as Mr. Abinanti so ably pointed out, in the gun control measures that we thought were necessary to be in this bill.

      MR. SALADINO:  You mentioned a member of the Assembly who brought up some issues that I'm having trouble with as a balanced person who respects both sides.  I don't understand how one bullet in one gun protects someone in a very nervous situation, an untrained person who might, in fact, miss.  Then what do you do? Someone breaks into your home, is going to hurt your wife, hurt your children.  The only reason you own that gun is to protect them.  You only have one round in that gun.  You're nervous.  It's dark.  You're tired.  You might not have your glasses on, and you miss.  What do you do then, Joe?

MR. LENTOL:  Well, I think that if you're that concerned and you have a permit for a weapon, you have a right to surround yourself with several guns if you think that one gun is not enough.

MR. SALADINO:  How about the importance of more than one round, if we're really going to protect our families?

MR. LENTOL:  It's not one round.  I'm not looking for one round.  We have seven in this bill that are allowed.

MR. SALADINO:  But you just complimented the idealogy of someone who is advocating for only allowing one round.

MR. LENTOL:  No, I didn't.  I did not, Mr. Saladino.  What I did was I spoke to his talking about -- his discussion regarding compromise.

MR. SALADINO:  Okay.

MR. LENTOL:  Which is what we do here and, unfortunately, the United States Congress doesn't engage in.  And I'm happy that we're able to come to a solution to a problem by compromise.

MR. SALADINO:  I just don't -- I don't understand that idealogy, Joe, and I ask these questions because I -- I'm trying to understand -- I'm trying to explain when my constituents call, the people I'm very fortunate to represent, ask why is it that they didn't pass a law that says if you use a gun in a crime you're going go away to State prison for 20 or 30 years, to stop the gang violence that's hurting all of our communities and, frankly, help the people who need

136

**NYS ASSEMBLY**                                **JANUARY 15, 2013**

it the most in communities that are prevalent in gun violence.

MR. LENTOL:  Did you read the bill?  I don't know if you've read the bill, but there are pretty tough criminal penalties where you can go to jail for life.

MR. SALADINO:  On the third conviction?

MR. LENTOL:  All right.  And the first time you can --

MR. SALADINO:  Why not the first conviction?

MR. LENTOL:  -- go away for seven years, and the second time you can go away for double that, and then you can go away for life.

MR. SALADINO:  I'm just trying to understand why we didn't make sure on the first time -- if we're doing what we say, if we want to protect every life in this State --

MR. LENTOL:  Mr. Saladino, if I didn't tell you once I'll tell you again, and I'm not going to mention any member's name. He was the only one who happened to mention the art of compromise in this bill and the way it was done.  It wasn't done in a way where we got everything we wanted and the Senate and the Governor got everything they wanted.  It was done in a way where some of the parties got what they wanted, a little bit of what they wanted, and others got a little bit of what they wanted, not all of what they wanted, and that's what a compromise is.

MR. SALADINO:  I think we're here, in my opinion, to put an end to the violence and to embrace the best strategies to be

inclusive of the ideas of all and to let people know New York is first.
If you commit a crime with a gun, you're going go away to prison for a
very long time.  And what I'm starting to see is a shift toward the legal
law-abiding taxpayer gun owner instead of putting the priority of
putting people away who threaten, who shoot, who wound and kill our
children.

And, Joe, let me ask you one more question.  Is the
act of stigmatizing someone with mental illness adverse to their life
and their recovery.

MR. LENTOL:  Say that again?  I'm sorry.

MR. SALADINO:  Is the act of stigmatizing someone
with mental illness adverse to their life and to their recovery?

MR. LENTOL:  Yes.

MR. SALADINO:  Okay.  So, isn't it possible that
people would refrain from reporting mental illness?  Isn't it possible
that mental health providers would refrain from writing that letter?

MR. LENTOL:  Anything's possible.

MR. SALADINO:  So, how is it that when we really
want to address the issue, and I think we're all of the same minds, that
severe mental illness, schizophrenia, the things associated with that,
people who have mental illness but choose not to take their
medication?

MR. LENTOL:  Again, we're relying on
professionals.  These are licensed professionals in our State who have
to make a determination based upon the individual before them.

138

When they see that that person could be a danger to themselves or others, they have a duty to report that in order -- not only because they will be guilty of professional misconduct if they don't, but, more importantly, because it's the right thing to do.

MR. SALADINO:  So, then, why, please tell me, would the Majority negotiate for a bill without -- to solve this problem without negotiating for greatly-increased mental health care, especially for those who have insurance and aren't getting that care?

MR. LENTOL:  I told you earlier that we have a budget process that, hopefully, will provide resources for the kind of things that you're recommending.  I think that the things that you are saying are accurate and we need to do that, too, but we need to do this bill first.

MR. SALADINO:  I hope.

MR. LENTOL:  Well...

MR. SALADINO:  You stated earlier that if the State of Connecticut had this bill in place for years it would not have stopped that horrible and tragic crime, and here we're just going to repeat that.  Instead of using this opportunity to embrace all the drivers and to make sure that when people spray bullets in our communities, a phrase you used, when people commit crimes with a gun -- I just don't get it, why we're not putting that person in jail in State prison for a very long time.  And I just don't get it why the caring and thoughtful people in this Body would reject that notion when the State Senate was pushing for it and why we had to compromise when

we know that that's a big trigger in the solution.

        MR. LENTOL:  And I think there will be further compromises down the road and, hopefully, we'll all get more of what we think are necessary to solve this problem.

        MR. SALADINO:  On the bill, Mr. Speaker.

        ACTING SPEAKER AUBRY:   On the bill.

        MR. SALADINO:  As I begin my 10th Session in the New York State Assembly, I find myself facing a very difficult vote; perhaps one of the most difficult.  It's not difficult to reject the idealogy that getting -- going after the guns as if a gun is a victim, it's the idealogy of not embracing the need of intensive mental health care, not embracing the needs associated with inpatient detox and rehab.  Many of us on both sides of the aisle have been calling for this.  The mental health associations of this State have been calling for that.  Here's our opportunity, but it's not in the bill.  It doesn't make sense to me and so many of us.  The bill doesn't protect our children from the profile that killed without mercy recently and on so many other occasions in so many crimes before, whether there were multiple victims or one victim in a spray of bullets from a moving car in a neighborhood.

        You know, Governor Cuomo must be commended for taking on this issue in a decisive manner.  I applaud his motivation, his intention and his drive to genuinely protect the public.  I applaud and appreciate Senator Skelos and our responsible Senators for negotiating as tough as they could for pushing for Kendra's Law,

for life in prison, for the emergency responders.  We would all be

voting for those issues if they were stand-alone bills, and they should

be.  Those are important issues on their own, to stand alone and be

passed into law.  You know, their actions prove a strong resolve to

advocate for the constituents who have elected them to represent these

communities.  They were the voice of reason, just like so many have

spoken today.  Also, the courage of our Assembly Minority Leader is

very commendable.  He's made it public how it's so wrong to exclude

nearly a third of the members of this House from the process, to stifle

the voices of millions of New Yorkers and to fail to work inclusively.

Our Minority Leader's attempt to bring inclusiveness would bring

about effective ideas, strategies and solutions that Republican

members have brought to the issue, to work together with the

Democrat members because we both have good ideas that should be

embraced.

               The reality is I'm appalled by this recent tragedy and

all of the tragedies, the murders that have taken the lives of

Americans, but if this legislation was enacted in Connecticut, it

wouldn't have solved the problem and we should be making sure that

our solutions solve the problems, especially when we go down the

road of constitutional rights.  Better access to intensive mental

healthcare, better and more inclusive access to inpatient rehab and

detox for substance abuse patients will lead to a safer society and will

dramatically reduce these violent acts.  Thank you.

               ACTING SPEAKER AUBRY:   Thank you, Mr.

Saladino.

Mr. Ryan.

MR. RYAN:  Thank you, Mr. Speaker.  Will the sponsor yield for a question or two?

ACTING SPEAKER AUBRY:   Will you yield.

MR. LENTOL:  Yes, Mr. Ryan.

MR. RYAN:  It's been a long day.  I just have a few questions.  We've heard statements about the infringements on rights of sportsmen and hunters.  I just wanted to ask just a few basic questions and to see if we can ferret out how this works.  I currently own a 12-gauge shotgun that I use to hunt pheasants with, and it's a semi-automatic and it holds five shells.  Would that be infringed under this bill?

MR. LENTOL:  No.

MR. RYAN:  Would I have to register --

MR. LENTOL:  I don't believe so.

MR. RYAN:  -- this gun under this bill?

MR. LENTOL:  No.

MR. RYAN:  Would I be in any way limited from bringing this firearm into the field?

MR. LENTOL:  No.

MR. RYAN:  And the current DEC laws limit a six-shot -- a weapon with a six-shot capability from going into the field now; is that correct?

MR. LENTOL:  Yes.  That's correct.

**NYS ASSEMBLY**                              **JANUARY 15, 2013**

MR. RYAN:  So, this whole idea of limiting clip size or limiting the number of shots available really wouldn't affect sportsmen at all?

MR. LENTOL:  Not at all, you're right.

MR. RYAN:  Because we're currently already limited to only bringing weapons that have a capability of holding six shots?

MR. LENTOL:  Yes.

MR. RYAN:  Thank you very much.

MR. LENTOL:  You're welcome.

ACTING SPEAKER AUBRY:   Thank you, Mr. Ryan.

Mr. Ceretto.

MR. CERETTO:  Thank you, Mr. Speaker.  Joe, happy birthday.

MR. LENTOL:  Thank you, John.

ACTING SPEAKER AUBRY:   Will you yield.

MR. LENTOL:  Yes, sir.

MR. CERETTO:  I'm just going to speak on the bill, Joe.

ACTING SPEAKER AUBRY:   Even better.  On the bill.

MR. CERETTO:  But I wanted to say happy birthday. I was going to ask you your age, but...  I'm joking.

Mr. Speaker, it's been an interesting night and interesting day and, actually, it's been a great debate.  I just want to

say that in the last 24 hours I've gotten a text message from my staff members and they're telling me that about 400 of the constituents in my district have either contacted our office through phone calls, visited the office, or through e-mails and what they're saying is, interesting enough, that 400 of those that have contacted my office are saying that they're against this bill.  Not one has said that they're in favor of it.  So, that's just an idea of the representation of my district of what they're thinking.  At least that's what I'm hearing.

The reason why I'm troubled is because I don't like this process.  I don't like the idea that they do not have a chance or an opportunity to be part of this process.  And as their representative, the way that I got this information about voting on this or making this an issue and deciding what to do on this vote, you know, hearing about it last night, struggling with what I had -- with the information I had last night, trying to sleep on it and then being here, trying to gather this information and make a good vote for the people that I represent, I'm troubled by that process.  I'm troubled by the process that this is such an important amendment, the Second Amendment.  And I was a history major, I was a history teacher.   The key things is the forefathers -- I mean, these amendments, like others, the Second Amendment, the right to bear arms, freedom of speech, freedom of religion, they deserve more time to discuss actions in the process of government.  It can't be dissolved and within 12 hours or 24 hours of what we're going to do to determine how we're going to affect these laws on these amendments for the people that we serve, and for that

**NYS ASSEMBLY**                    **JANUARY 15, 2013**

reason I'm troubled.

I just want to say, finally, that if we had more time, more time that I truly believe that we deserved to have more time in this issue, that we would have come to a better consensus, a better bill because I truly believe that looking around at the members of this Assembly, knowing the Governor, the Senate, we're all responsible people.   We all truly believe that we want to do what's best for the safety and the security of the people that we serve.  The question tonight is we didn't have enough time in this process to work together to do that, and because of that I think you're going to see those amendments coming forward because this bill in front of us doesn't answer all the solutions of what we're trying to achieve because of the process.

So, because of that I want to thank you for allowing me to speak and give my opinions, and I will not be voting in favor of this legislation today.  I will be voting no.  Thank you.

ACTING SPEAKER AUBRY:   Ms. Barron.  I'm sorry.  Out of order.  Ms. Fahy.

MS. FAHY:  Thank you, Mr. Speaker.  I want to rise in support of this legislation, and I'll rise as a new co-sponsor on what I believe is historic and comprehensive.   It is one of my very first acts in the Assembly, and I take great pride in that.  Just two weeks ago I gave an opening statement in my swearing-in ceremony that talked about how proud I am that New York is my adopted home, and I want to see New York be a leader on a number of issues because I think

145

**NYS ASSEMBLY**                                    **JANUARY 15, 2013**

that is what has distinguished New York for so many decades, if not centuries.  I think this does allow us to distinguish it.

I, too, am troubled and I want to speak for a minute on the process.  I, too, was troubled by the process.  This is far from a perfect process, but in this instance, I think, for two reasons, it is worth going forward with this imperfect process because it is important to move rapidly.  I have seen the efforts towards comprehensive gun control be beat back for decades now, decades, and I see that if this were allowed to lie for a few days more of those efforts would be beat back and compromised.  I'm not only distinguished here as being a new member, I'm also distinguished by being probably one of the only members that's been held up by gunpoint; not in this State.  But I would like to think that I will prevent future folks from being held up because -- well, we've talked a lot today about assault weapons.   One of my primary concerns is handguns and the proliferation of handguns.  It may not have prevented the crime committed on me, but it may prevent us going forward.  And lots of folks today have talked about how this will not solve this problem or not solve that, but if New York does continue to lead the nation, maybe we will set the standards for the rest of this country and move beyond something that has haunted me for many years.

So, I do believe we should seize the day.  It is not perfect.   It will not solve every problem, but it does allow us to move forward.  It is very much a common-sense approach and very much

146

many steps in the right direction.  I do commend the Governor.  I commend all of my colleagues here, the Speaker and the Senate, the work that has been put into this legislation, and I do think that so much of this has been accomplished while respecting the rights of law-abiding licensed gun owners.

So, again, I thank you for this opportunity.   I did feel a need to speak.   I should also say I'm a parent and a PTA member.   I want to do everything in my power that will help even incrementally move us forward to safer streets, safer communities and, particularly, safer schools.   Thank you very much for the time.

ACTING SPEAKER AUBRY:   Thank you, Ms. Fahy.

Mr. Stec, Daniel Stec.

MR. STEC:  Thank you, Mr. Speaker.  On the bill.

ACTING SPEAKER AUBRY:   On the bill.

MR. STEC:  Thank you.  I, too, have been contacted over the last few days by many, many of my constituents via e-mail and calls to the office.  The vast, vast majority have all expressed concerns and complaints about the process that was used, specifically our message of necessity, that translates into a lack of transparency and an inability for not only us but, more importantly, our public to effectively review the bill before us.  Certainly, additionally, the vast majority of those folks that contacted me are very upset and concerned with the content of the bill.

My background, I come from a town in Warren

County.  I was the Town Supervisor for nine years, and the last two

years I was the Chairman of the County Board.  I can tell you from

experience that in order to change the zoning code of the town or to

erect a stop sign in our community, it required a ten-day notice and a

public hearing, and we're talking about altering things that have

impacts on the Bill of Rights.  Now, among those people that

contacted me, I was sent an e-mail and I thought I would just share a

portion of that.  Three quotes that I think are relevant and I think are

weighty.  "The very atmosphere of firearms anywhere and everywhere

restrains evil interference.  They deserve a place of honor with all that

is good," George Washington.   "The best we can hope for concerning

the people at large is that they be properly armed," Alexander

Hamilton.  "The Constitution shall never be construed to prevent the

people of the United States who are peaceable citizens from keeping

their own arms," Samuel Adams.

                    Now, there's some good in the bill and I don't

question the intent behind the bill in response to what is clearly a

problem we have in this country with gun violence.  And there's a lot

that I could support.  If they were broken out separately, perhaps there

are many portions of the bill that I would vote in favor of; however, I

find that the shackling of the Second Amendment to this goes too far

and the impacts on the Second Amendment is unacceptable to me.  If

the goal is public safety -- and, again, I'll refer back to my experience

in local government -- then I urge this Body to take up something that

was not mentioned in the State of the State address, to much of our

disappointment, but if the goal is public safety, then I encourage us to also look at taking up mandate relief.

My district is an Adirondack district.   It's a very rural district in many places, and the impact of the tax cap on counties without mandate relief has led counties to get creative in identifying what is and what is not mandated by the State for the county taxpayer to pay for.  And counties have figured out in Upstate New York that one of the non-mandated areas that can be looked at is sheriff's road patrol.  Counties are cutting back on their sheriff's road patrols.  There have been counties in Upstate New York that have considered eliminating the sheriff's road patrol.  So, when you couple that with a very rural district, it brings home a different perspective that some people that have a lot more experience on subway systems than I do might want to consider.

This bill simply does not accomplish our stated goal. Historical data does not support any strong correlation between more gun control and less gun violence and, in fact, there's plenty of evidence to the contrary.  Thank you, Mr.  Speaker.

ACTING SPEAKER AUBRY:   Mr. Walter.

MR. WALTER:  Thank you, Mr. Speaker.  On the bill.

ACTING SPEAKER AUBRY:   On the bill.

MR. WALTER:  The tragic mass murders in Newtown broke all of our hearts.  As a father of two young children, it was hard not to look at the faces of the victims in Connecticut and not

see the faces of my own boys.  Like many of us, I couldn't watch the coverage on television without breaking into tears.  And when emotions are that high, it's even more important to take a step back and thoroughly discuss and analyze an important issue like this and get down to the true causes.  But that didn't happen here.  The process was rushed and the people of this State have been short-changed.  If a more thorough review had been done and had taken place, we may have found the following:  That despite the sensationalism and tragedy of mass shootings throughout this country -- and I by no means mean to diminish them and the tragedies that they are, but they still only account for less than one percent of all homicides in this nation.  So-called "assault weapons bans" have proven to be completely ineffective in decreasing the murder rate in this country.  The National Institute of Justice studied the impact of the 1994 assault weapons ban.  The ban did not produce any statistical significant reduction in the murder rate.  There was no decline in the average number of victims and there was no decline in murder victims with multiple wounds.  Because these rifles were never really used for murders and other weapons were used instead and the statistics in New York bear this out, as you've heard already, 5 out of 769 murders in the State of New York were committed with rifles.  And that's just not the rifles we're planning on banning here today, all rifles.  We have a murder rate in New York State of 4 per 100,000 people.  The rifles account for .03 of that statistic.  But what would really have an effect?  Well, there was a study by Professor Steven Segel.  He did a comparison of

murder rates and the mental treatment policies in various states.  Less access to psychiatric inpatient beds and more poor mental health services leads to an increase in homicide rates of more than 1 per 100,000.   Broader involuntary civil confinement laws were associated with 1.42 fewer homicides per 100,000, 1.42 fewer homicides per 100,000 as compared to .03 by doing this ban on rifles.  This bill addresses some of these mental health issues, but does not go nearly far enough.

A more thorough approach, an open and honest process with public hearings, expert testimony could have made it better.   Instead we get illusory reform.  Rifle and ammunition bans in this bill will receive the headlines and allow its supporters to pat themselves on the back and claim victory, but will do nothing to make us safer.   The bill would not have prevented the tragedies in Newtown or Webster and will only serve to further infringe on the rights of law-abiding citizens.   I cannot support this legislation.  Thank you.

ACTING SPEAKER AUBRY:   Thank you.  Ms. Barron.  With my apologies, Ms. Barron.

MS. BARRON:  Thank you.  First, congratulations on your new position.

Will the speaker yield?  I'm sorry, will the sponsor yield.

MR. LENTOL:  Don't promote me yet.  Thank you.

MS. BARRON:  Thank you.  First, I also want to add

my voice to those who have expressed the pain that they feel at the tragedy that most recently occurred, and to say that it's time that we look to have those measures in place that will improve the conditions and protect citizens wherever they are.  I also, though, have concerns about the process and the short period of time that we had to review this bill, so I've been spending the last few hours reading this bill and listening to the comments that my colleagues have offered.  I wanted to ask you, I may have missed it, but none of my colleagues asked the question about page 38, lines 24 through 43, which it appears talks about funding for metal detectors and security cameras in schools.  So, I just wanted you to give me some further information about that.  Who would made that decision?  How would those schools be selected and where's that money coming from that would do that?

MR. LENTOL:  Yes.  I think I'm going to defer it to the Chair of the Education Committee, Ms. Nolan, who helped formulate that provision in the bill.

MS. BARRON:  Thank you.

ACTING SPEAKER AUBRY:   Ms. Nolan.

MS. NOLAN:  Certainly.  I would be happy to, Mr. Speaker.  I thank you.  As I understand it, currently building aid -- and I'm sure the member is well aware of this -- the localities, each district comes up with their request for building aid and then they are reimbursed a certain amount, a certain percentage, based on just what it is -- there are lengthy guidelines from the State Education Department, which I know some of that is on that website to look at.

This will allow for a slightly higher level of reimbursement -- I think 10 percent is the figure.  I'm going to double-check with the staff.  Ten percent, right?  I'm always happy when I get those numbers right -- so that certain things like hardening of doors and other security features will be more available.  By having a larger reimbursement, more districts will elect to, perhaps, look at some of those important safety procedures.

MS. BARRON:  So will every school that's requesting this be granted this funding?

MS. NOLAN:  Well, whatever the process in each locality is.  So, for example, in the City of New York I know that there is a give-and-take between the central Board of Ed or the Department of Education and schools.  I would imagine principals will initiate in some instances and say, *We think we'd like to have this,* in other instances, in other school districts, the district may decide to want to do it for every school in their district.  There will be a process.  State Ed will issue regulations.  What this really does is enhance the reimbursement for security features, I think just for the next three years, so that districts do have some time, if they wish, to explore having heightened security measures.

MS. BARRON:  Thank you.

Mr. Speaker, on the bill.

ACTING SPEAKER AUBRY:   On the bill.

MS. BARRON:  While this bill does much to ban assault weapons and increases the penalty for criminal possession of

**NYS ASSEMBLY**                                **JANUARY 15, 2013**

weapons and requires health professionals to make referrals for persons that they feel may engage in conduct that would result in harm, I think that there's another aspect that we have not addressed that's not in this bill, and that talks about getting to -- give assistance and aid to people in need for their mental health who have not committed a crime and who have not been involved in the system. And I'm talking specifically about students in schools.  We're looking at a diminution of services where you don't have guidance counselors that are there who can intervene and offer services to children who are in need, and we're talking about not giving additional funds to those community groups that are engaged in crime reduction.  There's a group in my community that offers services directly to people through schools.  They offer the opportunity to be involved in gang reduction and they also talk about going to individual schools and doing remediation.   I think that it's incumbent upon us to make sure that as we look at this budget process, we give adequate funding to those community organizations and those institutions that are engaged in reducing crime, and not just do this piece about the guns.  Certainly, they are a major factor, but I would encourage my colleagues as we go forth to give that full consideration.  Thank you.

           ACTING SPEAKER AUBRY:   Thank you, Ms. Barron.

           Mr. Palmesano.

           MR. PALMESANO:  Thank you, Speaker.  Will Mr. Lentol please yield for a couple of questions?

ACTING SPEAKER AUBRY:   Will you yield.

MR. LENTOL:  Yes, I will, Phil.

MR. PALMESANO:  Happy birthday, Joe.

MR. LENTOL:  Thank you.

MR. PALMESANO:  I just have a couple of quick questions and then I'll speak on the bill.  Joe, regarding the five-year renewal, are there any fees associated with the renewal process?

MR. LENTOL:  No.  It's not a renewal of your registration, it's only a certification.  So, there's no fee.

MR. PALMESANO:  Is there any language in the bill that would prohibit an assessment of a fee in the future?

MR. LENTOL:  No.  Nothing authorizes it either.

MR. PALMESANO:  Regarding the database with the State Police, it's my understanding they'll take over this database.  Will the State be assuming all the costs?  Could there be any costs that the localities will have to pick up on this?

MR. LENTOL:  Yes.  And that cost is minimal in comparison.  You know, the DNA database may have cost $200,000.  I don't know if it was that database, but it's in the hundred thousands, we're not even talking about millions to do.

MR. PALMESANO:  So, the State's going to assume that cost?  And is there any language in the bill or in the statute that will prohibit any cost to the localities in the future?

MR. LENTOL:  The State will bear the cost.  I think the bill says that the State will bear the cost.

MR. PALMESANO:  All right.  Thank you, Joe.

MR. LENTOL:  You're welcome.

MR. PALMESANO:  On the bill.

ACTING SPEAKER AUBRY:   On the bill.

MR. PALMESANO:  Mr. Speaker, my colleagues, I certainly understand and respect the passion and viewpoints of everyone in this Chamber on this issue, and I also believe all of us in this Chamber, regardless of how we vote on this bill, are concerned about violence in our society and the safety of our citizens and children.  We may have different viewpoints and ideas, but I do believe we all care about safety and want a safer society.  However, I'm extremely  -- regarding the process of this bill and how it came to the floor, to say I'm disappointed is an understatement.  To rush a bill to the floor of the Assembly, circumventing the 72-hour vetting process which is part of this House, when there's been people talking about we're in a new era of transparency and openness, but it seems like that only works when it fits a specific case.  To not allow for public hearings, public input or public vetting on this issue is unfortunate.  I actually read one article where someone indicated that it was good to rush it to prohibit people with influence to come up and lobby and maybe change the bill one way or another.  To rush this bill without a proper viewing, vetting, public hearings or input just to say we are the first in the nation to make a political statement is unfortunate, especially when we are dealing with changes that impact the Second Amendment rights of law-abiding citizens.

If we are going to address violence in our society, especially in light of the recent horrific tragedy in Newtown, Connecticut and Webster, New York, then we needed and deserved to have a deliberative and thoughtful discussion and process, rather than a rush to print and vote on a bill without any public review. An issue as important as this and its implications deserves nothing less than a thorough and deliberative process.

I know it's been mentioned in the State of the State and some of our colleagues who have mentioned nobody needs a ten-clip magazine clip to hunt deer. While I argue the Second Amendment is not about hunting, hunters and sportsmen benefit from the Second Amendment and the Second Amendment is to allow an individual to protect their family and their home from those who want to do harm. According to the Department of -- DCJS, 90 percent of the firearms used in New York crimes come from out of State, and most of these guns are illegal. We all know criminals aren't looking to follow the law, they're going to break the law if that's their intention.

One of my colleagues mentioned one bullet is enough or they'll wait for the police to come. Just one of the counties I represent is from a very rural area. Just one county, 1,400 square miles. To pick up the police -- to call the police to come, it could be 10 minutes, 15 minutes. A very large rural area. Not every town has a police department, and with cuts to the sheriff's department there's not that type of a force. And what if there's two criminals coming in

to invade your home?  When the police get there what they'll find is not good.

To kind of bring this home I just want to share comments of a letter I received from a constituent of mine who lives in a very rural area in one of my counties.  She goes on to say, "I'm a 59-year-old woman who lives on a dirt road.  In the last six months we've had three break-ins and four meth labs broken up, all within ten miles of my home.  I'm a law-abiding citizen.  I went through the process of acquiring a concealed carry permit for personal protection. What will this law do to stop the criminal activities surrounding my home, and how is it going to allow me to protect my family?  I'm a responsible gun owner.  All of my guns are in a safe and protected from those who will attempt to steal them or from people not qualified to use them.  Not one of those guns has killed anyone, and I pray that I will never have to use them to protect myself or my family."  So that's why someone might need a ten-round clip, because you know criminals coming into a home are not going to abide by the law.  The Second Amendment is about protecting themselves, their family and their home against these criminals who want to do them harm, to steal, to hurt, to rape or kill.

Again, a criminal is not going to pay attention to the law we're passing here today about registering a gun, for being on a database.  That's not what they're going to do.  They're going to find a way.  The Second Amendment is a fundamental right for our law-abiding citizens to protect themselves, their families and their

home against those individuals who have no moral values or regards for the law or their neighbor.

For this and other reasons, Mr. Speaker, I will be voting in the negative today.

ACTING SPEAKER AUBRY:   Mr. Blankenbush.

MR. BLANKENBUSH:  Thank you, Mr. Speaker. On the bill.

ACTING SPEAKER AUBRY:   On the bill.

MR. BLANKENBUSH:  I pulled out an article that I am going to briefly mention.  David Kupelian, who wrote the book *How Evil Works.*  He talked about psychiatric drugs and antidepressants.  I'm not going to read the whole article to you, but in part of his article he mentions how in the last -- in a modern era that most predators in school shootings and mass murders in our modern era has recently come off or on psychiatric medication.  And he goes and he points out which individuals he's talking about.  He talks about Columbine.   Eric Harris was on Prozac, Paxil, Zoloft.  Patrick Purdy, who went on a schoolyard shooting rampage in Stockton, California in 1989, which actually was the catalyst bill that the legislators in California passed a ban on semi-automatic weapons on both antidepressants and psychiatric medication.  It talks about a 15-year-old murderer who murdered his parents in 1998, and the next day he went to his high school in Springfield, Oregon and opened fire on classmates, killing two and wounding 22 others.   He was on Prozac and Ritalin.  In 1988, 31-year-old Laurie Dann went on a shooting

rampage in a second grade classroom.  She was also on both antidepressants and antipsychotic drugs.  In 1997, a 14-year-old shot -- went to his high school and, again, opened fire, again on Ritalin.  In 2005, a 16-year-old in Minnesota, same deal -- I don't have to read it all to you -- in 1989, just a month after he began taking Prozac went on a shooting spree at work, shooting 20 members that he worked with.  An 18-year-old in 1996, after two weeks of starting Prozac, went in and shot his father to death.  His statement was this, *I didn't realize I did it until after it was done.*  He said, *This might sound weird, but it felt like I had no control of what I was doing, like I was left there holding a gun.*

Hinckley, who shot President Reagan, was also -- after two hours he had Valium.  Andrea Yates.  If anybody remembers this lady who drowned her five kids in a bathtub, said Satan told her to do it.  She was also on the same type of drugs.  And there's other -- I could keep going, and I'm not going to do that for the amount of time we have.   The article goes on and even talks -- and it goes into talking -- and this article came out just after Sandy Hook.  And he talks about Lanza and he doesn't know yet whether the gentleman was on any types of drugs at all.  I'll just go to his last sentence in this article where he says, *In the end, it may well turn out that knowing what kind of guns he used isn't nearly as important as what kind of drugs he was using.*

I think we have a pattern in all of these murders and mass murders that we have in our schools and in our communities.

It's much, much more than drugs -- I mean, guns.  It's what is in the mind of the perpetrators that do these crimes.  And I think we're looking at a pattern here that goes on and on and on, and until we straighten out what kind of prescriptions and what kind of drugs our young people are on that we may never end the violence that's happening today.

I'm going to be voting in the negative on this bill because it really doesn't answer the questions on what we have in our society and what's going on.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:   Thank you, Mr. Blankenbush.

Mr. Barclay.

MR. BARCLAY:  Thank you, Mr. Speaker.   I wonder if the sponsor would yield for some short questions?

ACTING SPEAKER AUBRY:   Mr. Lentol, I believe for the 70th time you're asked to yield.

MR. LENTOL: Not yet.

MR. BARCLAY:  Joe, you might be able to answer these in one-word answers, but the first question I have is regarding guns that take ammunition that load in the stock.  There's some .22's out there where the ammunition goes in the stock.  How about if that has more than a seven-round fill that you can put in that stock?  Say it's 10 or 12; would that gun now be outlawed?

MR. LENTOL:  We're checking.  I'm not sure they're covered because you have to be able to eject a magazine in order for it

NYS ASSEMBLY                                        JANUARY 15, 2013

to be covered, except one that has a detachable handle.

   MR. BARCLAY:  So, it only applies to detachable

clip --

   MR. LENTOL:  Magazine.

   MR. BARCLAY:  -- it wouldn't apply to something --

maybe in a shotgun you could put -- I don't know if it's going to fit 12

rounds, but something over 10.

   MR. LENTOL:  Yes.

   MR. BARCLAY:  Some of our colleagues have

mentioned there's a lot of reasoning of what happened in Connecticut

and the tragedy that took place in Connecticut.  Some things that I

don't know have been mentioned, there's violent video games,

certainly has been talked about as maybe a reason and inspiring some

of these people that do the horrors that they've done, and also media

sensationalism going on.  Does this bill cover either of those things,

violent video games or anything about media, curbing the media or

the First Amendment rights for people that report on these issues?

   MR. LENTOL:  No, it doesn't.

   MR. BARCLAY:  Thank you.

   ACTING SPEAKER AUBRY:   Mr. McLaughlin,

second time around.

   MR. MCLAUGHLIN:  Thank you, Mr. Speaker.

Would you yield, Joe, for a couple of questions?

   MR. LENTOL:  Yes, Mr. McLaughlin.

   MR. MCLAUGHLIN:  Joe, are you 70 today?  Is that

your age?  I think we had you yield for each one of your years, maybe.

MR. LENTOL:  I said I was 39.

MR. MCLAUGHLIN:  When you started the debate. A couple of questions for you that I didn't get to before.  Is there anything in this bill regarding antidepressants and their use or the restrictions of anybody on an antidepressant or -- I know we're talking a lot about mental health.  Is there anything about antidepressants?

MR. LENTOL:  No, there isn't.

MR. MCLAUGHLIN:  Okay.  The other thing that struck me as just a little ironic is the ability with a soon-to-be-banned weapon to gun walk it out of New York State and sell it to another state.  Does that bother you at all that we view it as such a problem that we're about to ban it, but we seem to have no problem pushing that on to another state?

MR. LENTOL:  Yes, it does bothers me.  What bothers me is that we ought not be leading the way.  The President and the Congress ought to be leading the way and not us but, unfortunately, as always, we find ourselves in the unique position as being one of those states of the Union that people follow and I think we're fortunate to have a Governor who understands that and wants to lead the way.

MR. MCLAUGHLIN:  But it just seems to me that to allow this to walk out of the State, if it's such a bad problem you'd think a progressive State like this would prevent it from leaving the State, but I guess not.

MR. LENTOL:  But you have to understand that we're trying to accommodate gun owners by some of these provisions. We're not trying to -- we understand that there has to be some accommodation to the gun owners, too.

MR. MCLAUGHLIN:  Understood.  But the accommodation did not include allowing you to pass that gun on to a law-abiding heir like a son or a daughter or a spouse, it didn't include that accommodation.

MR. LENTOL:  Not if they reside in New York.

MR. MCLAUGHLIN:  Okay.  Now, the three-day waiting period.  I read a statistic that said we had about 22,000-something guns that were actually sold to people because the background check could not be completed within the three-day waiting period.  Do we address that in this legislation, you know, if the system goes down or they can't come back with it in the right manner?  As it stands right now they're allowed to, if they decide to, the FFLs are allowed to issue or sell the gun, if you will, to the person. But what happens now, going forward?  Have we addressed that at all?

MR. LENTOL:  No, that's not in this bill.  The only thing that we addressed was the ammunition provision, in case you couldn't get ammunition when you buy from a gun dealer and the system is down.

MR. MCLAUGHLIN:  But, yes, that would be the ammunition part, but if you go apply for a gun permit and you can't

**NYS ASSEMBLY**                                    **JANUARY 15, 2013**

get it done in three days, have we addressed that at all?  Because right now in 22,000 instances they issued guns to people that otherwise -- that then we found out failed the background check but the three days had expired.

> MR. LENTOL:  We didn't change that.

> MR. MCLAUGHLIN:  Okay.  And that wasn't in New York.  I believe that was nationwide.  Okay, just kind of curious about that.  And Joe, I have in my hands here something that we received from the Senate, which is rejected Democrat proposals in this gun bill.  I don't know that you've seen this or if you know that these are there or not.

> MR. LENTOL:  No, but we don't have our own list of rejected proposals that the Senate rejected, so I don't have anything to show you.

> MR. MCLAUGHLIN:  Okay.  So then I won't address it then if you haven't seen it.  I'll leave that one alone.  Okay, thank you, Joe.  I appreciate it.  And Mr. Speaker, on the bill.

> MR. LENTOL:  And, by the way, I would recommend not to have that list shared because it really has the capacity to dampen the enthusiasm to compromise.

> MR. MCLAUGHLIN:  Well, it sure does when we talk about confiscation of assault weapons.  It absolutely has the ability to dampen a compromise.

> Mr. Speaker, on the bill.

> ACTING SPEAKER AUBRY:  On the bill.

MR. MCLAUGHLIN:  You know, I want to tell a little bit of a quick story and how it ties into this.  When I was flying airplanes for a living, one of the things that you never wanted to do in an emergency was move too quickly.  The first thing you wanted to do is take a breath, analyze the situation.  Nothing was going to hurt you that quickly, you had time to analyze it and then make a plan and address the situation appropriately.  In 1987, Delta flight 810, it was a 767 flying L.A. to Cincinnati, had a problem with their auto throttles and this genius pilot reached down and shut off both fuel levers and came within 500 feet of killing 208 people onboard that airplane, 500 feet -- they were within 500 feet of the Pacific Ocean.

I tell that story because that's what we've done here.  We've moved too quickly.  We have not analyzed this appropriately, and we now find a situation where we're amending all kinds of law in New York State and already seeing the flaws in this.  We could've and should've waited and given this the proper respect that it deserves.  You can tell we're on a three- to four-hour debate here.  It's a big deal, people, and we should've given this the respect it deserves and let the people of New York weigh in on this.  To do anything other than that was an abuse of power and it was disrespectful.  We could have rejected the message of necessity.  We have the ability to do it.  We could have put the brakes on and just said, *Wait a minute*, and we chose not to.  I think that is a mistake that this Legislature has made repeatedly now, where we just move too quickly.  All of the big things we do seem to get done on a message of necessity.  That is not the

essence of good government.

Just recently, in Georgia we had a mom whose home was invaded.  Luckily, she had a .38.  That's the same weapon the police use to carry.  It carries six bullets.  This animal came through her door with a crowbar.  She retreated.  In her own castle, she retreated with her nine-year-old twins, a boy and a girl.  She went upstairs and locked the bedroom door.  He kept coming in.  He came through that door.  She retreated to the crawl space of her home with her twins and her six-shooter which her husband, thank God, had trained her how to use.  This animal came through to get into that crawl space.  And any of you can listen to the 911 call, and it shows the complete fallacy of magazine limits.  She unloaded until that gun went click.  Sadly, did not kill this piece of garbage.  Hit him five times, punctured stomach, punctured lungs, punctured liver.  He's on the ground crying, telling her to stop shooting.  She had to stop shooting because she was out of bullets.  So, five out of six she hit him.  Pretty good shoot when you're in a tight space, trying to protect her children.  He gets up and she tells him not to move or she'll shoot him again, but she had to stop shooting, she couldn't reload.  He gets out of that house, gets into a car, goes down the street, crashes into pole and that's how he was caught.  The police were called almost immediately, before he even came in the front door but, as usual, and no fault of our very good police force -- and this was in Atlanta, but all over the nation we have good police -- they were a ways away and it took them, as usual, eight to ten minutes to respond.  But they were

**NYS ASSEMBLY**                                    **JANUARY 15, 2013**

on their way.  So, six bullets, five out of six didn't get the job done.

So, I would like somebody with a straight face explain to me how one

bullet and calling the cops is an adequate method of defense.  That's

shameful.

We have reached the point now that we are debating

bills and debating a gun control law based on a scary package.  That's

what this is all about.  Assault weapons -- which is a political term,

not a gun term -- assault weapons scare people because they look like

military weapons.  They don't behave that way, and we've had all

kinds of falsehoods put out about that.  They are semi-automatic

weapons.  They are not the most powerful weapon out there.  They

perform much like many other semi-automatic guns.  But I get it, they

look scary.  If we take the gun, break it down, clothe in a nice pretty

wooden stock and a wooden handle, that doesn't offend anybody's

sensibilities and that gun's okay.  The performance of the gun is

exactly the same.  So, that's what we've come to now, is legislating

based on a scary package.  We've already pointed out that out of 769

homicides in New York, five were done with long guns.  Not even

necessarily assault weapons, but long guns.

So, once again, I believe that the criminals will laugh

at this law like they laugh at every other law.  They won't pay any

attention to this.  One to seven percent of all homicides in the State

are committed -- in this nation, actually, are committed with assault

weapons.  One to a maximum of seven percent.  It is not the weapon

of choice for gang-bangers and drug dealers.  That is handguns.  So, if

you had a real drive to get something done, you would be truthful and going after handguns.  But, you're not yet, although I know that day is coming.

Mental health has been on the table here but, yet, we ignore the role of prescription drug abuse and antidepressant abuse in this nation.  And in almost every instance that I know of -- we're waiting to see this Connecticut drug report -- but in the others almost exclusively they are on some kind of antidepressant, which removes them from reality, they have thoughts of suicide, all the other side effects.  I was watching a commercial the other day for dry eye, and one of the side effects was suicidal thoughts but, yet, we don't address it.  We don't even talk about it.  We don't even talk about what the real issue here is, which is mental health.  Now, speaking of mental health, we talked a lot last year about how we supposedly have fixed this problem.  Well the truth is in just of first three-quarters of last year 263 New Yorkers died in the care of our mental health system.  So, it's not fixed, but we're about to overburden them again with all kinds of requirements.  So, I don't think they're quite ready for what's coming at them.

I do think, once again, that this was an abuse of power to use a message of necessity.  It did not and should not have been done.  Just because we're first doesn't mean much.  We need to be the best.  If we're going to do something, we should do it the best.  Rushing to judgment does not solve anything.

In the end, there's all kinds of studies that show gun

control is counter-productive.  You're choosing to ignore them, and that's your prerogative.  But the data is out there, you can't deny it.  It's the Harvard study that I'm looking at here.  The CDC has said that there's no connection.  As a matter of fact, there's an anti-connection, there's a counter-connection, if you will.  There is statistical proof all over the place that as gun ownership increases, murder and suicide decrease.

We have heard repeatedly over the past week how we respect the rights of hunters and sportsmen.  What about the respect of those people who choose to defend their families?  You are limiting their ability to do that when you tell law-abiding citizens to *Suck it up and put seven rounds in the chamber and if that doesn't work, good luck, call the cops.*  Tell that to my people that live in rural Rensselaer County where the nearest officer may be an hour away because he's on another call.  How dare you, how dare you put New Yorkers at risk?  You don't have that right.  They have the God-given right to defend themselves and their family, and if they choose not to, that is certainly their right as well.  If they choose to have one bullet and then throw the gun at the perpetrator, that's their right, too, but this Legislature does not have the right to tell the citizens of New York that they cannot defend their families.  And not all of us live in downtown Manhattan where the cops are maybe just minutes away; although I don't think it occurs down there, either, because they're pretty busy.

So, I would say in closing I'm not proud of this legislation.  Don't be proud of this.  You've done nothing to make New

York safer.  You've done quite a bit to make New Yorkers less safe by limiting their ability to defend themselves and their family.

ACTING SPEAKER AUBRY:   Last on our list, Mr. Jordan.

MR. JORDAN:  Thank you, Mr. Speaker.  May I ask Assemblyman Lentol to yield one more time?

ACTING SPEAKER AUBRY:   Will you yield, Mr. Lentol.

MR. LENTOL: Certainly, Mr. Jordan.

MR. JORDAN:  Thank you, Chairman.  And I would also like to thank you and Assemblyman Ortiz for at least attempting to respond to our questions, of which there were many, and I think it's a very important part of the process.

I would like to direct your attention first to Section 38 of the new bill dealing with high-capacity magazines.

MR. LENTOL:  Yes.

MR. JORDAN:  As I read that, it appears as though clips or other mechanisms capable of handling more than ten bullets are banned immediately; is that correct?

MR. LENTOL:  Yes.

MR. JORDAN:  And as I read it, those capable of holding seven to ten are banned within 60 days; is that correct?  Or 90 days, I apologize.  I couldn't read my own writing.

MR. LENTOL:  Ninety days.

MR. JORDAN:  The question that occurred earlier

**NYS ASSEMBLY**                    **JANUARY 15, 2013**

and there seemed to be some confusion and we're looking to just clarify the record, are police or peace officers exempt from that provision, and if yes, how so?

MR. LENTOL:  We believe that they are by general language that already exists in Section 265 of the Penal Law, but we have a chapter amendment that's going to clarify it to make sure that it's our intent.

MR. JORDAN:  And I think I agree when you say "we believe," that is part of the problem because there is a provision but it is tenuous, at best, to find and certainly could create great confusion.

MR. LENTOL:  That's correct.  And there is a chapter amendment that I've looked at and, I think -- believe will solve the problem.

MR. JORDAN:  I would next turn your attention to Section 41 of this new bill.  That deals with possession of guns on school grounds.

MR. LENTOL:  Yes.

MR. JORDAN:  And similarly, I find nothing in this bill, and unlike the last one I find nothing that even in general language would exempt the police.

MR. LENTOL:  Yes.  Once again, that also falls under the 3505 justification section, but we have -- but we're going to fix that in a chapter amendment.  That was brought up in the Codes Committee that you used to be on, remember?  We went to work

**NYS ASSEMBLY**                              **JANUARY 15, 2013**

immediately because we saw that there were some mistakes and I thank the members of the Codes Committee.  They're very astute in pointing out many of these things and we're going to get it done.

MR. JORDAN:  As we're talking of chapter amendments I would then turn your attention to Section 48 -- or actually, I apologize.  It's not Section 48 of the bill.  It's the provision dealing with failure to register, and I don't have that section in front of me.  But, under Section 48 of the Penal Law as amended in this provision it would suggest that failure to register is a misdemeanor.  If you then turn to the section that amends Section 41-A of Penal Law, that seems to make it a felony.  And admittedly, although, granted, we are not yet to 24 hours with the bill, we could not find anything that meshed those two for clarification.

MR. LENTOL:  It's a little confusing because it's a misdemeanor not to register, but you have the opportunity, if you unknowingly fail to register then you have an opportunity to cure, but if you fail to do that then it becomes a D felony.

MR. JORDAN:  Well, actually, I think you're mixing the two sections.

MR. LENTOL:  I'm sorry.  It's an E felony afterwards to posses the weapon and it continues to be.  It doesn't change from an A misdemeanor to a felony.  It's an A misdemeanor for failure to register and an E felony for possessing the illegal weapon.

MR. JORDAN:  Well, except as I read Section 41-A of the Penal Law it says it's a felony to fail to register.  But I submit

we have these inconsistencies between the two provisions, and while we're at it, rather than have a lengthy debate over what "knowingly" means, I submit the way this bill has been written it puts the burden on an otherwise law-abiding citizen that if they are stopped, the ticket will be issued.  Now they have a misdemeanor charge pending against them in local court which will appear on their DCJS File 15 report forever and we are now stigmatizing law-abiding citizens.  It would be helpful for our police --

      MR. LENTOL:  Counsel informs me that the arrest does not appear on your rap sheet.

      MR. JORDAN:  Oh, it absolutely does.  When you run a File 15 it shows up.  And if it's disposed of by an ACOD it will show up.  If it is not reported back, it will show up.

      MR. LENTOL:  What if it's dismissed?

      MR. JORDAN:  Reports that were put on that DCJS in 1976 continue to appear, because I continue to get calls in my office from people who cannot cross back into the United States from Canada because of their undisposed-of criminal charges on their File 15.

      MR. LENTOL:  Well, that's wrong.

      MR. JORDAN:  I would rather move on to something more meaningful, and since we're doing chapter amendments I think we should --

      MR. LENTOL:  But it is true that if the case is dismissed, it's supposed to be taken off your rap sheet.

MR. JORDAN:  Correct.  Supposed to, though, is a far different cry from actuality.  And I would submit, though, while counsel is considering chapter amendments, we should provide a clear definition of what "knowingly" means, because for everyone who has ever been stopped in a 30 mile-an-hour zone doing 45 and tells the police officer, *I thought it was 45 miles an hour,* the officer will say, *I am so very sorry* and hand you the ticket.  We should not be putting otherwise law-abiding citizens in a position of having to answer in court to a misdemeanor charge for something they did not know about.

MR. LENTOL:  Well, that's a problem that I would love to work with you on because we should cure that.  If the DCJS is not removing those cases that are dismissed from the rap sheet, we should solve that problem.  That's a different problem altogether that ought to be resolved.

MR. JORDAN:  When we started this this morning I think there was talk about chapter amendments and continuing, I believe some of them have been drafted.  Are we taking those chapter amendments up this afternoon to avoid many of these inconsistencies from actually occurring?

MR. LENTOL:  No, we're not.  The Senate is not here to take them up anyway.

MR. JORDAN:  And what happens with some of these exemptions that are not clear if we fail to take up these chapter amendments?  Do they remain in the bill as written?

175

MR. LENTOL:  They will, but I suspect that most of these chapter amendments are amendments that the Senate will want to cure and that we will get it done with this batch next week.

MR. JORDAN:  If only they were here today we could correct the problem and avoid many of these ambiguities. Thank you, Mr. Speaker; thank you, Chairman.

MR. LENTOL:  Thank you, sir.

ACTING SPEAKER AUBRY:   Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:   The Clerk will record the vote.

(The Clerk recorded the vote.)

Mr. Hevesi to explain his vote.

Members, votes will be explained.  Please try and hold down the noise.

MR. HEVESI:  Thank you, Mr. Speaker.  This is my first time speaking in this legislative Session, and I want to congratulate you, Mr. Morelle and Mr. Jordan on your new posts. Classier people to lead this Body I could not think of.  But, this was a very emotional issue, complicated, multi-faceted, and I think we should all, especially since there are a lot of new members here, just take a moment to acknowledge the class, dignity and grace with which the Chairman of the Codes Committee has just conducted himself.  He really is the gold standard of how debates should be done in this Body,

and it's also his birthday.  So, if I could ask everybody to just give him a round of applause for what he's done here today.

(Applause)

And also just to suggest that I am sincere in my beliefs because I currently have no bills going through the Codes Committee.  Thank you very much.

ACTING SPEAKER AUBRY:   Mrs. Robinson to explain her vote.

MRS. ROBINSON:  Thank you very much, Mr. Speaker.  I, too, rise to congratulate you on the position that you have assumed and wish you well, and also to our Majority Leader, Joe Morelle, in his position as well.

I stand today -- I've listened very intently to all of the debate and discussions that have taken place this afternoon, and I submit to you that for me and others that live in the communities that I represent, this is a state of emergency.  It's a state of emergency that says that we need to put something in place so that people know that we are serious about gun violence in and around our communities.  Each and every day I'm called upon to participate in some press conference or some kind of discussion regarding gun violence in the community.  It's too much and it's too often that we have this experience.  Much discussion has gone forward in terms of talking about mental health, and when I heard one of the speakers, one of my colleagues, talking about the illnesses that are taking place or what people have been addicted to, I think about it goes back to the

177

discussion that one of our members had spoken about earlier about the need for health facilities in the schools and guidance counselors so that there would be people there, perhaps, to be able to identify situations that are going on with young people that need to be addressed, and those things are not happening.  We continue to take resources out of the schools, whereas our teachers don't have an opportunity to be able to teach because they're dealing with a lot of other issues that we don't address.  And, so, I think that in addition to that, we are also looking at how our communities are being put together.  Are the resources being retrenched out of our communities in terms of our jobs and training, community centers and after-school programs?  Those things are not there and our young people are standing around with nothing to do and they get into trouble.

So, I'm pleased to support this legislation and thank all of those partners that participated in putting this together.  Is it a perfect piece of legislation?  No, it's not.  I look forward to the various amendments that will come forward to make this an even better piece of legislation and, hopefully, we'll be able to get the kind of personnel in the schools that we need -- unarmed personnel in the schools to be able to assist and provide additional safety.  Thank you, and I vote in the affirmative.

ACTING SPEAKER AUBRY:   Mrs. Robinson in the affirmative.

Mr. Cahill.

MR. CAHILL: Thank you, Mr. Speaker.  The

arguments today that the Second Amendment is a shield against any gun legislation is disingenuous.  Decision after decision by court after court in this land have said that reasonable regulations of firearms is perfectly within the purview of our legislative Bodies.  It's within our power and, in fact, it is our duty.

We've heard several times today that this legislation fails the test of perfection.  Well, perfection is a lofty goal and it ought to guide us every single day, but it's not a pass when we fail to achieve it to do nothing.  With the exception of the 20 freshman, 20 or so freshman that are here, the fact that this matter is before us today under a message of necessity and that it's comprehensive and complex is really not a very sincere argument.  In fact, most of the provisions that we have before us have been discussed and debated ad nauseam on this floor in the past.  These are not new ideas, ladies and gentlemen.  The opponents of this legislation have said today that, essentially, any gun legislation is unacceptable.  They say that the answer to this culture of violence that's swallowing our cities, that's spread to our shopping centers, our colleges, our high schools and now even our elementary schools is to put an armed guard in the halls of those elementary schools and a gun in the desks of our teachers. It's never, ever the gun.  It's never the lethal capacity of the firearm. It's always something else.  Well, it's a lot of things.  So let's start today.  Let's not consider this the end of gun rights.  Let's not consider this the end of violence.  Let's not consider the end of the culture of violence and that we've done our job.  Let's start this discussion today

and let's find out what we have to do to change our society so that every citizen and especially, ladies and gentlemen, every single child in our society is safe.  I withdraw my request and vote in the affirmative.

ACTING SPEAKER AUBRY:   Mr. Cahill in the affirmative.

Mr. Butler.

MR. BUTLER:  Thank you very much, Mr. Speaker. Certainly, as this debate continued on it became clear that our objections from this side of the aisle centered around both a process and product.  We believe this bill was rushed through.  As we've heard repeatedly during debate, there are some flaws in it that have to go back and be corrected.  Foremost among our concerns, despite the protestations of my colleagues, we're concerned about protecting the Second Amendment rights, constitutionally guaranteed rights of legal gun owners.  I think if you look through history, and we have a history teacher, but if there's a lesson to be learned there that when these rights begin to be taken away it happens by degrees.  It happens incrementally.  And I think we heard some of our speakers today talk about future legislation, additional.  We haven't even passed this bill and we're already talking about additional legislation coming up. Who is to say what's going to happen two years, three years down the road?  I think we've started a very dangerous precedent here, a very dangerous process and, based on that, Mr. Speaker, I'm compelled to vote no on this piece of legislation.  Thank you very much.

ACTING SPEAKER AUBRY:   Mr. Butler in the negative.

Mr. Lavine.

MR. LAVINE:  Thank you, Mr. Speaker.  After the mass killings at Columbine, Virginia Tech, Fort Hood, Oikos University, Tucson, Binghamton, a gymnasium in Pittsburgh, a Sikh temple in Wisconsin, a theater in Aurora and, the other day, Aurora again, Sandy Hook Elementary School, 60 miles from where we sit here today, and Webster, New York, we can no longer stay the course. We have learned and the public knows that more guns equals simply more madness.  Now, I agree with one who will vote against this that this is feel-good legislation but in a very different sense of the use of those words.  It will feel good to know that assault weapons and high-capacity magazines can no longer be legally sold in the State of New York, and it will feel good to know that we today are taking steps, meaningful steps, against a very well-funded special interest to make sure that there will be fewer occasions when we need to have the mass sale of 20 little coffins the next time someone decides to go in and commit mass murder and mayhem in a school in the United States.

And, finally, let me say this simply about the Second Amendment:  Those who wrote the Second Amendment, those who gave us democracy, they pledged their lives, their sacred honor and their fortunes for democracy.  It is incomprehensible.  It is impossible to imagine that those who wrote the Constitution would ever for a moment have been so complacent as to tolerate the mass killings that

occur in this nation far too often.  New Yorkers are proud of what we are doing here today, and I have no doubt that the Founders would have been proud as well and I am proud to cast my vote in the affirmative.

ACTING SPEAKER AUBRY:   Mr. Lavine in the affirmative.

Mr. Tedisco.

MR. TEDISCO:  Thank you, Mr. Speaker, my colleagues.  This was an important and significant debate today on the floor because what it has done is really exposed what the real intent and potential and, I think, real outcome of what this piece of legislation is going to do.  The real intent, from the logic I've heard on the floor here today, is to make innocent, honest, law-abiding citizens, law-abiding gun owners, criminals.  And the by-product of a part of this legislation is to create a false sense of security, because let me reiterate:  There were 769 murders in New York State.  What you're telling your constituents is you made them safer today by banning the vehicles of potentially impacting up to five of those homicides when, in comparison, 31 homicides took place with blunt instruments like a hammer.  Let me say it again:  You took away the opportunity for that vehicle who potentially might have impacted five lives when 31 lives were taken away with a hammer or blunt instrument.  But it gets worse than that.  I heard your members get up on the floor and say, *We've got to redefine the Second Amendment,* or what I would call now the "1.5 Amendment" because you've diminished it after this bill

**NYS ASSEMBLY**                    **JANUARY 15, 2013**

passes.  The new definition for the Second Amendment is you can only have, as a taxpayer, one gun with one bullet in it and when those gang-bangers, those five of them break into your house, the first thing you do is run to the farthest room in your house, call law enforcement and when they break through the door you tell them to line up with their hearts next to each other and you have a high velocity bullet and you're going to be so good at marksmanship you're going to shoot the first one and it's going to go through all five of their hearts.  No, you're going to die.  That's what you're telling your constituents.  They're going to die.  But it gets worse than that.  One of your colleagues stood up and said it's the innocent, honest, law-abiding citizens who are guilty because you've allowed them to steal your guns.  Well, when they break into your garage and steal your vehicle it's their fault that those gang-bangers stole your vehicle and ran down five of your constituents.  And then when you let them borrow the hammer next door and your next-door neighbor kills your next-door neighbor with that hammer, it's your fault.  You let them borrow the hammer.  What kind of logic are you using here with this legislation?

        ACTING SPEAKER AUBRY:   Mr. Tedisco, how do you vote.

        MR. TEDISCO:  I'm going to vote no to this because this is tragic for our rights and freedoms and for our Second Amendment.  Thank you.

        ACTING SPEAKER AUBRY:   Mr. Tedisco in the negative.

Ms. Weinstein.

MS. WEINSTEIN:  Thank you, Mr. Speaker.

Firearms pose a particular threat to victims of domestic violence, and lost in some of this discussion are some important sections of the law that we will be amending to protect victims of domestic violence.  In 2009, women accounted for 67 percent of domestic homicides in New York as compared to 13 percent of all other homicides, and firearms were used in approximately 30 percent of intimate partner homicides that year.  And one study has found that abused women are five times more likely to be killed by their abuser if the abuser owns a firearm.

One of the things we do by this legislation is to ask criminal and family court judges when issuing orders of protection or temporary orders of protection to suspend or revoke firearm licenses when they find a substantial risk that the perpetrator of abuse may use the weapon to threaten unlawfully -- cause harm unlawfully against the victim for whose protection the order is issued.  Currently, it is only discretionary with a very limited mandatory provision.  I don't know if this was law if this would have prevented the young woman who was killed and murdered in my district over the weekend by her ex-boyfriend but, certainly, I do know that once this becomes law there will be victims of domestic violence who will be alive to tell the tale, there will be abusers who will not have weapons and we will certainly be making our State much safer for victims of domestic violence.  I withdraw my request and vote in the affirmative.

ACTING SPEAKER AUBRY:  Ms. Weinstein in the

affirmative.

Mr. Graf.

MR. GRAF:  Thank you, Mr. Speaker.  I think by
going around the normal legislative process we have created a piece of
flawed legislation.  We received this bill -- I got the first look at it at
11 o'clock.  Just today we have discussed a need to amend this bill, to
fix this bill on some of the flaws that are contained in it.  We have
heard that this legislation will avert situations like Sandy Hook.
Unfortunately, this bill doesn't even -- this bill will not do that.  This is
a bill of missed opportunities.  There are so many issues surrounding
this that we have not even touched upon.  A lot of times these children
that strike out have been subject to taunting and bullying in our
schools to the point where we had a young girl that couldn't take it
anymore and jumped in front of a train.  Others will strike out against
the people that have tormented them.  We haven't touched that.  We
haven't touched violent video games that have desensitized our
children to this type of violence.

What I have in front of me today that you expect me
to vote upon is a flawed piece of legislation that everybody admits has
to be fixed.  Well, I'm voting on this bill that's in front of me today.
I'm told, *Don't worry about it, we will fix it.*  My problem is fixing this
bill and the chapter amendments are going to wind up on top of that
pile, underneath the mandate relief that we were promised two years
ago and never got.  I will be voting in the negative.  We should not be
rushing this.  We should take our time and put forward legislation we

can be proud of.  Thank you.

ACTING SPEAKER AUBRY:   Mr. Graf in the negative.

Ms. Rosenthal.

MS. ROSENTHAL:  When the tragic murder by a disturbed individual who had access to high-powered semiautomatic weapons transpired, the people in my neighborhood on the Upper West Side were devastated.  We came together and we had rallies and we held peaceful vigils, but they demanded that something be done.  They demanded that something be done on the Federal level as well as the State level, so I'm very proud today that we, in the Legislature, are going to pass the first bill in the nation to combat the scourge of gun violence.  This is an excellent bill with many provisions that will save lives in the future.

In terms of having this bill rushed, as one of my colleagues said this topic has been discussed ad nauseam, although we will to continue discuss it once it is the law.  This is a matter that has been ruminated over by all of us and by all of our constituents.  It is a state of emergency, and that's why it was so urgent to pass this with a message of necessity.

Today would have been Martin Luther King's 84th birthday.  He was killed by a gun.  He lived a life of and preached non-violence.  What he had to say about emergencies and urgency is especially germane regarding this vote.  We are now faced with the fact that tomorrow is today.  We are confronted with the fierce

186

urgency of now.  In this unfolding conundrum of life and history, there is such a thing as being too late.  This is no time for apathy or complacency.  This is a time for vigorous and positive action.

So, in honor of his birthday and all that he stood for, including peace and non-violence, I withdraw my request and cast my vote in the affirmative.

ACTING SPEAKER AUBRY:   Ms. Rosenthal in the affirmative.

Ms. Gibson.

MS. GIBSON:  Thank you, Mr. Speaker, and congratulations on your appointment.  Certainly, colleagues, this is a defining moment in our history in the State of New York and, certainly, throughout this long debate on such a sensitive issue when you talk about gun control and the proliferation of guns in our community, we know that something has to be done.  We recognize that this is a crossroad, that this is certainly a defining point where we must do something.  Many of us have talked in our communities about the notion *Enough is enough.*  At what point will we recognize that too many people have died and lost their lives at the hands of illegal guns?

Now, while this bill before us is certainly not a perfect bill, I believe it is a bill in the right direction and gives us great strides of progress in coming to that moment.  I am proud that within this bill we are addressing the assault weapon ban; a Statewide gun license and record database; safe storage and establishing

requirements for the maintaining of rifles and firearms; extending

Kendra's Law, addressing provisions for those individuals that live

with mental illnesses; and also the school safety improvement where

we're making sure our school districts have the resources that they

need.  Again, this is not a perfect bill, but we are moving in the right

direction.  And in light of what my colleague, Ms. Rosenthal, just

said, it's also a significant moment in history because of the birthday

of Dr. Martin Luther King, Jr., a civil rights leader, teacher and

preacher who gave his life for the work that we are doing here today.

And so, again, in his honor I am here because of the

work he has done as a pioneer and a trailblazer in the struggle for

equality and protecting the lives of our children and our families.  In

his honor I'm delighted to cast my vote in the affirmative, because I

believe that this is a bill in the right direction.  There are other

ingredients that we must continue to discuss when we get to the

budgetary process but, again, this is a very good bill in the right

direction and I proudly vote yes.  Thank you.

ACTING SPEAKER AUBRY:   Ms. Gibson in the

affirmative.

Mr. DiPietro.

MR. DIPIETRO:  Thank you.  I will not quote the

wisdom of our Founding Fathers because I have learned today that

many of my colleagues do not believe in our Founding Fathers.  I will

not quote the Second Amendment of the United States nor the

extremely strong, deliberate and unabashed language of the New York

State Civil Rights Law because I have learned today that Governor Cuomo and some of my colleagues do not believe in the Second Amendment or the New York State Civil Rights Law.  I will not quote from our Governor what he has said and pledged about transparency, openness and the respect of the importance of hearing all sides of an issue because I have learned today, as a freshman, that Governor Cuomo does not care about the people's agenda, only his own -- to be president, to beat Obama to the punch and be the first on the 6 o'clock news tonight.

I have learned today that this gun bill does absolutely nothing to protect our law-abiding citizens of our great State.  It is crystal clear to me that this bill will not stop one criminal from committing a heinous act.  This bill does infringe upon and again weaken our Second Amendment rights.  While gun crime's an extremely important issue, this Assembly should have worked together to put forth the best bill we could which would be a beacon to the rest of the country.  We had that opportunity and we failed. Instead, this bill and this Assembly will forever be remembered as the one who rammed a flawed, useless, self-serving bill through the dead of night with absolutely zero transparency, and the end game will be law-abiding citizens will turn into criminals overnight and lose more of their constitutional freedoms.  I vote no, Mr. Speaker.

ACTING SPEAKER AUBRY:   Mr. DiPietro in the negative.

Mr. Ortiz.

MR. ORTIZ:  Thank you, Mr. Speaker.  Before I make a quick statement, I would like to really thank Governor Cuomo for taking on an issue that most politicians are afraid to take on, especially issues regarding mental health issues.  I think that the Governor has a clear understanding about this issue, and to attach this issue with the gun control it is imperative, important not just for the State New York, but to send a clear message to the people of this nation.

While Washington continues to work through the process, New York State is finishing the product and the process.  And I do believe that this will help us.  As the Chair of the Mental Health Committee, I feel proud to be voting in the affirmative on this bill and working together with Assemblyman Lentol and the staff that, day by day, night by night, dedicated their time for the last three, four weeks to come out with a product such as the one that we have.  And I also would be remiss if I don't thank the Speaker of the Assembly for having the tenacity to stick together to make sure that he listened very carefully to the needs of the members of our conference on how this bill has to come to light.  And also, I would be remiss if I don't thank Mrs. Gunther for her vision and understanding and for helping us to shape up the bill.  Last, but not least, I also would like to say that the arguments of this bill and what we have discussed here today should not be about people with mental illness being violent, it should be about people with mental illness getting the appropriate services that they need in their community and, furthermore, we should be working

together as the budget gets developed in bringing resources to our

school system from pre-K all the way to college.  Thank you, Mr.

Speaker.

ACTING SPEAKER AUBRY:   How do you vote,

Mr. Ortiz.

MR. ORTIZ:  I'm voting in the affirmative.

ACTING SPEAKER AUBRY:   Mr. Ortiz in the

affirmative.

Mr. Goodell.

MR. GOODELL:  Thank you, Mr. Speaker.  As you

know, and all my colleagues know, we banned assault weapons and

they've been banned in New York State since 1994, almost 20 years

ago.  And this bill, while it increases the definition and adds more

restrictions on the definition of assault bans, doesn't remove any

assault ban -- or any weapons, any guns that are out there now.  Every

gun that is out there today that's lawful today will be lawful tomorrow.

That's what this bill does.  Nothing.  It doesn't take any of those guns

away, it doesn't take them out of circulation.  So, what does this bill

do?  What it does is it requires about a million rifle owners, about a

million of them, to register their rifle and if they don't, they're subject

to a Class E felony.  And every five years they have to renew that

registration, and if they don't it's a Class A misdemeanor.  So, we take

a million people who today lawfully own a gun, and we require them

to go through this registration process or they become a felon.  A

million people.

Let's not delude ourselves into thinking that this actually did anything about gun control because it really doesn't.  We could say, *Oh, what a great victory because now with your ten-bullet clip you can only put seven in*.  None of us here, not one of us, thinks for one second that a criminal is going to stop at seven, are they?  They're going to go and they'll put ten in and the only one who stops at seven is the hapless individual who is trying to comply with the law.  We have a unique law here where we require that you report a weapon that's been stolen from you within 24 hours of finding out about it or you're guilty of a  misdemeanor.  That's unique.  And, you know, we're making history where we arrest the victim.  For all these reasons and others, I urge a no vote.  Thank you.

ACTING SPEAKER AUBRY:   Mr. Goodell in the negative.

Mr. Wright.

MR. WRIGHT:  Thank you, Mr. Speaker.  You know, if we needed a reason, if we needed a reason as to why we have been debating this bill for some four-and-a-half hours, if we needed a reason as to what our purpose is and what our purpose is as legislators here in this room -- I want to thank Ms. Rosenthal for bringing this up -- today is the actual day of the birthday of the Reverend Dr. Martin Luther King.  Today is the actual birthday.  So, we have done something good.  We have done something productive here today.  We have done something that has some meaning here today.  So, *I have a dream*.  I do have a dream as well, that we will eradicate and

**NYS ASSEMBLY**                                    **JANUARY 15, 2013**

eliminate all of these weapons of mass destruction.  Mr. Speaker, I

withdraw my request and vote in the affirmative.

                        ACTING SPEAKER AUBRY:   Mr. Wright in the

affirmative.

                        Mr. Nojay.

                        MR. NOJAY:  Thank you, Mr. Speaker, and

congratulations.

                        ACTING SPEAKER AUBRY:   Thank you, Mr.

Nojay.

                        MR. NOJAY:  This being my freshman year, I've

been listening to these four hours of debates with great interest, and if

I may distill what I have taken away from it, it is that this bill will

affect those who do not commit crimes, and those who commit crimes

will not be affected by this bill; therefore, I vote against it.  Thank

you.

                        ACTING SPEAKER AUBRY:   Mr. Nojay in the

negative.

                        Mr. Perry.

                        MR. PERRY:  Thank you, Mr. Speaker.  Eight years

ago, and with the solid support of many of my colleagues who this

afternoon argued solidly against this legislation, our national leaders

decided to invade the nation of Iraq.  We lost over 4,000 good men

and women.  We spent over $800 billion.  Some people think the

actual cost was up to $3 trillion.  We convinced the whole world to

join us, assembling over 150,000 soldiers.  Why did we do this?  We

did this because we thought Iraq had weapons of mass destruction that threatened the security of the world, and we thought we had a responsibility to deny them the right to posses these weapons.  So why can't my colleagues who think so strongly against this bill understand that if you put it in perspective, a bushmaster assault weapon in a neighborhood like most of us live in is a weapon of mass destruction?  And I believe, Mr. Speaker, that we have a responsibility to act like our national leaders thought we had to do with Iraq.  And whether you like it or not, whether you agree or not, it is our responsibility and the people of this State want us to act responsibly.

And so, today, Mr. Speaker, I am proud to join my colleagues in supporting this legislation.  I respectfully withdraw my request and vote in the affirmative.  Thank you.

ACTING SPEAKER AUBRY:   Mr. Perry in the affirmative.

Mr. Mosley.

MR. MOSLEY:  Thank you, Mr. Speaker.  Last week during the State of the State address, our Governor vowed to set the progressive standard for gun control measures in our State and for our nation.  Today, with the passage of this bill we are, as a State, one step closer to achieving this goal.  This legislation, though imperfect, as espoused by many of my colleagues, better equips New York to regulate gun sales and keep dangerous weapons out of the hands of those who are not equipped to handle firearms.  But there is more work to be done.  The illegal and legal gun crises and lethal gun crisis

**NYS ASSEMBLY**                                **JANUARY 15, 2013**

in our communities cannot be resolved overnight.  In this fight, our families and our children must be our first priorities and the actions will be necessary, our actions will be necessary, from all levels of government.  For their safety and their future, we must be dedicated to ending a glorified culture of violence while providing constructive opportunities to keep our young people off the streets and out of harm's way.  As such, I look forward to working with the Governor and my colleagues in the Legislature to successfully bring about this change as we continue to address this ongoing matter.

So, Mr. Speaker, I withdraw my request and I vote in the affirmative as my very first vote as a member of this humbled Body.  Thank you so much.

ACTING SPEAKER AUBRY:   Mr. Mosley in the affirmative.

Mr. Lentol to close.

MR. LENTOL:  You would have thought that I had nothing left to say; however, I won't say very much.  First of all, I want to wish everybody a great deal of -- I want to thank everybody for wishing me a happy birthday, and I want to thank my colleagues for mentioning Dr. Martin Luther King, who I didn't tell you shares a birthday with me, or I share a birthday with him today.  He was the champion of non-violence, as you know, and what we're about here today lives in one of the speeches that he gave that said that, *Tomorrow will bring us a brighter future*.  And what we're doing here today is trying to create a brighter future than what we experienced in

195

**NYS ASSEMBLY**                                    **JANUARY 15, 2013**

December.  And we will do that by passing this bill.  I vote in the affirmative.

ACTING SPEAKER AUBRY:   Mr. Lentol in the affirmative.

Are there any other votes?

The Clerk will announce the results.

(The Clerk announced the results.)

The bill is passed.

Mr. Morelle

MR. MORELLE:  Mr. Speaker, any resolutions or further housekeeping?

ACTING SPEAKER AUBRY:   We have a number of fine resolutions before the House.

Legislative resolution by Mr. Tedisco, the Clerk will read.

THE CLERK:  Resolution No. 18.

Legislative resolution honoring David Oliker upon the occasion of his retirement after many years of distinguished service to MVP Health Care.

WHEREAS, The State of New York takes great pride in acknowledging its esteemed residents who have distinguished themselves in their careers; and

WHEREAS, David Oliker will be honored during a reception and presentation to be held at Proctors Theatre on January 31, 2013; and

196

**NYS ASSEMBLY**                                    **JANUARY 15, 2013**

WHEREAS, David has served as President and Chief Executive Officer of MVP Health Care since its inception in 1982; and

WHEREAS, He has announced his retirement from this position effective February 28, 2013; and

WHEREAS, David earned a bachelor's degree from East Carolina University,a Master's degree from American University, and a post-graduate certificate in health care administration from George Washington University; and

WHEREAS, Under his capable leadership and commitment to innovation and customer service, MVP grew to serve 650,000 members in New York, Vermont and New Hampshire; and

WHEREAS, MVP has become a national leader in the promotion of health awareness, wellness, and education in the community; and

WHEREAS, David serves on the Board of Directors of American's Health Insurance Plans and is a member of its Executive Committee; and

WHEREAS, He also contributes his time to the MVMA Foundation, the Taconic IPA, MedAllies, and Health Advancement Collaborative of Central New York; and

WHEREAS, Furthermore, David is active in the community, serving as Chairman of the Advisory Council of the Graduate College of Union University and member of the Proctors Theatre Board, Albany College of Pharmacy Board, Board of Trustees

and Board of Visitors of East Carolina University, and Excelsior College Board of Trustees; and

WHEREAS, David's dedication, expertise, and enthusiasm have been tremendous assets to MVP Health Care and the State of New York is pleased to join his family, friends and colleagues in wishing him a healthy and happy retirement; now, therefore, be it

RESOLVED, That this legislative Body pause in its deliberations to honor David Oliker upon the occasion of his retirement after many years of distinguished service to MVP Health Care; and be it further

RESOLVED, That a copy of this Resolution, suitably engrossed, be transmitted to David Oliker.

ACTING SPEAKER AUBRY:   On the resolution, all those in favor signify by saying aye; opposed, no.  The resolution is adopted.

Legislative resolution by Mr. Aubry, the Clerk will read.

THE CLERK:  Resolution No. 19.

Legislative resolution commemorating the 150th Anniversary of the Emancipation Proclamation.

WHEREAS, It is the sense of this legislative Body to commemorate significant events which represent turning points in our unique history and which are indelibly etched in the saga of our great Nation; and

WHEREAS, Attendant to such concern, and in full

198

accord with its longstanding traditions, this legislative Body is justly proud to commemorate the 150th Anniversary of the Emancipation Proclamation; and

WHEREAS, On January 1, 1863, Abraham Lincoln presided over the annual White House New Year's reception; late that afternoon, he retired to his study to sign the Emancipation Proclamation; and

WHEREAS, The Emancipation Proclamation arose from many causes and was the work of many individuals; it began at the outset of the Civil War, when slaves sought refuge behind Union lines, and did not end until December 1865, with the ratification of the 13th Amendment, which irrevocably abolished slavery throughout the nation; and

WHEREAS, A crucial turning point in history, the Emancipation Proclamation embodied a double emancipation: For the slaves, since it ensured that if the Union emerged victorious, slavery would perish, and for Abraham Lincoln himself, for whom it marked the abandonment of his previous assumptions about how to abolish slavery and the role blacks would play in post-emancipation American life; and

WHEREAS, The Emancipation Proclamation marked a dramatic transformation in the nature of the Civil War and in Abraham Lincoln's own approach to the problem of slavery, as no longer did he seek the consent of slave holders; and

WHEREAS, Within the Emancipation Proclamation,

Abraham Lincoln addressed blacks directly, not as property subject to the will of others, but as men and women whose loyalty the Union must earn; and

WHEREAS, For the first time, Abraham Lincoln welcomed black soldiers into the Union Army; over the next two years some 200,000 black men would serve in the Army and Navy, playing a critical role in achieving Union victory; and

WHEREAS, Abraham Lincoln also urged freed slaves to go to work for reasonable wages in the United States; and

WHEREAS, From the first days of the Civil War, slaves had acted to secure their own liberty; the Emancipation Proclamation confirmed their insistence that the war for the Union must become a war for freedom; and

WHEREAS, The Emancipation Proclamation added moral force to the Union cause and strengthened the Union both militarily and politically; as a milestone along the road to slavery's final destruction, the Emancipation Proclamation has assumed a place among the great documents of human freedom; now, therefore, be it

RESOLVED, That this legislative Body pause in its deliberations to commemorate the 150th Anniversary of the Emancipation Proclamation.

ACTING SPEAKER AUBRY:   On the resolution, all those in favor signify by saying aye; opposed, no.  The resolution is adopted.

Mr. Morelle.

200

**NYS ASSEMBLY**                                              **JANUARY 15, 2013**

MR. MORELLE:  Yes, I want to thank all my colleagues for their cooperation today.  I now move that the Assembly stand adjourned until Wednesday, January 16th, tomorrow being a legislative day and that we reconvene at noon, January 23rd, that Wednesday being a Session day.

ACTING SPEAKER AUBRY:   The House stands adjourned.

(Whereupon at 4:19 p.m., the House stood adjourned until Wednesday, January 16th, Wednesday being a legislative day, to reconvene at noon on Wednesday, January 23rd, Wednesday being a Session day.)