*Montgomery vs. Cuomo*

Exhibit Group C

Exhibit #4 – NYS Senate Hearing Transcript (May 31, 2013)

1    BEFORE THE NEW YORK STATE SENATE
     STANDING COMMITTEE ON MENTAL HEALTH AND
2    DEVELOPMENTAL DISABILITIES

3    ------------------------------------------------------

4                    PUBLIC HEARING:

5      TO LOOK AT THE IMPLEMENTATION AND IMPACT OF THE
       MENTAL HEALTH REQUIREMENTS IN THE NEW YORK SAFE ACT
6
7    ------------------------------------------------------

8                         250 Broadway, 19th Floor
                          Senate Hearing Room
9                         New York, New York  10007

10                        May 31, 2013
                          2:00 p.m. to 5:00 p.m.
11

12

13   PRESIDING:

14      Senator David Carlucci
        Chair
15

16   SENATE MEMBERS PRESENT:

17      Senator David J. Valesky

18

19

20

21

22

23

24

25

2

| | SPEAKERS: | PAGE | QUESTIONS |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | Jed Wolkenbreit<br>Attorney<br>Conference of Local Mental Health<br>   Hygiene Directors | 4 | 19 |
| 4 | | | |
| 5 | Dr. Glenn Martin<br>President | 24 | 34 |
| 6 | Seth Stein<br>Executive Director, and General Counsel<br>New York State Psychiatric Association | | |
| 7 | | | |
| 8 | Carla Rabinowitz<br>Public Policy Chair<br>NYAPRS | 42 | 48 |
| 9 | | | |
| 10 | Mary Beth Anderson<br>Project Director<br>Urban Justice Mental Health Project | 49 | 54 |
| 11 | | | |
| 12 | Jason Lippman<br>Senior Associate for Policy & Advocacy<br>Coalition of Behavioral Health Agencies | 54 | 58 |
| 13 | | | |
| 14 | Dr. Eric Neblung<br>President | 59 | 64 |
| 15 | Jerry Grodin, Ph.D.<br>Director of Professional Affairs<br>New York State Psychological Association | | |
| 16 | | | |
| 17 | Ari Moma<br>Registered Nurse, on behalf of<br>New York State Nurses Association | 66 | 74 |
| 18 | | | |
| 19 | Beth Haroules<br>A Senior Staff Attorney<br>New York Civil Liberties Union | 75 | 88 |
| 20 | | | |
| 21 | Kim Williams<br>Director of the  Center for Policy, | 92 | 98 |
| 22 |    Advocacy, and Education<br>Mental Health Association of New York City | | |
| 23 | | | |

24                          ---oOo---

25

1          SENATOR CARLUCCI:  Good afternoon.

2          I want to thank everyone for coming today.

3          I'm Senator David Carlucci, the Chairman of

4     the Mental Health and Developmental Disabilities

5     Committee.

6          I want to thank you for attending this

7     important hearing to address the mental-health

8     components of the SAFE Act.

9          The goal here today is to hear from all of

10    you, as respected members of your field serving

11    people with mental-health issues, to make sure that

12    the purpose of this law, the SAFE Act, to save

13    lives, to protect people, to make sure that there

14    isn't an undue burden, in terms of servicing people

15    that need treatment for health with their issues,

16    make sure that there is not a stigma attached.

17          And just, again, I want to thank you.

18          I know your time is valuable, so we'll move

19    through this hearing quickly.

20          Today I'm joined by Senator Valesky, and I'll

21    let Senator Valesky say a few words.

22          SENATOR VALESKY:  Thank you very much,

23    Mr. Chairman.  I appreciate the opportunity join

24    you here today.

25          I represent the Syracuse area in the

4

1      State Senate, and these issues and the

2      implementation of the SAFE Act, and its impact on

3      the mental-health community, is certainly a

4      statewide issue.

5            So I appreciate Chairman Carlucci's

6      leadership on this issue, and in conducting this

7      hearing, and in taking a leadership role as a new

8      Chair of this Committee, and he's been very active.

9            And I appreciate his advocacy on behalf of

10     the entire mental-health community.

11           And I'm looking forward to hearing your

12     testimony.

13           Thank you.

14           SENATOR CARLUCCI:   Thank you,

15     Senator Valesky.

16           We're going to start with our first speaker,

17     who's from the Conference of Local Mental

18     Health [sic] Hygiene Directors, Jed Wolkenbreit, who

19     is the counsel.

20           Jed.

21           JED WOLKENBREIT:   Thank you, Senator.

22           First of all, thank you for the opportunity

23     to address you this afternoon.

24           My name is Jed Wolkenbreit.   I am the counsel

25     to the New York State Conference of Local Mental

1       Hygiene Directors, commonly known as

2       "The Conference."

3               The Conference is a statutory organization

4       established pursuant to Section 4110 of the

5       Mental Hygiene Law, whose only members are the

6       directors of community services for the city of

7       New York and the 57 other counties in the state.

8               As you know, Article 41 of the Mental Hygiene

9       Law requires that each local government establish a

10      subdivision known as "a local governmental unit,"

11      or, an "LGU," to act as the policymaking arm of

12      local government in the areas of mental health,

13      developmental disabilities, and chemical abuse.

14              It is The Conference's role to act as the

15      statewide spokesperson for these local governmental

16      units.

17              And on a personal note, I would like to

18      extend our best wishes from our chair, who's the

19      Commissioner of Onondaga County, Bob Long, Senator.

20              On January 15th, as you know, Governor Cuomo

21      signed the New York Secure Ammunition and Firearms

22      Enforcement Act, commonly known as the

23      "New York SAFE Act," into law.

24              Section 20 of the law adds a new section,

25      946, to the Mental Hygiene Law, which requires that

6

1   when a mental-health professional -- defined in the

2   law as a physician, a psychologist, a licensed

3   clinical social worker, or a registered nurse -- who

4   is currently providing treatment services to a

5   person determines, in the exercise of reasonable

6   professional judgment, that the person is likely to

7   engage in conduct which would cause or result in

8   serious harm to self or others, that professional

9   shall report the name of that person to the director

10   of community services.

11        The director must then agree or disagree with

12   the report.

13        And if he or she say agrees, then they report

14   that on to the Division of Criminal Justice Services

15   to be entered into a database, for purposes of

16   either suspending or revoking that person's gun

17   permit, or, ultimately, preventing that person from

18   receiving a new permit.

19        As you know, there is no specificity in the

20   statute as to how the procedure was intended to be

21   implemented, nor, in fact, was any money

22   appropriated to implement it.

23        So on January 15th, our local governments

24   were told that we had 60 days to implement this

25   system, and we would be given no extra resources to

7

1     do so.

2             Initially, it was assumed that there would be

3     58 different systems of reporting throughout the

4     state.

5             Fortunately, the State Office of Mental

6     Health worked with The Conference to develop what

7     has become known as the "Integrated SAFE Act

8     Reporting System," or, "ISARS," which is a portal

9     which creates a single system for all mental-health

10    professionals to file their 946 reports.

11            ISARS went live in an abbreviated form on

12    March 16th, and continues to be in the state of

13    development.

14            The ISARS system requires the reporter to

15    give enough personal information so that a

16    determination can be made that the person who is

17    reporting is, in fact, an authorized reporter, one

18    of the four professions authorized under the

19    statute, and it allows the reporter to give enough

20    clinical information so the DCS can either agree or

21    disagree that the person being reported meets the

22    criteria of the statute.

23            Indeed, much credit is due to the IT team at

24    State Office of Mental Health, for really

25    accomplishing this portal in a relatively short

8

1    period of time.

2         A two-month period to develop a whole new

3    system like this is -- especially in state

4    government, with all due respect, is almost unheard

5    of.

6         As we read the statute, DCS needs to be

7    assured of four things:

8         First, that the report made by the person

9    defined as the mental -- is made by a person defined

10   under the statute as a "mental-health professional";

11        Secondly, that the DCS is satisfied that the

12   mental-health professional has independently

13   exercised reasonable professional judgment;

14        And, third, has determined that the patient

15   is likely to engage in the dangerous conduct set

16   forth in the statute;

17        And, finally, the report must indicate that

18   the mental-health professional is currently

19   providing treatment services at the time that the

20   determination is made.

21        We believe that if one of those criteria is

22   not present, then the DCS should disagree with the

23   report and not report it on to DCJS.

24        From the outset, most DCSs (directors of

25   community service) throughout the state, have

1    believed, and we still believe as The Conference,

2    and The Conference has advocated, that it was a

3    mistake to include the DCS to be responsible for

4    this type of screening.

5         We have taken the position from the start,

6    that local mental-health offices are not set up or

7    funded to carry out what is essentially a

8    criminal-justice responsibility, and we agree with

9    what has been said by many mental-health

10   professionals; namely, that this reporting

11   requirement interferes with the therapist's

12   relationship.

13        And, quite frankly, local governments do not

14   have the resources to carry out this unfunded

15   mandate in a responsible manner.

16        However, while The Conference still believes

17   that the DCS should not be involved in this

18   procedure, our members have tried to do their best

19   in carrying out their new obligations, under the

20   law.

21        As counsel to The Conference, much of my time

22   for -- frankly, for the last two and a half months,

23   has been spent dealing with questions and concerns

24   regarding the SAFE Act.

25        Since March 16th, there have been over

10

1    6,000 reports made through the ISARS system, with

2    about two-thirds of those coming from here in

3    New York City.

4         The vast majority, over 92 percent, come from

5    hospitals, primarily Article 28 hospital emergency

6    departments and psychiatric units.

7         Although, more recently, State-operated

8    psychiatric centers have filed about a thousand new

9    reports, in bulk, into the system, a very small

10   percentage of the reports, about 5 percent, actually

11   come from outpatient providers, and an insignificant

12   number are being received from private

13   practitioners.

14        Until recently, DCSs have passed on to DCJS

15   about 90 percent of the reports that they have

16   received, but most recently, some issues have come

17   to our attention which are troubling, and have made

18   many DCSs very skeptical.

19        Those problems include the following:

20        One, some DCSs are receiving reports that

21   appear to be made by someone other than a

22   mental-health professional treating the patient.

23        This might be a person designated by the

24   hospital to make such reports, or, even in some

25   cases, by a computer-generated report coming out of

1    the admission -- the Electronic Health Records

2    System.

3           Technically, we believe such report is not

4    appropriate under the statute;

5           Secondly, there is a great deal of confusion

6    about the intent of the statute as the language was

7    somewhat unclear.

8           For example, for some period of time, the

9    State took the position that all persons admitted to

10   a State psychiatric center met the criteria of 946

11   simply by virtue of their admission.

12          And for at least some period of time, all

13   such admitted persons were apparently being reported

14   en masse by computer-generated reports.

15          This is not even consistent with State Office

16   of Mental Health's published guidance, which has

17   indicated, that even though a person could meet the

18   2 PC standard, the normal standard for admission on

19   an involuntary basis, they might still not pose a

20   risk of harm that justifies reporting under the

21   946 standard.

22          Groups representing the Article 28 hospitals

23   have indicated to us that they are also concerned

24   with this procedure, and we all agree that not all

25   persons admitted for mental-health treatment meet

12

1   the criteria of 946.

2          It would have been useful for those of us who

3   deal with this system every day to have been called

4   upon for advice in drafting the language of statute,

5   and we remain available if changes are to be made;

6          Three, we are advised that, in some cases,

7   based on the potential risk -- based on potential

8   risk-management standards, hospital administrators

9   or hospital counsel have recommended or required

10  that all persons admitted to hospitals with a

11  mental-illness diagnosis be reported under 946.

12         In passing on a 946 Report, a DCS is required

13  by the law to make a judgment, which involves

14  weighing what is essentially an invasion of a

15  person's civil rights just because they're mentally

16  ill, against the legitimate need of the State to

17  protect the public.

18         The statute requires that this judgment be

19  based on a reasonable professional judgment, and

20  should be made on a case-by-case basis by a trained

21  professional who is treating a person.

22         Someone being admitted to a hospital merely

23  because of their inability to care for themselves

24  due to a mental illness or for medication management

25  is not, in most cases, likely to meet the criteria

1    of the statute.

2         In some cases, the numbers of reports are

3    simply just too staggering for any independent

4    evaluation to occur, so the DCS is required by

5    reality to accept the validity of the ISARS report.

6         Some DCSs are concerned that, in such cases,

7    it is possible that persons who do not meet the

8    requirements of the statute are being reported on to

9    DCJS, but without adequate resources, there is

10   little that we as DCSs can do;

11        Four, the statute, as written, contains no

12   specification regarding the age of a patient to be

13   reported.

14        Recently, DCSs have begun receiving numerous

15   reports, primarily from State hospitals, which

16   involve children who are as young as 11 years old.

17        Upon investigation, we determined that the

18   State Office of Mental Health is requiring all of

19   its hospitals, and advising Article 28 hospitals, to

20   report admissions of all 11-year-old children or

21   anyone older.

22        We are told that this is because,

23   theoretically, it is possible for a 16-year-old to

24   enter into military service with parental consent,

25   and to be potentially discharged, also at age 16,

14

1    and then apply for a gun permit.

2         And as you know, under Penal Law Section 400,

3    the age requirement for veterans is waived, and the

4    name remains in the database for five years.

5         So, therefore, 16 minus 5 is 11, so they've

6    begun reporting 11-year-olds.

7         Many members of The Conference feel that

8    placing the name of an 11-year-old emotionally

9    disturbed child into what is, essentially, a

10   criminal-justice database, is, in and of itself,

11   unconscionable.

12        But, to determine that the benefit of the

13   unlikely possibility that there might be a

14   16-year-old who had been emotionally disturbed at

15   age 11, and then managed to enlist in the military

16   at 16 with parental consent, and then was also

17   discharged at 16, because of some unknown reason,

18   might get a gun permit, is just, in our opinion, it

19   defies logic.

20        The Conference has written to

21   Commissioner Woodlock, outlining these issues, and

22   we expect to be meeting with her and her staff in

23   the near future to discuss and, hopefully, resolve

24   these issues.

25        We would also hope that the Legislature would

15

1    alleviate and correct this egregious practice;

2         Lastly, our members feel that the greatest

3    problem that we have with the SAFE Act is that it is

4    simply diverting too much time and resources from

5    other duties of the DCS for what we believe to be a

6    minimal return.

7         We are told that of the 6,000 reports that

8    have been filed, 11 have resulted in action.

9         And we believe that the amount of time and

10   energy involved in that, for people who would

11   probably have been found out during the appropriate

12   investigation, is simply not worth the diversion of

13   resources.

14        The large numbers of 946 reports are

15   diverting substantial time and energy away from an

16   already overburdened staff.

17        New York City alone has filed -- has received

18   over 3500 such reports already.

19        And in other larger counties in the state,

20   such as Syracuse, the range of reports are 50 to

21   100 reports per week.

22        Given that people who apply for gun permits

23   also have to undergo a formal investigation, we

24   believe that this is just simply not a good use of

25   what are, essentially, mental-health resources for

16

1    criminal-justice purposes.

2            And, finally, as a lawyer, and former counsel

3    to a legislative committee on mental health myself,

4    I cannot close without at least pointing out some of

5    the problems that I perceive with the statute, as

6    written:

7            First of all, the law defines "mental-health

8    professionals" as including all physicians and all

9    registered nurses, and does not require that the

10   mental-health professional actually be treating the

11   subject for a mental illness.

12           While we are interpreting it as such, it is

13   possible that some court might not.

14           And as the law was written, any physician who

15   is treating any patient for any reason, who

16   determines that the patient may be likely to engage

17   in dangerous conduct, could -- should be reported.

18           Theoretically, therefore, a dermatologist who

19   is treating an 11-year-old for acne, and is told by

20   the patient, "I hate my skin so much that I could

21   kill myself," could, in fact, be required to file a

22   946 Report.

23           And this, of course, makes no sense;

24           Secondly, the law does not say that the

25   likelihood of the danger must be imminent.

1        As you know, all the other provisions of

2   Article 9 of the Mental Hygiene Law that allow the

3   limitation of another's freedom, provide that there

4   must be some immediate danger to self or others.

5        And, here, the standard is only "likely to

6   engage in conduct."

7        Now, does that mean tomorrow? next week? next

8   year?

9        We have been interpreting it as meaning

10  immediate, but a court could undoubtedly interpret

11  it otherwise.

12       Indeed, the court of appeals has held that

13  the fact of mental illness does not result in the

14  forfeiture of a person's civil rights.

15       The courts will, of course, have the final

16  say, but I question whether placing someone's name

17  in what is, essentially, a criminal-justice

18  database, based on the SAFE Act standards, meets the

19  test, especially when the person is 11 years old.

20       The statute specifically limits liability for

21  the mental-health professional with regard to

22  reporting, but there is no such limit on liability

23  for the DCS or the local government in making

24  reporting decisions in good faith.

25       And we believe that that should be corrected;

18

1          And, finally, from the point of view of

2     government -- a local government, Section 946 is

3     simply another unfunded mandate of a growing and

4     potentially disastrous magnitude for which

5     localities are neither equipped nor funded to

6     implement.

7          If the statute's intent is simply to gather

8     names, then why have the DCS involved in the process

9     at all?

10         If the intent is to really clinically assess

11    each of these 6,000 reports, then either that should

12    be done by a state agency, or substantial resources

13    must be allocated to local governments to do it.

14         Since all gun-permit applications, as I said,

15    require investigation, we believe that this is

16    casting such a wide net, when it appears to

17    criminalize people simply who are suffering from

18    mental illness, and increases the very stigma which

19    we are all so hard trying to decrease.

20         So on behalf of The Conference of Local

21    Mental Hygiene Directors, I want to thank you all

22    for your efforts on behalf of the mentally disabled

23    of the state who depend on us to help them go

24    forward toward recovery, and for the opportunity to

25    share The Conference's views and perspectives on the

19

1     SAFE Act with you today.

2          As always, The Conference remains available

3     to you as a resource as you continue your work.

4          Thank you.

5          SENATOR CARLUCCI:  Great, thank you,

6     Mr. Wolkenbreit.

7          Just a few quick questions, because the

8     testimony was pretty thorough, and I appreciate

9     that.

10         You talked about the 92 percent of the

11    reports are coming from hospitals.

12         And, what do you attribute that to?

13         JED WOLKENBREIT:  Well, we've heard -- and

14    although this is all anecdotal, of course, we've

15    heard there's a substantial reluctance amongst

16    private practitioners.

17         I think, initially, there was not a lot of

18    knowledge on the part of many people that this

19    reporting requirement even existed.

20         I think that's becoming less of an issue.

21         But I think that there's -- that hospitals

22    clearly have the apparatus involved to have

23    explained it all to their physicians.

24         Hospital counsels are on it, obviously.

25         There's numerous organizations and

1     professional groups that have made that clear.

2          I think there's a lot of mental-health

3     professionals who firmly believe that, in treating

4     people on an outpatient basis, if they can handle it

5     on an outpatient basis, by definition, the person is

6     not really dangerous enough to require a report.

7          And I think there's a lot of reluctance upon

8     professionals to have the professionals get involved

9     in reporting, effectively, somebody to the police,

10    and merely because they're mentally ill.

11         SENATOR CARLUCCI:  Now, has your organization

12    run some numbers in terms of, when we talk about the

13    mandated costs on local governments, what you

14    anticipate that this could cost local governments?

15         JED WOLKENBREIT:  We did a study initially.

16    We anticipated it was about $11 million that it's

17    going to cost state governments.

18         And it's really become, you know, the problem

19    is, if you were to really review every report, it

20    would probably be more than that.

21         I mean, the fact that the State has, you

22    know, created the ISARS system has helped

23    substantially, and we're very thankful for that.

24    And I've commended them on numerous occasions,

25    publicly.

1            But, you know, it still requires the DCS

2       and/or his or her designee to sit there and go

3       through these things, or -- and that's not going

4       happen.

5            If you get 3500 reports, I mean, it would

6       require more staff than the mental-health department

7       has to -- you know, full time to be doing it.  And

8       it's just not going to happen.

9            SENATOR CARLUCCI:  In the -- out of the

10      6,000 cases that we're talking about, and the

11      11 actual cases that have come forward, could you

12      elaborate on those, what those were, a little more?

13           JED WOLKENBREIT:  I haven't -- I don't --

14      I've only gotten the statistics.

15           SENATOR CARLUCCI:  Right.

16           JED WOLKENBREIT:  I have no personal

17      knowledge.

18           SENATOR CARLUCCI:  Have you seen, have you

19      gotten real information, in terms of, like, you

20      talked about the hypothetical case of the

21      dermatologist reporting someone?

22           Has there been any validity to that?

23           JED WOLKENBREIT:  I don't think -- well,

24      there hasn't actually -- nothing that -- I mean, I'm

25      obviously exaggerating the point to make a point,

22

1    but, I think what has happened, in many cases,

2    though, is that, reports have been made of people,

3    because I think some mental-health professionals who

4    work for hospitals or for other, you know, entities

5    have been advised, basically, for the liability

6    purposes, that they have to report, so they're

7    reporting, when, in their own professional judgment,

8    it might not be appropriate.

9         And we have been told -- or, DCSs have been

10   told, in checking some of these reports, when

11   they've talked to the professional, and they call up

12   and said, "Why did you file this report?  It doesn't

13   look" -- I mean, for example, just because somebody

14   had suicidal ideations does not necessarily mean

15   that they're dangerous, or that they're going commit

16   suicide.

17        And, you know, the professional would admit,

18   "Well, I don't really think, but I'm concerned not

19   to do it."  And they're sort of being pushed into

20   making those reports.

21        SENATOR VALESKY:  Just a couple quick

22   questions for you, and thank you for your testimony.

23        Is The Conference in any way engaged in, or

24   considering engaging in, drafting any potential

25   changes to the law?

23

1        JED WOLKENBREIT:  We have suggested language

2   to both Houses of the Legislature and to the

3   Governor's Office, and at this point, we're being

4   told that no changes are being considered.

5        So, I haven't heard anything back.

6        SENATOR VALESKY:  Okay.

7        The other thing that you mentioned in your

8   testimony, you remind us that the court of appeals

9   has held to the fact that mental illness does not

10   result in the forfeiture of a person's civil rights.

11        There are, obviously, a number of

12   high-profile court challenges right now to the

13   SAFE Act, based on other components of that law.

14        Are there any legal challenges to this

15   particular section of the SAFE Act?

16        JED WOLKENBREIT:  I'm not aware of any.

17        SENATOR VALESKY:  I'm not aware either, but

18   I --

19        JED WOLKENBREIT:  I'm not aware of any, at

20   this point.

21        SENATOR VALESKY:

22        Okay, thank you.

23        SENATOR CARLUCCI:  All right, thank you.

24        JED WOLKENBREIT:  Thank you.

25

24

1          SENATOR CARLUCCI:  Next we're going to hear

2     from Dr. Glenn Martin, and Seth Stein.

3          Dr. Martin is the president of the

4     New York State Psychiatric Association, and

5     Mr. Stein is the executive director.

6          Thank you for being here today.

7          DR. GLENN MARTIN:  Thank you for having us.

8          So, Senators, thank you for the opportunity

9     to offer testimony regarding the mental-health

10    reporting requirements of the SAFE Act.

11         As you know, my name is Glenn Martin.  I'm a

12    practicing psychiatrist, and the current president

13    of the New York State Psychiatric Association, which

14    I'm representing today.

15         Joining me is Seth Stein, our executive

16    director, and general counsel.

17         Just, New York State Psychiatric Association

18    is a statewide medical-specialty organization with

19    over 4,000 psychiatrists in New York State.

20         And as requested, we e-mailed our testimony

21    to you on Wednesday.

22         I'm also appearing today on behalf of the

23    Medical Society of the State of New York, where I

24    serve as Chairperson of the Committee on Addiction

25    and Psychiatric Medicine Committee.

1         I'm pinch-hitting for the MSSNY president,

2    Dr. Sam Unterricht, who, unfortunately, can't be

3    with us today.

4         Dr. Unterricht's written testimony has also

5    been submitted.

6         And, I think I'll spare all of us, and if you

7    permit, rather than reading the testimony from both,

8    I would prefer to speak extemporaneously, which may

9    be a problem, but -- it won't be a problem to speak,

10   but it may be a problem once I get started.

11        So what I would like to point out is, first

12   of the all, the New York State Psychiatric

13   Association and the American Psychiatric Association

14   clearly recognize that gun violence is a

15   public-health concern.

16        It is, with suicide actually being the more

17   important concern, from our point of view, in the

18   sense that many more patients with mental illness

19   are going to die as a result of suicide from guns

20   than they are going to either commit or be a victim

21   of violence.

22        In fact, all studies will show that you're

23   much more likely, if you're mentally ill, to be a

24   victim of violence than a perpetrator of violence.

25        And, in fact, a number of diagnosed mentally

1    ill who are involved in violent crimes totally comes

2    down to about 2 to 5 percent, depending on what

3    you're doing.

4           This is not a huge number.  It's certainly

5    very headline-grabbing when it occurs.

6           And, unfortunately, the focus on this is what

7    leads to my first concern, which is the stigma

8    associated with singling out mental illness for

9    doing -- for making reports, as well as the concerns

10   we have about confidentiality.

11          Now, clearly, our profession has always

12   understood that protecting patients from mental

13   illness, and those around them, is an important part

14   of what we do.  And we have never advocated for an

15   absolute privilege of confidentiality.

16          And the State, and the government in general,

17   has understood, though, that it's absolutely crucial

18   that we do have a great deal of leeway in

19   confidentiality in order to do our jobs.

20          People are not going talk to us if they're

21   worried that we are going to rat them out at a

22   moment's notice.

23          There are other professions that also have

24   this.

25          For example, the clergy and lawyers also have

```
 1      pretty absolute confidentiality.

 2              I will just mention, parenthetically, and

 3      probably not politically correctly, that they're not

 4      obligated to report dangerous behavior when it comes

 5      to their attention.

 6              And I would imagine that many lawyers have

 7      been faced with situations of people coming into

 8      their offices who they believe are dangerous to

 9      others, either because they're professional

10      criminals -- innocent, of course, but professional

11      criminals -- or, in a divorce proceeding, or

12      something, would say something that would make them

13      dangerous, and the State is not mandating them to do

14      anything to violate their confidentiality;

15              Nor priests, or the like.

16              But I'm saying, we are used to doing this,

17      but, what we're used to doing is more what's in

18      3113 of the regulations, where it allows people who

19      work in OMH to either, basically, hospitalize a

20      patient who is dangerous, or, arrange for the police

21      to be notified to protect somebody, or, notify the

22      person who is the direct likely victim.

23              That's not mandated.  It's left in our

24      judgment to decide whether or not we're going to do

25      that.
```

28

1          And as has been pointed out by the previous

2    speaker, in fact, the changes to the law don't allow

3    us to do that.  It tells us we are supposed to --

4    actually, it doesn't say anything about going

5    online, or anything else.

6          And let me just say that we applaud OMH's

7    effort to try to interpret what the legislation

8    says, but, in fact, what they've done isn't what the

9    legislation says.

10          The legislation refers to "likelihood."

11          I can either argue that everyone is likely to

12    be violent at some point.

13          My children would argue I can do that to them

14    in a matter of moments, if I try.

15          On the other hand, no one is particularly

16    likely of being a violent.  Unless you're a

17    professional hitman, it's a relatively rare event.

18          "Likelihood" isn't a standard that we work

19    with.

20          "Imminence" is something we can understand.

21          Also, we are not very good at protecting --

22    predicting violence in any particular period of

23    time.

24          Short term -- and I ran a psychiatric

25    emergency room for eight years out of Queens when it

```
 1        was really hopping -- we were pretty good, or we
 2        like to think we were pretty good, at determining
 3        whether or not somebody was likely to be violent in
 4        the near future, imminently.
 5              There are other people who, I had a pretty
 6        good chance, were going to end up dead at some point
 7        in their lives, but I didn't think it was going to
 8        be imminent, and we would let them go and arrange
 9        for outpatient care.
10              This standard doesn't make a huge amount of
11        sense.
12              And, frankly, as the previous speaker pointed
13        out, it's sort of a mix between trying to identify
14        people who you think shouldn't have guns, and at the
15        same time, not giving us the legal authority,
16        essentially, to break confidentiality.
17              There's nothing in this statute that let's us
18        do what we would want to do, when we need to do it.
19              So, we have, in fact, worked, and suggest
20        that there are some changes to the law that we think
21        will make it better, because we do understand this
22        is an important public-health issue.
23              We do believe that "imminence" should be
24        included in this statute; that it should be a
25        short-term defined period of time.
```

1          Also, I point out that OMH has decided that

2     substance abuse is not a psychiatric disorder, which

3     is interesting to me, because, certainly, in DSM-5,

4     which you may have heard we just published, we did

5     not remove all substance abuse from our manual.

6          We do consider that part and parcel of what

7     we do for a living, frequently comorbid with other

8     disorders, but, they have taken the role that pure

9     substance abuse, whatever that is, is not

10    reportable, even though those people might be even

11    more likely to be imminently dangerous.

12         They also don't necessarily allow us to

13    report pure criminal behavior.

14         I mean, frequently, we see people in the

15    emergency room who had gotten into a fight, and have

16    basically said:  I'm going to go back, you know, and

17    get the guy who punched me out at the bar.

18         He's sober now.  He is going take vengeance.

19         That's not a mental illness, necessarily, but

20    he sure as heck is dangerous, in my judgment.

21         It is unclear whether we're supposed to

22    report or not.

23         OMH says no, but the statute is unclear.

24         And, as much as I agreed with virtually

25    everything the previous speaker had said, I thought,

1      actually, his example of the dermatologist is an

2      interesting one.

3          Change it to a 35-year-old man or woman with

4      horrible skin disease who's on a medication that can

5      cause depression, of which some of theirs can, comes

6      in and says:  I really can't stand living like this

7      anymore.  I've been thinking about ending my life.

8          Would you not think that that is a

9      professional stance that they should do something

10     about it, and why would you precludes that person

11     from doing it?

12         So in this great fog of uncertainty, as the

13     previous speaker pointed out, you have the

14     risk-management approach: "report everyone," to the,

15     "I don't want to report anyone confidentiality"

16     [unintelligible].

17         And I think as he said, the idea that most of

18     your reports coming out of the hospital makes sense.

19         If you really think somebody's imminently

20     likely to hurt themselves, and they're in your

21     office, you will take steps to get them into a

22     hospital, and probably let the hospital do the

23     reporting for you.

24         If you don't think they're imminent, even

25     though you think that they're, you know, possibly

32

1      going to end their life, because they have a bad

2      personality disorder with chronic depression, at

3      some point it may end badly, but you're doing your

4      best to try to avoid it, and hospitalization isn't

5      going to add anything right now, you may decide not

6      to do that;

7           The second issue is, who to report to.

8           As mentioned, we have this convoluted thing

9      where, theoretically, I could report it online.

10          The -- interestingly, when you go online now,

11     it flashes to you:  Imminent danger, call 911.

12     Imminent danger, call 911.

13          But calling 911 isn't good enough, because I

14     still have to make this report.

15          I would argue that, frankly, you should allow

16     us to do what you allow OMH-licensed facilities to

17     do, which is, call 911 and say:  I have a patient

18     who is in danger, or dangering somebody else.

19     Please send the police to safely escort him to an

20     emergency room where he can be treated.

21          And then they can do all the reporting they

22     want.

23          Confidentiality becomes less of an issue.

24     There's already a police report, there's an

25     ambulance call report...all of this is done.

1        And I would mention, on the back end, the

2   reporting is going on right now anyway.

3        All involuntary hospitalizations have to be

4   reported to the federal database to be checked

5   against.

6        So, again, from a confidentiality point of

7   view, that's already occurring;

8        Thirdly, the liability issue, which was

9   raised from a DCS [unintelligible].  They're not

10  covered at all.

11       I have to say that, as a practicing

12  physician, I'm not particularly thrilled by the

13  language that is used about "good judgment," because

14  good judgment can always be questioned, especially

15  through the retrospective scope by another expert,

16  three months after the fact, where something bad

17  happened, you can say, Well, obviously you showed

18  bad judgment.

19       I believe that organized medicine would be

20  much happier if we used "malice" or

21  "intentional misconduct," which is the standard that

22  already exists in statute, and I think would do

23  what's necessary to allow us to do this;

24       And then, lastly, I would just point out what

25  the previous speaker had mentioned, about the scope.

34

1    Nurses, to my understanding, other than nurse

2    practitioners, are not in a position where they can

3    diagnose or treat or prescribe.

4    So, why they have this mandated obligation to

5    do something that the government, in its wisdom, has

6    not given them the scope of practice to do, doesn't

7    make a huge amount of sense either.

8    So...

9    All right, I'll shut up, and answer any

10   questions, if there are any.

11   And, again, as I said, so those are the four

12   major points that we've made.

13   And as I said, Assembly Bill of A6233 has

14   some of the language already incorporated.

15   UNIDENTIFIED SPEAKER 1:  The Pretlow bill

16   does?

17   UNIDENTIFIED SPEAKER 2:  Yes.

18   DR. GLENN MARTIN:  Yeah.

19   And, of course, we stand ready to cooperate

20   with anyone who is willing to listen to us.

21   SENATOR CARLUCCI:  Just one question about,

22   with HIPAA, in terms of, as a professional, in your

23   role, what happens when state law contradicts HIPAA?

24   DR. GLENN MARTIN:  Well, almost by

25   definition, it can't, in the sense, that the most

1     restrictive -- the -- HIPAA is always a floor, not a

2     celling.  And that if the State is more restrictive,

3     you have to follow the state law.

4          The state can't be more permissive than

5     HIPAA.

6          So, in fact, we have filed an inquiry, or

7     complaint, with the Office of Civil Rights, because

8     we believe, in fact, this is not compliant with

9     HIPAA, because of the lack of imminence, in

10    particular, as well as some of the subtleties about

11    the mandate, and what you do and don't have to do,

12    that it's actually not compliant with HIPAA right

13    now, which does not make, you know, many of us

14    particularly happy when we have to do this.

15         We have had no problem, from a HIPAA

16    perspective, if there's an imminent risk, you know,

17    basically, all bets are off.  We do what's necessary

18    to do, to protect the patient and protect the

19    potential victim.

20         Again, the intent of this law is not to do

21    that.

22         I mean, the intent of this law is to remove

23    firearms from people with mental illnesses who have

24    a likelihood of dangerousness for approximately

25    five years.

36

1           I know OMH, just in some of the talks they

2      mentioned, when they talk about the 11-year-old, and

3      that rather convoluted theory about them joining the

4      military, you know, is I do believe that there is

5      something in the law that will go into effect about

6      purchasing ammunition, as well as requiring the

7      owner of a firearm, that has somebody in the

8      household who is not allowed to have a firearm, to

9      properly secure it.

10          So you can argue, again, that reporting

11     children in that context, may not be quite as silly

12     as it sounds with their other argument about joining

13     the military, and leaving, blah blah blah blah.

14          SENATOR CARLUCCI:  Just one other part, in

15     your -- in the written testimony that you submitted,

16     you had mentioned the required-by-law exception

17     under HIPAA.

18          DR. GLENN MARTIN:  Right.

19          SENATOR CARLUCCI:  And, could you just

20     elaborate upon that?

21          DR. GLENN MARTIN:  If you don't mind, that

22     becomes technical enough --

23          SENATOR CARLUCCI:  Go ahead.

24          DR. GLENN MARTIN:  -- and I'll allow --

25          SETH STEIN:  Well, our HIPAA argument really

37

1    is two sides:

2           HIPAA contains an authorization to disclose

3    confidential information in this scenario, but it

4    requires that the circumstance be an imminent danger

5    to self or others, and, that it be to law

6    enforcement or an identifiable victim.

7           So, HIPAA authorizes that.

8           Then there's a section on mandates.

9           And it could be argued that the SAFE Act

10   isn't a mandate at all, because it looks like a

11   mandate, but when you examine it, you could compare

12   it in New York to the child-abuse reporting

13   requirement.  That's a mandate, and it has a

14   misdemeanor attached to it if you don't do it.

15          And this -- so this is neither an

16   authorization, exactly, or, a mandate.  It sits kind

17   of in between.

18          And that's the reason why we pursued this

19   with the Federal Office of Civil Rights, because we

20   said that it's neither -- it's neither of the two;

21   and, therefore, a doctor who is compelled --

22   perceives themselves to be compelled by the SAFE Act

23   could be construed as violating HIPAA.

24          And we felt that you could be caught between

25   the two different state and federal law.

38

1          And as Dr. Martin said, HIPAA makes it

2     quite clear that it is -- that it only will yield to

3     state laws that are more stringently protecting

4     privacy.

5          And in this -- so, therefore, it would not

6     yield to the SAFE Act, because the SAFE Act does not

7     provide more stringent protections of privacy.

8          In fact, it weakens it, from the HIPAA's

9     perspective.

10         But I think the solution to that, that we've

11    suggested, and that's reflected in the Pretlow bill,

12    is simply to put in this 3313 standard -- 3313(f)

13    standard -- (6) standard, which says, "imminent risk

14    of serious harm to self or others," right, and make

15    it an authorization statute, right, and change the

16    "exculpation" language to mirror 3313.

17         In other words, it's right there.

18         In fact, just, ironically, I believe that the

19    HIPAA section on "Authorization" was based on

20    New York State's 3313; in other words, it almost

21    tracks that language, and why.

22         So that we feel the simplist solution, is to

23    track that language.

24         And if the Legislature, in its wisdom, still

25    wants the reporting, in addition to police, and

1    identifiable victim, and in addition, the gun thing,

2    to go on, rather than have the police do that,

3    which, it seems to us, to be a far more logical

4    thing.

5         In other words, if they -- if a psychiatrist

6    calls up the police and says, "I'm worried about

7    this individual," right, the police are in a much

8    better position, quickly, to ascertain whether that

9    person has a licensed or registered firearm than

10   anybody else has, instantaneously, even before they

11   go to the apartment or to their residence, to

12   ascertain whether they have a firearm at that

13   location or not.

14        Which I assume would be a prudent step to

15   take.

16        And what we pointed out in the statute, is

17   that the process now, right, of that whole long

18   circuitous process to get to the Division of

19   Criminal Justice Services, doesn't really intervene

20   quickly, when that's really what should be taking

21   place: a quick intervention, based upon an imminent

22   risk, and an assessment of whether the individual

23   possesses a registered or legal firearm before the

24   police go and knock on the door, to inquire as to

25   what's going on.

40

1          SENATOR VALESKY:  Can I just get a point of

2     clarification on your comparison between this and

3     the child-abuse reporting?

4          The result of a lack of a penalty, that's why

5     this would not be considered a mandate?

6          Is that what you said?

7          SETH STEIN:  Yeah, because it's really, when

8     you look at the statute carefully, it's not -- it

9     doesn't have the same -- it doesn't say -- it's not

10    really a "must" statute, because the federal HIPAA

11    law says that a mandate must be associated with a

12    penalty for failure.

13         And there really isn't any penalty under the

14    SAFE Act, so, it looks like a mandate, but isn't

15    really a mandate.

16         But as we heard from the first -- you know,

17    from the Local Mental Hygiene Directors' counsel,

18    it's being interpreted, and overinterpreted, as a

19    super-mandate; in other words, they're reporting

20    anybody.

21         I mean, they're not even -- in other words,

22    because, why not?  Why not do it?

23         And I think that's why the "exculpation"

24    language, if it copied 3313, people would feel more

25    comfortable exercising, what Dr. Martin said, is

41

1      that professional judgment, and weighing whether or

2      not.

3            Because even -- I mean, it could be argued,

4      and we thought originally, before OMH came out, that

5      a person who is involuntarily hospitalized, right,

6      where they can't leave, is a person for whom,

7      otherwise, no report.

8            In other words, the police wouldn't be called

9      if someone was involuntary hospitalized, right,

10     unless they eloped, or something like that.

11           But absent that, they're safe.

12           But if the safe -- but, you know, that's --

13     but we came to realize that OMH intended, actually,

14     we said in our testimony, they were even talking

15     about reporting on discharge, let alone reporting on

16     admission.

17           So that made no sense to us, because how

18     would could someone be danger to self or others,

19     unless you're talking about, could they possibly be

20     at some time in the remote future, right, if their

21     symptomatology returned, and so forth and so on.

22           And if that -- and that's exactly what they

23     meant.

24           And it seems to me, is that that gets beyond

25     the scope of what's reasonable, or useful.

42

1          SENATOR VALESKY:  Thank you, both.

2          SETH STEIN:  Thank you.

3          DR. GLENN MARTIN:  Thank you.

4          SENATOR CARLUCCI:  Thank you, Mr. Stein.

5          Dr. Martin, thank you.

6          DR. GLENN MARTIN:  Thank you for having us.

7          SENATOR CARLUCCI:  And our next speaker is

8     from the New York Association of

9     Psychiatric Rehabilitation Services, or, "NYAPRS,"

10    Carla Rabinowitz, who's the public-policy chair.

11         CARLA RABINOWITZ:  So thank you for this

12    opportunity to present the concerns of thousands of

13    New Yorkers represented by NYAPRS, the

14    "New York Association of Psychiatric Rehabilitation

15    Services."

16         NYAPRS is a unique partnership of people with

17    psychiatric disabilities across the state and the

18    mental-health professionals who support us.

19         So, I'm Carla.  I'm the co-chair of NYAPRS's

20    Public Policy Committee, and today I'm also

21    representing NYAPRS's executive director,

22    Harvey Rosenthal, who apologizes, but was unable to

23    be here because he had a previous out-of-state

24    commitment.

25         I also work for, get paid by, an organization

1    called "Community Access," which I'm plugging, which

2    is a 39-year-old organization that empowers

3    mental-health recipients in many ways, by providing

4    quality housing, and employment, for people with

5    mental-health concerns.

6        So, State mental-health policy is a very

7    personal matter to NYAPRS.  It's a personal matter

8    to NYAPRS's organizational members.  It's a personal

9    matter to the board members, to the staff, the

10   mental-health recipients, and to myself, as we --

11   most of us all share some type of psychiatric

12   disability.

13       So Harvey and myself would like to begin by

14   focusing on the media coverage: what's been

15   happening, and how this all came to be.

16       So you know about the horrific media

17   coverage, the demonization, the criminalization, in

18   the minds of people of mental-health recipients, due

19   to the -- in the wake of the recent tragedies in

20   Newtown, New York City, and elsewhere.

21       Now, these tragedies are abhorrent.

22       They are especially abhorrent to the

23   mental-health recipients, because, as other speakers

24   have said, we're more likely to be victims of crime,

25   twelve times, and we're five times more likely than

44

1    the general public to be murdered.

2        But there's no studies that are showing,

3    despite all the stigma, that we're more likely to be

4    violent.

5        There is some association and some studies

6    with substance use and violence, but that applies to

7    everybody in the general public, not just

8    mental-health recipients.

9        Despite this, and, you know, as people, these

10   horrific act of violence are often associated with

11   mental illness, and we get demonized in the

12   mental-health community.

13       An example is, the "New York Post," where --

14   when they talked about releasing people,

15   reinvestment, releasing -- releasing people from

16   psychiatric hospitals that weren't serving them

17   well, the headline was, "11,000 psychotics on the

18   street."

19       Or, you know, the headlines such as that.

20       And it's -- and if you look at what

21   "The Daily News" found, which isn't always the

22   greatest, but "The Daily News" said they did a study

23   of what happened in 2007.  They found that, of

24   500 murders, only 5 were by mental-health

25   recipients.

1          Yet, those five were probably in the news for

2     months; right?

3          And the stark truth is, that the public

4     doesn't need protection from people with

5     mental-health concerns.

6          It's us who need protection from this

7     outrageous mischaracterization, and from the rush to

8     enact laws that provides false solutions to appease

9     public fears: this violence occurred, people got

10    afraid, elected officials representing the vast

11    majority of people who don't have mental-health

12    concerns said, Let's pass this law without concerns

13    for the mental-health recipients.

14          So we at NYAPRS applaud the State's acts --

15    attempts to reduce gun-related violence, but the

16    requirement that mental-health clinicians report

17    clients who disclose impulses to harm themselves or

18    others is really, really problematic.

19          Some of the things that haven't been talked

20    about is the chilling effect that it's going to have

21    with mental-health recipients and therapists or

22    psychiatrists.

23          You trust someone.  You think about it, if

24    you were talking to a priest and you told him some

25    confidential secrets, and then you found out he

46

1    disclosed it to the State, you know, there goes the

2    relationship.

3            And you can imagine that -- you know, you've

4    heard from the APA and others who are concerned

5    about that.

6            So we think that this reporting requirement

7    really intrudes in a client-patient relationship,

8    and that's just a mild way of saying it.

9            It's, like, people -- let's say you were in

10   the Army, and you have PTSD.  You know, you might

11   have thoughts of violence.

12           Are you going to keep on going to your

13   therapist?  Are you going to stop what you're saying

14   to your therapist?

15           And then it's less helpful, and the

16   psychiatrist is less helpful, and maybe you don't

17   get the medication you need, because you're not

18   saying the truth.

19           Also, clinicians don't have the ability to

20   predict future violence, as this man from the APA

21   was saying.

22           We have a study here, but there's other

23   better studies from the APA that basically says they

24   can't predict future violence, they just can't,

25   amongst anybody.

1           And as was said, our real concern right here

2       is that the SAFE Act, using this broad language,

3       right, "likely to engage in conduct that will result

4       in serious harm to self or others," and nobody knows

5       what that means.   Right?

6           So some may underreport, and some may

7       overreport.

8           We need to get back to the "serious and

9       imminent danger threat" standard.

10          And a type of technical amendment was

11      proposed this past session by someone named

12      "Pretlow."

13          And you have the citation here, the statute,

14      the bill, A6233.   He's from Mount Vernon, Pretlow.

15          And it basically, you know, clarifies what

16      triggers a reporting by professionals to this

17      imminent danger.

18          And I just want to conclude by thanking you

19      for your time, but just to let you know that, you

20      know, I myself am a mental-health recipient.   And, I

21      got my license back by proving that I was going to

22      treatment, and such, my law license.

23          And in today's world, I don't know if that

24      would happen.

25          You know, there's a lot of hysteria going on,

48

1    and that's how this law came to be.  And we need to

2    tailor it a little bit more to what would really

3    work, and what would not destroy a relationship with

4    therapists and psychiatrists.

5        SENATOR CARLUCCI:  Carla, thank you so much

6    for your testimony.

7        And it's a very important and serious issue

8    in terms of the stigma, and it's something that we

9    do have to fight against.

10        And, I appreciate your testimony and some --

11    the written testimony, specifically, and some

12    strategies to do that.

13        I just was at a Veterans' Advisory Committee

14    meeting, and we were talking about PTSD and the

15    stigma attached to that.

16        And, you know, we talk about it.  And I don't

17    think I even have to ask about your feelings on

18    people not going for the treatment that they need

19    out of fear of this stigma.

20        So, we have something that we definitely have

21    to work towards, and appreciate your work in that

22    area.

23        CARLA RABINOWITZ:  Narrow it down to

24    [unintelligible], like everyone's saying.

25        Thank you.

1          SENATOR CARLUCCI:  Thank you.

2          SENATOR VALESKY:  Thank you, Carla.

3          SENATOR CARLUCCI:  Next we have

4    Mary Beth Anderson, who's the project director of

5    the Urban Justice Mental Health Project.

6          MARY BETH ANDERSON:  I want to thank you so

7    much for scheduling me early in the day.  Sarah from

8    your office agreed to do that, as I do have another

9    meeting to go to.

10         And my colleague Megan Crowe-Rothstein, who

11   is our director of social work, will remain

12   throughout the hearing.

13         And I do echo many of the comments made by

14   Dr. Martin regarding the statistics on people with

15   mental illness and the tenuous connection to

16   violence.

17         I also echo the concerns of Ms. Rabinowitz.

18         I agree completely that the major problem, in

19   my view, with any connection between violence and

20   mental illness, is that there is still so much

21   stigma attached to having a mental illness and

22   receiving mental-health treatment.

23         And, I think that ways to -- finding ways to

24   decrease this stigma are really essential in order

25   to help people with mental illness access treatment.

50

1          I won't reiterate my written testimony, but

2     just highlight a few things that are contained in

3     it.

4          New York State has one of the lowest levels

5     of gun violence in the entire country.  It seems to

6     be within the bottom five in any study that's been

7     done, and there have been a lot of studies done.

8          And I do believe this is largely due to our

9     strong gun-control laws.

10         The Urban Justice Center Mental Health

11    Project provides direct legal and social-work

12    services, and we do impact litigation, to try to

13    help people with mental illness receive treatment,

14    live fuller lives.

15         And we have had clients and prospective

16    clients come in and tell us about their concerns

17    about the SAFE Act.

18         And we certainly know that one of the greater

19    problems for some people to access treatment, is

20    paranoia about being included on some sort of

21    government list.

22         The SAFE Act just increases that paranoia.

23         And what -- in addition to increasing the

24    stigma, we feel that there are particular classes of

25    people that will be inhibited.

51

1          We echo Ms. Rabinowitz's concern about

2     veterans being unwilling or reluctant to access

3     treatment.

4          And I also know members of law enforcement

5     would have great difficulty.  I mean, most members

6     of law enforcement are licensed to carry guns, and I

7     think that this will inhibit them.

8          And, in fact, I've talked with three

9     different groups of law-enforcement officers in the

10    past month, and all of them felt that the SAFE Act

11    did not assist to make -- to meet the aims.

12         What's really of concern to me, is we had a

13    real tragedy that propelled the enactment of this

14    law, but the tragedy likely would not have been

15    prevented by the enactment of this law.

16         So if this type of legislation had existed in

17    Connecticut, in Colorado, in Arizona, in any of the

18    places where we've seen some tremendous mass

19    shootings in the past couple of years, I don't

20    believe that it would have prevented any of those

21    incidences.

22         My experience in dealing with people with

23    mental illness comes primarily through 20-plus years

24    of work as a public defender, where I spent the last

25    15 years of my work really concentrating my practice

52

1    around trying to help people with mental illness who

2    get caught up in the criminal justice system, to get

3    out of the criminal justice system.

4            I did this at the Legal Aid Society of

5    New York, and, at Brooklyn Defender Services, in

6    their criminal practices.

7            And I have worked -- even before I became the

8    director of the Urban Justice Center Mental Health

9    Project, I have worked with the Mental Health

10   Project to try to improve the lives of people with

11   mental illness who get caught up in the criminal

12   justice system here in New York City, and who

13   receive mental-health services in the state prisons.

14           By and large, people with mental illness that

15   do commit crime do not commit violent crime.

16           And, the violent crime that's committed is

17   generally not gun crime.

18           And when guns are used, they are almost

19   always illegally possessed.

20           And, I forget whether it was the first

21   speaker or Dr. Martin who talked about, that there

22   have only been, out of some thousand --

23   5,000 reports, there have only been 11, or,

24   3,000 reports, 11, founded circumstances where there

25   were guns involved.

53

1          The vast majority of guns that people -- any

2     people in New York use to commit crimes, are

3     illegally possessed.

4          And I just don't think that there's enough of

5     a connection between gun crime and mental illness to

6     justify this reporting, which so, so increases

7     discrimination against people with mental illness.

8          In addition, there is just one other item

9     that I would like to highlight.

10         I find it almost beyond belief that there's a

11    mandate for people who are released from state

12    prison to psychiatric -- local psychiatric

13    facilities to be mandated for assessment for

14    assisted outpatient treatment.

15         In my view, I know that assisted outpatient

16    treatment is used far more frequently downstate than

17    upstate, and maybe there is a need to try to help

18    people who are eligible upstate, to have clinicians

19    refer eligible people.

20         But, I think that it's just flat out wrong,

21    and clearly discriminatory, to say:  If you were in

22    state prison, and you were discharged to a

23    psychiatric facility, you need to be assessed for

24    AOT before you can be released to the community.

25         There is really -- while many of those people

54

1    may meet the criteria for AOT, the ones who meet the

2    criteria for AOT should be referred if it would be

3    helpful and of benefit to them.

4         One of the criteria for AOT, is that the

5    order would be a benefit to the respondent of the

6    order.

7         So, if they meet the criteria, and the order

8    would be of benefit, they should be referred, but

9    they should not be referred for assessment merely

10   because they happen to be caught up in the criminal

11   justice system.

12        Thank you very much for giving me this

13   opportunity to testify today.

14        SENATOR VALESKY:  We thank you for your

15   interest, and your work in the field.

16        Thank you.

17        MARY BETH ANDERSON:  Thank you.

18        SENATOR CARLUCCI:  Next we're going to hear

19   from Jason Lippman, who's the senior associate of

20   policy and advocacy for the Coalition of Behavioral

21   Health Agencies.

22        JASON LIPPMAN:  Good afternoon,

23   Senator Carlucci and Senator Valesky.

24        Thank you for allowing me the opportunity to

25   testify before you today.

1    The New York SAFE Act, as it relates to

2    mental-health services and

3    mental-health-professional reporting requirements.

4    Before I address concerns about the SAFE Act,

5    I thought it is important to point out that, as has

6    been mentioned by other speakers, that the link

7    between mental illness and violence is a serious

8    one.

9    Each year, 20 percent of Americans suffer

10   from a mental illness, and almost half of Americans

11   experience some form of behavioral health symptoms

12   throughout their lives; yet, when it comes to

13   incidence of violent crimes, only a very small

14   portion, about 4 percent, are committed by

15   individuals with mental illness.

16   In addition, individuals with mental illness

17   are 12 times more likely to be victims of crime, as

18   you heard earlier as well.

19   More reliable predicters of violence include

20   things like age, gender, prevalence of substance

21   abuse, disorder, and the nature and quality of one's

22   environment, and past behavior.

23   Misperceptions about people with mental

24   illness can lead to discrimination and hinder

25   recovery.

56

1           Such stigma also deters people with mental

2   illness from seeking professional help.

3           The coalition actually supports provisions in

4   the SAFE Act related to gun control.

5           Specifically, we support the expanding of

6   New York's laws to ban assault weapons and

7   high-capacity magazines, as well as expanding

8   background checks on sales and purchase of firearms

9   for all New York State residences.

10          We believe that gun control is a significant

11  public-health issue.

12          We are concerned, obviously, about the

13  SAFE Act's requirement that mental-health

14  professionals have to report.

15          We believe that it not only stigmatizes

16  people with mental illness and deter them from

17  treatment, but it is also in violation of HIPAA, as

18  you heard earlier, and because of that, it exposes

19  practitioners to liability risks.

20          It is current the case that the HIPAA law

21  allows practitioners to report clients in the

22  presence of an imminent threat, and to a person or

23  entity that is reasonably able to prevent or lessen

24  such a specific threat.

25          The SAFE Act does not meet this standard.

1      Furthermore, it creates an environment where
2   individuals may not feel safe to speak freely or
3   fully disclose their thoughts and feelings to
4   mental-health professionals.
5      The HIPAA standard balances constitutional
6   protection, personal safety, and privacy issues
7   associated with mandatory reporting and database
8   building, with the need to protect public health and
9   safety.
10      Moreover, having two contradictory standards
11   in place makes the SAFE Act's reporting requirements
12   confusing and contradictory to follow.
13      Finally, rare acts of violence are usually
14   carried out by individuals who are not in treatment.
15      We need to identify and engage them before
16   crisis situations arise.
17      Preventive measures should include early
18   identification and treatment for substance-abuse
19   problems, more community behavioral health services,
20   more screening and outreach engagement in primary
21   care in schools, and more housing for people with
22   severe mental illness and substance-abuse disorders.
23      On behalf of the 130 non-for-profit coalition
24   members throughout New York City, Westchester,
25   Rockland, and surrounding counties, we look forward

58

1    to working with you and members of the Legislature

2    to remove this troubling provision, or at least

3    tweak it in some way, while retaining the freedom to

4    report that HIPAA allows.

5         I thank you for your time and interest, and

6    I am available to answer any questions that you may

7    have.

8         SENATOR CARLUCCI:  Well, thank you very much.

9         You talked about the liability in terms of

10   practitioners.

11        Could you elaborate on that a little bit

12   more, in terms of what the fear is?

13        And, has there been some specific

14   circumstances that you have seen in this case?

15        JASON LIPPMAN:  I guess because the

16   provisions in the SAFE Act are so vague, it leaves

17   them open to interpretation in many different ways.

18        Also, in the SAFE Act, it lists four types of

19   professionals that must report.

20        We've had questions from agencies:  Well,

21   what if someone else tells them?

22        I mean, that part I guess is kind of clearer.

23        But I guess, also, because it contradicts

24   with the HIPAA standard.

25        It's hard to follow both at once.  And if

59

1    you're caught in the middle, and you wind up in

2    court, it leaves it open.

3         Stuff that are wide open, that the

4    "likelihood" language, "using reasonable judgment,"

5    all of that was is open to interpretation.

6         And it's not just the practitioner itself.

7    Also the provider agencies themselves would likely

8    be open.

9         SENATOR VALESKY:  Just a thought, I could

10   have asked probably anyone who testified before:

11   Are you aware of any similar reporting requirements

12   in any other states?

13        JASON LIPPMAN:  I am not.

14        That's a good question.  And I think it's

15   something I would like to look into.

16        So, I will, and I can get back to you.

17        And I'm sure other people would want to know.

18        We can do that too.

19        That's a good question.

20        SENATOR VALESKY:  Thank you.

21        SENATOR CARLUCCI:  Great.

22        Mr. Lippman, thank you very much.

23        JASON LIPPMAN:  All right, thank you.

24        SENATOR CARLUCCI:  Next we're going to hear

25   from the New York State Psychological Association.

60

1          We have Dr. Eric Neblung, who's the

2     president; and, Jerry Grodin, who's the director of

3     professional affairs.

4          DR. ERIC NEBLUNG:  Good afternoon.

5          Thank you very much for taking our testimony

6     today.

7          Before I begin, I'd just like to say:

8          David, as a constituent, I'm very proud of

9     the work you've been doing, and I'm very happy to be

10    here with you today.

11         SENATOR CARLUCCI:  Thank you.

12         DR. ERIC NEBLUNG:  And, also, it's

13    Dr. Grodin.

14         The New York State Psychological Association

15    believes that the SAFE Act represents a sincere

16    attempt to address the plague of gun violence in our

17    state.

18         As such, we congratulate the New York State

19    Legislature for taking on the hard task of reducing

20    gun violence.

21         However, it is also our consensus opinion

22    that the mental-health reporting provisions of the

23    SAFE Act are not acceptable as they are currently

24    written.

25         To be clear, these comments are limited only

61

1    to the mental-health reporting provisions of the

2    act.

3         Regarding the act's mental-health reporting

4    provisions, our opinion is based on the following

5    conclusions:

6         First, the act's mental-health reporting

7    provisions do nothing to allow a mental-health

8    provider to take immediate action to deal with a

9    dangerous mental-health patient.

10        By the very nature, the act's current

11   mental-health reporting provisions are not designed

12   to allow clinicians to breach confidentiality in a

13   way that will allow them to take the necessary,

14   direct, and immediate steps that will simultaneously

15   help a dangerous patient and protect society from

16   that patient.

17        Instead, the act requires the mental-health

18   professional to make a report that must work its way

19   relatively slowly through a bureaucracy.

20        The only possible result from this report,

21   are the removal of licensed firearms or a

22   restriction on an individual's ability to obtain

23   firearms in the future.

24        The act does not provide for any other

25   action; thus, it provides no assistance to

62

1        mental-health professionals who are dealing with

2        immediately dangerous patients who may pose imminent

3        threat to themselves or others;

4             Second, the act's mental-health reporting

5        provisions are much too vague, and will lead to

6        confused and inconsistent reporting.

7             Other jurisdictions that have tackled this

8        problem have clarified the mental-health reporting

9        requirements by specifying that the patient's threat

10       of harm must be serious and imminent and involve

11       threats of physical harm.

12            The addition of these terms "imminent,"

13       "serious," and "physical harm," would help mental

14       professionals report only those patients who are

15       clearly dangerous, and would prevent the expenditure

16       of resources on investigations of a potential flood

17       of vague and indefinite threats.

18            In addition, a clearly and specifically

19       defined set of reporting criteria will limit the

20       act's infringement on the confidentiality and

21       privacy of persons who are not imminently and

22       seriously dangerous, and would allow such persons to

23       discuss their problems without fear of triggering a

24       sudden and dramatic governmental intrusion into

25       their private lives.

63

1          Thus, the clearer and more specific the

2    mental-health reporting criteria, the less likely

3    that the act will deter patients from seeking

4    mental-health treatment, and the less likely that it

5    will inhabit the honest disclosure of information

6    during mental-health treatment;

7          Finally, the focus of the SAFE Act

8    exclusively on the mentally ill, as opposed -- as

9    potential sources of violence unnecessarily

10   stigmatizes a part of the population that is much

11   more likely to be the victims of, as opposed to the

12   perpetrators of, violence.

13         Indeed, research suggests that the presence

14   of mental illness only minimally predicts the

15   commission of future violence.

16         Rather, there are other much more powerful

17   predicters, most notably, active substance abuse,

18   the presence of environmental stressors, and history

19   of past violence.

20         We urge the Legislature to consider refining

21   the act so that it more accurately and thoroughly

22   addresses the factors that are known to raise the

23   risk of future violence.

24         Thank you.

25

64

1          SENATOR VALESKY:  I just wanted to follow up:

2              You, actually, in your testimony, have hinted

3      at an answer to the previous question that I just

4      asked.

5              You said, that, "other jurisdictions that

6      tackled this problem."

7              Do you have -- what other jurisdictions are

8      you referring to?

9              DR. ERIC NEBLUNG:  There's other states that

10     have looked into this issue.

11             California.  Uhm...

12             Do you have some others in mind, Jerry?

13             DR. JERRY GRODIN:  California, in particular,

14     they were all struggling with this, and were much

15     more specific in their definitions.

16             SENATOR VALESKY:  Okay.  So their statute --

17     from your perspective, their statute would be

18     acceptable?

19             DR. JERRY GRODIN:  It would be, because, I

20     think that, for people in private practice, this is

21     constructed in a way that is so non-specific, I

22     think there would be great reluctance to actively

23     report someone.

24             SENATOR CARLUCCI:  Well, Dr. Grodin,

25     Dr. Neblung, in the testimony, you did speak about

65

1    those specifics, and you mentioned them just now,

2    and, we speak about these predicters of future

3    violence.

4         Now, with these -- you know, with these

5    predicters, are there ways that we could tailor the

6    SAFE Act provisions that would address those

7    predicters, and do it without further stigmatizing

8    individuals?

9         DR. JERRY GRODIN:  I think that tightening it

10   up would make more much sense, so that it's more

11   useable to people in private practice.

12        Because the private practitioner is going to

13   feel like they're using what is called "their best

14   judgment," the best judgment, based upon research,

15   is:

16        Was the person under the influence of

17   substances?  No.

18        Was -- does the person have a past history of

19   violence?  No.

20        "So, you're basing your reporting based upon,

21   what?"

22        And they would be very exposed under those

23   conditions.

24        SENATOR CARLUCCI:  Well, thank you so much.

25        We really appreciate the testimony, and look

1    forward to working with you in the future.

2           DR. ERIC NEBLUNG:  Thank you, both.

3           DR. JERRY GRODIN:  Thank you.

4           SENATOR CARLUCCI:  Next we'll hear from

5    Ari Moma, who is from the New York Nurses

6    Association.

7           ARI MOMA, R.N.:  Thank you, and good

8    afternoon.

9           I appreciate your having us, the New York

10   State Nurses Association, to present our testimony.

11          First, and foremost, I am a registered nurse.

12          I live in Brooklyn, and I work in Brooklyn.

13          And I'm here to speak on behalf of New York

14   State Nurses Association.

15          We appreciate the opportunity to submit our

16   testimony to this Committee.

17          The New York Association is the oldest and

18   largest professional organization for registered

19   nurses in New York State, and it represents the

20   interests of more than 270,000 registered nurses in

21   New York State.

22          I'm also the [unintelligible]

23   collective-bargaining agent for more than

24   36,000 nurses, with 150 collective-bargaining

25   facilities -- health-care facilities in

67

1    New York State.

2         Furthermost, I would tell you that nurses are

3    front line.  You know, we are in the hospital

4    [unintelligible] we triage a patient and see them

5    [unintelligible] first line.

6         And they experience the tragic effects of gun

7    violence on a regular basis.

8         In my work on a psych unit --

9         I work in a psych unit at Interfaith Medical

10   Center, and I've been a psych nurse for

11   17 years-plus.

12        -- and I've seen the effect [unintelligible]

13   violence has taken on families, their loved ones,

14   and community at large.  And especially where I

15   live, or where I work, which is [unintelligible]

16   Brooklyn, I see it firsthand.

17        And most of the patients we have there are

18   mostly classified as mostly forensic patients.

19        The New York Association will support the --

20   and we support and appreciate the effort to reduce

21   the gun violence; however, we have serious concerns

22   regarding the provision of the SAFE Act;

23   specifically, the addition of Section 9.46

24   [unintelligible] of the Mental Health --

25   Mental Hygiene Law which establishes that the

68

1     mental-health-professional reporting requirements.

2          We appreciate the opportunity to speak with

3     you, to be -- and hope to engage you as a panel in

4     amending the requirement.

5          Mostly, before I continue, I will thank you

6     [unintelligible] because, most of the time, we're in

7     Albany, and we [unintelligible] New York has worked

8     diligently to make most of the laws passed,

9     especially the violence towards the nurses, which is

10    the same [unintelligible] law that has -- it applied

11    to the police officers.

12         So, with that, [unintelligible] you're going

13    to work diligently to bring that concern, you know,

14    to your -- you know, to the Committee -- to the full

15    Committee.

16         The law we're talking about includes

17    provision [unintelligible] mental-health

18    professionals to make a report to local director of

19    community services when the head [unintelligible]

20    professional concludes, in their reasonable

21    professional judgment, that the patient is likely to

22    engage in conducts that would result in serious harm

23    to self or others.

24         There are three concerns the New York

25    Association has, and that is, [unintelligible] about

1    reporting requirement.

2          The first, and foremost, is the HIPAA.

3          Your reporting provision are not in

4    compliance with the HIPAA standards;

5          Two, that the requirement that all

6    mental-health registered nurses would be mandated

7    reporters.

8          It's not consistent with current scope of our

9    practice, and it poses us, the registered nurses, to

10   liability;

11         And the third, the linking the gun-control

12   efforts with mental health stigmatizes mental

13   illnesses, and would create barriers to treating for

14   individuals who would need it.

15         In elaborating those three points, the

16   violation of HIPAA, as are groups that are

17   testifying today, pointed -- some of the other

18   groups pointed out earlier, that mandatory reporting

19   requirement by the SAFE Act to a local director of

20   community services constitute a violation of HIPAA,

21   because SAFE Act, as presently written, (1) fails to

22   require the presence of immediate threat as a

23   precondition to release confidential health

24   information, (2) it also fails to mandate the report

25   that [unintelligible] patients or entity who is

70

1    resembling [unintelligible] mitigates the immediate

2    threats.

3         The New York Association urges an amendment

4    to the SAFE Act to conform to HIPAA standards; that

5    is, disclosure only when there is a significant and

6    immediate threat to the health and safety, which is

7    the threshold in existing Mental-Health Hygiene Law;

8         And, also, disclosure [unintelligible]

9    reasonably effort to prevent or lessen the threat,

10   including the target of the threat, such as the

11   enforcement agency;

12        Secondly, mandating all mental-health nurses

13   is not consistent with our scope of practice.

14        Currently, the submission of serious and

15   imminent danger in New York State Mental Hygiene Law

16   that allow for disclosure of confidential clinical

17   records, are made by treating providers who has the

18   authority to [unintelligible] prescribed.

19        I'm a nurse.  I'm a registered nurse.  All I

20   do: I assess the patient, get all the necessary

21   data, and I will give it over to a provider, which

22   is a psychiatrist, or, nurse practitioners, be they

23   are an advanced -- have advanced training.  They are

24   the other people that will diagnose, they're

25   prescribed.

1          So to put that burden on a registered nurse,

2    I don't think is fair on them, and it exposes them

3    to litigation.

4          And, what are their protection?

5          And another thing, is that, it's not within

6    their scope.

7          We know, when you put us outside their scope,

8    you're exposing us to a litigation.

9          And the first of most, when you go to the

10   Department of Education, when you sit before the

11   board, you have your scope, which a code to work

12   within this scope.

13         Again, outside your scope, it's not

14   acceptable.  It's unprofessional.

15         Why is the State putting these -- the nurses

16   in danger of losing their license, and all their

17   livelihoods?

18         And also endangering the patient, because you

19   are not -- you're treating what they're not supposed

20   to do;

21         And, thirdly, linking gun control with mental

22   illness will increase the stigma on the patient.

23         The New York Association has serious concern

24   that mental-health-profession reporting requirement

25   will further stigmatize mental health, and may

1    function as a barrier to treatment for those who

2    need it.

3         Mental health and gun control are a separate

4    concern, and to promote the criminalization of

5    people with mental health would -- with this broad

6    reporting requirement is an injustice.

7         I sit with my patient every day.  And when

8    you do an assessment, most of the mental patients

9    are they had -- they're delusional.

10        And when you sit with them, and start to get

11   information, the first thing they ask you:  This

12   information, where are you talking it to?

13        Is it going to be beyond this place?

14        Is it going to go to [unintelligible] way

15   before this [unintelligible]?

16        And most of the time that means, how much

17   information are they going to give you?

18        If they realize that this information, most

19   of them have criminal records.

20        You know, I mean, the kind of patient I see,

21   [unintelligible], the area [unintelligible] criminal

22   records.

23        Their criminal record is not that violent.

24   Maybe shoplifting.

25        With this, this law, they would not give you

73

1    much information about them.  They will lie.

2              And when they lie, we're going to be treating

3    something that they are not there for.

4              How does that help them?

5              It does not help them.

6              And it does not help the society to reduce

7    the gun violence.

8              Most of the gun violence are merely from

9    smugglers.

10             Few people that have the gun that are

11   registered, there are always a background check that

12   out that are done.

13             And most of all of the killing from illegal

14   guns smuggled in, and are people buying gun from --

15   maybe from other people.

16             How is this going to help?

17             How is it going to help the nurses?

18             And how is it going to help the mental-health

19   patients?

20             It's not going help them.

21             They will not give you more information.

22             Most of them would bar themself from coming

23   to get treatments.

24             So in conclusion, the New York Nurses

25   Association urges the Legislature to work with us to

74

1    modify this provision in the SAFE Act, to protect

2    the public well-being, [unintelligible] as a mental

3    illness, and creating barriers to necessary

4    treatments.

5         In conclusion, also, I thank you for the

6    opportunity you have given to me to represent my

7    association, New York State Nurses Association, to

8    bring our concern up to you.

9         And we urge you to consider this amendment,

10   and others, to protect, not only the professionals

11   who are dedicated to providing -- the professionals

12   who are dedicated to providing care for those with

13   mental illness, but also to protect the patient and

14   public as well.

15        Thank you.

16        Do you have any questions?

17        SENATOR CARLUCCI:  Thank you, Ari.  We really

18   appreciate your testimony.

19        SENATOR VALESKY:  I was just going to

20   mention, obviously, we have heard a great deal about

21   the HIPAA concerns, and the stigma, but, I wasn't as

22   aware with your scope of practice concerns, and the

23   potential for liability.

24        So, I appreciate your specifically bringing

25   that to our attention.

1        ARI MOMA, R.N.:  Thank you.

2        SENATOR CARLUCCI:  Next we'll hear from

3   Beth Haroules, who is the senior staff attorney for

4   the New York Civil Liberties Union.

5        BETH HAROULES:  Hi, good afternoon.

6        My name is Beth Haroules.  I'm a senior staff

7   attorney at the New York Civil Liberties Union.

8        We are the New York State affiliate of the

9   American Civil Liberties Union.

10        We have 7 chapters, or regional offices, and,

11   nearly 50,000 members across New York State, and the

12   forefront of our efforts have been our defense of

13   the rights of individuals with disabilities under

14   both the federal Constitution and the New York State

15   Constitution.

16        I would like to thank the Committee for

17   inviting NYCLU here to provide testimony relating to

18   the implementation impact of the mental-health

19   requirements contained in the SAFE Act.

20        I'm one of plaintiffs' lead counsel in the

21   Willowbrook case, as well as lead counsel in the

22   **Hirschfeld versus HHC** case.

23        You may know that the Willowbrook case is a

24   landmark class-action litigation on behalf of people

25   with intellectual developmental disabilities, mental

76

1    retardation, or developmental disabilities,

2    initiated in 1972 by my office and others, that was

3    in the vanguard of the civil-rights movement for

4    people with disabilities.

5        The Hirschfeld case is a pending lawsuit

6    challenging the squalid conditions, substandard

7    mental-health services, and abusive and negligent

8    treatment of adult and child and adolescent patients

9    confined to King County's Hospital psychiatric

10   facilities, a New York City HHC corporation that is

11   operated under the auspices of the New York State

12   Office of Mental Health.

13       I was also the lead counsel in the

14   Amicus Group that challenged the enactment of

15   Kendra's Law in the case, "K.L.," in 2004.

16       It's been my experience, as I monitor

17   implementation of two federal consent judgments in

18   the Willowbrook and Hirschfeld matters that the

19   stigma that attaches to people with disabilities,

20   whether it be developmental disability or mental

21   illness, including Alzheimer's and other mental

22   illnesses that affect the elderly, is pervasive

23   throughout society, and persists unbated,

24   notwithstanding continuing efforts to combat the

25   stigma.

1            The stigma visited on individuals who are,

2     for the most part, poor and marginalized, with no

3     voice in the political system, is particularly

4     severe.

5            The New York SAFE Act of 2013 is 39 pages

6     long, and it includes wide-ranging changes to

7     New York State laws, from mental health and family

8     courts, to criminal procedure and business laws.

9            At bottom, the mental-health provisions of

10    the New York SAFE Act rests on fundamental

11    misapprehensions about the highly complex links

12    between violence, mental illness, and gun control.

13            You've heard it before, and I'll say it

14    again:

15            People with mental illness are no more

16    violent than the general population, and are, in

17    fact, actually 12 time more likely to be victims of

18    violent crime, as opposed to perpetrators.

19            Dr. Richard Friedman warned in a

20    "New York Times" article published one month prior

21    to the enactment of the SAFE Act:

22            That all the focus on the small people of

23    people -- small number of people with mental illness

24    who are violent serves to make us feel safer by

25    displacing and limiting the threat of violence to a

78

1    small, well-defined group.  But the sad and

2    frightening truth, is that the vast majority of

3    homicides are carried out by outwardly normal people

4    in the grip of all too ordinary human aggression to

5    whom we provide nearly unfettered access to deadly

6    force.

7         We have three main concerns with the New York

8    SAFE Act:

9         New York's SAFE Act mandates the creation of

10   an enormous database with no privacy protections,

11   administered by New York State's Division of

12   Criminal Justice Services.

13        They call it the "Disqualifying-Data

14   Database."

15        The database contains the names and addresses

16   of all New Yorkers who live under a guardianship

17   order.

18        This is your grandmother with Alzheimer's

19   that you have pursued guardianship, so that you can

20   manage her funds to keep her at home for as long as

21   possible.

22        It includes people with a developmental

23   disability.  Your son or daughter with

24   Down Syndrome.

25        And it includes people with a mental illness.

79

1    Your son with ADD.

2         The database is supposed to be used merely to

3    check to ensure there's no licensed firearm, but,

4    there are no privacy protections built into it.

5         The law does not exempt the

6    Disqualifying-Data Database from FOIL.

7         The lack of protection afforded the people

8    who are going to be in this Disqualifying-Data

9    Database stands in stark contrast to the new

10   New York State Police-controlled statewide license

11   and record database of the licensed gun owners in

12   New York.

13        The gun-owners database specifically exempts

14   the records assembled or collected for purposes of

15   inclusion in such database from disclosure pursuant

16   to FOIL.

17        This is an equal-protection violation.

18        State and local law enforcement should not

19   have carte blanche access to the names and

20   identifying information contained in this extensive

21   database about people under guardianship, people

22   with developmental disabilities, or people with

23   mental illness, or, people reported under 946.

24        Law-enforcement personnel routinely perceive

25   New Yorkers living with these disabilities through

80

1    the pejorative lens of emotionally disturbed

2    persons, or, "EDP," and New Yorkers are all too well

3    aware that law-enforcement encounters with EDPs

4    generally do not end well.

5         Research suggests that persons with DD or

6    mental-health issues are 7 times more likely to come

7    into contact with law enforcement than others.

8         There is extensive public memory of

9    high-profile interactions between law enforcement

10   and individuals with psychiatric disabilities that

11   have resulted in the death of numerous New Yorkers

12   over the years.

13        This is Eleanor Bumpurs;

14        This is Giton Bush [ph.];

15        Kevin Cerbelli;

16        Recently, Mohamed Bah;

17        Darius Kennedy.

18        In addition to these well-publicized

19   incidents, many individuals with DD or mental

20   illness, and their families, have had strained

21   interactions of their own with members of law

22   enforcement.

23        The public and private experiences create a

24   perception that encounters with law enforcement can

25   have unintended results; injury, or even death.

1          In New York State, my experience has been,

2     that few, if any, disabled individuals possess, or

3     want to possess, firearms; yet New York SAFE Act

4     calls for criminal investigations of those persons

5     mandated into the Disqualifying-Data Database, and

6     ensures that there will be numerous and potentially

7     adverse contacts initiated between New Yorkers with

8     disabilities and law enforcement personnel who are

9     untrained in mental-health and disability issues.

10         There's already been a report suggesting

11    additional misconduct by the New York State Police

12    in carrying out their investigations.

13         There was a suggestion in a permit-revocation

14    situation in Erie County that DCJS and/or the

15    State Police may have had access to the New York

16    State Prescription-Drug Database, resulting in

17    confidential medical information being harvested in

18    order to pull weapons from a person who did not meet

19    the new 946 reporting standards.

20         The circumstances of that case are murky, but

21    we urge the Committee to conduct oversight over this

22    incident.

23         You have heard a lot about the 946 mandate.

24         I won't go into much detail here, other than

25    to note that, again, the reporting mandate

82

1       represents a major change in the presumption of

2       confidentiality that has been inherent in

3       mental-health treatment and recognized in

4       New York State, for years, decades.

5               This privilege is codified in the CPLR.

6               The reporting requirements you've heard have

7       had -- could have the undesired consequence of

8       deterring people from seeking or fully disclosing

9       during treatment.

10              I have to tell you, we have consulted as

11      well, as Ms. Anderson noted, with law-enforcement

12      professionals, police, corrections officers, who may

13      be deterred from seeking treatment for fear they

14      lose their firearms, and then their jobs.

15              We're also very much concerned that there

16      will be the potential for racial bias injected into

17      the 946 reporting regimen.

18              As you've heard, there is no age threshold

19      with respect to patients who must be reported to

20      DCJS.

21              And as we also heard, OMH is directing that

22      all children, ages 11 and up, be reported into the

23      database.

24              We know that many public-school students,

25      most often, young men of color, are inappropriately

83

1    transferred from school to psychiatric emergency

2    rooms for psychological evaluation following minor

3    classroom disturbances and disciplinary infractions.

4         And we've heard today that they're going into

5    the DCJS database, at a point in time where they

6    don't even have a mental illness, much less qualify

7    for 946 reports.

8         The concern about overreporting is not

9    hypothetical.  You heard the numbers today.

10         It was reported that, in Westchester, they're

11    getting in reports at a hundred a clip, and it's

12    coming out of the hospital emergency rooms'

13    mental-health clinics.

14         An area that has not been touched on today,

15    except tangentially, is modification to

16    Kendra's Law, that have been affected by New York's

17    SAFE Act.

18         We -- I -- my testimony deals with three

19    areas.

20         There's so much more that could be talked

21    about today.

22         The duration of the initial assisted

23    outpatient treatment order has been extended to one

24    year, from the current six months.

25         When we litigated "K.L." before the court of

84

1       appeals, the court was very assured by the fact that

2       the duration of the initial order was a six-month

3       period, and did not think that there needed to be

4       modification to the due-process provisions set forth

5       Kendra's Law.

6               By extending that initial order term to a

7       period of 12 months, we think that there is some

8       serious issues with respect to the due-process

9       provisions contained in the statute.

10              The other provision, which relates to the

11      treatment order, quote, following the person from

12      one county to another when the person moves, it

13      appears to conflict with the mandates of

14      Kendra's Law that requires governmental units, as

15      part of its local or unified services plan, to plan

16      for the provision of services to individuals who may

17      be included in an AOT program administered,

18      supervised, or operated by the locality.

19              Each local governmental unit is required to

20      plan for the provision of mental-health services to,

21      quote, "high-need patients," as that term has been

22      defined by the Commissioner of Mental Health to

23      include Kendra's recipients.

24              The treatment order following the plan, the

25      person has the potential to wreak havoc on county

1    community mental-health planning budgets.

2        If the county wishes to make the treatment

3    services mandated, under a new residence, Kendra's

4    order are available to that person.

5        But while the Kendra's order imposes ongoing

6    mandated treatment and compliance obligations on the

7    recipient of the order, the modifications do nothing

8    to mandate the new county of residence to modify its

9    local or unified services plan to plan for the

10   provision of the services mandated to the newly

11   arrived Kendra's-order recipient.

12       When a Kendra's-order recipient is not

13   compliant with their treatment modality, whether

14   it's because they choose not to comply, or because

15   the services are unavailable, they can be, and are,

16   picked up and transported to a psychiatric facility.

17       To the extent that this provision

18   [unintelligible] Kendra's-order recipient from

19   relocating within New York State to a different

20   county of residence, we believe that this provision

21   of Kendra's Law [unintelligible] a violation of

22   New York citizens' constitutional right to

23   intrastate travel.

24       Kendra's law was set to sunset in 2015, and

25   would have been subjected to a fair amount of

1    scrutiny, as the Legislature has done in each of the

2    past five-year incremental extensions of time.

3         There is major evidence of racial bias as

4    these Kendra orders are entered.

5         There is major evidence of geographic

6    uncertainty.

7         If you're in an urban area downstate,

8    Long Island, or up in the Erie County, you tend to

9    be ordered more frequently than in other of the

10   counties.

11        The Legislature has very carefully moved

12   forward in assessing the efficacy of the Kendra's

13   regime, and, bumping it out another two years,

14   really, doesn't add anything to the process, and

15   really seems to be gratuitous.

16        I do want to make a final note on the

17   legislative process before I close here, and, you

18   know, at the Civil Liberties Union, we're

19   particularly concerned about this:

20        Like many significant areas of recent

21   legislation in New York State over the past few

22   years, the SAFE Act was crafted behind closed doors

23   by the Governor's Office, and pushed rapidly through

24   the Legislature, and immediately signed into law by

25   Governor Cuomo.

87

1       There was a message of necessity passed.

2       20 hours barely elapsed between the

3   introduction of the bill and signature by the

4   Governor.

5       The Senate approved the measure on its first

6   day in session after the New Year's holiday, at

7   11:30 at night, and the Assembly on the 2nd.

8       Few lawmakers, and no one in the public, had

9   time to read, digest, or debate the details, and, no

10  individuals with disabilities or their advocates or

11  mental-health professionals were consulted in

12  connection with the mental-health ramifications of

13  the legislation.

14      This legislative process makes a mockery of

15  the core democratic principles of transparency,

16  accountability, and public participation in

17  government.

18      The basic requirements of open government in

19  the legislative process, including public-comment

20  period and robust legislative debate, were

21  completely jettisoned in the enactment of this piece

22  of legislation.

23      I think most of us who advocate on behalf of

24  New Yorkers with developmental disabilities and

25  mental-health disabilities, the elderly, the young

88

1    alike, agree with [unintelligible] reflection that

2    last December's tragic Newtown School shooting has

3    offered all of us a kind of opportunity that only

4    comes once every generation or two: to rethink the

5    entire mental-health system with a focus on

6    re-envisioning community mental-health care, taking

7    steps to ensure more vigilance for problems in young

8    people, and ultimately reducing stigma.

9         I hope this Committee hearing is the

10   beginning of just such a process.

11        Thank you for the opportunity to testify

12   today.

13        SENATOR CARLUCCI:  We really appreciate your

14   testimony, and all the work that you've done over

15   the years, with the extensive resume.

16        So, thank you for your service.

17        One question that I wanted to ask:

18        I know you touched upon the Freedom of

19   Information law.

20        Are there other recommendations from the

21   Civil Liberties Union that would protect people's

22   privacy?

23        BETH HAROULES:  I think you really have to go

24   back.

25        There were modifications made to the

1   Mental Hygiene Law Privacy Protections, 3313, that

2   have been reconfigured in a way that, effectively,

3   strips everyone of their privacy rights.

4       These are putting all of this information

5   that, in the past, for example, there are certain

6   standards for including people with mental-health

7   and developmental disabilities interactions with OMH

8   and OPW into the federal mixed database.

9       You know, I think you need to go back to

10  where that process is, what those privacy

11  protections are, and, abandon the concept that DCJS

12  has the right to have access to confidential

13  mental-health, developmental disability, elder

14  information.  There's no need for them to have a

15  database of all of these people.

16      It should not be administered by a

17  criminal-justice entity.

18      I mean, these are not people who need to be

19  tarred with a brush of criminal-justice oversight.

20      These are people with disabilities.

21      And, so, you know, our basic recommendation

22  is, it needs to be jettisoned, and you really have

23  to come to the table with all of the people, you

24  know, including many of the suggestions that were

25  made today, to look at exactly what it is that is

90

1    trying to be accomplished here.

2         You know, as I said, most people with

3    disabilities don't want weapons.

4         You know, the grandmother with Alzheimer's,

5    you know, it may be her family's guns, you know,

6    but, presumably, the family is already looking at

7    that.

8         DCJS is not going to send the State Police in

9    to batter down a grandmother's door, you would

10   think, but they have the right to do that.

11        And, there is no clarity, there are no

12   guidelines.

13        And I think what we've heard is:  Everybody

14   into the bin, because nobody wants to be the person

15   that the "New York Post" reports on, for having

16   failed to exercise appropriate judgment; for the

17   State Police having to fail, you know, to go to

18   their door, because they were in the database.

19        You really need to start at square one with

20   this.

21        And there's a lot of us who are willing, and

22   available, to assist in the process.

23        SENATOR CARLUCCI:  Great, thank you.

24        SENATOR VALESKY:  One more question?

25        SENATOR CARLUCCI:  Yeah, please.

1    SENATOR VALESKY:  Has the Civil Liberties

2    Union looked at the Pretlow bill that's been

3    referred to by a few previous speakers?

4        BETH HAROULES:  No, actually, and I would be

5    interested in seeing what that does.

6        You know, I think there are a lot of -- you

7    know, obviously, there are concerns when you have

8    bills that are introduced on behalf of providers,

9    versus, the actual advocates and the constituents

10   who are the people that are going to be impacted.

11       I did, actually, on the California law that

12   was alluded to, California is the state that has the

13   Tarasoff case in place.

14       It's a case, I believe from the '80s, where

15   reporting obligations imposed on treating

16   mental-health providers sort of came to first light.

17       And the California statute, as I understand

18   it, tracks very much what the requirements that were

19   imposed on treating mental-health professionals are

20   under the California Supreme Court case out there.

21       So, it's a little bit of a different

22   reporting regime.

23       I know clinicians are trained on that.

24       The New York, sort of, approach has mirrored

25   that, but there's never been a Tarasoff reporting

1    requirement in New York State.  And I think you need

2    to look at what Tarasoff was, who it applies to.

3         In my submission, I also pointed out the

4    irony of the fact that, for all of the mandated

5    groups of individuals under 946, State workers are

6    exempt.

7         So, there doesn't seem to be really -- you

8    know, if you're looking at who the appropriate

9    reporters are, to exempt out a lot of people who are

10   working off licensing out of New York State

11   Education simply because they're employed by a state

12   developmental disability setting or an Office of

13   Mental Health facility, it -- really, there's no

14   logic there.

15        SENATOR CARLUCCI:  Great.  Thank you.

16        SENATOR VALESKY:  Thank you very much.

17        SENATOR CARLUCCI:  Next we'll hear from

18   Kim Williams, who's the director of the Center for

19   Policy, Advocacy, and Education for the

20   Mental Health Association of New York City.

21        KIM WILLIAMS:  Hi.

22        So, good afternoon.

23        SENATOR VALESKY:  Hello.

24        KIM WILLIAMS:  Senator Carlucci,

25   Senator Valesky, thank you for the opportunity to

93

1    testify this afternoon on the provisions of the

2    New York State SAFE Act relating to mental-health

3    services and mental-health-professional reporting

4    requirements.

5         My name is Kimberly Williams.  I'm the

6    director of the Center for Policy, Advocacy, and

7    Education at the Mental Health Association of

8    New York City (MHANYC).

9         MHA is a not-for-profit organization that has

10   a three-part mission of direct service, advocacy,

11   and education, and, is a national leader in ensuring

12   that people in emotional distress get the help they

13   need.

14        And, our policy center promotes the

15   development of an advocacy for mental-health

16   policies and services that support high-quality

17   practices designed to meet the mental-health needs

18   of the diverse population in New York, as well as

19   across the United States, and to provide training,

20   technical assistance, and public education.

21        MHA of New York City is deeply concerned

22   about the impact that the New York State SAFE Act

23   will have on the rights of, and access to care for,

24   people with mental illness.

25        This law erroneously associates mental

94

1    illness with violence and dangerous criminal

2    behavior, further stigmatizing people with mental

3    illness, and which may, in fact, prevent people from

4    seeking the care that they need.

5         As has been stated, murders and overall

6    violence are extremely rare by people with mental

7    illness.

8         And, in fact, only about 4 percent of

9    violence in the United States can be attributed to

10   people with mental illness, and most of these

11   violence -- violent acts do not involve guns.

12        In fact, firearms result in nearly twice as

13   many suicides than homicides in this country every

14   year.

15        And while the mental-health components of

16   this law are intended to protect individuals who may

17   be of harm to themselves, it may actually deter

18   people from seeking treatment, or fully disclosing

19   to their therapist or doctor their suicidal

20   ideation, for fear of losing the right to possess

21   firearms, and, fear around privacy issues.

22        Additionally, longstanding laws, as have been

23   noted, already encourage mental-health professionals

24   to warn the appropriate parties if they believe

25   clients are in danger of harming themselves or

1    others.

2          Therefore, the SAFE Act is unlikely to

3    identify dangerous people who would not otherwise be

4    reported; but, rather, instead, discourage people

5    from seeking help in the first place.

6          The real mental-health issue in gun violence

7    is suicide, which we need to be confronting in a

8    non-stigmatizing manner that encourages people to

9    get help.

10          Firearms are the most common and most lethal

11   method of suicide.

12          And as I already stated, they result in more

13   suicides than homicides each year.

14          Access to firearms dramatically increases the

15   risk for completing suicide due to the lethality of

16   gunshot wounds, which occurs so quickly, and with

17   such force, that suicide attempts using firearms

18   leave people with little opportunity to survive a

19   suicide attempt.

20          While over 90 percent of people who survive a

21   suicide attempt will not go on later to complete

22   suicide, people generally do not survive

23   self-inflicted gunshot blasts.

24          If we want to reduce gun violence in the

25   state of New York, we need to focus on effective

96

1    means for suicide prevention that do not infringe on

2    an individual's right to privacy, but that do reduce

3    a suicidal person's access to highly lethal means,

4    and foster, not discourage, getting help.

5         Limiting access to guns during periods of

6    vulnerability is critical to saving lives.

7         Limiting access is not about gun control or

8    about permanently removing firearms, but about safe

9    dispensation, use, and storage of legal firearms.

10        Limiting access to lethal means is also about

11   ensuring that health and mental-health professionals

12   are trained to assess for risk of suicide, and on

13   how to counsel individuals at risk about limiting

14   his or her access to lethal means until they are no

15   longer in crisis.

16        This is known as "lethal-means counseling,"

17   and it involves acquiring of the individual, and

18   with permission from his or her family members,

19   about whether there are firearms or other lethal

20   means in the home, and working with them to

21   temporarily, rather than permanently, limit access

22   until the crisis is averted.

23        Local law enforcement or a family member or a

24   friend may be able to temporarily store the firearm

25   until the circumstances improve.

1         Suicidal crises do not last.  Many have an

2     impulsive component and occur during a short-time

3     crisis.

4         To implement the suicide-prevention approach

5     on a wide scale, professional groups can add

6     lethal-means-counseling protocols to their current

7     suicide-prevention protocols.

8         Providers can also get trained in

9     firearms-safety-counseling methods, such as the

10    CALM training, which stands for "counseling on

11    access to lethal means."

12        Another important and innovative way to limit

13    access to lethal means is to partner with the

14    gun-owning community to increase their involvement

15    in promoting suicide prevention.

16        This promising approach, which is being

17    implemented in other states, includes incorporating

18    suicide-prevention awareness as part of basic

19    firearms-safety training; developing guidelines with

20    gun-store and firing-range owners about how to

21    recognize a customer who is in distress, and avoid

22    selling or renting a firearm to a customer; and

23    encouraging gun-store and fire-range owners to

24    display and distribute suicide-prevention materials.

25        We are fortunate at the Mental Health

98

1    Association to have received a small grant from the

2    New York State Office of Mental Health to pilot such

3    a suicide-prevention initiative.

4         It's a gunshop project here in the state of

5    New York which we'll be implementing over the next

6    few months, and will be happy to share with you some

7    results of that project.

8         If we can implement commonsense approaches,

9    these commonsense measures like these, as part of a

10   comprehensive approach to suicide prevention, we can

11   increase the time that passes between impulse and

12   action; and, therefore, increase chances of

13   survivor, all while maintaining an individual's

14   rights, and encouraging help-seeking.

15        We encourage the New York State Senate to use

16   this opportunity to save lives by doing more about

17   the most common way in which guns cause death: by

18   supporting comprehensive suicide-prevention efforts

19   that incorporate limiting access to lethal means,

20   including firearms.

21        Thank you for the opportunity to testify.

22        SENATOR CARLUCCI:  Thank you, Ms. Williams.

23        And we look forward to working with you as

24   the Mental Health Committee, and working on

25   strategies towards effective suicide prevention.

99

1          So, some of the items in your testimony are

2    very helpful, and we look forward to hearing more

3    from you in ways that we can work together.

4          KIM WILLIAMS:   I would be happy to share

5    more.

6          SENATOR VALESKY:   Thank you for the work that

7    you're doing right here.

8          Thanks.

9          KIM WILLIAMS:   Thank you.

10          SENATOR CARLUCCI:   Thank you.

11          And that completes the list of speakers.

12          I think we have everyone.

13          Is there anyone else in attendance that

14    wanted to speak?

15          Okay.

16          Well, we appreciate your time, and for being

17    here, and working with us, to make sure that we

18    fight stigma with mental health, and make sure that

19    we do what is intended in this law: to protect

20    people, and to keep people safe in New York State.

21          With that, I want to thank everyone for

22    attending.

23          And, this hearing of the Mental Health

24    Committee is adjourned.

25          Thank you.

100

1              (Whereupon, at approximately 3:41 p.m.,

2        the public hearing held before the New York State

3        Senate Standing Committee on Mental Health and

4        Developmental Disabilities concluded, and

5        adjourned.)

6                        ---oOo---

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

05/02/2014  13:50   17168394583   ASSEMBLYWOMAN CORWIN   PAGE  02/12

### Western New York Legislative Forum on
### School Safety, Mental Health, and Gun Violence
#### *February 13, 2013*

### Testimony from the Mental Health Association of Erie County, Inc.

Two months ago, 26 people – including 20 young children – were murdered at Sandy Hook Elementary School in Newtown, Connecticut. We're here today to do everything in our power to make sure that never happens in our community.

All three of the issues being addressed at today's forum – school safety, mental health, and gun violence – are vitally important. Each demands our attention. But we are concerned that when they are lumped together, this discussion often further stigmatizes people with mental illness.

The recently enacted New York State SAFE Act is a case in point. We believe it unfairly singles out people with mental illnesses. Both science and research tell us that these people are 12 times more likely to be victims – not perpetrators – of violent crime. We must stop associating violence with mental illness.

Most violence is not committed by people with a mental illness. That is one of the most insidious stereotypes. The seriously mentally ill, in fact, are involved in only 4% of violent crimes.

We know that one in four Americans deals with a mental illness. They are your neighbors, your co-workers, your friends...maybe even your children or parents. By perpetuating stereotypes and stigma, we inadvertently push people away from the support and services they need to move toward recovery and wellness.

1

Unwittingly, the SAFE Act may also have the unintended consequence of deterring people from seeking care or fully disclosing their concerns to their therapists or counselors. We reject the criminalization and psychiatric profiling of people with mental illnesses. The use of registry data must not extend – and cannot be shared – beyond gun-related purposes.

Delaying treatment is especially troubling for young people. We know that 75% of all mental illness appears before age 24. And it often takes decades for people to seek help. Tragically, four out of every five young people who struggle with a mental illness never receive treatment.

If we all know that we have a problem, what are the solutions? In our remaining time, we'd like to identify actions we can take as a community to strengthen mental health and wellness. Even though most of us are mentally healthy most of the time, we realize that good health must be nurtured and protected, especially among our most vulnerable, which certainly includes our children.

We'll conclude our remarks with a few suggestions on how we can more effectively respond to our friends, family members, and fellow New Yorkers who struggle with a mental illness.

In New York, more than 300,000 of our young people are living with a *serious mental health condition* that significantly impairs their daily functioning. In Erie County, that's enough children to nearly fill the First Niagara Center to capacity, or approximately 15,000 children. Still our education laws show little, if any, recognition of the need to teach about this critical aspect of health.

2

More than 50% of students labeled with emotional or behavioral disorders drop out of high school and, of those who do remain in school, only 42% graduate with a high school diploma. Many high school graduates go to war, most who were never taught about Post Traumatic Stress Disorder, or PTSD.

Other young people have parents returning from war, some with serious mental health needs. Many will require treatment. Every day, 22 veterans in the United States kill themselves. That's a tragedy of Sandy Hook proportions every single day. We've asked a lot of our military over the last decade. We owe them – and their children and families – better care than we've given them so far.

A lack of knowledge, coupled with stigma, discourages many people from taking full advantage of today's treatment options in a timely manner. This is both serious and disturbing since untreated mental illness tends to become more severe over time and, in extreme cases, often ends in suicide or self-injury.

Suicide is the third-leading cause of death for young people ages 15-24. More than 90% of young people who die by suicide were suffering from depression or another diagnosable and treatable mental illness at the time of their death. We do young people a disservice by remaining silent about mental health conditions like depression, eating disorders, and PTSD.

Unfortunately, in most New York State classrooms, there is little or no discussion of mental health. Without a clear policy direction and intervention from lawmakers, there is little hope of breaking this silence.

By ensuring that young people are educated about mental health, we improve their ability to recognize signs in themselves and others, including family members, then

3

get the right help. As we begin to teach the facts about mental health and openly discuss the issues, we also lessen the stigma surrounding mental illness.

Mental health is an essential element of overall health, and should be included as an integral part of health education in schools. Our public education system in New York has long recognized the value of health education. We have updated this statutory imperative to include education in alcohol, drugs, tobacco abuse, and the prevention and detection of certain cancers. The time has come to include mental health education. To that end, we support Assembly Bill 1911.

Our educational focus must shift from just recognizing and treating illnesses to preventing them and promoting better mental health. Just as we incentivize people to develop good physical health habits, so too must we identify, then support good behavioral and emotional health. At the federal level, this is why we support HR 751, the Mental Health in Schools Act.

Any comprehensive approach to mental health education must include screening, which can identify emotional and behavioral issues early, often before they develop into full-blown disorders. Screening increases the likelihood that people in need get help, while minimizing the adverse impact on their life.

In light of the direct and indirect annual costs – estimated at $247 billion – investments in early intervention programs, especially those that better connect health and education systems, should be prioritized.

In addition to making mental health screening and education available to all of our young people, we also need to expand and strengthen the mental health services in our community, which have endured a series of devastating cuts in recent years.

4

People can and do recover and they do it best when there is strong care coordination, peer services, housing, family involvement, trauma services, suicide prevention, mobile crisis teams, clinical interventions, diversion programs, and other services. We support sweeping Medicaid and mental health reforms that will solidify this wide array of strategies and services.

Finally, we urge New York to require mental health parity across all private insurance plans, Healthy New York, and in the new Health Exchanges. We must do everything in our power to ensure that people diagnosed with these debilitating and sometimes life-threatening disorders will not suffer needless or arbitrary limits on their care.

On behalf of the nearly quarter-million Erie County residents who struggle with mental illness – especially our young people, who represent the future of this community – I thank you for convening today's forum.

Intelligent investments in community mental health services will help keep people, especially young people, out of the criminal justice system, out of hospital emergency rooms, and out of psychiatric units. They will help many people regain their hope, their lives, and their futures. They will save many families from untold heartache and loss. They will also save taxpayer dollars.

I can think of no better way to honor the lives of the 20 children who lost their lives at Sandy Hook. No better way to honor the lives of our own children.

Thank you.

5

# Dr. Peter Faustino

## New York State Association of School Psychologists

Good morning.

Assemblywoman Jane Corwin and Assemblymen John Ceretto, Raymond Walter, and David DiPietro, thank you for inviting me to speak on behalf of the NY Association of School Psychologists.

My name is Dr. Peter Faustino and I am immediate Past President of NYASP. Several colleagues could not be in attendance today as this happens to be the same week as our national convention. President Kelly Caci, Legislative Chair John Kelly, and Board Member Amanda Nickerson, from your very own Alberti Center for the Prevention of Bullying Abuse and School Violence at the University at Buffalo were integral in drafting this testimony and wanted me to express their desire to engage in a future dialogue at your request.

The NY Association of School Psychologists has long been a leader in promoting safe, supportive learning environments; ones that protect both the physical and psychological safety of students and staff. So we applaud this panel on committing to identifying concrete and comprehensive strategies to ensure that we meet our responsibility to every school, every child, every family, and every community in NYS. We strongly posit that any strategies on school safety must include addressing mental health. We believe that effective policies MUST be built upon **known evidence-based strategies** and practices as well as collaborative efforts between schools, families, and communities.

With the Governor's signing of the SAFE act comes the urgency to not allow the light shed on this issue by the tragedy in Newtown, CT to dim without our leaders taking real, meaningful action. In reviewing and reading the different components of the SAFE act, many elements have great promise. While we believe that the events in CT were too important not to expedite action, we greatly appreciate the critical steps and substantive work at hearings like this. NYASP is committed to helping guide policies that lead to increased physical and psychological safety in schools by providing the recommendations outlined below. And endorsing the efforts of other allied organizations and experts, such as the December 2012 Connecticut School Shooting Position Statement released last month by the Interdisciplinary Group on Preventing School and Community Violence.

I would like to acknowledge at the outset that I have chosen to focus on the topics with which NYASP has the most expertise and are closely related to our mission, but we recognize that violence prevention is a multi-layered issue that warrants attention to the availability and misuse of weapons or media influences on youth.

The goal of my remarks today is to highlight common ground and practical strategies, of which there is a great deal among school safety experts. Further, I will strive to ensure that the focus moves beyond the historical practice of primarily increasing school building safety measures

(e.g., metal detectors, armed security guards, surveillance cameras) and instead focus on addressing the continuum of needs and services that lead to improved safety, well-being, and learning for children and youth.

NYASP calls upon all legislators in NYS to follow your lead and amend or enact legislation that addresses the following primary areas for improved policy and practice:

Given that I work in a school, everything gets boiled down to ABC or 123, so I have consolidated our main points into 3 issues.

### Issue #1: Increasing access to mental health services and supports in schools.

Good mental health is critical to children's success in school and life. Mental health is not simply the absence of mental illness but also encompasses social, emotional, and behavioral health and the ability to cope with life's challenges. Left unmet, mental health problems are linked to costly negative outcomes such as academic and behavior problems, dropping out, and delinquency. Approximately 1 in 5 adolescents has a diagnosable mental health disorder, making these disorders one of the leading causes of disability among this age group. However, studies have found that most children and adolescents with mental health disorders do not seek out or receive the services that they need. Estimates suggest that between 60 and 90 percent of adolescents with mental health disorders fail to receive treatment. Of the adolescents who do get help, nearly two thirds do so ONLY in school. A recent SAMHSA-funded study revealed that two thirds of school districts reported that the need for mental health services has increased since the previous year, while over one third of these districts also reported a reduction in mental health program funding.

Multiple challenges exist in trying to connect adolescents with mental health disorders to the services and treatments that can help them attain a better quality of life. School leaders who recognize the relationship between student success, good schooling/instruction, and comprehensive school health programs that include attention to students' mental health will more effectively improve student and school outcomes. Additionally, close collaboration between school-employed (e.g., school psychologists and school social workers) and community-employed mental health services providers is critical to meeting the full range of mental health needs.

So what can be done?

### NYASP asks that NY Advance legislation which provides for licensure of school psychologists, currently A3570 submitted by Assemblywoman Rosenthal AND the same as S2923 submitted by Senator Flanagan

Publicly funded insurance pays for a large portion of adolescents' mental health care. Coverage for children through Medicaid and SCHIP was expanded recently through a Reauthorization Act in 2009 and The Affordable Care Act of 2010. These efforts will further improve access to behavioral health treatment for children and adolescents in schools. Despite our political viewpoints on this, New York State is limiting their ability to access funds for school-based psychological services. The vast majority of school psychologists in New York are prevented by

their current credential from being considered "Medicaid Qualified Providers." No credential exists for these professionals to obtain this status. Therefore, school districts are unable to claim for psychological services provided to Medicaid eligible students. An analysis of Medicaid reimbursement for school-based psychological services indicated that this represents approximately $100 million in untapped revenues to school districts. The licensure of school psychologists, which would allow for "Medicaid Qualified Provider" status, requires action on the part of the New York State Legislature to restore these funds.

To illustrate this point, The Medicaid numbers for the Buffalo city schools for psychological counseling during the 05-06 year was $1.2 million. For the Rochester City schools it was $1.7 million. Even smaller school districts like Lakawanna City schools or the Kenmore UFSD, for example, Medicaid reimbursement was approximately $100,000. 2005-2006 was the last full year that school psychologists were qualified providers. While school psychological services are one critical aspect to this conversation, it follows an overall trend in loss of Medicaid dollars and is evident by the comparison that in 2004, Buffalo City schools received total Medicaid reimbursement of $23 million. In 2009; it was down to $4.5 million. Rochester's numbers for 2004 were $14.5 million in reimbursement from the federal government...in 2009 just $4.5 million.

Passing the proposed legislation that is currently in both houses would go a long way to bringing necessary funds to the children most in need.

**Issue # 2 Improving crisis prevention and preparedness procedures.**

Schools must provide the infrastructure to develop and maintain active school safety and crisis teams that focus on efforts year-round to promote a safe, positive school culture while minimizing the impact of school crises when they occur. This entails a multi-tiered approach consistent with other school systems of support—which includes universal screenings and interventions as well as more intensive approaches for students deemed at risk. School mental health professionals (like school psychologists and social workers), in collaboration with families and educators, remain our greatest resources to helping identify students at risk for violence to themselves or others, and identifying interventions and supports to help minimize those risks.

We know from the U.S. Secret Service study on school shootings that there is no "profile" for a school shooter. Therefore, it is ill advised to try to pinpoint characteristics that might suggest that a student will be the next shooter. However, the U.S. Secret Service report did find that the shootings were planned carefully, and that other people often were aware of the plan. Educating the school community and larger public about how to report threats and having threat assessment procedures in place to identify the extent to which a threat is substantiated or unsubstantiated is a practical and important step. Effective screening and assessment also requires interagency collaboration and communication across education, health, mental health, and law enforcement.

So what can be done?

**NYASP suggests conducting a state-wide campaign to reduce stigma around mental illness and to promote access to mental health services.**

Among the general public, there is fear and stigma of people with mental illness when, in fact, people with mental illness are far more likely to be the victims than perpetrators of violent crime.

"recently I was speaking to the father of boy with mental illness, who thanked me for helping find appropriate educational services for his son but asked what I could do to help educate the community about what the family was struggling with. He shared the rejection they experience in their neighborhood or at the ball field.

This stigma reduces the likelihood that families and students will seek out and receive the mental health supports and services needed to learn and thrive in school and throughout life. Given the natural interaction between physical and mental health, the importance of caring for an individual's mental health needs must be on par with the importance of physical health.

These efforts should promote **wellness** as well as address mental health needs of all community members while simultaneously responding to potential threats to community safety. This initiative should include a large scale public education and awareness campaign, along with newly created channels of communication to help get services to those in need.

More public information (such as these proceedings) can de-stigmatize mental illness and are a wonderful starting point for discussions on ways to promote mental health. These conversations have begun at the national level and NYS (if interested in leading the way towards safety and security) must recognize that legislation like the SAFE act is only one small step toward increasing safety. The next step is collaborating and partnering with the representative groups here today. There exists a wealth of resources in NYS and we welcome being at the table.

**Issue # 3 Maintaining safe and supportive schools.**

Despite the horror that we all feel after the shooting in Newtown, CT, schools remain one of the safest places for children in the United States. We need to continue to focus on how we build and maintain safe school environments that promote learning, psychological health, and student success. We need to ensure that adequate learning supports and policies are present to provide a continuum of services that respond to the needs of all students. Critical to this is enhancing school connectedness and trust between students and adults as well as reinforcing open communication and the importance of reporting concerns about someone hurting themselves or others.

Indeed, the primary focus of school-based mental health services is to provide students with the necessary supports to thrive in school and throughout life. Providing ongoing access to these services promotes school safety by helping students feel connected and supported and by helping to identify students who may need more intensive services.

So what can be done?

**NYASP recommends that NYS legislators take a careful look at unfunded mandates that may be able to provide financial relief to schools so they can maintain safe school environments.**

NYS needs to examine unfunded mandates. There are several unfunded mandates that do NOT impact children's programs. As an example, we are calling for Wicks Law to be repealed as it is not cost efficient and does not directly impact children and families.

Another is streamlining paperwork and reporting procedures. SED has repeatedly advanced a bill that would reduce the number of individual reports required by the state. Any effort that would reduce or eliminate the excessive and often duplicative reporting requirements imposed on school districts would be extremely helpful. Many of the current requirements divert staff time and resources from districts' primary objective of educating students. Given tight fiscal constraints, school districts must be freed from administrative restrictions and mandates that hamper their ability to devote every education dollar to the pursuit of educating every child.

But in an effort to provide relief we must ensure that other mandates which represent good educational practices as well as built in rights for children and families, are not altered. Some may say that ALL mandates are ill-conceived but they are NOT created equal. Currently, school districts have flexibility with many of the special education mandates in our current educational law. For example, regarding the Committee on Special Education composition, any committee member may be excused with permission of the parent. In addition, committee members can serve multiple roles during those meetings further streamlining the cost efficiency.

Restraint must be employed in making over-inclusive demands for "mandate relief" to ensure that New York State does not jeopardize the educational advancements of our students. At the same time, we call for a consideration of the mandates that do not directly impact our students and instead contribute to increased time and costs that take away from schools' primary goal.


In Conclusion:

Effective school safety is a day-in, day-out commitment that infuses every aspect of school life. Our challenge is to not let increased anxiety over this horrible tragedy obscure the proven fundamentals of violence prevention. Instead we must become more unified, vocal advocates for policies that support what schools are doing and CAN do effectively, which in turn supports the primary mission of learning. We must create and pass legislation to reduce and prevent violence in order to promote the well-being our children and youth. An investment in school mental health services is an investment in that prevention.

Thank you!


For more information, visit www.nyasp.org or contact NYASP Legislative Chair Dr. John Kelly at legislative@nyasp.org