IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
Rochester Division

DONALD MONTGOMERY,
as an individual, and on behalf of
all other persons similarly situated,

     Plaintiff

   vs.

ANDREW M. CUOMO, Governor of the State
of New York; ANN MARIE T. SULLIVAN,
Commissioner of the New York State
Office of Mental Health; MICHAEL C. GREEN,
Executive Deputy Commissioner of the
New York State Division of Criminal Justice Services;
JOSEPH A. D'AMICO, Superintendent of
the New York State Police; VINCENT F. DEMARCO,
Suffolk County Sheriff's Department; and,
EASTERN LONG ISLAND HOSPITAL,

    Defendants.

**Memorandum of Law
On Behalf of the Plaintiff**

Civil No.: 6:14-cv-06709

Hon. Charles J. Siragusa

## I. Introduction

New York Mental Hygiene Law §9.46 and its implementation violate the Second, Fourth,

Fifth, and Fourteenth Amendments to the United States Constitution, as well as its privacy

protections. The State is actively conducting an overreach into the personal health information

of tens of thousands of people, more than 99% of whom do not even know that the

confidentiality of their doctor-patient relationship has been compromised. The few individuals

who have found out have learned about this insidious conduct know only because the State has

stripped them of their pistol license and firearms, even though they have done no more than seek

out medial treatment for conditions as simple as trouble sleeping.

It is critical that this Court put an immediate stop to the on-going reporting by medical providers to the State during the pendency of this lawsuit. More than 3,000 people are being reported per month into a statewide database that is controlled by the NYS Police. Every week, the NYS Police are involved in and/or directing county and local law enforcement and licensing officers to deny, suspend, and revoke pistol permits and to confiscate firearms. This State Police action is being undertaken and directed without a warrant, without probable cause - without any basis even for an investigation of the targeted individual.

This is the reality in New York since such time as the State enacted MHL §9.46 in January 2013 and publicly launched ISARS in March 2013: the State has effectively created a dragnet with the help of medical providers to target those who may – or may not – have been diagnosed with a mental health issue, advertising to medical personnel that reporting of such persons is "mandatory."

We are fortunate that Mr. Donald Montgomery, the Plaintiff, was caught up in all of this at one of the hospitals that have effectively become agents of the State, labeling everyone who walks through the Emergency Room doors as "involuntarily committed." Fortunate, because Mr. Montgomery suffered from no more than a transient disruption of sleep during an intrastate move, not a mental health disorder, and not an involuntary commitment. He is a Veteran. He spent his career in law enforcement. He has been licensed to and has carried a firearm for decades with no issue.

There is no basis in research to target those who make connection with a mental health provider as being so dangerous as to justify a stripping of their civil liberties without any due process. We don't go that far even when it appears that involuntary commitment should be imposed due to an immediate threat of serious harm to the self or others. Even in that situation,

we have detailed laws and procedures designed to safeguard the civil liberties of those who would be vulnerable to physical restraint akin to imprisonment and who may be forced to endure unwanted and potentially invasive medical treatment.

This Memorandum is designed to walk the Court through the federal safeguards already in place concerning those who seek to purchase a firearm, the disqualifying events that will extinguish such a right, and the process through which, in theory, one can request relief from such disabilities. It will also explain to the Court how the State has been singled out by the federal government due to its failed reporting efforts vis-à-vis the NICS background check system and how the State is now constructing its own database as an apparent sidestep. With privacy of the doctor-patient relationship being the other immediate concern, it will walk through the State's disregard of HIPAA and it will explain the need for this Court to follow the gold standard of the HIPAA Breach Notification so that the 99% who have already been reported can become informed of their status.

There was no gain for public safety under MHL §9.46. A temporary injunction with notification of effected individuals will in no way compromise public safety. The "911" system remains in place for those medical providers who face an imminent threat of serious harm and need to report an individual patient to law enforcement in accordance with the HIPAA emergency provisions, and the "involuntary commitment" process likewise remains in place for those individuals meeting the criteria for initiation of a process to remove them from the general public. What would be suspended through the requested temporary injunction is a "mandatory" reporting system that does not comply with the United States Constitution or federal law and which does not enhance public safety by any standard.

## II.  The Issues Presented in *Montgomery vs. Cuomo*
## are Likely to Result in the Declaration that MHL §9.46 is Unconstitutional.

To borrow from the approach taken by the Hon. Antonin Scalia in *District of Columbia vs. Heller,* there is no standard by which the State will be able to defend that MHL §9.46 is anything other than unconstitutional.  554 U.S. 570, 635-636 (2008).  You simply cannot strip an individual of their rights under the Second Amendment of the United States Constitution without any due process.  The right to bear arms is "fundamental." *Heller, id., McDonald vs. Chicago,* 561 U.S. 742, 791 (2010).  You cannot strip someone of a fundamental right to bear arms through a permanent disqualification without due process. *McDonald, id.; U.S. vs. Rehlander,* 666 F.3d 45, 48 (1ˢᵗ Cir., 2012).

You also cannot grab someone's personal health information, transmit it all throughout various government offices and agencies, and not provide any due process. *Griswold vs. Connecticut,* 381 U.S. 479, 484 (1965).  "Medical information in general, and information about a person's psychiatric health and substance-abuse history in particular, is information of the most intimate kind." *O'Connor vs. Pierson,* 426 F.3d 187, 201 (2d Cir., 2005).  Through *In re Quinlan,* 70 N.J. 10, 41 (1976), cert. denied *sub nom.,* the New Jersey Supreme Court noted that the state's interest "weakens and the individual's right to privacy grows as the degree of bodily invasion increases and the prognosis dims."  Here, the State's interest naturally holds an inverse relationship, as well, where the privacy invasion seeks not only personal health information, but, also, to use that ill-gotten data to extinguish a fundamental civil liberty.

The Due Process Clause of the Fourteenth Amendment of the United States Constitution demands that no state may "deprive any person of life, liberty, or property, without due process of law."  "[I]t is settled that the due process clause of the Fourteenth Amendment applies to

matters of substantive law as well as to matters or procedure. Thus all fundamental rights comprised within the term liberty are protected by the Federal Constitution from invasion by the States." *Whitney vs. California,* 274 U.S. 357, 373 (1927), Brandeis, concurring.

"To determine whether [a plaintiff] received the process he was due, we must consider: (1) the private interest at stake; (2) the risk of an erroneous deprivation of that interest through the procedures used and the probable value (if any) of alternative procedures; [and] (3) the government's interest, including the possible burdens of alternate procedures." *O'Connor, supra,* at 197, citing *Mathews vs. Eldridge,* 424 U.S. 319, 335 (1976). "The Constitution, not state law sources…determines what process is due." *Ciambriello vs. County of Nassau,* 292 F.3d 307, 319 (2d Cir. 2002); see also *Vitek vs. Jones,* 445 U.S. 481, 491 (1980).

MHL §9.46 has created a constitutional violation of epic proportion, effecting tens of thousands of people, 99% of whom have no way of even knowing that their personal health information has been compromised by their medical providers and by state, county, and local governments, and 1% of whom have lost their Second Amendment rights. "Such a law cannot stand in light of the familiar principle, so often applied by this Court, that a "governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *Griswold, supra,* at 485, citing *NAACP vs. Alabama,* 377 U.S. 288, 307 (1964).

Through MHL §9.46, the State seeks to institute a "mandatory" reporting system, requiring public and private medical providers to transmit personal health information about individuals with no notice to the individual and for a non-medical and non-emergency purposes. {Please refer to, e.g., Exhibit 5, OMH "Guidance Document," unpaginated, at the prefatory page;

OMH "Guidance Document," p. 4, emphasis in original.} The reporting involves clinical information, which under HIPAA is referred to as "protected health information," including the diagnosis and additional narrative information from a medical provider concerning an individual in a medical setting. 45 CFR §160.103. {Please refer to Exhibit 7, "User Guide: Integrated SAFE Act Reporting System (ISARS), Version 1.0.2.6" (updated September 30, 2013), pp. 33-34.} The OMH reporting is not part of the medical chart. The OMH reporting has no notification process, whether from the medical provider or the government. The OMH reporting process involves no request for a waiver of confidentiality from the patient.

The standard at MHL §9.46 is a far lesser standard than the emergency reporting provisions within HIPAA at 45 CFR §164.512(j) and the involuntary commitment standards within MHL Article 9. There is no charging instrument, special proceeding motion, or pleading. There is no notice of a proceeding because there is no proceeding. There is no opportunity to be heard. There is no assignment of or right to counsel. There is no right to provide evidence. There is no judge. There is no record created. There are no findings or written decision. There is no appellate process. In short, there is absolutely no due process afforded to the individual.

"Where there is a significant encroachment upon personal liberty, the State may prevail only upon a subordinating interest which is compelling." *Bates vs. Little Rock,* 361 U.S. 516, 524 (1960). The law must be shown to be "necessary, and not merely rationally related, to the accomplishment of a permissible state policy." *McLaughlin vs. Florida,* 379 U.S. 184, 196 (1964); *Schneider vs. State,* 308 U.S. 147, 161 (1939). For the Second Amendment and for the privacy penumbra, as elsewhere, "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP vs. Button,* 371 U.S. 415, 438 (1963).

"The analysis does not end with the one percent…upon whom the statute operates; it begins there.  Legislation is measured for consistency with the Constitution by its impact on those whose conduct it affects." *Planned Parenthood vs. Casey,* 505 U.S. 833, 894 (1992).  A civil right is not lost merely because an individual is "unable to sense a violation of it." *In re Conroy,* 98 N.J. 321, 361 (1985).  The United States Supreme Court wrote those words in *Casey* more than twenty years ago, but it so eloquently captures the importance of our work in this case. It is not "just" Mr. Montgomery or the 286 other permit holders, comprising the 1%, about whom we must be concerned.  It is the 99% who do not even yet know that they have become part of a law enforcement database, against whom we must measure MHL §9.46.

Which brings us to the simple fact that the State has no defense on equal protection grounds for the targeting in which it is engaged and in which it is encouraging medical providers to engage.  MHL §9.46 targets one and only one group for immediate termination of pistol licenses and confiscation of firearms and that is the person making contact with a medical provider for something that resembles a mental health diagnosis.  "There is patently no legitimate overriding purpose independent of invidious racial discrimination which justifies this classification," were the words from *Loving vs. Virginia,* and, if you substitute "mental health patient" for "racial," it is what this Court needs today to stop. 388 U.S. 1, 12 (1967).  There can be no doubt that restricting fundamental Second Amendment rights solely because a person seeks medical treatment that may be related to a mental health issue violates the central meaning of the Equal Protection Clause. *Id.,* at 12-13.

## A. The Second Amendment Disqualifying Event Under 18 U.S.C. §922(g)(4) Requires a Formal Adjudication as a "Mental Defective" or as "Involuntarily Committed."

Federal law already protects against the ownership, possession, and transfer of a firearm by a person who is adjudicated a "mental defective" or "involuntarily committed." Federal law is clear: a permanent termination of an individual's right to own, possess, or transfer a firearm is conditioned upon a formal adjudication that the individual is a "mental defective" or has been "involuntarily committed." 18 U.S.C. §922(g)(4).

Specifically, 18 U.S.C. §922(g)(4) states it is unlawful for a person "who has been adjudicated as a mental defective or who has been committed to a mental institution" to "ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

Under the accompanying regulations at 27 CFR §478.11, the term "adjudicated as a mental defective" is defined as:

> "(a) A determination by a court, board, commission, or other lawful authority that a person, as a result of marked subnormal intelligence, or mental illness, incompetency, condition, or disease:
>
> (1) Is a danger to himself or to others; or
>
> (2) Lacks the mental capacity to contract or manage his own affairs.
> (b) The term shall include:
>
> (1) A finding of insanity by a court in a criminal case; and
>
> (2) Those persons found incompetent to stand trial or found not guilty by reason of lack of mental responsibility pursuant to articles 50a and 72b of the Uniform Code of Military Justice, 10 U.S.C. 850a, 876b."

The federal term "committed to a mental institution" at 18 U.S.C. §922(g)(4) does not include a person at a medical facility for observation or in a mental institution by voluntary admission.  It is defined also at 27 CFR §478.11, meaning:

> "A formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority.  The term includes a commitment to a mental institution involuntarily.  The term includes commitment for mental defectiveness or mental illness.  It also includes commitments for other reasons, such as for drug use.  The term does not include a person in a mental institution for observation or a voluntary admission to a mental institution."

As we walk through this discussion of federal disqualifying standards as a minimum threshold for the depravation of an individual's fundamental rights under the Second Amendment, please keep in mind that none of this applies to Mr. Montgomery.  He was not involuntarily committed; he was mislabeled "involuntarily committed" without any due process.

The federal disqualifying event at 18 U.S.C. §922(g)(4) required a formal adjudication prior to termination of an individual's Second Amendment rights long before the United States Supreme Court through *Heller* and *McDonald* declared that our Second Amendment rights are "fundamental."  What came to be numbered as 18 U.S.C. §922(g)(4) was part of the Gun Control Act of 1968 (Pub. L. 90-618), which initially created the federal disqualifying events.

The State involuntary commitment proceedings already specified in great detail at MHL Art. 9 prior to the enactment of MHL §9.46 met the threshhold requirement of 18 U.S.C. §922(g)(4).

In New York, there are several routes through which the involuntary commitment can occur:  MHL §9.27, MHL §9.37, MHL §9.39, and MHL §9.40.  Within these statutory sections, there are distinctions around examination at time of application, available transportation, the

evaluation prior to admission, confirmation evaluation, and duration of hospital stay.  These provisions are to be differentiated from the provisions for voluntary admissions. MHL §9.13, *et seq.*  All processes for involuntary (and even for voluntary) commitment include notice, attorney, and judicial review provisions.  All provisions under Art. 9 that is, except for MHL §9.46.

It may be that the State will try to argue that there is a federal statutory provision through which Mr. Montgomery can "set the record straight," so to speak, namely 18 U.S.C. §925A. However, that Congress suspended any funding to the relief from disabilities program in 1992 has caused at least the Sixth Circuit Court of Appeals to declare unconstitutional the entire provision at 18 U.S.C. §922(g)(4) in light of the *Heller* declaration that Second Amendment rights are "fundamental." *Tyler vs. Hillsdale*, 2014 U.S. App. LEXIS 23929 (6th Cir., December 18, 2014).  Even where there is an involuntary commitment, in the absence of a "genuine" federal relief from disabilities program, the Second Amendment right is too important to extinguish without meaningful due process.  A statue "flunks narrow tailoring" by being overboard if "[the preferred] interests could be achieved by narrower ordinances that burde[n] [the right] to a far lesser degree." *Id.,* at 52.  "A state "shall grant…relief" to a person "who will not be likely to act" dangerously." *Id.* at 82, citing Pub. L. No. 110-180, §105, "NICS Improvement Amendments Act of 2007."

**B.  Post-*Heller* Circuit Court Guidance Relevant to 18 U.S.C. §922(g)(4).**

There is a substantial body of cases of a criminal nature that have well established the due process requirements to meet 18 U.S.C. §922(g)(4), both pre and post *Heller*.  For purposes of this motion for temporary relief, in accordance with an argument on likelihood of success on the

merits, I wish to highlight for the Court two recent decisions where individuals were successful attacking 18 U.S.C. §922(g)(4) under a strict scrutiny standard on final determinations.

The first case is *United States vs. Rehlander*, 666 F.3d 45 (First Circuit, 2012), wherein the court found that a temporary hospitalization through an *ex parte* process did not satisfy the due process requirements for involuntary commitment imposed by 18 U.S.C. §922(g)(4). The *ex parte* process in Maine, called an "emergency hospitalization," involved an application by a health or law enforcement officer, a certifying medical examination by a medical practitioner, and an endorsement by a judge or justice of the peace that these steps were performed. *Id.* at 46. The Maine involuntary commitment required "a traditional adversary proceeding (citation omitted), culminating in a judicial determination as to whether the subject both is mentally ill and poses a danger to himself or others. The First Circuit determined that the *ex parte* process did not qualify as a "commitment" for federal purposes, stating that post *Heller* the right to bear arms "is no longer something that can be withdrawn by government on a permanent and irrevocable basis without due process." *Id.* at 47, 48.

In the *Rehlander* case, the court distinguished between the process that provided "all that is practical for an emergency hospitalization" but which did not meet all that was necessary for a termination of a fundamental civil liberty under the Second Amendment. *Id.* at 48.

The circumstances of Mr. Montgomery's voluntary and brief hospitalization do not meet even the *ex parte* temporary hospitalization process found to be inadequate in *Rehlander*. The State of New York brought no charging instrument or motion of any kind. No judge reviewed anything during the two-day admission or subsequently. So, even this bare minimum that the First Circuit found to be adequate for an *ex parte* temporary hospitalization but inadequate for a

repression of fundamental Second Amendment Rights was not at all present in
Mr. Montgomery's circumstances.

The second case to raise at the moment is *Tyler, supra.* Tyler was a 73-year old,
involuntarily committed to a mental institution in 1986, while going through a divorce from his
wife of 23-years. He had bruises on his head and face, was suffering suicidal thoughts, was
depressed, sobbing, shaking, and had not been sleeping. In 2012, Tyler posited that he had not
experienced another depressive episode, had remarried, maintained a close relationship with the
daughters from his first marriage, and worked for near twenty years. *Id.,* at 10.

Tyler attempted to purchase a firearm in 2011 and was denied because the NICS Index
contained a record that he had previously been committed to a mental institution. He appealed
through the FBI's NICS Section, but was denied. The denial letter indicated "Until your state
has an ATF approved relief from disabilities program in place your federal firearm rights may
not be restored." *Id.,* at 11.

In its detailed and highly analytical decision, the Sixth Circuit asked the question:

> "But is §922(g)(4)'s net too wide? Are previously institutionalized persons
> sufficiently dangerous, as a class, that it is permissible to deprive permanently all
> such persons of the Second Amendment right to bear arms? It is a difficult
> question but one that we need not answer in the first instance. Congress has
> already determined that the class of individuals previously committed to a mental
> institution is *not* so dangerous that all members must be permanently deprived of
> firearms. Congress created a relief-from-disabilities program in which individuals
> subject to a §922 prohibition can regain their firearm rights by showing that they
> are unlikely to present a threat. See §925(c)." *Id.,* at 55.

Ironically, the Sixth Circuit concluded – on the very day after this lawsuit was filed on behalf of Mr. Montgomery – that "We have reviewed scores of opinions presenting post-*Heller* Second Amendment challenges, and we do not believe that any other court of appeals in a reasoned opinion has reviewed a firearm restriction as severe as this one – one that forever deprives a law-abiding, non-violent, non-felon of his Second Amendment rights." *Id.,* at 61.

This Court now has the case that exceeds the depravations struck down in *Tyler,* and should be no less rigorous in its protection of our civil liberties.

### C.  The United States Government Owns and Operates the National Instant Criminal Background Check System ("NICS").

Coming back to the matter of public safety measures that already guard against the transfer of firearms to someone who has been adjudicated a "mental defective" or "involuntarily committed" in accordance with 18 U.S.C. §922(g)(4), we should review the federal background check system.

Section 922(g) of the Gun Control Act of 1968 prohibits certain individuals from shipping or transporting any firearm in interstate or foreign commerce, from receiving any firearm which has been shipped or transported in interstate or foreign commerce, or possessing any firearm in or affecting commerce.  The NICS Index houses records from federal and state governments relating to the nine disqualifying factors found at 18 U.S.C. §§922(g)(1)-(9).

The National Instant Criminal Background Check System ("NICS") is administered by the Federal Bureau of Investigation.  It provides what is called "full service" to Federal Firearms Licensees ("FFLs") in 30 states, including New York.  It provides partial service to the remaining states.  The federal background check came in through Pub. L. 103-159 in 1993 with a five-year deadline for implementation.  The federal system went live on November 30, 1998.

There are currently near 13,000,000 active records in the NICS Index of which 3,774,301 are records of those "adjudicated mental health." {Please refer to Exhibit 17, FBI datasheet, "Active Records in the NICS Index" (as of December 31, 2014).}

The federal firearms background check system begins with a consumer completing the "Form 4473," as published by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). {Please refer to Exhibit 14, ATF Form 4473, "Firearms Transaction Record" (rev. April 2012).}   The consumer completes part. The FFL completes part. The FFL then submits the information to the NICS Section for an instant background check of the individual as against the Interstate Identification Index III ("NICS Index").

If the individual is "denied" at the FFL, or point-of-purchase, the individual receives a "NICS Transaction Number," which is a unique identifier that the customer is required to include in the NICS appeal. The NICS appeals process is formalized through an on-line submission on the FBI website and includes the ability to be represented by an attorney during the process. It is a process to learn what has been filed into the NICS Index about you, as well as a process through which you can protest the accuracy or appropriateness of the record. {Please refer to Exhibits 16A – 16E, Federal Bureau of Investigation, "NICS Appeals Brochure," "NICS Appeal Request Form," FD-258 fingerprint card with instructions (rev. 9-9-13), and "Authorization to Release Criminal History Information and Release of Liability" (web page, September 2013).}

From date of inception through December 31, 2014, only 16,669, or, 1%, of more than 1,000,000 persons have been denied the purchase of a firearm at an FFL because of a corresponding record that the person was "adjudicated mental health." {Please refer to Exhibit 17, FBI datasheet, "Federal Denials" (as of December 31, 2014).}

State governments and federal agencies submit records into the NICS Index. The contributing agency is responsible for the accuracy and validity of the data in the NICS Index. "It is imperative to update the NICS Index, as necessary, to minimize erroneous details." And, "[t]he contributing agency is responsible for responding to appeals, assessments, and audits of the submitted records." {Please refer to Exhibit 17, FBI brochure, "NICS Index" (December 2013), page 2.}

Within Assembly Bill A2388-2013, the State added the requirement that a NICS background check be run at an FFL also for private sales. With additional states already also doing the same, the ATF issued a procedure document for FFLs on conducting the check, and, as anticipated, it uses the ATF Form 4473. {Please refer to Exhibit 15, ATF Proc. 2013-1.}

### D. The State Failed to Demonstrate Its Comprehension of and Appropriate Reporting to the NICS Index and was Given More Than $10 Million in Federal Aid to Correct the Problems.

The federal government has rated New York the worst state in the country for its inability to properly report records to the NICS Index. {Please refer to Exhibit 18, The National Center for State Courts with The National Consortium for Justice Information and Statistics, "State Records Estimates Development and Validation Project" (dated September 30, 2010), p. 26.} Prior to the passage of MHL §9.46 and the ISARS system, the State was already floundering in its role of providing accurate data in a technically correct manner to the FBI for inclusion in the NICS Index. The State lost out on the opportunity for who knows how many years to be a meaningful participant in NICS and to assist other state and the federal government in halting the sale of a firearm to a person disqualified under 18 U.S.C. §§922(g)(1)-(9).

As a result of its inferior reporting, the State received more than $11 million in federal aid from 2008 to 2010 to correct its reporting problems, specifically as related to disqualification for those adjudicated as a "mental defective" or "involuntarily committed" and those guilty of the commission of a "misdemeanor crime of domestic violence." New York received more federal funding for this program than any other state. {Please refer to Exhibit 19, Bureau of Justice Statistics, "State-by-State Summaries for FY2013 NICS Act Record Improvement Program (NARIP)."}

And what did the State do with the more than $11 million? As I can locate no follow-up study or federal documentation, I cannot say at this point in this lawsuit. It is part of what discovery will involve because it appears reasonable based upon a number of datapoints to use the hypothesis that the statewide database at issue in this lawsuit was at least initiated, if not constructed through, use of the federal funds. There was not a separate state budget allocation in January or February 2013 on the heels of the enactment of MHL §9.46, which was, coincidentally, at the end of the previous budget year.

Here is what we do know. The "SAFE Act" was signed into law on January 15, 2013 and less than 60 days later, the ISARS system was publicly launched on a statewide basis. {Please refer to Exhibit 4, Sen.Tr.7.} The Office of Mental Health was ready to go with guidance documents, PowerPoint training, video training, and website. The NYS Police were ready with form letters and direct communication to fan the personal health information out to offices and agencies across the state, county, and local levels. And by September 2013, Counsel for the NYS Police issued the "Field Guide," describing its procedures for the mandatory removal of "ALL" firearms, including ones that would be slated for "immediate" destruction as "nuisance

firearms." "A two-month period to develop a whole new system like this is – especially in state government, with all due respect, is almost unheard of." {Please refer to Exhibit 4, Sen.Tr.8.}

The OMH training and marketing materials released as early as the public ISARS launch in March 2013 are replete with references to "mandatory" reporting, even though the statute has no provision for penalty for failure to report. OMH materials are also filled with notification to medical professionals that the personal health information transmission will not end at OMH, but will continue on through the bureaucracy until it reaches local law enforcement for firearms confiscation. OMH has effectively turned medical providers into agents of the state, carrying out "what is essentially a criminal justice responsibility," with some hospitals reporting "every patient who walks through the Emergency Room door." {Please refer to Exhibit 4 for quoted material, Sen.Tr.9 and 12.}

The dynamic between the state, county, and local law enforcement levels is tense, at best. In Mr. Montgomery's situation, the County Sheriff's Department said to him and also to me that they were not going to fight the state. To Mr. Montgomery, they stated that there was repeated pressure to confiscate his firearms and they revoked his permit without even scheduling a hearing. In K.B.'s case, the NYS Police were so bold as to challenge the validity of an attorney transmission of a written county court order, reinstating K.B.'s permit.

Quite simply, it appears that the State lacks comprehension of 18 U.S.C. §922(g)(4) and the NICS Index. The State is sidestepping to build its own database, which, it appears, is merging the MHL §9.46 records with other Article 9 records. If the State is now uploading all of these records into NICS, it is polluting the data integrity of the NICS Index. Prior to MHL §9.46, the State may have been underreporting records, but post MHL §9.46, it is likely

over-reporting erroneous entries.  Either way, if the State has not yet become proficient as a participant in the NICS Index, how can we think it will be capable of managing a freestanding database housing the same or similar records?

It will be important for the determination of the request for temporary relief for this Court to be ever mindful that the endpoint of use for the collected data is for law enforcement purposes, whether NYS Police or for the county and local officers that they are directing into certain action and restraining from other actions.  Homes are being entered and firearms are being seized without warrants.  Pistol licenses are being revoked without hearings.  Personal health information that begins within the medical setting is electronically processing straight through to law enforcement in non-emergency circumstances in order to deprive individuals of multiple of their civil liberties.  All of it is happening because the State got itself into a position to launch a statewide initiative involving medical providers under MHL §9.46.

### E.  The State Demonstrates No Understanding of HIPAA, but Wants to Guard the Database Against Those Who May Be Within It.

If we say the State is flailing in its ability to understand 18 U.S.C. §922(g)(4) and NICS, we must say that the State is lost in even starting to look at HIPAA.  There is simply no credible argument the State could make that MHL §9.46 corresponds to HIPAA's emergency reporting provision.

For purposes of this motion for temporary relief, I have crafted the requested notification relief around the HIPAA Breach Notification Rule at 45 CFR §§164-400-414.  This regulatory protocol has been in final form since 2009 and it represents the gold standard of patient notification for a data breach.

There is no way for an individual to access ISARS.  Mr. Montgomery wrote to each state agency and office we believed may have handled his personal health information or, at a minimum, have seen the "involuntarily committed" label, and we were unable to obtain any substantive response.  And yet, medical providers shared information and labeling that went into motion at state, county, and federal levels in order to snag Mr. Montgomery's pistol permit and confiscate his firearms.

If the State, county, or local government is concerned about release of personal health information for which they were not the original Covered Entity, then how does it justify its continual transmission of data throughout the state, county, and local government office and agencies?  The State is publishing the data to numerous third parties and with no apparent security measures, protocols, or training.  {Please refer to Exhibit 33, NYS Police letters in response to SCOPE FOILs.}

### III. The Bill Was Jammed Through a Vote, But Expert Testimony Didn't Trigger any Remedial Legislative Action.

Assembly Bill A2388-2013 was jammed through the Senate and the Assembly and signed into law in less than 24 hours.  There was no legislative deliberation.  The Governor, the Assembly Speaker, and the Senate Majority Leader completed the Bill behind closed doors, even without input from their own conferences.  {Please refer to Exhibit 34.}

Five months later, two Senators conducted a hearing at which the leadership of prominent statewide mental health associations testified in a non-stop litany of criticisms of MHL §9.46. {Please refer to Exhibit 4.}

Even after the witnesses raised multiple alarm bells against MHL §9.46, neither Senator Valesky nor Senator Carlucci took the appropriate and necessary steps to repeal MHL §9.46.

The expert testimony given at the Senate hearing included:

- 90% of the reports are being passed from OMH to DCJS [Sen.Tr.10];

- reports are being made by other than persons authorized by statute and not part of the treatment team [Sen.Tr.10];

- the State took the position that all persons admitted to a state psychiatric center were reportable [Sen.Tr.11];

- some hospital administrators and/or counsel are advising the reporting of all persons admitted to hospitals with a mental-illness diagnosis [Sen.Tr.12]; and,

- providers are being "pushed into" making reports [Sen.Tr.22].

Across the board, the testimony criticized the implementation as being overly broad and dipping below the federally-mandated floor for the protection of personal health information, namely, HIPAA standards.  One witness had already filed a federal HIPAA complaint to DHHS. [Sen.Tr.35.]  The reporting "requirement" was called "egregious." [Sen.Tr.15.]

Additionally, the witnesses at the Senate hearing universally disputed that MHL §9.46 provided any benefit to public safety against criminal behavior and reduced the public health benefit of encouraging participation in mental health treatment:

- of the 6,000 reports filed at that time, 11 resulted in "action" [Sen.Tr.15];

- violence cannot be predicted for any particular period of time [Sen.Tr.28, 46];

- there is not a sufficient connection between gun crime and mental illness to justify reporting [Sen.Tr.53];

- this type of legislation would not have prevented any of the recent mass shootings [Sen.Tr.51];

- those with mental illness are 12 times more likely to be a victim of a crime and five times more likely to be murdered [Sen.Tr.43-44];

- there are "more powerful predictors, most notably, active substance abuse, the presence of environmental stressors, and history of past violence" [Sen.Tr.63]; and,

- Veterans and law enforcement officers will be at greater risk of becoming inhibited from participating in mental health treatment [Sen.Tr.51].

In summary, "...this is just simply not a good use of what are, essentially, mental-health resources for criminal-justice purposes." [Sen.Tr.15-16.]

It wasn't just criticism of MHL §9.46 that came across during testimony; it was also a frustration that the MHL §9.46 reporting inhibited faster and legally appropriate reporting through the "911" system. As one witness testified:

> "The – interestingly, when you go online now, it flashes to you:  Imminent danger, call 911.  Imminent danger, call 911.[1]
>
> But calling 911 isn't good enough, because I still have to make this report.
>
> I would argue that, frankly, you should allow us to do what you allow OMH-licensed facilities to do, which, call 911 and say: I have a patient who is in danger, or dangering (*sic*) somebody else.  Please send the police to safely escort him to an emergency room where he can be treated.
>
> And then they can do all the reporting they want.
>
> Confidentiality becomes less of an issue.  There's already a police report, there's an ambulance call report...all of this is done.

---

[1] The witness is describing the OMH website page where the clinician enters the 9.46 report. The referenced text is in red color at the top of the page.

And I would mention, on the back end, the reporting is going on right now anyway.

All involuntary hospitalizations have to be reported to the federal database to be checked against." [Sen.Tr.32-33.]

When the experts testified, they spoke fluently and from decades of experience in the very field to which MHL §9.46 pertains.  None of this was voiced prior to the release and vote on January 14 and 15, 2013.

Equally, the testimony included a beautiful and painfully true depiction of the harm that will befall those who could otherwise benefit from mental health services:

- "It's us who need protection from this outrageous mischaracterization, and from the rush to enact laws that provides (*sic*) solutions to appease public fears: this violence occurred, people got afraid, elected officials representing the vast majority of people who don't have mental health concerns said, Let's pass this law without concerns for the mental health recipients." [Sen.Tr.45.];

- "…the focus of the SAFE Act exclusively on the mentally ill, as opposed – as potential sources of violence unnecessarily stigmatizes a part of the population that is much more likely to be victims of, as opposed to the perpetrators of, violence." [Sen.Tr.63]; and,

- "Mental health and gun control are a separate concern, and to promote the criminalization of people with mental health would – with this broad reporting requirement is an injustice." [Sen.Tr.72].

When you directly compare the confused and misguided remarks on the floor of the Assembly on January 15, 2013 with the poignant testimony of the Senate hearing on May 31, 2013, if Senators Valesky and Carlucci could sit through the hearing and do nothing, well, then, we will have to trust in submitting this Motion that Your Honor will feel the fire in the belly that fuels necessary action to protect our constitutional liberties.

### IV.  There is No Relief for Those Wrongfully Reported,
### Which is the Very Definition of "Irreparable Harm."

Mr. Montgomery has no viable avenue of redress other than this lawsuit.  He has been wrongfully characterized as "involuntarily committed" by the hospital and has had his license and firearms confiscated by the County because they deferred to the NYS Police instead of utilizing their individual authority as the licensing officer.  He cannot file a NICS appeal because he cannot seek to purchase a firearm at this time.  He cannot obtain his own records from the State because it won't release the records.  He filed a state court Art. 78 to request a hearing be directed on his pistol license, but has no hope that proceeding will be successful, given the extent of the misinformation circulated throughout the government bureaucracy and the unwillingness of the hospital to correct its errors.

To request an ATF NICS appeal, Mr. Montgomery would have to try to purchase a firearm and get denied.  He cannot do this because of the advance notification that he has been "disqualified."  To request relief from OMH, Mr. Montgomery would have to open all of his records and submit to a state-sponsored medical health examination.  Mr. Montgomery is not going to acquiesce to a further and more expansive invasion of his privacy.  To request relief from the County, Mr. Montgomery will have to win an Art. 78 proceeding and appear before a licensing officer who has already stated he does not want to fight the State.

If this can happen to Mr. Montgomery, a Veteran and a decorated member of the law enforcement community, it can happen to anyone.

This Court cannot allow dozens of people per day to suffer the kind of break down in civil liberties that Mr. Montgomery has suffered.  He is likely to succeed on the merits,

particularly after discovery allows us to acquire some additional information to complete the timeline and full operational reach and content of the statewide program and database. We have already a good foundation for this lawsuit because so many people have contributed their expertise, testimony, and personal experiences. We also expect to learn more from the public, as well, as the case is now being publicized, including those who recently contacted my office to provide information about their circumstances.

We have also to obtain the temporary injunction because bringing this lawsuit carries with it the heavy burden that as the Defendants' activities become increasingly public, people are going to refrain from obtaining medical care and treatment and/or will self-edit and provide incomplete or inaccurate information to their treatment providers. Among those who support the Second Amendment, the lawsuit is confirmation of a system they have (rightfully) believed was being constructed. Among privacy advocates, the lawsuit escalates the question of what the State will do with the information on the 99%.

Mental health treatment "…depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears. Because of the sensitive nature of the problems for which individuals consult psychotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace. For this reason, the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment." *Jaffee vs. Redmond,* 518, U.S. 1, 10 (1996). "The psychotherapist privilege serves the public interest by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem. The mental health of our citizenry, no less than its physical health, is a public good of transcendent importance." *Id.,* at 11.

It is critical that a temporary injunction issue to stop the flow of thousands more people being reported into the statewide database and to reassure the public that they should continue to seek treatment while this lawsuit is pending.  Medical providers can still call "911" – they lose nothing as a result of the temporary injunction.  NICS checks will still be conducted – nothing is lost from a firearms purchase perspective.

Essentially, what would be lost as a result of the requested injunction is the ability of the State to collect information it should not have to use for purposes that it should not perform.

Dated:  January /6 , 2015

_Paloma A. Capanna_
Paloma A. Capanna, Attorney

## CERTIFICATION

I hereby certify that on January _15_, 2015, a copy of the foregoing MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION was filed electronically and served by mail upon anyone unable to accept electronic filing.  Notice of this filing was/will be sent via e-mail to all Parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Paloma A. Capanna, Attorney