IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
Rochester Division

DONALD MONTGOMERY,
ANDREW CARTER, LOIS REID,
KARL BECHLER, and "M.M.,"
as individuals, and on behalf of
all other persons similarly situated,

**AMENDED COMPLAINT**

Plaintiffs

*vs.*

Civil No.: 6:14-cv-06709

ANDREW M. CUOMO, Governor of the State
of New York; ANN MARIE T. SULLIVAN,
Commissioner of the New York State
Office of Mental Health; MICHAEL C. GREEN,
Executive Deputy Commissioner of the
New York State Division of Criminal Justice Services;
JOSEPH A. D'AMICO, Superintendent of
the New York State Police; VINCENT F. DEMARCO,
Suffolk County Sheriff's Department; and,
EASTERN LONG ISLAND HOSPITAL,

Hon. Charles J. Siragusa

Defendants.

## AMENDED COMPLAINT

### (For Declaratory Judgment and Injunctive Relief)

Plaintiffs, Donald Montgomery, Andrew Carter, Lois Reid, Karl Bechler, and

"M.M.," as individuals and on behalf of all other persons similarly situated, do hereby,

through their attorney, allege against Andrew M. Cuomo, Governor of the State of New

York; Ann Marie T. Sullivan, Commissioner of the New York State Office of Mental

Health; Michael C. Green, Executive Deputy Commissioner of the New York State

Division of Criminal Justice Services; Joseph A. D'Amico, Superintendent of the New York State Police; Vincent F. DeMarco, Suffolk County Sheriff's Department, and Eastern Long Island Hospital (hereinafter "the Defendants") as follows:

## NATURE OF THE ACTION

This lawsuit alleges the creation, implementation, marketing, and use of a reporting system for medical professionals to transmit personal health information to the State pursuant to NY Mental Hygiene Law §9.46, enacted January 15, 2013 as part of the "New York Secure Ammunition and Firearms Enforcement Act" violates the civil liberties of the Plaintiffs and all other persons similarly situated, including his/her/their rights under the Second, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. The State has amassed the confidential, personal health information of tens of thousands of people into a database shared by various State agencies. The personal health information amassed includes, but is not limited to, any mental health diagnosis of a patient. The personal health information is shared by numerous agencies, including, but not limited to law enforcement and non-state agencies and offices. The State does not use a subpoena to obtain this confidential personal health information. The State has made the affirmative misrepresentation to medical professionals and others that transmitting the data is lawful. Neither the treatment providers, nor the State has provided notice to patients of the sharing of their personal health information. In the absence of relief from this Court, virtually no one whose personal health information has been freely shared by medical providers and state and local actors will learn or be able to

find out whether the integrity of their personal health information has been compromised, including that it has been transmitted to law enforcement personnel.

## THE PARTIES

1.    Plaintiff DONALD MONTGOMERY is an individual person with a residence in Fairport, New York, which is within the Western District Court of New York. Mr. Montgomery is both a Veteran of the United States Armed Services and a retired law enforcement officer, having served his country and his community with distinction. Mr. Montgomery brings this action on behalf of himself and all other persons similarly situated.

2.    Plaintiff ANDREW CARTER is an individual person with a residence in Tonawanda, New York, which is within the Western District Court of New York. All of his events complained of herein transpired within WDNY. Mr. Carter is disabled, has held a New York pistol license since 2000, and owns firearms. Mr. Carter joins this action on behalf of himself and all other persons similarly situated.

3.    Plaintiff LOIS REID is an individual person with a residence in Amherst, New York, which is within the Western District Court of New York. All of her events complained of herein transpired within WDNY. Ms. Reid is disabled, has held a New York pistol license since 2007, and owns firearms. Ms. Reid joins this action on behalf of herself and all other persons similarly situated.

4.    Plaintiff KARL BECHLER is an individual person with a residence in Livonia,

New York, which is within the Western District Court of New York. All of his

events complained of herein transpired within WDNY. Mr. Bechler has held a

New York pistol license since 1976, and owns firearms. Mr. Bechler joins this

action on behalf of himself and all other persons similarly situated.

5.    Plaintiff "M.M." is an individual person with a residence within the Western

District Court of New York. All of M.M.'s events complained of herein transpired

within WDNY. M.M. is a licensed medical professional and owns firearms.

M.M. joins this action as an individual and on behalf of all other persons similarly

situated.

6.    Defendant ANDREW M. CUOMO is the Governor of the State of New York,

whose principal place of business is in Albany (Albany County), New York. The

Governor was the principal architect of the Act, signed it into law, and oversees its

implementation, including, but not limited to, the provisions herein enumerated.

The Governor also has the ultimate authority over the New York State Office of

Mental Health, the New York State Department of Criminal Justice Services, and

the New York State Police Department.

7.    Defendant ANN MARIE T. SULLIVAN is the Commissioner of the New York

State Office of Mental Health ("OMH") with a principal place of business in

Albany, New York. Ms. Sullivan is authorized to supervise and implement all

operations and functions of OMH.  The Office of Mental Health is an executive

agency responsible for collecting and distributing the personal health information

from medical professionals under the challenged law and other, associated

provisions.  The functions performed by OMH relevant to the Plaintiffs' claims are,

but are not limited to, collection of personal health information, dissemination of

personal health information, creation and operation of a computer system to

support such collection and dissemination of personal health information,

marketing of the personal health information collection program to medical

professionals, and creation and operation of a program to collect personal health

information directly from individuals and their treatment providers including as

part of a review process.

8.    Defendant MICHAEL C. GREEN is the Executive Deputy Commissioner for the

New York State Department of Criminal Justice Services ("DCJS") with a

principal place of business in Albany, New York.  Mr. Green is authorized to

supervise and implement all operations and functions of DCJS.  The Department of

Criminal Justice Services is an executive agency responsible for collecting and

distributing personal health information from treatment providers and/or the Office

of Mental Health and/or the New York State Police under the challenged law and

other, associated provisions.  The functions performed by DCJS relevant to the

Plaintiffs' claims include, but are not limited to, entering personal health

information into the National Instant Criminal Background Check System

("NICS"), comparing personal health information against the NICS and/or other

databases both federal, state, and local, identifying persons who hold New York

pistol permits, influencing pistol permit determinations and/or firearms

confiscations, and directing other state and local law enforcement entities to

suspend and/or revoke a pistol permit and/or conduct a firearms confiscation.

9.   Defendant JOSEPH A. D'AMICO is the Superintendent of the New York State

Police with a principal place of business in Albany, New York.  Mr. D'Amico is

authorized to supervise and implement all operations and functions of the New

York State Police ("NYS Police").  The NYS Police is an executive department

responsible for collecting and distributing personal health information from

treatment providers, OMH, DCJS, and other local government and law

enforcement offices and agencies under the challenged law and other, associated

provisions.  The functions performed by the NYS Police relevant to the Plaintiffs'

claims are, but are not limited to, entering such information into NICS, comparing

such information against NICS and/or other databases whether federal, state, or

local, identifying persons who hold or are applying for New York pistol permits,

influencing the application and continued possession of pistol permits and/or

firearms confiscation, and directing other law enforcement entities to suspend

and/or revoke a pistol permit and/or conduct a firearms confiscation.

10.   Defendant VINCENT F. DEMARCO is the Chief Sheriff at the Suffolk County

Sheriff's Department with a principal place of business in Hauppauge (Suffolk

County), New York.  Mr. DeMarco has ultimate authority for supervising and

implementing all operations and functions of the Suffolk County Sheriff's

Department.  The Suffolk County Sheriff's Department is independent of the

authority of the State, and Mr. DeMarco is a law enforcement officer elected by the

voters of Suffolk County, and, as such, has independent constitutional authority to

determine the enforceability of any law.  The Suffolk County Sheriff's Department

did collect personal health information from other of the Defendants to use in its

determination to suspend and then to terminate the pistol permit of

Mr. Montgomery, as well as to confiscate his firearms.

11.   Defendant EASTERN LONG ISLAND HOSPITAL is a private hospital with a

principal place of business in Greenport (Suffolk County), New York.  Eastern

Long Island Hospital provides medical services to persons, including

Mr. Montgomery.  Eastern Long Island Hospital engages in reporting of personal

health information to non-covered entities and non-medical third parties, such as

the other Defendants, as well as other federal, state, and local government entities.

## JURISDICTION AND VENUE

12.   All individually named Defendants are being sued in their official capacities.

13.    This case arises under the Constitution and the laws of the United States, and it

presents one or more federal questions within this Court's jurisdiction under

Article III of the United States Constitution and 28 U.S.C. § 1331.  This court also

has jurisdiction of this case under 28 U.S.C. §1343(a)(3) in that this action seeks to

redress the deprivation, under color of the laws, statutes, ordinances, regulations,

customs, and usages of the State of New York, of rights, privileges, or immunities

secured by the United States Constitution.  And further, this court has jurisdiction

of this case under 42 U.S.C. §1983 in that this action seeks relief from the

deprivation of rights, privileges, or immunities secured by the United States

Constitution under color of statute, ordinance, regulation, custom, or useage by the

State of New York.  The Court also has jurisdiction under 5 U.S.C. §702 (the

"Administrative Procedure Act").

14.    Venue lies in this District Court pursuant to 28 U.S.C. §1391.

15.    The Court has the authority to grant declaratory relief pursuant to 28 U.S.C.

§§2201 – 2202 (the "Declaratory Judgment Act"), and 42 U.S.C. §1983.

16.    The Court has the authority to award attorney's fees and costs pursuant to

28 U.S.C. §2412 and 42 U.S.C. §1988.

## FACTS

17. On January 15, 2013, Defendant Andrew Cuomo, Governor of the State of New York, signed into law the "New York Secure Ammunition and Firearms Act" (hereafter "the Act"), which included a new reporting requirement for treatment providers of those with mental health needs at new Mental Hygiene Law §9.46 and associated amended provisions. As such, the Act severely and adversely effects the Plaintiffs, along with tens of thousands of similarly situated persons throughout New York.

18. The statutory provision at issue herein is Mental Hygiene Law §9.46, as follows:

>(a) For purposes of this section, the term "mental health professional" shall include a physician, psychologist, registered nurse or licensed clinical social worker.

>(b) Notwithstanding any other law to the contrary, when a mental health professional currently providing treatment services to a person determines, in the exercise of reasonable professional judgment, that such person is likely to engage in conduct that would result in serious harm to self or others, he or she shall be required to report, as soon as practicable, to the director of community services, or the director's designee, who shall report to the division of criminal justice services whenever he or she agrees that the person is likely to engage in such conduct. Information transmitted to the division of criminal justice services shall be limited to names and other non-clinical identifying information, which may only be used for determining whether a license issued pursuant to section 400.00 of the

penal law should be suspended or revoked, or for determining whether a person is ineligible for a license issued pursuant to section 400.00 of the penal law, or is no longer permitted under state or federal law to possess a firearm.

(c) Nothing in this section shall be construed to require a mental health professional to take any action which, in the exercise of reasonable professional judgment, would endanger such mental health professional or increase the danger to a potential victim or victims.

(d) The decision of a mental health professional to disclose or not to disclose in accordance with this section, when made reasonably and in good faith, shall not be the basis for any civil or criminal liability of such mental health professional.

19.  Governor Cuomo was the principal architect of the Act.

20.  On Monday, January 14, 2013, Governor Cuomo issued a "Message of Necessity," preceding the legislative vote on the Act, declaring the Bill was an emergency vote, should not be subject to the three-day desk rule, and would enhance the safety of "children, first responders and citizens as soon as possible."

21.  No hearings or testimony preceded passage of the Act, nor was any research commissioned.

22.  MHL §9.46 requires a mental health professional providing treatment services to a person to report, as soon as practicable, personal health information concerning the patient to the director of community services under the auspices of OMH.

23.  Under the implementation of MHL §9.46, the OMH local directors of community services transmit personal health information to various of the other Defendants, particularly to DCJS.

24.  Under the implementation of MHL §9.46, the Defendants within the state government transmit personal health information between each other and store such personal health information in one or more electronic computer programs, databases, and other formats (herein "databases").

25.  Passage of MHL §9.46 resulted in a fundamental shift in the presumption of confidentiality for mental health treatment that has been codified and recognized for decades.

26.  Prior to the enactment of MHL §9.46, the statutory standard for a break in the confidential doctor-patient relationship leading to a report to a law enforcement officer was " a likelihood of serious harm to self or others," meaning "a substantial risk of physical harm to self as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself or a substantial risk of physical harm to other persons as manifested by homicidal

or other violent behavior by which others are placed in reasonable fear or serious physical harm." This standard was codified in MHL Art. 9, including, but not limited to §9.37 and §9.39.

27. Prior to the enactment of MHL §9.46, the state statutory standard for a break in the confidential doctor-patient relationship leading to a report to a law enforcement officer was in harmony with the federal statutory standard, notably the one articulated under "HIPAA." (As used throughout this pleading, the acronym "HIPAA" is used to designate, collectively, both to the "Health Insurance Portability and Accountability Act," first at Pub.L. 104-91 (1996) and the "HITECH" or "The Health Information Technology for Economic and Clinical Health Act," as well as to those common references that may break down its provisions into designations such as "The Privacy Rule," "The Transactions and Code Sets Rule," "The Security Rule," "The Unique Identifiers Rule," "The Enforcement Rule," and "The Breach Notification Rule.")

28. Under 45 CFR §164.512(j), in the HIPAA Security Rules, there is federal authority to disclose specified and limited protected health information, such as the patient's name, address, and Social Security Number, in order to avert a serious threat to health or safety where the covered entity, in good faith, believes the use or disclosure "(i)(A) is necessary to prevent or lessen a serious and imminent threat to the health or safety of a person or the public <u>and</u> (B) is to a person reasonably able

to prevent or lessen the threat, including the target of the threat, *or*, (ii) is necessary

for law enforcement authorities to identify or apprehend an individual (A) because

of a statement by an individual admitting participation in a violent crime that the

covered entity reasonably believes may have caused serious physical harm to the

victim *or* (B) where it appears from all the circumstances that the individual has

escaped from a correctional institution or from lawful custody (as those terms are

defined at 45 CFR §164.501)." (emphasis added)

29.   Prior to the effective date of MHL §9.46, medical and mental health professionals

have historically had the option and the professional mandate to utilize one or more

forms of "involuntary commitment" when demanded by their professional

judgment.  Involuntary commitment can include law enforcement restraint,

observation for up to 72-hours, hospitalization upon certification by two examining

physicians, and even compulsory medication.  A corresponding set of laws

emerged under Mental Hygiene Law Art. 9, including various patient and third

party designee notifications, rights to counsel, rights to judicial intervention and

hearings, and such other civil liberty protections as are generally afforded to those

who are literally or effectively detained against their will or capacity, such as when

incarcerated.

30.   On March 16, 2013, a state-wide reporting system went into effect to implement

MHL §9.46, involving the OMH, DCJS, and the NYS Police, local law

enforcement officers throughout New York such as the Suffolk County Sheriff's

Department, and treatment providers, both public and private, throughout New

York such as the Eastern Long Island Hospital.

31.     On March 16, 2013, the NYS Office of Mental Health launched the "Integrated

SAFE Act Reporting System" ("ISARS") to facilitate reporting of personal health

information by medical professionals pursuant to MHL §9.46.

32.     One NYS Senate Committee hearing (by invitation only) relative to MHL §9.46

was conducted on May 31, 2013, Senator David Carlucci, Chair, and Senator

David J. Valesky, present.  This hearing before two NYS Senators was conducted

after passage of the Act and after implementation of the ISARS statewide reporting

system.  (All references herein to "testimony" refer to statements made by

witnesses at this hearing.)

33.     The statewide reporting system functions through an on-line computer program

designed to elicit personal health information from treatment providers on an

automated form.  The user interface then transmits the personal health information

from the treatment provider to OMH, specifically, and to the State, generally.

34.     The Office of Mental Health underplays and misrepresents the seriousness of the

personal health information being transmitted on the MHL §9.46 form, including,

but not limited to its statement that "The 9.46 form captures a patient's

demographic information.  No diagnosis/medical information is provided," as per

its "Introduction for Mental Health Providers" (dated March 12, 2013), available to

the public on the OMH website.

35.   The MHL §9.46 form includes the patient's diagnosis in a pull-down list of

Diagnostics and Statistical Manual codes and includes a "reason" field (required)

as an expandable text box.

36.   According to the "Integrated SAFE Act Reporting System, version 1.0.2.6 User

Guide," the "diagnosis" field is required, although it allows for the selection of

"diagnosis or condition deferred on Axis I" (Axis I being a reference to a multi-

axial mental health diagnosis).  The drop down list of diagnoses is taken from the

DSM-IV-TR.

37.   According to the "Integrated SAFE Act Reporting System, version 1.0.2.6 User

Guide," the "reason" field is required, and accepts a minimum of 50 and a

maximum of 500 characters.  The field is used to enter "the reason why they

believe the patient being reported is a specific threat."

38.   Also on the OMH website is the OMH "Guidance Document" (undated), which

misrepresents the MHL §9.46 report and relief from liability for personal health

information transmission is conditioned upon the medical professional making a

determination pursuant to the "likely to result in serious harm to self or others" standard.

39. The OMH "Guidance Document" describes that upon receipt of a report, the local Director of Community Services reviews the report to make a determination under the "likely to result in serious harm to self and others" standard, at which point OMH transmits identifying information to DCJS and/or the NYS Police, which then transmit(s) that information to the local firearms licensing official "who must either suspend or revoke the license." (emphasis added)

40. In reality, once the Form 9.46 personal health information is received at OMH it is, in whole or in part, transmitted /or accessed by other departments and agencies of the state and local governments, including, but not limited to DCJS and the NYS Police.

41. According to the testimony of Attorney Beth Haroules, Senior Staff Attorney at the New York Civil Liberties Union, the personal health information collected under MHL §9.46 goes into what DCJS calls a "Disqualifying Data Database," which includes those under guardianship orders, those with developmental disabilities, and those adjudicated as involuntarily admitted to a psychiatric facility.

42. According to the OMH "Guidance Document," as a next step "DCJS will then determine whether the person possesses a firearms license and, if so, will notify the

appropriate local licensing official, who <u>must</u> suspend or revoke the license as soon

as practicable. The person <u>must</u> surrender such license and all firearms, rifles, or

shotguns to the licensing officer, but if the license and weapons are not

surrendered, police and certain peace officers are authorized to remove all such

weapons." (emphasis added)

43.   The OMH "Guidance Document" demonstrates the intention of the State to use an

MHL §9.46 report to usurp the statutory discretion ascribed to the county-level

pistol permit licensing officer under Penal Law §400.00.

44.   The deliberations of the NYS Assembly on January 15, 2013 also reflected an

understanding that a report under MHL §9.46 that matched to a record at DCJS

would result in an immediate revocation of the license and the confiscation of all

firearms. (p. 43)

45.   Under Penal Law §400.00(1), at the county level, an applicant for a new license or

a license holder for renewal is considered upon application and investigation by the

licensing officer, who is entitled to an understanding whether the person has ever

suffered from any mental illness, and/or has been involuntarily committed to a

mental institution or a secure treatment facility. The applicant is not automatically

disqualified by virtue of having ever suffered from a mental illness, but is required

to disclose such information. The licensing officer has the discretion to make a

determination of the suitability of the issuance of or denial of an individual

applicant, as well as for a suspension or revocation.

46. There is a distinction between the licensing officer's discretionary power and the

federal, mandatory disqualifying events for the ownership, transfer, and possession

of a firearm. An individual who falls under the federal disqualifying events at

18 U.S.C. §922(g)(1)-(9) is permanently restricted from purchasing, transferring,

or possessing a firearm.

47. Specifically, 18 U.S.C. §922(g)(4), it is unlawful for a person "who has been

adjudicated as a mental defective or who has been committed to a mental

institution" to "ship or transport in interstate or foreign commerce, or possess in or

affecting commerce, any firearm or ammunition; or to receive any firearm or

ammunition which has been shipped or transported in interstate or foreign

commerce."

48. Under 27 CFR §478.11, the term "adjudicated as a mental defective" is defined as:

"(a) A determination by a court, board, commission, or other lawful

authority that a person, as a result of marked subnormal intelligence, or

mental illness, incompetency, condition, or disease:

(1) Is a danger to himself or to others; or

(2) Lacks the mental capacity to contract or manage his own affairs.

(b) The term shall include:

(1) A finding of insanity by a court in a criminal case; and

(2) Those persons found incompetent to stand trial or found not guilty by reason of lack of mental responsibility pursuant to articles 50a and 72b of the Uniform Code of Military Justice, 10 U.S.C. 850a, 876b."

49.   The federal term "committed to a mental institution" at 18 U.S.C. §922(g)(4) does not include a person at a medical facility for observation or in a mental institution by voluntary admission.

50.   The OMH "Guidance Document" indicates the State's awareness that it should not be populating the NICS database with records of persons who do not meet this specific statutory criteria.

51.   From the onset of the Act, the Conference of Local Mental Health Hygiene Directors, among others, took the position that local mental health offices are neither designed nor funded to carry out this function, and that the reporting requirement interferes with the relationship of the treatment provider and the individual.

52.   The State adopted the position that all (100%) of emergency room admissions to a state psychiatric center meet the MHL §9.46 reporting criteria.

53.   Additionally, certain hospital administrators and/or hospital attorneys "have

recommended or required that all persons admitted to hospitals with a mental

illness diagnosis be reported under NY MHL §9.46," according to the testimony of

Jed Wolkenbreit, Counsel to the Conference of Local Mental Health Hygiene

Directors.

54.   Once the personal health information is transmitted to and/or accessed by the NYS

Police, the personal health information is run against one or more additional

databases, including a database of pistol permit holders.

55.   According to the testimony of Attorney Haroules, once the data is collected, state

and local law enforcement have "carte blanche access" to the names and

identifying information of people within the Disqualifying Data Database.

56.   According to the New York Times article of October 19, 2014, reporting responses

received through their Freedom of Information Law request, from March 16, 2013

until October 3, 2014, a total of 41,427 persons have been reported by treatment

providers pursuant to MHL §9.46.

57.   According to the New York Times article of October 19, 2014, a reported

278 persons matched as pistol permit holders out of the 41,427 persons reported by

treatment providers to the State pursuant to MHL §9.46.  This figure translates into

a match for less than One Percent (1%) of those persons reported to the State by medical professionals.

58. According to the New York Times article of October 19, 2014, of the reported 278 persons matched as pistol permit holders, the largest geographic groups were the 36 persons in Monroe County, followed by 17 in Westchester County, 16 in Suffolk County, and 14 in Dutchess County. It is presumed that one or more of the Plaintiffs named herein are among such persons.

59. The day after this statistical information about the MHL §9.46 database was published by the New York Times on October 19, 2014, Governor Cuomo made a statement to the New York Times that the figures were "too low."

60. According to the testimony of Attorney Wolkenbreit, since on or about March 15, 2013, approximately 3,000 persons per month have been reported by treatment providers pursuant to NY Mental Hygiene Law §9.46. This would equate to more than 60,000 people by this time.

61. According to the testimony of Attorney Wolkenbreit, over 92% of reports through ISARS in the first 60-days after launch came from hospitals, "primarily Article 28 hospital emergency departments and psychiatric units," 5% came from outpatient providers, and "an insignificant number" came from private practitioners.

62.   According to the testimony of Attorney Wolkenbreit, some reports appear to be made by "someone other than a mental-health professional treating the patient."

63.   According to the testimony of Attorney Wolkenbreit, some reports might be submitted through an automated computer report made at admission through the "Electronic Health Records System."

64.   According to the testimony of Attorney Wolkenbreit, some reports might be submitted for children as young as 11 years of age.

65.   According to the testimony of Attorney Wolkenbreit, of the first 6,000 persons reported, approximately eleven (11) were actionable reports.

66.   The full extent of the transmission of personal health information from treatment providers to the State is unknown.

67.   The full extent of access to the personal health information by one or more of the government Defendants is unknown.

68.   The full extent of the use of the personal health information collected and in circulation by the government Defendants is unknown.

69.  The credentials and training of those with access to the personal health information

transmitted by treatment providers and collected by the government Defendants is

unknown.

70.  The electronic and physical security measures, protocols, training, and expertise

used by the government Defendants to protect this personal health information, if

any, are unknown.

71.  Since in or about January 2014, individual members of the Shooters Committee on

Political Education ("SCOPE"), Monroe County Chapter, have pursued such basic

information about the MHL §9.46 system as is outlined in the preceding

paragraphs, but have been denied this information from the Governor and the

NYS Police.  SCOPE is a Petitioner in one of three pending lawsuits in New York

State Supreme Court, Albany County, against Governor Cuomo and the

NYS Police pursuant to CPLR Art. 78 to compel production of various records

under the State's Freedom of Information Law.  On or about December 5, 2014,

the Records Access Officer at the NYS Police provided written responses,

including that there are "no records"[1] pertaining to security clearance requirements

for personnel who will be authorized to access the statewide license and record

---

[1] The term "record" as used relative to a New York Freedom of Information Request has a
statutory definition at Public Officers Law §86(4), meaning "any information kept, held, filed,
produced or reproduced by, with or for an agency or the state legislature, in any physical form
whatsoever, including, but not limited to reports, statements, examinations, memoranda,
opinions, folders, files, books, manuals, pamphlets, forms, papers, designs, drawings, maps,
photos, letters, microfilms, computer tapes or discs, rules, regulations or codes."

database, "no records" of the names of personnel assigned to build the statewide

database, no records relating to the qualifications of persons who will be authorized

to access the statewide license and record database, and "no records" relating to

any notifications that will be sent to individuals providing notification that a check

has been run through the statewide license and record database on that individual.

72.     In comparison to the structure and implementation of HIPAA, the State has no law

        or regulation defining "personal health information," its solicitation, its protection,

        its inter-agency and inter-governmental transmission, its employee authorizations,

        its electronic platforms and protections, or other similar measures.

73.     In comparison to the federal HIPAA, there are no state level consequences,

        whether through criminal or civil prosecution, incarceration, fine, or loss of

        approval for government contract that would apply to the improper use of the

        personal health information solicited by or coming into the possession of state and

        local government entities.

74.     According to the testimony of Dr. Glenn Martin, President of the New York State

        Psychiatric Association, MHL §9.46 amounts to a lower standard than the HIPAA

        reporting exceptions standard and is thus a state statutory violation of HIPAA.

        Dr. Martin revealed during his testimony that this organization had filed a formal

        complaint with the Office of Civil Rights at the United States Department of

        Health & Human Services.

75. The NY Office of Mental Health affirmatively promoted the use of the §9.46 on-line reporting system, using a variety of promotional materials aimed at treatment providers through its website, written documents, and a help line.

76. Because of the marketing by the State Defendants, generally, and OMH, specifically, an atmosphere has been created that makes medical and mental health professionals afraid to not report an individual through ISARS, even if, in their professional judgment, the person does not represent a threat of immediate harm to the self or others.

77. No person is notified by the Defendants of the transmission of personal health information from medical providers to the State or Federal Government.

78. No person is requested by the Defendants to give permission to the medical providers for the transmission of personal health information from the medical providers to the State or Federal Government.

79. No person is notified by the Defendants of the transmission of personal health information from the medical providers to the State or the Federal Government.

80. No patient is notified by the Defendants of any right s/he may have to request a removal of her or his personal health information from any record-keeping system of the State or Federal Government.

81.   No patient is notified by the Defendants of any right s/he may have to obtain copies

of records of transmission of personal health information from treatment providers

to the State or Federal Government.

82.   Medical providers do not maintain records of transmission of the personal health

information to the State or Federal Government as part of the medical record of the

patient.

83.   No patient is notified of any right s/he may have to legal representation in matters

associated with the reporting of their personal health information to the State or

Federal Government.

84.   Such failures of notification of patients relative to the reporting system pursuant to

MHL §9.46 is designed to minimize patient awareness and ability to take legal and

other action to try to protect their personal health information from inappropriate

transmission from treatment providers to the State and Federal Government.

85.   The State intends its operations around MHL §9.46 to be conducted in a secretive

and over-reaching manner.

86.   The State does not have a breach notification protocol to inform individuals that

their personal health information has come under the auspices of the State or in the

event that the State should commit a breach of personal health information as this

term is defined and understood as part of the HIPAA Breach Notification Rule.

87.     In September 2013, the NYS Police published a "field guide" to the "NY SAFE

Act," which included instruction from Counsel to the NYS Police to NYS Police

employees on the confiscation of firearms and the destruction of firearms.

88.     Included in the instructions to employees of the NYS Police in its "field guide" are

the following instructions relative to firearms of persons owned by persons

"ineligible because of a mental health disqualifier." The use of the phrase "mental

health disqualifier" is not defined within the NYS Police "field guide." The phrase

"mental health disqualifier" has a commonly-used meaning in reference to the

federal 18 U.S.C. §922(g)(4) provision. The phrase "mental health disqualifier"

does not have a state equivalent statutory provision or common meaning. The

NYS Assembly on January 15, 2013, indicated its intention that the mental health

provisions of the SAFE Act should "[bring] our statute in conformity" "with

federal law" (p. 90), including that a firearm should not be provided "...to

somebody who is dangerously mentally ill, who's been adjudicated as such."

(p. 92)

89.     The NYS Police "field guide" thus incorrectly uses the legal term "mental health

disqualifier" as having a broad and generic meaning for the officer in the field,

which is incompatible with the federal statutory term.

90.   Specifically, the NYS Police "field guide" instructs officers as follows:

> "If the person is determined to be ineligible because of a mental health disqualifier or due to an order of protection, the statute provides that he or she will be afforded the opportunity to arrange for the lawful transfer or sale of that weapon. The law enforcement agency assigned will secure the weapon for safekeeping until the person has made these arrangements in accordance with the procedure set forth in Penal Law 400.05(6). If the subject fails to make these arrangements, the weapon automatically becomes a nuisance weapon and must be destroyed or rendered useless for its intended purpose." (p. 6)

> "If the license and weapons are not surrendered, they will be removed by a police officer and declared a nuisance. At that point, the person would lose the ability to lawfully transfer the weapon." (p. 12)

> "If a person becomes ineligible to hold a pistol permit, the Safe Act requires the person to surrender **all** firearms to police, including all rifles and shotguns for which no license or registration is required." (emphasis in original, p. 12)

> Once OMH has notified DCJS, "...DCJS will notify the State Police to confirm the existence of the license and the licensing authority will be notified so they can make a determination as to whether to suspend or revoke the subject's license. The licensing authority, and the appropriate local law enforcement agency, will handle the suspension and the recovery of any weapons in the same manner as they do now in the event the licensing authority revokes a firearms license." (p. 13)

91.   In reality, the NYS Police have taken the position of instructing local licensing

officials to suspend and terminate pistol permits for all persons reported through

MHL §9.46 as having been involuntarily committed to a mental institution.

92.   The NYS Police have taken or are actively in the process of taking effective control

of the county-level licensing system.

93.   The NYS Police have taken the position of directing local law enforcement

agencies and offices to conduct warrantless search and seizures of the homes and

personal properties of persons reported through MHL §9.46 to seize all firearms

and licenses.

94.   The NYS Police have taken effective control of county and local law enforcement

office discretion on the approach to investigation of, judicial application for, and

prosecution of individuals who own firearms.

95.   The level of control taken by the NYS Police as the effective agent of the Governor

and DCJS is expressed also in the "Memorandum" that accompanied the Act,

wherein it states:  "When a Section 9.46 report is made, the Division of Criminal

Justice Services will determine whether the person possesses a firearms license

and, if so, will notify the appropriate local licensing official, who must suspend the

license. The person's firearms will then be removed."

96. The policies, procedures, and actions of the NYS Police may or may not also be related to a determination of the inclusion of the reported individual in the NYS Police database of registered "assault weapons" pursuant to NY Penal Law §265.00(22).

97. And, the policies, procedures, and actions of the NYS Police may or may not also be related to a determination of the inclusion of the reported individual in the federal database of "NFA firearms," registered under the National Firearms Act (Pub. Law 474, 1934).

98. The implementation of MHL §9.46 is the beginning of the unlawful confiscation of firearms through a police state model.

99. If the deliberations of the NYS Assembly on January 15, 2013 are any indication, there is an expressed intention that the State will only go further, as Members call for dealing "more severely" with those with mental health concerns (p. 56) and getting the "guns out of their hands and [making] sure they don't get it" (p. 60).

100. MHL §9.46 potentially delays what would be an appropriate response in the event of serious and imminent threat of danger to the self or others using a firearm because the ISARS reporting creates a slower data transmission protocol than use of the statewide "911" system, through which a live call goes to a live operator and

across to local law enforcement, who already have the ability to ascertain whether the individual has a pistol permit and/or registered assault weapons.

101.  According to the testimony of Eric Neblung, PhD, President of the New York State Psychological Association, MHL §9.46 does "nothing" to allow a mental health provider to take immediate action to deal with a dangerous mental health patient, as the provision is not designed to allow clinicians to breach confidentiality in a way that will allow them to take the "necessary, direct, and immediate steps that will simultaneously help a dangerous patient and protect society from that patient," instead requiring the mental health professional to make a report "that must work its way relatively slowly through a bureaucracy."

102.  According to the testimony of Attorney Haroules, because reporting under MHL §9.46 calls for criminal investigation, it "ensures" that there will be numerous and potentially adverse contact between persons with disabilities and law enforcement officers who are untrained in mental health and disability issues.

103.  MHL §9.46 is a less safe reporting protocol of personal health information than was already provided for under NY Mental Hygiene Law Art. 9 and HIPAA.

104.  MHL §9.46, as it is commonly understood among laymen, is already chilling those who may be in need of medical and/or mental health services, whether out of fear for their privacy or concern about their Second Amendment freedoms, or both.

105.  According to the testimony of Dr. Neblung, the chilling effect upon patients can

include "fear of triggering a sudden and dramatic governmental intrusion into their

private lives."

106.  MHL §9.46 is also acting as a negative impetus for medical and mental health

providers, who fear liability for reporting as well as liability for failing to report.

107.  According to the testimony of Ari Moma, R.N., member of the New York Nurses

Association, which represents more than 270,000 registered nurses across the State,

by including nurses within the listing of reporters pursuant to MHL §9.46, it pulls

nurses outside the scope of their medical responsibilities to a mental health patient

as part of a treatment team, while simultaneously exposing nurses to liability, a

danger of losing their license, and a risk of losing their livelihoods.

108.  MHL §9.46 is having a chilling effect more likely to result in decreased safety of

individual patients and of the broader society.

109.  The adverse impact of MHL §9.46 will only increase with the filing of this lawsuit

and the making public the extent of the abuses of individual civil liberties by the

Defendants, particularly against those with no pistol permit because the pistol

permit revocation has functioned as an accidental form of notification of the

reporting event.  Without any notification process, the general public will be left to

fear the worst and will consciously and actively avoid contact with the mental

health setting when access to such services may be medically advisable or appropriately self-directed.

110. According to the testimony of Attorney Carla Rabinowitz, Public Policy Chair of the New York Association of Psychiatric Rehabilitation Services, those persons facing mental health issues are twelve times more likely to become a victim of a crime than to commit a crime, and are five times more likely than a member of the general public to become a murder victim.

111. According to the testimony of Attorney Rabinowitz, there is no study demonstrating a person facing mental health issues is any more likely than a member of the general public to commit a violent crime.

112. According to the testimony of Attorney Rabinowitz, there are studies that reflect a potential correlation between drug use and violence, which study findings apply to the general public, not just mental health service recipients.

113. Federal law enforcement agencies have yet to develop a profile of the "mass shooter."

114. The State has not developed a profile of the "mass shooter."

115. According to the American Psychological Association, there is no study that predicts future violence.

116. According to the testimony of Attorney Mary Beth Anderson, Project Director at the Urban Justice Mental Health Project and Managing Director at the Urban Justice Center, the MHL §9.46 reporting requirement will increase discrimination against people with mental health issues and would not have done anything to prevent recent events in Connecticut, Colorado, Arizona, or "any of the places where we've seen some tremendous mass shootings in the past couple of years."

117. According to the testimony of Attorney Anderson, when a person with a mental health issue commits a crime, it is not usually a violent crime. And, in the uncommon instance that it is a violent crime, it is generally not a gun crime.

118. According to the testimony of Jason Lippman, Senior Associate of Policy and Advocacy for the Coalition of Behavioral Health Agencies, representing 130 not-for-profit coalition members, only about 4% of violent crimes are committed by individuals with mental illness.

119. According to the testimony of Jason Lippman, more reliable predictors of violence include age, gender, prevalence of substance abuse, the nature and quality of one's environment, and past behavior.

120. According to the testimony of Dr. Neblung, more powerful predictors of violence are active substance abuse, the presence of environmental stressors, and a history of past violence.

121. According to the testimony of Jason Lippman, misperceptions about people with mental illness can lead to discrimination and hinder recovery.

122. Crimes that can be charged associated with a "mass shooting" scenario in which four or more persons are injured by gunfire without the shooter taking a cooling down period is a statistically irrelevant fraction of chargeable offenses.

123. Governor Cuomo is simultaneously campaigning for policies directly contradictory to public safety, including aggressive early release from prison, including those convicted of violent felonies, prison closings, and legalization of marijuana.

124. The current political and societal climate is focused upon those with mental health issues as a false culprit without any basis in federal or state law enforcement profiling and in direct contravention to the expert knowledge of the medical and mental health professionals in conjunction with community advocates.

125. To report every person who seeks medical or mental health support services through a government mandate or sponsored program is to fuel the fire of the stigma of a class of persons who are more likely to be victimized than to commit violent crimes with firearms, such as mass shootings.

126. Among those categories of persons who do and will continue to suffer most gravely as a result of MHL §9.46, its implementation, and its heightened stigma are Veterans and law enforcement officers.

127.  On January 16, 2013, the President of the United States issued a Memorandum
including that by October 1, 2013, and annually thereafter, federal agencies that
possess relevant records for the NICS database shall submit a report, which, *inter
alia*, for agencies that make qualifying adjudications related to the mental health of
a person, "the measures put in place to provide notice and programs for relief from
disabilities as required under [the NICS Improvement Amendments Act of 2007
(Pub Law 110-180)]," including "the measures put in place to correct, modify, or
remove records accessible by the NICS when the basis under which the record was
made available no longer applies."

128.  There is no meaningful process offered by the State to remove the false
classification and/or disqualification. The "process" offered by OMH requires a
person to sign HIPAA releases for records for an extended period of years to all
medical providers and to submit to a mental health examination at the provider of
the State's choosing. The State's "process" is a further violation of the privacy of
persons falsely reported as having been disqualified.

129.  The federal relief from disabilities directive is particularly applicable to New York,
which was found to be the single worst performing state in a national state survey
of data uploads to the NICS database, mistakenly believing that it had reported
more than 10 million records, when only approximately 4 million records had been
successfully entered.

130. In or about 2010, New York received more than ten million dollars from the federal government, specifically to improve the accuracy of its mental health and domestic violence record uploads into NICS. No other state received as much money under this statutory program.

131. Instead of rectifying its uploads of data fields of those individuals who had suffered a disqualifying event under 18 U.S.C. §922(g)(4) through the adjudication of confinement for a mental health defect, as per a well-developed body of federal law, regulations, and case precedents, it appears that the Defendants, including Eastern Long Island Hospital, now routinely upload identifying personal information of any person coming into contact with the mental health setting.

132. New York is a state which provides personal identifying information for inclusion in the NICS database, including such information as pertains to the federal disqualifying event found at 18 U.S.C. §922(g)(4), when a person has been adjudicated a mental defective or has been committed to a mental institution.

133. The Defendants have compromised the integrity of the NICS system, which will result in false denials at the point of purchase of firearms when an individual submits the Form 4473 as part of his or her federal background check.

134. It appears that the State Defendants in their political drive to confiscate firearms are failing to distinguish between the new MHL §9.46 and the continuing MHL §9.41, which is a pre-existing provision for involuntarily commitment.

135. It appears that the Office of Mental Health, particularly in conjunction with hospital Emergency Room providers, is categorizing individual patients under MHL §9.41 "involuntary commitment," even where the medical records clearly document a lack of admission, a principal medical issue, and/or an MHL §9.13 voluntary admission.

136. It appears that the Office of Mental Health, Department of Criminal Justice Services, and NYS Police are failing to obtain critical data that would support an accurate characterization of a patient as having been "involuntarily committed," meaning to have been formally adjudicated as a mental defective or involuntarily committed as these terms are defined at federal law and regulation cited herein.

137. Coterminous with the development of ISARS, the State, under the direction of Defendant Governor Cuomo, developed another database, this one linking the 5,398 licensed pharmacies in New York State (figure quoted as of January 1, 2015). The "I-STOP" (short for the "Internet System for Tracking Over-Prescribing Act")[2] online system allows registered medical personnel to access to

---

[2] This system appears more recently to be advertised by the NYS Department of Health as the "Prescription Monitoring Program Registry," or, "PMP."

all patient prescription and prescriptions-filled information as of August 27, 2013, a mere four months after ISARS went live. By March 27, 2015, all prescriptions in New York State will be required to be filed electronically by medical providers. The I-STOP bill was signed into law by Defendant Governor Cuomo in 2012.

138. The State is believed to be in an operational position to run computer algorithms across databases of patient mental health information, pharmacy records, and the "assault weapons" database. The State, led by the Defendant Governor Cuomo and the NYS Police are actively in the process of taking over the county licensing system for pistol licenses to create a statewide registry. At this point, it is believed that the State must still rely upon county licensing officers and county/local law enforcement to demand surrender of licenses, inhibit approvals of new applications, and achieve confiscation of firearms.

139. The State is already or is on the verge of being in a position of unprecedented and unparalleled power to widely abuse patient privacy rights in its drive to trample individual Second Amendment freedoms, along with multiple other civil liberties, including due process, equal protection, freedom from searches and seizures, and taking of property.

140. The determination of the Defendant Governor Cuomo to achieve these aims is reflected as plainly as the words he finds inspirational and quotes in his autobiography, as follows: "Niccolò Machiavelli wrote prophetically: 'There is

nothing more difficult to take in hand, more perilous to conduct, or more uncertain

in its success, than to take the lead in the introduction of a new order of things.'"

(Quoted from "All Things Possible," p. 183.)

## THE CIRCUMSTANCES OF PLAINTIFF
## DONALD MONTGOMERY

141.  On or about March 19, 2014, Mr. Montgomery had gone for routine blood work

and was pronounced "healthy" by his primary care physician.

142.  On or about May 6, 2014, Mr. Montgomery went to his primary care physician

with a complaint that he was having trouble sleeping.

143.  On or about Saturday, May 10, 2014, Mr. Montgomery presented himself at the

Emergency Department of the Eastern Long Island Hospital due to persistent

trouble sleeping.  The diagnosis was listed as "Depression; Insomnia."

A prescription was given to Mr. Montgomery for Trazodone, 50 mg, at bedtime,

and a recommendation was made that he contact his primary care physician and a

counseling service for re-evaluation in 2-3 days or if symptoms worsened.

144.  On or about Friday, May 23, 2014, Mr. Montgomery again presented himself at

and this time was admitted to the Eastern Long Island Hospital for a continuous

period of approximately 48-hours for sleep deprivation.

145. On or about his admission on May 23, 2014, unbeknownst to Mr. Montgomery, the
Eastern Long Island Hospital labeled him as an "involuntary admission."

146. At the time of his presentation at the Emergency Department on May 23, 2014, the
"Nurse's Notes" included "Patient has no thoughts of hurting self. Patient has no
thoughts of hurting others. Patient is not having suicidal thoughts. Patient is not
having homicidal thoughts." The initial threat assessment was negative.

147. On or about May 23, 2014, the "Psychiatric Admission History" of
Mr. Montgomery included a "mental status examination" that stated, in full, "This
is a well-developed, well-kempt male, dressed casually and in no acute distress.
He is calm, pleasant, cooperative. Eye contact is good, speech is fluent. Mood is
mildly depressed. Affect is appropriate, somewhat anxious but otherwise mood-
congruent. He denies suicidal ideation, homicidal ideation. There is no evidence
of any psychotic process, mania, or OCD symptoms. Insight, judgment, impulse
control are good."

148. Mr. Montgomery did not meet the criteria for an emergency mental health
admission pursuant to MHL §9.27, *et seq.*, including as such is articulated on the
Eastern Long Island Hospital "Emergency Admission" Form OMH 474 (2-09),
section A.

149. Eastern Long Island Hospital did not treat Mr. Montgomery as, nor was he
afforded the rights guaranteed to, a patient under an involuntary admission
pursuant to MHL §9.27, *et seq.*

150. Mr. Montgomery was not adjudicated as a mental defective by the Eastern Long
Island Hospital in accordance with MHL §9.27, *et seq.*

151. Some time after his presentation at the Emergency Department on May 23, 2014,
someone from Eastern Long Island Hospital left a black folder with
Mr. Montgomery, without discussion of its contents. Mr. Montgomery did not
review these materials. Mr. Montgomery was not asked to sign any of these
materials. Mr. Montgomery took the black folder home and later provided it to his
Attorney, who reviewed it. Within the black folder was a one-page sheet titled
"Notice of Status and Rights/Emergency Admission (to be given to the patient at
the time of admission to the hospital)/Section 9.30 Mental Hygiene Law." On the
form was written "Donald" and the date of arrival at the hospital "5/23/2014."
None of the rest of this form was completed including the patient identification
block, the "TO" line, the contact information for the Mental Hygiene Legal
Service, the signature and date of a staff physician, and the "COPIES TO" area.

152. The form in the black folder substantially differs from the copy of the same form
provided in response to a request for Mr. Montgomery's medical records. The
copy provided to Mr. Montgomery's Attorney from the Eastern Long Island

Hospital was completed, including the full identification information for the
Mr. Montgomery and the full contact information for the Mental Hygiene Legal
Services. This form in this version was not provided to Mr. Montgomery. It is
unknown how or when this became part of the medical records of
Mr. Montgomery, as claimed by Eastern Long Island Hospital.

153. Continuously from Mr. Montgomery's admission through his discharge less than
48-hours later on May 25, 2013, the Eastern Long Island Hospital wrongfully
labeled Mr. Montgomery as an "involuntarily admission."

154. Mr. Montgomery is a Veteran of the United States Navy.

155. Mr. Montgomery is a retired law enforcement officer with a distinguished career of
more than 30-years, who retired with the rank of Detective Sergeant.
Mr. Montgomery had a spotless record and was awarded the department's Bravery
Medal. Mr. Montgomery had been a Commanding Officer for 15 years.

156. At the time of his presentation at the Emergency Department of Eastern Long
Island Hospital, Mr. Montgomery suffered from sleep deprivation, occasioned by
his move from one location in the state to another, with his wife of many years, to
live closer to their adult child and young grandchild.

157. Mr. Montgomery had no mental health history.

158. Mr. Montgomery had no pre-existing medical conditions.

159. Mr. Montgomery was of good health and sound mind, except for a short-term difficulty sleeping during an intrastate relocation in or about May 2014.

160. Mr. Montgomery held a pistol permit since July 2005, for a period of approximately nine years.

161. In order to obtain his pistol permit, Mr. Montgomery went through a background check and was approved by the county licensing officer, Defendant Suffolk County Sheriff's Department.

162. Mr. Montgomery , as of May 2014, owned four (4) handguns, specifically, a Colt .38 revolver, a Derringer .38, a Glock 26 9 mm, and a Smith & Wesson Bodyguard 380.  All of Mr. Montgomery's handguns were properly registered at all times.

163. Of the firearms owned by Mr. Montgomery as of May 2014, one was his department-issue firearm, one he won for being second place scholastically in his class of recruits, one he bought in approximately 1975, one he bought approximately two years ago.

164. Mr. Montgomery has additionally undergone multiple background checks during the course of his career.

165. On or about May 25, 2014, less than 48-hours after he presented, Mr. Montgomery was discharged from Eastern Long Island Hospital.

166. The "Discharge Summary" from Eastern Long Island Hospital correctly lists that Mr. Montgomery was experiencing stress "in the setting of buying a new home and selling the old one" and that with properly prescribed medications "he slept soundly for the two nights."

167. During his admission at the Eastern Long Island Hospital, one of the psychiatrists said to Mr. Montgomery, "You don't belong here" and "I don't know why you were referred here."

168. On or about May 29, 2014, the New York State Police sent a letter to the Suffolk County Clerk's Office wrongfully stating that Mr. Montgomery "has been adjudicated as a mental defective or has been involuntarily committed to a mental institution" and that he was prohibited from possessing a firearm, rifle, or shotgun "pursuant to 18 U.S.C. 922(g)(4)."

169. Mr. Montgomery is not, as a matter of federal law, "disqualified" from firearms ownership, possession, or transfer under the federal disqualifying events found at 18 U.S.C. §922(g)(4) because Mr. Montgomery has not been adjudicated as a mental defective, nor was he involuntarily committed to a mental institution.

170. On or about May 30, 2014, Mr. Montgomery received a telephone call from an officer at the Suffolk County Sheriff's Department, informing him that the Suffolk County Sheriff's Department was going to have to come over and pick up his handguns because they were under repeated pressure from the New York State Police to immediately do so.

171. On or about May 30, 2014, the Suffolk County Sheriff's Department arrived at Mr. Montgomery's then residence and took physical possession of his pistol license and provided him with a "General Receipt."

172. On or about May 30, 2014, the Suffolk County Sheriff's Department arrived at Mr. Montgomery's then residence and took physical possession of his four firearms and provided him with an "Inventory."

173. When on or about May 30, 2014 Mr. Montgomery inquired to the Suffolk County Sheriff's Department into what was happening, the Suffolk County Sheriff's Department informed him that he had been reported for an involuntary psychiatric admission.

174. On June 2, 2014, the Suffolk County Sheriff's Department notified Mr. Montgomery that his pistol license was suspended, based upon the wrongful notification from the NYS Police that he was adjudicated as a mental defective or

had been involuntarily committed to a mental institution, such that he was federally disqualified from possessing a firearm, rifle, or shotgun.

175. Mr. Montgomery on or about June 10, 2014 made a written request to the Eastern Long Island Hospital to correct the misinformation that he had been involuntarily committed and to transmit such correction to the NYS Police and the Suffolk County Sheriff's Department. This letter was copied to the NYS Police and to the Suffolk County Pistol License Bureau at the Suffolk County Sheriff's Office.

176. On or about July 2, 2014, Eastern Long Island Hospital declined to correct the misinformation that Mr. Montgomery had been involuntarily committed.

177. On September 8, 2014, the Suffolk County Sheriff abruptly and without a hearing terminated Mr. Montgomery's pistol permit.

178. On September 11, 2014, Counsel to Mr. Montgomery received a telephone call from an officer at the Suffolk County Sheriff's Department, stating that he heard that the Sheriff was going to have to terminate Mr. Montgomery's license, that it was "out of their hands," and that they "would otherwise have to fight the state." The officer confirmed that there were "zero problems in Don's file."

179. If Mr. Montgomery had not been a pistol permit holder, he would not have known that his personal health information had been transmitted by the Hospital to other of the Defendants.

180.  If Mr. Montgomery had not been a pistol permit holder, even a request for a

complete, hospital certified copy of his medical records would not have revealed

that his personal health information had been transmitted by the Hospital to other

of the Defendants and possibly beyond.

181.  Mr. Montgomery did not provide permission to transmit his personal health

information to third parties outside of the Hospital, other than his medical

insurance carrier.

182.  Mr. Montgomery was not asked to provide permission for the Hospital to transmit

his personal health information to third parties outside of the Hospital, other than

his medical insurance carrier.

183.  Mr. Montgomery's personal health information was transmitted from Eastern Long

Island Hospital to other of the Defendants without his consent, notice, or ability to

seek emergency legal intervention.

184.  Mr. Montgomery's personal health information became part of the data collected,

maintained, and utilized by the Defendants for unauthorized purposes.

185.  To illustrate the seemingly arbitrary and capricious nature of the implementation of

MHL §9.46, consider in comparison to Mr. Montgomery's experience, the

following recent statements published by a single person who asserts himself to be

a gun owner in continuous possession of his firearm(s) as of the date of this
pleading:

a.  "I stayed in Jeff's apartment for nine months, too broken to do anything else.
     Even routine decisions were overwhelming. Thinking about where to live –
     near the girls in Westchester County? in an apartment in the city where I'd be
     close to work? – seemed beyond my emotional reach." (pp. 232-233)

b.  "Many days I didn't have the energy to try to unravel the tangled ball of
     emotions." (p. 233)

c.  "I was obsessive about seeing them." (p. 233)

d.  "But the constant high of political life – the juice; the action; the buzz; even
     more, the direction and goal – was gone." (p. 234)

e.  "Now I needed a total recalibration. Politics was not an option. What do I
     do? I was lost." (p. 234)

f.  "I realized that my frightening experience on the boat was a clear metaphor
     for my life after politics and marriage. I felt now as I had then, lost without
     anything I usually depended on to keep me safe." (p. 234)

g.  "Some have suggested that I see my return to political life as a second
     chance. Not really. I see it as if I had come back from the dead." (p. 267)

186.  The above sub-paragraphs were written by Governor Cuomo in his October 2014
       autobiography, describing his state of mind at the time of his divorce. Governor
       Cuomo is both the principle architect of the SAFE Act and in charge of the
       ultimate oversight and implementation of the MHL §9.46 ISARS system and

associated personal health information. Governor Cuomo's autobiographical statements reflect precisely why MHL §9.46 should be struck down and the ISARS system should be shut down: how, by comparison to Governor Cuomo, has Mr. Montgomery lost his civil liberties and his property?

187. On the "Admission/Procedure Consent" form of Long Island Hospital, signed by Mr. Montgomery on May 23, 2014, it states "Any resdisclosure of medical record information by the recipient(s) is prohibited except in connection with the further care of the patient and used solely for the patient's benefit."

188. Confiscation of Mr. Montgomery's firearms, termination of his pistol permit, and transmission and utilization of his personal health information as detailed herein was not done due to patient safety concerns and does not make New York a safer place.

189. Confiscation of Mr. Montgomery's firearms, termination of his pistol permit, and transmission and utilization of his personal health information places Mr. Montgomery and his family in a position of being unable to adequately defend themselves in the home and elsewhere and impedes his use of his long and distinguished years of training and service from being used in the aid of others in the community.

190. There is no meaningful process in New York through which Mr. Montgomery can seek to restore his rights and privileges under the Second Amendment of the United States Constitution.

191. Mr. Montgomery requested the Eastern Long Island Hospital change its wrongful "involuntary admission" labeling, and it expressly refused to do so.

192. Mr. Montgomery requested the Suffolk County Sheriff's Department Licensing Bureau afford him a hearing to request his suspended pistol permit be restored and it, instead, terminated his pistol permit without a hearing.

193. A pistol permit in New York is issued upon the discretion of the licensing officer who, in this instance, refused even the opportunity for a hearing to Mr. Montgomery.

194. A study of appeals of pistol permit revocation appeals shows a near zero (0%) chance of achieving a reversal of the pistol permit license upon appeal.

195. There is no meaningful process for Mr. Montgomery to attempt to have his wrongful "disability" removed from his record through OMH. The process offered to obtain a "Certificate of Relief Pertaining to Firearm Possession" demands production of "medical records detailing your psychiatric history over the past 20 years" plus "medical records from all of your current treatment providers over the past 5 years" plus "evidence of your reputation" and more, and even if items

"a" through "f" are submitted, it indicates that "we may also request that you undergo a clinical evaluation and risk assessment."

196. The OMH "process" to request relief from a "disability" is a further intrusion into Mr. Montgomery's life at a time when his reputation is now unjustly besmirched through the actions of the Defendants and where there is no clinically justifiable reason for him to submit to a mental health examination by someone of the State's choosing. It would amount to a waiver of privacy at the very time that Mr. Montgomery is a litigant against OMH, among other State actors.

197. Mr. Montgomery cannot even obtain his own records from the State Defendants. Each request under the Freedom of Information Law to the individual State actors was rejected as containing confidential information, or, in the case of the NYS Police, has simply gone unanswered in excess of statutory periods.

198. Mr. Montgomery is ineligible to request reconsideration through NICS because in order to initiate that process, he needs to have been denied the privilege of the purchase of a firearm upon submission of the federal ATF Form 4473 at the point of attempted purchase. Mr. Montgomery has not (nor will he) attempted to purchase a firearm since such time as he was contacted by the Suffolk County Sheriff's Department.

199. Mr. Montgomery's only recourse is to proceed with the instant action.

## THE CIRCUMSTANCES OF PLAINTIFF
## ANDREW CARTER

200. Mr. Carter has held a pistol license in New York since 2000.

201. Mr. Carter is a disabled person, as noted on his permit, and he relies upon his firearms for the defense of his person, his family, his property, and his home.

202. In July 2014, during a period of approximately two weeks, Mr. Carter had the difficult job to do of caring for his beloved family pet, a dog, who was increasingly sick, and had eventually to be put down.

203. During this period, Mr. Carter's sleep cycle was disrupted as he attended to the dog around the clock, including carrying her outside when she needed to go to the bathroom at any hour of the day or night. He consulted with his primary care physician, who prescribed Trazodone to try to help Mr. Carter get some sleep, but it was not initially successful at resolving the problem.

204. On the morning of July 26, 2014, shortly after the dog had been laid to rest, Mr. Carter felt quite ill, was slurring some words, had a racing heart rate, and was hallucinating.

205. Mr. Carter's wife is a licensed medical professional (separate and apart from "M.M.," who is a co-plaintiff in this lawsuit), and Mrs. Carter works in the hospital

medical setting. She called "911" because she suspected her husband was showing signs and symptoms of a stroke or other serious neurological event.

206. In response to the 911 call, local law enforcement and the ambulance and EMS staged their arrival around the corner of Mr. Carter's residence, and approached from a law enforcement threat position, both physically and verbally expressing the priority of securing firearms over any concern for Mr. Carter's medical condition.

207. The first persons to physically approach and ask questions of Mr. Carter were local law enforcement officers, not medical personnel.

208. The immediate approach of local law enforcement officers, upon finding Mr. Carter lying on the sofa, was to require that he physically get himself into an upright position and to self-ambulate into the kitchen to the kitchen table, in a seated position at the kitchen table.

209. Local law enforcement officers made clear to Mr. Carter that they wanted him to get checked out, saying "You're going in for 72-hours if we've got to force you." Mr. Carter asked if his wife could drive him and the officer said no. Mrs. Carter told the officers she was a nurse.

210. At some point in the chaos created by local law enforcement officers, the medical personnel were finally able to gain access to Mr. Carter and begin medical care and treatment.

211.  One or more of the local law enforcement officers repeatedly demanded of

Mrs. Carter to show them where Mr. Carter had his handguns, and when she could

not immediately and accurately respond to their questions, they became aggressive

and agitated, repeating multiple times, "Where are the guns?"

212.  Mr. Carter does not recall any law enforcement officer asking him about his

firearms, asking to see his license, or otherwise asking any questions relating to

safety.

213.  At no time was Mr. Carter a threat to any person.  He did not at any time have a

firearm on display.  He did not threaten to use a firearm.  He did not make any

manner of threat.  Mr. Carter was not in a position to do anything, due to the illness

he was experiencing, which was the purpose of the "911" call placed by

Mrs. Carter.

214.  Mr. Carter went by ambulance from his home to the Erie County Medical Center

and he did so voluntarily, as indicated both through his verbal responses and as to

his cooperative demeanor.  At that point, his focus and concern was on obtaining

medical care and treatment because the entire response by local law enforcement

officers was both confusing and unrelated to the unfolding medical events.

215.  Once at the Erie County Medical Center on July 26, 2014, medical staff conducted

a standard cardiac work-up, including, for example, running an EKG, and

requesting to perform neurological testing, including, for example, a CT scan of the brain.

216. Although Mr. Carter participated in a number of tests for the medical work-up, Mr. Carter declined the CT scan. The hospital classified this decision as "AMA," or, "against medical advice."

217. The "ER Initial Assessment" by a nurse reflects "States he has "been lacking sleep over past 2 weeks, and I thought my dreams were real when I would nod off." States he "would her (*sic*) his wife or daughter and start talking to them then realized they were not in the room." States grieving over the loss of his dog, who had been sick over past 2 weeks and he was caring for her 24/7. MAE.[3] Denies audio/visual hallucinations. Calm and cooperative."

218. The Attending Physician "Notes – AMA" include the discharge note:

> Danger to self or others: No
>
> Psychosis noted: No
>
> Medical Clearance completed: Yes
>
> Admission Criteria Met: No
>
> Safe for AMA discharge: Yes
>
> Patient presents with medically related visual hallucinations, likely related to sleep deprivation vs. medical delirium. Patient recommended to follow up with PCP, as patient has not refilled his trazodone. Patient has no psychiatric hx. Patient's presentation is not related to psychosis related to mental health as likely due to his medical issues and is susceptible to

---

[3] "M.A.E." stands for "major arrhythmic events."

delirium (*sic*). Patient recently visited ER for similar complaint. Discharge patient AMA."

219.  Mr. Carter was released from the Emergency Department after approximately four hours.

220.  Mr. Carter followed-up with his primary care physician on Monday, was again directed to try the Trazodone prescription, which he took, this time going out like a light for 8 hours, and felt fine when he woke up. Within a matter of a few days, Mr. Carter had resumed a normal sleep cycle.

221.  Shortly thereafter, Mr. Carter went to the property officer at the City of Tonawanda Police Department and requested the return of his firearms. He was denied. The Officer said he would be getting something from Erie County that would tell him what to do. The officer said it was "all due to the SAFE Act." At the time, Mr. Carter did not understand what the officer was talking about.

222.  Mr. Carter called the Erie County Licensing Department to inquire, and was told he would be receiving a permit suspension notice in the mail and that he would have to surrender his pistol permit.

223.  Approximately one month later, Mr. Carter received a letter from the County of Erie, Pistol Permit Department (dated August 20, 2014), alerting him that his pistol license had been suspended, that he was required to surrender his license and handguns, and that he would be required to pay a fee to do so.

224. Unbeknownst to Mr. Carter during the course of his four-hour medical care and treatment at Eric County Medical Center, one nurse wrote into his medical records that he was "9.41."[4]

225. Upon information and belief, the hospital labeled Mr. Carter as having been "involuntarily committed" and that incorrect label migrated into the New York State system and database, whether upon a report from a medical professional and/or access by a government official into his medical records.

226. Mr. Carter was not involuntarily committed.

227. Mr. Carter was not even admitted to the hospital.

228. Mr. Carter sought medical treatment at an Emergency Department over the course of approximately four hours.

229. In response to the written notification, Mr. Carter promptly surrendered his pistol license and his handguns and he immediately sought to exercise his right to a hearing.

230. On July 26, 2014, Mr. Carter received a "Property Receipt" from the City of Tonawanda Police for the surrender of his handguns.

---

[4] "9.41" is taken to stand for MHL §9.41, or, involuntarily committed.

231. Mr. Carter also promptly complied with the request to sign release forms for his medical records as part of the process dictated by county licensing officials.

232. Mr. Carter objects to the apparent requirement that he undergo a "mental health evaluation," based upon the facts and circumstances described herein as being medical in nature and that any such examination constitutes an unwarranted invasion of his privacy.

233. In spite of numerous efforts in person, via telephone, and in writing, to more than one county licensing and judicial branch official, Mr. Carter has been unable to secure a hearing date over a period of more than six months of efforts on his part.

234. Responses to his communication efforts have included that there are many more cases ahead of him, that his request for a hearing was not received, and that this is "all because of the SAFE Act."

235. Mr. Carter has been compelled to hire an attorney and expend moneys to try to obtain a hearing and restore his pistol permit and his firearms.

236. Mr. Carter fears that his license will not be restored and that his handguns will be destroyed. Mr. Carter fears for his personal safety, particularly due to his disability, and wishes to continue to exercise his fundamental rights under the Second Amendment.

237. Mr. Carter is concerned that his participation in this lawsuit will have negative repercussions in his efforts to obtain a hearing and a restoration of his rights and return of his property, and does not believe that he should be forced to choose to forego certain of his civil liberties in order to try to protect others of them.

238. Mr. Carter is upset over the loss of his reputation in a wrongful manner and by medical professionals and law enforcement. Mr. Carter has been harmed by the wrongful dissemination of the allegation that he was "involuntarily committed."

## THE CIRCUMSTANCES OF PLAINTIFF
## LOIS REID

239. Ms. Reid has held a pistol license in New York since 2007.

240. Ms. Reid suffers from a medical condition known as "Mitochondrial Myopathy," which causes prominent muscular and neurological problems. Its symptoms can include muscle weakness, exercise intolerance, ataxia, and asthma-like breathing issues. It belongs to the family of diseases associated with Muscular Dystrophy.

241. Since approximately 2010, Ms. Reid has engaged in regular medical treatment for this medical condition with licensed medical providers. Also since then, she has been prescribed a combination of over the counter medications and vitamins, as well as for which she is prescribed a pharmacist-compounded medication. Her

medical history is positive for Chronic Fatigue Syndrome and Fibromyalgia. Her

medication history is positive for Trazodone.

242. In or about November 2013, Ms. Reid received notification from her medical

insurance carrier that it would no longer cover her pharmaceuticals associated with

the Mitochondrial Myopathy. Ms. Reid actively pursued more than one appeal of

this determination, but she was unsuccessful.

243. The pharmacy informed Ms. Reid that the uninsured cost for her medications

would be approximately $1,300 per month.

244. Ms. Reid, unable to afford her medications, started running out of her medication.

245. Within a few days, on or about December 23, 2013, Ms. Reid's sister visited her

and a decision was made by them to go to the Emergency Room at Buffalo General

Hospital.

246. Ms. Reid voluntarily went to the Emergency Department at Buffalo General

Hospital, where it was recommended that she go to the Erie County Medical Center

Emergency Department.

247. Ms. Reid voluntarily went to Erie County Medical Center where she was

encouraged to and did voluntarily commit herself for several days of respite. She

was tired and discouraged, but she was not a threat to herself or others. She

expressly denied any suicidal ideation, when asked this question by medical providers.

248. Ms. Reid completed the "Voluntary Request for Hospitalization (Section 9.13 Mental Hygiene Law)" form of the NYS Office of Mental Health. She was approved for voluntary admission status by a medical professional.

249. Ms. Reid received and signed for a "Notice of Status and Rights/Voluntary Admission (Section 9.13 Mental Hygiene Law)" form of the NYS Office of Mental Health. It was countersigned by a medical professional.

250. Also in the medical records of Ms. Reid is a copy of the NYS Office of Mental Health form "Emergency or C.P.E.P. Emergency Admission (Sections 9.41, 9.45, 9.55 and 9.57 Mental Hygiene Law)." This form has the same label in the upper right corner to indicate Ms. Reid's name. This form is otherwise completely blank.

251. As part of the initial interview at the Erie County Medical Center, Ms. Reid was questioned about her ownership of firearms. When she declined to answer such questions, the male medical staff member stood up, physically positioned himself over her where she was in her seated position, raised his voice, and started yelling at her as being uncooperative.

252. The time at which this interview was being conducted was after midnight, after more than 10 hours of being denied any food and being given minimal water,

having been given a dose of Cipro, and having been refused her requests for the contact and companionship of her sister.

253. There is no indication in Ms. Reid's medical records that any person on staff sought to have Ms. Reid involuntarily committed at any time during her voluntary admission.

254. Just a few days after her discharge, on or about January 24, 2014, Ms. Reid was informed in writing that her pistol license was being suspended.

255. The "Notice of Objection" received by Ms. Reid from Erie County Court used language of "involuntarily hospitalized for mental health reasons" and "involuntary admission" and also includes that "On or about December 24, 2013 the above named LOIS JEAN REID was reportedly involved in an incident implicating MENTAL HEALTH PER SAFE ACT which obligates a mental health professional believing that such incident demonstrates that the person may be 'likely to engage in conduct that will cause serious harm to herself or others' to report such event." The language of this "Notice" implicates both MHL §9.41 and §9.46, without referencing any section of law.

256. Because Ms. Reid's handguns are coregistered with her husband, law enforcement permitted him to retain physical possession of the firearms at the second property owned by the couple.

257. All handguns owned by Ms. Reid are properly registered.

258. Ms. Reid was compelled to hire an attorney to represent her in efforts to get her pistol permit reinstated. She has complied with the request for a written hearing. She has complied with signing releases for the Erie County licensing officer to obtain copies of her medical records.

259. Ms. Reid has been trying for the past year to obtain the independent psychological evaluation described in the suspension letter, but had difficulty finding an appropriately licensed mental health professional, ultimately being informed she had to use a forensic psychologist, through an expensive and cumbersome process.

260. Particularly due to Ms. Reid's medical conditions, the prerequisites for a pistol license hearing have turned into an effective barrier of her ability to exercise whatever rights of due process may be available to regain her Second Amendment rights.

261. Ms. Reid disagrees with the "suggestion" that she – or anyone – undergo a mental health evaluation and believes this to be a further infringement by the State of her civil liberties, however, she is afraid that without submission of such a report, she will lose any chance of success at a hearing or on appeal.

262. Ms. Reid has no criminal history.

263.  Ms. Reid has undergone multiple background checks, including during her initial
      application for a pistol permit.

264.  Ms. Reid is a clinical social worker, and was employed by the NYS Department of
      Social Services, where her responsibilities included regulatory administration of
      child day care centers and homes, in addition to representing the county
      government at various public functions.

265.  Ms. Reid holds degrees as a Bachelor of Science, a Bachelor of Arts, and a
      Masters.

266.  Ms. Reid has also worked for the Erie County Youth Board, including in their
      Juvenile Delinquency Prevention Programs, and for the Salvation Army, doing
      casework for residents of homeless shelters.

267.  Ms. Reid is sufficiently well known in the community that her case was reassigned
      from Erie County to Niagara County, and she fears the impact that this widely
      circulating misinformation will have upon her reputation and good standing in the
      community.

268.  Ms. Reid values her civil liberties, particularly those under the Second
      Amendment.  She considers her skills as a marksman important to her defense of
      her person, her family, her property, and her home.

269. Because of the debilitating nature of her medical condition, Ms. Reid considers her right to self-defense with a firearm of special importance. Ms. Reid is acutely aware that as a woman or smaller stature and as a person with Mitochondrial Myopathy, she would be unlikely to be able to defend herself in a hand-to-hand situation. She is also aware that if her condition progresses, she may become reliant upon a walker or a wheelchair.

270. Ms. Reid is someone who is trained in and works with confidential personal information, including for government entities. Ms. Reid has a heightened sensitivity to the importance and value of privacy in the clinical setting and to the proper limitation of private information through government offices and agencies. Ms. Reid believes that her privacy rights have been both improperly compromised and also intentionally mishandled as part of a concerted effort by the State government to terminate pistol licenses and confiscate firearms.

## THE CIRCUMSTANCES OF PLAINTIFF
## KARL BECHLER

271. Mr. Bechler holds an undergraduate degree and has taken graduate degree courses. He has done work related to security for a federal disaster relief agency. He has held a pistol permit since 1976, and in more than one state. He is a certified NRA firearms instructor. He has collected firearms for more than forty years.

272. Mr. Bechler has no criminal history. He has never been involuntarily committed or adjudicated a mental defective.

273. On or about September 6, 2013, Mr. Bechler's wife called "911." They had been married for quite some time and she had recently asked him for a divorce. Mr. Bechler was depressed, but not suicidal or otherwise threatening harm to himself or anyone else.

274. The divorce case subsequently proceeded through an amicable process, resulting in a Separation Agreement being negotiated and stipulated to without trial. The firearms confiscated by a County Sheriff's Office and turned over to the NYS Police belonged to both Mr. Bechler and his wife, and those firearms and associated accessories were amiably distributed, as well, as part of equitable distribution.

275. On the day of the "911" call, Mr. Bechler was not feeling well. He had been getting sick over the course of a week or longer, due to problems with his diabetes and kidney medications. Mr. Bechler also had a recent history of difficulty sleeping, and had been prescribed Ambien by his primary care physician.

276. He voluntarily went by ambulance to Clifton Springs Hospital, where he spent approximately four days as a voluntary admission. The medical team involved Mr. Bechler in their discussions of the medical care and treatment being given to

him, particularly because he is diabetic and at the time of his admission his weight and blood sugar levels were causing signs and symptoms that appeared to be mental health related.

277. The purposes served by Mr. Bechler's hospitalization were to correct his blood sugar imbalance, to adjust various diabetes prescription medications, and to adjust a depression medication that had recently been prescribed by his primary care physician.

278. Throughout the ordeal beginning with the "911" call through the point of his hospital discharge, numerous of Mr. Bechler's civil liberties were violated.

279. On September 6, 2013, when local law enforcement arrived at Mr. Bechler's house, they approached in a menacing manner, armed with long guns, in spite of Mr. Bechler being seated on the front porch of his home with his hands raised in the air in a "don't shoot" position of submission.

280. Local law enforcement officers handcuffed Mr. Bechler and put him in the back of a police vehicle, where he was left, largely alone and unsupervised, for a period of approximately three hours before being transported to a medical facility.

281. During that period, law enforcement officers focused their attention on the confiscation of Mr. and Mrs. Bechler's extensive and valuable firearms collection.

Law enforcement officers also removed accessories such as unmounted scopes, additional magazines, and ammunition.

282. At the Emergency Department of Clifton Springs Hospital, Mr. Bechler requested an attorney. No attorney was provided. Hospital staff told Mr. Bechler he would have to personally hire an attorney, if he wanted to speak to one. He was denied the use of a telephone.

283. During the period Mr. Bechler was in law enforcement custody and during the initial Emergency Department and admission period, Mr. Bechler was denied his medications for his medical conditions.

284. At the request of the NYS Police, in conjunction with the Ontario County Sheriff's Department, the Ontario County licensing officer suspended Mr. Bechler's pistol license.

285. Shortly thereafter, Mr. Bechler received a notice from the Utah Department of Public Safety (dated August 21, 2014), revoking his permit because a NICS check upon his license renewal had shown him as a "mental defective" or "involuntarily committed," neither of which is accurate. Because Mr. Bechler has not sought to purchase another firearm since such time as the "911" call, he has not been denied on the NICS background check at the FFL point of purchase and does not have a NICS transaction number through which to initiate a NICS appeals process with

the FBI. The only reason he knows that this incorrect report was uploaded into the NICS Index is because of the Utah permit revocation letter.

286. Mr. Bechler subsequently hired an attorney to prepare a submission and represent him in a hearing before the county licensing officer, specifically an Ontario County Court Judge, to demonstrate that he had not been involuntarily committed or otherwise adjudicated a "mental defective." As part of this process, Mr. Bechler submitted his medical records from the hospital admission, along with other, relevant documentation. He was compelled to expend thousands of dollars in attorney's fees and costs, as well as lost time from work, in order to present his case to the County Court Judge.

287. Mr. Bechler did prevail in his pistol permit revocation case and the County Court Judge restored his pistol license, including that the Judge signed a written order to this effect on December 3, 2014.

288. During this process, the County Court Judge gave Mr. Bechler's attorney a copy of the NYS Police letter identifying that an MHL §9.46 report was made against him (dated September 17, 2013). This letter was not sent to Mr. Bechler and had the Court not provided this copy, Mr. Bechler would not have known such a report was made against him. The report was not made by the attending physician at the hospital.

289. When Mr. Bechler's attorney contacted the NYS Police to arrange for the pick-up of Mr. Bechler's firearms from inventory, the officer challenged the validity of the County Court Judge's written decision and said the NYS Police would have to directly contact the Judge.

290. Mr. Bechler was recently given approval from the NYS Police to pick up his firearms. He promptly presented himself, but not all of his firearms were returned. In addition, a quantity of magazines and ammunition were not returned.

291. Mr. Bechler has been engaged in the legal system for more than fifteen months. His New York pistol license was restored, but only after the expenditure of thousands of dollars. His Utah permit has not been restored and the incorrect data in the NICS Index has not been corrected, nor is there a route that will allow him to pursue that correction.

292. Mr. Bechler is concerned that his participation in this lawsuit will result in reprisal action against him. He fears that in coming forward that he will not receive his remaining firearms and that he will be targeted for further action to permanently revoke his Second Amendment rights. The extent of the action already taken against him that was done without a warrant at a time when he was in need of medical treatment, particularly for his diabetes, also causes Mr. Bechler to fear the future use of the "911" system and the Emergency Room admission process for medical conditions.

## THE CIRCUMSTANCES OF PLAINTIFF
## "M.M."

293. "M.M." is a licensed medical professional, who works in a hospital setting within the judicial district. M.M. has been a licensed medical professional for more than twenty years.

294. M.M. resides within the judicial district.

295. M.M. is an adult person, over the age of 18 years.

296. All events described concerning M.M. occurred within the judicial district.

297. Recently, the high school aged child of M.M. died unexpectedly as the result of an acute medical event for an undetected medical condition.

298. M.M.'s child had been full of life, enjoying history, writing to elected officials, looking forward to becoming a registered voter, and dreaming about the future.

299. At the time, M.M. was generally aware of the "SAFE Act," and at a subsequent point attended a lecture by law enforcement officials and Veterans that highlighted problems with the mental health reporting provisions.

300. M.M. is a lawful owner of firearms, other than handguns, and does not hold a pistol permit.

301.   M.M. relies upon these firearms for defense of home, person, family, and property.

302.   M.M. feared that going to counseling could result in the confiscation of M.M.'s firearms.  It also raised questions for M.M. whether the State collection of mental health information could impact M.M.'s license to practice medicine.

303.   Going into the holidays, M.M. knew extra emotional support was needed, and M.M. selected a counselor in private practice.

304.   At the first counseling session, M.M. was asked to fill in a questionnaire that included the question, "Do you have firearms in your home," or other, similar words to that effect.  M.M. left this question blank.

305.   At a subsequent counseling session, M.M. asked the counselor whether if the State asked for M.M.'s name, the counselor would provide it, and the counsel responded with words to the effect that if the State asked for that information it would be provided.

306.   M.M. discontinued treatment with the counselor out of a fear of being reported.

307.   M.M., as a medical professional, recognizes and respects mental health as a separate discipline, which is needed for a variety of reasons.

308. M.M. has witnessed the closing of mental health units within the western New York region during her career, and is aware of the unmet need suffered by patients in the medical setting who could benefit from the additional support services.

309. M.M. is familiar with HIPAA, and M.M. makes a daily contribution towards patient confidentiality. M.M.'s contribution to patient confidentiality is not limited to the four walls of the medial setting; it extends into the community where M.M. lives and works. M.M. often sees individuals who are patients during the course of a typical day's errands and activities.

310. M.M. has viewed the medical provider to patient relationship like that of going to a priest, that being one that is confidential unless the patient is going to commit a crime or is a serious and immediate threat of harm to self or others.

311. M.M. believes counseling could be beneficial under the current circumstances, but is too afraid of the risk to M.M.'s civil liberties to resume counseling.

312. M.M. fears that in coming forward to join this lawsuit, there is a significantly increased risk of being targeted, both as to civil liberties and as to medical licensure.

313. M.M. also fears discrimination, both personally and professionally, if M.M.'s name becomes part of a lawsuit with a public record. M.M. is highly conscious of the treatment by society and even by the medical profession of those labeled as or

perceived to have a mental health condition of any kind and that little to no differentiation is made from one end of the mental health spectrum to the other.

314. M.M. asks that all aspects of this lawsuit with regard to M.M. be conducted under seal.

## AS AND FOR A FIRST CAUSE OF ACTION:
### Violation of the Right to Privacy

315. Paragraphs "1" through "314" are repeated and realleged as if set forth again, herein.

316. The individual right of privacy is recognized to be a penumbra, reflecting that the people should be free from government intrusion, emanating from the individual liberties enshrined in the United States Constitution, particularly through the Bill of Rights at the First through Tenth Amendments and including the Fourteenth Amendment, and as reflected in such decisions of the United States Supreme Court as *Griswold vs. Connecticut,* 381 U.S. 479 (1965).

317. The reporting provisions of NY Mental Hygiene Law §9.46 violate the right to privacy of the people, including the Plaintiffs, who have the right to be secure in and to enjoy the privacy of their personal health information and their doctor-patient relationship, including, but not limited to, all "individually identifiable health information" as that term is understood under 45 CFR §160.103 to mean such information as identifies the individual or can be used to identify the individual and relates to past, present, or future physical or mental health or the condition or care of the individual.

318. NY Mental Hygiene Law §9.46, both on its face and through its implementation, unjustly infringes the civil liberties of the Plaintiffs and every other individual person reported by a medical professional to the State through ISARS, particularly considering that more than 99% of the tens of thousands of persons reported did not even have a pistol permit at such time as their personal health information was transmitted.

319. NY Mental Hygiene Law §9.46, both on its face and through its implementation, unjustly infringes the civil liberties of the Plaintiffs and all other persons similarly situated, particularly considering that the Plaintiffs were negative as a threat assessments and not representing any likelihood of imminent threat of harm to their self or to others.

320. The Defendants' repeated and far-flung transmissions amongst themselves and to other third parties of the personal health information of the Plaintiffs and others similarly situated constitute an egregious violation of the civil liberties of the Plaintiffs and every other individual whose personal medical information was collected by the State through ISARS or other, similar reporting system or database.

321. The Defendants' treatment of the Plaintiffs personal health information has resulted in emotional distress, loss of reputation, and other monetary damages. What the Defendants have built throughout their lives and careers has been significantly and irreparably impugned through the intentional actions of the Defendants.

322. The Defendants' treatment of the Plaintiffs' personal health information demonstrates a reckless indifference to their civil liberties and, in deed, to the civil rights of those similarly situated, warranting the award of treble damages.

## AS AND FOR A SECOND CAUSE OF ACTION:
### Violation of the Equal Protection Clause

323. Paragraphs "1" through "322" are repeated and realleged as if set forth again, herein.

324. The Plaintiff and all persons similarly situated are entitled to the equal protection of the laws pursuant to the United States Constitution at the Fourteenth Amendment.

325. NY Mental Hygiene Law §9.46 is a discriminatory denial of equal protection of the laws for persons coming into contact with medical providers for mental health purposes.

326. The Defendants used and continue to use NY Mental Hygiene Law §9.46 and its implementation through programs and systems such as ISARS to target a specific and vulnerable patient population, profiling and discriminating against such class of individuals coming into contact with the mental health setting, whether or not any individual persons presents a credible, immediate threat to the self or to another.

327. The grotesque overreach of NY Mental Hygiene Law §9.46 and its implementation through programs and systems such as ISARS to target a specific and vulnerable group of individuals coming into contact with the mental health setting does nothing more than exacerbate the stigma already associated with persons facing mental health challenges and issues.

328. NY Mental Hygiene Law §9.46 segregates and singles out persons coming into contact with the mental health setting for treatment different than the general patient population.

329. Within the class of those coming into contact with the mental health setting, NY Mental Hygiene Law §9.46 and its implementation through programs and systems such as ISARS unjustly and disproportionately results in deprivation of individual liberties of Veterans and law enforcement officers.

330. Within the class of those coming into contact with the mental health setting, NY Mental Hygiene Law §9.46 and its implementation through programs and systems such as ISARS unjustly and disproportionately results in deprivation of individual liberties of pistol permit holders and applicants.

331. The Defendants' treatment of the Plaintiff as a person involuntarily committed to a mental institution and as part of a class of persons likely to commit violent crime with a firearm has resulted in his emotional distress, his loss of reputation, and other monetary damages.

332. The Defendants' treatment of the Plaintiff as a person involuntarily committed to a mental institution and as part of a class of persons likely to commit violent crime with a firearm demonstrates a reckless indifference to his civil liberties and, in deed, to the civil rights of those similarly situated, warranting the award of treble damages.

## AS AND FOR A THIRD CAUSE OF ACTION:
### Violation of the Due Process Clauses

333. Paragraphs "1" through "332" are repeated and realleged as if set forth again, herein.

334. The Plaintiff and all persons similarly situated are entitled to both procedural and substantive due process, under the United States Constitution at the Fourth, Fifth, and Fourteenth Amendments.

335. The right to bear arms under the United States Constitution at the Second Amendment has been declared to be a fundamental right.

336. The taking of the Second Amendment rights of the Plaintiff and all persons similarly situated violates his/their due process rights.

337. The taking of the firearms of the Plaintiff and all persons similarly situated from their personal ownership, dominion, and use violates his/their fundamental rights under the United States Constitution at the Second Amendment as well as his/their rights to be secure in their persons and property under the United States Constitution at the Fourth Amendment and the Fourteenth Amendment.

338. The process through which the Plaintiff and other persons similarly situated have been reported and disqualified from firearms ownership, possession, transfer, and use is arbitrary and capricious.

339. The standard under which the Plaintiff and other persons similarly situated have been reported is vague and ambiguous.

340. The lack of a meaningful process and forum through which the Plaintiff and all persons similarly situated could request a redress of their grievances for the restoration of his/their pistol permits, for the restoration of his/their rights to buy, sell, transfer, and possess firearms, and for the restoration of his/their firearms violates his/their due process rights.

341. The Defendants' lack of notification of the Plaintiff and others similarly situated of the transmission of personal health information constitute an egregious violation of the civil liberties of the Plaintiff and every other individual person whose personal medical information was collected by the State under the guise of MHL §9.46.

342. The Plaintiff's ability or lack thereof to obtain a redress from the Defendants of their misuse and mischaracterization of the Plaintiff's personal health information has resulted in his emotional distress, his loss of reputation, and other monetary damages.

343. The Plaintiff's ability or lack thereof to obtain a redress from the Defendants of their misuse and mischaracterization of the Plaintiff's personal health information demonstrates a reckless indifference by the Defendants to his civil liberties and, in deed, to the civil rights of those similarly situated, warranting the award of treble damages.

## AS AND FOR A FOURTH CAUSE OF ACTION:
### The Right to Keep and Bear Arms

344. Paragraphs "1" through "343" are repeated and realleged as if set forth again, herein.

345. MHL §9.46 as enacted and implemented by the Defendants violates the Second Amendment rights of the Plaintiff and others similarly situated.

346. As a direct result of the report filed against him by Eastern Long Island Hospital and through the subsequent actions undertaken by the Defendants, the Plaintiff wrongfully lost his pistol permit, his firearms, and his rights to own, possess, and transfer firearms.

347. The rights afforded to an individual, including the Plaintiff, under the Second Amendment to the United States Constitution is fundamental, and should be accorded both the highest protection and the highest compensation because monetary compensation for such civil liberties is, by definition, inadequate.

348. The Defendants' termination of the Plaintiff's civil liberties under the Second Amendment of the United States Constitution, including his use of firearms both for the defense of his home and family, as well as his personal enjoyment of firearms use in the shooting sports, is a basis for an award of monetary damages.

349. The Defendants' termination of the Plaintiff's civil liberties under the Second Amendment of the United States Constitution demonstrates a reckless indifference to, if not an actual malicious intention to subvert, such individual liberties and, indeed, to the civil rights of those similarly situated, warranting an award of treble damages.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiffs respectfully request on behalf of themselves and on behalf of all others similarly situated that the Court grant the following relief:

I.  A declaratory judgment striking down and rendering void *ab initio* New York Mental Hygiene Law §9.46 as representing an unconstitutional violation of the Second, Fourth, Fifth, and Fourteenth Amendments of the United States Constitution, and as otherwise enumerated herein;

II. A preliminary and then a permanent injunction enjoining the Defendants, their officers, agents, and employees from administration, operation, and implementation of New York Mental Hygiene Law §9.46 through ISARS and through any other format or program or successor thereto;

III.  An order that the Defendants shall immediately transmit to the Court a complete copy of the data collected under MHL §9.46 through the ISARS reporting system and through any other similar format or program;

IV.  An order that the Defendants be required to immediately transmit written notification to every reported person concerning whom it received personal health information collected through the MHL §9.46 ISARS reporting system or through any other similar format or program, and also providing public notification and information through a website to be established by the State of New York, Office of the Governor, and through which persons may inquire whether their personal health information was collected through the MHL §9.46 ISARS reporting system, or otherwise;

V.  An order directing that the Defendants be required to certify the purge of all electronic and any paper records of patients' personal health information collected through the reporting system under NY Mental Hygiene Law §9.46;

VI.  An award of monetary damages, including punitive damages, to the Plaintiffs pursuant to 42 U.S.C. §1983;

VII.  An award of attorney's fees and costs to the Counsel for the Plaintiffs pursuant to 28 U.S.C. §2412 and/or 42 U.S.C. §1988; and,

VIII. An award such other, further, and different relief as to the Court is just.

Dated:  February 2, 2015
      Webster, New York

By:  *Paloma A. Capanna*
      Paloma A. Capanna, Attorney
      633 Lake Road
      Webster, New York 14580
      (585) 377-7260
      paloma@law-policy.com