

THE UNIVERSITY OF

ALABAMA

SCHOOL OF LAW

# Do the Mentally Ill Have a Right to Bear Arms?

Fredrick E. Vars & Amanda E. Adcock

*Forthcoming, Volume 48, Issue 1, Wake Forest Law Review*

This paper can be downloaded without charge from the Social Science Research Network Electronic Paper Collection: http://ssrn.com/abstract=2146767

## Do the Mentally Ill Have a Right to Bear Arms?

Fredrick E. Vars[†] & Amanda E. Adcock[††]

Abstract:
In the same opinion in which it recognized an individual right to keep and bear arms, the Supreme Court suggested that the mentally ill are excluded. This article rejects that suggestion and considers three possible levels of constitutional scrutiny. At the lowest level of scrutiny, all current laws restricting gun possession by the mentally ill are likely constitutional; at the highest level, none. The action is in the middle. Such laws are generally grounded on a perception that the mentally ill are dangerous to others. Most are not, but virtually all are at significantly higher risk of suicide. In the end, suicide, not violence, prevention is the rationale most likely to provide adequate constitutional footing for present policies.

Introduction……………………………………………………..2
I. DELINEATING THE RIGHT TO BEAR ARMS………………………5
    A. What *Heller* Says…………………………………………5
    B. What *Heller* Does Not Mean………………………………6
    C. What *Heller* Might Mean…………………………………7
        1. Reasonableness………...……………………………8
        2. Intermediate Scrutiny…………………………………..9
        3. Hybrid……………………………………………...10
II. ARE CURRENT RESTRICTIONS CONSTITUTIONAL?.....................11
    A. Federal and State Bans on Gun Possession by the Mentally Ill……………………………………………………11
    B. Fit with the Government Interest in Safety………………13
        1. Accidents…………………………………………...13
        2. Violence……………………………………………14
          a. Literature………………………………………14
          b. Applying the Standards…………………………...16
        3. Suicide……………………………………………...19
Conclusion…………………………………………………….22

[†]Associate Professor, University of Alabama School of Law. J.D., Yale; A.B., Princeton.
[††]Assistant District Attorney, Calhoun County District Attorney's Office. J.D., Alabama; A.B., Jacksonville State. Thanks to Adam Cox, Caroline Harada, Paul Horwitz, Ron Krotoszynski, Grace Lee, Roger Perlstadt, Charles Slowikowski, and Andrew Townsley for comments on earlier drafts.

Electronic copy available at: http://ssrn.com/abstract=2146767

INTRODUCTION

At the midnight premier of the latest Batman movie on Friday, July 20, 2012 in Aurora, Colorado, James Holmes "tossed two hissing gas canisters and calmly walked up the aisle firing at movie-goers, killing 12 and wounding 58."[1]  Some called almost immediately for reinstatement of the ban on assault weapons and high-capacity magazines.[2]  President Obama hinted in that direction, but called instead for better enforcement of existing gun laws and keeping guns out of the hands of the mentally ill.[3]  Although all of Holmes's guns were obtained legally,[4] he was apparently seeing a psychiatrist before the shooting.[5]

The politics of gun control are complicated.  The Brady Campaign to Prevent Gun Violence and the National Rifle Association ("NRA") are generally on opposite sides of gun policy debates.[6]  After the Virginia Tech massacre, however, the NRA actually worked *with* the Brady Campaign on a bill encouraging states to submit records of the dangerously mentally ill for background checks.[7]

This temporary alignment of strange bedfellows and Obama's response to the movie massacre are undoubtedly derived from the strong public perception that the mentally ill are dangerous to others.[8]  High profile killings certainly fuel that perception: in addition to Virginia Tech and Aurora, consider Jared Loughner and John Hinckley, both of whom attempted to assassinate prominent

---

[1] Karen E. Crummy & Jordan Steffen, *A Calculated Plan: Apartment Rigged with Deadly Traps*, DENV. POST 1A (7/22/12); Opinion, *Restrict Access to Mass Killing Tools*, DENV. POST 21A (7/24/12).

[2] Opinion, *Restrict Access to Mass Killing Tools*, DENV. POST 21A (7/24/12).

[3] Amy Gardner & Philip Rucker, *President Promises More Action on Guns*, WASH. POST A04 (7/26/12).

[4] Opinion, *Restrict Access to Mass Killing Tools*, DENV. POST 21A (7/24/12).

[5] Karen E. Crummy & Jeremy P. Meyer, *Suspect Saw Psychiatrist*, DENV. POST 1A (7/28/12).

[6] *Brady Campaign Statement on the NRA's Defense of Dangerous "Shoot First" Laws*, May 2, 2012, at http://www.bradycampaign.org/media/press/view/1495/ (visited 6/18/12).

[7] Editorial, *One Gun Bill Too Many*, L.A. TIMES (12/4/09).  What happened to the fragile truce?  "After the bill became law in 2008, the N.R.A. began lobbying state lawmakers to keep requirements for petitioners [seeking a restoration of gun rights after disqualification for mental illness] to a minimum."  Michael Luo, *Some With Histories of Mental Illness Petition to Get Their Gun Rights Back*, N.Y. TIMES A1 (7/3/11).

[8] Bruce G. Link et al., *Public Conceptions of Mental Illness: Labels, Causes, Dangerousness, and Social Distance*, 89 AM. J. PUBLIC HEALTH 1328, 1332 (1999).

Electronic copy available at: http://ssrn.com/abstract=2146767

politicians. Fear was also the motivation for the current federal law prohibiting firearm possession by some mentally ill individuals.[9] And it would be hard to conclude that the perception of danger did not contribute to the United States Supreme Court's recent dictum to the effect that such laws do not violate the Second Amendment.[10]

In fact, the vast majority of mentally ill individuals will not be violent toward others and large subsets do not even pose an increased risk. The risk of suicide, on the other hand, is substantially elevated for nearly every diagnosis. Mental illness likely played a role in the gun suicides of Junior Seau, Kurt Cobain, Ernest Hemingway, and Vincent van Gogh. Current restrictions on gun ownership by the mentally ill would rest on much stronger constitutional footing if based on preventing suicide rather than violence toward others.[11] Of course, this assumes that the mentally ill have some right, however limited, to bear arms.

The Supreme Court's dictum is the starting point for answering the title question: Does the Second Amendment protect the mentally ill?[12] Section I considers several possible interpretations of the dictum. One reading is that the mentally ill simply fall outside the scope of the Second Amendment and have no right to bear arms. All but one Court of Appeals has strongly suggested that they would take this approach.[13] This reading is unsatisfactory, as explained below. The Seventh Circuit would apparently apply intermediate scrutiny.[14] State courts interpreting their own constitutions have adopted a less exacting standard:

---

[9] Clare Priest, Note, *When a Stopgap Measure Triggers a Permanent Proscription: The Interpretation of "Committed to a Mental Institution" in the Gun Control Act of 1968*, 80 WASH. U. L.Q. 359, 369 (2002).

[10] *See infra* notes 18-24 and accompanying text.

[11] Professor David Williams has suggested that suicide prevention is a stronger rationale for gun regulation than violence prevention. David C. Williams, *Death to Tyrants:* District of Columbia v. Heller *and the Uses of Guns*, 69 OHIO ST. L.J. 641, 657 (2008).

[12] Note that the question is descriptive, not normative. This article does not answer the question of how the constitution *should* be interpreted, or the question of whether restrictions on firearm possession by the mentally ill are good policy. On the latter, see, e.g., Lawrence O. Gostin & Katherine L. Record, *Dangerous People or Dangerous Weapons: Access to Firearms for Persons with Mental Illness*, 305 JAMA 2108 (2011); Paul S. Appelbaum & Jeffrey Swanson, *Gun Laws and Mental Illness: How Sensible Are the Current Restrictions*, 61 PSYCHIATRIC SERVS. 652 (2010).

For purposes of this article, individuals with substance abuse disorder and no other comorbid mental illness are not considered "mentally ill."

[13] *See infra* note 31-34 and accompanying text.

[14] *See infra* note 52-55 and accompanying text.

reasonableness.[15]    Finally, some commentators and courts have advocated hybrid or other unorthodox approaches.[16]

Rather than arguing for the adoption of one approach or another, the balance of this article examines whether existing gun laws restricting the right of the mentally ill to possess firearms are constitutional under the three viable approaches: (1) reasonableness; (2) intermediate scrutiny; and (3) hybrid or other.

The first goal of this article is to assess what is at stake when selecting a level of scrutiny.    The second and perhaps more important goal is to illuminate a hidden and flawed assumption of current gun policy.    Even if we have the right laws, it may be for the wrong reasons.    Section II.A begins by outlining current laws restricting gun possession by the mentally ill.    There is a continuum from the federal law disallowing possession primarily by those who have been involuntarily committed to a few states' laws banning possession by anyone merely diagnosed as mentally ill.

All three standards require consideration of the government interest justifying regulation (Section II.B).    Preventing gun accidents, violence, and suicides are the relevant interests.    There is little question that these interests are sufficiently important--- rather, the issue is whether the fit between the interests and current gun laws is sufficiently tight to pass constitutional muster.    There is a substantial amount of evidence regarding the relationship between mental illness and violence and suicide.    Under the reasonableness approach, all current gun laws are very likely constitutional.    Under intermediate scrutiny, only targeted restrictions are justified by the goal of preventing harm to others. On the other hand, preventing suicide is likely a sufficient constitutional justification for sweeping prohibitions.    The most exacting, third approach considered here would invalidate all such laws.    Almost everything turns on the level of scrutiny.

This examination of laws prohibiting gun possession by the mentally ill reveals hidden tensions beneath a "consensus" issue. Such laws pit civil liberties against civil rights---more specifically, the right to bear arms against the rights of the mentally ill not to be discriminated against.    A second tension is fear versus reality. Contrary to popular misconceptions, the mentally ill are far more dangerous to themselves than to others.[17]  If the government wants to robustly regulate their gun rights, it may have to embrace paternalism.

---

[15] *See infra* notes 43-48 and accompanying text.
[16] *See infra* notes 56-63 and accompanying text.
[17] *See infra* notes 79-94 and accompanying text.

# I. Delineating the Right to Bear Arms

## A. What *Heller* Says

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The path-marking case is the United States Supreme Court's 2008 decision in *District of Columbia v. Heller*.[18] After an extensive analysis of the history of the Second Amendment, the Court struck down a total ban on handgun possession in the home, as well as a requirement to maintain other firearms either disassembled or bound by a trigger lock.[19]

History was at the heart of the *Heller* opinion. In its historical exegesis, the Court stated and implied multiple times that *all* Americans have a right to bear arms:

> What is more, in all six other provisions of the Constitution that mention "the people," the term unambiguously refers to all members of the political community, not an unspecified subset.[20]

> We start therefore with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans.[21]

> "Keep arms" was simply a common way of referring to possessing arms, for militiamen *and everyone else*.[22]

From this language it would seem clear that the mentally ill, like all other Americans, have a right to bear arms.

But the Court in dicta suggested otherwise: "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill."[23] A

---

[18] 554 U.S. 570 (2008).

[19] *Id.* at 628-30.

[20] *Id.* at 580.

[21] *Id.* at 581.

[22] *Id.* at 583 (emphasis in original). *See also id.* at 583 n.7 ("The right of every individual to keep arms for his defence . . . .") (quoting W. Duer, Outlines of the Constitutional Jurisprudence of the United States 31–32 (1833)); *id.* at 585 n.8 ("Every citizen has a right to bear arms . . . .") (quoting Ala. Const., Art. I, § 23 (1819); Conn. Const., Art. I, § 17 (1818); Miss. Const., Art. I, § 23 (1817)).

[23] *Heller*, 554 U.S. at 626.

footnote described these prohibitions as examples of "presumptively lawful regulatory measures."[24]

How should one reconcile these cross-currents in *Heller*?[25]

## B.  What *Heller* Does Not Mean

Start with the most expansive view of gun rights for the mentally ill.  First, one could simply ignore the dictum and conclude that the mentally ill have precisely the same Second Amendment rights as other Americans.  Dicta are dicta and not controlling.[26]  But lower federal courts fear reversal and take the Supreme Court's "considered dicta" quite seriously.[27]  One commentator has gone so far as to describe these as "dicta of the strongest sort."[28]  Ignoring them does not seem a viable option.

A second approach would focus on the "presumptively lawful" language.  A minimalist reading of this phrase is that restrictions on the gun rights of the mentally ill will be presumed constitutional in the same way practically all other legislation is.[29]  Nothing in the *Heller* opinion casts doubt on such restrictions because they were not at issue and the presumption of constitutionality survives.  This argument is too clever by half.  Recognizing an individual right to bear arms obviously casts doubt on, even if it does not automatically invalidate, restrictions on gun ownership.  So when

---

[24] *Id.* at 627 n.26.

[25] The Court had a chance to answer this question in *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3047 (2010) (plurality op.), but choose instead merely to apply *Heller* against the states and to reiterate the enigmatic dicta.

[26] Cohens v. Virginia, 19 U.S. 264, 399 (1821) (Marshall, C.J.) ("It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.").

[27] United States v. Southern Union Co., 630 F.3d 17, 34 (1st Cir. 2010) ("We are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly when ... a dictum is of recent vintage and not enfeebled by any subsequent statement.") (internal quotation marks and citation omitted).

[28] Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 HASTINGS L.J. 1371, 1372 (2009).

[29] United States v. Morrison, 529 U.S. 598, 607 (2000) (applying "presumption of constitutionality" to act of Congress); Kennedy v. Louisiana, 554 U.S. 407, 465 (2008) (Alito, J., dissenting) ("Laws enacted by the state legislatures are presumptively constitutional . . . ."); *but cf.* Kramer v. Union Free School Dist. No. 15, 395 U.S. 621, 627-28 (1969) ("Accordingly, when we are reviewing statutes which deny some residents the right to vote, the general presumption of constitutionality afforded state statutes and the traditional approval given state classifications if the Court can conceive of a 'rational basis' for the distinctions made are not applicable.")

the Court says its opinion casts no doubt, it is sending a signal regarding the merits of mental illness gun restrictions.[30]

Skipping for a moment over more complicated middle ground, the third approach would be simply to rely upon the dictum to uphold existing restrictions on gun possession by the mentally ill.[31] All three lower courts to address the question squarely have, without analysis, done precisely this.[32] All but one Court of Appeals has similarly followed the *Heller* dicta in upholding felon-in-possession laws.[33] One problem with this approach is that the ban on gun possession by the mentally ill is not "longstanding," at least not in the constitutionally relevant sense of pre-dating adoption of the Second or Fourteenth Amendments.[34] A second defect is that this reading of *Heller* arguably drops the word "presumptively" from the phrase "presumptively lawful." Finally, this approach would seem to jettison *Heller*'s soaring rhetoric about the rights of *all* citizens. This last objection is the weakest because the above-quoted passages from *Heller* appeared in the course of rejecting the argument that the right to bear arms was limited to militia members, not that it applied equally across all other divides. The other two objections, however, should be decisive. The mentally ill have a right to bear arms.

## C. What *Heller* Might Mean

---

[30] Essentially the same could be said of another possible limiting construction: the Court was strongly suggesting that such restrictions are facially valid, but subject to as-applied challenge. The as-applied challenges are strengthened, indeed created, by the recognition of an individual right to bear arms.

[31] Jason Racine, Note, *What the* Hell[er]? *The Fine Print Standard of Review Under* Heller, 29 N. Ill. U. L. Rev. 605, 621 (2009) ("The more plausible inference would be that the Court intended to assert that felons and the mentally ill are not protected under the Second Amendment.").

[32] United States v. McRobie, No. 08-4632, 2009 WL 82715, at *1 (4th Cir. Jan. 14, 2009) (per curiam slip. op.); United States v. Murphy, 681 F. Supp. 2d 95 (D. Maine 2010); United States v. Roy, 742 F. Supp. 2d 150 (D. Maine 2010).

[33] United States v. Torres-Rosario, 658 F.3d 110, 112-13 (1st Cir. 2011); United States v. Stuckey, 317 Fed. Appx. 48, 50 (2d Cir. 2009); United States v. Barton, 633 F.3d 168, 171-72 (3d Cir. 2010); United States v. Moore, 666 F.3d 313, 316-19 (4th Cir. 2012); United States v. Scroggins, 599 F.3d 433, 451 (5th Cir. 2010); United States v. Carey, 602 F.3d 738, 741 (6th Cir. 2010); United States v. Joos, 638 F.3d 581, 586 (8th Cir. 2011); United States v. Vongxay, 594 F.3d 1111, 1114-15 (9th Cir. 2010); United States v. McCane, 573 F.3d 1037, 1047 (10th Cir. 2009); United States v. Rozier, 598 F.3d 768, 770-71 (11th Cir. 2010) (per curiam).

[34] Larson, *supra* note 28, at 1376 ("One searches in vain through eighteenth-century records to find any laws specifically excluding the mentally ill from firearms ownership. Such laws seem to have originated in the twentieth century.").

A more attractive, fourth alternative would be to adopt a brand of scrutiny that would likely validate mental illness restrictions. This would arguably give meaning to both words in the phrase "presumptively lawful."[35]   The *Heller* majority did not adopt a specific level of scrutiny for evaluating gun restrictions, but expressly rejected the rational-basis test.[36]   Justice Breyer in dissent argued that the majority implicitly rejected strict scrutiny as well by listing as presumptively valid restrictions that would likely fail that high hurdle.[37]   Notably, Justice Breyer omitted mental illness restrictions from his list, suggesting that some of these could survive strict scrutiny.[38]   But because the felon exception, paired with mental illness by *Heller*, is almost certainly not narrowly tailored to a compelling state interest,[39] strict scrutiny cannot be the relevant test.[40]   That leaves several other options. Professor Carlton Larson narrows the candidates to three: (1) reasonableness;[41] (2) intermediate scrutiny; and (3) some hybrid.[42]

*1. Reasonableness*

---

[35] United States v. Chester , 628 F.3d 673, 679 (4th Cir. 2010).

[36] *Heller*, 554 U.S. at 628 n.27.

[37] *Id.* at 688 (Breyer, J., dissenting); *see also id.* (explaining that strict scrutiny would require that a restriction be "narrowly tailored to achieve a compelling governmental interest") (internal quotation marks and citation omitted).

[38] *Accord* Larson, *supra* note 28, at 1383 ("[A]lthough this exception, if focused on a specific subset of the mentally ill, would probably be upheld under strict scrutiny, it is by no means a clear-cut case, and a broader law would almost certainly fail.").

[39] *Id.* at 1382 ("It is . . . implausible to claim that an across-the-board exclusion for all felons from this one particular constitutional right can be justified as narrowly tailored under strict scrutiny.").  Nor consistent with history, according to another commentator.  C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J.L. & PUB. POL'Y 695 (2009).

[40] Stephen Kiehl, Comment, *In Search of a Standard: Gun Regulations After* Heller *and* McDonald, 70 MD. L. REV. 1131, 1156-57 & n.227 (2011).

[41] One commentator has argued that *McDonald* rejected the reasonableness standard.  Stacey L. Sobel, *The Tsunami of Legal Uncertainty: What's a Court To Do Post-*McDonald?, 21 CORNELL J.L. & PUB. POL'Y 489, 502 (2012).  It did not.  It merely rejected the argument that state and local government was the arbiter of reasonableness.  *McDonald*, 130 S. Ct. at 3046 (plurality op.) ("Municipal respondents therefore urge us to allow state and local governments to enact any gun control law that they deem to be reasonable . . . .").  Indeed, the same opinion went on to cite favorably the amicus position that "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment."  *Id.* (citation omitted).

[42] Larson, *supra* note 28,  at 1380.

Is there support for "reasonableness" review? Professors Laurence Tribe and Akhil Amar have endorsed this view.[43] Professor Adam Winkler has shown that state courts interpreting their constitutions have uniformly adopted a reasonableness approach: "any law that is a 'reasonable regulation' of the arms right is constitutionally permissible."[44] This standard may be more exacting than rational basis review,[45] but only slightly.[46] In effect, courts ask, with a healthy dose of deference, whether the legislature has struck a reasonable "balance between safety and weapons."[47] "Courts will hold unconstitutional a gun control law (or its application to a particular individual) only in extreme circumstances where (a) the law or its application is so profoundly unfair as to be arbitrary and irrational, or (b) the law or its application is so restrictive as to be effectively a destruction or nullification of the right."[48]

## 2. *Intermediate Scrutiny*

Intermediate scrutiny would require that a restriction upon the gun rights of the mentally ill would have to be substantially related to an important government objective.[49] At least one commentator has advocated[50] and several district courts have adopted[51] this approach.

---

[43] *See* Laurence H. Tribe & Akhil Reed Amar, Op-Ed., *Well-Regulated Militias, and More*, N.Y. TIMES, Oct. 28, 1999, at A31 ("The right to bear arms is certainly subject to reasonable regulation in the interest of public safety.").

[44] Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683, 686-87 (2007).

[45] *Id.* at 717; *see also* Joseph Blocher, *Reverse Incorporation of State Constitutional Law*, 84 S. CAL. L. REV. 323, 380-84 (2011); Nordyke v. King, 644 F.3d 776 (9th Cir. 2011) (Gould, J., concurring).

[46] Winkler, *supra* note 44, at 687 ("Since World War II, state courts have authored hundreds of opinions using this test to determine the constitutionality of all sorts of gun control laws. All but a tiny fraction of these decisions uphold the challenged gun control laws as reasonable measures to protect public safety."). *But see* Robert A. Levy, *Second Amendment Redux: Scrutiny, Incorporation, and the* Heller *Paradox*, 33 HARV. J.L. & PUB. POL'Y 203, 207 (2010) (suggesting that state court review has been less deferential than claimed).

[47] *Id.* at 713; *accord* 717-18.

[48] *Id.* at 723.

[49] Craig v. Boren, 429 U.S. 190, 197 (1976).

[50] Kiehl, *supra* note 40, at 1133 ("This Comment will then argue that courts should apply intermediate scrutiny in evaluating gun regulations that are short of absolute bans on possession, and that prohibitions on carrying weapons do not implicate the core constitutional right identified in *Heller* and *McDonald* of possessing a gun in the home for self-defense."). This approach is arguably "hybrid." *See infra*. Professor Brannon Denning agrees that *Heller* adopted "at least" intermediate scrutiny. Brannon P. Denning, *The New Doctrinalism in*

The Seventh Circuit as well has adopted intermediate scrutiny. In *United States v. Skoien*, an *en banc* panel upheld a statute prohibiting firearm possession by an individual with two convictions for "misdemeanor crime[s] of domestic violence."[52] The court expressly applied intermediate scrutiny.[53] One might distinguish misdemeanants from felons and the mentally ill on the ground that *Heller* did not mention them, but the Seventh Circuit in *Skoien* rejected that distinction.[54] Any doubt as to that conclusion was removed just weeks later, when a Seventh Circuit panel applied intermediate scrutiny to a felon-in-possession ban.[55]

*3. Hybrid*

The universe of "hybrid" approaches is potentially limitless, so this article summarizes just two with substantial scholarly support. First, in a relatively straightforward hybrid of intermediate and strict scrutiny, Professor Calvin Massey argues that material infringements of the right to bear arms should be upheld only if they are substantially related to a compelling government purpose.[56] Several lower federal courts have similarly adopted or suggested a threshold burden on gun rights before heightened scrutiny need be applied.[57] This approach may be attractive, but it can be set to one side for present purposes. It is indistinguishable

---

*Constitutional Scholarship and* District of Columbia v. Heller, 75 TENN. L. REV. 789, 799 (2008).

[51] The cases are in the felon-in-possession context. United States v. Miller, No. 08-cr-10097, 217 PLI/Crim 121, at *134-35 (W.D. Tenn. July 22, 2009) (citing United States v. Radencich, 3:08-CR-00048(01)RM, 2009 WL 127648, at *4 (N.D. Ind. Jan. 20, 2009); United States v. Schultz, No. 1:08-CR-75-TS, 2009 WL 35225, at *5 (N.D. Ind. Jan. 5, 2009); United States v. Bledsoe, No. SA08-CR-13(2), 2008 WL 3538717 (W.D. Tex., Aug. 8, 2008)).

[52] 614 F.3d 638 (7th Cir. 2010) (en banc) (quoting 18 U.S.C. § 922(g)(9))..

[53] *Id.* at 641-42.

[54] *Id.* at 640 ("The language we have quoted warns readers not to treat *Heller* as containing broader holdings than the Court set out to establish: that the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense. What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open.").

[55] United States v. Williams, 616 F.3d 685, 692-93 (7th Cir. 2010); *see also* Ezell v. City of Chicago, 651 F.3d 684, 708 (7th Cir. 2011) .

[56] Calvin Massey, *Guns, Extremists, and the Constitution*, 57 WASH. & LEE L. REV. 1095, 1137 (2000). *See also* Heller v. District of Columbia, 670 F.3d 1244, 1257 (D.C. Cir. 2011) (suggesting that heightened scrutiny applied only to restrictions that amount to a "substantial burden" on right to bear arms).

[57] Nordyke v. King, 644 F.3d 776, 782–86 (9th Cir.2011) (citing United States v. Masciandaro, 638 F.3d 458, 469–70 (4th Cir. 2011); United States v. Chester, 628 F.3d 673, 680–83 (4th Cir. 2010); United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010); Heller v. District of Columbia, 698 F. Supp. 2d 179, 188 (D.D.C. 2010)).

from intermediate scrutiny in this context: an absolute prohibition on gun possession is plainly material and sufficiently burdensome to trigger heightened scrutiny, and the government objectives of preventing gun deaths and injuries are plainly compelling, not merely important.[58]

A second "hybrid" approach is more complicated. Professor Eugene Volokh has argued that courts should examine restrictions separately based on four different categories of justification: (1) scope, (2) burden, (3) danger reduction, and (4) government as proprietor.[59] Volokh suggests that prohibiting the mentally ill from possessing firearms may be a valid limitation on the scope of the right to bear arms,[60] but is probably not justified for danger reduction.[61] His scope argument is based on the false historical assumption that limitations on the rights of the mentally ill to bear arms are "longstanding" (discussed above), so our focus will be danger reduction. Volokh frames the question as follows: "The real inquiry is into whether and when a right may be substantially burdened in order to materially reduce the danger flowing from the exercise of the right, and into what sort of proof must be given to show that the substantial restriction will indeed reduce the danger."[62] Volokh suggests some form of exacting scrutiny for substantial burdens like the mental illness gun ban.[63]

In sum, there are no fewer than three potential levels of constitutional scrutiny, from least to most exacting: reasonableness, intermediate scrutiny, and Volokh's theory. Part II will apply each of these three standards to current restrictions on gun possession by the mentally ill.

## II. ARE CURRENT RESTRICTIONS CONSTITUTIONAL?

### A. Federal and State Bans on Gun Possession by the Mentally Ill

The Federal Gun Control Act of 1968 provides: "It shall be unlawful for any person—who has been adjudicated as a mental

---

[58] Winkler, *supra* note 44 at 731 ("public safety is already a compelling government interest"); *cf.* United States v. Salerno, 481 U.S. 739, 750 (1987) ("the Government's general interest in preventing crime is compelling").

[59] Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443 (2009).

[60] *Id.* at 1510 ("I suspect that those whose judgment is seen as compromised by mental illness . . . have historically been seen as less than full rightholders . . . . But again, some solid historical research would be more helpful than either scholars' or judges' speculation."). Recall that gun restrictions on the mentally ill are of recent vintage. *See supra* note 34 and accompanying text.

[61] *Id.* at 1513.

[62] *Id.* at 1461.

[63] *Id.* at 1471-73.

defective or who has been committed to a mental institution" to purchase or possess a firearm.[64]  A person has been adjudicated as a mental defective if a lawful authority finds that he "as result of marked subnormal intelligence, or mental illness, incompetency, condition or disease: is a danger to himself or to others; or lacks the mental capacity to contract or manage his own affairs."[65]  The term also includes "a finding of insanity by a court in a criminal case; and those persons found incompetent to stand trial or found not guilty by reason of lack of mental responsibility."[66]  A person has been committed to a mental institution if through a formal hearing a legal authority makes the decision to commit the individual.  This term includes commitment for mental illness, but it "does not include a person in a mental institution for observation or a voluntary admission to a mental institution."[67]

The diverse approaches of states to gun possession by the mentally ill can be reduced to three.  Several states have no statute directly on point.[68]  Others basically follow the lead of the federal statute and restrict access to people who have been involuntarily committed or adjudicated mentally defective.[69]  Where there is no state statute or the state statute tracks the federal one, the federal standard effectively controls.  Other states are more restrictive and prohibit possession or ownership by those who have had any type of commitment, voluntary or involuntary.[70]  A small minority of states is extremely restrictive and prohibits ownership or possession by people with mental illness who have no history of commitment.[71]  For example, Hawaii prohibits gun possession by

---

[64] 18 U.S.C.A. § 922 (g)(4).

[65] 27 C.F.R. § 478.11.

[66] *Id.*

[67] *Id.*

[68] For example: Alaska, Mississippi, Montana, New Hampshire, South Dakota, Texas, and Vermont.  *See* Joseph R. Simpson, *Bad Risk? An Overview of Laws Prohibiting Possession of Firearms by Individuals With a History of Treatment for Mental Illness*, 35 J. Am. Acad. Psychiatry & Law 330, 334-35 tbl.1 (2007).

[69] *E.g.*, Ark. Code Ann. § 5-73-103(a); Fla. Stat §790.065(4); Iowa Code §§ 724.8(6), 724.31; Ohio Rev. Stat. §2923.125(D)(1)(i); Pa. Con. Stat. tit. 18 §6105(c)(4); Utah Code Ann. 1953 §76-10-503(1)(b)(vi).

[70] *E.g.*, Del. Code tit. 11, § 1448(2); State v. Dunham, No. 9812012054, 1999 WL 1223767, at *3 (Del. Super. Oct. 6, 1999) ("the person's voluntariness is irrelevant"); D.C. Code § 7-2502.03(a)(6); Ga. Code § 16-11-129(b)(2)(J); Ill. Rev. Stat. ch. 720 § 5/24-3.1(a)(4); Mass. Gen. Laws Ch. 140 § 131(d)(ii).

[71] N.Y. Pen. Law § 400.00(d); Mazzone v. Czajka, 777 N.Y.S.2d 812 (3d Dept. 2004) (affirming revocation of license with diagnosis; no indication of hospitalization); R.I. Gen. Laws §11-47-6.

anyone who "[i]s or has been diagnosed as having a significant behavioral, emotional, or mental disorder[]."[72]

These restrictions can be justified, if at all, by the government's interest in reducing gun injuries and deaths. The causes may include accidents, aggressive acts, and self-harm. What is the evidence that the mentally ill pose a higher risk in these areas? Is there evidence specific to the different categories of the mentally ill that trigger the firearm ban in different jurisdictions: (1) involuntarily committed or adjudicated mentally defective; (2) voluntarily committed; and (3) merely diagnosed as mentally ill?

### B. Fit with the Government Interest in Safety

The government obviously has a compelling interest in preventing firearm deaths. In 2009, there were 554 unintentional firearm deaths in the United States.[73] By comparison, there were 18,735 gun suicides and 11,493 gun homicides.[74] Avoiding serious injuries is also a compelling government interest. The following table summarizes for 2001 firearm-related deaths and injuries serious enough to require treatment in hospital emergency departments:[75]

**Table 1. Fatal & Nonfatal Firearm Injuries, United States: 2001**

| | *Fatal* | | *Nonfatal* | |
|---|---|---|---|---|
| *Type* | *Number* | *Rate\** | *Number* | *Rate\** |
| Unintentional | 802 | 0.3 | 8,741 | 3.1 |
| Assault | 11,671 | 4.1 | 35,496 | 12.4 |
| Self-harm | 16,869 | 5.9 | 2,980 | ** |
| Undetermined | 231 | 0.1 | 9,480 | 3.3 |

\* Per 100,000 population.

\*\* Rate not calculated because estimate may have been unstable.

One way to frame the constitutional question is to ask whether the mentally ill, if their firearm possession were unrestricted, would disproportionately increase these numbers.

---

[72] Haw. Rev. Stat. §134-7(c)(3). Although the facts are not clear, it appears that only a prohibition this broad would have barred gun sales to the Aurora, Colorado shooter, James Holmes.

[73] CDC, National Center for Injury Prevention and Control, at http://www.cdc.gov/injury/wisqars/fatal.html (visited 6/1/12).

[74] *Id.*

[75] Sara B. Vyrostek, Joseph L. Annest, & George W. Ryan, *Surveillance for fatal and nonfatal injuries--United States, 2001*, 53 MMWR SURVEILLANCE SUMMARIES 1 tbls. 6, 7 (Sep. 3, 2004), at http://www.cdc.gov/mmwr/preview/mmwrhtml/ss5307a1.htm (visited 6/1/12).

### 1. Accidents

There are no studies showing that the mentally ill pose an increased risk of unintentional gun injuries.[76]  Particularly given the relatively low number of accidental firearm fatalities---802 in 2001, 554 in 2009---even the narrow federal restriction on gun possession by involuntary committees and adjudicated mentally defectives would likely fail the most lenient "reasonableness" standard if this were the only justification.

One researcher estimates that more than one million people in the United States annually are civilly committed for psychiatric treatment, one third involuntarily.[77]  Of course, the total number of individuals barred by federal law from possessing firearms is much greater than the roughly 333,000 detained each year.[78]  To deny all Second Amendment rights to such a large class of individuals in the blind hope of preventing some fraction of unintentional gun fatalities and other injuries does not seem reasonable.  Without any supporting data, the restriction seems, in Winkler's words, "so profoundly unfair as to be arbitrary and irrational."

### 2. Violence

The mentally ill are widely perceived as dangerous.  Whether this perception is grounded in reality has been disputed.[79]  This section will first summarize the key literature, and then will consider whether the evidence supports current restrictions under the three possible levels of scrutiny.

#### a.  Literature

---

[76] *Cf.* Donald W. Black, Giles Warrack, & George Winokur, *The Iowa Record-Linkage Study—I. Suicides and Accidental Deaths Among Psychiatric Patients*, 42 ARCH. GEN. PSYCHIATRY 71, 72-73 (1985) (finding a significant increase in accidental deaths (undifferentiated causes) only during the first year after psychiatric hospital admission).

[77] Adam J. Falk, Note, *Sex Offenders, Mental Illness and Criminal Responsibility: The Constitutional Boundaries of Civil Commitment after* Kansas v. Hendricks, 25 AM. J.L. & MED. 117 & n.3 (1999) (citing Mary L. Durham, *Civil Commitment of the Mentally Ill: Research, Policy and Practice*, *in* MENTAL HEALTH AND LAW 17, 17 (Bruce D. Sales & Saleem A. Shah eds., 1996).

[78] One researcher has more recently suggested that the actual figure may be double: "as many as 660,000 patients per year may be subject to involuntary commitment."  BRUCE J. WINICK, CIVIL COMMITMENT: A THERAPEUTIC JURISPRUDENCE MODEL 3 (2005).

[79] Eric Silver, *Understanding the Relationship Between Mental Disorder and Violence: The Need for a Criminological Perspective*, 30 L. & HUMAN BEHAV. 685, 685-86 (2006).

In one large study of community residents, Jeffrey Swanson and colleagues concluded that 6.81% of people with a serious mental illness reported violent behavior in the past year as compared with only 2.05% of people without a major mental disorder.[80] The diagnoses considered were schizophrenia, major depression, mania or bipolar disorder, alcohol or drug abuse or dependence, obsessive-compulsive disorder, panic disorder and phobia.[81] Of particular interest was the question about use of a weapon, which expressly included a gun. Weapon use was significantly higher for every diagnosis except mania or bipolar disorder where the *N* was only 30 and none had wielded a weapon.[82] Of the non-substance abuse disorders, schizophrenia had the highest weapon use: 8.58% as compared with 0.40% of individuals without a disorder.[83]

A second study, this one by Bruce Link and colleagues, of mental patients reported assaultive weapon use in the past five years for 2.7% of never-treated community residents, 2.1% for first-contact patients, 12.9% for repeat-contact patients (p<0.01), and 11.1% for former patients (p<0.05).[84] These effects remained statistically significant after controlling for age, sex, education, race, ethnicity, need-for-approval scale, and homicide rate in the community,[85] but lost significance after controlling for psychotic symptoms.[86] This strongly suggests that a subset of the mentally

---

[80] Jeffrey W. Swanson, Charles E. Holzer, Vijay K. Ganju, & Robert Tsutomu Jono, *Violence and Psychiatric Disorder in the Community: Evidence From the Epidemiologic Catchment Area Surveys*, 41 HOSP. & COMM. PSYCH. 761, 767 fig.1 (1990). An elaboration of this research appears in Jeffrey W. Swanson, *Mental Disorder, Substance Abuse, and Community Violence: An Epidemiological Approach, in* VIOLENCE AND MENTAL DISORDER: DEVELOPMENTS IN RISK ASSESSMENT 101 (John Monahan & Henry J. Steadman, eds. 1994).

[81] *Id.* at 763.

[82] *Id.* at 768 tbl.6.

[83] *Id.*

[84] Bruce G. Link, Howard Andrews, & Francis T. Cullen, *The Violent and Illegal Behavior of Mental Patients Reconsidered*, 57 AM. SOC. REV. 275, 283 tbl.1 (1992). The link between use of mental health services, presumably in part a proxy for severity of illness, was confirmed by Jeffrey W. Swanson et al., *Psychotic Symptoms and Disorders and the Risk of Violent Behavior in the Community*, 6 CRIM. BEHAV. & MENTAL HEALTH 309, 314, 319 tbl.1 (1996) (finding significantly elevated levels of violence among individuals ever hospitalized or otherwise using mental health services in the past six months).

[85] Link et al., *supra* note 84, at 287 tbl.4.

[86] *Id.* at 288 tbl.5; *accord* Bruce G. Link & Ann Stueve, Psychotic Symptoms and the Violent/Illegal Behavior of Mental Patients Compared to Community Controls, *in* VIOLENCE AND MENTAL DISORDER: DEVELOPMENTS IN RISK ASSESSMENT 154 tbl.7 (John Monahan & Henry J. Steadman, eds. 1994); *see also* Swanson et al., *supra* note 80, at 320 tbl.2 (finding significantly increased violence among those with psychotic symptoms).

ill with psychotic symptoms may account for the higher observed overall levels of violence, including weapon use.

Supporting the role of psychosis is a recent meta-analysis by Seena Fazel and colleagues of violence studies involving schizophrenia and other psychoses.[87]  The researchers found that such patients were roughly twice as likely to engage in violent behavior as control groups.[88]  Summarizing five studies, the meta-analysis found that schizophrenics were almost 20 times more likely to commit homicide.[89]

State firearm bans are not limited to the acutely, or even potentially, psychotic.  Again, the key trigger for a firearm ban in most places is commitment to an inpatient facility.  That is why a study funded by the MacArthur Foundation and published in 1998 is so important: it compared "civil admission" patients discharged from acute psychiatric facilities with a control group living in the same neighborhood.[90]  It concluded that, among non-substance abusers, the prevalence of violence by patients was no higher than by neighbors.[91]  The study also showed that, among acts of violence, weapon use or threat were significantly *less* likely among patients.[92]

The exclusion of substance abusers was important.  When they were included, there was a significantly higher prevalence of violence among patients (11.5% in first follow-up period) than among the control group (4.6%; p<0.05).[93]  As the authors of the MacArthur study later conceded: "Mental disorder has a significant

---

[87] Seena Fazel et al., *Schizophrenia and Violence: Systematic Review and Meta-Analysis*, 6 PLoS MED. 1 (8/11/09), at www.plosmedicin.org (visited 9/1/11).

[88] *Id.* at 4 fig.2 (2.1 odds ratio, 11 studies).  With substance abuse comorbidity, the odds ratio jumps to 8.9.  *Id.* at 5 fig.3.

[89] *Id.* at 12 fig.9.

[90] Henry J. Steadman et al., *Violence by People Discharged From Acute Psychiatric Inpatient Facilities and by Others in the Same Neighborhoods*, 55 ARCH. GEN. PSYCHIATRY 393, 394 (1998).

[91] *Id.* at 393, 399 tbl.5.  *See also* Virginia Aldigé Hiday, *Dangerousness of Civil Commitment Candidates: A Six-Month Follow-Up*, 14 L. & HUMAN BEHAV. 551, 562 (1990) ("Following a large sample in one state through arrest records, patient ward charts, hospital admission evaluations, civil commitment affidavits, and mental health center patient records, and using objective behavioral indicators, we found that civil commitment candidates do not tend to be dangerous, much less violent, within the 6 months following their court hearings.").  *But see* Swanson, *supra* note 80, at 111 ("Major mental disorder without alcohol or drug abuse complications emerged as a quite rare condition in the community, yet one that was significantly more common among persons who reported that they had committed assaultive acts.").

[92] Id. at 400 tbl.6 (22.3% for patients; 42.3% for community).

[93] *Id.* at 399 tbl.5.

effect on violence by increasing people's susceptibility to substance abuse."[94]

### b. Applying the Standards

The three standards are (1) reasonableness, (2) intermediate scrutiny, and (3) the Volokh approach. Even the most restrictive state statute would almost certainly survive reasonableness review. Hawaii proscribes gun possession by anyone ever diagnosed with a mental illness. One needs look no further than the first study above, by Swanson and colleagues, for a sufficient basis for this proscription. Nearly 7% of people with a serious mental illness reported violent behavior as compared with 2% of those without.

One slippage here is the word "serious." Many common diagnoses were omitted from the Swanson study but are nonetheless disqualifying.[95] A second missing link is harmful use of a firearm, as opposed to violence of any kind. Nevertheless, it is exceedingly unlikely that a court would conclude that the Hawaii legislature acted "arbitrarily" or "irrationally" in lumping all mentally illness together or in assuming that gun violence is positively correlated with overall violence.

State courts applying the reasonableness standard have upheld similar laws. The Court of Appeals of Oregon held reasonable a statute providing for an individualized determination that a mentally ill person was too dangerous to possess firearms.[96] And the Colorado Supreme Court upheld a much broader restriction, explaining that "[i]t is clearly reasonable for the legislature to regulate the possession of firearms by those who are under the influence of alcohol or drugs."[97]

In contrast, applying intermediate scrutiny to existing law would generate uncertainty. Commentators are split on this issue.[98] The narrowest restriction is the federal one barring gun possession by involuntary committees and those adjudicated mentally defective. The MacArthur study found a significant, double risk of violence for released inpatients. In combination

---

[94] John Monahan, Henry J. Steadman, & the MacArthur Study Group, *The MacArthur Violence Risk Assessment Study Revisited: Two Views Ten Years After Its Initial Publication*, 59 Psych. Servs. 147, 149 (2008).

[95] *See, e.g.*, Ronald C. Kessler, *Lifetime Prevalence and Age-of-Onset Distributions of DSM-IV Disorders in the National Comorbidity Survey Replication*, 62 Arch. Gen. Psychiatry 593, 596 tbl.2 (2005) (reporting lifetime prevalence rates of 9.5%, 8.1%, and 6.8%, respectively, for conduct disorder, attention-deficit/hyperactivity disorder, and posttraumatic stress disorder, none of which was included in the Swanson study).

[96] State v. Owenby, 826 P.2d 51, 53 (Or. App. 1992).

[97] People v. Garcia, 595 P.2d 228, 230 (Colo. 1979).

[98] *Compare* Kiehl, *supra* note 40, at 1160; Winkler, *supra* note 44, at 688-89, 722, *with* Volokh, supra note 59, at 1463-64.

with the higher rates of violence associated with mental illness in the other studies, most courts would likely conclude that the federal restriction is substantially related to the important government interest in curbing gun violence.[99]

But there is a serious problem of over-breadth. Excluding substance abusers eliminated the effect observed in the MacArthur study. The other studies suggest that only the *seriously* mentally ill or those with psychosis are more violent. There is no clear answer as to the degree of over-inclusiveness that will be tolerated under intermediate scrutiny.[100] Even if facial challenges to the federal restriction fail, there may be winning as-applied challenges by mentally ill individuals without comorbid substance abuse or only mild or moderate symptoms not including psychosis.[101]

Even if known low-risk groups were excluded from the ban, there would still be massive over-breadth. Schizophrenia is a serious mental illness typically accompanied by hallucinations and delusions.[102] Suppose the firearm ban were targeted at just schizophrenics. Fazel reported a nearly 20-fold increased risk of homicide by schizophrenics. Of course, not every homicide involves a firearm. Still, the number is quite close to Swanson's finding of a roughly 21 times higher rate of weapon use by schizophrenics.

Prohibiting firearm possession by schizophrenics would certainly seem to be substantially related to reducing firearm homicide. But the base rates for homicide and homicide with a firearm are very low. As a result, even a well-substantiated policy sweeps quite broadly.[103] Based on the United States population,[104]

---

[99] It could go without saying, but the federal law would no doubt be held "reasonable." One probably would need to look no further than the usual trigger for civil commitment: danger to self or others. BRUCE J. WINICK, CIVIL COMMITMENT: A THERAPEUTIC JURISPRUDENCE MODEL 42 (2005).

[100] *See* Volokh, *supra* note 59, at 1549 n.109 (suggesting felon-in-possession ban fails intermediate scrutiny because it covers non-violent felons).

[101] United States v. Williams, 616 F.3d 685, 693 (7th Cir. 2010); *see also* Gary Kleck, *Policy Lessons from Recent Gun Control Research*, 49 LAW & CONTEMP. PROBS. 35, 42 (1986) ("[V]iolence potential above the minimal level characterizing the general public is limited to a small, identifiable minority of mentally ill persons.").

[102] DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 312 (4th ed., text rev. 2000) (listing delusions and hallucinations among schizophrenia's characteristic symptoms). Furthermore, nearly 50% of schizophrenics have lifetime substance abuse comorbidity. Peter F. Buckley et al., *Psychiatric Comorbidities and Schizophrenia*, 35 SCHIZOPHRENIA BULLETIN 383, 394 (2009).

[103] *See* Marilyn Price & Donna M. Norris, *National Instant Criminal Background Check Improvement Act: Implications for Persons With Mental Illness*, 36 J. AM. ACAD. PSYCH. & L. 127, 128 (2008) ("Even if the persons with mental illness who are part of the prohibited class are truly at increased risk, can

lifetime prevalence of schizophrenia,[105] and rate of assaultive firearm deaths,[106] I estimate that, each year, roughly 1500 schizophrenics who would commit no deadly firearm assault would be denied their constitutional right to bear arms for every one life saved.[107] Adding serious gun injuries avoided, the number would drop to around 400. Deciding whether that relationship is substantial enough necessarily requires an uncertain balancing of interests.[108]

The Volokh approach suffers on its face from much the same indeterminacy as intermediate scrutiny. In some sense, it is heightened scrutiny along a sliding scale. As to mental illness restrictions, however, Volokh is clear: "I don't think that any class of mentally competent adults should be denied constitutional rights based on their demographic characteristics, as opposed to things they have personally done."[109] No quantum of statistical evidence, even the strong schizophrenia findings (or suicide numbers below), would seem sufficient under Volokh's approach to justify a ban on firearm possession.

### 3. Suicide

A majority of suicides are committed with a firearm.[110] People without access to a gun are less likely to kill themselves, or others,

---

the legislation actually decrease the suicide and homicide rates, and at what cost?").

[104] U.S. Census Bureau, USA QuickFacts, at http://quickfacts.census.gov/qfd/states/00000.html (visited 6/7/12) (2010: 308,745,538).

[105] Samuel J. Keith, Darrel A. Regier, & Donald S. Rae, *Schizophrenic Disorders*, *in* PSYCHIATRIC DISORDERS IN AMERICA: THE EPIDEMIOLOGIC CATCHMENT AREA STUDY 37 tbl.3-2 (Lee N. Robins & Darrel A. Regier, eds., 1991) (1.4%).

[106] *See supra* Table 1.

[107] If the increased risk were 2 instead of 20 times---as the broader studies suggest---the 1500 figure would jump to 12,000. *See* Bruce G. Link & Ann Stueve, *New Evidence on the Violence Risk Posed by People With Mental Illness*, 55 ARCH. GEN. PSYCHIATRY 403, 403 (1998) ("Furthermore, because serious mental illness is relatively rare and the excess risk modest, the contribution of mental illness to overall levels of violence in our society is minuscule."). *Cf.* GARY KLECK, POINT BLANK: GUNS AND VIOLENCE IN AMERICA 345 (1991) ("If only a few percent of gun owners will ever use their guns to commit an unlawful violent act, broad-based controls are highly inefficient. A hundred people must be disarmed in the hopes of preventing two or three from doing violence with a gun.").

[108] Jud Mathews & Alec Stone Sweet, *All Things in Proportion? American Rights Review and the Problem of Balancing*, 60 EMORY L.J. 797, 853 (2011). Underinclusiveness is generally not viewed as constitutionally problematic.

[109] Volokh, *supra* note 59, at 1513.

[110] CDC, WISQARS Fatal Injury Reports, National and Regional, 1999 – 2009, http://webappa.cdc.gov/sasweb/ncipc/mortrate10_us.html (visited 6/8/12).

with a gun.[111]  Importantly, not having a gun appears to deter a substantial number of suicide attempts altogether, rather than simply steering the victim to alternative means:[112]

**Table 2. Suicides by State Gun Ownership, 2001-2005**

| Variable | High Gun Ownership States | Low Gun Ownership States |
|---|---|---|
| Person-years | 195 million | 200 million |
| Households with guns | 47% | 15% |
| Number of firearm suicides | 16,577 | 4,257 |
| Number of nonfirearm suicides | 9,172 | 9,259 |
| Total number of suicides | 25,749 | 13,516 |

The dramatically lower number of total suicides in low gun ownership states makes more sense in light of two additional facts: (1) "one third to four fifths of all suicide attempts . . . are impulsive," and (2) "more than 90% of people who survive a suicide attempt . . . do not go on to die by suicide."[113]  Whether firearm restrictions effectively curb access and reduce total suicides is disputed,[114] but the federal background check system

---

[111] Matthew Miller et al., *Household Firearm Ownership and Rates of Suicide Across the 50 United States*, 62 J. TRAUMA 1029 (2007); Linda L. Dahlberg, Robin M. Ikeda, & Marcie-jo Kresnow, *Guns in the Home and Risk of a Violent Death in the Home: Findings from a National Study*, 160 AM. J. EPIDEMIOLOGY 929, 934 tbl.4 (2004).

[112] Matthew Miller & David Hemenway, *Guns and Suicide in the United States*, 359 NEW ENG. J. MED. 989 tbl. (2008).  *See also* Miller et al., *supra* note 111, at 1031 tbl.1.

[113] Miller & Hemenway, *supra* note 112.

[114] *Compare* J. John Mann et al., *Suicide Prevention Strategies: A Systematic Review*, 294 JAMA 2064, 2070 (2005) ("Suicides by [firearms in U.S. men] have decreased after firearm control legislation."); Deborah Azrael, *Cook and Ludwig's Principles for Effective Gun Policy: An Extension to Suicide Prevention*, 73 FORDHAM L. REV. 615, 618 (2004) ("policies that reduce access to guns are likely to be associated with reduced [suicide] mortality"), *with* Marilyn Price & Donna M. Norris, *National Instant Criminal Background Check Improvement Act: Implications for Persons With Mental Illness*, 36 J. AM. ACAD. PSYCH. & L. 127, 128 (2008) ("There are few data showing that limiting legal firearm access to persons with mental illness as defined by the Brady Act will in fact have an effect on suicide and homicide rates using firearms."); KLECK, *supra* note 107, at 255 ("On the whole, previous studies failed to make a solid case for the ability of gun controls to reduce the total suicide rate.").

However, even a skeptic concedes that "gun controls might still reduce suicide by reducing gun ownership levels among depressed and other suicide-prone segments of the population," *id.* at 256; *accord* Joseph R. Simpson, *Issues Related to Possession of Firearms by Individuals with Mental Illness: An Overview Using California as an Example*, 13 J. PSYCHIATRIC PRACTICE 1, 6 (Mar. 2007), a possibility supported by the relatively low gun ownership rates

prevented 87,474 gun sales in 2007 alone.[115]  The ultimate policy question, however, is beyond the scope of this article, which is concerned with the constitutionality of the current gun laws.

Ninety percent (or more) of suicide victims in the United States suffered from mental illness.[116]  (Estimates from England are consistent with this figure[117] and globally the level may be even higher.[118])  In contrast, lifetime prevalence in the U.S. of any mental disorder has been estimated at 46%.[119]  These figures imply that the mentally ill are over 10 times more likely to commit suicide.

Another way to estimate the increased risk is to directly compare the suicide rates for the mentally ill with the overall rate. One review article estimated the lifetime risk for suicide at 6% for affective or mood disorder, 7% for alcohol dependence, and 4% for schizophrenia.[120]  A more recent reexamination put the schizophrenia number at 4.9%.[121]  By way of comparison, the overall yearly suicide rate was 1.2 per 10,000 people in 2009.[122]

A thorough meta-analysis of published papers found a suicide risk for individuals with any psychiatric diagnosis in any treatment setting 11 times that of individuals without any diagnosis.[123]  The

---

observed among psychiatric inpatients. Dale E. McNiel, Christopher M. Weaver, & Stephen E. Hall, *Base Rates of Firearm Possession by Hospitalized Psychiatric Patients*, 58 PSYCH. SERVS. 551, 552 (2007) (only 9 out of 100 acknowledged either owning or having access to a gun).

[115] Thomas E. Bush, III, DOJ, Letter to Hon. Michael R. Bloomberg Dated 10/21/2008, at 19 tbl., at http://www.mayorsagainstillegalguns.org/html/trace/nics.shtml (visited 6/5/12).

[116] Yeats Conwell et al., *Relationships of Age and Axis I Diagnoses in Victims of Completed Suicide: A Psychological Autopsy Study*, 153 AM. J. PSYCHIATRY 1001, 1002 (1996) (90.1%); Charles L. Rich, Deborah Young, & Richard C. Fowler, *San Diego Suicide Study: I. Young vs Old Subjects*, 43 ARCH. GEN. PSYCHIATRY 577, 579 tbl.5 (1986) (93.5%).

[117] Elizabeth King, *Suicide in the Mentally Ill: An Epidemiological Sample and Implications for Clinicians*, 165 BRITISH J. PSYCHIATRY 658, 659 (1994).

[118] José Manoel Bertolote et al., *Psychiatric Diagnoses and Suicide: Revisiting the Evidence*, 25 CRISIS 147 (2004) (98%).

[119] Ronald C. Kessler, *Lifetime Prevalence and Age-of-Onset Distributions of DSM-IV Disorders in the National Comorbidity Survey Replication*, 62 ARCH. GEN. PSYCHIATRY 593, 596 tbl.2 (2005) (reporting 46.4% lifetime prevalence of any mental disorder, the overwhelming majority of which were axis-I under DSM-IV-TR); DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 28 (4th ed., text rev. 2000).

[120] H.M. Inskip, E.C. Harris, & B. Barraclough, *Lifetime Risk of Suicide for Affective Disorder, Alcoholism and Schizophrenia*, 172 BRITISH J. PSYCHIATRY 35, 35 (1998).

[121] B.A. Palmer, V.S. Pankratz, & J.M. Bostwick, *The Lifetime Risk of Suicide in Schizophrenia: A Reexamination*, 62 ARCH. GEN. PSYCHIATRY 247 (2005).

[122] CDC, Leading Causes of Death, at http://www.cdc.gov/nchs/fastats/lcod.htm (visited 6/8/12).

[123] E. Clare Harris & Brian Barraclough, *Suicide as an Outcome for Mental Illness: A Meta-Analysis*, 170 BRIT. J. PSYCHIATRY 205, 221 tbl.14h (1997).

meta-analysis also examined diagnoses separately and concluded that, "[i]f these results can be generalized, then virtually all mental disorders have an increased risk of suicide excepting mental retardation and possibly dementia and agoraphobia."[124] Data on suicide *attempts* generally confirm this result.[125]

How do current laws fare under the three standards if preventing suicide is the goal? Given the much higher rate of suicide among virtually all mental illnesses, it is difficult to imagine any court striking down as "unreasonable" even the broadest restriction on gun possession by the mentally ill.[126] But what about intermediate scrutiny? Courts would probably reach the same result, but, as with harm to others, the connection to suicide prevention may not qualify as a sufficiently substantial relationship in some judges' eyes.

To see this more clearly, focus again on the narrow, federal restriction. Here, the evidence of a higher suicide risk gets even stronger. The meta-analysis described above also examined released involuntary committees and found a suicide risk 39 times greater than expected.[127] Taking the high *yearly* estimate above of 660,000 involuntary committees as an approximation for the number of people who have *ever* been civilly committed,[128] the federal restriction denies gun rights to about 450 former patients who would not use a firearm to commit suicide for every gun suicide it prevents. Assuming instead for illustration that three million people have ever been involuntarily committed, the ratio increases to about 575. The case for constitutionality of current

---

[124] *Id.* at 222, 223 tbl.15.

[125] R.C. Kessler, G. Borges, & E.E. Walters, *Prevalence of and Risk Factors for Lifetime Suicide Attempts in the National Comorbidity Survey*. 56 ARCH. GEN. PSYCHIATRY 617, __ tbl.2 (1999). *Cf.* Guilherme Borges, *Twelve Month Prevalence of and Risk Factors for Suicide Attempts in the WHO World Mental Health Surveys*, 71 J. CLINICAL PSYCHIATRY 1617 (2010) ("[A]lthough the presence of a DSM-IV mental disorder was associated with significantly higher odds of experiencing suicide ideation in virtually every instance, few mental disorders predicted suicide attempts among those with ideation.").

[126] Jeffrey Swanson & Allison R. Gilbert, *Mental Illness and Firearm Violence, Letter to the Editor*, 306 JAMA 930, 930 (2011) ("Suicide prevention may be an area of convergence between laws focused on guns and laws focused on individuals who should not have them.").

[127] Harris & Barraclough, *supra* note 123, at 219 tbl.14b, 220; *see also* Donald W. Black, Giles Warrack, & George Winokur, *The Iowa Record-Linkage Study—I. Suicides and Accidental Deaths Among Psychiatric Patients*, 42 ARCH. GEN. PSYCHIATRY 71, 73 (1985) ("[O]verall, male patients were 14.98 times more likely to commit suicide than non-patients, and female patients were 41.33 more likely (p<0.001 for both effects).").

[128] And assuming that involuntary commitment does not affect the percentage of suicides by firearm as opposed to by other means.

laws is certainly stronger when the rationale is suicide prevention, but, as with violence, it ultimately comes down to balancing.[129]

CONCLUSION

The Supreme Court in *Heller* stated that *all* Americans have a right to keep and bear arms, but suggested in dicta that current restrictions on the mentally ill exercising that right are "presumptively lawful." All but the Seventh Circuit have apparently reconciled these statements simply by dropping the word "presumptively." That reading of *Heller* is unsatisfactory. The Second Amendment protects the mentally ill. The interesting question is the extent of that protection. This article finds support for three possible constitutional standards for restrictions on the gun rights of the mentally ill: (1) reasonableness; (2) intermediate scrutiny; and (3) some hybrid.

Current restrictions are tested against these three standards. Federal law prohibits firearm possession by, principally, individuals who have been involuntarily committed. Some state laws are more restrictive, and a few ban gun possession by anyone with a mental illness. All of the restrictions would likely be deemed reasonable. Intermediate scrutiny poses a closer question. The broadest restrictions would likely have to be justified on grounds of suicide, not violence, prevention. Notwithstanding high-profile events like the Aurora, Colorado shooting, the statistical relationship to preventing violence is arguably not substantial. On the other hand, suicide risk is substantially increased for basically all diagnoses. The particular hybrid approach considered here would strike down all status-based restrictions.

Several core findings emerge. First, despite *Heller*'s dictum, it is an open question which standard applies to restrictions on gun possession by the mentally ill. Second, the choice of standard may very well be dispositive with respect to current firearm regulations. Third, particularly if intermediate scrutiny controls, a reexamination of the rationale for our gun laws is required. An undifferentiated and unsubstantiated fear that all persons with mental illness pose a grave threat to others will not suffice. This lowest common denominator of stigma may ultimately explain the common cause of politicians, the Brady Campaign and the NRA to disarm the mentally ill. But the stronger, and probably constitutionally adequate, rationale is suicide prevention.

Preventing suicide may seem a less powerful goal than preventing violence against others. It is not. First, most courts

---

[129] Again, Volokh's hybrid approach would apparently strike down such status restrictions in all cases.

have held that preventing suicide is a "compelling" government interest.[130] The United States Supreme Court has suggested that, even in the context of the terminally ill, it is "unquestionably important."[131] Second, preventing suicide by the mentally ill falls within the government's traditional *parens patriae* power, a "well-established exception[] to a broad general presumption of individual liberty in the liberal society."[132] If the prospect of self-harm is a sufficient basis for involuntary civil commitment (and it is[133]), it should equally suffice to justify a loss of gun possession rights. Finally, the public already recognizes that schizophrenics, individuals suffering from major depression, and alcohol dependents pose greater risks to themselves than to others.[134] To be sure, violence creates fear whereas suicide does not, but saving lives should be more important than calming nerves.

---

[130] *E.g.*, Grand Jury Subpoena John Doe v. United States, 150 F.3d 170, 172 (2d Cir. 1998); Krischer v. McIver, 697 So. 2d 97, 103 (Fla. 1997); Final Exit Network, Inc. v. State, 722 S.E.2d 722, 724 (Ga. 2012); McNabb v. Department of Corrections, 180 P.3d 1257, 1266 (Wash. 2008).

[131] Washington v. Glucksberg, 521 U.S. 702, 735 (1997). Even critics of *Glucksberg* agree. *See id.* at 747 ("I agree that the State has a compelling interest in preventing persons from committing suicide because of depression or coercion by third parties.") (Stevens, J., concurring in the judgment); Erwin Chemerinsky, Washington v. Glucksberg *Was Tragically Wrong*, 106 MICH. L. REV. 1501, 1510 (2008) (conceding that state "obviously" "has an interest in preventing suicide").

[132] Robert F. Schopp, *Civil Commitment and Sexual Predators: Competence and Condemnation*, 4 PSYCHOL. PUB. POL'Y & L. 323, 333 (1998).

[133] Addington v. Texas, 441 U.S. 418, 426 (1979). For an argument that it shouldn't be, see Bruce J. Winick, *The MacArthur Treatment Competence Study: Legal and Therapeutic Implications*, 2 PSYCHOL. PUB. POL'Y & L. 137, 144-45 (1996).

[134] Bernice A. Pescosolido et al., *"A Disease Like Any Other"? A Decade of Change in Public Reactions to Schizophrenia, Depression, and Alcohol Dependence*, 167 AM. J. PSYCHIATRY 1321 tbl.1 (2010).