UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____
DONALD MONTGOMERY, ANDREW CARTER,
LOIS REID and KARL BECHLER,                                    DECISION AND ORDER

          -v-                    Plaintiffs,                    14-CV-6709 CJS

GOV. ANDREW M. CUOMO, Governor of the
State of New York, ANN MARIE T. SULLIVAN,
Commissioner of the New York State Office of
Mental Health, MICHAEL C. GREEN, Executive
Deputy Commissioner of the New York State
Division of Criminal Justice Services, GEORGE
P. BEACH, II, Superintendent of the New York
State Police, VINCENT DeMARCO, Suffolk
County Sheriffs Department, EASTERN
LONG ISLAND HOSPITAL,
                              Defendants.
_____

APPEARANCES

For Plaintiffs:                          Paloma A. Capanna, Esq.
                                         633 Lake Road
                                         Webster, New York 14580
For Andrew M. Cuomo,
Ann Marie T. Sullivan,
Michael C. Green and
George P. Beach, II:                     Monica A. Connell, Esq.
                                         William J. Taylor, Jr., Esq.
                                         Office of the New York State Attorney General
                                         120 Broadway
                                         New York, New York 10271

For Suffolk County:                      Rudolph M. Baptiste, Esq.
                                         Office of the Suffolk County Attorney
                                         100 Veterans Memorial Highway
                                         P.O. Box 6100
                                         Hauppauge, New York 11788

For Eastern Long Island
Hospital:                                Catherine A. Brennan, Esq.
                                         James F. Farrell, Jr., Esq.
                                         Fumuso Kelly DeVerna Snyder Swart & Farrell, LLP
                                         110 Marcus Boulevard, Suite 500
                                         Hauppauge, New York 11788

INTRODUCTION

New York Mental Hygiene Law ("MHL") § 9.46 requires mental-health treatment providers to report patients who appear to pose a threat of serious harm to themselves or others. Then, if the patient reported under MHL § 9.46 has a New York State firearms license, New York Penal Law ("PL") 400.00(11)(b) requires that the license be suspended or revoked, and that the patient's firearms be seized. Plaintiffs bring this action pursuant to, *inter alia*, 42 U.S.C. § 1983, alleging that these enactments violate the Federal statutory and constitutional rights of gun owners who seek mental health treatment. Plaintiffs further maintain that New York State is encouraging mental health treatment providers to file such reports against even non-dangerous patients, especially patients who are admitted to hospitals for any type of mental health treatment, because the State wishes to disarm its citizens and obtain financial incentives from the federal government in exchange for reporting such patients to the National Instant Criminal Background Check System ("NICS").[1] Now before the Court are Plaintiffs' application for preliminary injunctive relief (Docket No. [#3]) and Defendants' motions to dismiss (Docket Nos. [#22][#24][State Defendants' Motion]). Defendants' motions to dismiss are granted, Plaintiff's motions for preliminary injunctive relief and for leave to amend are denied, and this action is dismissed.

---

[1]"The Brady Handgun Violence Prevention Act (the "Brady Act"), Pub. L. No. 103-159, 107 Stat. 1536 (1993) . . . created the National Instant Criminal Background Check System ("NICS Background Check") to prevent the transfer of firearms to individuals barred from firearm possession by federal or state law. 18 U.S.C. §§ 922(t),(g),(n). All persons attempting to purchase firearms must undergo an NICS Background Check. See 18 U.S.C. §§ 922(t), 923(a). As part of that procedure, prospective customers must complete a firearms transaction record known as the ATF Form 4473, which elicits personal information and propounds questions to certify that the customer is qualified to possess a firearm under the enumerated Brady Act factors. 27 C.F.R. § 478.124; 28 C.F.R. § 25.7(a); 18 U.S.C. § 922(g)(1)-(9),(n) (setting forth ten conditions that render an individual ineligible to purchase a firearm). The Form 4473 information is then compared against databases from multiple agencies, including the Federal Bureau of Investigation's National Crime Information Center ("NCIC"). See 28 C.F.R. § 25.6(c)(1)(iii)." *Robinson v. Sessions*, No. 17-1427-CV, 2018 WL 456725, at *1 (2d Cir. Jan. 18, 2018).

BACKGROUND

New York's Secure Ammunition and Firearms Enforcement Act of 2013 (the "SAFE

Act") was enacted in January 2013, following a series of mass shootings around the United

States by mentally disturbed individuals.  At least some of the shooters in these incidents

were able to legally obtain firearms even though they were known to be dangerous by their

mental health treatment providers.[2]  Adopted as part of the SAFE Act,[3] MHL § 9.46

provides as follows:

> **§ 9.46 Reports of substantial risk or threat of harm by mental health professionals**
>
> (a) For purposes of this section, the term "mental health professional" shall include a physician, psychologist, registered nurse or licensed clinical social worker.
>
> (b) Notwithstanding any other law to the contrary, when a mental health professional currently providing treatment services to a person determines, in the exercise of reasonable professional judgment, that such person is likely to engage in conduct that would result in serious harm to self or others, he or she shall be required to report, as soon as practicable, to the director of community services, or the director's designee, who shall report to the division of criminal justice services whenever he or she agrees that the person is likely to engage in such conduct. Information transmitted to the division of criminal justice services shall be limited to names and other non-clinical identifying information, which may only be used for determining whether a [firearms] license issued pursuant to section 400.00 of the penal law should be suspended or revoked, or for determining whether a person

---

2*See, generally*, State Defendants Motion to Dismiss, Ex. 37, Shaundra K. Lewis, *Firearm Laws Redux-Legislative Proposals for Disarming the Mentally Ill Post-Heller and Newtown*, Mental Health Law & Policy Journal, Vol. 3, at pp. 328-334 (2014).

3The SAFE Act amended New York's Criminal Procedure Law, Correction Law, the Family Court Act, Executive Law, the General Business Law, the Judiciary Law, the Mental Hygiene law, the Penal Law and the Surrogate's Court Procedure Act. *See*,   2013 Sess. Law News of N.Y. Ch. 1 (S. 2230) (McKINNEY'S)

is ineligible for a license issued pursuant to section 400.00 of the penal law, or is no longer permitted under state or federal law to possess a firearm.

(c) Nothing in this section shall be construed to require a mental health professional to take any action which, in the exercise of reasonable professional judgment, would endanger such mental health professional or increase the danger to a potential victim or victims.

(d) The decision of a mental health professional to disclose or not to disclose in accordance with this section, when made reasonably and in good faith, shall not be the basis for any civil or criminal liability of such mental health professional.

New York Mental Hygiene Law § 9.46 (West 2018) (emphasis added).

MHL § 9.46 works in tandem with New York Penal Law § 400.00(11)(b) (referenced above in MHL § 9.46(b), and also adopted as part of the SAFE Act) to remove guns from persons with pistol licenses who have been identified as being likely to engage in conduct that would result in serious harm to themselves or others. In particular, Penal Law § 400.00(11) states in pertinent part:

Whenever the director of community services or his or her designee makes a report pursuant to section 9.46 of the mental hygiene law, the division of criminal justice services shall convey such information, whenever it determines that the person named in the report possesses a [firearms] license issued pursuant to this section, to the appropriate licensing official, who shall issue an order suspending or revoking such license.

NY Penal Law § 400.00(11)(b) (emphasis added).

Accordingly, MHL § 9.46 requires "mental health professionals," including doctors, psychologists, registered nurses and licensed clinical social workers, to make a notification when they reasonably believe in their professional judgment that a patient under their treatment "is likely to engage in conduct that would result in serious harm to self or others,"

4

provided that they can do safely. In particular, such mental health professionals must notify the State of New York's Office of Mental Health ("OMH") "director of community services, or the director's designee." An OMH "'director of community services' [("DCS")] means a county's director of community services for the mentally disabled appointed pursuant to article forty-one of [the Mental Hygiene Law]." N.Y. Mental Hyg. Law § 9.01 (McKinney 2017). Article 41 of the Mental Hygiene Law requires each county (in order to be eligible for state aid) to maintain a Local Governmental Unit ("LGU") to oversee the delivery of mental health services within the county. *See*, MHL § 41.05(a). The DCS is the chief executive officer of the LGU, *see*, MHL § § 41.05(c), 41.09, and is a county employee.

To facilitate the making of notifications under MHL § 9.46, the State of New York created a computer system, called the Integrated SAFE Act Reporting System ("ISARS"), for transmitting patient information between mental health care providers and their local DCS. Such information includes the patient's name, address, date of birth, Social Security Number, sex, race, and diagnosis, along with an explanation for why the mental health professional believes the patient poses a specific threat.[4] The ISARS system is used only to file reports under MHL § 9.46, and not to file reports that might be required under other sections of the Mental Hygiene Law. In that regard, mental health professionals access ISARS by going to the OMH website and clicking on links identified as either "NY SAFE

---

[4]*See, e.g.*, OMH ISARS User's Manual, Vertions 1.0.2.9 (Sep. 28, 2015) ("ISARS Users Manual"), nics.ny.gov/docs/user_guide.pdf According to the website maintained by the New York State Office of NICS Appeals & SAFE Act, "Mental health professionals should convey information necessary to allow the DCS to review the matter and determine if a report to the NYS Division of Criminal Justice Services (DCJS) is required (e.g., what clinical evidence, history, and risk factors have caused the mental health professional to conclude that the patient is likely to engage in conduct that would result in serious harm to self or others)." http://nics.ny.gov/sa-faq.html

Act" or "9.46 Reporting."[5]

If, after reviewing a report filed by a mental health professional, the DCS "agrees that the person [named in the report] is likely to engage in [seriously harmful] conduct," he or she must notify the New York State Division of Criminal Justice Services ("DCJS") of that fact. DCJS is an agency that provides a wide variety of services related to law enforcement, including "maintain[ing] criminal history records and fingerprint files and perform[ing] background checks for employment and licensure."[6] To make such a notification, a DCS transmits information to DCJS using the Integrated Justice ("IJ") Portal.[7] Such information is required to be limited to the patient's "name[ ] and other non-clinical

---

5ISARS Users Manual at p. 7 ("1. SAFE Act Users can enter the application in one of two ways: a. through the OMH home page at http://www.omh.ny.gov by clicking the "NY SAFE ACT" link, then clicking the "9.46 Reporting" link at http://www.omh.ny.gov/omhweb/safe_act/. (Additional SAFE ACT Reporting resources are available at this site). b. or by directly accessing the reporting portal by typing this URL in to their web browser: https://nysafe.omh.ny.gov.").

6See, http://www.criminaljustice.ny.gov/crimnet/mail.htm ("The agency provides direct training to law enforcement and other criminal justice professionals; oversees a law enforcement accreditation program; ensures Breathalyzer and speed enforcement equipment used by local law enforcement operate correctly; manages criminal justice grant funds; analyzes statewide crime and program data; provides research support; oversees county probation departments and alternatives to incarceration programs; and coordinates juvenile justice policy. DCJS maintains criminal history records and fingerprint files and performs background checks for employment and licensure. The agency also administers the state's Sex Offender Registry; the Missing Persons Clearinghouse; the state's DNA Databank in cooperation with the New York State Police Forensic Investigation Center; and provides staff support to independently appointed commissions and councils, including the New York State Commission on Forensic Science, which monitors and accredits the state's forensic laboratories.").

7Aff. of Donna Marie Call at ¶ 17 ("All information received by DCJS pursuant to the Mental Hygiene Law, including all information received pursuant to MHL § 9.46, is maintained as confidential. Such information is sent and received by DCJS via the Integrated Justice (IJ) portal. The IJ portal utilizes encryption that meets FBI Criminal Justice Information (CJIS) data encryption policy."). Apparently, then, ISARS is only used to send MHL § 9.46 reports from mental health providers to the DCS.

identifying information." Mental Hygiene Law § 9.46(b).[8]  In other words, a DCS does not send DCJS information about a patient's diagnosis or the reasons why the patient is believed to be dangerous.  When DCJS receives a § 9.46 report, it adds the patient's name to a state database created as part of the SAFE Act,[9] and then checks to see whether the patient holds a New York firearms license or has applied for one.  If so, DCJS notifies "the appropriate [firearms] licensing official" (usually a judge, sheriff or police commissioner).[10]  In particular, if DCJS finds that the patient reported under MHL § 9.46 has a firearms license, it notifies the New York State Police ("NYSP"), which double checks the firearms-license database and then provides notice to the licensing official.[11]  Upon receiving such notice under MHL § 9.46, the "appropriate licensing official" *must* either suspend or revoke the patient's firearms license. Penal Law § 400.00(11)(b).

Upon such mandatory suspension or revocation of the patient's pistol license under

---

[8]DCJS is permitted to retain such information for a period of five years, after which it is supposed to destroy the information. *See* New York Executive Law § 837(19) ("The division shall have the following functions, powers and duties: . . .  19. Receive names and other non-clinical identifying information pursuant to section 9.46 of the mental hygiene law; provided, however, any such information shall be destroyed five years after such receipt, or pursuant to a proceeding brought under article seventy-eight of the civil practice law and rules determining that an individual is eligible for a license pursuant to section 400.00 of the penal law and otherwise permitted to possess a firearm.").

[9]*See*, Penal Law § 400.02 ("Statewide license and record database").

[10]"Licensing officer" means in the city of New York the police commissioner of that city; in the county of Nassau the commissioner of police of that county; in the county of Suffolk the sheriff of that county except in the towns of Babylon, Brookhaven, Huntington, Islip and Smithtown, the commissioner of police of that county; for the purposes of section 400.01 of this chapter the superintendent of state police; and elsewhere in the state a judge or justice of a court of record having his office in the county of issuance." N.Y. Penal Law § 265.00(10) (McKinney 2017).

[11]*See, e.g.*, Complaint [#1] at ¶ ¶ 86-87.  The  NYSP actually maintains the state-wide database of firearms license holders. Pl. Prelim. Inj. Motion, Exhibit Group D, Ex. 5, OMH Guidance Document at p. 5; see also, id., Exhibit Group D, Ex. 10 NYS Police SAFE Act Field Guide at p. 2; *see also, id.* at p. 13 ("DCJS will notify the State Police to confirm the existence of the license and the licensing authority will be notified so they can make a determination as to whether to suspend or revoke the subject's license."); see also, Affidavit of Donna Marie Call, ¶ 13.

MHL § 9.46 and PL 400.00(11)(b), "an appropriate law enforcement agency" must seize all of the patient's guns, including those for which no license is required. On this point, Penal Law § 400.00(11)(c) states:

> In any instance in which a person's license is suspended or revoked under paragraph . . . (b) of this subdivision, such person shall surrender such license to the appropriate licensing official and any and all firearms, rifles, or shotguns owned or possessed by such person shall be surrendered to an appropriate law enforcement agency as provided in subparagraph (f) of paragraph one of subdivision a of section 265.20 of this chapter. In the event such license, firearm, shotgun, or rifle is not surrendered, such items shall be removed and declared a nuisance and any police officer or peace officer acting pursuant to his or her special duties is authorized to remove any and all such weapons.

N.Y. Penal Law § 400.00(11)(b)&(c) (McKinney 2017). An "appropriate law enforcement agency," as mentioned above, is defined to include "the sheriff of the county in which such person [surrendering weapons] resides." Penal Law § 265.20(1)(f) (McKinney 2017).[12]

In sum, whenever a mental health professional and DCS issue notifications under § 9.46 concerning a patient, DCJS determines whether the patient has a firearms license and, if so, NYSP notifies[13] the local licensing official, who must at least suspend the license, thereby requiring the patient to immediately surrender all of his firearms to the police. In the event that the patient fails to surrender his guns, Penal Law § 400.00(11)(c)

---

12"[S]uch surrender shall be made to the superintendent of the division of state police or a member thereof designated by such superintendent, or to the sheriff of the county in which such person resides, or in the county of Nassau or in the towns of Babylon, Brookhaven, Huntington, Islip and Smithtown in the county of Suffolk to the commissioner of police or a member of the police department thereof designated by such commissioner, or if such person resides in a city, town other than one named in this subparagraph, or village to the police commissioner or head of the police force or department thereof or to a member of the force or department designated by such commissioner or head;" N.Y. Penal Law § 265.20(1)(f) (McKinney 2017) (emphasis added).

13As will be discussed further below, NYSP uses a particular form letter to make this notification. *See*, Pl. Prelim. Inj. Motion, Exhibit Group H, Ex. 37.

authorizes the police to take them.

MHL 9.46 and PL 400.00(11)(b) affect persons who have firearms licenses.  These provisions would have no immediate effect on gun owners who do not have pistol licenses. For example, if a DCS forwarded a § 9.46 report to DCJS concerning an individual who owned a shotgun but did not have a pistol license, DCJS would not find the person's name in the firearms license database.  DCJS would therefore add the person's name to the database created by PL § 400.02 (where it would remain for five years), but would not notify the local licensing officer, and the report would not result in the seizure of the shotgun.

The aforementioned SAFE Act provisions were adopted in addition to existing provisions of New York Mental Hygiene Law Article 9, which provide for the hospitalization and treatment of  mentally-ill individuals.  For example, MHL § § 9.13[14] and  9.15[15] allow persons to voluntarily admit themselves to a hospital for mental health treatment, without having to show that they pose a threat to themselves or to others.  Also, MHL § 9.27 allows a person to be involuntarily admitted to a mental hospital, upon the "certification by two physicians that [the] individual has a mental illness for which care and treatment as a patient in a hospital is essential to the person's welfare,"[16] but does not require "an active

_____

14MHL § 9.13, entitled "Voluntary Admissions," subsection (a), states in pertinent part: "The director of any hospital may receive as a voluntary patient any suitable person in need of care and treatment, who voluntarily makes written application therefor."

15MHL § 9.15, entitled "Informal Admissions," states: "The director of any hospital approved by the commissioner for such purpose may receive therein as an informal patient any suitable person in need of care and treatment requesting admission thereto. Such person may be admitted as a patient without making formal or written application therefor and any such patient shall be free to leave such hospital at any time after such admission."

16Pl. Prelim. Inj. Motion, Exhibit Group D, Ex. 5, OMH Guidance Document.

display of dangerous behavior."[17]

On the other hand, other provisions of MHL Article 9 provide for involuntary admission of patients who are actively displaying dangerous behavior. MHL § 9.37 states that a hospital may involuntarily admit a patient who "has a mental illness for which immediate inpatient care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others," while MHL § 9.39 provides for the involuntary admission, for up to fifteen days, of "any person alleged to have a mental illness for which immediate observation, care, and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others." MHL § 9.45 also gives a DCS the power to remove someone to a hospital upon a report that the person "has a mental illness for which immediate care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others." Further, MHL § 9.41 permits police officers to take into custody "any person who appears to be mentally ill and is conducting himself in a manner which is likely to result in serious harm to himself or others," and to transport such person to a hospital.

As used in these statutes and throughout MHL Article 9, a finding that a patient is "likely to result in serious harm to himself or others" must be supported by certain signs:

> "likelihood to result in serious harm" or "likely to result in serious harm" means (a) a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal

---

[17] OMH SAFE Act Guidance Document at p. 3 ("The courts have interpreted the 2 PC standard as requiring both mental illness and a finding that the person is dangerous to self or others, but such dangerousness may be found even without an active display of dangerous behavior, conduct, or threats if the person has a history of dangerous conduct associated with noncompliance with mental health treatment programs.").

or other violent behavior by which others are placed in reasonable fear of serious physical harm.

N.Y. Mental Hyg. Law § 9.01 (McKinney 2018).

This is the same standard to be applied under MHL § 9.46. Not only is the relevant language in § 9.46 essentially identical to the language in § 9.01, but OMH interprets the definitions consistently. In that regard, after passage of the SAFE Act, OMH issued various instructions to mental health professionals, explaining how to apply newly-enacted § 9.46, and, in particular, how to interpret § 9.46's reporting standard, "likely to engage in conduct that will cause serious harm to self or others." For example, OMH issued a "Guidance Document" explaining that such standard is consistent with, and should be interpreted the same as, the standards contained in MHL § § 9.39 and 9.45, but is different than the standard under MHL § 9.27:

> With respect to initial reports made by mental health professionals, the reporting standard is 'likely to engage in conduct that will cause serious harm to self or others.' This standard is consistent with the 'likely to result in serious harm to self or others' standard that a [DCS] or designee uses to direct emergency 'removals' from the community to a psychiatric hospital for examination under MHL Section 9.45. This is also consistent with the standard for emergency admissions for observation, care and treatment pursuant to MHL Section 9.39.
>
> As such, decision making with respect to a Section 9.46 report requires a clinical determination that a person's clinical state creates either: '(a) a substantial risk of physical harm to the person, as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior which places others in reasonable fear of serious physical harm.'
>
> The standard differs from the non-emergency, involuntary commitment

standard pursuant to MHL Section 9.27 (i.e., the '2 PC' standard). The '2 PC' standard requires certification by two physicians that an individual has a mental illness for which care and treatment as a patient in a hospital is essential to the person's welfare. Furthermore, the person's judgment must be so impaired that s/he is unable to understand the need for care and treatment. The courts have interpreted the 2 PC standard as requiring both mental illness and finding that the person is dangerous to self or others, but such dangerousness may be found even without an active display of dangerous behavior, conduct , or threats if the person has a history of dangerous conduct associated with noncompliance with mental health treatment programs. Accordingly, a person could meet the '2 PC' standard, but still not pose a risk of harm that justifies action pursuant to either the emergency removal or admission standard, or the 9.46 standard.

Because the 9.46 standard is consistent with the standard that is used for emergency removals and admissions under MHL Article 9, a person who requires a Section 9.46 report could simultaneously require an emergency removal to a psychiatric hospital for an examination pursuant to MHL Section 9.41, 9.43, or 9.45. Depending on the results of the examination, such person could also thereafter be admitted and retained in a hospital pursuant to MHL Section 9.39.[18]

Additionally, OMH has made an instructional power point on the SAFE Act available, entitled "NY SAFE Act Introduction for Mental Health Providers."[19] This document indicates that MHL § 9.46's "likely to engage in conduct that will cause serious harm to self or others" standard is consistent with the "likely to result in serious harm" definition in MHL § 9.01, which "justifies the need for immediate action, such as an involuntary transport by police or an ambulance service to a psychiatric hospital for an examination."[20] According to OMH, therefore, a person who must be reported under MHL § 9.46 should also be a candidate

---

18 OMH Guidance Document, State Defs. Mtn to Dismiss, Ex. 11 at pp. 2-3.

19 State Defs. Mtn. to Dismiss, Ex. 12.

20 State Defs. Mtn to Dismiss, Ex. 12 at p. 5.

for emergency involuntary transport  to hospital and/or involuntary admission.

Prior to the SAFE Act, and continuing to the present, a person who is involuntarily admitted to a hospital for mental treatment under MHL Article 9 becomes federally disqualified from having any type of firearm.  In particular, 18 U.S.C. §  922(d)(4) , states that "[i]t shall be unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person . . . has been adjudicated as a mental defective or has been committed to any mental institution," while 18 U.S.C. § 922(g)(4) states that "[i]t shall be unlawful for any person . . . who has been adjudicated as a mental defective or who has been committed to a mental institution" to possess any firearm or ammunition.[21]

The relevant federal regulation explains that the term "committed to a mental institution" "includes a commitment to a mental institution involuntarily." 27 C.F.R. § 478.11.[22]  Significantly, any involuntary commitment under MHL Article 9, including under MHL § 9.27, constitutes a disqualifying "commitment to a mental institution" for purposes of 18 U.S.C. § 922(g)(4).[23]  However, the term "committed to a mental institution" "does

---

21However, while 18 U.S.C. § 922(g)(4) makes it illegal for persons who have been involuntarily committed to possess firearms, it does not compel the seizure of any firearms that such persons may already possess.

22This same regulation defines a "mental institution" as follows: "Mental institution. Includes mental health facilities, mental hospitals, sanitariums, psychiatric facilities, and other facilities that provide diagnoses by licensed professionals of mental retardation or mental illness, including a psychiatric ward in a general hospital." 27 C.F.R. § 478.11.

23See, 14 NYCRR 543.4(b) ("Committed to a mental institution means, as such term is defined in Federal regulations at 27 C.F.R. 478.11, a formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority. Such term includes a commitment to a mental institution involuntarily[.]  . . .  For purposes of this Part, committed to a mental institution shall include persons who have been involuntarily committed or confined pursuant to article 9 or 10 of the Mental Hygiene Law."). See also, U.S. v. Waters, 23 F.3d 29 (2d Cir. 1994).   Where an individual has been involuntarily committed, the subsequent application of § 922(g)(4) to prevent him from owning or possessing firearms does not violate the Second Amendment. See, Heller v. Bedford Cent. Sch. Dist., 665 F. App'x 49, 54 (2d Cir. 2016) ("Restrictions on the purchase of guns by the mentally ill are presumptively lawful.  Heller's

13

not include [the placement of] a person in a mental institution for observation or a voluntary admission to a mental institution." 27 C.F.R. § 478.11.

Prior to the SAFE Act, the fact that a person was involuntarily committed, and therefore disqualified by 18 U.S.C. § 922(g)(4) from possessing firearms, did not result in the suspension or revocation of that person's New York pistol license.[24]  As part of the SAFE Act, though, the firearms licenses of persons who have been involuntarily committed are revoked, and any firearms possessed by such persons are taken. *See*, PL § § 400.00(1)(j) & (11)(a)&(c) (Indicating that persons who have been involuntarily committed are not eligible for firearms licenses, and that if a person who holds a firearms license later becomes ineligible, his license is revoked and his guns must be surrendered).  In that regard, New York now checks reports of involuntary admissions against the state's firearms database.[25]  Such a revocation differs from the suspension/revocation that takes place under MHL § 9.46.  Specifically, pursuant to Penal Law § 400.02, an "involuntary

---

Second Amendment claim was properly dismissed because the restriction on gun purchases by individuals committed to a mental institution is presumptively lawful, and because Heller has not stated a plausible claim that he was improperly committed.") (citations omitted).

[24] *See*, Aff. of Donna Marie Call, ¶ 9, n. 2 ("The SAFE Act amended Penal Law § 400.00 to amend the eligibility requirements for a firearms license in New York to conform with federal law, so that those persons who are federally prohibited from possessing guns, including those disqualified on mental health grounds under 18 U.S.C. § 922(g)(4), are also expressly precluded from having a firearms license by state law.").

[25] *See*, Aff. of Donna Marie Call, ¶ 9, n. 2 ("[R]eports of involuntary commitments which have been made to NICS for years, are now also run against a database of State firearms licensees to identify those persons who are not permitted to legally possess a gun. See, MHL § 7.09(j), 33.13(c)(15); *see also*, Penal Law § 400.00(11)(a) and (c), § 400.00(4), and Penal Law § 400.02."); *see also*, State Defs. Motion to Dismiss, Exhibit 22, letter from NYSP to Suffolk County, advising that Mr. Montgomery was ineligible to possess firearms pursuant to 18 U.S.C. § 922(g)(4), due to having been "adjudicated as a mental defective or . . . involuntarily committed to a mental institution.").

commitment" requires the licensing officer to revoke the firearms license,[26] while MHL § 9.46 gives the licensing officer discretion to either suspend or revoke the firearms license.

As can be seen, a person who is involuntarily committed under MHL Article 9 must be reported to OMH and DCJS, and such report should necessarily result in the revocation of the involuntarily-committed person's firearms license (if any) and the seizure of such person's weapons.[27] Such ought to be the case regardless of whether a report concerning the person is also filed under MHL § 9.46, though it appears that the SAFE Act requires both types of reports to be filed.[28] The primary benefit of MHL § 9.46, therefore, appears to be either as a means to alert OMH/DCJS of persons who, in the opinion of at least two mental health professionals (the treating mental health professional and the DCS) arguably meet the standard for involuntary commitment (MHL § 9.01) even though they have not been involuntarily committed for whatever reason,[29] or as a fail-safe in situations where a person has been involuntarily committed but not reported to OMH/DCJS/NICS as such.

---

26 N.Y. Penal Law § 400.02 (McKinney) ("The division of criminal justice services, upon determining that an individual is ineligible to possess a license . . . shall notify the applicable licensing official of such determination and such licensing official shall not issue a license or revoke such license and any weapons owned or possessed by such individual shall be removed consistent with the provisions of subdivision eleven of section 400.00 of this article."). It appears that the foregoing section intends to say, "or *shall* revoke such license."

27 Penal Law § 400.00(1)(j) & 11(a)7(c).

28 The SAFE Act apparently requires that MHL § 9.46 reports be filed even for persons who have been involuntarily admitted, even though such a report would seem to be redundant. That is, MHL § 9.46 does not contain any express exception concerning patients who have been or who are being involuntarily admitted.

29 Even if there is not sufficient agreement among doctors to have a person involuntarily committed, the report by a single treatment provider under MHL § 9.46, when it is agreed with by the DCS, will result in at least the suspension of the patient's firearms license and the seizure of his weapons.

As briefly noted earlier, pursuant to federal law, all persons attempting to purchase firearms must undergo an NICS Background Check. However, federal law does not compel states to report information to NICS that would disqualify someone from possessing a gun under 18 U.S.C. § 922(g) (such as an involuntary commitment). Nevertheless, because Congress determined that a lack of such state reporting was resulting in failures by NICS to screen out mentally-ill persons who should have been prevented from buying guns,[30] the NICS Improvement Amendments Act of 2007 now provides financial incentives for states which increase their reporting to NICS, and penalties for those which do not.[31] To be eligible for such incentives, states are required to first provide the U.S. Attorney General with a "reasonable estimate" of the number of records that the state has concerning persons who have become disqualified under 18 U.S.C. § 922(g) & (n), and then make at least ninety percent of such records electronically accessible to NICS.[32] The NICS Improvement Amendments Act does not reward states

---

[30] See, NICS IMPROVEMENT AMENDMENTS ACT OF 2007, PL 110–180, January 8, 2008, 122 Stat 2559 (Setting forth Congressional findings concerning two high-profile incidents, including the massacre at Virginia Polytechnic Institute and State University, perpetrated by mentally ill persons who were able to purchase firearms due to the fact that NICS had incomplete information); see also, Tyler v. Hillsdale Cty. Sheriff's Dep't, 837 F.3d 678, 682 (6th Cir. 2016) ("Seeking to remedy weaknesses in the national instant criminal background check system (NICS), Congress authorized federal grants to encourage the states to supply accurate and up-to-date information to federal firearm databases.") (citation and footnote omitted).

[31] See, generally, Franklin v. Lynch, No. 3:16-CV-36, 2016 WL 6879265, at *3 (W.D. Pa. Nov. 21, 2016) ("In the wake of the 2007 mass shooting at the Virginia Polytechnic Institute and State University, Congress enacted the NICS Improvement Amendments Act ("NIAA"). NIAA sought to improve the background-check system by facilitating access by the FBI of records relating to criminal history and mental health. See NIAA § 2. Employing established principles of federalism, NIAA adopted a two-pronged approach. First, NIAA imposed a requirement on federal departments and agencies to share relevant records with the Attorney General. See NIAA § 101(a)-(b). Second, NIAA authorized the issuance of federal grants to incentivize states to improve the quality of information they provide to NICS. See NIAA § 103. To be eligible for such a federal grant, a state must "certify, to the satisfaction of the Attorney General, that the State has implemented a relief from disabilities program in accordance with section 105 [of NIAA]." NIAA § 103(c).") (footnote omitted).

[32] See, 34 U.S.C. § 40912.

merely for increasing the number of reports of disqualifying events made available to NICS; rather, it rewards states for thoroughness and accuracy in reporting such events, regardless of the total number of such events.[33]

In response to the NICS Improvement Amendments Act of 2007, New York State law was amended to allow relevant mental health records to be made accessible to NICS.[34] For example, MHL § 7.09(j) gives OMH authorization to collect data, including the "names and other non-clinical identifying information of persons who [were] involuntarily committed to a hospital," and to make such information available to queries from NICS.[35] In particular, OMH provides such information to DCJS, which then transfers the information to NICS.[36] Further, MHL § 31.11(5) requires mental health service providers to notify OMH of patients "who may be disqualified from possessing a firearm pursuant to" 18 U.S.C. § 922. Mental health providers transmit such information to OMH using an electronic system that pre-dates, and is different than, ISARS.[37] At all relevant times, the information that OMH maintains for reporting to NICS (via DCJS) has been kept by OMH in a database that is

---

[33]Id.; see also, 34 U.S.C. § 40913(b)(4) ("Grants awarded to States . . . under this section may only be used to-- supply accurate and timely information to the Attorney General concerning the identity of persons who are prohibited from obtaining a firearm under section 922(g)(4)[.]').

[34]See, New York Bill Jacket, 2008 Senate Bill 8706, Ch. 491.

[35]2008 Sess. Law News of N.Y. Ch. 49 (S. 8706) (McKinney's); see also, Aff. of John B. Allen, Jr. at ¶ 9. As part of the SAFE Act, MHL § 7.09(j) was further amended, to require OMH to forward such information to DCJS and/or the FBI, "for determining whether a [firearms] license issued pursuant to section 400.00 of the [New York Penal Law] should be denied, suspended or revoked . . . or for determining whether a person is no longer permitted under federal or state law to possess a firearm." MHL § 7.09(j)(1) (West 2018).

[36]Aff. of Donna Marie Call at ¶ 7. OMH is not the only state agency that provides information to DCJS for use in responding to NICS queries. The Office of Court Administration, the Office for People with Developmental Disabilities, the Department of Health, and the Office of Mental Health also provide information to DCJS for that purpose. Id.

[37]Aff. of John B. Allen, Jr. at ¶ ¶ 9, 15.

separate from the database that was later created as part of the SAFE Act and used in connection with MHL § 9.46.[38] Reports of involuntary commitments are reported to NICS pursuant to MHL § 7.09(j), but reports under MHL § 9.46 which do not also involve an involuntary commitment are not reported to NICS.[39]

As already discussed, DCJS receives reports concerning events such as involuntary commitments under the Mental Hygiene Law that entirely disqualify persons from having guns under federal law, and DCJS also receives reports under MHL § 9.46 that result in the suspension, if not the revocation, of firearms licenses issued under New York State law. DCJS has the ability to search its records to determine whether either type of report has been filed against a particular individual, and, if so, when and by whom. As previously indicated, persons may become involuntarily committed under various sections of the Mental Hygiene Law, including § 9.27, § 9.37 and § 9.39. However, regardless of the particular MHL section under which a person is involuntarily committed, DCJS uses the descriptor "9.41" as shorthand in its database for all involuntary commitments.[40] That is, DCJS refers to reports of involuntary commitments as "9.41 reports. Accordingly, DCJS has the ability to search its records and determine whether a person was reported under MHL § 9.46 ("9.46 reports") or whether such person was reported as having been

_____

[38] Aff. of John B. Allen, Jr. at ¶ 10.

[39] Aff. of John B. Allen, Jr. at ¶ 10, n. 3. The fact that someone is involuntarily committed is a disqualifying event under 18 U.S.C. § 922(g)(4). The fact that a mental health provider reasonably believes that a patient is "likely to engage in conduct that would result in serious harm to self or others" is not, by itself, a disqualifying event under 18 U.S.C. § 922(g)(4).

[40] Aff. of Donna Marie Call at ¶ 9, n. 1 ("The identifier 'MHL § 9.41' is used by DCJS as shorthand to identify individuals who have been reported as having been adjudicated mentally defective or involuntarily committed to a mental institution under provisions of the Mentaly Hygiene Law where such commitment constitutes an involuntary commitment for the purposes of 18 U.S.C. § 922(g)(4).").

adjudicated a mental defective/ committed to mental institution ("9.41 reports"), but with regard to the latter type of report DCJS's search results do not indicate the actual section of the Mental Hygiene Law under which the individual was adjudicated mental defective/committed to a mental institution.[41]

MHL § 9.46 was enacted amidst an existing framework of federal and state laws designed to protect patients' privacy in their confidential medical information. Most notably, the federal Health Insurance Portability and Accountability Act of 1996 ("HIPAA") generally provides for the confidentiality of medical records.[42] However, HIPAA provides various exceptions which permit health providers to disclose protected health information without the patient's authorization. In pertinent part, HIPAA permits such disclosures *either* where they are required by law, including state law, or where they are necessary to prevent or lessen a serious and imminent threat to the health or safety of the patient or a third party. Specifically, 45 C.F.R. § 164.512, entitled "Uses and disclosures for which an authorization or opportunity to agree or object is not required," states:

> A covered entity may use or disclose protected health information without the written authorization of the individual . . . or the opportunity for the individual to agree or object . . . in the situations covered by this section, subject to the

---

[41]Aff. of Donna Marie Call at ¶ ¶ 9, n.1, 18-25.

[42]*See, Ross v. Westchester Cty. Jail*, No. 10 CIV. 3937 DLC, 2012 WL 86467, at *9 (S.D.N.Y. Jan. 11, 2012) ("Although HIPAA generally provides for the confidentiality of medical records, 42 U.S.C. §§ 1320d–1 to d–7, an individual cannot sue for its enforcement or for damages caused by disclosures. *See Acara v. Banks*, 470 F.3d 569, 571 (5th Cir.2006); *Warren Pearl Constr. Corp. v. Guardian Life Ins. Co. of Am.*, 639 F.Supp.2d 371, 377 (S.D.N.Y.2009) (collecting cases). Only the Secretary of Health and Human Services or other government authorities may bring a HIPAA enforcement action. See 42 U.S.C. § 300gg–22."). There is no private right to sue for a HIPAA violation. *See, Roberts v. Vermont Dep't of Corr.*, No. 2:16-CV-135-CR-JMC, 2017 WL 2189707, at *3 (D. Vt. Apr. 4, 2017) ("Courts have overwhelmingly concluded that there is no private right of action under HIPAA. Furthermore, an alleged HIPAA violation cannot form the basis of a 42 U.S.C. § 1983 claim.") (citations and internal quotation marks omitted), report and recommendation adopted, No. 2:16-CV-135, 2017 WL 2198139 (D. Vt. May 17, 2017).

applicable requirements of this section.

\*\*\*

(a) Standard: **Uses and disclosures required by law.**

(1) A covered entity may use or disclose protected health information to the extent that such use or disclosure is <u>required by law</u> and the use or disclosure complies with and is limited to the relevant requirements of such law.

\*\*\*

(j) Standard: **Uses and disclosures to avert a serious threat to health or safety.**

(1) Permitted disclosures. A covered entity may, consistent with applicable law and standards of ethical conduct, use or disclose protected health information, if the covered entity, in good faith, believes the use or disclosure:

(i)(A) Is <u>necessary to prevent or lessen a serious and imminent threat</u> to the health or safety of a person or the public; and

(B) Is to a person or persons reasonably able to prevent or lessen the threat, including the target of the threat[.]

45 C.F.R. § 164.512 (West 2018) (emphasis added).

Importantly, disclosure is permitted under 45 C.F.R. § 164.512(a) (the "required by law" exception) where the disclosure is mandatory (not merely permissible)[43] under a particular federal or state law.[44] In this regard,

---

43The New York State Psychiatric Association has argued that disclosure under MHL § 9.46 does not fall under HIPAA's "required by law" exception, since "it is not truly compulsory - it includes an exception to the duty to report with respect to any action which, in the exercise of reasonable professional judgment, would endanger the reporter or increase the danger to a potential victim or victims." *See*, http://www.nyspsych.org/index.php?option=com_content&view=article&id=53:safe-act-press-release&catid =20:site-content  This view,  however, is contrary to Plaintiffs' submissions, which repeatedly assert that disclosure under MHL § 9.46 is mandatory.

44Significantly in this regard, HIPAA  defers to the judgment of the state and federal legislators who drafted the law requiring disclosure. *See*, Standards for Privacy of Individually Identifiable Health Information, 65 FR 82462-01, 2000 WL 1875566 (Dec. 28, 2000)  ("[W]e intend this provision [(sec 164.512(a)] to preserve access to information considered important enough by state or federal authorities to require its disclosure by law.  The importance of these required uses or disclosures is evidenced by the legislative or other public process necessary for the government to create a legally binding obligation on a covered entity.  . . .  It is not possible, or appropriate, for HHS to reassess the legitimacy of or the need for each of these mandates in each of their specialized contexts.  . . .  [J]urisdictions have determined that

"law" is intended to be read broadly to include the full array of binding legal authority, such as constitutions, statutes, rules, regulations, common law, or other governmental actions having the effect of law. [Moreover,] for the purposes of § 164.512(a), law is not limited to state action; rather, it encompasses federal, state or local actions with legally binding effect, as well as those by territorial and tribal governments.[45]

Notably, OMH's SAFE Act Guidance Document refers to MHL § 9.46 as a "mandatory reporting requirement."[46]  Because of that, the Guidance Document states, mental health professionals need nor worry about violating HIPAA by filing § 9.46 reports, since HIPAA's "required by law" exception, 45 C.F.R. sec 164.512(a), applies.[47]

On the other hand, disclosure is allowed under 45 C.F.R. § 164.512(j) only where a health provider believes that an emergency situation exists, and that disclosure is necessary to prevent or lessen  a serious and imminent threat to the health or safety of the patient or a third party.  As such, § 164.512(j) "is intended to apply in rare circumstances – circumstances that occur much less frequently than those described in other parts of [§ 164.512]."[48]

Significantly, HIPAA permits disclosure (without the patient's authorization or notice)

---

public policy purposes cannot be achieved absent the use of certain protected health information, and we have chosen in general not to disturb their judgments.").

[45]Standards for Privacy of Individually Identifiable Health Information, 65 FR 82462-01, 2000 WL 1875566 at *82668 (Dec. 28, 2000); *see also*, 45 C.F.R. § 164.103 ("Required by law means a mandate contained in law that compels and entity to make a use or disclosure of protected health information that is enforceable in a court of law.  Required by law includes, but is not limited to . . . . statutes or regulations that required the production of information[.]").

[46]OMH Guidance Document, State Defs. Mtn to Dismiss, Ex. 11 at p. 3.

[47]OMH Guidance Document, State Defs. Mtn to Dismiss, Ex. 11 at p. 4.

[48]Standards for Privacy of Individually Identifiable Health Information, 65 FR 82462-01, 2000 WL 1875566 at *82703 (Dec. 28, 2000)

if either one of the aforementioned exceptions under § 164.512 applies; in other words, if disclosure is mandated by state law, then § 164.512(a) permits the disclosure, even if the situation is not "serious and imminent" as described in § 164.512(j).[49] These exceptions apply to all health information, including psychotherapy notes.[50]

In addition to HIPAA, the New York Mental Hygiene Law provides that clinical records involving mental health treatment shall not be released, except in particular limited circumstances. Of course, MHL § 9.46 authorizes disclosure to OMH where the patient appears likely to engage in conduct that would cause serious harm. Further, MHL § 33.13 permits the disclosure of information, without the patient's consent, "to an endangered individual and a law enforcement agency when a treating psychiatrist or psychologist has determined that a patient or client presents a serious and imminent danger to that individual," MHL § 33.13(c)(6), or, with OMH's consent, to other "appropriate persons and entities when necessary to prevent imminent serious harm to the patient or client or another person." MHL § 33.13(c)(9)(v).[51]

---

[49]Standards for Privacy of Individually Identifiable Health Information, 65 FR 82462-01, 2000 WL 1875566 (Dec. 28, 2000) ("We note that a covered entity may use or disclose protected health information as permitted by and in accordance with one of the paragraphs of § 164.512, regardless of whether that use or disclosure fails to meet the requirements for use or disclosure under a different paragraph in § 164.512 or elsewhere in the rule.").

[50]Standards for Privacy of Individually Identifiable Health Information, 65 FR 82462-01, 2000 WL 1875566 at *82515 (Dec. 28, 2000).

[51]MHL § 33.13(12) permits the disclosure of records to the director of community services when, *inter alia*, required by MHL § 9.46. Further, MHL 33.13(13)-(15) permit the disclosure of patient health information to DCJS or the Federal Bureau of Investigation ("FBI"), in order to allow the FBI to perform its functions in connection with the National Instant Criminal Background Check System ("NICS"), or to allow DCJS to perform its duties under New York Penal Law § § 400.00 and 400.02. On this point, State Defendants indicate: "[S]ince 2008, New York hospitals have been required to report to OMH mental health information federal disqualifiers, including any involuntary commitment pursuant to Article 9 of the Mental Hygiene Law. MHL § § 31.11(5), 33.13(c)(13)(ii). Upon receipt of such information, OMH sends the individual's 'name[ ] and other non-clinical identifying information' to [DCJS]. *Id*. § 7.09(j). DCJS then sends that same information to the FBI, in order to update NICS." State Defs. Memo of Law in Support of

22

With this background in mind, the Court now turns to the particular claims in this action, in which Plaintiffs maintain that after they sought mental health treatment, reports were improperly filed against them, which resulted in their New York pistol licenses being suspended and their firearms (pistols, rifles and shotguns) being seized by police.[52]

On December 18, 2014, Plaintiffs commenced this action. At that time, Donald Montgomery ("Montgomery") was the lone plaintiff, though he purported to be suing on behalf of himself and "all other persons similarly situated."[53] Although Montgomery resided in the Western District of New York when he commenced the action, he resided in the Eastern District of New York when most of the events about which he complains occurred. The factual averments in the original Complaint [#1] are as follows.

Montgomery, a Navy veteran and retired police detective, contends that while he was residing in Cutchogue, New York, he voluntarily admitted himself to defendant Eastern Long Island Hospital ("the Hospital"), due to insomnia and anxiety. Montgomery indicates that after receiving medication, he slept soundly for two nights and was discharged. Montgomery admits that during such hospital stay, someone at the hospital left a document in his room, titled "Notice of Status and Rights/Emergency Admission (to be given to the patient at the time of admission to the hospital)/Section 9.39 Mental Hygiene Law."[54] However, Montgomery indicates that he did not review the form, and was never asked to

---

Motion to Dismiss at p. 6 (some citations omitted).

52 Plaintiff Lois Reid indicates that her firearms were not actually seized from her, but rather, that law enforcement allowed her husband to retain custody of the firearms at a separate location.

53 Complaint [#1].

54 Complaint [#1] at ¶ 140. The Complaint actually indicates that he notice referred to § "9.30" of the Mental Hygiene Law, but that was a typographical error. Docket No. [#24-3] at p. 3.

sign the form.

After being discharged, Montgomery learned that the Hospital had notified OMH that he had been involuntarily admitted to the hospital for mental health treatment. As a result of such notification, Montgomery's name was presumably added to the federal NICS database. Further, NYSP notified[55] defendant Suffolk County Sheriff DeMarco that Montgomery had "been adjudicated as a mental defective or ha[d] been involuntarilyl committed to a mental institution," and was therefore "prohibited from possessing a firearm, rifle or shotgun pursuant to 18 U.S.C. § 922(g)(4)." As a consequence of such report, Sheriff Demarco suspended Montgomery's pistol license and seized his firearms.[56] Montgomery attempted to convince the Hospital, as well as state and county officials, that he had voluntarily admitted himself for treatment, but the Hospital declined to change its position.

While Montgomery was in the process of disputing the suspension of his pistol license, he moved his residence to Monroe County, New York, after which Sheriff DeMarco's office informed him that it was terminating his pistol license because he had changed his residence without informing the Suffolk County licensing officer. On or about January 3, 2015, Montgomery commenced an Article 78 proceeding in New York State

---

[55]As will be discussed further below, NYSP used a particular form letter to make this notification. Pl. Prelim. Inj. Motion, Exhibit Group G, Ex. 23.

[56]It is unclear to the Court why the Sheriff suspended Montgomery's license, as opposed to revoking it, since as discussed earlier, the fact the Montgomery was classified as having been involuntarily committed should have resulted in the immediate revocation of the license. *See*, PL § § 400.00(1)(j) & (11)(a)&(c) & 400.02 (Indicating that persons who have been involuntarily committed are not eligible for firearms licenses, and that if a person who holds a firearms license later becomes ineligible, his license is revoked).

Supreme Court, Suffolk County.[57]  The Article 78 petition alleged that Montgomery had been erroneously classified as having been "adjudicated as a mental defective or involuntarily committed to a mental institution."

Purportedly based upon these factual allegations, the Complaint [#1] asserts four causes of action: 1) "violation of the right to privacy" concerning medical records; 2) "violation of the Equal Protection Clause," involving discrimination against persons who seek mental health treatment; 3) "violation of the Due Process Clauses [(substantive and procedural)] as to the taking of Second Amendment rights arbitrarily and without notice or an opportunity to be heard; and 4) violation of the Second Amendment right to keep and bear arms.  The Complaint asserts that all four of these claims arise from MHL § 9.46 and Defendants' misuse of that statute.[58]

Importantly, though, the Complaint contains no factual averment that Eastern Long Island Hospital filed a report against Montgomery under MHL § 9.46.  That is, the pleading never alleges that hospital staff, or anyone else, reported Montgomery under § 9.46 as being "likely to engage in conduct that would result in serious harm to [him]self or others." Rather, as already noted, the pleading asserts that hospital staff reported that Montgomery had been "involuntarily admitted," thereby implicating 18 U.S.C. § 922(g).[59]  Indeed, the closest the Complaint [#1] comes to connecting Montgomery's experience to MHL § 9.46 is the following cryptic statement:

---

57State Defs. Mtn to Dismiss, Ex. 14.

58Montgomery's Article 78 proceeding did not mention MHL § 9.46.

59The Complaint acknowledges that MHL Article 9 contains provisions for "involuntary commitment" that existed "prior to the effective date of MHL § 9.46." Complaint [#1] at ¶ 25.

> In reality, the NYS Police have taken the position of instructing local licensing officials to suspend and terminate pistol permits for all persons *reported through MHL § 9.46* as having been involuntarily committed to a mental institution.

Complaint [#1] at ¶ 87.[60] (emphasis added).  While this statement implies that Montgomery was reported under MHL § 9.46, it has no factual support in the pleading.  Nevertheless, the pleading demands a declaratory judgment "striking down" Mental Hygiene Law § 9.46, an injunction enjoining the enforcement of § 9.46, an order directing the State of New York to disclose all information that has been collected pursuant to § 9.46, an order requiring the State of New York to notify all persons whose medical information has been collected and/or transmitted pursuant to § 9.46, an order directing the State of New York to purge all records collected pursuant to § 9.46, and an award of money damages and attorney fees.

On January 23, 2015, Plaintiff's counsel wrote to the Court, in response to conversations and/or communications that she had with opposing counsel, who had not yet appeared in the case, concerning the lawsuit.  Plaintiffs' counsel indicated, *inter alia*, that she wanted to clarify the nature of this action, since it seemed to her that opposing counsel were confused on that point:

> It appears that [State Defendants'] Counsel has somewhat missed the point of the lawsuit. . . .  This case is, I believe, a watershed question, that will map out the intersection of privacy rights and Second Amendment rights, particularly with respect to confidential medical information that does not

---

[60]This bare assertion is disproven by Plaintiffs' own submissions.  In that regard, Plaintiffs have submitted a form letter from NYSP advising the local licensing authority that Montgomery's license should be revoked based upon involuntarily commitment/18 U.S.C. § 922(g), as well as a form letter from NYSP advising the local licensing authority that Bechler's license should be suspended or revoked pursuant to MHL § 9.46.

qualify as an adjudication of a 'mental defect' or an 'involuntary commitment.'

***

We are . . . not seeking to challenge whether the pre-existing process of county licensing officer review of medical and mental health history and events is invalid, nor are we seeking to challenge the pre-existing structure of Mental Hygiene Law Article 9 as it offered pre-existing routes for involuntary and voluntary commitments.  Any one of these other roads may contain challenges for another day.

We are focused in this instance on the abuse and overreach of MHL § 9.46 and its 'likelihood' standard, the false marketing of the statute by OMH to lure the medical profession to become agents of the State, and the excesses and pressures of DCJS and the NYSP to suppress the independent authority of the county licensing officers with regard to pistol permits and to firearms confiscation.

Letter of Paloma Capanna, dated January 23, 2015 (Docket No. [#9]).  Plaintiffs' counsel stated, in other words, that this lawsuit is about MHL § 9.46.

On January 30, 2015, Montgomery filed a motion [#3] for preliminary injunctive relief.  Similar to the Complaint [#1], the motion for injunctive relief is directed at MHL § 9.46.  In particular, the application asserts that Plaintiff is likely to succeed in this action, because MHL "§ 9.46 and its implementation violate the Second, Fourth, Fifth and Fourteenth Amendments to the United States Constitution, as well as its privacy protections."[61]  The application first maintains that insofar as MHL § 9.46 requires the disclosure of patient health information without the patient's notice or consent, and the resulting suspension of firearms licenses and seizure of firearms, it violates procedural due process (and HIPAA).  The application also contends that MHL § 9.46 violates equal

---

[61]Memorandum [#4] at p. 1; *see also, id.* at p. 5 ("MHL § 9.46 has created a constitutional violation of epic proportion[.]");  *see also*, Amended Notice of Motion for Prelim. Inj. [#3] at p. 4 ("MHL § 9.46 violates the Plaintiff's right to privacy, denies the Plaintiff the equal protection of the laws, denies the Plaintiff the right of due process, and infringes the Plaintif's rights under the Second Amendment[.]").

protection, because it impermissibly "targets" persons seeking mental health treatment. Further, the application asserts that the classification of Montgomery as "involuntarily committed" violates his Second Amendment rights, because he was not actually involuntarily committed within the meaning of 18 U.S.C. § 922. The injunctive relief requested includes the following: 1) an Order enjoining the enforcement of § 9.46 and the use of the ISARS system; 2) an Order appointing a Special Referee to gather all information transmitted and collected by Defendants in connection with § 9.46 and ISARS since the statute went into effect; and 3) an Order establishing a process for the identification and notification of persons whose personal information was disclosed pursuant to § 9.46.

The preliminary injunction motion is supported by an affidavit from Mr. Montgomery, that essentially reiterates the allegations in the Complaint [#1] concerning his hospitalization and the events that transpired afterward.[62] Similar to the Complaint [#1], this affidavit, while urging the Court to "suspend MHL § 9.46 and its associated reporting system," does not expressly contend that Montgomery was reported under MHL § 9.46. Rather, Montgomery's affidavit asserts that he was "wrongfully tagged as . . . 'involuntarily committed.") Montgomery Aff. [#3-2] at ¶ 10; *see also, id*. at ¶ 22 ("Eastern Long Island Hospital labeled me an 'involuntary commitment.'"). Similarly, the supporting memorandum of law states, while discussing 18 U.S.C. § 922(g)(4), that Montgomery "was not involuntarily committed; he was mislabeled 'involuntarily committed' without any due process." Memo [#4] at p. 9. It is axiomatic, however, that the filing of a report under MHL § 9.46 does not result in anyone being committed.

---

[62]Docket No. [#3-2].

The preliminary injunction motion is also supported by approximately 850 pages of exhibits (Docket Nos. [#3-2] - [#3-13]), including, *inter alia*, the following: 1) the legislative history of the SAFE Act;[63] 2) a transcript of hearing in the New York State Senate involving the SAFE Act's impact on mental health treatment; 3) documents issued by the State of New York (OMH) to mental health providers explaining the SAFE Act and ISARS; 4) documentation concerning the process by which persons, who have been disqualified from possessing firearms under 18 U.S.C. § 922 due to having been involuntarily committed, may apply to OMH, under MHL § 7.09(j), for a Certificate of Relief from Disabilities;[64] 5) newspaper articles and other publications concerning the SAFE Act; 6) copies of correspondence related to freedom of information law ("FOIL") requests for information concerning the SAFE Act; 7) copies of records and correspondence pertaining to Montgomery's admission to the hospital, the seizure of his firearms, and his attempts to recover the firearms; and 8) documentation related to the suspension and eventual reinstatement of a pistol license belong to an individual named Karl Bechler.[65]

Much of the application for preliminary injunctive relief is devoted to arguing that the SAFE Act is an ill-advised piece of legislation. The application harshly criticizes Governor

---

[63]The Court notes that in the transcript of the  Assembly Debate, Exhibit Group B, Ex. 3, at p. 42, MHL § 9.46 is referred to as a "mandatory reporting" provision.  OMH also refers to § 9.46 as a "mandatory reporting requirement." Pl. Prelim. Inj. Motion, Exhibit Group D, Ex. 5, OMH Guidance Document at p. 3.

[64]Prelim. Inj. Motion, Exhibit Group D, Exs. 9A-9D.  These documents pertain to persons who have been reported to NICS as having been involuntarily committed or adjudicated a mental defective, and who have therefore been disqualified from having firearms under 18 U.S.C. § 922.  The documents do not mention MHL § 9.46,  or pertain to any procedure for correcting a false report filed under MHL § 9.46.

[65]Karl Bechler is presently a plaintiff in this action, though he was not at the time that Montgomery filed the preliminary injunction motion.

Cuomo and his use of the "message of necessity"[66] legislative process to obtain passage of the SAFE Act, and asserts that the law was enacted without sufficient "legislative deliberation" or "input" from individual legislators.[67] At the same time, the application characterizes statements by legislators, during the limited debate on the bill, as "confused and misguided."[68] Further, the application asserts that "the leadership of prominent statewide mental health associations [were not consulted before the legislation was passed, and have offered] a non-stop litany of criticisms of MHL § 9.46" since its passage.[69] Moreover, Plaintiffs insist that § 9.46 has not "provided any benefit to public safety."[70] For example, Plaintiffs insist that making a report under § 9.46 using the ISARS system is slower and less-effective than simply telephoning 911 to report a dangerous

---

66 *See, generally*,The Wall Street Journal, https://www.wsj.com/articles/no-headline-available-1396387892 ("It is one of the most powerful tools available to New York's governor: the so-called message of necessity, which allows immediate votes on complex legislation that otherwise could have had days of debate."). Plaintiffs' submissions indicate that Cuomo used this process to keep a veil of secrecy over the details of the proposed SAFE Act, which involved certain prohibitions involving "assault rifles," in part to avoid a spike in purchases of such rifles prior to enactment of the law.

67 *See*, Pl. Memo of Law [#4] at p. 19 ("The Governor, the Assembly Speaker, and the Senate Majority Leader completed the Bill behind closed doors, even without input from their own conferences."). Plaintiffs do not, however, maintain that the procedures followed during passage of the act violated any laws. Plaintiffs also assert that Cuomo would not have had sufficient time between the Newtown School Shootings and January 2013 to draft a comprehensive piece of legislation like the SAFE Act, implying that Cuomo already had the SAFE Act legislation prepared, and merely exploited the Newtown murders as a justification for obtaining quick passage of the SAFE Act. State Defendants point out, however, that the Newtown murders were just the latest in a long line of mass murders by gun- wielding mentally ill persons who had exhibit clear signs of dangerousness before they killed, but who were nevertheless able to buy or obtain guns. *See*, Defs. Mtn to Dismiss, Ex. 37

68 Pl. Memo of Law [#4] at p. 22.

69 Pl. Memo of Law [#4] at p. 19. *But see, City of Greensboro v. Guilford Cty. Bd. of Elections*, 251 F. Supp. 3d 935, 947, n. 102 (M.D.N.C. 2017) ("The Constitution does not require legislatures to pass only those bills that have public support, and anecdotal evidence of public opinion is immaterial to constitutional analysis.").

70 Pl. Memo of Law [#4] at p. 20.

patient.[71]  Additionally, Plaintiffs argue that § 9.46 could have the unintended consequence of discouraging people from seeking mental health treatment.[72]  Generally, these types of arguments are not probative of whether a court should enjoin the enforcement of a statute.[73]

Of more relevance to the instant action, the application for injunctive relief also provides various anecdotal evidence purporting to show that MHL § 9.46/ISARS  is being over-utilized by certain mental health providers, and improperly administered by certain county-level Directors of Community Services.  In this regard, the application primarily relies upon testimony from various mental-health professionals at a hearing conducted by the New York State Senate shortly after passage of the SAFE Act.[74]  For example, Jed Wolkenbreit, Attorney for the Conference of Local Mental Health Hygiene Directors, testified that some medical providers were reporting patients under MHL § 9.46 "simply by virtue of their admission," even though such reporting "was not even consistent with the State Office of Mental Health's published guidance" on the issue.[75]  Wolkenbreit opined

---

[71] Pl. Memo of Law [#4] at p. 21.

[72] Pl. Memo of Law [#4] at p. 24.

[73] *See, Gibbs v. Babbitt*, 214 F.3d 483, 504 (4th Cir. 2000) ("[A] judge's view of the wisdom of enacted policies affords no warrant for declaring them unconstitutional.  In recognition of the fact that the wisdom of legislation is different from its constitutionality, courts have always started with a presumption in favor of an enactment's constitutionality.") (citations omitted), *cert. denied.*, 121 S.Ct. 1081 (2001); *see also, State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.*, 313 U.S. 508, 527, 61 S. Ct. 1050, 1060, 85 L. Ed. 1487 (1941) (Policy questions relating to the "wisdom, need and effectiveness" of legislation are "questions for the [legislature] not the courts.").

[74] Prelim. Inj. Motion, Exhibit Group C, Exhibit 4, Transcript of NYS Senate hearing on May 31, 2013.

[75] Prelim. Inj. Motion, Exhibit Group C, Exhibit 4, Transcript of NYS Senate hearing on May 31, 2013 at p. 11.  Although, as noted earlier, OMH indicates that persons who are involuntarily admitted on an emergency basis usually also meet the standard for filing a report under § 9.46.

that some medical providers were filing reports even though their patients did not meet the

§ 9.46 standard, out of fear that they might face liability for failing to make a report.[76]

Wolkenbreit also indicated that some hospital staffs were submitting reports using the

"Electronic Health Records System," rather than the ISARS system, even though such use

was "not appropriate under the statute."[77]  The injunction application also cites a New York

Times newspaper article claiming that "mental health workers feel compelled to routinely

report mentally ill patients brought to an emergency room by the police or ambulances."[78]

The same newspaper article quotes a County DCS as stating that he does not follow the

requirements of MHL § 9.46, but instead, merely "rubber stamps" reports from medical

providers sent to him via the ISARS system:

> Kenneth M. Glatt, commissioner of mental  hygiene for Dutchess County,
> said that at first, he had carefully scrutinized every name sent to him through
> the SAFE Act.  But then he realized that he was just "a middleman," and that
> it was unlikely he would ever meet or examine any of the patients.  So he
> began simply checking off the online boxes [on the ISARS system],
> sometimes even without reviewing the narrative about [the] patient [that had
> been submitted by the treatment provider].  "Every so often I read one just
> to be sure," Dr. Glatt, a psychologist, said.  "I am not going to second guess.
> I don't see the patient.  I don't know the patient."[79]

From such anecdotal evidence, the injunction application suggests that wide-scale over-

reporting is occurring pursuant to MHL § 9.46.  Further, the application contends that the

---

[76]Prelim. Inj. Motion, Exhibit Group C, Exhibit 4, Transcript of NYS Senate hearing on May 31, 2013 at p. 22;  *see also, id.* at p. 40, testimony of Seth Stein  ("[T]hey're reporting anybody.").

[77]Prelim. Inj. Motion, Exhibit Group C, Exhibit 4, Transcript of NYS Senate hearing on May 31, 2013 at p. 11.

[78]Prelim. Inj. Motion, Exhibit Group D, Ex. 11 at p. 3.

[79]Prelim. Inj. Motion, Exhibit Group D, Exhibit 11 at p. 4.

State of New York actually desires and encourages such over-reporting under MHL § 9.46, as part of an overall plan to disarm its citizens, and that hospitals "have effectively become agents of the state, labeling everyone who walks through the Emergency Room doors as 'involuntarily committed.'"[80]

At the same time, however, the preliminary injunction motion submits documents issued by OMH to mental-health providers, which explain that patients should *not* automatically be reported under MHL § 9.46 merely because they are involuntarily admitted for mental health treatment.[81]  In particular, and as mentioned earlier, the SAFE Act "Guidance Document" issued by OMH correctly sets forth the standard for making reports under MHL § 9.46, ("likely to result in serious harm to self or others"), and notes that involuntary commitment under MHL § 9.27 should not necessarily result in the filing of a report under MHL § 9.46: "[A] person could meet the [MHL § 9.27] '2 PC' standard [for involuntary admission], but still not pose a risk of harm that justifies action pursuant to either the emergency removal or admission standard, *or the 9.46 standard*."[82]  Further, the OMH SAFE Act "Guidance Document" clearly states that a DCS should not forward a § 9.46 report to DCJS unless he "*agrees with* the [reporting] mental health professional's

---

80Pl. Memo of Law [#4] at p. 2.  Such statement reflects a disconnect in Plaintiffs' papers between the MHL § 9.46 reporting standard and involuntary commitment.

81Pl. Prelim. Inj. Motion, Exhibit Group D, Ex. 5, OMH Guidance Document at p. 2.  By implication, therefore, OMH's guidance documents do not encourage or condone filing § 9.46 reports against "everyone who walks through the Emergency Room doors."

82Pl. Prelim. Inj. Motion, Exhibit Group D, Ex. 5, OMH Guidance Document at p. 3 (emphasis added).  In view of this, it is difficult to understand Plaintiff's suggestion of "false marketing of the statute by OMH." Docket No. [#9] at p. 3.

determination."[83]

The application for preliminary injunctive relief also purports to show that MHL § 9.46 is unlawful because it is inconsistent with pre-existing state and federal laws, many of which the Court has already discussed above. First and foremost, the application contends that MHL § 9.46 "disregards"[84] HIPAA, because it sets a standard for the disclosure of private health information that is less-protective than HIPAA.[85] In particular, the application asserts that "[t]he standard at MHL § 9.46 is a far lesser standard than the emergency reporting provisions within HIPAA at 45 CFR § 164.512(j)," which, as noted earlier, permit disclosure of private health information without a patient's consent where "necessary to prevent or lessen a serious and imminent threat to the health or safety of a person or the public." Significantly, though, the preliminary injunction application fails to mention HIPAA's *other* disclosure exception, 45 C.F.R. § 164.512(a), which, as already noted, allows such disclosure when "required by law," without any showing of a serious and imminent threat.[86] The preliminary injunction application also compares MHL § 9.46 to other provisions of MHL Art. 9, especially § § 9.27, 9.37, 9.39 and 9.40, and argues that such provisions provide adequate due process protections, while § 9.46 does not. *See*, Memo of Law [#4] at p. 10 ("All processes for involuntary (and even for voluntary) commitment [under MHL Art. 9] include notice, attorney, and judicial review provisions. All

---

83Pl. Prelim. Inj. Motion, Exhibit Group D, Ex. 5, OMH Guidance Document at p. 2.

84Pl. Memo of Law [#4] at p. 3 (referring to New York State's "disregard of . . . HIPAA.").

85Pl. Memo of Law [#4] at p. 3 (The application contends that HIPAA provides "the gold standard" for disclosure of private health information, and that MHL § 9.46 falls short of that standard.)

86Plaintiff's application admits that MHL § 9.46 is "mandatory" within the meaning of § 164.512(a), *see*, Pl. Memo of Law [#4] at p. 5, referring to MHL § 9.46 as a "mandatory reporting system." *See also, id.* at p. 17, noting that OMH materials are "replete with references to 'mandatory' reporting).

provisions under Art. 9 that is, except for MHL § 9.46.").[87]

In immediate response to being served with Montgomery's Complaint [#1] and Motion for Preliminary Injunctive Relief [#3], Defendants argued, *inter alia*, that venue was not proper in this district,[88] and that Montgomery lacked standing because MHL § 9.46 "never applied to him."[89] *See*, Docket No. [#8]. Plaintiffs' counsel submitted a responding letter [#9], in which, *inter alia*, she briefly laid out her theory as to why Montgomery has standing to challenge MHL § 9.46, even though his firearms disqualification resulted from having been labeled as "involuntarily committed." Essentially, Plaintiffs' counsel indicated that Montgomery must have been reported under MHL § 9.46, because the Hospital's claim that Montgomery had been involuntarily committed did not "make sense" to her.[90]

On January 29, 2015, the Court held oral argument on the application for injunctive relief. During such appearance, the Court asked Plaintiffs' counsel to explain how venue was proper in this district. Without directly answering the Court's question, Plaintiffs'

---

87*See also*, Docket No. [#9], Capanna letter dated January 23, 2015 ("[We] are [not] seeking to challenge the pre-existing structure of Mental Hygiene Law Article 9.")

88Defendants stated that a transfer under 28 U.S.C. § 1406(a) might be appropriate to either the Northern District or the Eastern District. (Docket No. [#8] at p. 3).

89Defendants indicated that Plaintiff became ineligible to have firearms not pursuant to MHL § 9.46, but pursuant to 18 U.S.C. § 922, after he was reported as having been involuntarily committed.

90Docket No. [#9], Capanna letter dated Jan. 23, 2015 at p. 4 ("The letter from the hospital [indicating that Montgomery was reported as having been involuntarily committed, rather than having been reported under MHL § 9.46] is not dispositive of Mr. Montgomery's standing to challenge MHL § 9.46. Simply put, the letter does not make sense. The medical records do not support the tag of an 'involuntary commitment.' State agencies are responsible for periodic data uploads into the NICS Index; not private medical providers. And the person [hospital employee] who spoke to Mr. Montgomery indicated every person going through the Emergency Room doors was tagged 'involuntary commitment,' which jives with Attorney Wolkenbreit's testimony that various hospitals were reporting every patient being admitted through the Emergency Department to OMH for ISARS purposes.").

counsel indicated that she wished to file an amended pleading,[91] and Defendants expressed the intention to file motions to dismiss. The Court adjourned the matter to allow Montgomery to file an amended pleading, with the understanding that Defendants intended to file motions to dismiss immediately thereafter.

On February 2, 2015, Montgomery, along with newly-added plaintiffs Andrew Carter ("Carter"), Lois Reid ("Reid") and Karl Bechler ("Bechler"), filed an 82-page Amended Complaint [#14], which purports to assert four causes of action: 1) that MHL § 9.46 violates the Plaintiffs' federal constitutional right to privacy in personal health information and doctor-patient relationships; 2) that MHL § 9.46 violates the Equal Protection Clause of the Fourteenth Amendment, by treating persons seeking mental health treatment differently from "the general patient population";[92] 3) that MHL § 9.46 violates Plaintiffs' rights to substantive due process and procedural due process under the Fourteenth Amendment, because "the process through which [they] have been reported and disqualified from firearms ownership, possession, transfer, and use is arbitrary and capricious," and lacks a "meaningful process" by which to "request a redress of their grievances for the restoration of" their rights which have been affected by § 9.46;[93] and 4) that MHL "§ 9.46 as enacted and implemented by the Defendants violates the Second

---

[91]Plaintiff's counsel stated that the purpose of such amendment would be to "implead" additional plaintiffs into the case, who resided in the Western District. In response to such statement, one of the defendant's attorneys opined that even if such an amendment occurred, Montgomery would lack standing to challenge Mental Hygiene Law § 9.46, since he was actually disqualified from possessing guns under a different section of law, Mental Hygiene Law § 9.39, based upon having been involuntarily committed.

[92]Amended Complaint [#14] at p. 77.

[93]Amended Complaint [#14] at p. 79.

Amendment rights of the Plaintiffs."[94]  The pleading indicates that all individually-named defendants are being sued in their official capacities.[95]

Whereas Montgomery had lived in the Eastern District of New York when his firearms were seized, Carter, Bechler and Reid all reside in, and had their firearms licenses suspended or revoked in, the Western District of New York.

With minor exceptions,[96] the Amended Complaint [#14] generally mirrors the original Complaint, except that it adds detailed allegations specific to Carter, Reid and Bechler. Concerning Carter, the pleading alleges that Carter's firearms were seized after his  wife called "911" "because she suspected that he was showing signs and symptoms of a stroke or other serious neurological event."[97]  The pleading contends that police officers -- members of the Tonawanda Police Department -- came to Carter's home along with ambulance personnel, and seemed more concerned about his firearms than about his medical condition.[98]  Carter maintains that officers seized multiple firearms from his house. Carter contends that he  was not a threat to anyone, but that the police officers nevertheless told him that he was going to the hospital for 72 hours, "even if they had to

---

94Amended Complaint [#14] at ¶ 345.

95Amended Complaint [#14] at ¶ 12.

96*See, e.g.*, Amended Complaint [#14] at ¶ ¶ 128-129, 134-140.

97Amended Complaint [#14] at ¶ 205.

98State Defs. Motion to Dismiss, Ex. 25.  As will be seen later, the Amended Complaint [#14] appears to intentionally omit the reason why the police would have been concerned about firearms, over even have known that Carter had firearms.  The reason is that Carter's wife told the 911 operator that Carter had a pistol under his pillow.

37

force him."[99]   Carter maintains that he went to hospital by ambulance voluntarily, and discharged himself (against his doctors' advice) four hours later.  Carter further maintains that hospital records reflect that he was not a danger to himself or anyone else. Nevertheless, when Carter later attempted to retrieve his firearms from the police, a police officer denied his request, and stated that it was "all due to the SAFE Act."[100]   Carter later received a notification from Erie County advising him that his firearms license was suspended.  Carter subsequently learned that someone at the hospital had indicated in his medical chart that he had been "involuntarily committed" pursuant to MHL § 9.41.[101]

Regarding Ms. Reid, the Amended Complaint [#14] alleges that hospital staff unjustifiably filed a report against her after she voluntarily went to the emergency room for treatment of a neurological condition similar to muscular dystrophy.  Reid indicates that she initially went to Buffalo General Hospital, and was transferred to Erie County Medical Center, where she voluntarily remained for several days.   Reid maintains that she requested to be voluntarily admitted to ECMC under MHL section 9.13 and 9.23, and has paperwork documenting such request.[102]   Reid indicates that she was not a threat to herself or others.  While at the hospital, staff aggressively questioned Reid about her ownership of firearms.  After being discharged, Reid received a notice that her pistol

---

99Amended Complaint [#14] at ¶ 209.

100Amended Complaint [#14] at ¶ 221. This quote does not reference a particular section of the SAFE Act.  As already noted, this could have been reference to MHL § 9.46 or to PL § 400.00(1)(j), or to some other provision of the SAFE Act.

101Amended Complaint [#14] at ¶ ¶ 224-225.

102Docket No. [#28-1], Exhibit Group I, Ex. 38.

license was suspended.[103]  The pleading does not attach the actual document that Reid received, but describes it as follows:

> The 'Notice of Objection' received by Ms. Reid from Erie County Court used language of 'involuntarily hospitalized for mental health reasons' and 'involuntary admission' and also includes that 'On or about December 24, 2013, the above named LOIS JEAN REID was reportedly involved in an incident implicating MENTAL HEALTH PER SAFE ACT which obligates a mental health professional believing that such incident demonstrates that the person may be 'likely to engage in conduct that will cause serious harm to herself or others' to report such event.'[104]

According to the pleading, "[t]he language of this 'Notice' [sent to Ms. Reid] implicates both MHL § 9.41 and § 9.46, without referencing any section of law."[105]

Regarding Mr. Bechler, the pleading alleges that Bechler's wife called "911" about him because he was ill and depressed, but was "not suicidal or otherwise threatening harm to himself or anyone else."[106]  Nevertheless, the 911 call resulted in NYSP officers coming to Bechler's home, arresting him, and seizing his extensive firearms collection.[107]  The pleading indicates that the NYSP officers approached Bechler's house "in a menacing manner, armed with long guns," but does not explain why.[108]  Although the pleading implies that Bechler was placed under arrest, it further maintains that Bechler went to Clifton Springs Hospital voluntarily, and spent four days there receiving treatment, primarily

---

103Amended Complaint [#14] at ¶ 254.

104Amended Complaint [#14] at ¶ 255.

105Amended Complaint [#14] at ¶ 255.

106Amended Complaint [#14] at ¶ 273.

107State Defs. Motion to Dismiss, Ex. 31, NYSP arrest report.

108Amended Complaint [#14] at ¶ ¶ 279-280.

for diabetes. The Ontario County licensing officer subsequently suspended Bechler's New York State firearms license.[109] Thereafter, a report was filed against Bechler under MHL § 9.46. Later, on September 17, 2013, NYSP sent a form letter to the licensing official (County Clerk's Office), indicating that a report had been filed against Bechler under MHL § 9.46.[110] Bechler subsequently brought a successful court action to have his firearms license reinstated.

Similar to the original Complaint [#1] and the application for preliminary injunctive relief [#3], the Amended Complaint [#14] does not explain how Plaintiffs' contentions, that they were incorrectly designated as having been "involuntarily committed," relate to MHL § 9.46. The closest the Amended Complaint [#14] comes to doing so is the following curious statement:

> 134. It appears that the State Defendants in their political drive to confiscate firearms are failing to distinguish between the new MHL § 9.46 and the continuing MHL § 9.41, which is a pre-existing provision for involuntary commitment.

This paragraph seems to imply that the alleged mis-classification of Plaintiffs as having been involuntarily committed is somehow related to the enactment of MHL § 9.46. However, the pleading offers no factual support for the assertion that State Defendants are failing to distinguish between MHL § 9.46 and MHL § 9.41.[111]

---

109Amended Complaint [#14] at ¶ ¶ 284-286.

110Prelim. Inj. Motion, Exhibit Group H, Exhibit 37.

111As will be discussed further below, in support of State Defendants' motion to dismiss, they submit an affidavit indicating that DCJS's records use the term "MHL § 9.41" to refer to all various types of emergency involuntary admissions under MHL Article 9. See, Aff. of Donna Marie Call at ¶ 9, n. 1. However, that affidavit does not indicate, nor is there any other evidence, that DCJS or OMH conflate MHL § 9.41 with MHL § 9.46. Moreover, paragraph 134 of the Amended Complaint, cited above, was

On February 27, 2015, Defendants filed motions to dismiss the Amended Complaint. Sheriff DeMarco and Eastern Long Island Hospital each filed their own motions, while New York State Defendants (Cuomo, Sullivan, Green and Beach) filed a joint motion.

Sheriff DeMarco filed a motion [#22] to dismiss, for improper venue and failure to state a claim, or, in the alternative, to transfer venue. Preliminarily, DeMarco contends that since he is sued him in his official capacity as Sheriff of Suffolk County, the claim is really against Suffolk County, and is therefore a claim under *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 98 S.Ct. 2018 (1978) ("*Monell*"). Plaintiffs do not dispute DeMarco's contention on this point. Indeed, Plaintiffs have asked the Court to substitute Suffolk County as a defendant for Demarco.[112] Accordingly, the Court will grant that request and will henceforth in this Decision and Order refer to Suffolk County ("the County") rather than to DeMarco.

Regarding venue, the County contends that venue is improper in the Western District, because Plaintiffs evidently chose venue based upon the fact that they reside in the Western District, which is not a valid basis to establish venue under 28 U.S.C. § 1391(b)(1). The County further indicates that venue is not proper in this District under 28 U.S.C. § 1391(b)(2), since a substantial part of the events or omissions giving rise to Montgomery's claim did not occur in the Western District.[113]

---

clearly not based upon such affidavit, because the affidavit was not filed until after the Amended Complaint was drafted.

112*See*, Docket No. [#28] at ¶ 5.

113At times, DeMarco's papers seem to conflate the concepts of improper venue and inconvenient venue.

Alternatively, the County contends that the Amended Complaint fails to state an actionable claim against the County. In this regard, the only claims asserted against Suffolk County are by Montgomery. Further, the County maintains that only two of the claims in the Amended Complaint involve the County: The Third Cause of Action (14th Amendment substantive and procedural due process) and the Fourth Cause of Action (Second Amendment). Further, the County maintains that the Amended Complaint fails to plead any constitutional claim under *Monell*, since it does not plausibly allege facts showing that any alleged constitutional violation resulted from a municipal policy, custom or practice.

On this point, the County contends that it did not act pursuant to its own policies, but rather, acted pursuant to New York State law and Federal law.[114] The County insists that it had no discretion to disobey such laws, as they were properly-enacted and did not obviously violate the Constitution. Along this same line, the County contends that the pleading fails to state a procedural due process claim, as neither "the SAFE Act [nor the] Penal Law" provide for a pre-deprivation hearing,[115] and the County has no authority to create its own due process procedures. Further, the County maintains that the subject statutory scheme involves a public-safety situation requiring "quick action by the State,"[116] and that CPLR Article 78 therefore provides an adequate post-deprivation hearing remedy,

---

114DeMarco Memo of Law [#22-4] at p. 12 ("[T]the Sheriff's Office acted lawfully in complying with and enforcing a presumptively valid and constitutional state statute, the SAFE Act, Penal Law § § 400(1)(j) & 400(11)(b), in suspending Montgomery's pistol license, confiscating his firearms, and subsequently cancelling [his] pistol license when he relocated without applying for a transfer of the license under Penal Law § 400(5)(a).").

115DeMarco Memo of Law [#22-4] at p. 20.

116DeMarco Memo of Law [#22-4] at p. 21 (citing *Spinelli v. City of New York*, 579 F.3d 160, 170 (2d Cir. 2009)).

of which Montgomery has already availed himself.[117]  The County also maintains that the Amended Complaint fails to state a claim for a substantive due process violation, since the County's actions were not conscience-shocking.

Eastern Long Island Hospital also filed a motion to dismiss [#24] the Amended Complaint, for lack of standing, improper venue and failure to state a claim.  With regard to standing, the only claims against the Hospital are those being asserted by Montgomery, who, the Hospital contends, lacks standing to bring this action because the Hospital never filed a report against him under MHL § 9.46.  In this regard, the Hospital insists that dismissal is required under Rule 12(b)(1), since Montgomery's admission to the Hospital was not voluntary, as he maintains.  In support of this contention, the Hospital submitted an affidavit from its Director of Behavioral Services, Helene de Reeder, RN, MSN ("de Reeder"), who asserts that she did not file a report  concerning Montgomery under MHL § 9.46, but rather, that she filed a report under MHL § 7.09, as she was required to do after Montgomery was involuntarily admitted under MHL § 9.39.  In that regard, de Reeder indicates that Montgomery was involuntarily admitted under MHL § 9.39 "by a private attending physician" who is not an employee of the Hospital.[118]  Nurse de Reeder further indicates that she submitted the MHL § 7.09 report using "the New York State Department of Health portal," not ISARS.  Nurse de Reeder also states that such report did not contain any protected health information, such as Montgomery's diagnosis.  Nevertheless, the Hospital indicates that even if the report contained such protected health information, the

---

117On January 5, 2015, Montgomery commenced an Article 78 proceeding against DeMarco's office in New York State Supreme Court, Suffolk County.  The Article 78 petition requested, *inter alia*,  an order vacating the revocation of Montgomery's pistol permit.

118de Reeder Aff. [#24-1] at ¶ 2.

disclosure would have been permitted by HIPAA, 45 C.F.R. § 164.512(a) (disclosures required by law, *i.e.*, MHL § 7.09(j)).

The Hospital alternatively contends that the Amended Complaint must be dismissed under Rule 12(b)(6), because the Hospital is a private entity, not a state actor, and therefore cannot be sued under 42 U.S.C. § 1983.[119] The hospital argues, further, that it cannot be held responsible for the alleged deprivation of Montgomery's Second Amendment rights, since it "did not revoke [his] pistol permit and had no role in the determination that it be revoked." The Hospital maintains, though, that Montgomery's Second Amendment rights were not violated in any event, since he lost the right to possess firearms pursuant to 18 U.S.C. § 922(g)(4) and PL § § 400.00(1)(j), 11(a)&(c) due to having been involuntarily admitted.[120] The Hospital also maintains that venue is improper in the Western District, since none of the Defendants resides here and none of the events involving Montgomery's claim against the Hospital occurred here.

New York State Defendants (Cuomo, Sullivan, Green and Beach) also filed a motion to dismiss, for lack of standing, failure to state a claim and improper venue. State Defendants' motion is accompanied by 42 exhibits.[121] With regard to standing, State Defendants contend that Montgomery, Carter and Reid were never the subject of a report under MHL § 9.46, and therefore have no standing to challenge the statute. In this regard, OMH records indicate that reports were filed against Montgomery and Reid indicating that

---

119Citing, *inter alia*, *Thomas v. Beth Israel Hosp., Inc.*, 710 F.Supp. 935, 940 (S.D.N.Y. 1989).

120Memo of Law [#24-3] at p. 14.

121Exhibits 1-38 attached to the Notice of Motion; Exhibits A-C attached to the Declaration of Donna Marie Call; and Exhibit A attached to the Declaration of John B. Allen, Jr.

they were involuntarily committed (at Eastern Long Island Hospital and Erie County Medical Center, respectively), but that no reports were filed against them under MHL § 9.46.[122]   OMH records further indicate that no record of any type has ever been filed concerning Carter, and that the suspension of Carter's pistol license was therefore the result of the Tonawanda Police Department providing information directly to the local licensing officer.[123]

As for Bechler, State Defendants acknowledge that he was the subject of a § 9.46 report, but contend that such report caused Bechler no injury because he had already been involuntarily admitted to the hospital, and his  pistol license had already been suspended, by the time the § 9.46 report was filed.[124]  In particular, the record indicates that Bechler's firearms license was initially suspended after NYSP directly contacted the Ontario County licensing officer, the Honorable Frederick Reed, County Court Judge, on the day of Bechler's arrest, and related the details of the arrest.[125]  That same day, Judge Reed

---

[122]Aff. of John B. Allen, Jr. at ¶ ¶ 19-20; *see also*, Aff. of Donna Marie Call at ¶ ¶ 18-21, 23-24.

[123]Aff. of John B. Allen, Jr. at ¶ 21  ("Therefore, the purported suspension of [Carter's] pistol permit was done by the local licensing official without any information provided pursuant to the MHL § 9.46 reporting system or any data provided to the federal NICS database by New York State."); *see also*, Aff. of Donna Marie Call at ¶ 22.

[124]*See*, State Defs. Memo of Law in Support of Mtn to Dismiss at p. 19 ("[T]he suspension was ordered by the local licensing officer, Ontario County Judge Frederick Reed, before any § 9.46 report as to Bechler was ever submitted to DCJS.  The suspension order itself makes plain that it was issued by Judge Reed based on his discretion as a licensing officer 'as provided by Section 400.00 of the Penal Law,' not MHL § 9.46. Thus, Bechler cannot meet his Article III burden of demonstrating the suspension was 'fairly traceable' to MHL § 9.46.") (citations omitted); *see also*, Aff. of John B. Allen, Jr. at ¶ ¶ 22-23 (Indicating that Bechler was reported to OMH as having been involuntarily committed on September 6, 2013, and was then reported under MHL § 9.46 on September 10, 2013, while he was still in the hospital).

[125]Def. Mtn to Dismiss, Ex. 31 at p. 4.

suspended the firearms licenses of both Mr. Bechler and Mrs. Bechler.[126] Also that day, Clifton Springs Hospital notified OMH that Bechler had been involuntarily committed. OMH sent such information to DCJS, "both to update NICS and to [allow DCJS to] determine whether Mr. Bechler had a firearms license."[127] Thereafter, on or about September 10, 2013, a mental health professional at Clifton Springs Hospital also filed an MHL § 9.46 report against Bechler. The Ontario County DCS reviewed the § 9.46 report and agreed that Bechler was likely to engage in conduct that would result in serious harm to himself or others, and forwarded Bechler's non-clinical identifying information to DCJS.[128] State Defendants therefore argue that Bechler was not injured by MHL § 9.46. Alternatively, State Defendants contend that Bechler lacks standing because his injury has already been addressed, insofar as a state-court judge has reinstated his pistol license.

State Defendants further contend that venue is improper in the Western District, because none of them reside in the Western District, and because a substantial part of the events giving rise to the lawsuit did not occur in the Western District. With regard to residency, State Defendants contend that they all reside in the Northern District, while DeMarco and the Hospital reside in the Eastern District.

State Defendants also maintain that even if Plaintiffs have standing, the Amended Complaint fails to state actionable claims. In that regard, State Defendants contend that MHL § 9.46 violates neither the Second Amendment nor the Fourteenth Amendment. With

---

126Def. Mtn to Dismiss, Ex. 31 at p. 6.

127Aff. of John B. Allen, Jr. at ¶ 22.

128Aff. of John B. Allen, Jr. at ¶ 23; *see also*, Aff. of Donna Marie Call at ¶ 25 (describing the chronology of the reports that were filed against Mr. Bechler).

regard to the Second Amendment, State Defendants maintain that MHL § 9.46 regulates conduct (possession of firearms by the mentally ill) that falls outside the scope of the Amendment, and that restrictions on the possession of guns by mentally ill persons are presumptively lawful.  Indeed, State Defendants note that it has been a long-standing requirement of applicants for firearms licenses in New York to disclose their mental health records, and that MHL § 9.46 merely facilitates the conveyance of such information to local licensing officials.  Further, State Defendants  argue that even if MHL § 9.46 implicates Plaintiffs' Second Amendment rights, it does not substantially burden those rights since, as just mentioned, the statute merely adds to the existing requirement that firearms licensees disclose their mental health information.   State Defendants also contend that even if MHL § 9.46 substantially burdens Plaintiffs' Second Amendment rights, the statute nevertheless passes constitutional muster under heightened (intermediate) scrutiny, since MHL § 9.46 is substantially related to important governmental objectives, such as crime prevention and suicide prevention.  As for Plaintiffs' Procedural Due Process claims, State Defendants maintain that even assuming that Plaintiffs have a protected liberty interest, they have sufficient process available to them, through an Article 78 proceeding.  Finally, State Defendants assert that Plaintiff's Equal Protection and Substantive Due Process claims are duplicative of their Second Amendment claim, and lack merit in any event.  In that regard, State Defendants maintain that MHL § 9.46 does not discriminate, and is neither arbitrary nor a gross abuse of governmental authority.

On March 13, 2015, Plaintiffs filed a combined response [#28] to all of the Defendants' various motions to dismiss.  Plaintiffs' response is organized into three sections: 1) legal sufficiency of the claims; 2) standing; and 3) venue.

Regarding standing, Plaintiffs generally argue that they have standing because their "civil liberties have been and continue to be violated."[129]  Plaintiffs' response, however, does not attempt to explain how Montgomery, Carter or Reid have standing specifically under MHL § 9.46.  Instead, Plaintiffs seem to argue that they have standing by virtue of having been wrongly labeled as involuntarily committed.  Plaintiffs have not submitted affidavits concerning standing from any plaintiff except Montgomery, and, as already mentioned, Montgomery's affidavit indicates that he was improperly reported as "involuntarily committed,"[130] but does not explain how he was injured by MHL § 9.46.  In sum, Plaintiffs argue that they have standing because they were injured, regardless of the specific mechanism by which they were injured, whether it be MHL § 9.46 or some other provision of New York law, such as MHL §  9.41.

Regarding State Defendant's contention that Bechler was not injured by MHL § 9.46 because he was already reported as having been involuntarily committed, Plaintiffs assert, incorrectly, that Defendants have not submitted any evidence to support that claim.[131] Alternatively, Plaintiffs vaguely argue that it was the MHL 9.46 report, and not the report of the involuntary commitment, that caused Ontario County Court Judge Reed to suspend Bechler's pistol license.[132]  However, this argument ignores the fact that, as State Defendants have shown, Judge Reed suspended Bechler's license on the same day that

---

129Docket No. [#28-2] at p. 45.

130Montgomery Aff. [#3-2] at ¶ ¶ 10, 22, 27-29, 32, 33.

131As already discussed, State Defendants have submitted affidavits stating that Bechler was reported as having been involuntarily committed days before a report was filed under MHL § 9.46. See, e.g., Aff. of Donna Marie Call at ¶ 25.

132Pl. Memo of Law [#28-2] at p. 48 ("Mr. Bechler's permit review was conducted under the auspices of the NYS Police '9.46' letter, which was provided by the Court to his Counsel.").

he was arrested, September 6, 2013, which was several days before the MHL § 9.46 report was filed.[133]  As for State Defendants' argument that Bechler lacks standing because his injury has already been remedied, Plaintiffs argue that even though Bechler's firearms license has been restored, the State could "swoop in" and take his license again.[134]

Regarding venue, Plaintiffs state that venue in this District is proper, in part, because "the State has physical offices throughout the state, including in Rochester," because NYSP also has offices in this District, and because OMH has a DCS in each county within the Western District.[135]  Plaintiffs also maintain that the "Western District [is the] place where several of the Plaintiffs . . . have suffered . . . injury . . . as a result of the actions of the Defendants."[136]  Otherwise, Plaintiffs discuss factors, such as "where a substantial presence of parties and witnesses are found, the means of the Plaintiffs, [and] the statewide reach of the State Defendants," as well as the fact that all counsel are admitted to practice in this district.[137]  Plaintiffs further contend that venue is proper in this district because an "abnormally high" number of reports under MHL § 9.46 have supposedly been filed in this district.[138]  Alternatively, Plaintiffs state that venue should "remain in the Western District, if for no other reason than in the interests of justice. 28

---

133Def. Mtn to Dismiss, Ex. 31 at pp. 4, 6.  NYSP notified Ontario County of the MHL § 9.46 report by letter dated September 17, 2013. Def. Mtn. to Dismiss, Ex. 34.

134Pl. Memo of Law [#28-2] at p. 46.

135Capanna Aff. [#28] at ¶ ¶ 35, 37-38.

136Pls. Response [#28] at ¶ 7.

137Pl. Memo of Law [#28-2] at p. 52.

138Pl. Memo of Law [#28-2] at p. 52.

U.S.C. § 1404(a)."[139]

Plaintiffs arguments concerning the legal sufficiency of the pleadings, are, for the most part, not responsive to Defendants' specific objections. Nevertheless, the Court is able to discern the following major points. Plaintiffs argue that they have plausibly pleaded that they were discriminated against insofar as they were wrongly categorized as having been "involuntarily committed."[140] Plaintiffs' argument on this point briefly references MHL § 9.46 a few times, but does not attempt to explain how their claims of having been wrongly treated as "involuntarily committed," even if true, are related to MHL § 9.46. Plaintiffs further maintain that there are inadequate due-process procedures in place to assist persons who have been incorrectly labeled as "involuntarily committed." In this regard, Plaintiffs argue that the procedure for correcting an erroneous report of "involuntary commitment," consisting of an Article 78 proceeding, is inadequate and not meaningful.[141] Specifically, Plaintiffs argue that Article 78 proceedings are too costly and time-consuming.[142] Plaintiffs also assert that New York State has a "financial incentive" to

---

[139]Docket No. [#28-2] at memo p. 52.

[140]Pl. Memo of Law [#28-2] at pp. 6-12.

[141]Pl. Memo of Law [#28-2] at p. 26-31. Plaintiffs also contend that there is no procedure available to challenge a report under MHL § 9.46. *Id.* at p. 26. ("[T]here is no pre- or post-termination process for the '9.46' and no meaningful process for the '9.41' classifications.").

[142]Plaintiffs also assert that an Article 78 proceeding would be useless, because even if they prevailed in such a proceeding, the local licensing officer would conduct a sham hearing. Pl. Memo of Law [#28-2] at p. 30. This argument is entirely inaccurate, and is based on a misunderstanding of Suffolk County's papers. In particular, the County indicated only that New York State law currently does not provide local licensing officials with discretion as to whether to suspend or revoke a firearms license once notification has been given under § 9.46 or a similar statute. The County stated, therefore, that if it attempted to conduct a pre-deprivation hearing, the proceeding would be a sham, since it would be contrary to the current statutory scheme. The County never indicated that it would refuse to comply with a court's direction following an Article 78 proceeding.

encouraging hospitals to mis-categorize patients as "involuntarily committed," so that State can then report such information to NICS.[143]  Plaintiffs' do not explain, however, how the State of New York could actually benefit financially from such false reporting.  Plaintiffs also contend that the legislative history of the SAFE Act fails to demonstrate any connection between the legislation and public safety.[144]  On this point, Plaintiffs argue that there is no reliable evidence that mentally ill persons are more dangerous than anyone else.[145]   Plaintiffs also insist that their privacy rights were violated, when they were reported as having been involuntary committed,  and that MHL § 9.46 violates HIPAA, and in particular, 45 C.F.R. § 164.512(j).  Plaintiffs also claim that their Second Amendment rights were violated, insofar as they were deprived of their firearms after they were falsely reported as having been involuntarily committed.[146]  Alternatively, Plaintiffs request leave to file a Second Amended Complaint, if the current Amended Complaint [#14] is found to be "inadequate."[147]

On March 30, 2015, Defendants filed their replies.  Suffolk County's reply [#30]

---

143Pl. Memo of Law [#28-2] at p. 20 ("The State is motivated to procure patient reports to secure federal funds and advance towards Executive-centric power."); *see also, id.* at p.  21 ("The financial incentives to states for reporting are enormous.").

144Pl. Memo of Law [#28-2] at pp. 21-

145Pl. Memo of Law [#28-2] at pp. 22-24.  Regarding the relationship of MHL § 9.46 to a governmental objective of preventing gun violence by mentally ill persons, Plaintiffs submit a journal article concerning threat assessment, which concludes, in part, that "extremely rare events such as school homicide, workplace violence, or assassination do not lend themselves well to predictability with statistical equations. Additionally, the extent to which existing knowledge about criminal offenders and people with severe mental illness will generalize to other populations . . . has yet to be determined." Pl. Resp. [#28-1], Exhibit Group I, Ex. 40. Plaintiffs also submit literature suggesting that violence by persons with serious mental illness is rare, and that laws linking mental illness to gun control may deter people from seeking treatment. Docket NO. [#28-1], Exhibit Group I, Ex. 41.

146Pl. Memo of Law [#28-2] at pp. 38-42.

147Pl. Memo of Law [#28-2] at p. 42.

again asserts that the Amended Complaint fails to state a *Monell* claim, since the County was not acting pursuant to its own policy when it suspended Montgomery's pistol license and seized his guns.[148]  The County also contends that Plaintiffs' alternative request to amend would have no effect on the County's motion, and would therefore be futile as to the County, since the proposed amended pleading contains no new allegations or arguments concerning the County.

Eastern Long Island Hospital's reply [#31] repeats that Montgomery was admitted under MHL § 9.39 by a private attending physician, and that no report was filed against him under MHL § 9.46.  Further, the Hospital indicates that an MHL § 9.39 admission is an involuntary admission, which the Hospital was required to report to OMH.  Regarding the sufficiency of the pleadings, the Hospital indicates, with regard to Plaintiffs' privacy claim, that reports of involuntary admissions are required by law (MHL § 7.09(j)), and therefore do not violate HIPAA.  Regarding the Equal Protection, Due Process and Second Amendment claims, the Hospital reiterates that it cannot be sued under Section 1983 because it is not a state actor, and that Plaintiffs' response does not address this point. Further, as to the Second Amendment claim, the Hospital indicates that it merely reported Montgomery's commitment under MHL § 9.39 as required by law, and was not involved in the taking of his guns or firearms license. In sum, the Hospital emphasizes that it did not make the decision to admit Montgomery, and that the only action it took was to file the report concerning Montgomery's involuntary admission, as required by law, MHL § 7.09(j).

State Defendants' reply [#33] begins by noting that "Plaintiffs' puzzling opposition

---

148The County further observes that Plaintiffs have not challenged, or even mentioned, the County's explanation that Montgomery's pistol license was properly cancelled after he moved to a different county without first notifying Suffolk County.

. . . neither engages the State Defendants' arguments [concerning standing] nor addresses the governing caselaw [on that issue] cited in [State Defendants'] moving brief." [149]   State Defendants point out, in that regard, that Plaintiffs have not challenged the assertion that MHL § 9.46 was never applied to Montgomery, Carter or Reid.   As for Bechler, State Defendants repeat that MHL § 9.46 caused him no injury to begin with, and that in any event he has already regained his pistol license and his guns.   The mere possibility of future harm, State Defendants argue, is too speculative to give Bechler standing.   State Defendants also contend that Plaintiffs' response fails to explain how venue is proper in this District.   Regarding the sufficiency of Plaintiffs' claims, State Defendants' begin by reasserting that MHL § 9.46 does not violate the Second Amendment, even assuming that a claim involving MHL § 9.46 was pleaded.   In that regard, State Defendants specifically argue, contrary to what Plaintiffs claim, that any such Second Amendment analysis would not require strict scrutiny, and that MHL § 9.46 satisfies intermediate scrutiny.   State Defendants further maintain that Plaintiffs' response fails to demonstrate a violation of Plaintiffs' privacy rights.   Regarding Plaintiffs' procedural due process claims, State Defendants argue that Plaintiffs incorrect in asserting that persons reported under MHL § 9.46 have no remedies available to them, since they can bring Article 78 proceedings, and that pre-deprivation hearings in the context of MHL § 9.46 are not feasible for public safety reasons.   State Defendants also contend that Plaintiffs' response fails to address their equal protection arguments, and that the cause of action fails in any event since Plaintiffs do not claim membership in a suspect class, and MHL § 9.46 does not treat similarly-situated persons differently or infringe fundamental rights.   Finally, State Defendants argue

---

[149]State Defs. Reply [#33] at p. 3.

that Plaintiffs' substantive due process claims should be deemed abandoned, since Plaintiffs did not address them in their response.

On September 17, 2015, counsel for the parties appeared before the undersigned for oral argument. During oral argument, the Court questioned Plaintiffs' counsel on issues including standing, joinder and Eastern Long Island Hospital's status as a state actor for purposes of § 1983. The Court also discussed a motion for temporary-sealing of documents that had been filed by Defendants, and Plaintiffs' response to that application. After oral argument, the Court invited additional briefing on the issue of joinder, and granted Plaintiffs permission to file their own motion to seal. On October 15, 2015, counsel for Plaintiffs and for Suffolk County submitted supplemental letter briefs, in which Plaintiffs argue that Eastern Long Island Hospital is a state actor under § 1983, while Suffolk County addresses issues of standing and joinder. Plaintiffs also filed a motion to seal (Docket No. [#39]), after which there was additional briefing on that application.[150]

In connection with the Court's consideration of all of the pending applications, it requested additional information relating to the circumstances of Mr. Montgomery's admission to Eastern Long Island Hospital, because it was relevant to the issue of his standing to challenge MHL § 9.46. In that regard, the Court observed, for example, that although Nurse de Reeder's affidavit indicated that Montgomery had been involuntarily admitted, it neither identified the private attending physician who admitted Montgomery, nor explained the circumstances warranting an involuntary admission. Also, based upon its review of the Mental Hygiene Law, the Court determined that a Form OMH 474 must have been completed by a physician at the time of Montgomery's admission, though it was

---

150The Court addresses the motion to seal in a separate Decision and Order.

54

not part of the record. On April 26, 2016, the Court sent a request to all counsel, requesting a copy of the Form OMH 474 that was allegedly used to involuntarily admit Montgomery. Counsel for the Hospital responded that she had a copy of the form, but was reluctant to provide it to the Court without Mr. Montgomery's express permission, in light of HIPAA. Plaintiffs' counsel responded and provided a copy of the form to the Court, but not to Defendants' counsel. Thereafter, Defendants' counsel requested copies of the form that Plaintiffs' counsel had provided to the Court.

On May 10, 2016, the Court issued a letter Order [#43] which, *inter alia*, observed that Montgomery had placed his medical/mental condition at issue, and directed the parties to immediately prepare a stipulated confidentiality order. The letter Order also directed Plaintiffs' counsel to provide opposing counsel with authorizations for "medical/mental health records." The letter Order further directed that Eastern Long Island Hospital submit a supplemental affidavit "clarifying the circumstances of Mr. Montgomery's admission, including the identity of the doctor who signed the OMH 474 form and his/her relationship to the hospital and to Mr. Montgomery," and indicating whether the Hospital had a policy of "classifying all psychiatrically-based emergency room admissions as involuntary commitments," as Montgomery alleged. The Court also directed Plaintiffs' counsel to submit an affidavit from Montgomery's doctor, who, the Hospital claimed, had recommended Montgomery for involuntary commitment.

Subsequently, the Court received a series of communications from counsel, regarding their unsuccessful attempts to draft a mutually-acceptable confidentiality order. The communications from Defendants indicated that Plaintiff's counsel was holding up the process. On August 9, 2016, the Court issued an Order to Show Cause [#44] directing

Plaintiffs to show cause why they should not be sanctioned for failing to comply with the Court's prior Order [#43].

On September 1, 2016, Plaintiffs filed a response [#45], addressing the Order to Show Cause, requesting a stay of the action to allow settlement negotiations, and submitting additional exhibits relating to the pending motions. The response includes an affidavit from Mr. Montgomery, dated June 4, 2016, indicating that he was admitted by doctors at the hospital, whose identity he does not know, and not by his own primary care physician. The response also includes an affirmation [#45] from Plaintiffs' counsel which is interesting to the Court insofar as it expresses her belief that the instant lawsuit, which is ostensibly directed at MHL § 9.46, and which demands relief (including preliminary injunctive relief) relating only to MHL § 9.46, actually involves "two topics" or "two tracks," namely, an "involuntary commitment" track and an MHL § 9.46 track. With regard to this so-called "involuntary commitment" track, counsel seems to allege that this lawsuit is attempting to assert a claim that Defendants have failed to conduct an "independent analysis" as to "whether a medical report of 'involuntary commitment' [from a hospital] rises to the federal standards for disqualification encoded at 18 U.S.C. § 922(g)(4)."[151]  That is, counsel seems to be now claiming that when OMH and/or DCJS receive a report from a hospital that an individual has been involuntarily committed, they have a duty to perform their own investigation into the matter before reporting the involuntary commitment to

---

[151] Capanna Aff. [#45] at ¶ 4.

NICS.[152]

On September 9, 2016, State Defendants filed a response to Plaintiffs' submission [#45], stating, in pertinent part, that

> although Plaintiffs have repeatedly tried to confuse the issue, this case is about New York Mental Hygiene Law ("MHL") § 9.46[.] . . . That is the only statutory provision challenged in the operative Amended Complaint. It is likewise the only aspect of New York law that Plaintiffs see to "strike down," "render void *ab initio*," and enjoin the State Defendants from "administering, operating and implementing." Plaintiffs have not mounted a challenge to other, separate provisions of state and federal law relating to gun possession and involuntary commitments.

Letter of William J. Taylor, Jr. dated September 9, 2016 (citations and internal quotation marks omitted).[153]

On December 8, 2016, the Court issued a letter Order [#46], declining to impose sanctions on Plaintiffs, but directing that the parties finalize a confidentiality order within seven days. The Court further directed that the parties address the matters discussed in the Court's prior Order [#43] "expeditiously." That is, the Court directed the parties to expeditiously submit the additional information (concerning Montgomery's hospitalization) requested by the Court in its letter Order [#43] issued on May 12, 2016, once the

---

152Capanna Aff. [#45] at ¶ ¶ 4-6. The assertion that Plaintiffs are challenging the involuntary commitment procedures under MHL Art. 9 as being inconsistent with 18 U.S.C. § 922, is contrary to arguments that Plaintiffs previously made in support of their motion for preliminary injunctive relief directed at MHL § 9.46, wherein they stated: "The State involuntary commitment proceedings [procedures] already specified in great detail at MHL Art. 9 prior to the enactment of MHL § 9.46 met the threshold requirement of 18 U.S.C. § 922(g)(4)." Docket No. [#4] at p. 9. It is also contrary to the explanation of Plaintiff's claims previously provided by Plaintiff's counsel, discussed earlier. *See*, Docket No. [#9] ("[N]or are we seeking to challenge the pre-existing structure of Mental Hygiene Law Article 9 as it offered pre-existing routes for involuntary and voluntary commitments.").

153On September 12, 2016, Eastern Long Island Hospital also submitted a letter commenting on Plaintiffs' response to the Court's Order to Show Cause.

confidentiality order was finalized.

On February 6, 2017, having heard nothing further from the parties, the Court emailed counsel to inquire about the case, pointing out that the Court still had "not received the materials discussed [in] the Court's letter order issued on May, 12, 2016." The same day, counsel for the Hospital responded, indicating that Defendants had only just received releases from Mr. Montgomery on January 12, 2017.[154]

On February 10, 2017, the Hospital filed a supplemental affirmation, with Mr. Montgomery's medical chart and affidavits from hospital staff attached as exhibits. The submission details that on May 23, 2014, Montgomery came to the Hospital emergency room with a letter from his treating nurse practitioner, indicating that Montgomery was "begging to be sedated" and required "hospitalization to stabilize his anxiety [and] psychotic thought processes[,] and to sleep."[155] The affirmation further indicates that Montgomery was examined by an emergency room physician, Lawrence Schiff, M.D. ("Schiff"), who then consulted with another physician, Daniel Klages, M.D. ("Klages"), and a psychiatrist, Douglas Hoverkamp, M.D. ("Hoverkamp"), after which the decision was made to admit Montgomery to the hospital psychiatric unit pursuant to MHL § 9.39.[156] Dr. Schiff and Dr. Hoverkamp both signed the OMH 474 form used to involuntarily admit Montgomery. Neither Schiff nor Hoverkamp are employees of the Hospital, though they have admitting

---

[154]Email from Catherine Brennan dated February 6, 2017.

[155]Brennan Supplemental Affirmation at ¶ 3. In particular, the noted from Nurse Practitioner Malcomson stated, in pertinent part: "He is so frantic about not sleeping and his ego functioning is so poor he is'begging to be sedated.' He is in need of hospitalization to stabilize his anxiety, psychotic thought processes and to sleep. Dr. Klages has contacted Dr. Hubercamp [Hoverkamp] regarding this.").

[156]Brennan Supplemental Affirmation at ¶ 5.

privileges at the Hospital.[157]  The relevant Form OMH 474 states that Montgomery was complaining of insomnia and racing thoughts, and was sent to the Hospital by his therapist's office "for admission evaluation for personal safety."[158]  The Form OMH 474 indicates that Montgomery did not "show a tendency to cause serious harm" to himself or to others.[159]  In a progress noted dated May 25, 2014, Dr. Hoverkamp noted that Montgomery had been "admitted under a 9.39 status," due to "worsening depressed mood, intractable insomnia and bordering on psychosis, in terms of worry and paranoia."[160]  The Hospital also submitted a supplemental affidavit from Nurse de Reeder, stating that the Hospital "does not have a policy of classifying all psychiatrically based admissions from the emergency room as involuntary commitments," but rather, that "[t]he type of admission to the psychiatric unit is determined by the on call psychiatrist directing the admission," which in Mr. Montgomery's case was Dr. Hoverkamp.[161]  The Hospital further indicates that once Montgomery was involuntarily admitted under MHL § 9.39, the Hospital was required by MHL § § 7.09(j) & 31.11(5) to report such fact, through the New York State Department of Health Portal.[162]  Nurse de Reeder further states that no one at the Hospital filed a report concerning Montgomery under MHL § 9.46.[163]

---

157Brennan Supplemental Affirmation at ¶ ¶ 4, 7.

158Brennan Supplemental Affirmation at ¶ 6.

159Brennan Supplemental Affirmation, Ex. 1.

160Brennnan Supplemental Affirmation, Ex. 1.

161Brennan Supplemental Affirmation at ¶ 9.

162Brennan Supplemental Affirmation at ¶ 13.

163de Reeder Aff. dated February 19, 2015, at ¶ 6.

Upon the Court's receipt of the Hospital's supplemental response, no further briefing deadlines were extant. Nevertheless, on March 13, 2017, State Defendants submitted a supplemental letter brief,[164] expressing the view that the Hospital's supplemental submission, along with the rest of the record, conclusively establishes that Montgomery was never reported under MHL § 9.46, and therefore lacks standing in this action.

Having received no further communications from the parties, on March 24, 2017, the Court issued a text order [#49], stating: "Counsel have had a sufficient amount of time to brief any applications currently pending before the Court. Accordingly, briefing on such applications is closed. The Court will render a written decision at its earliest opportunity."

One month later, on April 26, 2017, the Court received a letter from Plaintiffs' counsel, acknowledging the Court's text order [#49], but asking the Court to consider some additional points. Counsel first expresses confusion regarding the Court's handling of the case,[165] and questions whether the Court might be taking an incorrect view of the merits of the case due to its "apparent [negative] opinion of [her]." Counsel further contends that "none of the medical records" submitted by Defendants are "relevant to the legal inquiry of whether any [Plaintiffs] were 'involuntarily committed' in accordance with 18 U.S.C. § 922(g)(4)." Next, Counsel asserts that the "judicial branch" and "executive branches" are "conspiring" "to deprive the individual of Second Amendment, Privacy, Due Process, Property, and other, valuable civil rights." Additionally, Counsel again alludes to the idea

---

164Letter of William J. Taylor, Jr. dated March 13, 2017.

165Plaintiffs' counsel wrote that, "It is unclear why the Court has progressed the matter in the direction it took since May 2016, several months after what was thought to be the final written submissions on the Defendants' motions." The Court can only encourage Counsel to re-read the Court's Order [#43], which explains exactly why the Court was seeking additional information.

that the State of New York is attempting to profit financially from improperly reporting persons to NICS. ("In NY, individuals are only reported to the FBI for the NICS Index in the two categories [of 18 U.S.C. § 922] for which the State is paid money: g(4) and g(8) (the order of protection.").

In rendering its decision herein, the Court has considered all of the aforementioned submissions.

## DISCUSSION

Defendants' motions contend that the Court should dismiss this action for lack of subject matter jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(1), for improper venue, pursuant to Fed.R.Civ.P. 12(b)(3), and for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6). The Court will consider the issues in that order.

### *Motions to Dismiss for Lack of Subject Matter Jurisdiction*

Eastern Long Island Hospital and State Defendants [166] contend that all Plaintiffs lack standing to maintain this action, and the general legal principles concerning standing can be succinctly stated as follows:

The defect of standing is a defect in subject-matter jurisdiction.  In order to

---

[166] Unlike the other defendants, the County does not allege that Montgomery lacks standing to challenge MHL § 9.46.  Indeed, the County's motion includes at least  two references to MHL § 9.46 which imply such statute played some unspecified role in DeMarco's suspension of  Montgomery's license. *See*, DeMarco Memo of Law [#22-4] at p. 1 (referencing Penal Law § 400.00(11)(b), which relates to MHL § 9.46) and p. 15 (referencing MHL § 9.46).  However, the County's  references to MHL § 9.46 and PL § 400.00(11)(b) appear to based upon a mistaken reading of the law by the County's counsel, since DeMarco claims that the only notice his office received concerning Montgomery was that Montgomery had been adjudicated a mental defective or involuntarily committed, and was therefore ineligible to have firearms pursuant to 18 U.S.C. § 922(g). *See*, DeMarco Memo of Law [#22-4] at p. 1.  Moreover, none of the correspondence between NYSP and DeMarco's office, or between DeMarco's office and Montgomery, reference MHL § 9.46. Rather, they only reference involuntary commitment and 18 U.S.C. § 922. Accordingly, Montgomery was manifestly  disqualified under Penal Law § § 400.00(1)(j) & (11)(a)&(c) § 400.02, not under MHL § 9.46 or PL § 400.00(11)(b).  In any event, the County  has focused its  attack on Plaintiffs' alleged failure to plead *Monell* liability, rather than on standing.

establish constitutional standing, a plaintiff must demonstrate that a case or controversy exists by showing (1) that he has suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) that the injury is "fairly traceable" to the challenged action of the defendant; and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp. 2d 19, 30 (D.D.C. 2012) (citations omitted), *aff'd sub nom. Ass'n of Am. Physicians & Surgeons v. Sebelius*, 746 F.3d 468 (D.C. Cir. 2014); *accord, Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013).

Moreover, "[t]o establish standing to obtain prospective relief, a plaintiff must show a likelihood that he will be injured in the future." *Carver v. City of New York*, 621 F.3d 221, 228 (2d Cir. 2010) (citation and internal quotation marks omitted). [W]ith respect to [such] future injury . . . the prospect of such harm must be certainly impending, and real and immediate." *Lee v. Bd. of Governors of the Fed. Reserve Sys.*, 118 F.3d 905, 912 (2d Cir. 1997) (citations and internal quotation marks omitted).

"The basic question when standing is at issue is whether the plaintiff has alleged "such a personal stake in the outcome of the controversy" as to warrant his or her invocation of federal-court jurisdiction, and to justify exercise of the court's remedial powers on his or her behalf. *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). A federal court's jurisdiction can be invoked, then, only when the plaintiff himself or herself has suffered some threatened or actual injury resulting from the putatively illegal action." *Morabito v. Blum*, 528 F. Supp. 252, 260 (S.D.N.Y. 1981), *superseded on other grounds by regulation, see, Himes v. Shalala*, 999 F.2d 684, 692 (2d Cir. 1993); *see also, Lee v. Bd. of Governors of the Fed. Reserve Sys.*, 118 F.3d at 912 ("[T]he 'injury in fact'

test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured.") (citation omitted).

When considering this issue, District Courts must be careful not to confuse standing with the merits of the plaintiff's claim.[167]

> The Second Circuit has emphasized that the fundamental aspect of standing is its focus on the plaintiff and not on the issues the plaintiff wishes to have adjudicated. *United States v. Vazquez*, 145 F.3d 74, 80 (2d Cir.1998). The aim of a court's investigation into a plaintiff's standing is to determine "whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (internal quotation omitted). The standing issue must therefore be resolved "irrespective of the merits of [the] substantive claims."[168] *Bordell v. Gen. Elec. Co.*, 922 F.2d 1057, 1060 (2d Cir.1991).

*State Farm Mut. Auto. Ins. Co. v. Mallela*, No. CV-00-4923 (CPS), 2002 WL 31946762, at *6 (E.D.N.Y. Nov. 21, 2002); *see also*, *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011) ("That a plaintiff's claim under his preferred legal theory fails has nothing to do with subject-matter jurisdiction, unless the claim is so feeble as to be 'essentially fictitious.' . . . To put this differently, subject-matter jurisdiction is a synonym for adjudicatory

---

167 *See, e.g., Anderson v. Holder*, 691 F. Supp. 2d 57, 60–61 (D.D.C. 2010) ("The District of Columbia defendants' Rule 12(b)(1) motion to dismiss argues that "plaintiff lacks standing because the District of Columbia does not control his parole conditions and is therefore not a proper defendant." The argument conflates two materially different concepts. There is no question that plaintiff is subjected to the locally enacted SORA; thus, he has legal standing to challenge the statute's enforcement against him. . . . Whether the District is a proper defendant to redress plaintiff's claim, then, does not affect plaintiff's standing to sue but rather is a question for consideration under Rule 12(b)(6). The District's motion to dismiss under Rule 12(b)(1) therefore will be denied. (emphasis added, citations omitted), *aff'd*, 647 F.3d 1165 (D.C. Cir. 2011)

168 Moreover, where the contested basis for standing is also an element of the plaintiff's claim, the district court should not dismiss for lack of subject-matter jurisdiction, but should find that jurisdiction exists and proceed to address the alleged deficiency under Rule 12(b)(6). *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187,1189 (2d Cir. 1996).

competence. A federal court is the wrong forum when there is no case or controversy, or when Congress has not authorized it to resolve a particular kind of dispute. Other deficiencies in a plaintiff's claim concern the merits rather than subject-matter jurisdiction.") (citations omitted).

Challenges to standing can be either "facial" or "fact based," and the burden on the plaintiff varies depending upon which type of challenge is being made.

> [A] challenge to subject-matter jurisdiction pursuant to Rule 12(b)(1) may be facial or fact-based. When a defendant raises a facial challenge to standing based solely on the complaint and the documents attached to it, the plaintiff has no evidentiary burden and a court must determine whether the plaintiff asserting standing alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue. In making such a determination, a court must accept as true all allegations in the complaint and draw all inferences in the plaintiff's favor. <u>Where a Rule 12(b)(1) motion is fact-based, a defendant proffers evidence outside the pleadings and a plaintiff must either come forward with controverting evidence or rest on the pleadings if the evidence offered by the defendant is immaterial.</u> Where the evidence presented by defendants is both material and controverted, a court must make findings of fact in aid of its decision as to standing.

*Fullwood v. Wolfgang's Steakhouse, Inc.*, No. 13 CIV. 7174 (KPF), 2017 WL 5157466, at *3 (S.D.N.Y. Nov. 3, 2017) (*citing Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016), other citations and internal quotation marks omitted).

A dismissal for lack of standing must be without prejudice. *See, Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 121 (2d Cir. 2017) ("[W]here a case is dismissed for lack of Article III standing, as here, that disposition cannot be entered with prejudice, and instead must be dismissed without prejudice.") (citations omitted).

The question of standing is claim-specific.[169]  In other words, before a court can consider whether a plaintiff has standing to assert a claim, it first must identify the claim that is being asserted.[170]  The instant case is unusual, because the parties disagree about what claims Plaintiffs are asserting.  Movants insist that Plaintiffs' action involves only a challenge to MHL § 9.46.   Plaintiffs, however, contend that they are actually asserting two different claims: First, a challenge to MHL § 9.46; and second, a claim ("the involuntary commitment claim") that Defendants are intentionally mis-categorizing patients as "involuntarily committed" or that they have failed to conduct an "independent analysis" as to "whether a medical report of 'involuntary commitment' rises to the federal standards for disqualification encoded at 18 U.S.C. § 922(g)(4)."[171]  As part of this second "claim," Plaintiffs appear to maintain not only that Defendants are failing to verify that persons have been involuntarily committed before reporting their names to NICS, but that they are doing so intentionally, both to effectuate a general "anti-gun" agenda and to reap financial rewards flowing from financial incentives associated with the   NICS Improvement

---

169 *Ford v. Strange*, 580 F. App'x 701, 708 (11th Cir. 2014) ("The standing inquiry is both plaintiff-specific and claim-specific. Thus, a reviewing court must determine whether each particular plaintiff is entitled to have a federal court adjudicate each particular claim that he asserts.") (citations omitted); *see also, Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp. 2d at 31 ("Standing is a claim-specific inquiry."); *McKay v. State of New York*, No. 16-CV-6834-FPG, 2018 WL 1046792, at *3 (W.D.N.Y. Feb. 26, 2018) ("A plaintiff invoking federal jurisdiction "must demonstrate standing for each claim and form of relief sought." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011).").

170 As noted above, the second showing required under the basic standing analysis is that "(2) that the injury is 'fairly traceable' to the challenged action of the defendant."  This wording seems to assume that both the injury and the challenged action are known, and that what must be shown is a connection between the two.  Such a causal connection cannot be shown without first establishing the specific nature of the challenged action.

171 Capanna Aff. [#45] at ¶ 4.

Amendments Act.[172]

"[W]here, as here, the parties disagree whether the complaint was sufficient to put the defendant on notice of a particular claim, notice pleading standards require that the complaint be read liberally in favor of the plaintiff." *Perry v. Am. Airlines, Inc.*, 405 F. Supp. 2d 700, 705 (E.D. Va. 2005) (citations omitted); *see also, Rodriguez-Rivera v. City of New York*, No. 05 CIV. 10897 LAP, 2007 WL 766195, at *1 (S.D.N.Y. Mar. 12, 2007) ("Plaintiff's Amended Complaint is read liberally in accordance with the standard of notice pleading under Rule 8(a).").

Rule 8(a) of the Federal Rules of Civil Procedure requires only that a complaint give the defendant "fair notice" of the claims being asserted. *See, Keiler v. Harlequin Enterprises Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014) ("Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests."). Indeed, "the principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). If a complaint fails to provide the defendant with a fair understanding of the plaintiff's claims, or otherwise prejudices the defendant, it should be dismissed under Rule 8(a). *See*, *Green v. City of Mount Vernon,* 96 F. Supp. 3d 263, 281 (S.D.N.Y. 2015) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.

---

172The Court's statement on this point is not based upon anything set forth in the pleadings, but is primarily pieced together from stray remarks in Plaintiffs' briefs generally and a very generous reading of Plaintiffs' submission [#45] filed on September 1, 2016.

. . . Thus, courts will not dismiss a complaint . . . unless the complaint's form or substance prevents the defendant from forming a 'fair understanding' of the plaintiff's allegations or otherwise prejudices the defendant in responding to the complaint.") (citations omitted).

Here, the Amended Complaint [#14] fails to satisfy Rule 8(a) insofar as Plaintiffs claim to be asserting an "involuntary commitment" claim. To begin with, the Amended Complaint opens with a one-page statement purporting to explain the "NATURE OF THE ACTION," which is entirely focused on MHL § 9.46. This paragraph does not mention involuntary commitment. Rather, this paragraph gives the reader the clear and unmistakable impression that this lawsuit involves a challenge to the recently-enacted MHL § 9.46, which is not a commitment statute. If Plaintiffs were intending to assert a claim involving systematic mis-classification of persons as "involuntarily committed," as they now claim, this opening paragraph would have been a very opportune place for them to say so. They did not do so, and consequently the reader is led to believe that this action is about MHL § 9.46. Certainly, that was the Court's understanding from reading the paragraph.

The Amended Complaint [#14] then continues with 292[173] paragraphs of factual allegations, almost all of which expressly relate to MHL § 9.46. "Involuntary commitment" is not mentioned until the thirteenth page of the pleading, and even then it is only mentioned in the context of differentiating MHL § 9.46 from the rest of Mental Hygiene Law Article 9. The eighteenth and nineteenth pages of the pleading discuss the fact that a person may become ineligible from possessing firearms under 18 U.S.C, § 922(g) after being adjudicated mental defective or involuntarily committed, but without any explanation

---

[173]This calculation does not include the paragraphs relating to plaintiff "M.M.," who is no longer a party to this action.

for how such fact relates to MHL § 9.46, which had been the sole topic of discussion up until that point. Page twenty-seven of the pleading again briefly mentions 18 U.S.C. § 922(g), but only in the context of discussing a publication issued by the NYSP concerning the SAFE Act. At page twenty-nine, the pleading abruptly asserts that,

> In reality, NYS Police have taken the position of instructing local licensing officials to suspend and terminate pistol permits for all persons reported through MHL § 9.46 as having been involuntarily committed to a mental institution.

Amended Complaint [#14] at ¶ 91. However, although this paragraph mentions involuntary commitment, it implies that Plaintiffs were "reported through MHL § 9.46," and does not indicate that Plaintiffs are attempting to assert a stand-alone claim involving improper involuntary commitments.

It is not until page thirty-eight of the Amended Complaint, at paragraphs 134-136, that the pleading says anything resembling what Plaintiffs now refer to as their "involuntary commitment" claim. Paragraph 134 asserts, without explanation, that "State Defendants in their political drive to confiscate firearms are failing to distinguish between the new MHL § 9.46 and the continuing MHL § 9.41, which is a pre-existing provision for involuntarily [sic] commitment." Paragraph 135 asserts that "it appears" that OMH and "emergency room providers" are classifying persons as "involuntarily committed" who were not in fact involuntarily committed, but provides no factual basis for that statement. And finally, paragraph 136 states:

> It appears that the Office of Mental Health, Department of Criminal Justice Services, and NYS Police are failing to obtain critical data that would support an accurate characterization of a patient as having been 'involuntarily committed," meaning to have been formally adjudicated as a mental

68

> defective or involuntarily committed as these terms are defined at federal law
> and regulations cited herein.

Judging from Plaintiffs' later submissions, paragraph 136 of the Amended Complaint is apparently where Plaintiffs believe they have pleaded an "involuntary commitment" claim. Only with the benefit of such later submissions does it now appear that Plaintiffs were attempting to claim that state officials should not rely upon reports, provided to them by hospitals or doctors, indicating that someone has been involuntarily committed. Apparently, in that regard, Plaintiffs contend that state officials should not accept such reports at face value, and should not report involuntary commitments to NICS, until after a court has performed its own investigation into the circumstances of each alleged involuntary commitment.

However, regardless of what Plaintiffs intended, the Amended Complaint does not give Defendants fair notice of such a claim. Notably, after paragraphs 134-136, the pleading makes factual allegations concerning the individual plaintiffs, which, although they include allegations that Plaintiffs were wrongly labeled as involuntary commitments, seem to blame any mistake in that regard on the SAFE Act, and, particularly, MHL § 9.46.[174] Consequently, since the expressly-stated purpose[175] of the Amended Complaint is to attack a specific section of the SAFE Act -- MHL § 9.46 -- the reader is left with the impression that Plaintiffs are somehow blaming the fact that they were improperly classified as "involuntarily committed" on MHL § 9.46. Although such a claim makes no logical sense,

---

174Amended Complaint [#14] at ¶ ¶ 221, 234, 255, 288.

175See, Amended Complaint [#14] at p. 2 "NATURE OF THE ACTION."

it nevertheless seems to be what the pleading is asserting.[176]

This impression is reinforced at the end of the Amended Complaint, where Plaintiffs set forth their four causes of action. The first cause of action ("right to privacy"), third cause of action ("due process") and fourth cause of action ("right to keep and bear arms") refer only to MHL § 9.46, and do not mention involuntary commitment. The second cause of action repeatedly references MHL § 9.46, but then ends with two references to involuntary commitment. However, it is not obvious that those references to involuntary commitment are attempting to assert a separate claim, unrelated to the immediately-preceding statements about MHL § 9.46.

Similarly, the Amended Complaint's *ad damnum* clause seeks relief almost entirely related to MHL § 9.46, and does not mention involuntary commitment. "The prayer for relief is no part of the plaintiff's cause of action." *City of Los Angeles v. Lyons*, 461 U.S. 95, 130, 103 S. Ct. 1660, 1680, 75 L. Ed. 2d 675 (1983). However, a prayer for relief can, as in this case, give the defendant the wrong idea about the type of claim that the complaint is attempting to assert.

In sum, the Court finds that the Amended Complaint fails to give fair notice to Defendants that it is attempting to assert a stand-alone involuntary commitment claim. Rather, the pleading only gives fair notice that it is challenging MHL § 9.46. Accordingly, to the extent that Plaintiffs were attempting to assert an "involuntary commitment" claim in the Amended Complaint, it is dismissed under Rule 8(a), without

---

176Again, Plaintiff's counsel has explained that she concluded that Montgomery must have been reported under MHL § 9.46, because the Hospital's claim that Montgomery had been involuntarily committed did not "make sense" to her. Docket No. [#9], Capanna letter dated Jan. 23, 2015 at p. 4.

prejudice.[177]  Therefore, in connection with the challenge to Plaintiffs' standing, the Court will only consider whether Plaintiffs have standing to challenge MHL § 9.46.

Having found that the Amended Complaint asserts a challenge only to MHL § 9.46, it is clear that Montgomery, Carter and Reid have no standing in this action, since they were not affected by MHL § 9.46, and have not shown that they are in imminent danger of being affected by MHL § 9.46 in the future.  That is, they have not shown an injury that is "fairly traceable" to the challenged action of the defendants in enacting and/or enforcing MHL § 9.46.

For example, there is not a single shred of evidence in the record that MHL § 9.46 had anything whatsoever to do with what happened to Mr. Montgomery.  Rather, all of the evidence indicates that whatever happened to Montgomery resulted from him being admitted to the hospital pursuant to MHL § 9.39, rightly or wrongly.

There is similarly no evidence that a § 9.46 report was filed concerning Carter.  At most, the Amended Complaint indicates that after Carter was taken to the hospital by police under circumstances clearly implicating MHL § 9.41, a police officer told him that his guns could not be returned to him, "due to the SAFE Act."[178]  However, even if it could be inferred that this vague statement refers to MHL § 9.46, as opposed to some other provision of the SAFE Act, such as PL § 400.00(1)(j)&(11)(a)&(c), Defendants have provided sworn evidence that no MHL § 9.46 report was filed concerning Carter.  Moreover, Plaintiffs admit that the relevant entry in Carter's medical chart refers to MHL

---

177Celli v. Cole, 699 F. App'x 88, 89 (2d Cir. 2017) ("[A] Rule 8 dismissal generally should be without prejudice[.]")

178Amended Complaint [#14] at ¶ 221.

§ 9.41.[179]

As for Reid, at most the Amended Complaint vaguely indicates that Reid received a notice which she interpreted as indicating that MHL § 9.46 might had something to do with the suspension of her pistol license.[180] However, the pleading admits that the "language [of the notice Reid received] implicates both MHL § 9.41 and § 9.46, *without referencing any section of law*."[181] Further, Reid has not submitted the actual document to which the pleading refers, nor has she otherwise refuted Defendants' sworn evidence that no MHL § 9.46 report was ever actually filed concerning her.

In any event, to the extent that there is any bona fide factual issue on this point, the Court finds that Montgomery, Carter and Reid were never reported under MHL § 9.46, and that to the extent that they suffered any injuries, they were not caused by MHL § 9.46. Further, Montgomery, Carter and Reid have not shown that they are in imminent danger of being reported under MHL § 9.46 in the future. Accordingly, the claims of Montgomery, Carter and Reid in the Amended Complaint [#14] are dismissed in their entirety, pursuant to Rule 12(b)(1), without prejudice. Moreover, since the only claims being asserted against Suffolk County and Eastern Long Island Hospital are by Montgomery, the County and the Hospital are dismissed from the action entirely, pursuant to Rule 12(b)(1), without prejudice.

Regarding Bechler, the issue remains whether he has standing to maintain claims

---

179Pl. Memo of Law [#28-2] at p. 54, memo at p.47 ("Mr. Carter's chart contains a '9.41' within one page of medical notes.").

180Amended Complaint [#14] at ¶ 255.

181Amended Complaint [#14] at ¶ 255 (emphasis added).

involving MHL § 9.46 against State Defendants, where an MHL § 9.46 report was filed against him only after his pistol license had already been suspended due to an involuntary commitment.[182] In this regard, it appears clear to the Court that even without the MHL § 9.46 report, Bechler's firearms license would have been suspended or revoked, his firearms would have been seized, his name would have been reported to both NICS and the New York State database, and he would have become ineligible to buy or possess firearms pursuant to 18 U.S.C. § 922, all due to factors other than MHL § 9.46. In particular, on September 6, 2013, Ontario County Court Judge Reed suspended Bechler's pistol license, due to the fact that Bechler had, that same day, been "arrested under the Mental Health [sic] Law as a result of a suicide threat."[183] The same day, Clifton Springs Hospital notified OMH that Bechler had been involuntarily committed, and OMH forwarded that information to DCJS, to allow DCJS "to update NICS and to determiner whether Mr. Bechler had a firearms license."[184] A report under MHL § 9.46 was not filed against Bechler until several days later.[185] Also, it is undisputed that Bechler's firearms license was subsequently reinstated, and that his guns have been returned to him.

For purposes of standing, the burden on a plaintiff to show that his injury is "fairly traceable" to the challenged conduct of the defendant is modest, and is less than the showing required to prove proximate causation:

---

182To the extent that Bechler is challenging this chronology, the Court finds that Defendants have established that the MHL § 9.46 report was not filed until days after Bechler had already been involuntarily committed.

183Decl. of William J. Taylor, Jr. dated Feb. 26, 2015, Exhibit 33, "Order Suspending Pistol Permit."

184Aff. of Donna Marie Call dated Feb. 25, 2015, at ¶ 22.

185See, Aff. of Donna Marie Call dated Feb. 15, 2015, at ¶ 25; Aff. of John B. Allen, Jr. dated Feb. 25, 2015, at ¶ ¶ 22-23;

The requirement that a complaint allege an injury that is fairly traceable to defendants' conduct for purposes of constitutional standing is a lesser burden than the requirement that it show proximate cause. Thus, the fact that there is an intervening cause of the plaintiff's injury may foreclose a finding of proximate cause but is not necessarily a basis for finding that the injury is not "fairly traceable" to the acts of the defendant. . . . [I]t is wrong to equate injury "fairly traceable" to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation. Rather, at the pleading stage of the litigation, the plaintiffs' burden of alleging that their injury is "fairly traceable" to the challenged act is relatively modest.

*Rothstein v. UBS AG*, 708 F.3d 82, 92 (2d Cir. 2013) (citations and internal quotation marks omitted).

Nevertheless, State Defendants contend that Bechler cannot meet this burden, since his firearms license was already suspended by the time the MHL § 9.46 report was filed, and he would have faced all of the same consequences (suspension of license, reporting to DCJS and NICS, seizure of weapons) about which he complains in this action even if no MHL § 9.46 report had been filed. On this point, State Defendants cite, *inter alia*, *Exotic Animal Owners v. New York*, No. 03-7327, 98 F.App'x 905 (2d Cir. Jun. 4, 2004) (Second Circuit found that monkey owner living in New York City, who was challenging a provision of the New York Gen. Mun. Law requiring owners of wild pets to notify the state, lacked standing because he was independently prohibited from owning the monkey pursuant to the New York City Health Code: "He thus has no standing in this case, because we can only speculate whether the remedy he seeks would redress his purported injuries.") (citation and internal quotation marks omitted).

The Court agrees with State Defendants, and finds that Plaintiffs have failed to carry their burden of affirmatively showing that Bechler has standing to challenge MHL § 9.46.

Specifically, Plaintiffs have not shown either that Bechler's alleged injury is "fairly traceable" to actions of State Defendants involving MHL § 9.46, or that it is likely such injury will be redressed by a favorable decision by this Court involving MHL § 9.46.

Bechler's injury is not fairly traceable to MHL § 9.46, because the filing of the MHL § 9.46 report was redundant, and put him in no worse position than he was already in after he was reported as involuntarily committed. *See, Phelps v. Bosco*, No. 113CV1510GTSCFH, 2017 WL 437407, at *29 (N.D.N.Y. Feb. 1, 2017) (Plaintiff, who claimed that the State of New York had wrongly reported that his admission to a mental hospital in 1996 pursuant to MHL § 9.37 was an "involuntary commitment" under 18 U.S.C. § 922(g)(4), lacked standing, because he also had a *different* involuntary commitment which he was *not* challenging: "The Court finds that Plaintiff's 2005 commitment to Columbia Memorial Hospital provides an independent disqualifying event under 18 U.S.C. § 922(g)(4)."), *aff'd*, No. 17-627, 2018 WL 858703 (2d Cir. Feb. 14, 2018).

Similarly as to "redressability," Plaintiffs have not explained how a favorable ruling in this action concerning MHL § 9.46 would redress Bechler's alleged injury, since he suffered even more injuries due to having been classified as "involuntarily committed" than he would have suffered solely from an MHL § 9.46 report.[186]  Nor has Bechler shown that he is in imminent danger of being reported under MHL § 9.46 in the future.  Accordingly, Bechler lacks standing to challenge MHL § 9.46.

For all of the foregoing reasons, the applications to dismiss the Amended Complaint, for lack of standing pursuant to Rule 12(b)(1), by Eastern Long Island Hospital

---

[186]For example, involuntary commitment results in an NICS report, whereas an MHL § 9.46 report does not.

and State Defendants, are granted. Moreover, although Suffolk County did not move to dismiss for lack of standing, the Court finds, *sua sponte*, that Plaintiffs also lack standing to assert claims under MHL § 9.46 against the County, for the same reasons that they lack standing to assert MHL § 9.46 claims against the other defendants. *See, In re Indu Craft, Inc.*, 630 F. App'x 27, 28 (2d Cir. Nov. 10, 2015) ("It is well-established that a district court may raise the issue of standing *sua sponte*[.]").[187] The Amended Complaint is dismissed in its entirety, without prejudice.

Although the Court is satisfied that it lacks subject-matter jurisdiction over this action, due to Plaintiffs' lack of standing to challenge MHL § 9.46, it knows that on appeal, a reviewing Court might disagree. Moreover, the Court is keenly aware of the amount of time and energy that has been expended in researching, briefing and arguing the remaining aspects of the pending motions, concerning venue and the merits of Plaintiffs' claims. Therefore, despite the Court's ruling on jurisdiction, it would be the Court's preference to proceed and consider, in the alternative, the remaining aspects of the pending applications. However, the Second Circuit has indicated that such an alternative ruling by this Court would amount to an advisory opinion and a "nullity." For example, in *Roistacher v. Bondi*, 624 F. App'x 20 (2d Cir. 2015), the Second Circuit had before it a case in which the District Court found that it lacked subject-matter jurisdiction, but proceeded, in the alternative, to consider the merits and grant summary judgment to the defendants. Significantly, on appeal the Second Circuit found that the District Court's

---

187Under the circumstances of this case, where two-of-three defendants moved to dismiss for lack of standing on grounds that are equally applicable to Suffolk County, Plaintiffs have had a full and fair opportunity to brief the standing issue, a cannot claim to be prejudiced by the Court's *sua sponte* dismissal on this ground of the claims against Suffolk County.

ruling on subject-matter jurisdiction had been "wrong," and one might expect that the Circuit Court would have then proceeded to consider whether the District Court's alternative ruling on summary judgment was correct. Instead, however, the Second Circuit declined to review the District Court's alternative ruling, stating:

> [T]he portion of the judgment purporting to [alternatively] grant summary judgment to the defendants must be vacated as well. "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1868). *See also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("[A] court ... resolv[ing] contested questions of law when its jurisdiction is in doubt ... produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by this Court from the beginning."). Having determined that it lacked subject-matter jurisdiction, the district court's subsequent consideration of the merits of Roistacher's claims was thus a nullity. We therefore cannot simply affirm the judgment's dismissal, in the alternative, of the case on the merits. The only effective part of the judgment below was the dismissal for lack of subject-matter jurisdiction[.]

*Roistacher v. Bondi*, 624 F. App'x 20, 22–23 (2d Cir. 2015)(emphasis added). In other words, the District Court's finding that it lacked jurisdiction rendered its alternative discussion of the merits a nullity, even though it turned out that the District Court actually had jurisdiction. *Id*.; *see also, Crawley v. United States*, 417 F. App'x 94 (2d Cir. 2011) ("There may be no more unambiguous limitation on the power of the federal courts than

that proscribing the entry of advisory opinions.").[188]  Accordingly, this Court must dismiss

the action, without considering Defendants' remaining arguments concerning venue and

the merits of Plaintiffs' claims.

<u>Plaintiffs' Alternative Motion for Leave to Re-plead is Denied</u>

Plaintiffs have alternatively requested leave to replead,[189] and although the Court

lacks subject matter jurisdiction over Plaintiffs' MHL § 9.46 claims, it may nevertheless

allow Plaintiffs an opportunity to file an amended complaint. *See, Oliver Sch., Inc. v. Foley*,

930 F.2d 248, 252 (2d Cir. 1991) ("[T]he principle that permission to amend to state a claim

should be freely granted is likewise applicable to dismissals for failure to plead an

adequate basis for federal jurisdiction.") (citation omitted).

However, even the liberal amendment standard has its limits. *See, Jin v. Metro. Life

Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002) ("Leave to amend should be freely granted, but

the district court has the discretion to deny leave if there is a good reason for it, such as

futility, bad faith, undue delay, or undue prejudice to the opposing party.").  A request to

re-plead may be denied as futile where the problems with the complaint are substantive,

and would not be cured by better pleading. *See, Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d

Cir.2000) ("The problem with Cuoco's causes of action is substantive; better pleading will

---

188See also, Prof'l Traders Fund, LLC v. Prairie Oil & Gas, Inc., 521 F. Supp. 2d 313, 315 (S.D.N.Y. 2007) (Observing that, "On the one hand, the policy of avoiding advisory opinions, which is grounded in Article III of the Constitution, argues in favor of deciding the matter solely on the jurisdictional ground . . . and proceeding no farther. On the other hand, taking that course would risk the possibility that the jurisdictional dismissal will be appealed and overturned, thus perhaps requiring a remand and further proceedings that might be avoided by ruling in the alternative on the merits," but concluding that such an alternative ruling would run afoul of Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 118 S.Ct. 1003 (1998) and Ruhrgas AG v. Marathon Oil Co.,  526 U.S. 574, 119 S.Ct. 1563 (1999)).

189Pl. Memo of Law [#28-2] at p. 50, memo at p. 43 ("[I]f this Court is in any way inclined to otherwise dismiss the Plaintiffs' Amended Complaint  . . . then the Plaintiffs respectfully request that the Court accept the filing of the Second Amended Complaint.").

not cure it. Repleading would thus be futile. Such a futile request to replead should be denied.").

Leave to amend may also be denied where the plaintiff has already had sufficient opportunities to fix the complaint. As one Court has stated,

> [w]hile pleading is not a game of skill in which one misstep may be decisive to the outcome, neither is it an interactive game in which plaintiffs file a complaint, and then bat it back and forth with the Court over a rhetorical net until a viable complaint emerges. It is the plaintiffs' responsibility to plead their case adequately, and a court may deny a plaintiff leave to replead when that party has—as here—been given ample prior opportunity to allege a claim.

*In re Refco Capital Markets, Ltd. Brokerage Customer Sec. Litig.*, No. 06 CIV. 643 (GEL), 2008 WL 4962985, at *2 (S.D.N.Y. Nov. 20, 2008) (citations and internal quotation marks omitted), *aff'd sub nom. Capital Mgmt. Select Fund Ltd. v. Bennett*, 680 F.3d 214 (2d Cir. 2012).

Here, Plaintiffs have already filed two complaints that are not actionable for the reasons stated above. (Docket Nos. [#1] & [#14]). Additionally, Plaintiffs have requested leave to file a "Second Amended Complaint" in the event that the Court is "inclined to grant the Defendants' motions to dismiss,"[190] which it is. In support of this alternative request to amend, Plaintiffs' make a one-page argument,[191] which states in pertinent part:

> A 'Second Amended Complaint' would bring together the additional information from the Defendants [referring to the exhibits filed by Defendants in support of their motions to dismiss] to, in essence, complete the story against '9.46' in the full context of its associated '9.41' reporting

---

[190] Docket No. [#28] at ¶ 1.

[191] Docket No. [#28-2] at pp. 49-50 (Memo of Law at pp. 42-43).

system. . . . This amendments would not relate to the Plaintiffs; the amendments finish the narrative about the actions being taken in an on-going manner against those tagged as 'mentally ill' and/or 'involuntarily committed,' reported through the PERDS form or the ISARS form, being fanned out across state and local offices and agencies and uploaded to the federal government.

Docket No. [#28-2] at p. 49 (Memo p. 42).

As for the proposed Second Amended Complaint itself (Docket No. [#28-3]), the Court notes, as an initial matter, that the proposed pleading does not comply with Rule 15(b) of the Local Rules of Civil Procedure.[192] As for the actual allegations, the proposed pleading, like the first two complaints, is focused almost entirely on MHL § 9.46. Indeed, the vast majority of the proposed pleading appears to be identical to the Amended Complaint [#14]. From the Court's visual comparison of the two documents, the changes in the proposed pleading seem to be in paragraphs 134, 141-156, 340-346, 357, 361-362, 364, and the *ad damnum* clause, paragraphs VI-IX. The bulk of these changes, appearing at paragraphs 141-156, are factual allegations summarizing the procedures under New York State law for reporting persons, who have been involuntarily committed under the Mental Hygiene Law, to OMH/DCJS/NICS, as discussed by the Court above. The proposed pleading then asserts that such provisions are confusingly similar to the provisions under MHL § 9.46, which has "created confusion, including among licensing officers, court personnel, and other government employees charged with license

---

[192]Such rule states in pertinent part that "the amendment(s) or supplement(s) to the original pleading shall be identified in the proposed pleading through the use of a word processing "redline" function or other similar markings that are visible in both electronic and paper format." Plaintiffs' proposed Second Amended Complaint [#28-3] does not contain any identification of newly-added material or omitted material. Instead, Plaintiff's counsel has merely applied the "strikeout" feature to the words "Second Amended Complaint" and the date at the end of the pleading. This resulted in the Court having to compare the proposed amended pleading with the Amended Complaint [#14], paragraph by paragraph.

interface."[193]  The proposed pleading further alleges that the State of New York "actively recruits medical providers, especially hospitals," to report information to the federal government, to help the State get "grant moneys and further its goals of termination of firearms licenses and firearms ownership."[194]  Although the proposed pleading does not expressly say so, the Court understands, from Plaintiffs' other submissions, that Plaintiffs' theory in this regard is that the State of New York encourages medical providers to file false reports of involuntary commitments, so that the State can reap financial rewards related to the NICS Improvement Amendments Act of 2007.

The proposed Second Amended Complaint [#28-3], like the Amended Complaint, purports to set forth four causes of action.[195]  These causes of action are basically identical to those in the Amended Complaint, except that instead of referring just to MHL § 9.46, they now refer to "[MHL] 9.41 and/or 9.46" or "'9.46' and '9.41.'"  As for relief, the proposed amended pleading demands, in addition to previously-demanded relief relating to MHL § 9.46, that the Court order an audit of all of the State of New York's records concerning reports of involuntary commitments under the Mental Hygiene Law, and that the Court issue

> an order requiring that any persons reported by the State to the FBI or otherwise uploaded to the federal government to be included in the NICS database shall be released from said disqualification unless the third party audit can establish that the patient was 'involuntarily committed' as such term means at statutory and regulatory federal law.

---

193Docket No. [#28-3] at ¶ ¶ 153-154.

194Docket No. [#28-3] at ¶ 155.

195Docket No. [#28-3] at ¶ ¶ 331-365.

Docket No. [#28-3] at pp. 85-86, ¶¶ VII & VIII.  In other words, Plaintiffs want this Court to order that the names of any New York residents who have been reported to NICS due to involuntarily commitment, be expunged and removed from the State's records and from NICS, unless the State can independently prove that such persons were, in fact, involuntarily committed.  In this regard, Plaintiffs are contending that it is unconstitutional for the State to rely solely upon reports, from hospitals and medical providers, indicating that patients have been involuntarily committed, when disqualifying persons from holding firearms licenses or from possessing guns.

Plaintiffs' request to replead is denied.  To the extent that the proposed amended pleading re-asserts claims involving MHL § 9.46, leave to amend is denied as futile for the reasons already discussed herein.  Leave to amend is also denied as futile insofar as the proposed pleading attempts to state claims regarding "involuntary commitment."  The proposed pleading contends that medical providers are being confused by similarities between MHL § 9.46 and the involuntary commitment provisions under MHL Article 9, and implies that such confusion is resulting in reports being improperly filed against persons seeking mental health treatment.  The proposed pleading further alleges that the State is intentionally encouraging medical providers to file false reports  concerning involuntary commitments, which can be uploaded to NICS.  According to the proposed pleading, the purpose of the State's alleged scheme is twofold:  To disarm citizens, and to obtain money from the Federal Government.

However, the proposed pleading fails to allege facts to make any of these allegations plausible.  For example, there are no factual allegations plausibly suggesting that medical providers are actually failing to distinguish between MHL § 9.46 and MHL §

9.41.[196] Nor are there any factual allegations to support Plaintiffs' contention that the State is encouraging medical providers to file false reports of involuntary commitments. Additionally, there are no factual allegations to plausibly suggest that the State would benefit financially from padding the number of names reported to NICS. To the contrary, the Court has already discussed how the financial incentives under the NICS Improvement Amendments Act of 2007 are based upon the accuracy of reporting, not upon the number of names reported.

Furthermore, to the extent that Plaintiffs are maintaining that the State cannot permissibly rely upon the reports of doctors to disqualify persons from firearms ownership, or to report names to NICS, the argument fails as a matter of law.[197] Specifically, the Second Circuit recently stated that such reports from doctors are "exactly the sort of" evidence that should be used to establish an "involuntary commitment" under 18 U.S.C. § 922 :

> Like Section 9.27, Section 9.39 [of the New York Mental Hygiene Law] creates a procedure to admit an individual into a hospital against her will when her mental illness presents a serious danger to herself or others. Individuals hospitalized under either provision, or their representatives, have a right to seek judicial review of that determination. See N.Y.M.H.L. § 9.31(a) (providing this right for Section 9.27 confinements); N.Y.M.H.L. § 9.39(a)

---

196The fact that a medical provider filed an MHL § 9.46 report concerning a person who had been involuntarily committed would not be indicative of confusion, because the standard for involuntary commitment and for filing a § 9.46 report is essentially the same, and the two provisions are not mutually exclusive.

197Plaintiffs maintain that part of what they are seeking in this action is to "remove the medical provider from the position to which the State has elevated it, namely, making the sole determination as a matter of state and federal law whether an individual is disqualified from all rights under the Second Amendment in a non-adjudicatory setting." Pl. Memo of Law ][#28-2] at p. 53, memo at p. 46; *see also*, Capanna letter dated April 25, 2017 ("None of the *medical* records of the Defendants [sic] are relevant to the *legal* inquiry of whether any [of the Plaintiffs] were 'involuntarily committed' in accordance with 18 U.S.C. § 922(g)(4).") (emphasis added). In other words, Plaintiffs contend that Courts, and not psychiatrists, should be determining whether patients are too mentally ill to have firearms.

(providing this right for Section 9.39 confinements). And, as in [*U.S. v. Waters*, 23 F.3d 29 (2d Cir. 1994),[198] *cert. denied*, 513 U.S. 867, 115 S.Ct. 185 (1994)], [the Appellant's] 2005 admission was based on the recommendation of at least two physicians, at least one of whom was a psychiatrist, and included treatment during the course of his stay. That is exactly the sort of determination that a federal statute should include in its definition of "commitment" insofar as it is concerned with preventing firearms from getting into the hands of those whose mental illness might lead them to commit acts of violence. And it is the sort of process that ensures the determination is not arbitrary.

*Phelps v. Bosco*, No. 17-627, --- Fed. Appx. --- , 2018 WL 858703 at *2 (2d Cir. Feb. 14, 2018) (citations omitted). Consequently, Plaintiffs' request to file the proposed Second Amended Complaint is denied.

Plaintiffs have not requested further leave to amend, and the Court would not be inclined to grant such a request in any event. Plaintiffs have already made three attempts to plead actionable claims, and seem to be no closer to doing so than when they started. For example, although Defendants raised the issue of Plaintiffs' lack of standing to challenge MHL § 9.46 as soon as they appeared in the action, Plaintiffs have continued to press the same claims under that statute in all three iterations of the complaint. Further, Plaintiffs' pleadings have repeatedly insisted that MHL § 9.46 violates HIPAA, while overlooking the very provision (45 C.F.R. § 164.512(a)(1)) which is most relevant to whether MHL § 9.46 actually violates HIPAA. Moreover, Plaintiffs' theory of a conspiracy between the State of New York and medical providers to obtain federal funds seems

---

198Plaintiffs have urged this Court not to rely upon *Waters*, because "[i]t was decided in 1994," and was wrongly decided. Pl. Memo of Law [#28-2] at pp. 47-48, memo at pp. 40-41). The Second Circuit apparently does not share Plaintiffs' view of *Waters*' precedential value.

fanciful, or, at the very least, entirely speculative and implausible.[199]

Additionally, the Court believes, from its experience to date with this action, that if Plaintiffs are given a further opportunity to amend, they will continue to press the very same claims and theories, rather than admit that they have been barking up the wrong tree all along by focusing on MHL § 9.46.[200]  For example, Plaintiffs's papers indicate that if they were given a further opportunity to amend, they would use it to take information from *Defendants*' submissions, and "bring together the additional information from the Defendants to, in essence, complete the story against '9.46' in the full context of its associated '9.41' reporting system."[201]   The Court has fully reviewed Defendants' submissions, and fails to see how they help Plaintiffs' case.

In the Court's view, Plaintiffs' claims arise, if at all, from the fact that they were wrongly classified as having been involuntarily committed under provisions of MHL Article 9 *other than* MHL § 9.46.[202]  To the extent that Plaintiffs were incorrectly classified in that regard, such fact would be the result of error in medical judgment, as opposed to any

_____

199*See, Yefimova v. Bank Trustco*, No. 117CV00403TJMTWD, 2017 WL 2123153, at *4 (N.D.N.Y. May 1, 2017) (Denying leave to amend as futile, where complaint was "based on a factually fanciful scenario."), report and recommendation adopted, No. 117CV00403TJMTWD, 2017 WL 2116508 (N.D.N.Y. May 15, 2017), reconsideration denied, No. 117CV403TMJTWD, 2017 WL 4570789 (N.D.N.Y. Oct. 12, 2017), and reconsideration denied, No. 117CV403TMJTWD, 2017 WL 4694038 (N.D.N.Y. Oct. 17, 2017).

200For example, instead of amending their pleadings to address legitimate problems identified by the Defendants' motions to dismiss, such as standing, Plaintiffs blithely argued that Defendants' motions somehow actually strengthened their case. *See, e.g.*, Pl. Memo in Opposition to Motions to Dismiss [#28-2] at p. 1 ("Far from serving as a mechanism to defeat the Plaintiffs' case, the Defendants' Motions support and enhance the Plaintiffs' claims.").  Plaintiffs also misstate or misinterpret the legal arguments being raised by Defendants, as shown by such incorrect and histrionic statements as this: "Defendants treat the term 'involuntary commitment' as a generic term, synonymous with 'mental illness,' 'likely to commit a crime with a gun,' and the functional equivalent of 'convicted criminal serving a life sentence without possibility of parole." (Pl. Memo of Law [#28-2] at p.17, Memo at p. 10).

201Pl. Memo of Law [#28-2] at p. 49, memo at p. 42).

202Again, MHL § 9.46 is not a commitment statute.

defect in the provisions of MHL Article 9. Moreover, Plaintiffs have already argued to this Court that such provisions have adequate due-process procedures built into them.[203] Accordingly, it seems that what Plaintiffs really need to do is to utilize those procedures to correct the record as to the nature of their admissions. Indeed, it appears that all or most of the Plaintiffs have already done so through Article 78 proceedings or similar proceedings. To the extent that Plaintiffs now claim that MHL Article 9's commitment provisions are unconstitutional, they may wish to bring an action to that effect, preferably in the Northern District where venue would unquestionably be proper as to State Defendants.[204]

For all of the foregoing reasons, any further request for leave to amend is denied. *See, Levin v. Credit Suisse, Inc.*, No. 14-397-cv, 577 Fed.Appx. 85 (2d Cir. Sep. 5, 2014) (District Court did not abuse its discretion when it denied further leave to amend, after Plaintiff had three chances to plead actionable claims, and continued to assert the same deficient claims after being advised of their deficiencies).

CONCLUSION

Defendants' applications to dismiss for lack of subject matter jurisdiction are granted, and this action is dismissed without prejudice. Plaintiffs' cross-motion to amend is denied, and further leave to amend is also denied. Plaintiffs' application for preliminary

---

[203]*See*, Memo of Law [#4] at p. 10 ("All processes for involuntary (and even for voluntary) commitment [under MHL Art. 9] include notice, attorney, and judicial review provisions. All provisions under Art. 9 that is, except for MHL § 9.46."); *see also*, Docket No. [#9], Capanna letter dated January 23, 2015 ("[We] are [not] seeking to challenge the pre-existing structure of Mental Hygiene Law Article 9.")

[204]Subject, of course, to the applicable statute of limitations.

injective relief is denied as moot.[205]  The Clerk of the Court is directed to close this action.

      SO ORDERED.

Dated:      March 5, 2018
              Rochester, New York

                                                  /s/ Charle J. Siragusa
                                                  CHARLES J. SIRAGUSA
                                                  United States District Judge

---

[205]*See, e.g., Wagner v. Stout St. Fund I L.P.*, No. 13-CV-4256 MKB, 2013 WL 4679623, at *1 (E.D.N.Y. Aug. 30, 2013) ("As there is no basis for subject matter jurisdiction, the Court cannot consider Plaintiff's request for a preliminary injunction."); *see also, Glatzer v. Barone*, 614 F. Supp. 2d 450, 456 (S.D.N.Y. 2009) ("[A]bsent authority to adjudicate, the Court lacks a legal basis to grant any relief[.]"), *aff'd*, 394 F. App'x 763 (2d Cir. 2010).