UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DONALD MONTGOMERY, ANDREW CARTER,
LOIS REID, KARL BECHLER, and "M.M.," as
individuals, and on behalf of all other persons similarly
situated,

                Plaintiffs,

- against -

ANDREW M. CUOMO, Governor of the State of New
York; ANN MARIE T. SULLIVAN, Commissioner of
the New York State Office of Mental Health;
MICHAEL C. GREEN, Executive Deputy
Commissioner of the New York State Division of
Criminal Justice Services; JOSEPH A. D'AMICO,
Superintendent of the New York State Police;
VINCENT F. DEMARCO, Suffolk County Sheriff's
Department; and EASTERN LONG ISLAND
HOSPITAL,

                Defendants.

14-cv-06709-CJS

## MEMORANDUM OF LAW IN SUPPORT OF STATE DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
*Attorney for State Defendants*
120 Broadway, 24th Floor
New York, New York 10271
(212) 416-8426
william.taylor@ag.ny.gov

WILLIAM J. TAYLOR, JR.
ANTHONY J. TOMARI
JONATHAN CONLEY
Assistant Attorneys General
   *Of Counsel*

**TABLE OF CONTENTS**

**Page**

TABE OF AURHORITIES ............................................................................. iii

PRELIMINARY STATEMENT ...................................................................... 1

STATEMENT OF FACTS .............................................................................. 2

A.  The Relevant Law Prior to the SAFE Act ............................................ 2

    1.  New York's Firearm Licensing And Its Restrictions on
        Gun Possession on Mental Health Grounds.................................. 2

    2.  Federal Criminal Prohibitions on Gun Possession by the Mentally Ill ........................ 4

    3.  NICS and Mental Illness ................................................................ 5

B.  The SAFE Act .......................................................................................... 6

    1.  New York's Strengthened Eligibility Requirements for Firearms Licenses ............... 7

    2.  Mental Hygiene Law § 9.46: New York's New
        Mental Health Reporting Requirement ........................................ 8

C.  The Plaintiffs ........................................................................................... 10

    1.  Donald Montgomery .......................................................................... 10
    2.  Andrew Carter .................................................................................... 12
    3.  Lois Reid ............................................................................................ 13
    4.  Karl Bechler ...................................................................................... 13
    5.  M.M .................................................................................................... 15

ARGUMENT .................................................................................................. 15

  I.  THE PLAINTIFFS LACK ARTICLE III STANDING ........................... 15

    A.  Plaintiffs Montgomery, Carter, and Reid Have Never Been the Subject
        of Mental Hygiene Law § 9.46, and Thus Each Plainly Lacks Standing Here..... 16

    B.  M.M.'s Speculative Allegations of Future Harm
        Are Also Not Enough to Demonstrate Standing.................................. 18

    C.  Bechler Also Lacks Article III Standing.............................................. 19

II.    VENUE IS NOT PROPER IN THE WESTERN DISTRICT OF NEW YORK ........ 21

    A.  None of the defendants reside in the Western District of New York .................... 21

    B.  No substantial part of the events or omissions
        giving rise to the claims occurred in this District ................................................ 22

III.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE
     SECOND AMENDMENT ..................................................................................... 22

    A.  The Second Circuit's framework for assessing Second Amendment claims ....... 23

    B.  Mental Hygiene Law § 9.46 regulates conduct that is outside the scope
        of -- and thus entirely unprotected by -- the Second Amendment ...................... 23

    C.  Count Four also fails because MHL § 9.46 does not
        substantially burden the Second Amendment right ................................................ 24

    D.  Even if heightened scrutiny applied here, Mental Hygiene
        Law § 9.46 would plainly pass constitutional muster .......................................... 25

        1.  At most, intermediate scrutiny applies .......................................................... 25

        2.  Mental Hygiene Law § 9.46 satisfies intermediate scrutiny ........................... 27

IV.    MENTAL HYGIENE LAW § 9.46 DOES NOT VIOLATE
     PLAINTIFFS' PRIVACY RIGHTS ....................................................................... 30

V.    PLAINTIFFS' DUE PROCESS CLAIMS FAIL AS A MATTER OF LAW ............ 33

VI.    PLAINTIFFS' REMAINING CLAIMS ALSO FAIL ................................................ 35

CONCLUSION ............................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Adams v. Suozzi,*
  517 F.3d 124 (2d Cir. 2008)................................................................34

*Arar v. Ashcroft,*
  532 F.3d 157 (2d Cir. 2008), *vacated on other grounds*, 585 F.3d 559 (2d Cir. 2009)..........20

*Aron v. Becker,*
  No. 3:13-CV-0883, 2014 U.S. Dist. LEXIS 132448 (N.D.N.Y. Sept. 22, 2014)..............28, 34

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009).................................................................35

*Azim v. Vance,*
  530 F. App'x 44 (2d Cir. 2013)........................................................20

*Bach v. Pataki,*
  408 F.3d 75 (2d Cir. 2005)...........................................................3

*Barker v. TSA,*
  353 F. App'x 450 (1st Cir. 2009).....................................................20

*Barlow v. Fischer,*
  2010 U.S. Dist. LEXIS 37522 (W.D.N.Y. Apr. 15, 2010).................................21

*Capellupo v. Webster Cent. Sch. Dist.,*
  2014 U.S. Dist. LEXIS 170912 (W.D.N.Y. Dec. 9, 2014)................................16

*Carver v. City of New York,*
  621 F.3d 221 (2d Cir. 2010)..........................................................16

*Clapper v. Amnesty Int'l,*
  133 S. Ct. 1138 (2013)...........................................................18, 19, 21

*Cnty. Of Sacramento v. Lewis,*
  523 U.S. 833 (1998).................................................................35

*Contractors Against Unfair Taxation Instituted on New Yorkers v. City of New York,*
  1994 U.S. Dist. LEXIS 11799 (S.D.N.Y. Aug. 18, 1994)...............................31

*Daniel v. Am. Bd. of Emergency Med.,*
  428 F.3d 408 (2d Cir. 2005).........................................................22

*District of Columbia v. Heller,*
  554 U.S. 570 (2008)..............................................................2, 23, 27

*Doe v. Cuomo,*
    No. 10-CV-1534, 2013 U.S. Dist. LEXIS 40899 (N.D.N.Y. Feb. 22, 2013) .......................... 15

*Gaul v. Giardino,*
    95 A.D.3d 1456 (3d Dep't 2012) ................................................................................................. 4

*Hodge v. Jones,*
    31 F.3d 157 (4th Cir. 1994) ....................................................................................................... 32

*In re Grand Jury Subpoena John Doe v. United States,*
    150 F.3d 170 (2d Cir. 1988) ...................................................................................................... 26

*Japan Press Serv., Inc. v. Japan Press Serv., Inc.,*
    2013 U.S. Dist. LEXIS 2163 (E.D.N.Y. Jan. 2, 2013) ............................................................ 22

*Kachalsky v. Cnty. of Westchester,*
    701 F.3d 81 (2d Cir. 2012).......................................2, 3, 4, 23, 24, 26, 27, 28, 31, 35

*Kinlaw v. Pataki,*
    2007 U.S. Dist. LEXIS 85555 (W.D.N.Y. Nov. 15, 2007) ..................................................... 21

*Kwong v. Bloomberg,*
    723 F.3d 160 (2d Cir. 2013)......................................................................... 23, 25, 26, 35

*Lamar Adver. of Penn, LLC v. Pitman,*
    573 F. Supp. 2d 700 (N.D.N.Y. 2008) ..................................................................................... 15

*Los Angeles v. Lyons,*
    461 U.S. 95 (1983)..................................................................................................................... 18

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)................................................................................... 16, 17, 18, 19

*Marino v. Hubert,*
    117 A.D.3d 829 (1st Dep't 2014) ................................................................................................ 4

*Matter of Douglas L.B.,*
    44 Misc. 3d 241 (Otsego Cnty. Ct. 2014) .............................................................................. 4, 9

*Matter of Guddemi v Rozzi,*
    210 A.D.2d 479 (1994) ............................................................................................................. 34

*Matter of Perretta v Mulvey,*
    77 A.D.3d 758 (2d Dep't 2010)................................................................................................. 34

*McConnell v. FEC,*
    540 U.S. 93 (2003).................................................................................................................... 20

*McDonald* v. *City of Chicago,*
    561 U.S. 742 (2010)..........................................................................................................2, 24

*Montalbano* v. *Port Authority of NY & NJ,*
    843 F. Supp. 2d 473 (S.D.N.Y. 2012)..........................................................................34, 35

*Moreno* v. *N.Y.C. Police Dep't,*
    2011 U.S. Dist. LEXIS 76129 (S.D.N.Y. May 6, 2011), *adopted by* 2011 U.S. Dist.
    LEXIS 76131 (S.D.N.Y. July 14, 2011)...............................................................................28

*NASA* v. *Nelson,*
    562 U.S. 134 (citing *Whalen* v. *Roe,* 429 U.S. 589 (1977))..............................30, 31, 32, 33

*Nat'l Council of La Raza* v. *Gonzales,*
    468 F. Supp. 2d 429 (E.D.N.Y. 2007), *aff'd,* 283 F. App'x 848 (2d Cir. 2008)....................20

*Nat'l Fed'n of Indep. Bus.* v. *Sebelius,*
    132 S. Ct. 2566 (2012)..........................................................................................................27

*Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives,*
    700 F.3d 185 (5th Cir. 2012) ............................................................................................25, 27

*Nat'l Rifle Ass'n of Am., Inc.* v. *Reno,*
    216 F.3d 122 (D.C. Cir. 2000) ............................................................................................5, 6

*Natale* v. *Town of Ridgefield,*
    170 F.3d 258 (2d Cir. 1999)................................................................................................35

*New York Civil Service Commission* v. *Snead,*
    425 U.S. 457 (1976) (per curiam)........................................................................................17

*NYSRPA* v. *City of New York,*
    2015 U.S. Dist. LEXIS 13956 (S.D.N.Y. Feb. 4, 2015)......................................................23

*NYSRPA* v. *Cuomo,*
    990 F. Supp. 2d 349 (W.D.N.Y. 2013)..................................................................................23

*Pearl River Union Free Sch. Dist.* v. *Duncan,*
    2014 U.S. Dist. LEXIS 124440 (S.D.N.Y. Sept. 5, 2014).....................................................16

*Reichle* v. *Howards,*
    132 S. Ct. 2088 (2012)..........................................................................................................35

*Rosu* v. *City of New York,*
    742 F.3d 523 (2d Cir. 2014).................................................................................................34

*San Diego Cnty. Gun Rights Comm.* v. *Reno,*
    98 F.3d 1121 (9th Cir. 1996) ...............................................................................................20

*Schneider v. Sutter Amador Hosp.*,
    2014 U.S. Dist. LEXIS 152869 (E.D. Cal. Oct. 28, 2014) ........................... 32

*Spinelli v. City of New York*,
    579 F.3d 160 (2d Cir. 2009) .................................................................... 34

*Teras Int'l Corp.* v. *Gimbel*,
    No. 13-CV-6788 (VEC), 2014 U.S. Dist. LEXIS 174328 (S.D.N.Y. Dec. 17, 2014) ........... 17

*Turner Broad. Sys., Inc.* v. *FCC*,
    512 U.S. 622 (1994) ................................................................................ 26

*Tyler* v. *Hillsdale County Sheriff's Department*,
    775 F.3d 308 (6th Cir. 2014), *petition for rehearing and rehearing en banc filed*, No. 13-876 (6th Cir. Feb. 2, 2015) .................. 27

*United States* v. *Bogle*,
    717 F.3d 281 (2d Cir. 2013) (per curiam) ............................................... 24

*United States* v. *Decastro*,
    682 F.3d 160 (2d Cir. 2012) ...................................................... 23, 25, 27

*United States* v. *Lahey*,
    967 F. Supp. 2d 731 (S.D.N.Y. 2013) .................................................... 24

*United States* v. *Waters*,
    23 F.3d 29 (2d Cir. 1994) ......................................................................... 5

*W.R. Huff Asset Mgmt. Co.* v. *Deloitte & Touche LLP*,
    549 F.3d 100 (2d Cir. 2008) .................................................................... 15

*Warth* v. *Seldin*,
    422 U.S. 490 (1975) ................................................................................ 16

*Wash. State Grange* v. *Wash. State Republican Party*,
    552 U.S. 442 (2008) ................................................................................ 27

*Washington* v. *Glucksberg*,
    521 U.S. 702 (1997) ................................................................................ 26

*Whalen* v. *Roe*,
    429 U.S. 589 (1977) .................................................................. 30, 31, 32, 33

*Whitaker* v. *Sec'y*,
    2009 U.S. Dist. LEXIS 43320 (W.D.N.Y. May 20, 2009) ....................... 16, 19

*White* v. *United States*,
    601 F.3d 545 (6th Cir. 2010) ..........................................................

*Will v. Mich. Dep't of State Police*,
    491 U.S. 58 (1989)....................................................................................................35

**Federal Statutes**

18 U.S.C.
    § 922(d)(4) ....................................................................................................5
    § 922(g)(4) ....................................................................................................5
    § 924(a)(2) .............................................................................................. passim
    § 924(a)(2) ....................................................................................................7

28 U.S.C.
    § 1391........................................................................................................21, 22
    § 1406(a) ....................................................................................................21

**Federal Rules of Civil Procedure**

Rule 12(b)(1)....................................................................................................1

Rule 12(b)(3)................................................................................................2, 21

Rule 12(b)(6)................................................................................................2, 23

**Federal Regulations**

27 C.F.R.
    § 478.11 ....................................................................................................5, 9

28 C.F.R.
    § 25.6(c)(1)(iv) ....................................................................................................6
    § 25.7........................................................................................................5

**State Statutes**

Civil Practice Law and Rules ("CPLR") Article 78 ....................................... passim

New York Mental Hygiene Law ("MHL")
    § 7.09(j)........................................................................................5, 6, 7, 8, 11, 32
    § 9.46 .................................................................................................. passim
    § 31.11(5) ....................................................................................................6, 11
    § 33.13(c)(15) ................................................................................................6, 7, 11

N.Y. Exec. Law
    § 837........................................................................................................10, 32, 33

N.Y. Penal Law
    § 265.00................................................................................................................4
    § 265.01............................................................................................................3, 4
    § 265.20............................................................................................................3, 4
    § 400.00.............................................................................................3, 7, 8, 9, 11, 18, 25

Secure Ammunition and Firearms Enforcement Act, 2013 N.Y. Laws, ch. 1 (the "SAFE
    Act")................................................................................................................. passim

**State Regulations**

14 N.Y.C.R.R.
    §§ 543.1...............................................................................................................5
    § 543.4................................................................................................................9

**Miscellaneous Authorities**

13A Charles Alan Wright et al., *Federal Practice & Procedure* § 3531.5 (3d ed. 2008 &
    Supp. 2014)....................................................................................................21, 24

Frederick E. Vars & Amanda Adcock Young, *Do the Mentally Ill Have a Right to Bear
    Arms*, 48 Wake Forest L. Rev. 1, 21 (2013) ...................................................28

George F. Parker, M.D., *Application of a Firearm Seizure Law Aimed at Dangerous
    Persons: Outcomes from the First Two Years* .................................................29

Investigation, *National Instant Criminal Background Check System*,
    http://www.fbi.gov/about-us/cjis/nics.................................................................6

J.R. Stimson, *Bad Risk? An Overview of Laws Prohibiting Possession of Firearms by
    Individuals with a History of Treatment for Mental Illness*..............................29

Jeffrey W. Swanson *et al.*, *Preventing Gun Violence Involving People with Mental
    Illness, in Reducing Gun Violence in America: Informing Policy with Evidence and
    Analysis* 33 (Daniel W. Webster & John S. Vernick eds., 2013) .....................29

L.E. Saltzman *et al.*, *Weapon Involvement and Injury Outcomes in Family and Intimate
    Assaults* .............................................................................................................29

le Brun, George P., *It's Time to Tell*, William Morrow & Co., 1962, pp. 102-14) ......................3

M.A. Ilgen *et al.*, *Mental Illness, Previous Suicidality, and Access to Guns in the United
    States*................................................................................................................29

M. Miller & D. Hemenway, *Guns and Suicide in the United States* ................................29

R.A. Friedman, M.D., *Violence and Mental Illness – How Strong Is the Link?* ...........................28

Seena Fazel *et al.*, *The Population Impact of Severe Mental Illness on Violent Crime* ................28

Defendants Andrew Cuomo, Governor of the State of New York; Ann Marie T. Sullivan, Commissioner of the New York State Office of Mental Health; Michael C. Green, Executive Deputy Commissioner of the New York State Division of Criminal Justice Services; and Joseph A. D'Amico, Superintendent of the New York State Police (collectively "State Defendants") submit this memorandum of law in support of their motion to dismiss Plaintiffs' Amended Complaint, dated February 2, 2015, pursuant to Rules 12(b)(1), 12(b)(3), and 12(b)(6) of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 1406(a) and 1404(a), or, alternatively, to transfer this case to the Northern or Eastern District of New York.

## PRELIMINARY STATEMENT

On January 15, 2013, in the wake of a series of mass shootings perpetrated by individuals displaying clear signs of mental illness -- including the horrific shooting deaths of twenty schoolchildren in Newtown, Connecticut, on December 14, 2012, and the murder of two first responders in Webster, New York, on December 24, 2012 (Ex. 37 at 332-38; Ex. 38) -- the State of New York enacted the Secure Ammunition and Firearms Enforcement Act, 2013 N.Y. Laws, ch. 1 (the "SAFE Act"). Among its many measures to combat gun violence, the SAFE Act took important steps to strengthen the longstanding restrictions on gun possession by the mentally ill.

Included among these provisions is new Mental Hygiene Law § 9.46 ("MHL § 9.46"), which requires mental health professionals in New York to report when one of their patients is "likely to engage in conduct that would result in serious harm to self or others." Plaintiffs' challenge to this provision is without merit, and should be dismissed as a matter of law.

*First*, no Plaintiff can demonstrate Article III standing for any claim, mandating dismissal of the Amended Complaint pursuant to Rule 12(b)(1). *See infra* Point I.

*Second*, no defendant resides in this District nor did a substantial part of "the relevant activities of the defendant[s]" occur here. Thus, venue is not proper and the action should be dismissed or transferred to the Northern or Eastern District of New York. *See infra* Point II.

*Third*, Plaintiffs' claims -- under the Second Amendment, for alleged violation of their constitutional right to privacy, on procedural and substantive due process grounds, and under the Equal Protection Clause -- fail as a matter of law under Rule 12(b)(6). *See infra* Points III-VI.[1]

Accordingly, as discussed in detail below, the State Defendants' motion should be granted, and the Amended Complaint dismissed, in its entirety, with prejudice. Alternatively, the action should be transferred to the Northern or Eastern District of New York.

## STATEMENT OF FACTS

The facts and circumstances relevant to this proceeding are briefly summarized below.

### A.   The Relevant Law Prior to the SAFE Act

Legal restrictions on the possession of guns by the mentally ill have existed for decades in New York and throughout the nation. As the Supreme Court made clear in *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), these "longstanding prohibitions on the possession of firearms by . . . the mentally ill" are "presumptively lawful." *Id.* at 626-27; *McDonald* v. *City of Chicago*, 561 U.S. 742, 786 (2010).[2]

### 1.   New York's Firearm Licensing and Restrictions on Gun Possession on Mental Health Grounds

"New York's efforts in regulating the possession and use of firearms predate the Constitution." *Kachalsky*, 701 F.3d at 84. In 1911, due to a rise in violent crime associated with

---

[1] To the extent Plaintiffs seek monetary damages, their claims also plainly fail. *See infra* n. 19.
[2] The Second Circuit has stated that such restrictions on gun possession by the mentally ill are "longstanding," and thus "presumptively lawful" under *Heller*. *Kachalsky* v. *Cnty. of Westchester*, 701 F.3d 81, 90 n.11 (2d Cir. 2012).

concealable firearms, New York enacted the Sullivan Law, which made it illegal to possess a concealable gun without a license. *Id.* In fact, the Sullivan Law was enacted, in part, as a response to the murder of a prominent author by a man suffering from mental illness. (Ex. 2.)[3] This licensing regime has regulated the possession of guns in New York State for more than a century. *Kachalsky*, 701 F.3d at 84-86; Penal Law ("PL") §§ 265.01, 265.20(a)(3), 400.00.

In 1956, New York amended its licensing statute to address mental illness concerns expressly. License applicants were required to disclose whether they had "ever suffered any mental illness or been confined … for mental illness." (Ex. 3.) Local authorities were required to investigate all statements in the application "concerning previous or present mental illness of the applicant." (*Id.*) The amendment further provided that "the records of the department of mental hygiene shall be available for inspection" for that purpose. (*Id.*) These measures remain the law today. Licenses are limited "to those over twenty-one years of age, of good moral character, without a history of crime or mental illness, and 'concerning whom no good cause exists for the denial of the license.'" *Id.*, 701 F.3d at 86 (quoting PL § 400.00(1).)

"The application process for a license is 'rigorous' and administered locally." *Id.* at 87 (quoting *Bach* v. *Pataki*, 408 F.3d 75, 79 (2d Cir. 2005)). Every application triggers an investigation into the applicant by local law enforcement, including an investigation into the applicant's mental health history. PL § 400.00(4); *Kachalsky*, 701 F.3d at 87. Upon completion of its investigation, law enforcement reports the results to the local licensing officer. PL § 400.00(4); *Kachalsky*, 701 F.3d at 87.

Firearms licensing officers in New York -- often local judges -- "are 'vested with considerable discretion' in deciding whether to grant a license application." *Kachalsky*, 701 F.3d

---

[3] Citations to "Ex.", unless otherwise noted, refer to the exhibits to the accompanying Declaration of William J. Taylor, Jr., dated February 26, 2015 ("Taylor Decl.").

at 87. Similarly, they have broad discretion in deciding whether to suspend or revoke a license, including on grounds relating to mental illness. *See, e.g.*, *Gaul* v. *Giardino*, 95 A.D.3d 1456, 1457 (3d Dep't 2012); *Matter of Douglas L.B.*, 44 Misc. 3d 241, 243 (Otsego Cnty. Ct. 2014). Judicial review of a licensing officer's decision is available through the filing of a proceeding under Article 78 of New York's Civil Practice Law and Rules. *Kachalsky*, 701 F.3d at 87; *see, e.g.*, *Marino* v. *Hubert*, 117 A.D.3d 829 (1st Dep't 2014).

New York has also enacted specific criminal prohibitions on the possession of rifles and shotguns by certain mentally ill individuals. PL §§ 265.01(6), 265.00(16). Penal Law § 265.01(6), enacted in 1974, provides that "a person who has been certified not suitable to possess a rifle or shotgun . . . and refuses to yield possession of such rifle or shotgun upon the demand of a police officer" is guilty of criminal possession of a weapon in the fourth degree. *Id.* § 265.01(6). Law enforcement is authorized to take firearms "possessed by such person." *Id.*

## 2.   Federal Criminal Prohibitions on Gun Possession by the Mentally Ill

In 1968, after a multi-year inquiry into violent crime, Congress enacted the first express federal restrictions on gun possession by the mentally ill. The Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 (1968), mandated that any person "who has been adjudicated as a mental defective or who has been committed to a mental institution" be prohibited from shipping, transporting, possessing, or receiving any guns or ammunition. *Id.* tit. 1, § 102, 82 Stat. 1220-21 (now consolidated at 18 U.S.C. § 922(g)(4)).

The prohibition set forth in 18 U.S.C. § 922(g)(4) encompasses those "persons who have been involuntarily committed or confined pursuant to articles 9 or 10 of the [New York] Mental Hygiene Law." 14 N.Y.C.R.R. § 543.4(b); *see* 27 C.F.R. § 478.11; *United States* v. *Waters*, 23

F.3d 29, 36 (2d Cir. 1994) (holding that "the involuntary admission procedures of the New York Mental Hygiene Law constitute a 'commitment' within the meaning of 18 U.S.C. § 922(g)(4)").[4]

### 3.   NICS and Mental Illness

The prohibitions on gun possession set forth in 18 U.S.C. § 922(g)(4) can also preclude the purchase of guns by such individual, through the operation of federal criminal background checks. *See* 18 U.S.C. 922(t). Enacted in 1993, the Brady Handgun Violence Prevention Act "required the Attorney General to establish a 'national instant criminal background system,' known as the NICS, to search the backgrounds of prospective gun purchasers for . . . information that would disqualify them from possessing firearms." *NRA v. Reno*, 216 F.3d 122, 125 (D.C. Cir. 2000); Pub. L. No. 103-159, § 103(b), 107 Stat. 1536 (1993).

NICS contains data from both state and federal sources and electronically searches the data for disqualifying information. 216 F.3d at 125. "Before selling a weapon, firearms dealers must submit the prospective purchaser's name, sex, race, date of birth, and state of residence" to NICS. 216 F.3d at 125; 28 C.F.R. § 25.7. If a search reveals that the prospective purchaser may not legally possess a gun, the dealer receives a purchase "denied" response from NICS and may not lawfully transfer the firearm. 216 F.3d at 125; 28 C.F.R. § 25.6(c)(1)(iv).

---

[4]Pursuant to a grant program established under federal law, states may receive authorization to provide certificates of relief from the federal firearm disabilities contained in 18 U.S.C. § 922(d)(4) and (g)(4) if the states establish a qualifying program to assess whether "the person will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." NICS Improvement Amendments Act, Pub. L. No. 110-180, § 105(a)(2), 121 Stat. 2559, 2569-70 (2008) (codified at 18 U.S.C. § 922 note) (Ex. 5). The state program must also "permit[] a person whose application for relief is denied to file a petition with the State court of appropriate jurisdiction for a de novo judicial review of the denial." *Id.* § 105(a)(3), 121 Stat. 2570. New York has created such a relief-from-disabilities program. MHL§ 7.09(j); 14 N.Y.C.R.R. §§ 543.1-543.6;(*see* Declaration of John B. Allen, Jr., dated Feb. 25, 2015 ("Allen Decl.") ¶¶ 12-13).

In 2008, Congress enacted the NICS Improvement Amendments Act to address serious deficiencies in the reporting of disqualifying mental health information. This legislation, *inter alia*, authorizes federal grants to assist states in improving the quality of information they make available to databases searched by NICS. (Ex. 5 at § 103(a)(1).)  New York subsequently enacted legislation "clarifying that [the Office of Mental Health ("OMH")] has the authority to obtain the relevant mental health records from private hospitals and by lifting confidentiality restrictions for the limited purpose of allowing transmission of the relevant records" to the division of the FBI that administers NICS. (Ex. 6 at 3); *see* 2008 N.Y. Laws, ch. 491.

Thus, since 2008, New York hospitals have been required to report to OMH mental health information federal disqualifiers, including any involuntary commitment pursuant to Article 9 of the Mental Hygiene Law. MHL §§ 31.11(5), 33.13(c)(13)(ii).  Upon receipt of such information, OMH sends the individual's "name[] and other non-clinical identifying information" to the Division of Criminal Justice Services ("DCJS"). *Id.* § 7.09(j); (Allen Decl. ¶¶ 9-10).  DCJS then sends that same information to the FBI, in order to update NICS.

B.   **The SAFE Act**

On January 15, 2013, New York enacted the SAFE Act. Intended to address gun violence, the SAFE Act included a broad array or reforms.  Among the Act's many provisions are two measures to strengthen the already existing state and federal restrictions on gun possession by the mentally ill: (i) the amendment of the eligibility requirements for a firearms license in New York to conform it to federal law, PL § 400.00(1) (Ex. 8 at 89-90); and (ii) MHL § 9.46, which requires mental health professionals to report when a patient is deemed "likely to engage in conduct that would result in serious harm to self or others," MHL § 9.46; *see* Exec. Law § 837(19).  It is the second of these measures -- the reporting requirements established by

6

MHL § 9.46 -- that Plaintiffs challenge in this litigation.

1.   <u>**New York's Strengthened Eligibility Requirements for Firearms Licenses**</u>

For nearly half a century, federal law has prohibited any person "adjudicated as a mental defective or . . . committed to a mental institution" from possessing guns and has made possession of guns by such persons a serious criminal felony.  *See* 18 U.S.C. §§ 922(g)(4). 924(a)(2).  But prior to the SAFE Act, such federally disqualified individuals were not expressly ineligible for a firearms license under New York law.  The SAFE Act corrected that discrepancy, by "conforming [the State's licensing statute] with Federal law." (Ex. 8 at 90.)  It does so by amending the eligibility criteria for a firearms license set forth in Penal Law § 400.00(1) to disqualify those who have been involuntarily committed (*see* PL § 400.00(1)(j)) or who have been adjudicated mentally defective (*see id.* § 400.00(1)(m)).

To implement these new license eligibility requirements, the SAFE Act also amended several additional sections of the Penal Law and the Mental Hygiene Law.[5]  The ultimate effect of these statutory amendments is that the same "non-clinical identifying information" regarding, for example, an individual's involuntary commitment that the State has, for years, sent to the FBI to update NICS, is now also used to determine whether the individual has a firearms license that, pursuant to new Penal Law § 400.00(1)(j), he or she is precluded from having.  MHL §§ 7.09(j), 33.13(c)(15); PL § 400.00(11)(a),(c).  When information is received by DCJS, the online system automatically checks the subject of the report against the database of firearm license holders.  If there is a match, an electronic message is transmitted to the New York State Police, notifying them of the association.  The State Police then confirm that the identified person has an active gun license, and proceed to notify the local licensing official that the individual "has been

---

[5] *See* MHL §§ 7.09(j), 33.13(c)(15); PL §§ 400.00(11)(a), (c), 400.00(4), 400.02.

adjudicated as a mental defective or has been involuntarily committed to a mental institution"

and thus "is prohibited from possessing a firearm, rifle or shotgun pursuant to 18 U.S.C.

922(g)(4)." MHL § 7.09(j)(1)(ii).  As appropriate, the licensing officer and local law

enforcement take steps to suspend or revoke the individual's firearms license and take custody of

his or her weapons.  PL § 400.00(11)(a), (c); (e.g., Exs. 9-10).  To ensure that this disqualifying

information is available for the investigation of any future license application by a person

prohibited from possessing guns , the SAFE Act establishes a confidential "statewide  license

and record database" for that limited investigatory purpose.  PL § 400.02.[6]

2.      **Mental Hygiene Law § 9.46: New York's**
        **New Mental Health Reporting Requirement**

Mental Hygiene Law § 9.46 -- the provision challenged in this action -- requires four

groups of mental health professionals (i.e., physicians, psychologists, registered nurses, and

licensed clinical social workers), in the exercise of their reasonable professional judgment, to

make a report as soon as practicable to the county director of community services ("DCS") if an

individual for whom they are providing mental health treatment is "likely to engage in conduct

that will result in serious harm to self or others." MHL§ 9.46; (Allen Decl. ¶ 14; Declaration of

Donna Marie Call, dated Feb. 25, 2015 ("Call Decl.") ¶ 10).[7]  Upon receiving a § 9.46 report, the

---

[6] The SAFE Act also expanded the scope of New York's existing relief-from-disabilities program, see supra note 4, to cover both federal and state prohibitions.  MHL § 7.09(j)(2).

[7] In order to facilitate and ease the implementation of the MHL § 9.46 reporting requirement, OMH, created an electronic reporting system called the Integrated SAFE Act Reporting System or "ISARS." ISARS allows the mental health professional to make a confidential report to the DCS which will contain clinical information.  If the DCS agrees that the report meets the statutory criteria, the system then transmits only the non-clinical identifying information directly to DCJS.  The ISARS system is used only for MHL § 9.46 reports.  In order to access ISARS, all DCSs and designees are provided security tokens to validate their identities.  OMH staff who have access to ISARS is limited to a small number of computer programmers and program administrators who are responsible for supporting the application and administrative management.  Each of these individuals has been given a Secret Security Clearance issued by the

DCS reviews the matter to determine whether to submit the report.  If so, he or she will then report the "name[] and other non-clinical identifying information" of such individual to DCJS. DCJS then determines if the individual who is the subject of the § 9.46 report has or has applied for a firearms license and, if so, will work with the State Police to notify the appropriate local licensing officer.  MHL§ 9.46; (Allen Decl. ¶ 14; Call Decl. ¶ 10).

If the individual is found to have a firearms license, the local licensing officer must "issue an order suspending or revoking such license."  PL § 400.00(11)(b).  As with any license suspension or revocation, law enforcement will take custody of all firearms.  PL § 400.00(11)(c). But notably, unlike the disqualifying mental health conditions of 18 U.S.C. § 922(g)(4) or Penal Law § 400.00(1)(j) and (m), this license suspension is not permanent and any revocation is not automatic.  *See, e.g., Douglas L.B.*, 44 Misc. 3d at 242-44.

A § 9.46 report does not mean that a person is criminally prohibited from possessing guns pursuant to 18 U.S.C. § 922(g)(4), it does not result in a report to NICS precluding the purchase of guns, and it does not make a person automatically ineligible for a firearms license in New York.  PL § 400.00(1); 14 N.Y.C.R.R. § 543.4; 27 C.F.R. § 478.11; *Douglas L.B.*, 44 Misc. 3d at 242-44.  Instead, as was the case before the SAFE Act, licensing officers continue to have "broad discretion" in deciding whether to grant a license application, keep in place or lift a suspension, or revoke an individual's firearms license on mental health grounds.  44 Misc. 3d at 243.  A § 9.46 report simply provides relevant mental health information -- regarding whether a person is

---

United States Department of Health and Human Services to handle Personally Identifiable Information (PII).  For added security, OMH maintains a number of computer security safeguards including a variety of data encryption mechanisms to ensure that only individuals who are authorized to access and/or use the data can do so.  (Allen Decl. ¶ 16.)  DCJS staff do not have access to ISARS and, in particular, do not have access to any clinical information. Although having only non-clinical information in their MHL § 9.46 database, DCJS similarly takes security to limit access and maintain the data as confidential.  (Call Decl. ¶¶ 16-17.)

"likely to engage in conduct that would result in serious harm to self or others" -- that licensing officers have long considered in deciding whether to deny, suspend, or revoke a license for reasons of mental illness or other "good cause." *Id.* at 243-44. Judicial review remains available, through a proceeding under CPLR Article 78. (Ex. 8 at 99-102).

DCJS retains the name and other non-clinical identifying information of a person who is the subject of a § 9.46 report for, at most, five years. Exec. Law § 837; (Exs. 12-13). During that time, DCJS keeps this information securely and confidentially. Access is strictly limited, and the information may be used only to determine whether a firearms license should be granted, denied, suspended, or revoked. (Call Decl. ¶¶ 10-17); MHL§ 9.46(b); Exec. Law § 837. At the end of this five-year period (or sooner if, through an Article 78 proceeding, it is determined that an individual is eligible for a firearms license), the information is destroyed. Exec. Law § 837(19).

## C.     The Plaintiffs

### 1.     Donald Montgomery

On May 23, 2014, plaintiff Donald Montgomery ("Montgomery") was admitted to defendant Eastern Long Island Hospital (the "Hospital"). (AC ¶ 144.) The Hospital's records indicate that he was involuntarily committed on that date, pursuant to MHL § 9.39, "because [he was] alleged to have a mental illness," which was " likely to result in serious harm, which . . . means '(a) a substantial risk of physical harm to the person as manifested by threats of, or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.'" (Ex. 16; AC ¶¶ 151-53); *see* MHL§ 9.39; *id.* § 9.01).

10

As required by law, the Hospital reported Montgomery's involuntary commitment to OMH. (Allen Decl. ¶ 19; Exs. 17-18); *see* MHL§§ 7.09(j)(1), 31.11(5), 33.13(b).  OMH sent Montgomery's "name[] and other non-clinical identifying information" regarding his involuntary commitment to DCJS, both to update NICS and to determine whether Montgomery had a firearms license that now should be "denied, suspended or revoked" pursuant to Penal Law § 400.00(11).  (Allen Decl. ¶ 19 ; Call Decl. ¶¶ 20-21.)

On May 29, 2014, the State Police informed the Suffolk County Clerk's Office that "a subject bearing the same name and non-clinical identifying information" as Montgomery "has been adjudicated as a mental defective or has been involuntarily committed to a mental institution" and thus "is prohibited from possessing a firearm... pursuant to 18 U.S.C. 922(g)(4)." (Ex. 10; AC ¶ 168.)  Because the Hospital reported that Montgomery had been involuntarily committed, he was determined to be legally prohibited under federal and state law from possessing any guns, and defendant Vincent F. DeMarco, Suffolk County Sheriff's Department (the "Sheriff") suspended, and subsequently canceled, Montgomery's pistol license and took custody of his handguns on May 30, 2014.  (Exs. 10, 19-22; AC ¶¶ 171-74, 177.)

Although Montgomery challenged the Hospital's designation of him as having been involuntarily committed, the Hospital "investigated" his concerns and, after speaking with his treating psychiatrist, confirmed that he was, in fact, involuntarily committed.  (Exs. 17-18; AC ¶¶ 175-76, 191.)  On January 8, 2015, Montgomery filed an Article 78 proceeding to overturn the suspension and cancellation of his pistol license and recover his surrendered firearms.  That proceeding is currently pending in Suffolk County Supreme Court.  (Exs. 14, 23.)

Montgomery has never been the subject of a report under MHL § 9.46.  (Allen Decl. ¶ 19; Call Decl.  ¶¶ 19, 21 & Ex. A.)  MHL § 9.46 simply played no role in the suspension and cancellation of his firearms license or the surrender of his guns.

### 2.    Andrew Carter

On the evening of July 26, 2014, the wife of plaintiff Andrew Carter ("Carter") called 911 to report that that there was something "really wrong" with her husband, that he was "hallucinating," "delirious," "saying all of these really unusual things," and, in her view, "need[ed] to go somewhere."  She further informed the 911 dispatcher that her husband "has had a mental change recently," and that she "believes [he] will become adjitated [sic] if she confronts him."  She volunteered that he "has a gun under his pillow." (Exs. 24-25; AC ¶¶ 24-25.)  Carter was subsequently transported to Erie County Medical Center because responding officers determined that he "appear[ed] to be mentally ill and [wa]s conducting himself . . . in a manner which is likely to result in serious harm to the person or others." (Exs. 26-27); MHL§ 9.41.  The officers also removed three handguns from the home. (Ex. 26.)

On August 13, 2014, the City of Tonawanda Police Department sent documentation to the Pistol Permit Division of the Erie County Clerk's Office to have Carter's firearms license reviewed.  (Id.)  In a letter dated August 20, 2014, as well as in a prior phone call, the Pistol Permit Division notified Carter that his license was suspended.  (AC ¶¶ 222-23.)  It is the State Defendants' understanding that Carter was scheduled to have a hearing before his local licensing officer, Erie County Supreme Court Justice William Boller, on February 24, 2015 to review the status of his firearms license.

Carter has never been the subject of a report under Mental Hygiene Law § 9.46.  (Allen Decl. ¶ 21; Call Decl.  ¶ 22.)  Nor was he ever reported to State as having been involuntarily

committed.  (Allen Decl. ¶ 19; Call Decl. ¶ 22.)  Rather, the suspension of Carter's license and

surrender of his guns were the result of actions of local licensing officials.

### 3.     Lois Reid

On or about December 24, 2013, Erie County Medical Center reported plaintiff Lois Reid

to OMH as having been involuntarily committed.  (Allen Decl. ¶ 20; Call Decl. ¶ 24 & Ex. B.)

As required by law, OMH sent Reid's "name[] and other non-clinical identifying information"

regarding her involuntary commitment to DCJS.  (Allen Decl. ¶ 20; Call Decl. ¶ 24 & Ex. A.)

On January 7, 2014, the State Police informed the local firearms licensing officials in Erie

County that "a subject bearing the same name and non-clinical identifying information" as Reid

"has been adjudicated as a mental defective or has been involuntarily committed" and thus "is

prohibited from possessing a firearm … pursuant to 18 U.S.C. 922(g)(4)."  (Ex. 9; AC ¶ 168.)

On or about January 24, 2014, Reid was informed by the Erie County Court that her

firearms license was suspended.  (AC ¶¶ 254-55.)  It is the State Defendants' understanding that,

after this matter was transferred from Erie County to Niagara County, a review of the status of

Reid's firearms license is currently pending before her local licensing officer, Niagara County

Court Judge Matthew Murphy.  (*See id.* ¶ 267.)  Reid has never been the subject of a report under

MHL § 9.46.  (Allen Decl. ¶ 20; Call Decl. ¶ 23 & Ex. B.)

### 4.     Karl Bechler

On September 6, 2013, the wife of Plaintiff Karl Bechler ("Bechler") called 911 to report

that her husband is "mentally upset over issues," "has a gun to his head" and "is trying to commit

suicide as we speak."  (Exs. 29-31; *see* AC ¶¶ 273, 275.)  The State Police responded to the call,

secured  the scene, including the firearm involved.  (Ex. 31.)  Bechler was subsequently

transported to Clifton Springs Hospital pursuant to MHL § 9.41.  (*Id.*)

Because Bechler was taken into custody as a "result of suicidal threat involving the use of a handgun," the State Police immediately advised a local licensing officer, Ontario County Court Judge Frederick Reed, of the incident. (Ex. 31.) Exercising his discretion under Penal Law § 400.00, Judge Reed subsequently issued two orders, both dated September 6, 2013, suspending the firearms licenses of both Bechler and his wife, and ordering that their licenses and all handguns be surrendered to the State Police. (Exs. 32-33.) Pursuant to these orders, the State Police secured all twenty-four handguns owned by the Bechlers. (Ex. 31.)

Also on September 6, 2013, Bechler was admitted as a patient at Clifton Springs Hospital. (AC ¶ 276.) Clifton Springs Hospital reported Bechler to OMH as having been involuntarily committed on or about that date. (Allen Decl. ¶ 22.) OMH then sent Bechler's "name[] and other non-clinical identifying information" regarding his involuntary commitment to DCJS. (*Id.;* Call Decl. ¶ 25 & Ex. C.)

Several days after he was reported to OMH as involuntarily committed, and several days after his license was suspended and his guns were taken, Bechler was also reported pursuant to MHL § 9.46. (Allen Decl. ¶ 23; Call Decl. ¶ 25 & Ex. C.) On or about September 10, 2013, a mental health professional who treated Bechler at Clifton Springs Hospital filed an MHL §9.46 report regarding Bechler. (Allen Decl. ¶ 23.) The Ontario County DCS agreed, and, thus, on September 12, 2013, the DCS reported Bechler's "name[] and other non-clinical identifying information" to DCJS. (Call Decl. ¶ 25 & Ex. C); MHL § 9.46(b).

On September 17, 2013, the State Police informed the Ontario County Clerk's Office of the MHL § 9.46 report. (Ex. 34.) On December 3, 2014, fifteen months after Bechler's firearms license was suspended, another local licensing officer, Ontario County Court Judge William

Kocher, reinstated the license.  (AC ¶ 287; Ex. 28.)  Pursuant to Judge Kocher's order, on or about January 16, 2015, the State Police returned Bechler's guns.  (AC ¶ 290; Ex. 35.)

     **5.**     **M.M.**

Plaintiff M.M. ("M.M.")[8] alleges that he or she "is a lawful owner of firearms, other than handguns."  (AC ¶ 300.)  M.M. does not allege that he or she has ever held a firearms license or ever been the subject of a report under MHL § 9.46.  Nor does M.M. allege that his or her rights or abilities to make use of his or her guns has been impacted in any way.

For the reasons set forth below, State Defendants now move to dismiss the Amended Complaint, or, alternatively, to transfer the case to the Northern or Eastern District of New York.

## ARGUMENT

## I.

## THE PLAINTIFFS LACK ARTICLE III STANDING.

Article III of the Constitution limits federal courts' jurisdiction to "cases" and "controversies."  U.S. Const., art. III, § 2.  "In order to ensure that this 'bedrock' case-or-controversy requirement is met, courts require that plaintiffs establish their 'standing' as 'the proper part[ies] to bring' suit."  *W.R. Huff Asset Mgmt. Co.* v. *Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008) (alteration in original).  "The obligation that courts must resolve threshold questions of jurisdiction and standing before proceeding to consider the merits of a claim at any stage of a proceeding is inflexible and without exception."  *Lamar Adver. of Penn, L.L.C.* v. *Town of Orchard Park*, No. 01-CV-556A(M), 2008 U.S. Dist. LEXIS 27647, at *10 (W.D.N.Y. Feb. 25, 2008); *see Warth* v. *Seldin*, 422 U.S. 490, 498 (1975).

---

[8] M.M. has not moved for leave to proceed anonymously in this action.  Courts in this Circuit grant such leave only in "exceptional situations."  *Doe* v. *Cuomo*, 2013 U.S. Dist. LEXIS 40899, at *16 (N.D.N.Y. Feb. 22, 2013).

The "irreducible constitutional minimum of standing contains three elements." *Lujan* v.

*Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Plaintiffs must show:

(1)   Injury: Injury in fact, an invasion of a legally protected interest which is concrete and particularized, and actual or imminent, not conjectural or hypothetical.

(2)   Causation: A causal connection between the injury and the challenged conduct.

(3)   Redressability: It must be likely, as opposed to merely speculative, that the injury complained of will be redressed by a favorable decision.

*Id.* at 560-61.  Plaintiffs have the burden of establishing standing for each claim asserted and

each type of relief sought. *Carver* v. *City of New York*, 621 F.3d 221, 225 (2d Cir. 2010).

Moreover, because it is a matter of subject matter jurisdiction, in resolving a motion to

dismiss for lack of standing, a court is not limited to the allegations in the complaint but may

consider evidence outside the pleadings.  *Whitaker* v. *Sec'y*, 2009 U.S. Dist. LEXIS 43320, at

*3-4 (W.D.N.Y. May 20, 2009).  To the extent that "jurisdictional facts are placed in dispute,"

the Court "has the power and the obligation to decide issues of fact by reference to evidence

outside the pleadings, such as affidavits," and Plaintiffs, as the party asserting standing, "ha[ve]

the burden of proving by a preponderance of the evidence that it exists." *Pearl River Union Free*

*Sch. Dist.* v. *Duncan*, 2014 U.S. Dist. LEXIS 124440 (S.D.N.Y. Sept. 5, 2014); *see, e.g.,*

*Capellupo* v. *Webster Cent. Sch. Dist.*, 2014 U.S. Dist. LEXIS 170912, at *8-9 (W.D.N.Y. Dec.

9, 2014).  Plaintiffs do not come close to meeting their burden here.

**A.    Plaintiffs Montgomery, Carter, and Reid have never been the subject of Mental Hygiene Law § 9.46, and thus each plainly lacks standing here.**

For three of the Plaintiffs -- Montgomery, Carter, and Reid -- the standing question here

is a particularly simple and straightforward one: none has ever been the subject of a report under

MHL § 9.46.  (Allen Decl. ¶¶ 19-21; Call Decl. ¶¶ 18-24 & Exs. A-C.)  Thus, regardless whether

they could each show the requisite "injury-in-fact" for each claim and form of relief they seek

(they cannot), Montgomery, Carter, and Reid cannot possibly satisfy the "causation" and "redressability" elements of Article III standing. *See Lujan*, 504 U.S. at 560-61.

The analysis here is not complicated. The only alleged actions by the State Defendants challenged here are the purported "creation, implementation, marketing, and use of a reporting system for medical professionals to transmit personal health information to the State pursuant to NY Mental Hygiene Law § 9.46." (AC at 2.) As Montgomery, Carter, and Reid have never been made subject to an MHL § 9.46 report, any legally cognizable injuries they may have sustained cannot be "fairly traceable" to such actions. *Id.* The Supreme Court's decision in *New York Civil Service Commission* v. *Snead*, 425 U.S. 457 (1976) (per curiam), controls. There, as here, plaintiff challenged the constitutionality of a New York statute but because the statute had not been applied to plaintiff, the Supreme Court held that plaintiff lacked standing. *Id.* at 457-58; *see also, e.g., Davis* v. *Scherer*, 468 U.S. 183, 189 n.7 (1984); *Lamar Adver.*, 2008 U.S. Dist. LEXIS 27647, at *21. That well-settled principle of law is beyond dispute and, by itself, precludes the claims of Montgomery, Carter, and Reid.

Moreover, because MHL § 9.46 has not been applied to Montgomery, Carter, and Reid -- and thus cannot be the cause of any alleged injury -- this litigation necessarily cannot redress their asserted injuries. *See, e.g., Teras Int'l Corp.* v. *Gimbel*, 2014 U.S. Dist. LEXIS 174328, at *15 (S.D.N.Y. Dec. 17, 2014). Even if Plaintiffs obtained all the relief they seek here, they would still face the same restrictions they do now under 18 U.S.C. § 922(g)(4) (as to Montgomery and Reid) and under Penal Law § 400.00(1) (as to Montgomery, Carter, and Reid). The declaratory and injunctive relief sought, which is directed at MHL § 9.46, could not do anything to alter that. This absence of redressability is fatal to Plaintiffs' standing.

In addition, in regard to Plaintiffs' request for declaratory and injunctive relief, they cannot satisfy the standing requirements for the same since they cannot show a likelihood that they will be injured in the future by MHL § 9.46. *City of Los Angeles* v. *Lyons*, 461 U.S. 95, 105 (1983); *Azim* v. *Vance*, 530 F. App'x 44, 45 (2d Cir. 2013). Montgomery, Carter, and Reid make no allegations of purported future injury (*see* Amended Complaint ("AC") ¶¶ 141-270), let alone the sort of "certainly impending" injury required under Article III. *Clapper* v. *Amnesty Int'l*, 133 S. Ct. 1138, 1143, 1147 (2013). For this reason, too, they lack standing to sue.

**B.     M.M.'s speculative allegations of future harm are also not enough to demonstrate standing.**

M.M. also plainly lacks Article III standing. This anonymous plaintiff concedes to never having been subject to MHL § 9.46, to not having a firearms license, and to never having been burdened in the use of guns in any way. Thus, there is no plausible basis for standing based on any actual harm. *See Lujan*, 504 U.S. at 560. Instead, M.M. tries to assert standing in this case based solely on an alleged threat of future injury. (*See* AC ¶¶ 293-314.) But Article III requires that a plaintiff's injury-in-fact be "imminent," "real and immediate," and "certainly impending," rather than "conjectural" or "hypothetical." *See Clapper*, 133 S. Ct. at 1143. And "[a]llegations of *possible* future injury are not sufficient." *Id.* at 1147 (emphasis in original) (internal quotation marks omitted).

M.M. does not come close to meeting this strict standard. On the contrary, M.M. alleges that he or she "*feared* that going to counseling *could* result in the confiscation of M.M.'s firearms" or that the law "*raised questions* for M.M. whether the State collection of mental health information *could* impact M.M.'s license to practice medicine."(AC ¶¶ 302, 306, 311 (emphases added).) These are precisely the sort of "highly speculative fear[s]" and "[a]llegations of subjective 'chill'" that, the Supreme Court recently made clear, do not meet the

requirements of Article III. *Clapper*, 133 S. Ct. at 1153. M.M.'s theory of standing is further

undercut because it necessarily rests on speculation about the decisions and actions of

independent actors, such as treating mental health professionals, county DCSs, and licensing

officials. It can thus provide no plausible basis for standing here. *Id.* at 1150 & n.5.

**C.     Bechler also lacks Article III standing.**

As noted, Bechler is the only one of the five Plaintiffs to actually have been subject to a

report under MHL § 9.46. Regardless, the allegations in the Amended Complaint, as well as the

"evidence outside the pleadings" that the Court may properly consider, *Whitaker*, 2009 U.S. Dist.

LEXIS 43320, at *3, make clear that Bechler also lacks standing.

*First*, Bechler's only asserted injury appears to be the temporary suspension of his

firearms license, from September 6, 2013 to December 3, 2014. But, as the record demonstrates,

that suspension was ordered by the local licensing officer, Ontario County Judge Frederick Reed,

*before* any § 9.46 report as to Bechler was ever submitted to DCJS. (Ex. 32); *see supra* p. 14.

The suspension order itself makes plain that it was issued by Judge Reed based on his discretion

as a licensing officer "as provided by Section 400.00 of the Penal Law," not MHL § 9.46. (Ex.

32.) Thus, Bechler cannot meet his Article III burden of demonstrating the suspension was

"fairly traceable" to MHL § 9.46. *Lujan*, 504 U.S. at 560-61.

*Second*, any cognizable injury resulting from the suspension of Bechler's firearms

license is over, as his license has been reinstated and his guns returned. It is well settled that

"[i]n the context of a claim for injunctive or declaratory relief, a plaintiff's allegation of past

injury is insufficient to establish standing; instead the plaintiff must show a likelihood of future

harm, a 'real and immediate threat of repeated injury.'" *Azim*, 530 F. App'x at 45.

19

*Third*, any injury suffered by Bechler was suffered as a result of the Hospital's reporting him as involuntarily committed and the strictures of 18 U.S.C. § 922(g)(4), not MHL § 9.46. (AC ¶ 285; Ex. 36.)  Such an injury cannot be redressed by the relief sought in this litigation, which is directed only at MHL § 9.46.  Even if MHL § 9.46 were somehow found to have contributed to a cognizable injury, that would not matter for standing purposes, because it is indisputable that other laws -- most notably, 18 U.S.C. § 922(g)(4) -- are independent causes of Bechler's alleged injuries.   Accordingly, his standing fails on both causation and redressability grounds.[9]  *See Arar* v. *Ashcroft*, 532 F.3d 157, 191-92 (2d Cir. 2008), *vacated on other grounds*, 585 F.3d 559, 563 (2d Cir. 2009) (en banc) (agreeing with panel decision on standing).

*Finally*, any attempt by Bechler (or any of the Plaintiffs) to establish injury-in-fact by relying on a purported privacy violation resulting from the entry of his "name[] and other non-clinical identifying information" in the database maintained by DCJS fails.  Entry of an individual's personal information into a government database and "speculation that at some point in the future some unauthorized party may access plaintiffs' file" in violation of an alleged privacy right does not give rise to a legally cognizable injury under Article III.  *Nat'l Council of La Raza* v. *Gonzales*, 468 F. Supp. 2d 429, 444 (E.D.N.Y. 2007), *aff'd*, 283 F. App'x 848, 851 (2d Cir. 2008); *Barker* v. *TSA*, 353 F. App'x 450, 453 (1st Cir. 2009).

---

[9] The Second Circuit has expressly recognized that a plaintiff lacks Article III standing to challenge one government action when another unchallenged government action was an independent cause of the injury asserted.  *See Arar*, 532 F.3d at 191-92; *see also, e.g.*, *Exotic Animal Owners* v. *New York*, 98 F. App'x 905, 906-07 (2d Cir. 2004).  Federal courts, in fact, routinely dismiss suits on standing grounds for such reasons.  *See, e.g.*, *McConnell* v. *FEC*, 540 U.S. 93, 228-29 (2003), *overruled on other grounds by Citizens United* v. *FEC*, 558 U.S. 310 (2010); *White* v. *United States*, 601 F.3d 545, 552 (6th Cir. 2010); *San Diego Cnty. Gun Rights Comm.* v. *Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996).

In sum, none of the Plaintiffs have met their "burden of establishing standing." *Clapper*, 133 S. Ct. at 1148.[10]  The Amended Complaint must therefore be dismissed.

## II.

## VENUE IS NOT PROPER IN THE WESTERN DISTRICT OF NEW YORK.

If an action is filed in the wrong division or district, the court "shall dismiss" it, or transfer it "to any district or division in which it could have been brought." 28 U.S.C. § 1406(a); *see* Fed. R. Civ. P. 12(b)(3).  "The burden is on the plaintiff to establish that venue is correct." *Barlow* v. *Fischer*, 2010 U.S. Dist. LEXIS 37522, at *3 (W.D.N.Y. Apr. 15, 2010).

Here, Plaintiffs make the conclusory allegation that venue in the United States District Court for Western District of New York is proper under 28 U.S.C. § 1391.  (AC ¶ 14.) Presumably, Plaintiffs intend to rely upon subsections (1) or (2) of § 1391(b), which provide that a civil action may be brought only in "(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located" or "(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b).  This statute does not provide a basis for venue in this District.

## A.   None of the defendants reside in the Western District of New York.

None of the defendants reside in the Western District of New York.  State Defendants all reside in Albany, in the Northern District of New York.  (AC ¶¶ 6-9, 12); *Kinlaw* v. *Pataki*, 2007 U.S. Dist. LEXIS 85555, at *2-4 (W.D.N.Y. Nov. 15, 2007).  The remaining defendants -- the

---

[10] Plaintiffs' assertions that they bring their claims "on behalf of . . . all other persons similarly situated" (AC ¶¶ 1-5) does not lessen their individualized standing burdens. *See, e.g., Simon* v. *E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976) ("That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured" (internal quotation marks omitted)).

Sheriff and the Hospital -- reside in the Eastern District of New York. (AC ¶¶ 10-12.) Thus, venue is plainly not proper on the basis of any defendant's residence.

**B.      No substantial part of the events or omissions
          giving rise to the claims occurred in this District.**

Plaintiffs appear to rest their venue argument on the allegations that the events complained of by the four newly added plaintiffs (Carter, Reid, Bechler, and M.M.) "transpired in WDNY." (AC ¶¶ 2-5.) But this does not suffice under 28 U.S.C. § 1391(b)(2).

In assessing whether venue is proper under § 1391(b)(2), courts must "focus on the relevant activities of the defendant[s], not the plaintiff[s]." *Daniel* v. *Am. Bd. of Emergency Med.*, 428 F.3d 408, 432 (2d Cir. 2005); *see, e.g.*, *TSIG Consulting, Inc.* v. *ACP Consulting LLC*, 2014 U.S. Dist. LEXIS 49843, at *5 (S.D.N.Y. Apr. 9, 2014). The activities of non-parties are likewise of no moment. *See Japan Press Serv., Inc.* v. *Japan Press Serv., Inc.*, 2013 U.S. Dist. LEXIS 2163, at *37 (E.D.N.Y. Jan. 2, 2013).

Here, the alleged relevant actions of the named defendants took place in either the Northern District of New York (where all relevant acts of the State Defendants occurred) or the Eastern District (where all the relevant acts of the Sheriff and the Hospital occurred). (AC ¶¶ 17-199.) Whether plaintiffs or unnamed non-parties may have performed potentially relevant acts or omissions in this District is of "no relevance" to the venue analysis. *Japan Press Serv.*, 2013 U.S. Dist. LEXIS 2163, at *37; *Daniel*, 428 F.3d at 432.

Accordingly, because venue is not proper in this District, the Court must dismiss the Amended Complaint or transfer the case to the Northern or Eastern District of New York.[11]

---

[11] Given that Plaintiffs assert that their claims in this case primarily concerns the constitutionality of a state statute and the actions of the State Defendants, the State Defendants submit that, of these two transfer possibilities, the Northern District is the more appropriate.

## III.

## <u>PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE SECOND AMENDMENT.</u>

Plaintiffs' claim that MHL § 9.46 violates their rights under the Second Amendment (AC

¶¶ 344-49) is entirely without merit and should be dismissed under Rule 12(b)(6).

**A.**   <u>**The Second Circuit's framework for assessing Second Amendment claims.**</u>

As Judge Skretny recognized in *NYSRPA v. Cuomo*, 990 F. Supp. 2d 349, 363 (W.D.N.Y.

2013), in deciding Second Amendment challenges to firearms regulations, the Second Circuit

applies "a three-part inquiry." *See Kachalsky*, 701 F.3d at 88-94; *United States* v. *Decastro*, 682

F.3d 160, 164-65 & n.3 (2d Cir. 2012). *First*, it asks whether the conduct at issue falls within the

scope of the Second Amendment right. *See Kachalsky*, 701 F.3d at 89. *Second*, if it does, the

court next determines whether the challenged law places a "substantial burden" on that right.

*Decastro*, 682 F.3d at 166. *Finally*, only if the challenged law is found to substantially burden

the right to keep and bear arms, then "some form of heightened scrutiny" is appropriate.

*Kachalsky*, 701 F.3d at 93; *Decastro*, 682 F.3d at 164-67. The Second Circuit and courts in this

Circuit have, without exception, applied intermediate scrutiny -- under which courts assess

whether a law is substantially related to an important governmental objective -- at this stage of

the analysis. *See, e.g., Kwong* v. *Bloomberg*, 723 F.3d 160, 168 (2d Cir. 2013); *Kachalsky*, 701

F.3d at 96-97; *NYSRPA*, 990 F. Supp. 2d at 367; *NYSRPA*, v. *City of New York*, 2015 U.S. Dist.

LEXIS 13956, at *17-18 (S.D.N.Y. Feb. 4, 2015). Plaintiffs' challenge fails at each step.

**B.**   **Mental Hygiene Law § 9.46 regulates conduct that is outside the**
**scope of -- and thus entirely unprotected by -- the Second Amendment.**

New York's mental health reporting requirement does not implicate Plaintiffs' Second

Amendment rights as it is in accord with, and, indeed, much less restrictive than, the sort of

"longstanding prohibitions on the possession of firearms by . . . the mentally ill" that the

Supreme Court in *Heller*, 554 U.S. at 626-27, found to be "presumptively lawful." These sorts of "presumptively lawful" restrictions on the possession of guns by the mentally ill have existed in New York for nearly a century. *See Kachalsky*, 701 F.3d at 90 n.11. Since 1956, in fact, state law has expressly provided that an individual's mental health records "shall be available for inspection" by licensing officials, and that, before any firearms license is granted, local law enforcement is required to investigate any "previous or present mental illness of the applicant." MHL § 9.46 simply strengthens and builds upon these measures, by facilitating the conveyance of relevant mental health information to local licensing officials as they determine, in their discretion, whether to grant or revoke an individual's firearms license. *See supra* pp. 2-10.

If even "prohibition[s]" on gun possession by the mentally ill are constitutionally unproblematic, *see Heller*, 554 U.S. at 626-27; *McDonald*, 561 U.S. at 786 -- and Plaintiffs here do not challenge these other prohibitions -- then merely providing a licensing officer with information regarding whether a person is "likely to engage in conduct that would result in serious harm to self or others," MHL§ 9.46, cannot raise a Second Amendment issue at all.[12]

**C.   Count Four also fails because MHL § 9.46 does not substantially burden the Second Amendment right.**

Even if the Court were to find that MHL § 9.46 implicates the Second Amendment right, because a section 9.46 report does not prohibit a person from possessing guns or make one automatically ineligible for a firearms license -- but instead simply provides the sort of highly relevant mental health information that licensing officers have for decades considered in deciding whether to deny, suspend, or revoke a firearms license for reasons of mental illness or

---

[12] Notably, in *United States* v. *Bogle*, 717 F.3d 281 (2d Cir. 2013) (per curiam), the Second Circuit relied entirely on these very same sentences in *Heller* and *McDonald* to find that the considerably more restrictive federal criminal prohibition on felons possessing guns, 18 U.S.C. § 922(g)(1), did not run afoul of the Second Amendment. *See also United States* v. *Lahey*, 967 F. Supp. 2d 731, 755 (S.D.N.Y. 2013).

other "good cause"[13] -- it does not substantially burden Plaintiffs' rights.  As the Second Circuit

has held, "heightened scrutiny is triggered only by those restrictions that (like the complete

prohibition on handguns struck down in *Heller*) operate as a substantial burden on the ability of

law-abiding citizens to possess and use a firearm for self-defense (or other lawful purposes)."

*Decastro*, 682 F.3d at 166.  But "where the burden imposed by a regulation on firearms is a

'marginal, incremental *or even appreciable restraint* on the right to keep and bear arms,' it will

not be subject to heightened scrutiny." *Kwong*, 723 F.3d at 167 (emphasis in original).  That is

the situation here.  *See id.* at 167-68; *Decastro*, 682 F.3d at 166-69.

And, as the State can retain the "name[] and other non-clinical identifying information"

of a person who is the subject of a § 9.46 report for, at most, five years, even if MHL § 9.46 were

found to impose a burden on an individual's right to bear arms, it would necessarily be a

temporary one  -- and thus, for this reason, too, not substantial.  *See, e.g.*, *NRA* v. *BATFE*, 700

F.3d 185, 207 (5th Cir. 2012) ("The temporary nature of the burden reduces its severity.").

**D.     Even if heightened scrutiny applied here, MHL**
**§ 9.46 would easily pass constitutional muster.**

Even if the Court were to find that MHL § 9.46 substantially burdens Plaintiffs' Second

Amendment rights, their claims should still be dismissed because intermediate scrutiny, at best,

is appropriate and the challenged provision unquestionably withstands such scrutiny.

**1.     At Most, Intermediate Scrutiny Applies**

---

[13] As explained above, *see supra* p. 9, if an individual who is the subject of a § 9.46 report is
found to have a firearms license, the licensing officer must "issue an order suspending or
revoking such license."  PL § 400.00(11)(b).  But, unlike the disqualifying mental health
conditions of 18 U.S.C. § 922(g)(4) and PL § 400.00(1)(j) and (m) (*i.e.*, an involuntary
commitment or an adjudication as mentally defective), this license suspension is not permanent
and any revocation is not automatic.  *See, e.g.*, *Douglas L.B.*, 44 Misc. 3d at 242-44.

25

Where a law substantially burdens the Second Amendment right, courts assess how severely the challenged provision burdens that right in order to determine the level of scrutiny applicable. *See Kwong*, 723 F.3d at 168 & n.15; *Kachalsky*, 701 F.3d at 93-94. As noted, the Second Circuit and district courts in this Circuit have, without exception, applied intermediate scrutiny at this stage of the analysis. Given the minimal nature of any burden imposed by MHL § 9.46, intermediate scrutiny is, at most, what the Court should apply here as well.

Under intermediate scrutiny, the Court is to assess whether a law "is substantially related to the achievement of an important governmental objective." *Kachalsky*, 701 F.3d at 96-97. Public safety and crime prevention are compelling governmental objectives, *id.* at 97, as is the prevention of suicide, *see Washington* v. *Glucksberg*, 521 U.S. 702, 735 (1997); *In re Grand Jury Subpoena John Doe* v. *United States*, 150 F.3d 170, 172 (2d Cir. 1988). Accordingly, here, the Court need only assess whether the challenged provisions of New York law are "substantially related to these interests." *Kachalsky*, 701 F.3d at 97.

Courts give "substantial deference" to legislative efforts to design solutions to address public safety and well-being. *Id.* This is especially true in the area of firearms regulation. *Id.* Indeed, "[i]n the context of firearm regulation, the Second Circuit has made clear that the legislature is 'far better equipped than the judiciary' to make sensitive policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Id.* (quoting *Turner Broad. Sys., Inc.* v. *FCC*, 512 U.S. 622, 665 (1994)).

To survive intermediate scrutiny, the fit between the governmental objective and the challenged regulation need only be substantial, not perfect. *Id.* at 97. In addition, "it is well-settled that 'a statute is not invalid under the Constitution because it might have gone farther than it did, that a legislature need not strike at all evils at the same time, and that reform may take one

26

step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.'" *NRA*, 700 F.3d at 211; *see Kachalsky*, 701 F.3d at 98-99.

Given the "general reticence to invalidate the acts of [our] elected leaders," firearms legislation of the sort at issue here should be struck down under the Second Amendment "only if 'the lack of constitutional authority to pass [the] act in question is clearly demonstrated.'" *Id.* at 100-01 (quoting *Nat'l Fed'n of Indep. Bus.* v. *Sebelius*, 132 S. Ct. 2566, 2579 (2012)) (internal quotation marks omitted) (alterations in *Kachalsky*). And, where, as here, Plaintiffs bring not only an as-applied, but a facial challenge to the provisions of a statute, that facial challenge can succeed only if Plaintiffs "show that 'no set of circumstances exists under which the [statute] would be valid, *i.e.*, that the law is unconstitutional in all of its applications,' or at least that it lacks a 'plainly legitimate sweep.'" *Decastro*, 682 F.3d at 168 (quoting *Wash. State Grange* v. *Wash. State Republican Party*, 552 U.S. 442, 449 (2008)) (alteration in *Decastro*).

## 2.    MHL § 9.46 satisfies intermediate scrutiny.

MHL § 9.46 reasonably fits New York's compelling interests in public safety, crime prevention, and the prevention of suicide -- and thus easily satisfies intermediate scrutiny.

Since *Heller*, courts have repeatedly, and without exception, upheld New York's firearms licensing requirements against Second Amendment attack. *See, e.g.*, *Kachalsky*, 701 F.3d at 101; *Aron* v. *Becker*, 2014 U.S. Dist. LEXIS 132448, at *49 (N.D.N.Y. Sept. 22, 2014); *Moreno* v. *N.Y.C. Police Dep't*, 2011 U.S. Dist. LEXIS 76129, at *10-14 (S.D.N.Y. May 6, 2011), *adopted by* 2011 U.S. Dist. LEXIS 76131 (S.D.N.Y. July 14, 2011). *A fortiori*, a statutory provision designed to facilitate the conveyance of relevant mental health information to licensing officers, so that this licensing system can function properly, is constitutional.

The available empirical evidence further demonstrates that MHL § 9.46 is substantially

27

related to the State's compelling interests in protecting its populace from gun violence.[15]

Research indicates that there is an association of an increased risk of harm to self or others, for

some persons who suffer from significant mental illnesses, particularly in the context of certain

types of symptoms, lack of treatment, or substance use. *See* Seena Fazel *et al.*, *The Population*

*Impact of Severe Mental Illness on Violent Crime*, 163 Am. J. Psychiatry 1397, 1401 (Aug.

2006) (reporting higher dangerousness risk "in patients with severe mental illness compared with

the general population"); R.A. Friedman, M.D., *Violence and Mental Illness – How Strong Is the*

*Link?*, New England J. Med. 2064, 2065 (2006) (finding that "the lifetime prevalence of violence

among people with serious mental illness was 16% . . . compared with 7% among people without

mental illness"). Mentally ill individuals also have a significantly increased risk of suicide. *See*

Frederick E. Vars & Amanda Adcock Young, *Do the Mentally Ill Have a Right to Bear Arms*, 48

Wake Forest L. Rev. 1, 21 (2013).

The presence of guns is likely to exacerbate these harms. Firearms are much more likely

to cause injury or death than other weapons. *See, e.g.*, L.E. Saltzman *et al.*, *Weapon Involvement*

*and Injury Outcomes in Family and Intimate Assaults*, 267 JAMA 22 (1992) (domestic violence

incidents involving firearms are 12 times more likely to result in the death of the victim than

non-firearms-related incidents). Suicides are no different in this regard, as "[a] suicide attempt

with a firearm rarely affords a second chance." M. Miller & D. Hemenway, *Guns and Suicide in*

*the United States*, 359 New England J. Med. 989-91 (2008). As these studies make clear,

removing firearms from those individuals suffering from mental illness who are an increased

likelihood to cause serious harm is very likely to save lives, including their own. *See, e.g.*, J.R.

Stimson, *Bad Risk? An Overview of Laws Prohibiting Possession of Firearms by Individuals*

---

[15] The Court may properly take judicial notice of "studies and data" in assessing Plaintiffs'
Second Amendment claim under intermediate scrutiny. *See Kachalsky*, 701 F.3d at 97-99.

*with a History of Treatment for Mental Illness*, 35 J. Am. Acad. Psychiatry Law 330, 338 (2007) (concluding that "individuals with psychiatric diagnoses may be at higher risk of suicide if there are firearms in their households"); M.A. Ilgen *et al.*, *Mental Illness, Previous Suicidality, and Access to Guns in the United States*, 59 Psychiatric Services 198-200 (2008).

For years, the primary model for addressing these serious problems of firearm access by the mentally ill has been that established by federal criminal law, *i.e.*, categorical prohibitions on possession by those who have been involuntarily committed or adjudicated as mentally defective. Recently, however, commentators have also suggested a more "[i]nnovative" approach -- one "not tied to involuntar[y] commitment or even necessarily to a diagnosis of mental illness but rather to a determination of dangerousness." J.W. Swanson *et al.*, *Preventing Gun Violence Involving People with Mental Illness, in Reducing Gun Violence in America: Informing Policy with Evidence and Analysis* 33, 48 (2013); *see* G.F. Parker, *Application of a Firearm Seizure Law Aimed at Dangerous Persons: Outcomes from the First Two Years*, 61 Psychiatric Services 478 (2010). This is the approach the New York legislature has followed with the enactment of MHL § 9.46. For the reasons discussed, it plainly passes constitutional muster under the Second Amendment.

## IV.
## MHL § 9.46 DOES NOT VIOLATE PLAINTIFFS' PRIVACY RIGHTS.

Plaintiffs contend that MHL § 9.46 violates a constitutional privacy interest by requiring the dissemination of their "personal health information." (AC ¶¶ 194, 315-322.) This contention is wholly without merit. While the Supreme Court has "referred broadly to a constitutional privacy 'interest in avoiding disclosure of personal matters,'" *NASA* v. *Nelson*, 562 U.S. 134, 138 (2011), controlling precedent demonstrates that Plaintiffs' privacy rights are not violated here.

Even assuming, *arguendo*, that MHL § 9.46 implicates a privacy interest of constitutional significance, *but see id.* (declining to decide whether such a constitutional privacy right exists), Plaintiffs' claims fail.  The Supreme Court considered a nearly identical claim in *Whalen* v. *Roe*, 429 U.S. 589 (1977), which concerned New York's promulgation of a centralized data system, similar to the system at issue here, to monitor medical patients receiving dangerous prescription drugs.  *Id.* at 591.  The Court's analysis in *Whalen* squarely applies here and highlights the legal deficiencies fatal to Plaintiffs' claims.

In *Whalen*, the plaintiffs -- including a group of medical patients who regularly received prescriptions for certain potentially dangerous drugs -- were concerned about the possible release of their private medical information, and alleged that other patients would decide not to receive necessary treatment out of fear of the stigma that could arise if their names were associated with these drugs.  *Id.*  The Supreme Court dismissed the plaintiffs' challenge, holding that New York's scheme did not constitute an invasion of constitutional rights under the Fourteenth Amendment.  *Id.* at 603-604.  In reaching its decision, the Court noted that the statutory scheme represented a "considered attempt" to deal with a social problem and there was nothing unreasonable about assuming that the identification of recipient patients would help enforce laws designed to minimize the misuse of certain dangerous drugs.  *Id.* at 597-598.  Moreover, the state had a "vital interest" in controlling the distribution of these drugs, *id.* at 598, and there was no basis to assume that the law's strong security provisions would be mismanaged, *id.* at 600-602.

Here, in enacting MHL § 9.46, the New York legislature sought only to strengthen the already existing, and longstanding, State and federal restrictions on gun possession by the mentally ill.  *See supra* pp. 2-10; *see also NASA*, 562 U.S. at 148 ("[J]udicial review of Government's challenged [acts] must take into account the context in which they arise.").  The

30

overarching purpose behind the statute is to promote public safety and prevent gun violence in

New York by preventing access to guns by those whose mental condition renders them a

potential danger to themselves or others.   The Second Circuit has recognized that these types of

goal constitute "substantial, indeed compelling governmental interests." *Kachalsky*, 701 F.3d at

97.   Under these circumstances, and given the "broad latitude" individual states have "in

experimenting with possible solutions to problems of vital concern," the enactment of MHL §

9.46 was unquestionably a reasonable exercise of "New York's broad police powers." [16]

*Whalen*, 429 U.S. at 597-98; *see also Contractors Against Unfair Taxation Instituted on New

Yorkers* v. *City of New York*, 1994 U.S. Dist. LEXIS 11799, at *31-33 (S.D.N.Y. Aug. 18, 1994).

Not only are the disclosure requirements under § 9.46 reasonable in light of the

compelling governmental interests at stake, any potential counterbalancing privacy interest is

overcome by the fact that the disclosures are subject to comprehensive safeguards against

unwarranted disclosure to the public.   The Supreme Court has acknowledged that "government

'accumulation' of 'personal information' for 'public purposes' may pose a threat to privacy," but

it has also recognized "that a 'statutory or regulatory duty to avoid unwarranted disclosures'

generally allays these privacy concerns." *NASA*, 562 U.S. at 155.   The SAFE Act contains

several statutory safeguards to prevent the dissemination of private information to the public.

*See, e.g.*, Exec. Law § 837(19); MHL §§ 7.09(j)(1), 9.46(b); PL § 400.02; (Allen Decl. ¶ 16; Call

---

[16] Plaintiffs allege that the Defendants have implemented § 9.46 in an "over-reaching manner" and that the statute's standard "is vague and ambiguous." (AC ¶¶ 81, 213.)   The allegations that § 9.46 is more intrusive than it needs to be are unavailing.   The Supreme Court has repeatedly rejected the argument that states have a "constitutional burden to demonstrate that" the regulation at issue is "the least restrictive means of furthering its interests,"  observing that "so exacting a standard runs directly contrary to *Whalen*." *NASA*, 562 U.S. at 760.

Decl. ¶¶ 16-17).[17] Like the statutory scheme at issue in *Whalen*, the reporting provisions of the SAFE Act "evidence a proper concern with, and protection of, the individual's interest in privacy." *Whalen*, 429 U.S. at 605.

Plaintiffs argue that these comprehensive protections against disclosure do not sufficiently alleviate the risks of potential privacy violations inherent in the implementation and administration of MHL § 9.46. As *Whalen* instructs, however, the concerns of *potential* "unwarranted disclosure of accumulated private data -- whether intentional or unintentional -- or by a system that did not contain comparable security provisions" do not provide a sufficient basis for establishing a constitutional violation. *Id.* at 605-06; *see NASA*, 562 U.S. at 158 ("The 'remote possibility of public disclosure created by these narrow 'routine use[s]' does not undermine the Privacy Act's substantial protections."); *Hodge v. Jones*, 31 F.3d 157, 166 (4th Cir. 1994) ("the tangential possibility of public disclosure" through "theoretical means "cannot by itself implicate a constitutional privacy right."). "[T]he mere possibility that security measures will fail provides no 'proper ground' for a broad-based attack on government information-collection practices." *NASA*, 562 U.S. at 158.

Finally, Plaintiffs' allegations that MHL § 9.46 is "chilling those who may be in need of medical and/or mental health services" are unavailing. (AC ¶ 100.) A similar argument was raised in *Whalen*, where the plaintiffs alleged that the New York State Controlled Substances Act of 1972 would prevent individuals concerned about privacy from seeking medical attention. *See Whalen*, 429 U.S. at 601-03. The Supreme Court rejected this claim:

---

[17] *See also Schneider* v. *Sutter Amador Hosp.*, 2014 U.S. Dist. LEXIS 152869 (E.D. Cal. Oct. 28, 2014) (rejecting a privacy claim based upon the dissemination of medical information to state agency, and holding that requiring the disclosure of such information to those responsible for public health or safety does not violate the plaintiff's right to privacy, particularly where the information was subject to confidential handling).

> Unquestionably, some individuals' concern for their own privacy may lead them
> to avoid or postpone needed medical attention.   Nevertheless, disclosures of
> private medical information to doctors, to hospital personnel, to insurance
> companies, and to public health agencies are often an essential part of modern
> medical practice even when the disclosure my reflect unfavorably on the character
> of the patient.   Requiring such disclosures to representatives of the State having
> responsibility for the health of the community does not automatically amount to
> an impermissible invasion of privacy.

*Id.* at 602.   The same reasoning holds true here.   The intra-governmental dissemination of a

person's name and non-clinical identifying information in accordance with the SAFE Act's

reporting requirement does not amount to a constitutional privacy violation.

In light of the safeguards provided under the SAFE Act's reporting requirement and the

compelling governmental interests the SAFE Act advances, Plaintiffs' constitutional rights to

informational privacy have not been violated and their claims should be dismissed.

## V.

## PLAINTIFFS' PROCEDURAL DUE PROCESS CLAIM FAILS.

Plaintiffs allege the defendants violated their procedural due process rights by failing to

provide adequate process to "redress [] their grievances for restoration of []their pistol permits,"

and their ability to "buy/sell/transfer and possess firearms."   (AC ¶ 340.)   To state a procedural

due process claim, Plaintiffs must (1) identify the protected liberty or property interest they

possessed and (2) the process they were due before they could be deprived of that interest.   *See*

*Adams* v. *Suozzi*, 517 F.3d 124, 127 (2d Cir. 2008).

Assuming, *arguendo*, that the Plaintiffs have stated a protected liberty or property interest

here, their due process claims still fail because sufficient process is available to them.[18]   Courts in

---

[18] It is not clear whether Plaintiffs assert that they were entitled to pre-deprivation process prior
to the issuance of the MHL § 9.46 report or suspension of their licenses, but such a claim would
be untenable here.   *See, e.g., Spinelli* v. *City of New York*, 579 F.3d 160, 170-171 (2d Cir. 2009);
*Rosu* v. *City of New York*, 742 F.3d 523, 527 (2d Cir. 2014); *Matter of Perretta* v. *Mulvey*, 77
A.D.3d 758 (2d Dep't 2010); *Matter of Guddemi* v. *Rozzi*, 210 A.D.2d 479, 480 (1994).

this Circuit have repeatedly held that Article 78 proceedings provide a meaningful post-deprivation remedy in the context of gun licensing decisions and in regard to other State actions and satisfy due process concerns. *See Aron*, 2014 U.S. Dist. LEXIS 132448, at \*56-57; *Montalbano* v. *Port Authority of NY & NJ*, 843 F. Supp. 2d 473, 485 (S.D.N.Y. 2012). Here, because Plaintiffs had access to an Article 78 proceeding, they have access to a meaningful post-deprivation remedy under state law and no due process claim lies.

To the extent that Plaintiffs' due process claim rests on the assertion that those who do not have a firearms license will not receive notice that they were the subject of a report pursuant to MHL § 9.46, this claim clearly lacks merit. Such report, by law, can be used only in connection with firearm licensing, and it has no impact otherwise. As set forth in Point IV, *supra*, where such report is maintained as confidential and used for public health and safety reasons, there is no infringement on privacy rights and thus Plaintiffs are entitled to no process.

## VI.
## PLAINTIFFS' REMAINING CLAIMS ALSO FAIL.

Plaintiffs assert that MHL § 9.46 is unconstitutional under the Equal Protection Clause (AC ¶¶ 323-32) and on substantive due process grounds (*id.*¶¶ 333-43). But these claims are entirely duplicative of their Second Amendment claim, as well as their alleged privacy claim, and thus are subject to dismissal on that basis. *See, e.g., Montalbano*, 843 F. Supp. 2d at 483 (substantive due process); *Kwong*, 723 F.3d at 170 n.19 (equal protection); *see also, e.g., Cnty. of Sacramento* v. *Lewis*, 523 U.S. 833, 842 (1998).

Nor do these claims have merit in any event. First, Plaintiffs fail to state an equal protection claim because MHL § 9.46 "does not treat similarly situated individuals differently," but instead "applies uniformly" to all persons. *Kachalsky*, 817 F. Supp. 2d at 273. Further, rational basis review, at most, would apply to such claims, *see Kwong*, 723 F. 3d at 170 & n.19,

34

and for the reasons already discussed, MHL § 9.46 easily survives such scrutiny. *See supra*

Points III-IV. Plaintiffs also have not come close to alleging any conduct by the State

Defendants that is so "outrageously arbitrary as to constitute a gross abuse of governmental

authority," *Natale* v. *Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999), as would be required

for any substantive due process claim. *Id.*; *see Montalbano*, 843 F. Supp. 2d at 483.[19]

## CONCLUSION

For the foregoing reasons, the State Defendants respectfully request that the Court grant

the State Defendants' motion and dismiss the Amended Complaint with prejudice. Alternatively,

the Court should transfer this action to the Northern or Eastern District of New York.

Dated: New York, New York
      February 26, 2015

                              ERIC T. SCHNEIDERMAN
                              Attorney General of the State of New York
                              *Attorney for State Defendants*
                              By:
                              /s/ *William J. Taylor, Jr.*
                              William J. Taylor, Jr.
                              Assistant Attorney General
                              120 Broadway, 24th Floor
                              New York, New York 10271
                              (212) 416-8426
                              william.taylor@ag.ny.gov

---

[19] Finally, to the extent Plaintiffs raise claims for monetary damages, they are plainly barred by the Eleventh Amendment and because the State Defendants are not "persons" under 42 U.S.C. § 1983. *Will* v. *Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); (AC ¶ 12). And, even if they were not so barred, Plaintiffs have failed to allege the requisite personal involvement here, *see, e.g.*, *Ashcroft* v. *Iqbal*, 556 U.S. 662, 676 (2009), nor could they overcome the barrier of qualified immunity, *see, e.g.*, *Reichle* v. *Howards*, 132 S. Ct. 2088, 2093-94 (2012).